**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE DOMESTIC AIRLINE TRAVEL ANTITRUST LITIGATION | **MDL Docket No. 2656** **Misc. No. 15-1404 (CKK)** |
| This Document Relates To: ALL CASES | |

**MEMORANDUM OPINION**
(October 28, 2016)

Presently before the Court is Defendants' [106] Motion to Dismiss Plaintiffs' Consolidated Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). Defendants allege that the Consolidated Amended Complaint should be dismissed because Plaintiffs failed to plead facts sufficient to demonstrate that Plaintiffs suffered injury-in-fact and because Plaintiffs failed to plead factual allegations of a plausible price-fixing conspiracy in violation of federal antitrust laws. Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the Court DENIES Defendants' [106] Motion to Dismiss Plaintiffs' Consolidated Amended Complaint for the reasons described herein.

---

[1] Consol. Am. Class Action Compl. ("Compl."), ECF No. [91]; Def.'s Mot. to Dismiss Pls.' Consol. Am. Compl. ("Defs.' Mot."), ECF No. [106]; Def. Southwest Airlines Co.'s Supp. Br. in Supp. of Defs.' Mot. to Dismiss Pls.' Consol. Am. Compl. ("Def. Southwest's Supp. Br."), ECF No. [110]; Pls.' Omnibus Mem. in Opp'n to Defs.' Mot. to Dismiss the Consol. Am. Compl. & Southwest Airline Co.'s Supp. Brief ("Pls.'s Opp'n"), ECF No. [116]; Defs.' Reply Mem. of P&A in Supp. of Mot. to Dismiss Pls.' Consol. Am. Compl. ("Defs.' Reply"), ECF No. [120]; and Def. Southwest Airline Co.'s Supp. Reply Mem. of P&A in Supp. of Defs.' Mot. to Dismiss Pls.' Consol. Am. Compl. ("Def. Southwest's Supp. Reply"), ECF No. [121]. The motion is fully briefed and ripe for adjudication. In an exercise of its discretion, the Court finds that holding oral argument would not be of assistance in rendering its decision. *See* LCvR 7(f).

# I. BACKGROUND

## A. Procedural Background

The United States Judicial Panel on Multidistrict Litigation ("the Panel") consolidated 23 actions pending in seven districts involving claims that four major airlines fixed prices for domestic airline tickets by keeping capacity artificially low. The Panel transferred these consolidated actions to this Court on October 13, 2015. The Panel subsequently transferred additional related actions to be consolidated into the instant litigation. There are presently a total of 105 cases consolidated in this action.

On October 30, 2015, the Court entered an Initial Practice and Procedure Order Upon Transfer Pursuant to 28 U.S.C. § 1407, in which the Court set out a general outline of how it intends to proceed in this matter. Initial Practice & Procedure Order Upon Transfer Pursuant to 28 U.S.C. § 1407, ECF No. [4]. On February 4, 2016, the Court entered an Order Appointing Plaintiffs' Interim Class Counsel and, on February 26, 2016, set a schedule for Plaintiffs to file their Consolidated Amended Complaint and for Defendants to file any responsive pleadings or motions. Order Appointing Pls.' Interim Class Counsel (Feb. 4, 2016), ECF No. [76]; Order (Feb. 26, 2016), ECF No. [83]. On March 24, 2016, at the parties' joint request, the Court held a telephonic conference call on the record to discuss Plaintiffs' request to lift the discovery stay for the limited purpose of obtaining the material that Defendants provided to the Government in response to the Government's subpoenas. On March 30, 2016, the Court entered a Memorandum Opinion and Order denying Plaintiffs' request to lift the discovery stay. Mem. Op. & Order (Mar. 30, 2016), ECF No. [96]. On March 25, 2016, Plaintiffs filed their Consolidated Amended Class Action Complaint ("Complaint"). On May 11, 2016, Defendants filed their Motion to Dismiss

Plaintiffs' Consolidated Amended Complaint, which is now fully briefed.

### B. Factual Background

For the purposes of the motion before the Court, the Court accepts as true the allegations in the Complaint.  *See generally* Compl., ECF No. [91].   The Court does "not accept as true, however, the plaintiff's legal conclusions or inferences that are unsupported by the facts alleged." *Ralls Corp. v. Comm. on Foreign Inv. in United States.*, 758 F.3d 296, 315 (D.C. Cir. 2014). The Court recites the principal facts pertaining to the issues raised in the pending motion relying on the Complaint and undisputed and/or uncontroverted facts.

Defendants, American Airlines, Inc. ("American"), Delta Air Lines, Inc. ("Delta"), Southwest Airlines Co. ("Southwest"), and United Airlines, Inc. ("United"), are the four largest commercial air passenger carriers in the United States.  Compl. ¶¶ 1, 23-26.  In addition to the four named Defendants, Plaintiffs allege that U.S. Airways prior to its merger with American, Air Canada, and the International Air Transport Association ("IATA") willingly conspired with Defendants to unlawfully restrain trade.  *Id.* ¶ 27.

Plaintiffs are purchasers of air passenger transportation for domestic travel directly from Defendants or their predecessors and/or through websites including Travelocity.com, Orbitz.com, Priceline.com, Expedia.com, and Flyfar.ca.  *Id.* ¶¶ 11-22.  Plaintiffs named in the Complaint include individuals who are residents of various states and the District of Columbia, a non-profit corporation, and a corporation.  Plaintiffs seek classwide recovery, defining the putative class, with certain exceptions, as: "All persons and entities that purchased air passenger transportation services for flights within the United States and its territories and the District of Columbia from Defendants or any predecessor, subsidiary or affiliate thereof, at any time between July 1, 2011

3

and the present." *Id.* ¶ 142.  Plaintiffs assert that they do not know the exact number of members in the putative class because such information is in control of Defendants but Plaintiffs believe that the number of Class members is in the millions and that Class members "are sufficiently numerous and geographically dispersed throughout the United States so that joinder of all Class members is impracticable." *Id.* ¶ 143.

Plaintiffs allege that Defendants colluded to limit capacity on their respective airlines in a conspiracy to fix, raise, maintain, and/or stabilize prices for air passenger transportation services within the United States, its territories, and the District of Columbia in violation of Sections 1 and 3 of the Sherman Antitrust Act (15 U.S.C. §§ 1, 3), and that Plaintiffs suffered pecuniary injury by paying artificially inflated ticket prices as a result of this purported antitrust violation.  *Id.* ¶¶ 1, 11-22.  Plaintiffs allege that the conspiracy commenced in the first quarter of 2009 and continues until the present, and seek to recover treble damages for the period of July 1, 2011, to the present ("Class Period").  *Id.* ¶ 1.  Defendants now move the Court to dismiss all of Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).

## II. LEGAL STANDARD

### A.  Federal Rule of Civil Procedure 12(b)(1)

To survive a motion to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject matter jurisdiction over its claim.  *Moms Against Mercury v. FDA*, 483 F.3d 824, 828 (D.C. Cir. 2007).  In determining whether there is jurisdiction, the Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations

omitted).  "At the motion to dismiss stage, counseled complaints, as well as pro se complaints, are to be construed with sufficient liberality to afford all possible inferences favorable to the pleader on allegations of fact."  *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1106 (D.C. Cir. 2005). "Although a court must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1)," the factual allegations in the complaint "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007) (citations omitted).

### B.  Federal Rule of Civil Procedure 12(b)(6)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint on the grounds that it "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6). The Federal Rules of Civil Procedure require that a complaint contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam).  "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).  Rather, a complaint must contain sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

5

In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court must construe the complaint in the light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations. *In re United Mine Workers of Am. Empl. Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994).   Further, in deciding a Rule 12(b)(6) motion, a court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint," or "documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011) (citations omitted).

## III. DISCUSSION

### A.  Plaintiffs Established Standing Under Article III of the U.S. Constitution

Pursuant to Article III of the Constitution, Defendants move to dismiss this action on the basis that this Court has no jurisdiction because Plaintiffs lack standing. "Article III of the Constitution limits the jurisdiction of federal courts to 'actual cases or controversies between proper litigants.'" *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 661 (D.C. Cir. 1996)). Because standing is a "threshold jurisdictional requirement," a court may not assume that Plaintiff has standing in order to proceed to evaluate a case on the merits. *Bauer v. Marmara*, 774 F.3d 1026, 1031 (D.C. Cir. 2014).  A plaintiff "bears the burden of showing that he has standing for each type of relief sought." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). "To establish constitutional standing, plaintiffs 'must have suffered or be imminently threatened with a concrete and particularized injury in fact that is fairly traceable to the challenged action of the defendant and likely to be redressed

6

by a favorable judicial decision.'" *Mendoza*, 754 F.3d at 1010 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, -- U.S. --, 134 S. Ct. 1377, 1386 (2014); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

"The 'irreducible constitutional minimum of standing contains three elements': injury in fact, causation, and redressability." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Lujan*, 504 U.S.at 560-61). "Injury in fact is the 'invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Id.* (quoting *Lujan*, 504 U.S. at 560) (alterations in original). "The 'causal connection between the injury and the conduct complained of' must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Id.* (quoting *Lujan*, 504 U.S. at 561). Finally, "it must be 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Id.* (quoting *Lujan*, 504 U.S. at 561).

Here, Plaintiffs allege that they purchased air passenger transportation for domestic travel directly from Defendants or their predecessors and/or through websites during the alleged conspiracy, that the fares were affected by the alleged conspiracy, and, as a result, that they paid artificially inflated ticket prices. Defendants argue that Plaintiffs have not established standing because they have failed to establish injury in fact. Specifically, Defendants argue that Plaintiffs must identify specific routes that were affected by the alleged conspiracy and plead that they purchased tickets on those specific routes, rather than simply pleading that they purchased tickets from Defendants during the alleged conspiracy. For the reasons described herein, the Court concludes that Plaintiffs sufficiently established their standing to bring this action.

Defendants assert that Plaintiffs acknowledge in their Complaint that: (1) the capacity of

some routes increased during the class period; and (2) fares for some routes decreased during the class period.  Def.'s Mot. at 42-43.  In support of this assertion, Defendants cite to the following information in the Complaint: (1) Defendant Southwest's announcement in May 2015, that it increased available seat miles ("ASM")[2] by 7 to 8 percent in 2015, the majority of which was related to the acquisition of two gates at Dallas Love Field and plans to expand service at Houston Hobby airport, Compl. ¶ 116; (2) fares on certain routes where Defendants faced competition from discount carriers declined after the Department of Justice commenced an investigation into a number of airlines on June 30, 2015, *id.* ¶¶ 133-34; and (3) charts included with the caption "Average Airfares and The Lack of Competitive Pricing on *Various Routes*" that Plaintiffs claim demonstrate a divergence in fares starting in 2009 on routes where one of the Defendants was the largest carrier as opposed to routes where a non-Defendant airline was the largest carrier, *id.* ¶¶ 64-65.  Defendants assert that these facts demonstrate an acknowledgement by Plaintiffs that only some routes were allegedly affected by the conspiracy.[3]

The Court rejects this narrow reading of the Complaint.  Indeed, Plaintiffs point to two actions undertaken by Defendants in 2015, and generally present evidence that fares on routes starting in 2009 grew at different rates when a Defendant rather than a non-Defendant airline was the major carrier on the route.  It is clear that Defendants misstate the gravamen of the Complaint by focusing on its inclusion of a subsection looking at "various" routes, while ignoring the

---

[2] "The term ASM is a common measurement of airline output that refers to one aircraft seat flown one mile, whether occupied or not." Compl. ¶ 76 n.38.

[3] Defendants also rely on facts not cited in the Complaint but contained in documents filed alongside their pleadings that they assert support the contention that Plaintiffs have alleged a conspiracy only as related to certain routes.  The Court shall not consider the facts cited outside the Complaint by Defendants for the reasons described in greater detail *infra*.

Complaint's broader allegation of a national conspiracy. Plaintiffs' discussion of fares on some routes does not preclude its argument that the conspiracy affected the fares more generally within the market. While Defendants read the Complaint to indicate that these specific routes or fares were unaffected by the conspiracy, that is a mischaracterization of Plaintiffs' claim.

Here, Plaintiffs allege that Defendants violated § 1 of the Sherman Act by participating in a conspiracy affecting air passenger transportation services within the United States. Specifically, Plaintiffs' allegation is that Defendants conspired "to fix, raise, maintain, and/or stabilize prices for air passenger transportation services within the United States, its territories and the District of Columbia . . . by, *inter alia*, colluding to limit capacity on their respective airlines." *Id.* ¶ 1. The crux of Plaintiffs' claim is that Defendants colluded to restrict capacity growth and, as a result, airfares were artificially inflated. This claim is not limited to certain routes or city-pairs, as Defendants contend, nor as discussed further below are Plaintiffs required to plead specific routes or city-pairs allegedly affected by the conspiracy. Plaintiffs' allegation is that they suffered a pecuniary injury by paying artificially inflated ticket prices as a result of the conspiracy. This is sufficient to establish injury in fact for purposes of standing.[4] *See Osborn v. Visa, Inc.*, 797 F.3d

---

[4] For the purposes of establishing standing, Plaintiffs also are required to demonstrate an antitrust injury, or "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" O*xbow Carbon & Minerals LLC v. Union Pac. R.R.* ("*Oxbow II*"), 81 F. Supp. 3d 1, 6-7 (D.D.C. 2015) (quoting *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 862 (D.C. Cir. 2008)). While the parties' briefing focuses on whether Plaintiffs established injury in fact, the Court finds that Plaintiffs also meet the standing requirement of pleading an antitrust injury: (1) their purported injury, paying artificially inflated fares, is the type of injury that the Sherman Act was intended to prevent; and (2) the injury flows from Defendants' purported collusion to restrict capacity growth. *See Adrx Pharma., Inc. v. Biovail Corp. Intern.*, 256 F.3d 799, 806 (D.C. Cir. 2001) (noting that the antitrust standing inquiry incorporates a traditional injury-in-fact or threatened injury-in-fact analysis).

1057 (D.C. Cir. 2015), *cert. granted* – U.S. --, 136 S. Ct. 2543 (2016) (quoting *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 293 (3d Cir. 2005)) ("Economic harm, such as that alleged here, 'is a classic form of injury-in-fact.'"); *Oxbow II*, 81 F. Supp. 3d at 7 ("[P]laintiffs need only allege, as they have in the amended complaint, that they suffered damages as a result of the conspiracy in which defendants participated.").

The Court notes that in order to establish causation, Plaintiffs' conspiracy allegations rely on certain economic principles which Defendants seek to undercut in their motion.  However, as the United States Court of Appeals for the District of Columbia Circuit recently explained, "A Rule 12(b)(1) motion . . . is not the occasion for evaluating the empirical accuracy of an economic theory."  *Osborn*, 797 F.3d at 1065-66.  Where, as here, "the economic facts alleged by the Plaintiffs are specific, plausible, and susceptible to proof at trial, they pass muster for standing purposes at the pleadings stage."  *Id.* at 1066.

### B.  Plaintiffs Sufficiently Pled a Plausible Claim Pursuant to § 1 of the Sherman Act

The parties dispute whether Plaintiffs pled a plausible claim pursuant to § 1 of the Sherman Act.  The Sherman Act prohibits any "contract, combination, . . . or conspiracy, in restraint of trade or commerce . . . ." 15 U.S.C. § 1.  "Section 1 [of the Sherman Act] applies only to concerted action that restrains trade."  *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010).  As such, "[t]o make out a Section 1 claim, 'plaintiffs must allege: (1) that the defendants entered into some agreement, contract, combination, conspiracy, or other concerted activity; (2) that at least one defendant committed an overt act in furtherance of the conspiracy; and (3) that the agreement constituted an unreasonable restraint of trade in the relevant market in a manner that had an impact on interstate commerce.'"  *Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*

10

("*Oxbow I*"), 926 F. Supp. 2d 36, 42 (D.D.C. 2013) (quoting *Jung v. Ass'n Am. Med. Colls.*, 300 F. Supp. 2d 119, 157-58 (D.D.C. 2004)).

The Supreme Court of the United States in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 554 (2007), set forth the pleading requirements for a Section 1 claim under Federal Rule of Civil Procedure 8(a)(2). The Court explained, "Because § 1 of the Sherman Act 'does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy,' '[t]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express . . . .'" *Twombly*, 550 U.S. at 553 (internal citation omitted). Accordingly, "a claim [pursuant to § 1] requires a complaint with enough factual matter (taken as true) to suggest that [such] an agreement was made." *Id.* at 556.

An antitrust plaintiff may plead the existence of a conspiracy through direct and/or circumstantial evidence that reasonably tends to prove that the defendants "'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980), *cert. denied*, 451 U.S. 911 (1981)). "[D]irect evidence of concerted action . . . [includes] 'a document or conversation explicitly manifesting the existence of the agreement in question . . . .'" *Havens v. Mobex Network Servs., LLC*, 820 F.3d 80, 91 (3d Cir. 2016). "[D]irect evidence in . . . [the antitrust] context is 'explicit and requires no inferences to establish the proposition or conclusion being asserted.'" *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004) (quoting *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003)). As such, "[d]irect evidence is extremely rare in antitrust cases and is usually referred to as the 'smoking gun.'" *Id.*

Circumstantial evidence in the antitrust context is evidence that "tends to exclude the possibility of independent action." *Monsanto Co.*, 465 U.S. at 768.  In *Twombly*, the Court recognized that parallel business behavior is admissible circumstantial evidence from which a factfinder may infer an agreement.  550 U.S. at 553-54.  However, evidence of parallel conduct without more is insufficient at the pleading stage to demonstrate an agreement as required under the Sherman Act.  *Id.* at 554 ("The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.").  Rather, "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557. "To show conspiracy, therefore, plaintiffs must plead 'plus factors' that suggest collusion, in addition to merely alleging parallel conduct." *Oxbow I*, 926 F. Supp. 2d at 46-47.  "The term 'plus factors' refers to circumstances demonstrating that the wrongful conduct 'was conscious and not the result of independent business decisions of the competitors.'" *Havens*, 820 F.3d at 91 (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3d Cir. 1999)).  "Plus factors" must be evaluated holistically.  *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 424 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015), *cert. denied*, -- U.S. --, 136 S. Ct. 2485 (2016).

Here, Defendants contend that Plaintiffs failed to plead sufficient facts to demonstrate that there was parallel conduct among Defendants and, if there was parallel conduct, that this conduct was the result of an agreement between them.  As discussed further *infra*, Defendants in their briefing seek to parse out each "plus factor" and consider individually whether each is sufficient

to demonstrate collusion on Defendants' part.  The Court declines to analyze Plaintiffs' allegations in this way as the Court must take the factual allegations in the complaint as a whole and accept them as true for the purposes of its analysis at this phase in the proceeding.  *See, e.g.*, *SD3, LLC*, 801 F.3d at 425; *Haley Paint Co. v. E.I. Dupont De Nemours & Co.*, 804 F. Supp. 2d 419, 426 (D. Md. 2011); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 32-33 (D.D.C. 2008).  Indeed, "[a]ctions that might seem otherwise neutral in isolation can take on a different shape when considered in conjunction with other surrounding circumstances."  *SD3, LLC*, 801 F.3d at 425.  As such, the Court first shall discuss the allegations in Plaintiffs' Complaint and shall analyze the sufficiency of these factual allegations in light of the relevant legal standard.  Next, the Court shall address Defendants' arguments that Plaintiffs failed to demonstrate a plausible antitrust claim pursuant to § 1 of the Sherman Act.  Finally, the Court shall address specific arguments raised by Defendant Southwest related to the sufficiency of Plaintiffs' claims only as applied to Southwest.

### 1. <u>Factual Allegations Set Forth in Complaint</u>

In their Complaint, Plaintiffs plead the nature of the alleged conspiracy as follows. Plaintiffs allege that Defendants conspired "to fix, raise, maintain, and/or stabilize prices for air passenger transportation services within the United States, its territories and the District of Columbia . . . by, *inter alia*, colluding to limit capacity on their respective airlines."  Compl. ¶ 1. Plaintiffs further allege that during the conspiracy that spans from the first quarter of 2009 to the present time, "Defendants' airfares rose substantially compared to those of other domestic air carriers, despite stagnant or decreasing demand and declines in the cost of jet fuel."  *Id.*  Generally, Plaintiffs assert:

> The alleged conspiracy was carried out, *inter alia*, by repeated assurances by the executives of Defendants to each other that: (a) each of their companies is engaging in 'capacity discipline' (*i.e.*, reduction or relative stabilization of airline capacity); (b) this is a practice that has to be utilized by the industry as a whole; (c) it is good for the industry as a whole; and (d) it reflects the collective commitment of the Defendants' airline managers.

*Id.* ¶ 3.  Plaintiffs cite to statements made during earning calls with analysts, at airline industry conferences as well as other conferences, and at meetings of the International Air Transport Association ("IATA")[5] that Plaintiffs claim were made in furtherance of the conspiracy.  *Id.* Plaintiffs further allege that Defendants limited consumers' ability to compare fares and deterred potential competitive entry of foreign air passenger carriers in order to advance the conspiracy.  *Id.* Plaintiffs assert that as a result of the conspiracy, airline capacity deviated from historical patterns, remaining largely stagnant or decreasing on an annual basis, and passengers were injured by paying higher airfares and facing a reduction in flight choices.  *Id.* ¶ 4.  The Court shall further expound below on the factual allegations in the Complaint that support these contentions.

As an initial matter, the parties dispute whether Plaintiffs alleged any direct evidence to support their claim that Defendants engaged in an antitrust conspiracy in violation of § 1 of the Sherman Act.  The Court agrees with Defendants that the facts alleged in the Complaint are not direct evidence of a conspiracy as they do not explicitly demonstrate an express agreement between Defendants.  However, as previously discussed, Plaintiffs are not required to plead direct evidence of a conspiracy.  Rather, Plaintiffs may allege parallel conduct on the part of Defendants coupled with circumstantial evidence sufficient to demonstrate a plausible antitrust conspiracy claim.  For

---

[5] IATA is an industry trade association to which Defendants American, Delta, and United belong.  Compl. ¶ 113.

the reasons described herein, the Court finds that Plaintiffs sufficiently set forth circumstantial evidence to demonstrate a plausible claim.  Moreover, Plaintiffs' Complaint sufficiently sets forth the specific time, place, and persons involved in the alleged conspiracy such that Defendants have fair notice of the claims against them.  *See Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 17 (D.C. Cir. 2008)  (noting that pleading requirements include notifying defendants as to the allegations of who conspired, at what time, to do what).

Generally, Plaintiffs allege that as early as September 2003, the former Executive Director of IATA discussed the importance of focusing on capacity within the industry.  Compl. ¶ 86 (citing statements made by Giovanni Bisignani from 2003, 2006, and 2010).  The crux of Plaintiffs' claim is that in 2009, after the economy improved and jet fuel prices declined, Defendants made a conscious, joint decision not to return to the previous industry practice of adding airline capacity and decreasing fares.  *Id.* ¶ 87.   Rather, Plaintiffs posit that Defendants colluded to exercise "capacity discipline," the reduction or relative stabilization of airline capacity, as a mechanism for increasing profits.  *Id.* ¶¶ 87, 3. This effort, Plaintiffs contend, was exercised collectively by industry members, supported by statements made by Defendants' executives, and resulted in a 10% reduction in capacity by United States airlines in 2009.  *Id.* ¶ 88.

Plaintiffs advance several factual allegations that tend to exclude the possibility of independent action.  Specifically, Plaintiffs' factual allegations can be divided into four main categories: (1) general allegations regarding the nature of the industry; (2) statements made by Defendants' executives and Defendants' participation in IATA; (3) economic evidence regarding capacity, airfares, and profits; and (4) allegations regarding Southwest's 2015 announcement.  The Court shall address each in turn.

15

a.  *General Allegations Regarding the Nature of the Industry*

Plaintiffs discuss certain aspects of the structure of the domestic airline passenger industry that they assert render the industry conducive to collusion.  Plaintiffs allege that the domestic airline industry is an oligopoly with high barriers to entry due to government regulations of airports and gates, capital requirements for technology and equipment, and the nature of ticketing and reservation systems.  Compl. ¶¶ 35, 47.  Moreover, Plaintiffs point to the concentrated nature of the industry and the shareholders.  Specifically, the Delta-Northwest, United-Continental, Southwest-AirTran, and American-U.S. Airways mergers altered the nature of the industry by reducing the number of major domestic air passenger carriers from ten to four within a decade.  *Id.* ¶¶ 37-38.  As a result of this consolidation, the four Defendant airlines control approximately 80% of the domestic air passenger seats.  *Id.* ¶ 34.  Furthermore, the industry is characterized by a concentration of common stockowners.  Indeed, Defendant airlines' four largest stockholders are BlackRock, Inc., State Street Corporation, J.P. Morgan Chase & Co., Primecap, and Capital Group Companies.  *Id.* ¶ 42.

Plaintiffs also note mechanisms within the industry that they contend facilitate the alleged conspiracy by allowing Defendants to coordinate their airfares, monitor the actions of their co-conspirators, and punish any co-conspirator that steps out of line.  The Airline Tariff Publishing Company ("ATPCO") is owned by airlines including Defendants Delta, United, and American. The ATPCO provides all airlines with complete, accurate, and real-time access to every airline's published fare structure on every route.  *Id.* ¶ 48.  Airlines provide their pricing data to ATPCO, including fare base code, dollar amount, fare rules or restrictions, and first and last ticket date information.  *Id.* ¶ 49.  Any fare changes received by ATPCO are processed and disseminated to

other airlines, including the Defendants, and ATPCO subscribers can generate detailed reports to monitor fare changes that are not yet available for sale to the public. *Id.* ¶ 50.

Plaintiffs also note that in the past, airlines have used cross-market initiatives ("CMIs") in situations when airlines compete on multiple routes to deter competitors from aggressively discounting fares. *Id.* ¶ 57. In this scenario, when an airline offers a discounted fare in one market, an affected competitor responds with a CMI or a discount in another market. *Id.* The purpose of the CMI is to cause the original discounting airline to withdraw its fare discount. *Id.* Plaintiffs also note the history of antitrust actions brought against the airlines. *Id.* ¶¶ 58-62.

While Plaintiffs' general allegations regarding the nature of the airline industry do not serve as conclusive proof of an antitrust conspiracy, the consolidation within the market, the concentration of common stockowners, Defendants' ability to monitor other airlines' fare structure and pricing, and past industry practice of using CMIs are all factors that the Court considers at this stage of the proceeding in reaching its determination as to whether Plaintiffs sufficiently pled a plausible antitrust conspiracy. *See, e.g.*, *Haley Paint Co.*, 804 F. Supp. 2d at 426 (relying in part on details of the titanium dioxide industry that facilitate collusion and market conditions favoring collusion); *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 631 (E.D. Pa. 2010) (considering the nature of the blood reagents market before the commencement of the alleged conspiracy); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1144-45 (N.D. Cal. 2009) (noting that high market concentration coupled with multiple and on-going business relationships, cross-licensing and joint-venture agreements, high barriers to entry, and homogeneity in products can be relied on as factors supporting an inference of collusion). As the Court noted earlier, none of these allegations are direct evidence of a conspiracy. However, as *Twombly* notes, this Court

17

should consider the context in which the alleged conspiracy arises, and this information is pertinent to that inquiry.  550 U.S. at 557 (discussing the importance of considering allegations of parallel conduct in context).

      b.  *Statements by Defendants' Executives and Defendants' Participation in IATA*

Plaintiffs point to a series of statements made by Defendants' executives regarding "capacity discipline" from 2009 through 2015 in support of their conspiracy claim.  Notably, Plaintiffs allege that the statements demonstrate that Defendants not only participated in capacity discipline but also advocated that such participation should be exercised collectively by industry members starting in 2009, a departure from past practice.

For instance, Plaintiffs cite to statements made in 2009 by Defendants' executive, including statements of: John Tague, President of Delta, during a third quarter earnings call; Kathryn Mikells, United's Senior Vice President and Chief Financial Officer ("CFO"), at a March 2009 industry summit hosted by Thomson Reuters; Mikells of United, Ed Bastian, President of Delta, and Grace C. Kelly, CEO of Southwest, at a March 10, 2009, industry conference hosted by J.P. Morgan; Tom Horton, CFO and Executive Vice-President of Finance & Planning for American, during an earnings call in July 2009; Bastian of Delta during December 2009; and Hank Halter, CFO of Delta, during a Morgan Stanley conference in December 2009.  *Id.*  Plaintiffs also cite to a host of other statements made by Defendants' executives during earnings calls, industry summits, industry conferences, and investment conferences from 2010 through 2015 regarding their individual commitment to capacity discipline as well as its role within the industry.  *See generally id.* ¶¶ 91-106, 108-112.

18

In addition to statements made by Defendants' executives, Plaintiffs also note that three of four Defendants participate in the trade association IATA.[6]   In 2015, IATA issued a report which discussed the consolidation of U.S. airlines and noted that airlines "have been very disciplined about capacity."  *Id.* ¶ 113.

Plaintiffs emphasize that this focus on capacity discipline was a departure from prior practice within the industry.  *Id.* ¶ 89.   In support of this assertion, Plaintiffs provide an excerpt from an article discussing statements made by Defendants' executives at the Bank of America Merrill Lynch Investment Conference in June 2010, in light of the newly announced United/Continental Airlines merger.  The cited article includes statements from Scott Kirby, U.S. Airways President prior to the U.S. Airways-American merger, Gerard Arpey, American Airlines' CEO, and Bastian of Delta, discussing the change in the industry.  Specifically, Arpey stated, "[t]here are . . . hopeful signs that the industry has learned its lesson about keeping capacity growth in line with demand—and will continue to apply that lesson even as the economy comes back." *Id.*   Kirby stated, "The industry, by and large, has CEOs with different views than the CEOs of yesteryear . . . . They are much more focused on returns and financial performance than they are on empire building, 'how big is my airline, what is my market share, how many cities do I fly to,'

---

[6] Plaintiffs also note the participation of three of Defendants' executives on the board of the trade group Airlines for America and the chief executives' participation in "Conquistadores del Cielo," a "secret club" of top aviation executives that meets, according to Plaintiffs, twice a year on an "off the record" basis.  Compl. ¶ 114. While Plaintiffs point to no specifics about this conduct, they aver that "[t]hese venues provide abundant opportunities for the Defendants' executives to meet face to face and conspire on capacity reduction and pricing." *Id.*  However, as Defendants note, "'[m]ere membership in associations is not enough to establish participation in a conspiracy with other members of those associations.'"  *Osborn*, 797 F.3d at 1067 (*quoting Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 265 (D.C. Cir. 1981)).

etc. things can change in a hurry, but I don't think rapid capacity growth is going to become a

problem in this industry, at least for the foreseeable future." *Id.* Bastian noted that consolidation

within the industry would "allow[] us to manage the overall capacity levels in a better way." *Id.*

Indeed, these statements upon which Plaintiffs rely demonstrate two points that support the

plausibility of their claim and, more specifically, the inference that Defendants' conduct was the

result of an agreement. First, Defendants made public statements about their own commitment to

capacity discipline as well as the importance of maintaining the capacity discipline within the

industry. Defendants' discussion of the need for capacity discipline within the industry as a whole

is notable because it involves more than a mere announcement of Defendant's own planned course

of conduct. *See In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1362

(N.D. Ga. 2010) (discussing at the motion to dismiss stage that plaintiffs alleged more than mere

price announcements because the executives' statements related to the allegation that "each

Defendant signaled its willingness to cut capacity and increase prices if the other Defendant acted

in concert"). Second, Defendants' statements concerning the focus on exercising capacity

discipline commenced in 2009 and were a deviation from past business practices. *See id.* at 1360

("Courts have . . . found that unlawful conspiracies may be inferred when collusive

communications among competitors precede changed/responsive business practices, such as new

pricing practices.").

c.  *Economic Evidence Regarding Capacity, Airfares, and Profits*

Plaintiffs also provide information regarding capacity, airfares, and profits that they

contend support their assertion that Defendants colluded to restrict capacity which resulted in

higher airfares and increased profits. Moreover, Plaintiffs argue that these economic trends are

not otherwise explained by market forces absent an agreement among Defendants.

Turning first to capacity, Plaintiffs provide information regarding load factors, a measurement of revenue passenger miles[7] divided by available seat miles, typically used by airlines to track capacity utilization. Compl. ¶ 76. Plaintiffs indicate that from 2005 through 2008, when there was substantially increasing demand, Defendants' annual load factors averaged approximately 80%. *Id.* In contrast, from 2009 through 2014, times of decreasing and steady demand and lower costs, Defendants' annual load factors averaged approximately 84%. *Id.* On September 22, 2015, the American Antitrust Institute ("AAI") sent a letter to the Department of Justice raising concerns of "coordinated conduct" within the airline industry and citing that domestic load factors for Defendant airlines increased from 76% to 86% between 2004 and 2014. *Id.* ¶ 77.

Plaintiffs also present economic evidence that they contend supports the conclusion that Defendants priced airfares differently from other airlines in the industry during the relevant time period, resulting in large profits. *Id.* ¶ 63. In support of this assertion, Plaintiffs present a chart reflecting the average fare per route and distinguishing between routes that a Defendant was the largest carrier and routes that a non-Defendant airline was the largest carrier from January 2003 through July 2015. *Id.* ¶ 64. The chart demonstrates what Plaintiffs contend is the result of the conspiracy that commenced during the first quarter of 2009. Specifically, prior to January 2009, the average fare per route when Defendant was the largest carrier was comparable to the average fare per route when another airline was the largest carrier on a particular route. *Id.* However, after

---

[7] "Revenue passenger miles" is "a term denoting how many of an airline's available seats are actually sold." Compl. ¶ 76 n.38.

January 2009, the chart displays a deviation between fares on routes that a Defendant was the largest carrier and routes when another airline was the largest carrier. *Id.* On routes where Defendant was the largest carrier, the chart shows increasingly greater than average fares as compared to city-pair routes where a non-Defendant airline was the largest carrier. *Id.*

Plaintiffs also provide a chart comparing the average quarterly growth rate in fares charged by the largest carrier on each route from the first quarter of 2003 through the fourth quarter of 2008, and between the first quarter of 2009 through the third quarter of 2015, when the Complaint was filed. *Id.* ¶ 65. The chart demonstrates that in the period prior to the commencement of the alleged conspiracy, airfare for both Defendants and non-Defendant airlines grew at approximately the same pace on routes where each was respectively the largest carrier. *Id.* Beginning in January 2009, the chart shows a departure from the previous trend, with airfares on routes which Defendant was the largest carrier growing at a much higher rate than airfares on routes which a non-Defendant airline was the largest carrier. *Id.*

More generally, Plaintiffs provide a chart based on data from the United States Producer Price Index that demonstrates an increase in prices of airfares from 2009 through January 2016. *Id.* ¶ 67. Plaintiffs assert that this general trend in increased prices cannot be explained by related increases in demand or an increase in jet fuel prices. Plaintiffs argue that "[a]s a matter of economics, all other things equal, falling demand would lead to falling prices and steady demand would lead to prices that do not change." *Id.* ¶ 73. However, Plaintiffs provide a chart demonstrating that the average number of daily passengers per route increased substantially from 2003 to 2008, fell from 2008 to 2009, remained steady from 2011 to 2013, and increased from 2013 to 2015. *Id.* Plaintiffs also allege that the increase in prices cannot be explained by jet fuel

prices. *Id.* ¶ 74. As a chart provided by Plaintiffs demonstrates, jet fuel prices peaked in September 2008 at $3.91 per gallon and then plummeted to $1.19 per gallon in March 2009. *Id.* Since that time, the price of jet fuel has not reached its 2008 peak but rather rose from the March 2009 price and then decreased again, reaching 91 cents per gallon in January 2016. *Id.* Plaintiffs assert that this reduction in the cost of jet fuel should have caused airfares to decrease but instead, the prices increased during this period.

Plaintiffs also note that in addition to the increase in fares from 2009 to 2015, Defendants "unbundled" charges for certain services such as imposing fees for checked bags, cancellations of tickets, seat selections, blankets and pillows, carry-on bags, reservations made over the phone or in person, and in-flight food and beverage. *Id.* ¶ 78. The revenue from baggage and cancellation fees grew from $1.4 billion in 2007 to more than $6.5 billion in 2014. *Id.* These new ancillary fees were previously included in the price of airfare, which continued to rise even when these charges were unbundled. *Id.*

Plaintiffs argue that the result of these actions taken by Defendants is record profits in recent years. *Id.* ¶ 80. Indeed, Defendants earned a record $22 billion in net income in 2015, with American earning $7.6 billion, Delta earning $4.6 billion, Southwest earning $2.2 billion, and United earning $7.3 billion. *Id.* ¶ 81. Plaintiffs assert that these record profits can be attributed in part to the decrease in the cost of jet fuel. *Id.* ¶ 82. However, Plaintiffs argue that absent collusion, this trend would not otherwise occur. *Id.*

Here, Plaintiffs base their claims in part on some economic assumptions that they assert support the inference that the behavior within the industry is contrary to Defendants' self interest in the absence of collusion. *See Osborn*, 797 F.3d at 1065 (in discussing standing, noting that

plaintiffs rely on certain economic assumptions about supply and demand that are provable at trial). As such, the Court shall consider these economic trends within the industry to the extent that the Court finds they provide some support for an inference of a conspiracy. *See, e.g., In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (considering "anomalous behavior" of defendants increasing prices in the face of steeply falling costs); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360-61 (3d Cir. 2004) ("Evidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market."). In simplistic terms, Plaintiffs contend that absent collusion to restrict capacity, fares would decrease with decreased demand and decreased costs. Here, Plaintiffs allege that fares increased despite a decline in fuel costs, that there was a decreased and/or steady demand, and an increase in ancillary fees, and that Defendants received record profits as a result. While this behavior may be explained by other factors as Defendants note in their briefing, it is at least some evidence that supports Plaintiffs' claim that this trend was the result of Defendants' collusion to limit capacity growth.

### d. *Allegations Regarding Southwest's 2015 Announcement*

Plaintiffs claim that while Defendants colluded to restrict capacity, Defendant Southwest's May 19, 2015, announcement of its 2015 capacity plans during the Wolfe Research Transport Conference, caused concern among its alleged co-conspirators and Defendant co-conspirators responded by emphasizing the importance of capacity discipline. Compl. ¶ 116. At the conference, Southwest CEO and Executive Vice President Tammy Romo stated that Southwest anticipated a 7 percent to 8 percent increase in capacity in 2015 with the majority of capacity related to the airline's expansion into Dallas Love Field. In response, John Rainey, United's former CEO, noted

United's commitment to capacity discipline and later indicated, "[A]t United we are very focused on capacity discipline, but we're not going to do it at the expense of United and to the benefit of others. The whole industry needs to have that level of discipline." *Id.* Plaintiffs point to other statements regarding capacity discipline made by Rainey during a presentation on June 4, 2015, at the Deutsche Bank Global Industrials & Basic Materials Conference, and statements made at the IATA Annual General Meeting from June 7 to 9, 2015.  *Id.* ¶¶ 119-20.  At the IATA meeting, Bastian of Delta indicated that Delta is "continuing with the discipline that the marketplace is expecting," and Parker of American noted that he thought everyone within in the industry had "learned their lessons" from past price wars. *Id.* ¶ 120.  On June 11, 2015, Kelly of Southwest was quoted in a *New York Times* article stating, "We have taken steps this week to begin pulling down our second half to manage our 2015 capacity growth." *Id.* ¶ 122.  Plaintiffs contend this action was taken after Defendant Southwest was criticized by its alleged co-conspirators following the announcement of its growth estimate for 2015.  While this information is not conclusive to establish the existence of the conspiracy, Plaintiffs demonstrate that Southwest's announcement of its plans to grow capacity was linked, at least temporally, to other Defendants' executives continuing to discuss capacity discipline.[8]

---

[8] Following this announcement by Southwest, Plaintiffs point to statements made by a United States Senator and the existence of a DOJ investigation to support their claim.  Plaintiffs claim their position is supported by a letter written by United States Senator Richard Blumenthal to the Department of Justice in response to the IATA annual meeting urging an investigation into "apparent anti-competitive conduct potentially reflecting a misuse of market power, and excessive consolidation in the airline industry."  Compl. ¶ 124.  Plaintiffs also cite to the DOJ's civil investigation of Defendants' anticompetitive conduct that involved DOJ issuing civil investigative demands to Defendants on June 30, 2015, and the Attorney General of the State of Connecticut announcing a similar investigation into collusive activity within the airline industry.  *Id.* ¶¶ 126, 129.  The Court briefly mentions these assertions in the interests of completeness.  However, the

e. *Plaintiffs Sufficiently Pled Their Claim*

In light of the factual allegations in the Complaint which this Court must accept as true for the purposes of the pending motion, Plaintiffs plead a plausible claim pursuant to § 1 of the Sherman Act. As discussed more fully below, Plaintiffs pled parallel conduct on the part of Defendants coupled with sufficient circumstantial evidence to raise a suggestion of a preceding agreement. Here, Plaintiffs allege that starting in the first quarter of 2009, Defendants colluded to limit capacity on their respective airlines and, as a result, the airfares rose during that period. Plaintiffs provide economic data that demonstrates this trend and at least tends to support their claim that Defendants' capacity decisions and the increase in airfares are not otherwise explained by other factors absent collusion. Moreover, Plaintiffs further demonstrate that this trend in limiting capacity was a departure from prior practice within the industry. Plaintiffs also point to specific statements made by specific executives of each of the companies that they assert were made as a result of and in furtherance of this agreement among Defendants. Plaintiffs also point to specific characteristics of the industry that render it conducive to collusion. The Court finds that the facts as alleged are sufficient to meet Plaintiffs' pleading requirement.

2. Defendants' Arguments Regarding the Sufficiency of the Complaint

Defendants raise three issues in their briefing that the Court shall address. First, Defendants allege that Plaintiffs failed to sufficiently plead their claim because Plaintiffs did not provide direct allegations of an agreement. Second, Defendants contend that Plaintiffs failed to allege Defendants engaged in parallel conduct and argue that the other factual allegations do not

---

Court does not rely on them in reaching its ultimate determination of the sufficiency of the Complaint because it is the Court's view that they are not necessary to establish a plausible claim.

support the inference of an agreement.  Finally, Defendants assert that the Court should consider other information provided in 39 documents attached as exhibits to their briefing in rendering its decision on the motion to dismiss.  For the reasons described herein, the Court finds that these arguments are without merit.

a.  *Plaintiffs' Direct Allegations of An Agreement*

Defendants first argue that Plaintiffs did not include direct allegations of an agreement including the formation, objective, or terms of the purported agreement.[9]  Specifically, Defendants assert that Plaintiffs failed to specify the time, place, and persons involved in the alleged conspiracy as required under *Twombly*.  *See* 550 U.S. at 565 n.10.  Moreover, Defendants assert that Plaintiffs failed to define the object of the horizontal agreement and pled only general, vague claims about an agreement to "limit capacity" and fix prices for "air passenger transportation services within the United States."   Defendants argue that Plaintiffs must plead with more specificity the precise behavior engaged in by Defendants to limit capacity and the specific routes that were affected by the alleged conspiracy.

As set forth in the discussion above, Plaintiffs provided sufficient details regarding the alleged agreement underlying the conspiracy.  Plaintiffs define "capacity discipline" as the "reduction or relative stabilization of airline capacity."  While it is true that Plaintiffs do not in their Complaint point to one specific meeting where the purported agreement was finalized, they are not required to make such an assertion.  Indeed, as the United States District Court for the

---

[9] To the extent that Defendants assert that Plaintiffs must present direct evidence of the agreement, the Court rejects this argument because, as described above, Plaintiffs may satisfy their pleading requirement through circumstantial evidence including factual allegations of parallel conduct coupled with "plus factors."

Northern District of Georgia explained in *In re Delta/AirTran Baggage Fee Antitrust Litigation*:

> Plaintiffs need not allege the existence of collusive communications in "smoke-filled rooms" in order to state a § 1 Sherman Act claim. Rather, such collusive communications can be based upon circumstantial evidence and can occur in speeches at industry conferences, announcements of future prices, statements on earnings calls, and in other public ways.

733 F. Supp. 2d at 1360; *see also Costco Wholesale Corp. v. Johnson & Johnson Vision Care, Inc.*, No. 3:15-cv-734-J-20JRK, 2015 WL 9987969, at *14 (M.D. Fla. Nov. 4, 2015) (same).  For the reasons described above, Plaintiffs pled the formation, objective, or terms of the purported agreement with enough specificity to survive a motion to dismiss.

To the extent Defendants assert that Plaintiffs must provide a more specific or "industry-accepted definition" of capacity discipline, the Court notes that Plaintiffs provided several examples of Defendants' own executives using the term "capacity discipline" and a discussion of the term as used in the complaint filed by the Department of Justice in *United States v. U.S. Airways Group, Inc.*, No. 1:13-cv-01236 (D.D.C.).   *See* Compl. ¶ 88 (quoting Tague of United, Mikells of United, Bastian of Delta, Horton of American, and Halter of Delta as discussing "capacity discipline" in 2009); *see also id.* ¶¶ 38-39 (quoting the complaint in *U.S. Airways Group, Inc.*, as alleging "capacity discipline").   Defendants' executives themselves noted that this emphasis on capacity discipline was a shift from prior practice within the industry.

Defendants also contend that Plaintiffs are required to plead specific routes or city-pairs that were affected by the conspiracy.  Plaintiffs instead assert that the conspiracy had an industry-wide effect on prices and plead that the conspiracy affected air passenger transportation services within the United States.  Defendants point to the decision of the United States District Court for the Northern District of California in *Malaney v. UAL Corporation* in support of its argument that

the Court should reject a nationwide industry definition.  *See* No. C 10-02858 RS, 2011 WL 6845773, at *1 (N.D. Cal. Dec. 29, 2011), *aff'd*, 552 F. App'x 698 (9th Cir. 2014).  While the court in *Malaney* granted a motion to dismiss on the grounds that plaintiffs failed to provide a proper market definition for a Clayton Antitrust Act claim, the facts there are distinguishable from this action.  First, *Malaney* involved an antitrust claim brought under the Clayton Act challenging the United and Continental airlines merger.  As part of the claim pursuant to the Clayton Act, the plaintiffs were required to plead a viable relevant market in which the defendants had market power.  *Id.* at *4.  Second, as the *Malaney* court stressed, the plaintiffs had previously moved the court for a preliminary injunction and, as result, the parties in that case had already "conducted substantial fact and expert discovery, including depositions and document production, culminating in a two day evidentiary hearing."  *Id.* at *1.  One of the key issues addressed through the briefing and the hearing on the motion for a preliminary injunction was the issue of the market definition. *Id.*  The court denied the request for a preliminary injunction finding that the plaintiffs had not established a viable market.  *Id.*  At the motion to dismiss phase, the plaintiffs continued to argue that a national market for air transportation was a legally adequate market definition.  *Id.* at *4. The court disagreed, noting that the plaintiffs "already enjoyed ample opportunity to develop a substantial record on this question."  *Id.*

In this case, Plaintiffs cite the United States District Court for the Northern District of Georgia's decision in *In re Domestic Air Transportation Antitrust Litigation* in support of their assertion that they have sufficiently pled a conspiracy affecting the air passenger transportation services within the United States.  137 F.R.D. 677, 687-88 (N.D. Ga. 1991).  At the class certification stage of that case, the court expressly rejected the defendants' city-pair argument.  *Id.*

29

at 686-88.   Rather, relying on expert testimony regarding the nature of the industry, the court found "air passenger service [is] a standardized product consisting of the transport of a passenger from an origin to a destination aboard an aircraft."   *Id.* at 687-88.   As such, the court granted class certification for all persons who purchased domestic airline passenger tickets from one or more defendant airlines for air transportation on a single defendant airline to and/or from a defendant's hub during the relevant time period.   *Id.* at 697.   In light of the conflicting case law on this point, the Court agrees that Plaintiffs are not required to plead specific city-pairs, particularly at this juncture when discovery has not yet commenced.

In sum, as previously discussed, to the extent that Defendants argue that Plaintiffs must plead specific city-pairs that are affected by the conspiracy, the Court rejects this argument for the same reasons discussed in its analysis of Plaintiffs' standing.   Specifically, Plaintiffs allege a system-wide conspiracy to limit capacity in order to drive up fares within the nationwide air passenger transportation market.   As such, Plaintiffs are not required to demonstrate specific city-pairs that were alleged to have been affected by the exercise of "capacity discipline."   Accordingly, the Court finds that Plaintiffs sufficiently pled the formation, objective, or terms of the purported agreement.

### b.   *Defendants' Parallel Conduct and Other Circumstantial Evidence*

Generally, Defendants in their motion parse out each of Plaintiffs' allegations and argue that each allegation in isolation is not sufficient to support an antitrust conspiracy claim. Defendants essentially ask the Court to engage in an analysis that is not proper at this point.   Rather, this Court is tasked with reviewing the Complaint as a whole when determining whether the allegations are sufficient to survive a motion to dismiss.   *See, e.g.*, *In re Blood Reagents Antitrust*

*Litig.*, 756 F. Supp. 2d at 629; *In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 373 (M.D. Pa. 2008) ("[A] district court must consider a complaint in its entirety without isolating each allegation for individualized review."); *In re Flat Glass Antitrust Litig.*, 385 F.3d at 369 ("A court must look to the evidence as a whole and consider any single piece of evidence in the context of other evidence.").

Here, Plaintiffs sufficiently pled parallel conduct.  Plaintiffs alleged that various executives from Defendant airlines made statements close in time regarding the exercise of capacity discipline and, in concert, with these statements a new trend of limited capacity growth occurred within the industry.  As Plaintiffs acknowledge, Defendants did not reduce or limit capacity in identical amounts.  However, Plaintiffs do not need to demonstrate that Defendants cut or limited capacity in exactly the same way in order to adequately allege parallel conduct.  *See SD3, LLC*, 801 F.3d at 428-29 (rejecting the argument that parallel conduct needs to be exactly simultaneous or identical, or that defendants need to move in relative lockstep to achieve their anticompetitive ends); *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d at 630 ("Plaintiffs are not required to plead simultaneous price increases—or that the price increases were identical— in order to demonstrate parallel conduct."); *In re Baby Food Antitrust Litig.*, 166 F.3d at 132 (recognizing that parallel pricing permits pricing within an agreed-upon range, but does not require uniform pricing).  Rather, Plaintiffs demonstrate that Defendants' executives made statements not only about their own exercise of capacity discipline but also about the importance of the practice within the industry starting in 2009.  Starting in 2009, the industry experienced limited capacity growth.  Notably, as Defendants' executives acknowledged, this restriction on growing capacity was a marked change within the industry.  The Court is satisfied that at this stage, Plaintiffs sufficiently pled parallel

31

conduct.

Plaintiffs also provided a host of other factual allegations that tend to exclude the possibility of independent action on the part of Defendants. Indeed, as discussed more fully above, Plaintiffs' factual allegations can be divided into four main categories: (1) general allegations regarding the nature of the industry; (2) statements made by Defendants' executives and Defendants' participation in IATA; (3) economic evidence regarding capacity, airfares, and profits; and (4) allegations regarding Southwest's 2015 announcement.  While Defendants provide alternative explanations for these undertakings, the Court finds at this stage of the litigation that it can reasonably infer the existence of a conspiracy, and, as such, the Court shall not weigh Plaintiffs' reasonable interpretation of these factual allegations against Defendants' alternative interpretation.  *See Twombly*, 550 U.S. at 556 ("[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'"); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 782 (2d Cir. 2016) ("[A]t the motion-to-dismiss stage, appellants must only put forth sufficient factual matter to plausibly suggest an inference of conspiracy, *even if* the facts are susceptible to an equally likely interpretation.") (emphasis in original); *Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013) ("[W]e may at this early stage only accept as true all factual allegations contained in a complaint, make all reasonable inferences in favor of the plaintiff, and properly refrain from any conjecture as to whether conspiracy allegations may prove deficient at the summary judgment or later stages.").

### c.  *Defendants' Exhibits to Their Briefing*

Defendants also seek to undercut the Plaintiffs' factual allegations by providing as exhibits

to their Motion to Dismiss, documents cited by Plaintiffs in their Complaint and other documents not cited by Plaintiffs.  Defendants argue that the Court should consider the full text of these exhibits in ruling on the motion to dismiss.  Specifically, Defendants attached 39 exhibits to the briefing on their pending motion that they assert the Court should consider.  The exhibits include: 34 documents that are cited by Plaintiffs in their Complaint, but not attached thereto; and five additional documents not cited by Plaintiffs in their Complaint.

In deciding a Rule 12(b)(6) motion, the Court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters about which the court may take judicial notice, and matters of public record.  *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993).  Defendants argue that the Court should consider facts outside of those cited in the Complaint in some instances by virtue of the incorporation-by-reference doctrine, and in other instances because these are facts about which the Court should take judicial notice.  Pursuant to Federal Rule of Civil Procedure 10(c), plaintiffs may attach exhibits to a complaint and the exhibit is considered "a part of the pleading for all purpose."  Fed. R. Civ. P. 10(c).  "Incorporation by reference can also amplify pleadings where the document is not attached by the plaintiff, but is 'referred to in the complaint and [] integral to [the plaintiff's] claim.'"  *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) (quoting *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004)).  However, the United States Court of Appeals for the District of Columbia Circuit has recognized the limits of the incorporation-by-reference doctrine.  Indeed, "Rule 10(c) 'does not require a plaintiff to adopt every word within the exhibits as true for purposes of pleading simply because the documents were attached to the

33

complaint to support an alleged fact.'" *Id.* (quoting *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 455 (7th Cir. 1998)). "When considering incorporation, it is necessary to consider 'why a plaintiff attached the documents, who authored the documents, and the reliability of the documents.'" *Id.* at 1133-34 (quoting *N. Ind. Gun & Outdoor Shows, Inc.*, 163 F.3d at 455). Moreover, "[i]f a document itself comes before the court *only as an attachment to the defendant's motion to dismiss*, it may not be appropriate for the court to treat the entire document as incorporated into the complaint." *Id.* at 1133 (emphasis added).

With respect to judicial notice, a court may consider matters about which the court may take judicial notice including, in appropriate circumstances, records in related cases, without converting the motion to dismiss into a motion for summary judgment. *See Dupree v. Jefferson*, 666 F.2d 606, 608 n.1 (D.C. Cir. 1981). However, the rule still holds that judicial notice is restricted to, in relevant part, "fact[s] that [are] not subject to reasonable dispute because [they] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Defendants first provide articles, industry reports, transcripts from earning calls, pleadings filed in other matters, and filings made with the Securities and Exchange Commission that they assert should be incorporated by reference because they were cited by Plaintiffs in their Complaint. Def.'s Mot., Exs. A-D, G-M; Def. Southwest's Supp. Br., Exs. 1-18, 21-24, Def.'s Reply, Exs. N-O. Defendants assert the Court should consider other information in these documents not cited in the Complaint because "plaintiffs' conclusory allegations of parallel 'capacity reductions' are contradicted by other allegations in the complaint . . . ." Def.'s Mot. at 18; *see also id.* at 11 n.4. Moreover, Defendants argue that "Plaintiffs' Complaint is constructed in large part out of selective

quotations drawn from third-party articles; take those away and there would be almost nothing left in the pleading."  Def.'s Reply at 3.  The incorporation-by-reference of a document is inapplicable in this instance.  The cited documents do not "'form . . . the basis for a claim or part of a claim,'" such as an authentic copy of a contract underlying a complaint asserting a breach of that contract.  *See Banneker*, 798 F.3d at 1133 (quoting *Carroll v. Yates*, 362 F.3d 984, 986 (7th Cir. 2004)).  As such, the Court finds that the documents are not "integral" to Plaintiffs' claims in that they were merely cited as the source of certain factual allegations within the Complaint.  *See Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985) ("[L]imited quotation does not constitute incorporation by reference.").  Indeed, Rule 10(c) does not require a plaintiff to adopt every word in a cited document as true for pleading purposes.  Here, the Court declines to consider the other facts in the documents attached to Defendants' pleadings under the incorporation-by-reference doctrine.

Defendants also appear to request that the Court take judicial notice of the 34 documents cited in the Complaint as well as five other documents attached as exhibits to their pleadings but not cited in the Complaint.  These documents include three articles, a Competitive Impact Statement filed by the government in another case, and a press release issued by the Department of Justice.  Def.'s Mot., Exs. E, F; Def. Southwest's Supp. Br., Exs. 19, 20, 23.[10]  In *Twombly*,

---

[10] From a review of the Complaint, it appears Defendants' Exhibits E and F were not cited by Plaintiffs, although Defendants do not expressly note this in their briefing.  Moreover, while Defendant Southwest only expressly requests that the Court take judicial notice of its Exhibits 19 and 20, Exhibit 23 also does not appear to be cited in the Complaint.  As such, for the purposes of its analysis, the Court only considers whether it should take judicial notice of these documents because the incorporation-by-reference doctrine is inapplicable.  Southwest appears to argue the Court should consider Exhibit 23 under the incorporation-by-reference doctrine because the article includes the same quotation from Southwest's Kelly that was cited by Plaintiffs in their Complaint although attributed to a different source.  Def. Southwest's Supp. Br. at 9 n.24.  The Court rejects this argument as Southwest has not provided any support for its assertion that the Court can

35

the Supreme Court suggested that a district court may take notice of "the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn." *Twombly*, 550 U.S. at 569 n.13.  Here, however, the Court declines to adopt this approach given the purpose for which Defendants seek to introduce the documents.  *Cf. In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 740 n.31 (E.D. Pa. 2011) (noting the suggestion in *Twombly* "appears in that case in relation to a narrow factual context where a *Chicago Tribune* article reported on a defendant-speaker's thoughts on a matter that were only selectively excerpted in the complaint.").  Indeed, in this case, Defendants provide the documents in order to present new factual allegations to counter the factual allegations underlying Plaintiffs' claim as set forth in the Complaint. *See Sandza v. Barclays Bank PLC*, 151 F. Supp. 3d 94, 113 (D.D.C. 2015), *appeal dismissed* (Mar. 7, 2016) (taking judicial notice of the *existence* of news articles but not accepting these articles for the truth of their assertions).  In essence, Defendants ask the Court to consider all the facts in the Complaint and the underlying documents provided as exhibits to their briefing and make factual determinations after weighing and considering the facts relied upon by each party. This is a proper inquiry to conduct when addressing a motion for summary judgment, rather than a motion to dismiss when the Court is tasked with accepting all factual allegations in the Complaint as true.  Moreover, other than asserting that the Court should take notice of these facts, Defendants do not set forth how each document at issue satisfies the requirements of Federal Rule of Evidence

---

consider a document *not cited* in the Complaint under the incorporation-by-reference doctrine, particularly in light of the fact that Plaintiffs did credit a different article as the source of the quotation at issue.  Moreover, the Court does not find that the one cited quotation within the Complaint is integral to the Plaintiffs' claim such that the entirety of the uncited article should be considered by the Court under the incorporation-by-reference doctrine.

201.  Fed. Evid. R. 201(b) (permitting judicial notice as to "fact[s] that [are] not subject to reasonable dispute because [they] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").   As such, the Court shall not consider other information within those documents when reaching its decision on the Motion to Dismiss.[11]

### 3.  Southwest's Supplemental Arguments Regarding the Sufficiency of the Complaint

Defendant Southwest filed a supplemental brief arguing that Plaintiffs failed to satisfy their pleading requirements specifically as applied to Southwest.  Indeed, Plaintiffs bear the burden of "alleging that each defendant participated in or agreed to join the conspiracy and played some role in it."  *Jung*, 300 F. Supp. 2d at 163.   Southwest seeks to distinguish itself from the other Defendants by noting that it operates under a different business model, including that it: operates under a point-to-point network; employs an all-inclusive pricing model, a single class of service, few ancillary fees, and no checked bag fees for up to two bags; exclusively sells tickets through its website and its own telephone reservation agents; and utilizes only one type of aircraft with a seat capacity ranging from 122 to 175 seats.  Defendant Southwest also argues that the documents cited by Plaintiffs from the Department of Justice recognize Southwest as a disruptive competitor within the industry.  Defendant Southwest further takes issue with Plaintiffs' reliance on its 2015 statements regarding its plans to increase capacity, arguing that its CEO announced on May 28, 2015, that Southwest intended to increase capacity around 7 percent in 2015, and reiterated the plan to grow 7 to 8 percent after the alleged backlash from the executives of the other Defendant

---

[11] To the extent that the Court declines to take judicial notice of certain documents provided by Defendant Southwest in its supplemental brief, the Court shall still consider Southwest's arguments underlying its request for judicial notice of those documents.

airlines.

Here, Plaintiffs alleged sufficient facts specific to Defendant Southwest to establish a plausible claim that Southwest had a conscious commitment to the alleged common scheme designed to achieve an unlawful objective.  Specifically, Plaintiffs allege that in 2001, Southwest stopped utilizing ATPCO, the system that allows airlines to monitor and analyze the fares of its competitors, but once again began filing its fares with ATPCO in August 2008.  Compl. ¶ 55 n.27. At the commencement of the alleged conspiracy in 2009, Southwest's Kelly stated, "[w]e are reducing our capacity . . . our schedule reductions were in effect as of January."  *Id.* ¶ 88.  In 2010, Laura Wright, Southwest's CFO and Senior Vice-President of Finance stated, "[n]o question, if there's a lot of capacity discipline in the market, that will -- that should help yields as well."  *Id.* ¶ 91.  In 2010, Wright also noted that Southwest had nearly an 8% reduction in capacity.  *Id.* ¶ 112 n.112.  In 2011, Wright indicated that Southwest's capacity would remain flat or slightly down in 2012.  *Id.* ¶ 96.  In 2012, Wright also noted, Southwest's "2012 combined available seat capacity will be relatively flat with our 2011 combined capacity."  *Id.* ¶ 112 n.112.  In 2012, Southwest also was purported to have launched two of the three fare increases during one quarter that year.  *Id.* ¶ 71.  In 2014, Southwest's Romo stated, "[T]he industry as a whole has enjoyed capacity discipline, which I think is good all the way around, including for Southwest."  *Id.* ¶ 106.   In 2014, Romo also noted that Southwest "continue[d] to have a disciplined growth strategy with flat year-over-year ASM [available seat mile] capacity in 2014."  *Id.* ¶ 112 n.112.  In 2015, Southwest had a net income of $2.2 billion.  *Id.* ¶ 81.

Turning to the 2015 Southwest capacity announcement, Romo announced on May 19, 2015, at the Wolf Research Transport Conference: "[W]ith the additional two gates that we have

acquired at Dallas Love Field, and our plans to expand service at Houston Hobby, our full year 2015 available seat miles falls in the 7% to 8% range, year-over-year. And so, again, the majority of that capacity is related to our rapid and very successful expansion out of Dallas Love Field." *Id.* ¶ 116. In response to a statement made by an industry analyst at the same conference, Romo stated, "[W]e're very focused on capacity, doing what's right of course, for the Southwest shareholders. What we want to do is, enable lot of flexibility in our fleet plans. I think the story for 2015 is really straightforward, and it is largely a Love Field story." *Id.* On June 11, 2015, the *New York Times* published an article quoting Kelly as indicating, "'We have taken steps this week to begin pulling down our second half 2015 to manage our 2015 capacity growth . . .'" *Id.* ¶ 122. The Complaint also alleges that from 2013 to 2015, the seven shareholders who controlled 60 percent of United also controlled 22.3 percent of Southwest as well as 27.5 percent of Delta.[12]

The Court considers these facts in addition to the facts alleged in the Complaint that apply equally to all Defendants, including the general trend of higher airfares, increased profits, and decreasing jet fuel costs. Upon review of these facts, the Court concludes that the Complaint sets forth a plausible claim that Southwest was a participant in the alleged conspiracy. Indeed, as Plaintiffs point out, "It is not necessary to plead that each defendant had a role in 'every detail in the execution of the conspiracy . . . to establish liability, for each conspirator may be performing different tasks to bring about the desired result.'" *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980). Here, Southwest's executives made statements regarding

---

[12] The Court notes that Defendant Southwest properly asserts that Southwest is not a member of IATA. The Complaint does allege that Southwest's Kelly is a member of the Conquistadores del Cielo. *Id.* ¶ 114; *see also supra* n.4.

the importance of capacity discipline both with respect to Southwest itself and within the industry starting in 2009, and the information regarding capacity follows the industry trend with the exception of the 2015 announcement.  Southwest again began utilizing ATPCO shortly before the alleged start of the conspiracy.  Moreover, Southwest also had some common shareholders with other Defendants.  While it is true that Southwest is distinguishable in some ways from the other Defendants, Southwest's arguments regarding its all-inclusive pricing model, exclusive sale of tickets through its website and reservation agents, and its seating capacity on its aircrafts does not exclude the possibility that Southwest was a participant in the alleged conspiracy.  Indeed, Plaintiffs' assertions about the increased use of ancillary fees and ticket sales through third-party vendors was information provided to support its assertion that Defendants' actions were not the result of independent business behavior.  However, these allegations did not serve as a separate basis for a conspiracy claim.  Plaintiffs' conspiracy claim centers around the reduction or limiting of capacity on flights resulting in increased fares.  The fact that Southwest has a limited ability to reduce the number of seats on its aircrafts similarly does not preclude its ability to participate in the scheme.  Indeed, Plaintiffs pointed to specific statements made by Southwest's executive indicating that the airline was reducing capacity despite this fact.

In sum, the Court concludes that Plaintiffs adequately established standing to bring this claim and pled a plausible claim pursuant to § 1 of the Sherman Act with respect to each Defendant. Accordingly, the Court shall deny Defendants' request that the Court dismiss the Complaint.  The Court notes that it does not reach this holding lightly, particularly in light of the high cost of discovery in antitrust cases.  *See Twombly*, 550 U.S. at 557-60.  However, Plaintiffs met their burden at the motion to dismiss phase and are entitled to proceed.  The Court shall require

Defendants to file an Answer to the Complaint by November 28, 2016.  By separate order, the

Court shall set this matter for an Initial Scheduling and Case Management Conference.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' [106] Motion to Dismiss

Plaintiffs' Consolidated Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1)

and 12(b)(6).   An appropriate Order accompanies this Memorandum Opinion.


                    */s/*

**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE