## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE DOMESTIC AIRLINE TRAVEL ANTITRUST LITIGATION | MDL Docket No. 2656<br>Misc. No. 15-1404 (CKK) |
| This Document Relates To:<br>ALL CASES. | |

## STIPULATION AND ORDER REGARDING THE SEARCH FOR AND PRODUCTION OF ELECTRONICALLY STORED INFORMATION AND HARD COPY DOCUMENTS

Pursuant to the Court's Order Regarding Initial Scheduling and Case Management Conference (ECF No. 125) and Scheduling Order Regarding Discovery and Briefing on Motion for Class Certification (ECF No. 152), the parties stipulate that this Stipulation and Order Regarding the Search for and Production of Electronically Stored Information and Hard Copy Documents ("Stipulation and Order") shall govern the parties in the above-captioned action on a prospective basis from the date this Stipulation and Order is entered.

### I.      SCOPE

This Stipulation and Order shall govern discovery among the parties in the above-captioned matter, including the search for, and disclosure and Production of relevant Electronically Stored Information ("ESI") and Hard Copy Documents as provided herein. Nothing in this Protocol is intended to be an exhaustive list of discovery obligations or rights of a Requesting or Producing Party. To the extent additional obligations or rights not addressed in this Protocol arise under the Federal Rules of Civil Procedure, local rules, or applicable state and federal statutes, those rules shall be controlling.

## II.     DEFINITIONS

A.     "Action" means *In re Domestic Airline Travel Antitrust Litigation*, No. 15-md-1404 (D.D.C.).

B.     "Archival Storage" and "Archival Systems" mean long-term repositories for the storage of records that Preserve the content of the Documents or data stored therein, prevent or track alterations to such Documents or data, and control access to electronic records. "Archival Data" means information maintained for Archival Storage that is not immediately accessible to a user of a computer system.

C.     "Backup Media" refers to magnetic tapes, CDS, DVDS, hard drives or other storage onto which Backup Systems store electronic information.

D.     "Backup Systems" refers to computer systems used to store copies of active electronic information on Backup Media to permit recovery of the information in the event of loss or damage to the original data.

E.     "Court" means the District Court or the Special Master appointed by the District Court.

F.     "Custodian" means any individual, department, business unit, or division of a party that has possession, custody, or control of information, Documents, or data sources.

G.     "Custodial Data Source" means ESI or Hard Copy Document sources kept, used, or maintained by a Custodian now or during the Preservation Period, including but not limited to personal computers used for business purposes, work stations, email mailboxes (including all email folders, whether on a workstation, mobile device, email server, or local archive), mobile devices (such as cellphones or tablets), individual folders on Networks (i.e., excluding Network folders used by departments, business unit, or division included under Non-Custodial Data

Sources), cloud storage systems, and social media. Custodial Data Source does not include shared Network folders that qualify as Non-Custodial Data Sources as defined herein.

H.     "Documents" and "Electronically Stored Information" ("ESI") have the same definition as set forth in Federal Rule of Civil Procedure 34.

I.     "Extracted Text" means the text extracted from a Native Document, and includes all header, footer and document body information when available. A "Text File" is a file containing the full text of native files extracted directly from the native file, or, in the case of paper/Hard Copy Documents subject to OCR, a file containing the text resulting from the OCR.

J.     "Hard Copy Document" means a Document that was maintained in paper form at the time these Actions commenced.

K.     "Load File" means an electronic file provided in connection with producing certain data in this Action. It contains information identifying a set of paper-scanned images or processed ESI and indicates where individual pages or files belong together as Documents, including attachments, and where each Document begins and ends. A Load File will also contain data relevant to the individual Documents, including extracted and user-created Metadata, should such data be available in the Document.

L.     "Metadata" means (i) information associated with or about a file that may not be viewable or printable from the application that generated, edited, or modified such native file which describes the characteristics, origins, usage or validity of the electronic file; and (ii) information that may be generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted, saved, or otherwise manipulated by a user of such system.

3

M.     "Native Format" means and refers to the file structure of a Document created by the original creating application (in contrast to a Static Image, which is a representation of ESI Produced by converting a native file into a standard image format capable of being viewed and printed on standard computer systems, such as .tiff or .pdf).

N.     "Network" or "Shared Storage Systems" means any data storage device accessible to multiple users remotely over a computer network.

O.     "Non-Custodial Data Source" means any data source that is not kept or maintained by any particular Custodian.  These sources will typically be those sources used by multiple individuals, including any groups of individuals comprising a department, business unit, or division of a party, or that are kept or maintained by such departments, business units, or divisions, that may contain data or Documents potentially relevant to this Action.  For purposes of clarity, a Non-Custodial Data Source includes, but is not limited to, Shared Storage Systems or other shared information sources (such as shared Network folders or electronic mail folders used by, or assigned or allocated to, any relevant department, business unit, or division of a party); Structured Data sources; shared hard copy repositories (e.g., shared file cabinets); Backup Systems or Backup Media; and Archival Systems or Archival Storage.

P.     "OCR File" means optical character recognition file which is created by software used in conjunction with electronic image or Hard Copy Documents and making such Documents searchable using appropriate software ("OCR Software").

Q.     "Producing Party" means the party to the Actions producing Documents in response to a formal or informal request for Production of Documents or information.

R.     "Production" or "Produced" includes any exchange of Documents or ESI between the Parties, whether voluntarily or in response to a formal or informal request or Court order.

4

S.    "Preservation or "Preserve" shall mean taking reasonable steps to prevent the loss of unique (i.e., non-duplicative), potentially relevant Documents and any then-existing Metadata identified in Exhibit A hereto that were created, received, or maintained during the Preservation Period.

T.    "Preservation Period" means for (1) Structured Data, the period between January 1, 2006 to December 31, 2017; and (2) for Unstructured Data, the period between January 1, 2008 through March 25, 2016 unless another period is subsequently agreed to by the parties or ordered by the Court.

U.    "Requesting Party" means the party to the Actions requesting, formally or informally, the Production of Documents or information from a party or non-party.

V.    "Search Term" means a combination of words (including synonyms) and phrases designed to capture potentially relevant ESI, and includes strings of words and phrases joined by proximity and Boolean connectors or other syntax.

W.    "Static Image" means or refers to a representation of ESI Produced by converting a native file into a universal image format capable of being viewed and printed in the same manner regardless of the software used to view it.

X.    "Structured Data" means data that resides in a fixed field within a record or file, or stored in a structured format, such as databases (such as Oracle, SQL, Access) or data sets, according to specific form and content rules as defined by each field of the database.

Y.    A "Tagged Image File Format" or "TIFF" image is a graphic file format for storing bit-mapped images and bears the file name suffix ".tiff" or ".tif." It is an example of a Static Image. A Group IV TIFF is a two-dimensional compression format for storing black and white images that typically compresses at a 20-to-1 ratio for standard business Documents.

Z.     "Technology Assisted Review and Similar Advanced Analytics" or "TAR" means a process for prioritizing or coding a collection of ESI using an automated software coding system.  Common processes include ones that that harness human judgments of subject matter expert(s) on a smaller set of Documents and then extrapolates those judgments to the remaining Documents in the collection.

AA.    "Unstructured Data" refers to free-form data which either does not have a data structure or has a data structure not easily readable by a computer without the use of a specific program designed to interpret the data, including but not limited to, word processing Documents, slide presentations, email, PDFs, Excel spreadsheets, webpages, blogs, image files, audio and video files, and others of similar variable format.

III.    **SEARCH AND RETRIEVAL METHODOLOGIES**

A.     **Cooperation:**  To facilitate the efficient and effective management of these Actions and to minimize unnecessary discovery disputes and motion practice, the Parties agree to cooperate in good faith to attempt to reach agreement on reasonable search methodologies the Parties will use to search for and produce relevant ESI for Production in this Action.

B.     **Disclosure of Intended Search Methodology for Unstructured Data:**  The parties recognize and agree that each party will use reasonable search methodologies to collect, review and produce relevant and responsive, non-privileged Documents and ESI in response to Rule 34 Requests for Production that require the collection, review and Production of Unstructured Data ("Unstructured Production Requests").  Prior to searching for and producing responsive ESI or Documents, the Producing Party shall disclose to the Requesting Party (i) the search methodology or methodologies (e.g., Search Terms, TAR or similar advanced analytics, manual review) it intends to use to search for and identify Documents potentially responsive to

Unstructured Production Requests, (ii) the applicable Custodians and information sufficient for the Requesting Party to assess appropriate custodial designations, (iii) the Custodial and Non-Custodial Data Sources to which each methodology shall be applied; and (iv) other disclosures reasonably necessary for the parties to meet and confer and resolve disputes related to such intended methodologies. Following such disclosures, the parties shall meet and confer and use reasonable efforts to reach agreement on the search methodologies according to the provisions that follow. If the parties cannot reach agreement following such disclosures and negotiations, they shall bring their disputes to the Court for resolution in a timely manner.

C.     **Use of Search Terms.**

1.     To the extent a party elects to use Search Terms and other limiters, including, by way of example only, date ranges and e-mail domains in Metadata fields, as a means of limiting the volume of information to be reviewed for responsiveness, prior to conducting searches, that party shall, within a reasonable period of time following conclusion of the parties' negotiations over a Requesting Party's Unstructured Document Requests or within a reasonable period of time following Court resolution of disputes regarding the scope of such Production requests, disclose to the Requesting Party a list of the Search Terms and other limiters the Producing Party proposes to use, and which if any, of the Search Terms will be applied exclusively to certain Custodial or Non-Custodial Data Sources.

To facilitate the meet and confers, the Producing Party shall make disclosures reasonably necessary for the Requesting Party to assess the proposed terms and resolve any disputes. Such disclosures may include, but are not limited to, whether the terms were designed to include relevant terminology, including nicknames, code words, euphemisms, acronyms, synonyms, slang, terms of art, and other language likely to be contained in responsive Documents, and

whether quality control or other validation procedures were, or will be used, to assess the Search Terms as a whole.

2.      Within fifteen (15) days of receipt of the Search Terms and disclosures set forth above by a Producing Party, the Requesting Party shall raise any concerns and propose any additions or modifications it may have to the Search Terms.  The Requesting Party shall, upon request, explain the reasoning behind the additions or modifications.

3.      Within fifteen (15) days of receipt of proposed additions to and/or modification of Search Terms from a Requesting Party, the Producing Party will agree in writing to the additions and modifications, or, if it does not, will explain the reasoning behind such rejection and provide any counterproposals.

4.      The parties agree and understand that such negotiations require a cooperative and a reasonably iterative process to evaluate and agree to Search Terms.

5.      The parties shall conclude meet and confers regarding a mutually agreeable list of Search Terms within thirty (30) days of transmission by the Requesting Party of proposed modifications to the Search Terms.  If the parties are unable to agree on Search Terms after meeting and conferring in good faith, the parties shall notify the Court of their unresolved dispute(s) and seek resolution by the Court.

6.      To the extent a party proposes to use Search Terms to search for responsive email, queries of email will be run against emails and their attachments.

7.      If the search syntax of the tool being used by a Producing Party is different from the search syntax agreed to by the parties during negotiations regarding Search Terms and modifying the search syntax for use by the tool materially changes the agreed-upon Search Terms, the Producing Party shall disclose the same to the Requesting Party and the parties shall

meet and confer on any changes, if any, to the Search Terms that may be required to effectuate the intent of the Parties with respect to any affected Search Terms.

      D.      **Use of Technology Assisted Review ("TAR") and Similar Advanced Analytics.**

            1.      In addition to, or in lieu of, Search Terms and other limiters described in Section III.C, *supra*, to the extent a party intends to use TAR as a means of including or excluding Documents to be reviewed for responsiveness or of culling or otherwise limiting the volume of information to be reviewed for responsiveness, and prior to employing TAR, that party shall as within a reasonable period of time following conclusion of the parties' negotiations over a Requesting Party's Unstructured Document Requests or within a reasonable period of time following Court resolution of disputes regarding the scope of such Production requests disclose to the Requesting Party its intent to use TAR to search for responsive Documents, the name and a description of the TAR Tool being used and the outside vendor (if any) being used to conduct TAR, the Custodians and data sources to which TAR shall be applied and any Document types that may be excluded from the TAR process.

            2.      Within fifteen (15) days of receipt of the disclosures set forth above, if the Requesting Party has any objections to or concerns about the proposed TAR tool and methodology it shall raise them with the Producing Party and the parties shall meet and confer regarding the proposed TAR methodology.

            3.      To facilitate the meet and confers, the Producing Party shall make disclosures reasonably necessary for the Requesting Party to assess the proposed TAR methodology. Such disclosures may include the vendor, if any, that will be used to employ TAR processes, the name of the TAR tool, and the general TAR processes to be employed and other disclosures that are reasonably necessary for the Requesting Party to evaluate the proposed TAR

9

process and/or for the parties to meaningfully meet and confer regarding the proposed TAR process.

        4.      The parties shall conclude meet and confers regarding a mutually agreeable TAR process within thirty (30) days of transmission by the Requesting Party of objections or concerns regarding the proposed TAR methodology.  If the parties are unable to agree on a protocol for the use of TAR after meeting and conferring in good faith, the parties shall notify the Court of their unresolved dispute(s) and seek resolution from the Court.

        5.      <u>Pre-Culling Prior to  Application of TAR</u>:

        a.      *Pre-Culling to Include Only Certain Documents in TAR.*  If a Producing Party using TAR intends to pre-cull a Document collection to be subject to TAR by using Search Terms or other limiters prior to applying TAR, such that only Documents captured by such Search Terms and limiters are subject to the TAR process, the parties shall meet and confer concerning the proposed Search Terms or other limiters pursuant to the provisions of Section III.C.

        b.      *Potentially Responsive Documents Culled but Subject to Other Search Methodologies.* The Parties shall also meet and confer regarding any Document categories or types in the collection that are potentially responsive but may not be suitable or may pose challenges for TAR (depending on the capabilities of the particular TAR tool to be used), or which the Producing Party choses to exclude from TAR, such as non-textual files, electronic contact files (e.g., v-cards), Outlook calendar items, audio or video files, and spreadsheets, along with the alternative search methodologies (e.g., Search Terms or manual

review) that will be used to review those types or categories of Documents for responsiveness.

    *c.*    *Pre-Culling to Exclude Known Irrelevant Document Types and Categories from TAR.*

    i.    A Producing Party may, however, bulk-eliminate the following types of Documents known to have no relationship to the subject matter of the Action from a collection prior to the application of TAR that it does not intend to search using other methodologies (such as those provided for in Section III.D.5.b),  without need to disclose such exclusions to the Requesting Party:

    A.    Documents outside of the agreed-upon discovery period, excluded through use of date filters;

    B.    music files;

    C.    stand-alone jpg. and png. files (i.e., those that are not part of a family of Documents);

    D.    Email captured by junk or spam email filters;

    E.    Automated or blast notifications or updates sent from social networking sites such as Instagram, FaceBook, or LinkedIn, provided, however, that a Producing Party may not bulk-eliminate personal or individual emails, messages, or other communications sent to or from another user via a social media site, including email notifications of such messages from a user (e.g., Google voice notifications, LinkedIn notifications of user messages directed at the Custodian; FaceBook messages sent via email, etc.). If a Producing Party cannot, by objective means, avoid excluding individual emails, messages, or other communications sent to or from another user via social media sites, it may not bulk-eliminate notifications or updates from social networking sites.

11

ii.     Provided further, a Producing Party may eliminate the following additional types of Documents known to have no relationship to the subject matter of Action and that it does not intend to search using other methodologies (as provided for in Section III.D.5.b) upon disclosure to the Requesting Party of the domain names, sender email addresses, or Search Terms (as described herein) proposed to be used by the Producing Party to exclude such Documents and may presumptively employ such domain names, email address, or keywords to bulk-eliminate these Document types prior to use of TAR if the Producing Party does not object within 14 days after receipt of such disclosures:

A.     Junk or spam email based on domain names and Search Terms known to be associated with such email;

B.     Commercial, political, or charitable email solicitations originating from external e-commerce, political campaign, civic, or charitable entities that are entirely unrelated to the business or operations of the Producing Party and can be objectively identified by a specific external domain name alone (e.g., amazon.com, ebay, espn.com, komen.org);

C.     Routinely generated (i.e., daily, weekly, monthly) internal company- or division-wide emails or newsletters sent to large internal distribution lists pertaining solely to administrative or human resources matters (e.g., office closures, food-service or intra-company social event notices, employee benefits announcements or instructions, etc.) using keywords based on either (a) email subject lines known to be used consistently in such emails or communications, (b) file names known to be used consistently in such emails or newsletters (c) by the email address of the originating internal human resources or administrative personnel or department

12

        sending mass emails of this type, (d) by the email domain of external employee benefits providers, or (e) by the name of distribution list known to receive such emails;

D.  Ancillary travel notifications, including those for rental cars, frequent flier program notifications, or travel add-on services such as wi-fi or early check-in; for purposes of clarity, travel confirmations and receipts other than as provided herein are not "ancillary travel notifications"; and

E.  Upon agreement between the parties, other types of Documents encountered during collection.

E.  **E-mail Threading:**  A Producing Party may not use e-mail threading (the practice of producing only the email or chat that includes an entire email conversation, including all subordinate emails or chats within that thread, rather than each of the individual emails that make up that conversation as individual Documents) to produce Documents without first conferring with the Requesting Party regarding the methodology used for threading and the means of preserving Metadata for the emails that make up that thread.

F.  **Reassessment:** After completion of the search methodology meet and confer sessions, should the Producing Party need to reassess a search methodology and/or validation process, it shall notify the Requesting Party and the parties will meet and confer to address any issues in a reasonable and timely manner.

## IV. GENERAL PRODUCTION SPECIFICATIONS

A.  **TIFF Image Files:**  The parties agree that all ESI and Hard Copy Documents will be Produced as single-page, black and white, CCITT Group IV TIFF image files of at least 300 dpi resolution, except as otherwise provided in this Stipulation and Order.  Each image file will use the Bates number of the page as its unique file name.  Page size shall be 8.5 x 11 inches unless, in the reasonable judgment of the Producing Party, a particular item requires a different

page size. Original Document orientation as displayed in the native file shall be maintained in the TIFF image (e.g., portrait to portrait and landscape to landscape).

B. **Text Files:** Each Document Produced under this Stipulation and Order shall be accompanied by a document-level text file containing all of the text for that item, not one text file per page. Each text file shall be named using the Bates number of the first page of the corresponding Production item.

1. <u>Extracted Text</u>: The text of each ESI item shall be extracted directly from the native file.

2. <u>OCR</u>:

a. For any native Document redacted by the Producing Party, the Producing Party shall apply OCR to the redacted TIFF Document and produce the OCR text in the text file for that Document. The text file shall indicate where the redactions were made, for example, with the notation "PRIVILEGED," or other appropriate stamp or legend.

b. For Hard Copy Documents, the Producing Party may apply OCR to the Document, and if OCR is applied, shall produce the OCR text in the text file for that Document.

c. For Documents for which text cannot be extracted from the native file, the Producing Party may OCR the Document, and if OCR is applied, shall produce the OCR text in the text file for that Document. If the Producing Party opts not to apply OCR to native Documents from which the text cannot be extracted, it shall disclose such decision to the Requesting Party, and the Requesting Party may request a meet and confer.

14

3.    <u>Foreign Language Text</u>:  The parties will make reasonable efforts to ensure that all technologies and processes used to collect, process and produce the text of any Document – including all TIFF conversion and OCR processes, and the extraction of text from native files – Preserves all foreign language text, punctuation and other characteristics as they exist in the source native file, including, where practicable, delivering foreign language Metadata in UTF-8 with the correct encoding to enable the Preservation of the Documents' original language.

C.    **Bates Numbering.**

1.    Each TIFF image Produced under this Stipulation and Order must be assigned a Bates number that must always:  (1) be unique across the entire Document Production; (2) contain no embedded spaces; (3) be sequential within a given Document; and (4) be endorsed on the bottom-right corner of each image.

2.    The Producing Party may provide a placeholder (*e.g.*, gap sheet, dummy image) within the Production if the party skips a Bates number or set of Bates numbers in a Production indicating the Bates range skipped.  If the Producing Party does not do so, it will identify any such gap(s) in Bates numbers in correspondence transmitting the Production volume containing the gap.

3.    The Producing Party will brand all TIFF images with their corresponding Bates number, using a consistent font type and size.  Parties will make reasonable efforts to avoid obscuring any part of the underlying image with the Bates number.

D.    **Confidentiality Designations:**  If a particular Document has a confidentiality designation, the designation shall be designated as set forth in the Stipulated Protective Order Regarding Confidential and Privileged Materials.  The confidentiality designation for each

Document must be reflected in the "Confidentiality" field specified in Appendix 2. Confidential designations must be endorsed on the bottom-left corner of each image of a confidential Document. Parties will make reasonable efforts to avoid obscuring any part of the underlying image with the Confidentiality Designation

      E.    **Load Files:** All Productions will be provided with an Opticon delimited file and a Concordance image and data Load Files as detailed in Appendix 1. The image Load File must reference each TIFF file in the corresponding Production, and the total number of TIFF files referenced in the Load File must match the total number of image files in the Production. The total number of Documents referenced in a Production's data Load File should match the total number of designated Document breaks in the corresponding image Load File for that Production.

      F.    **Fields.**

         1.    Documents shall be Produced with all of the Metadata fields set forth in Appendix 2 to the extent that such fields exist and can be reasonably extracted from the native file, provided, however, that certain fields must be populated whether or not they exist in the native file as identified in Appendix 2 and as follows.

Documents shall be Produced with the following coded fields in the DAT file regardless of whether the fields may be populated automatically from the native file or created using an automated process: (a) BegBates, (b) EndBates, (c) BegAttach, (d) EndAttach, (e) Custodian, (f) CustodianOther (for Documents that are globally deduplicated), (g) CustodianOtherDirectory (for Documents that were globally deduplicated) (h) SourceParty, (i) NativeFileLink (for ESI only), (j) AttachRange, (k) Confidentiality, (l) RecordType, (m) Redacted, (n) PageCount, and (o) ProductionVolume.

16

2.       All field information will be provided in a .DAT file consistent with the descriptions and the field names provided in Appendix 2.

3.       ESI shall be processed to reflect the date and time standardized to UTC. The date and time reflected in the fields in Appendix 2, and on any TIFF image will include UTC and may also include a UTC offset to show the local date and time.

G.       **ESI Liaison:**  Each party agrees to designate an attorney to act as its ESI Liaison. Each ESI Liaison will be prepared to participate in the resolution of ESI discovery issues; know the party's ESI discovery efforts; and have access to those who are familiar with the party's electronic systems and capabilities in order to answer relevant questions. Each party shall designate its ESI Liaison within 10 days after entry of this Stipulation and Order. Any party is free to change their designated ESI Liaison by providing written notice to the other parties.

## V.       PRODUCTION OF HARD COPY DOCUMENTS

A.       **Unitization:**  The parties will use reasonable efforts to produce images of Hard Copy Documents unitized as they were maintained in the Producing Party's files, including with: (1) attachments following parents; (2) Documents stored in a binder, folder, or similar container (each a "container") Produced in the same order as they appear in the container; (3) the front cover of the container Produced immediately before the first Document in the container; (4) the back cover of the container Produced immediately after the last Document in the container; and (5) pages that are stapled, clipped, collected in folders, or otherwise bound in any manner Produced as a single Document and not multiple one page Documents. Vendors will be instructed to make reasonable efforts, where practicable, to logically unitize Hard Copy Documents that are not otherwise bound (i.e. use cues such as consecutive numbering, report

titles, similar headers and footers, and other logical cues that indicate the pages belong together) prior to scanning.

B. **Search of Hard Copy Documents:** A party may use Search Terms or TAR and similar advanced analytics on some or all Hard Copy Documents or textual PDF and TIFF files if such Documents are run through OCR Software, provided that the Requesting Party and the Producing Party agree that that the OCR Files are of sufficient quality and accuracy (for example, based on the nature of such Documents to which the Producing Party intends to apply the search methodologies or technical analyses, sampling, or other metrics that assess errors in the OCR) that Search Terms or TAR and similar advanced analytics can be reliably applied. Otherwise textual PDFs and any scanned Hard Copy Documents shall be manually reviewed for responsiveness and Production.

C. **Fields:** The Producing Party must populate the fields indicated in Appendix 2 that are designated as "Must Be Populated for All Documents." However, population of the BegAttach and EndAttach fields is not required for Documents originating in Hard Copy.

D. **Production of Hard Copy Documents in Color:** A Requesting Party may request that particular Hard Copy Documents that originated as color Documents be Produced in their original color format, upon a showing of good cause. Within thirty (30) days of such request, or at another time upon agreement of the parties, the Producing Party shall either produce the requested Documents in color or disclose to the Requesting Party why it is impossible, unreasonable, or unnecessary to do so. The Producing Party reserves the right to seek reimbursement for costs of reproducing the Hard Copy Document in color.

## VI.    PRODUCTION OF ELECTRONICALLY STORED INFORMATION

A.    **System Files:** ESI shall be filtered for file type using an acceptable industry standard exclusion list or process based on the National Software Reference Library and commonly known as the "NIST List." The parties recognize that to reduce the Document review population, additional file types may need to be excluded and shall disclose any additional file types excluded.

B.    **Hidden Text:** ESI shall be processed in a manner that maintains and displays hidden columns or rows, hidden text or worksheets, formulas, speaker notes, tracked changes, and comments (i.e., shall force on hidden columns or rows, hidden work sheets, track changes, and comments). If the file ordinarily to be Produced as a TIFF under this Stipulation and Order cannot be expanded, the native shall be Produced with the image file.

C.    **Password Protected Files:** The Producing Party shall use reasonable efforts to attempt to decrypt password-protected or encrypted files that it reasonably believes may be responsive to the Requesting Party's Document requests. In the event that a password protected file cannot be successfully decrypted, the parties shall meet and confer regarding the Production of the password protected Document.

D.    **Embedded Documents:** Spreadsheets and PDFs embedded within other ESI Documents (e.g. a spreadsheet or PDF embedded within a word processing Document, etc.) will be extracted and Produced as an independent Document, and related back to the respective top level parent Document (e.g., standalone file, email message, etc.) via the BegAttach and EndAttach fields referenced in Exhibit A through file type-specific extraction (e.g., extraction of files with .xls, .xlsx, and .pdf extensions). Related embedded Documents will be Produced within a continuous Bates range. Non-substantive automatically-generated embedded files, such

as logos or confidentiality legends, need not be Produced as separate attachments. If the Requesting Party identifies other types of ESI other than spreadsheets and PDFs for which it requests extraction and Production as an independent Document, it will so notify the Producing Party and, if the Producing Party objects, the parties shall meet and confer.

E. **Compressed Files:** The Producing Party shall  undertake reasonable efforts to expand compressed file types (e.g., .CAB, .GZ, .RAR. .ZIP) to ensure that a compressed file within a compressed file are decompressed into the lowest possible compression resulting in individual folders and/or files.  Original compression files need not be Produced, provided the responsive decompressed content files are Produced.

F. **Custodian or Originating Source:**  The Custodian or originating source shall be identified in the Custodian field of the database Load Files, as provided in Appendix 2. Documents found in the possession of a natural person (or on a Custodial Data Source) shall be Produced in such fashion as to identify the natural person.  Documents found in the central possession of a department, group, entity, or other common facility (e.g., shared office, file room, archive, Network storage, file share, back-up, hard drive, etc.) shall be Produced in such a fashion as to identify the department, group, entity, or facility. A Producing Party shall use a uniform description of a particular Custodian across Productions.

G. **Production of ESI in Color:**  A Requesting Party may request that particular electronic Document that originated as color Documents be Produced as a color TIFF or as a JPG (JPEG) file, or in their original Native Format, upon a showing of good cause.  Within thirty (30) days of such request, or at another time upon agreement of the parties, the Producing Party shall either Produce the requested Documents in color or disclose to the Requesting Party why it is impossible, unreasonable, or unnecessary to do so.

H.     **Production of Native Items.**

1.     Through the pendency of this Action, the Producing Party shall exercise reasonable, good faith efforts to maintain all collected native files that may be relevant to this Action in a manner that does not materially alter, or modify the file or the Metadata other than as provided in this Stipulation and Order.

2.     Unless it has already been converted to another usable form prior to its commencement of this Action—or contains privileged information or information subject to any other applicable protection—spreadsheets, slide presentations (e.g., Excel files and Power Point, etc.), multimedia audio/video files (e.g., .wav, .mpeg, .avi), and comparable ESI that cannot render TIFF images, for which rendering TIFF images is unduly burdensome, or for which TIFF images are not reasonably usable shall be Produced in Native Format. Notwithstanding the foregoing, a Producing Party may also produce spreadsheets and slide presentations as TIFF images, so long as the natives of those TIFFs are also Produced. The Production Load Files shall contain a link to the Produced Native Format files as specified in the "Native Link" Metadata field described in Appendix 2.

3.     Where native files are Produced in lieu of TIFF images under Subsections VI.H.2 and J, each native file will be assigned a unique Bates number. The Producing Party will produce a placeholder (a single-page TIFF slip sheet indicating that the native item was Produced) along with the file itself in Native Format. The placeholder will be branded with the Bates number in the lower right hand corner and the phrase "PRODUCED IN NATIVE ONLY" branded in the center of the page. The Producing Party will also brand any confidentiality endorsements in the lower left hand corner of the placeholder.

I.      **Structured Data Productions:**  Where a discovery request may be satisfied by Production of Structured Data, in lieu of producing a native database or TIFF images of database content, the Producing Party shall extract data from Structured Data source(s), and the parties shall meet and confer on the content and format of that data extraction.  As part of that meet-and-confer process, the Producing Party shall disclose the nature of the data and structured database(s) in which they are contained and time frame it proposes to extract, the fields the Producing Party proposes to extract, and such information as may be reasonably necessary for the Requesting Party to understand the meaning and responsiveness of fields, abbreviations, and values with the database (such as a data dictionary for the Structured Data application or system, or a description of each field, abbreviation, or value, where applicable), and the responsiveness of the fields proposed to be extracted to the information requested.  If reasonable, and in an effort to reduce post-Production time and expense, the Producing Party may generate a sample report of such extracted data for review by the Requesting Party. Where a Producing Party that generates such sample report and the parties agree that such sample, and any-agreed upon modifications thereto, when applied to all extracted data, will be sufficient in content and format, the parties agree that such extracted data Production satisfies the Producing Party's obligation with respect to the applicable Document request for that Structured Data source.

J.      **Requests for Other Native Files:**  Other than as specifically set forth in Paragraph VI.H, *supra*, a Producing Party need not produce Documents in Native Format.  If a party wants particular ESI Produced in Native Format, and this Stipulation and Order does not require the Production of that ESI in its Native Format, the Requesting Party bears the burden of showing that good cause exists for the Producing Party to produce the ESI in its Native Format. The Requesting Party will provide a specific Bates range for ESI it wishes to be Produced in

Native Format. Upon receiving such a request, the Producing Party shall either produce the requested ESI in Native Format or disclose to the Requesting Party why it is unreasonable or unnecessary to do so. Any native files that are Produced under this procedure are subject to all of the Production requirements specified for native file Productions above.

K.      **Parent-Child Relationships:** Parent-child relationships for all ESI (*e.g.*, the association between an attachment and its parent) must be preserved by assigning sequential Bates numbers to all items within the parent-child group (with children immediately following the parent), and identifying those Bates numbers in the appropriate ESI Metadata and coding fields specified in Appendix 2. For example, if a party is producing an email with attachments, the attachments must be processed and assigned Bates numbers in sequential order, following consecutively behind the parent email. If any member of a Document family is responsive, the parties agree to produce the entire family. A party may withhold wholly privileged members of a family group so long as the party inserts a slip sheet in place of the withheld Document indicating that it has been "Withheld for Privilege" and logs such attachments in a privilege log in accordance with the requirements of this Stipulation and Order.

L.      **Redaction.**

1.      Format: Where ESI items need to be redacted, the ESI items shall be Produced in TIFF with the OCR text of the redacted TIFF and with each redaction clearly indicated on the face of the TIFF. The Producing Party will also provide data fields specified in Appendix 2 unless such fields reveal privileged or work-product protected information, in which case such fields will be identified as "redacted".

2.      If ESI redacted and partially withheld from Production is a Document that is to be Produced in Native Format under this Stipulation and Order, the Producing Party may

23

either redact the native file or produce TIFF images, including all unprivileged pages, with burned in redactions in lieu of a native file.

If redacting TIFF images, the Producing Party, or its e-discovery vendor, shall make reasonable efforts to: (1) reveal hidden rows, columns or sheets prior to converting the Document to TIFF; (2) clear any filters that may conceal information; (3) adjust column widths so that numbers do not appear as "########"; (4) ensure that column and row headings print; (5) ensure that the tab name appears in the header or footer of the Document; (6) process comments so that they are Produced at the end of the spreadsheet; (7) process spreadsheets so that they print across then down; and (8) process presentation Documents (e.g., Power Points) so that all speaker notes and comments are visible. If a Requesting Party receives a TIFF image that the Requesting Party does not believe is formatted so as to be legible (*e.g.*, column cells display "##########" instead of the value), or if a Requesting Party wants additional information from an Excel-type spreadsheet (*e.g.*, formulas), the Requesting Party may request from the Producing Party a legible TIFF image or a redacted native item. At that time the Requesting Party will explain why a reasonable need exists to make the request and will provide a specific Bates range for the ESI at issue. Upon receiving such a request, the Producing Party shall either produce a legible TIFF image or redacted native item or disclose to the Requesting Party why it is unreasonable, or unnecessary to do so.

       3.     Audio/Visual ESI: If ESI redacted and partially withheld from Production are audio/visual files, the parties shall meet and confer to discuss the appropriate manner for the Producing Party to produce the unprivileged portion of the content.

      M.    **Replacement Productions:**  Any replacement Production will be transmitted with a cover letter or email identifying the Production as a replacement and cross-referencing the

BegBates and EndBates of the Documents being replaced (to the extent new Bates numbers are used to replace prior Documents, which is optional). If the replacement Production is being transmitted by physical media, the media shall include the phrase "Replacement Production."

      N.    **De-duplication.**

      1.    The Producing Party need only produce a single copy of a particular ESI item.

      2.    A Producing Party shall de-duplicate ESI at the family-level (all files within a family must be an exact duplicate) vertically by Custodian, and may elect to deduplicate horizontally (globally) across the population of records provided the terms of Section VI.N.4 are satisfied. In all cases of deduplication, however, an email that includes content in the BCC or other blind copy field shall not be treated as a duplicate of an email that does not include content in the BCC or other blind copy field, even if all remaining content in the email is identical.

      3.    If a party elects to de-duplicate, that party shall identify ESI duplicated by using industry standard MD5, SHA-1, or SHA-2 algorithms to create and compare hash values for exact matches only.  No party shall eliminate duplicates of ESI or Hard Copy Documents by manual review, except, with respect to Hard Copy Documents, when, based on the circumstances, a party knows that the relevant Documents are identical (e.g., excess copies previously made of a facially identical Document, etc.).

Where any Document has an attachment, Hash values must be identical for both the Document plus the attachments(s) (including any associated Metadata) as well as for any attachment (including associated Metadata) standing alone, for the Document to be considered a duplicate. For email, the MD5 Hash value should be calculated at the parent level and include the full body of all attachments and include all Metadata fields in the hash calculation.  Any other

methodology for identification of duplicates or hashing must be discussed with the Requesting Party and approved in writing before implementation. The resulting hash value for each item shall be reflected in the HashValue field specified in Appendix 2.

4.      Horizontal Deduplication: If a Producing Party elects to de-duplicate horizontally, it must disclose to the Requesting Party that it has deduplicated horizontally, and, provided further, must identify all Custodians who were in possession of a de-duplicated Document and the directory structure where the Custodians stored the de-duplicated Document must be identified in the CustodianOther and CustodianOtherDirectory Metadata fields respectively, specified in Appendix 2. To ensure accuracy, the CustodianOther and CustodianOtherDirectory Metadata fields must be captured by an automated process and cannot be populated using a manual process. In the event of a rolling Production of Documents or ESI items, the Producing Party shall provide an overlay Load File with updated CustodianOther and CustodianOtherDirectory information along with each Production. In the event of a rolling Production of Documents or ESI items, the Producing Party shall provide an overlay Load File with updated CustodianOther and CustodianOtherDirectory Metadata fields along with each Production. The Metadata overlay may contain a full refresh of data for the CustodianOther and CustodianOtherDirectory fields or be a supplement to the information previously provided for the fields. At the time of Production, the Producing Party shall identify the overlay as a full refresh or a supplement. A Metadata overlay file shall be either a full refresh overlay or a supplemental overlay but shall not contain a full refresh for one Metadata field and a supplement for the other Metadata field.

O.      **Attachments:** Email attachments and embedded files must be mapped to their parent by the Document or Production number by including a "BegAttach" field designating the

beginning of each such attachment and "EndAttach" field designating the end of each such attachment. If attachments and embedded files cannot be separated from their parent Documents, then "BegAttach" and "EndAttach" fields listing the unique beginning and end number for each attachment or embedded Document must be included.

## VII. PRIVILEGE LOG PROTOCOLS

A.      Privilege logs provided in lieu of producing requested Documents shall be Produced no more than sixty (60) days after the party substantially completes its Production, or as the parties may otherwise agree, provided, however, that the parties shall meet and confer on whether an earlier date for Production of the privilege logs associated with such Productions is appropriate. This provision is without prejudice to Plaintiffs' right to request any extension of discovery deadlines or the rescheduling or renoticing of depositions should Production of logs after substantial completion delay discovery in this matter.

B.      Privilege logs shall comply with Fed. R. Civ. P. 26(b)(5).

C.      Any party asserting privilege shall provide a separate entry for each Document as to which the party asserts a privilege. Family members may be logged in the same entry as the parent Document if information is provided in the entry regarding the family members that is sufficient for the Requesting Party to assess whether such family members are independently privileged (i.e., author, date, description, privilege asserted, etc.).

The entry should contain the following fields for each Document:

1.      a sequential number associated with each privilege log record;

2.      Bates number for redacted Documents and Documents withheld but for which a placeholder TIFF was Produced per Section VI.K above, or a unique Document identifier;

27

3. nature of the privilege asserted (e.g., "attorney-client privilege" or "attorney work product");

4. the name of all persons who sent, authored, signed, or otherwise prepared the Document (if known);

5. the names of the addressees, recipients, copyees, and blind copyees (with addressees/recipients, copyees, and blind copyees, each separately identified by those categories in a separate field) (if known);

6. date the Document was created or sent (if known); and

7. a description of the contents of the Document and the general nature of the legal advice requested or provided therein that is sufficiently detailed for the Requesting Party or the Court to evaluate the privilege asserted.

D. The Producing Party shall identify which individuals listed on the log are attorneys, and may identify any persons working at the direction of attorneys, including, but not limited to, paralegals and support staff. The Producing Party shall provide with its privilege log a list (or legend) of non-employees appearing on the log, together with the identity of the employer of these third parties. Upon request of the Requesting Party, the Producing Party shall meet and confer with the Requesting Party about undertaking reasonable efforts to identify the job titles, employer or company affiliation of authors, addressees, and recipients who are not otherwise identified in privilege log legends Produced to the U.S. Department of Justice.

E. Notwithstanding these provisions, the Requesting Party reserves all rights to challenge the sufficiency of the log.

F. For ESI, as an alternative to manually entering the information required under Section VII, a portion of each Party's privilege log may be generated by exporting objective

Metadata from the review tool used to identify privileged or work-product protected Documents where the objective Metadata provides the information required under that Section (a "Metadata log"), provided, however, that: (i) the Metadata must be reasonably understandable and legible; ii) the provisions of Section VII.D are satisfied; and (iii) for email senders or recipients for which the Metadata reveals only an email address rather than an individual's name, the Producing Party provides a "key" that identifies the individuals associated with such email addresses, noting any email addresses for which the associated individual cannot be identified. In addition to the requirements of VII.C.1-3 and VII.C.7, the log shall include the following Metadata fields (to the extent they exist in files collected):

1. Custodian_Other and Custodian

2. File Name

3. Email Subject (where applicable)

4. Author (where available in the Metadata; and if not, shall be manually populated)

5. From/Sender

6. To

7. CC

8. BCC

9. Date Sent

10. Date Received

11. Date Created

12. Page Count or, if unavailable, File Size

With respect to the "Email Subject" or "File Name" field, the Producing Party may substitute a description of the Document where the contents of these fields may reveal privileged

information. In the privilege log(s), the Producing Party shall identify each instance in which it has modified the content of the "Email Subject" or "File Name" field.

The Parties agree and understand that a Metadata log may be used only where the Producing Party has a reasonable belief that sufficient Metadata associated with the Document exists for the Requesting Party to assess the propriety of the privilege asserted. If the Requesting Party believes the privilege log contains insufficient information to assess the propriety of the privilege asserted and notifies the Producing Party of this belief, the parties shall thereafter meet and confer in an attempt to resolve the Requesting Party's concern.

G.    **Logging of Email Threads.**

To the extent a Document is an email thread (a.k.a "an email chain"), the information identified in Section VII.C.1-7 and/or Section VII.F.3-10 shall be logged for each email constituting the thread that is withheld as privileged, unless:

1.      The Producing Party logs the last-in-time email in the thread in accordance with Sections VII.C or VII.D above, identifies the email as a thread in the privilege log, and produces the complete email thread to the Requesting Party with appropriate Bates stamping (which Bates stamping shall be noted in the log), redacting all privileged content but producing all header information (to, from, cc, bcc, date, and subject line, unless the subject line reveals privileged information) for the privileged emails withheld, in order to provide the Requesting Party with information that would otherwise be included in the log for each email in the thread (but relieve the Producing Party from the obligation to provide that information for each subordinate email in the privilege log for that email thread); or

2.      (a) For each email thread withheld as privileged in its entirety, the Producing Party identifies it as an email thread in the privilege log, identifies in the general

description field, per Section VII.C.7, the collective names of all senders and recipients of the subordinate emails, and the date range of the entire thread if different from the date of the last-in-time email in the thread (rather than populate each log field in Sections VII.C or VII.F for each subordinate email); and (b) for each email thread withheld only in part, the Producing Party produces the redacted thread with the email header information for each redacted email in the thread.

Unless otherwise agreed-to by the parties, the exception to logging all required information in Sections VII.C or VII.F for email threads applies only to the extent a Producing Party does not email thread its Production to the Requesting Party (see Section III.E).

H.     The parties do not need to log any withheld privileged or work-product protected Documents that were dated after June 30, 2015 and were either: (1) created for (a) purposes of prosecuting or defending the Action (including its constituent transferred actions) or (b) associated with a Defendants' response to the government investigations related to the allegations in the Complaint; or (2)  exclusively between a party and its outside counsel regarding this Action or the government investigation that commenced on June 30, 2015.

## VIII.  REDACTION

A.     To protect against inappropriate disclosure of information subject to the attorney-client or other privilege and sensitive "personally identifiable information," as referenced in Section 6 of the Stipulated Protective Order, and identified in VIII.A.1-3 below, and to comply with all applicable state and federal laws and regulations, the parties may redact from Produced Documents, materials or other things, or portions thereof, the following items, or any other item(s) agreed upon by the parties or ordered by the Court:

1.      the Social Security numbers, medical records, tax identification numbers, and other information clearly of a sensitive personal nature of Plaintiffs and all individuals affiliated with or employed by Defendants, provided, however, that such redactions must be marked as "REDACTED – SENSITIVE PERSONAL INFORMATION" or otherwise clearly indicate in the Metadata that Document has been redacted for this reason;

2.      materials that contain information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other recognized privilege; and

3.      the Social Security numbers, medical records, tax identification numbers, and other information clearly of a sensitive personal nature pertaining to any other individuals who are not parties to the Action; provided, however, that such redactions must be marked as "REDACTED – SENSITIVE PERSONAL INFORMATION" or otherwise clearly indicate in the Metadata that Document has been redacted for this reason.

B.      The parties shall list on their privilege logs all Documents that have been redacted to excise privileged information or information protected as attorney work product.  Where a redaction is subsequently lifted by order of the Court or by agreement of the parties, the Producing Party shall produce a non-redacted version of the Document pursuant to the requirements of the Stipulation and Order Regarding Production of Electronically Stored Information and Hard Copy Documents.

## IX.      PRIVILEGE DISPUTE PROCEDURE

A.      Any party seeking to challenge a claim of privilege, or to challenge a failure to provide a complete privilege log, shall use its best efforts to meet and confer with the party asserting the privilege in a timely manner to attempt to resolve the issue(s) prior to submitting a challenge to the Court.

B.      If a meet and confer does not resolve all issues, any party seeking to challenge a claim of privilege or to require the reproduction of a privilege log may submit a motion challenging the privilege claim or compelling the reproduction of a privilege log, and seeking in camera review, where appropriate.  The motion to challenge a privilege claim shall identify the specific entries on the Producing Party's privilege log that the Requesting Party challenges, or types of entries or descriptions where the challenge applies all such types or descriptions. Although the burden remains on the Producing Party to establish the privilege, the party challenging the designation shall have the opportunity to file a reply to the Producing Party's brief.

C.      The Court shall provide a ruling as to whether or not claims of privilege should be upheld.  If the Court determines that a claim of privilege is not valid with regard to one or more Documents, the party asserting the privilege shall have twenty-one (21) calendar days to produce the Documents at issue.  In the case of rulings by the Special Master, a party seeking or opposing certification of a ruling regarding a claim of privilege, shall do so in accordance with the Court's Order Appointing Special Master (ECF No. 154).

X.      **PRESERVATION**

A.      The parties recognize that certain Documents and ESI are potentially relevant to this Action and reasonable steps should be undertaken by the parties to ensure that such records including accompanying Metadata specified in Appendix 2 hereto are appropriately Preserved. The parties also recognize that the issue of Preservation of potentially relevant records can be a complex, expensive, and difficult task, and that further discussions regarding the scope of potentially relevant records to be Preserved may become reasonably necessary and appropriate.

B.      It is hereby stipulated by and between the parties, through their respective counsel, as follows:

1.      This Stipulation and Order governs the Preservation of potentially relevant records to these consolidated actions.  The parties to this Stipulation agree that none of the terms herein abrogates any party's obligations to comply with, or rights under, Fed. R. Civ. P. 26.

2.      The parties shall undertake reasonable good faith measures to Preserve throughout the pendency of this Action any potentially relevant, unique and non-duplicative records created, sent, received or maintained during the Preservation Period and all associated Metadata identified in Appendix A hereto.

## XI.    MISCELLANEOUS PROVISIONS

A.      **Objections Preserved:**  Nothing in this Stipulation and Order shall be interpreted to require disclosure of irrelevant information or relevant information that is overly burdensome, information whose Production was not agreed to, or is protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity.  Except as provided expressly herein, the parties do not waive any objections as to the Production, discoverability, authenticity, admissibility, or confidentiality of Documents, and the parties expressly reserve the right to challenge any specific discovery request concerning any such information and the right to challenge the competency, relevance, materiality, privilege, and/or admissibility into evidence of such Documents, information, or material in these or any subsequent proceedings, or at the trial of these or any other actions, in this or any other jurisdiction. With respect to ESI, the inclusion of a data type or source as an example of a type or source of ESI in the Definitions herein should not be construed as an agreement by a Producing Party that these types or sources of ESI may be potentially relevant and/or must be collected, searched, or Produced. Similarly,

the exclusion of a data type or source as an example of a type of ESI in the Definitions herein shall not be construed as agreement by the Requesting Party that these types or sources of ESI are not potentially relevant and/or need not be collected, searched, or Produced.

B.      **Waiver:** Nothing herein constitutes a waiver of a party's right to seek to recover costs for steps taken pursuant to this Stipulation and Order to Preserve and/or produce Documents or data.  Nothing herein constitutes a waiver of any defenses to this Action, including, but not limited to, a defense of lack of personal jurisdiction.

C.      **Cooperation:** The parties agree to act cooperatively and meet and confer regarding Preservation, processing, and Production issues, if reasonably necessary.

D.      **Modifications:** Any practice or procedure set forth herein may be varied by agreement of the parties, confirmed in writing, where such variance is deemed appropriate under the circumstances, or by order of the Court.

Dated:  May 4, 2017                              Respectfully submitted:

/s/ Michael D. Hausfeld                          /s/ Steven N. Williams
Michael D. Hausfeld                              Steven N. Williams
Hilary K. Scherrer                               Adam J. Zapala
Jeannine Kenney                                  Elizabeth Tran
HAUSFELD LLP                                     COTCHETT, PITRE & MCCARTHY, LLP
1700 K Street NW, Suite 650                      840 Malcolm Road, Suite 200Burlingame, CA
Washington, DC 20006                             94010
Telephone: (202) 540-7200                        Telephone: (650) 697-6000
mhausfeld@hausfeld.com                           swilliams@cpmlegal.com
hscherrer@hausfeld.com                           azapala@cpmlegal.com
jkenney@hausfeld.com                             etran@cpmlegal.com

Michael P. Lehmann                               *Plaintiffs' Interim Co-Lead Counsel*
Bonny E. Sweeney
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 9411
Telephone: (415) 633-1908
mlehmann@hausfeld.com
bsweeney@hausfeld.com

*Plaintiffs' Interim Co-Lead Counsel*

/s/ Richard G. Parker
Richard G. Parker (Bar No. 327544)
Benjamin G. Bradshaw (Bar No. 460539)
Katrina M. Robson (Bar. No. 989341)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414
rparker@omm.com
bbradshaw@omm.com
krobson@omm.com

Jeffrey A. N. Kopczynski
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061
jkopczynski@omm.com


Paul T. Denis (Bar No. 437040)
DECHERT LLP
1900 K Street, NW
Washington, D.C. 20006
Telephone: (202) 261-3430
Facsimile: (202) 261-3333
paul.denis@dechert.com

*Counsel for American Airlines, Inc. and American Airlines Group Inc.*

/s/ Alden L. Atkins
Alden L. Atkins (Bar No. 393922)
Thomas W. Bohnett (Bar No. 1017726)
VINSON & ELKINS LLP
2200 Pennsylvania Ave., NW,
Suite 500 West
Washington, D.C. 20037
Telephone: (202) 639-6500
Facsimile: (202) 879-8813
aatkins@velaw.com
tbohnett@velaw.com

Jason M. Powers
VINSON & ELKINS LLP
1001 Fannin Street
Suite 2500
Houston, TX 77002
Telephone: (713) 758-2522
Facsimile: (713) 615-5809

*Counsel for Southwest Airlines Co.*

/s/ James P. Denvir
James P. Denvir (Bar No. 225359)
William A. Isaacson (Bar No. 414788)
Michael S. Mitchell (Bar No. 986708)
Abby L. Dennis (Bar No. 994476)
BOIES, SCHILLER & FLEXNER LLP
1401 New York Avenue NW
Washington, D.C. 20005
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
jdenvir@bsfllp.com
wisaacson@bsfllp.com
mmitchell@bsfllp.com
adennis@bsfllp.com

*Counsel for Delta Air Lines, Inc.*

/s/ Kent A. Gardiner
Kent A. Gardiner (D.D.C. No. 432081)
Cheryl A. Falvey (D.D.C. No. 414277)
David M. Schnorrenberg (D.D.C. No. 458774)
Joseph L. Meadows (D.D.C. No. 467441)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
T: (202) 624-2578
F: (202) 628-5116
kgardiner@crowell.com
cfalvey@crowell.com
dschnorrenberg@crowell.com
jmeadows@crowell.com

*Counsel for United Airlines, Inc.*

**IT IS SO ORDERED.**

**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE

## APPENDIX 1

## PRODUCTION DELIVERY REQUIREMENTS

<u>General Instructions</u>

1.    A cover letter or e-mail should be included with each Production and shall include information sufficient to identify all accompanying media (hard drive, thumb drive, DVD or CD), including the Production volume number and Bates range for the provided Production. When producing Structured Data, the cover letter or email transmitting the data shall state that the Production includes Structured Data and identify the source from which the Structured Data were Produced and the Bates range for the Structured Data if Unstructured Data are also included on the Production media.

2.    Data can be Produced on CD, DVD, flash drive or hard drive, or via Secure FTP or other secure file transfer; parties shall make best efforts to use the media requiring the least number of deliverables.

3.    Productions will be identified numerically and made in sequential order (*i.e.*, Production 1, Production 2, etc.).

4.    Label all media with the following:

      a.    Case name and number,

      b.    Production volume number,

      c.    Production date,

      d.    Bates range; and

      e.    Disk number (*e.g.*, 1 of X, 2 of X, etc.), if applicable.

5.    Deliverables

      a.    IMAGES – this folder contains subfolders containing the TIFF images. Each sub-folder should contain no more than 5,000 files.

      b.    NATIVES  this folder contains subfolders containing files Produced in Native Format. Each sub-folder should contain no more than 5,000 files.

      c.    TEXT – this folder contains subfolders containing the TXT files. Each sub-folder should contain no more than 5,000 files.

      d.    LOAD FILES – this folder contains the .OPT and .DAT files for the specific Production volume. The name of the .DAT and .OPT files should mirror the name of the Production volume and should have the extension of .DAT, for the Concordance data file and .OPT for the Opticon Load File (image Load File), *e.g.*, ABC0001.DAT and ABC001.OPT.

6.  All Productions should be checked and Produced free of computer viruses.

7.  Passwords for Documents, files, compressed archives and encrypted media (if known) should be provided separately either via email or in a separate cover letter from the data.

**Image Load Files**

1.  Image Load Files should be Produced in Concordance Image (Opticon) format.

2.  The name of the image Load File should mirror the name of the delivery volume, and should have the appropriate extension (*e.g.*, ABC001.OPT).

3.  The volume names should be consecutive (*e.g.*, ABC001, ABC002, *et seq*.).

4.  There should be one row in the Load File for every TIFF image in the Production.

5.  Every image in the delivery volume should be cross-referenced in the image Load File.

6.  The imageID key should be named the same as the Bates number of the page.

7.  Load Files should not span across media (*e.g.*, CDs, DVDs, hard drives, etc.), *i.e.*, a separate volume should be created for each piece of media delivered.

8.  Files that are the first page of a logical Document should include a "Y" where appropriate.  Subsequent pages of all Documents (regular Document, email, or attachment) should include a blank in the appropriate position.

> Sample Concordance Image (Opticon) Load File:
>
> MSC000001,MSC001,D:\IMAGES\001\MSC000001.TIF,Y,,,3
> MSC000002,MSC001,D:\IMAGES\001\MSC000002.TIF,,,,,
> MSC000003,MSC001,D:\IMAGES\001\MSC000003.TIF,,,,,
> MSC000004,MSC001,D:\IMAGES\001\MSC000004.TIF,Y,,,2
> MSC000005,MSC001,D:\IMAGES\001\MSC000005.TIF,,,,,

**Concordance Data Load Files:**

1.  Data Load Files should be Produced in Concordance .DAT format.

2.  The data Load File should use standard Concordance delimiters:

    - Comma - ¶ (ASCII 20);

    - Quote - þ (ASCII 254);

    - Newline - ® (ASCII174).

3.  The first line of the .DAT file should contain the field names arranged in the same order as the data is arranged in subsequent lines.

4.      All date fields should be Produced in mm/dd/yyyy format.

5.      All attachments should sequentially follow the parent Document/email.

6.      Use carriage-return to indicate the start of the next record.

7.      Load Files should not span across media (*e.g.*, CDs, DVDs, hard drives, etc.); a separate volume should be created for each piece of media delivered.

8.      The name of the data Load File should mirror the name of the delivery volume, and should have a .DAT extension (*e.g.*, ABC001.DAT).

9.      The volume names should be consecutive (*e.g.*, ABC001, ABC002, *et seq.*).

10.     If foreign language / Unicode text exists, the .DAT file shall be in UTF-8 or UTF-16 format where appropriate, consistent with section IV.B.3. of the Stipulation and Order.

        Sample Concordance .DAT Load File:

        þBegBatesþ¶þEndBatesþ¶þBegAttachþ¶þEndAttachþ¶þPgCountþ¶þCustodianþ

## OCR/Extracted Text Files

11.     OCR or Extracted Text files shall be provided in a separate \OCR\ directory containing Document level text files.

12.     If Foreign Language/Unicode text exists, TEXT files shall be in appropriate UTF-8 or UTF- 16 format, consistent with section IV.B.3 of the Stipulation and Order.

## APPENDIX 2

## FIELDS

| Field Name | Field Description | Must Be Populated for All Documents |
|---|---|---|
| BegBates | First Bates number (Production number) of an item. | x |
| EndBates | Last Bates number (Production number) of an item.<br>**The EndBates field should be populated for single-page items. | x |
| BegAttach | First Bates number of attachment range (i.e. Bates number of the first page of the first attachment). | x |
| EndAttach | Last Bates number of attachment range (i.e. Bates number of the first page of the first attachment). | x |
| PgCount | Number of pages in the item. | x |
| Custodian | Name of person from whose files the item is Produced. | x |
| CustodianOther | Name of the person(s), in addition to the Custodian, from whose files the item would have been Produced if it had not been de-duplicated. | X (if deduplicated globally (i.e., horizontally)) |
| CustodianOtherDirectory | The file path of the Document de-duped in accordance with the global deduplication provisions of this Stipulation and Order.<br><br>If reasonably available, the data contained in the field shall start with the identification of the other Custodian followed by the source file path and ending in the filename, with a pipe delimiter between the CustodianOther identification and the actual directory structure and any container name (such as ZIP or PST containers) included in the path.<br><br>Note: Producing Party may truncate the file path using a method reasonably calculated to remove Network-level identification information for such as, without limitation, IP addresses, resolvable server names, and infrastructure file-path information, but excluding removal of the custodial or shared Network drive letter. The parties | X (if deduplicated globally (i.e., horizontally)) |

| Field Name | Field Description | Must Be Populated for All Documents |
|---|---|---|
| | understand that collection tools may add to or truncate file path information, provided however that collection tools do not overwrite the file path information to be provided, and they agree that Defendants shall provide file path information such as that consistent with the file paths provided to DOJ, subject to the caveat that they shall Preserve the original file paths as they existed at the time of collection. | |
| FilePath | The file path of the Document as it existed at collection.

Note:  Producing Party may truncate the file path using a method reasonably calculated to remove Network-level identification information for such as, without limitation, IP addresses, resolvable server names, and infrastructure file-path information, but excluding removal of the custodial or shared Network drive letter.  The parties understand that collection tools may add to or truncate file path information provided however that collection tools do not overwrite the file path information to be provided.  The parties agree that Defendants shall provide file path information consistent with the file paths provided to DOJ, subject to the caveat that they shall Preserve the original file paths as they existed at the time of collection. | |
| FileSize | Size (in kilobytes) of the source native file. | |
| FileName | File name of Document | |
| FileExt | The file extension of the Document (e.g. doc, nsf, rtf, pdf etc.) | |
| HashValue | The unique hash value of the file. | |
| EmailThreadFamilyID | Unique identifier from email threading algorithm to denote emails from a single thread. | |
| EmailOutlookType | Type of Outlook item, e.g., email, calendar item, note, task | |
| NativeFileLink | Hyperlink path for Documents provided in Native Format. | X (ESI only) |

| Field Name | Field Description | Must Be Populated for All Documents |
|---|---|---|
| | **The linked file must be named per the BegBates value. | |
| SourceParty | Name of party producing the item. | x |
| DateSent (mm/dd/yyyy) | Date email or calendar item was sent. | |
| TimeSent (hh:mmAM/PM) | Time email or calendar item was sent. | |
| DateReceived (mm/dd/yyyy) | Date email or calendar item was received | |
| TimeReceived (hh:mmAM/PM) | Time email or calendar item was received | |
| ParentBates | First Bates number for the parent item of a family. **This field should be populated for all members of a family. **Documents that are not part of a family should not have this field populated. | x |
| AttachBates | First Bates number of each "child" attachment. **Can be more than one Bates number listed depending on the number of attachments.  If multiple Bates numbers, separate by semi-colon (;). | x |
| To | The names and SMTP email addresses of all recipients that were included on the "To" line of the email or calendar item. | |
| From | The name and SMTP email address of the sender of the email or calendar item. | |
| CC | The names and SMTP email addresses of all recipients that were included on the "CC" line of the email or calendar item. | |
| BCC | The names and SMTP email addresses of all recipients that were included on the "BCC" line of the email or calendar item. | |
| DateCreated (mm/dd/yyyy) | Date the item was created. | |
| TimeCreated (hh:mm AM/PM) | Time the item was created. | |
| FileName | The filename of the source native file for an ESI item. | |
| Date Modified | Date the item was modified | |
| Subject | Any value populated in the Subject field of the source file Metadata or Document properties (*e.g.*, subject line of email or calendar item). | |
| TextPath | Full relative path to the current location of the document-level text file | |

| Field Name | Field Description | Must Be Populated for All Documents |
|---|---|---|
| Confidentiality | Indicates if item has been designated as "Confidential" or "Highly Confidential—Outside Counsel Only" under the Stipulated Protective Order. | x |
| AttachRange | Bates number of the first page of the parent item to the Bates number of the last page of the last attachment "child" item. | x |
| RecordType | To indicate "Paper," "Hard Copy," or "HC" if a Hard Copy Document and "ESI" if it is an ESI item. | x |
| Application | Indicates software application that generated the ESI item (e.g., Outlook, Word). | |
| PasswordProtection/Encryption | Descriptor for Documents that are password-protected or encrypted (<yes> or <no>) | |
| Production Volume | Production volume name or number | x |
| Redacted | User-generated field that will indicate redactions. "X," "Y," "Yes," "True," are all acceptable indicators that the Document is redacted. Otherwise, blank. | x |
| MessageID | The unique message identifier generated by the source email or calendar system. | |
| PrevMessageID | The MessageID of the previous message in the email thread (the message that was replied to or forwarded). | |
| Title | Any value populated in the Title field of the source file Metadata or item properties. | |
| Author | Creator of the Document; any value populated in the Author field of the source file Metadata or Document properties. | |