**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE DOMESTIC AIRLINE TRAVEL ANTITRUST LITIGATION | MDL Docket No. 2656 Misc. No. 15-1404 (CKK) |
| This Document Relates To: ALL CASES. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR AN EXTENSION OF FACT DISCOVERY DEADLINES**

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................ 1

II.    FACTUAL BACKGROUND ....................................................................................... 2

III.   LEGAL ARGUMENT ................................................................................................. 9

   A.   There is Good Cause to Extend the Discovery Schedule. .................................... 9

   B.   Plaintiffs Have Diligently Pursued Discovery. ................................................. 10

   C.   Plaintiffs Would Be Prejudiced Without a Schedule Extension. ....................... 13

   D.   Defendants Would Not Be Prejudiced by the Proposed Schedule Extension. ................. 16

   E.   The Court's Prior Extension of the Discovery Schedule Does Not Preclude a Further
        Extension & Is Consistent with Schedules in Complex MDLs. .............................. 17

IV.    CONCLUSION .......................................................................................................... 19

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abraham v. WPX Prods., LLC*,
  No. 12-cv-0917, 2016 WL 548251 (D.N.M. Jan. 25, 2016)....................................13

*In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-md-1775 (E.D.N.Y.)............................18

*In re Automotive Parts (Wire Harness Systems)*, No. 02-md-2311 (E.D. Mich.) ........................19

*In re Blue Cross Blue Shield Antitrust Litig.*, No. 13-cv-20000 (N.D. Ala.)................................18

*In re Christou*, No. 06-68251, 2008 WL 7880888 (Bankr. N.D. Ga. Nov. 30,
  2008) ...............................................................................................................17

*City of Colton v. Am. Promotional Events, Inc.*,
  277 F.R.D. 578 (C.D. Cal. 2011).............................................................................15

*Clientron Corp. v. Devon IT, Inc.*,
  310 F.R.D. 262 (E.D. Pa. 2015)................................................................................15

*Coleman v. Blockbuster, Inc.*,
  238 F.R.D. 167 (E.D. Pa. 2006)................................................................................14

*Dag Enterprises, Inc. v. Exxon Mobil Corp.*,
  226 F.R.D. 95 (D.D.C. 2005) (Kollar-Kotelly, J.) ....................................................10

*Equal Rights Ctr. v. Post Properties, Inc.*,
  No. 06-cv-1991, 2008 WL 11391642 (D.D.C. May 27, 2008)............................9, 17

*Haughton v. D.C.*, 315 F.R.D. 428 (D.D.C. 2014) ........................................................15

*Kwasniewski v. Sanofi-Aventis U.S. LLC*,
  No. 12-cv-515, 2013 WL 3297182 (D. Nev. June 28, 2013) ....................................15

*In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-2420 (N.D. Cal.) ....................19

*Marvin Lumber & Cedar Co. v. Norton Co.*,
  113 F.R.D. 588 (D. Minn. 1986).............................................................................13

*In re Municipal Derivatives Antitrust Litig.*, No. 08-cv-2516 (S.D.N.Y.)....................19

*In re NCAA Student-Athlete Name and Likeness Litig.*,
  No. 09-cv-1967 (N.D. Cal.) ....................................................................................18

*In re Polyurethane Foam Antitrust Litig.*, No. 10-md-02196 (N.D. Ohio) ..................................18

*In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa.) ....................................18

*Rae v. Children's Nat'l Med. Ctr.*,
    No. 15-cv-736, 2017 WL 1750255 (D.D.C. May 4, 2017)........................................................9

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-md-1827 (N.D. Cal.) ..................................19

*In re Thalomid and Revlimid Antitrust Litig.*, No. 14-cv-6997 (D.N.J.) ......................................18

*United States v. Sci. Applications Int'l Corp.*,
    301 F.R.D. 1 (D.D.C. 2013).....................................................................................................17

*Victor Stanley, Inc. v. Creative Pipe, Inc.*,
    269 F.R.D. 497 (D. Md. 2010).................................................................................................14

*Watt v. All Clear Bus. Sols., LLC*,
    840 F. Supp. 2d 324 (D.D.C. 2012) .......................................................................................18

*Williams v. Taser Int'l, Inc.*,
    No. 06-cv-51, 2006 WL 1835437 (N.D. Ga. June 30, 2006)..................................................15

*Youssef v. Lynch*,
    No. 11-cv-1362, 2016 WL 10674025 (D.D.C. Apr. 29, 2016)................................................16

**Rules**

Fed. R. Civ. P. 16 ...........................................................................................................................1, 9

Local Rule 16.4 ....................................................................................................................................9

Rule 34(b)(2)(E)(i) .............................................................................................................................15

Plaintiffs respectfully submit this memorandum in support of their motion, pursuant to Federal Rule of Civil Procedure 16(b)(4), to modify the deadline for close of fact discovery and certain related deadlines in the Court's February 14, 2018 Amended Scheduling Order Regarding Discovery and Class Certification (the "Scheduling Order"). ECF No. 207. Defendants United Airlines, Inc. ("United") and Delta Air Lines Inc. ("Delta") have informed Plaintiffs that they oppose this motion.

## I.  INTRODUCTION

Plaintiffs respectfully ask the Court to extend the fact discovery deadline and certain other interim discovery deadlines, as well as the deadlines for the submission and briefing of Plaintiffs' motion for class certification, the deadline for depositions, the deadline for serving requests for admissions, and the deadlines for motions to compel by six months.[1] Plaintiffs have sought to move this litigation forward efficiently and expeditiously, but have recently encountered an issue with United's "core" document production (*i.e.*, non-DOJ) necessitating modification to the Scheduling Order. Specifically, while United's core document production contains over 3.5 million documents, Plaintiffs have come to understand that due to United's technology assisted review process ("TAR"), only approximately 17%, or 600,000, of the documents produced are responsive to Plaintiffs' requests. In other words, United produced approximately 2.9 million documents that are not responsive to Plaintiffs' requests, and neither United nor Plaintiffs can readily distinguish between those that are and are not responsive. This significantly shifts the burden of reviewing non-responsive documents for potential responsiveness from United to Plaintiffs—a prospect Plaintiffs did not anticipate at the time of the last case schedule modification.

---

[1] Plaintiffs do not seek to move the deadline for serving additional requests for production of documents and interrogatories or deadlines associated with motions to compel regarding privilege logs.

Plaintiffs have engaged in a meet and confer and corresponded with United over the last few months to understand and seek clarity on their TAR validation results and to understand what, if anything, could be done to alleviate the problem. Unfortunately, the answer appears to be nothing short of United starting from scratch (an unrealistic option), leaving Plaintiffs with only the option to expend considerable time, effort, and monetary resources reviewing and hosting what is essentially an enormous dump of non-responsive documents to find the responsive documents buried within that are necessary to prosecute this case.

Plaintiffs are mindful of the Court's policy regarding any extensions of the current deadlines but believe these extraordinary circumstances constitute extremely good cause to extend the fact discovery and class certification deadlines and certain other interim discovery deadlines by six months.

## II.     FACTUAL BACKGROUND

Pursuant to the Scheduling Order, Defendants' deadline to produce their "core" (i.e., non-DOJ) documents was April 30, 2018. Defendants collectively produced approximately 5.1 million documents on that deadline, bringing the total core productions to approximately 6 million core documents.[2] United's core document production totaled over 3.5 million documents, or approximately 1 million more core documents than the number produced by Delta and American *combined*.

---

[2] While American produced more than half of its production of nearly 1.2 million core documents prior to the production deadline, United produced only 13% of its over 3.5 million core documents prior to that deadline. And Delta produced all but 4,500 of its approximately 1.3 million core documents on the production deadline. United produced an additional 123,000 documents in July 2018 that had been held back for privilege review.

United's core production was based on the results of its TAR process.[3] In order to ensure the accuracy and completeness of United's TAR production, the Parties had entered into an agreement regarding a validation protocol. *See* Exs. 2-4[4] (Mar. 26, 2017 email exchange between B. Beard and United's counsel and attached protocol). The Parties' protocol provided that United would "set a minimum estimated recall rate of 75% but will endeavor to achieve a higher estimated recall rate *if that rate may be obtained with a reasonable level of precision* through reasonable additional training effort, taking into account the concept of proportionality and the deadline for substantial completion of document production." Ex. 1. at ¶ D (emphasis added).[5]

To test the accuracy and completeness of the United's TAR production, the Protocol required United to review a statistically representative sample of documents classified by its TAR tool to test how often its TAR tool made the correct decision on responsiveness. United was to report to Plaintiffs, *inter alia*, the total number of:

- documents coded by the human reviewer as Responsive in the validation sample but predicted as Not Responsive by TAR (i.e., "false negatives");

- documents coded by the human reviewer as Responsive in the validation sample and correctly predicted as Responsive by TAR (i.e., "true positives"); and

- documents coded by the human reviewer as Not Responsive in the validation sample but incorrectly predicted as Responsive by TAR (i.e., "false positives").

---

[3] TAR is a means of classifying documents for production using computer software. Grossman Decl. ¶ 9.
[4] All exhibits cited to herein are exhibits to the Declaration of Jeannine M. Kenney.
[5] "Recall" measures how effective the tool was in finding responsive documents for production from all actually responsive documents in the collection. *See* Decl. of Maura Grossman ¶ 10. A high rate of recall means that a large proportion of responsive documents were found. "Precision" measures how accurate the tool was in identifying responsive documents rather than non-responsive documents for production. *See id.* A low rate of precision means that few of the documents in a production are responsive. *See id.* That is, Plaintiffs' recognized that achieving higher recall could come at the cost of precision, risking production of an unreasonably high number of non-responsive documents.

*See* Ex. 2 at ¶ E. The latter two statistics permitted Plaintiffs to calculate the rate of precision.

The former two statistics allowed Plaintiffs to calculate the rate of recall. Plaintiffs were

concerned about both measures: they did not want the process to exclude an unreasonable

number of responsive documents, nor did they want a document production loaded with non-

responsive documents that would unnecessarily and unreasonably burden their review. Kenney

Decl. ¶ 18. The intent of the agreement was that the metrics would be provided before production

to allow the Parties to meet and confer and avoid any "do-overs."

But that is not what happened. At 7:32 p.m. on Friday, April 27, one business day before

the April 30 production deadline, United provided its TAR validation metrics to Plaintiffs.

United also reported the precision and recall results from its "control set." Like validation

sampling, a control set is another means of assessing the accuracy and completeness of a TAR

process. United reported that based on its control set, the estimated recall was 85% and the

estimated precision was 58%—a reasonable result for a TAR process.[6] United also provided the

validation sampling metrics required by the Parties' TAR protocol. Plaintiffs analyzed these

metrics with their ESI consultant and confirmed that, contrary to the control set results, the

statistics from the validation sample indicated United's TAR process resulted in a recall of

97.4% (extraordinarily high) and precision of only 16.7% (extraordinarily low). Kenney Decl. ¶

20. After further consultation, Plaintiffs sent a list of questions to United on May 23, 2018,

including an inquiry about the discrepancy in the validation metrics and control set results,

among other issues. Ex. 5 at 6. Plaintiffs did not know whether the control set metrics were

incorrect, whether the validation sampling results were inaccurate, or whether something had

---

[6] Based on statistics provided by Delta prior to its core production, Delta's TAR process
achieved nearly this result. *See* Ex. 7.

happened between the control set calculations and the final production that might have accounted for the difference. Kenney Decl. ¶ 20.

Despite Plaintiffs' efforts to secure a response about this discrepancy (including two follow-up emails, the first on June 13, and the second on June 25), United did not respond until June 26, more than a month after Plaintiffs' initial inquiry. Even then, United's response did not explain the inconsistency between the different results. Ex. 5 at 4.[7] During a telephonic meet and confer two days later, Plaintiffs inquired about the cause of the discrepancy between the control set statistics and the validation metrics. Specifically, Plaintiffs asked whether some setting or "switch" for precision and recall was changed in between the time that the control set statistics were measured and the validation testing was conducted that could account for the low precision in United's validation sampling and which might be corrected. Kenney Decl. ¶ 21. United was unable to provide answers but committed to pursue Plaintiffs' inquiries with its vendor. Having not heard back from United for two weeks, Plaintiffs followed up on June 10, requesting information from United's investigation into the metrics. Ex. 5 at 3. Having heard no response, Plaintiffs followed up again on July 23. *Id.* at 2-3. On July 23, two months after Plaintiffs' initial inquiry, United finally explained that it had incorrectly reported the control set metrics, and that the correct control set metrics were, in fact, consistent with the validation sample results. *Id.* at 2. United reported that even at precision of 58%, its TAR process would result in recall of only 56%—an unacceptably low result that would eliminate nearly half of the responsive documents produced. *Id.*

---

[7] The explanation provided was that the higher level of recall in the validation sample *caused* the level of precision to drop. Ex. 5 at 4. Plaintiffs did not understand that explanation as *the sample results* for precision and recall cannot be causally related; the sample statistics reflect the population from which the sample was drawn. Plaintiffs' question was what accounted for the difference between the control set statistics and the validation sample statistics.

Plaintiffs finally understood at that point that, of United's core production of 3.5 million documents, only 600,000 are actually responsive to Plaintiffs' document requests; the remaining 2.9 million documents are non-responsive.[8] *See* Grossman Decl. ¶ 14. That is, to find *one* responsive document, Plaintiffs must review, on average, *six*. Plaintiffs understood as well, based on United's July 27 response, that United's problematic TAR production could not be corrected with a more acceptable balance between recall and precision without redoing United's entire TAR training and process.

Mindful of this Court's admonition that discovery extensions would not be favored, Plaintiffs began reviewing the core document productions as soon as they could be processed into Plaintiffs' review platform following production on April 30. More than 70 attorneys and staff are reviewing Defendants' productions, managing the document review, and performing targeted searching and review of the documents for deposition preparation and case development. Kenney Decl. ¶ 24.

Importantly, however, there is nothing in United's 3.5 million document production that permits Plaintiffs (or United, for that matter) to readily distinguish between the responsive and the non-responsive documents in the production. *See* Grossman Decl. ¶ 18. To try to prioritize and expedite review of these substantial productions in preparation for depositions and class certification, and to mitigate the impact of United's document dump, Plaintiffs have been

---

[8] Delta also used TAR and produced approximately 1.35 million documents with precision of approximately 50%-57% and recall of more than 85%. Combining the non-responsive documents in Delta's core document production with those in the United production results in a total non-responsive volume of approximately 3.5 million documents. In other words, more than half of the approximately 6 million core documents produced are not even responsive to Plaintiffs' requests (American used search terms and then performed a manual responsiveness review thus its core documents are all presumed to be responsive).

conducting targeted searches of United's production, and reviewing documents hit by those searches. Kenney Decl. ¶ 25.

But such searches do little to alleviate the unnecessary burden of reviewing non-responsive documents. This is because many keywords will still hit on voluminous non-responsive documents. For example, Exhibits 9-12, [9] attached to the Kenney Declaration, all produced from United's production, include the word "capacity" such that these and other irrelevant documents would be hit by such a targeted search for that word. United's TAR tool was apparently unable to discern the difference between airline capacity—a core concept in this case—and server capacity, power supply capacity, service center capacity, or personal capacity. *See* Exs. 9, 10, 11 (at slide 24), & 12 (at attachment, Article VII, Section 6).

Nor have Plaintiffs' efforts to apply their own TAR methodology yielded fruit. Long before receiving United's 3.5 million document production on April 30, Plaintiffs had begun training their vendor's TAR tool to prioritize important documents within the Defendants' productions based on Defendants' DOJ productions and interim productions. Kenney Decl. ¶ 25. This training, however, was designed to locate important types of documents from within responsive documents to prioritize review, not to categorize documents as responsive versus non-responsive to eliminate review of the latter (as *producing* parties using TAR usually do, *see* Grossman Decl. ¶ 15).  After additional training of their TAR tool following the voluminous April productions, Plaintiffs have determined that, even with the *further* training, the tool is unlikely to weed out the millions of non-responsive documents from United's production.

---

[9] Notwithstanding the fact that United did not conduct any review of its document production, it nevertheless designated nearly every document it produced in its core production as either Confidential (2.68 million documents) or Highly Confidential-Outside Counsel Eyes Only (761,000 documents), including these exemplar documents. At best, only 1 could conceivably qualify for either designation. Accordingly, Plaintiffs are obligated to file these exhibits under seal.

Kenney Decl. ¶ 25. For the tool to identify the responsive versus non-responsive documents (rather than prioritize certain types of documents), Plaintiffs would need to start their TAR training from scratch, *see* Grossman Decl. ¶ 18, at the cost of significant additional time and expense, diversion of resources, and delay in review of responsive documents.

Nor can Plaintiffs realistically segregate responsive from non-responsive documents through eyes-on review of the documents within the time remaining in the schedule to take depositions. Even if it were clear on the face of a document, without need for *any* substantive review, that the document was non-responsive, *each such document* must be reviewed. That is, to weed out United's non-responsive documents from the responsive documents, Plaintiffs would need to make that non-responsive assessment more than *2.9 million times*, just to eliminate the documents it need not review—time diverted from reviewing the actually responsive documents in this case. Importantly, however, it is frequently *not* clear on the face of a document whether it is relevant or not without a complete review of the document. For example, each page of the 24-page slide deck in Exhibit 11 must be reviewed before concluding the document contains only irrelevant information.

Other potential solutions do not appear viable. At the August 20, 2018 Status Conference with Judge Levie, United offered to provide Plaintiffs a list (or "overlay") of the documents that would have been produced had United used a lower recall rate and a higher precision rate. Since the Status Conference, Plaintiffs have had further communications with United regarding such an overlay, *see* Ex. 8, but have concluded that an overlay would not solve the problem. First, an overlay that identifies the documents in United's original core production that would have been produced at a more acceptable level of precision but lower recall rate would merely identify a lesser number of documents that United would have, but did not produce, had it used those

thresholds, and would exclude a significant volume of responsive documents. Grossman Decl. ¶ 19. It does little to aid Plaintiffs in timely finding and reviewing the 600,000 responsive documents actually produced United's 3.5 million document production within the pending deadlines. *See id.* ¶ 19-21.

## III.   LEGAL ARGUMENT

### A.   There is Good Cause to Extend the Discovery Schedule.

Local Rule 16.4 provides that the Court may modify the scheduling order at any time upon a showing of good cause. LCvR 16.4; *see also* Fed. R. Civ. P. 16. In evaluating good cause, the Court assesses: "(1) whether trial is imminent; (2) whether the request is opposed; (3) whether the non-moving party would be prejudiced; (4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court; (5) the foreseeability of the need for additional discovery in light of the time allotted by the district court; and (6) the likelihood that discovery will lead to relevant evidence." *Rae v. Children's Nat'l Med. Ctr.*, No. 15-cv-736, 2017 WL 1750255, at *2–3 (D.D.C. May 4, 2017). In making this assessment, courts focus primarily on the diligence of the party obtaining the discovery sought during the discovery period; a secondary factor is whether and to what degree the non-moving party would be prejudiced. *See Equal Rights Ctr. v. Post Properties, Inc.*, No. 06-cv-1991, 2008 WL 11391642, at *1-2 (D.D.C. May 27, 2008).

As discussed below, Plaintiffs more than satisfy this standard. Plaintiffs have demonstrated diligence in seeking the discovery buried somewhere in United's voluminous document production and Defendants suffer no prejudice from the proposed modification. Moreover, without the sought-after extension, Plaintiffs will be prejudiced in their ability to prosecute this case on the merits, forced to proceed with depositions and class certification (and

possibly summary judgment) without a meaningful ability to review the documentary record.

**B.      Plaintiffs Have Diligently Pursued Discovery.**

A showing of diligence involves demonstrating that the moving party (i) was diligent in

assisting the Court in developing workable scheduling orders, (ii) that despite the party's

diligence in complying with the scheduling order, it cannot comply with the order due to matters

that could not have reasonably been foreseen or anticipated at the time of the scheduling

conference, and (iii) that the party was diligent in seeking amendment once it became apparent

that compliance was not achievable without a scheduling modification. *See Dag Enters., Inc. v.

Exxon Mobil Corp.*, 226 F.R.D. 95, 106 (D.D.C. 2005) (Kollar-Kotelly, J.).

Here, Plaintiffs have diligently pursued discovery of the responsive documents

somewhere in United's document production, diligently sought to understand the issues with

United's production (in the face of United's silence) and whether they could be corrected or

mitigated without a schedule extension, and promptly moved to modify the scheduling order

when it became apparent that such correction or mitigation was not achievable under the pending

schedule.

First, Plaintiffs have assisted the Court in developing a discovery schedule. Prior to the

Court's January 26, 2017 scheduling conference, Plaintiffs conferred with Defendants to

negotiate a case schedule, and, when agreement could not be reached proposed their own

discovery schedule to the Court, providing for a 15-month discovery period, which the Court

adopted. *See* ECF Nos. 144 & 152. When both Parties agreed that the schedule was not

practicable based on the state of their discovery negotiations and the uncertainty of the time

needed for Defendants' production and Plaintiffs' review, with the Special Master's

encouragement, Plaintiffs and Defendants jointly proposed a modification of the schedule, with

their proposals differing only regarding whether fact discovery should close six months or nine months after Defendants completed their document productions. *See* Feb. 5, 2018 Status Report (ECF No. 204); ECF No. 207.

Second, Plaintiffs have diligently pursued discovery. After fact discovery opened in late January 2017, Plaintiffs promptly served their core document requests on Defendants the following month. As described in the Declaration of Jeannine M. Kenney, attached hereto, and in the Status Reports filed by the Parties, the Parties spent many months from spring through winter 2017 negotiating Defendants' objections to those requests,[10] proposed custodians, and the scope of Defendants' productions, and search methodologies used to produce the sought-after discovery and protocols regarding the same. Kenney Decl. ¶ 5-8; *see also* May 4, 2017 Joint Status Report (ECF No. 166); Sept. 14, 2017 Status Report (ECF No. 186); Nov. 13, 2017 Joint Status Report (ECF No. 194); Feb. 5, 2018 Joint Status Report (ECF No. 204). As noted, Plaintiffs have dedicated some 70 attorneys to reviewing documents produced. Plaintiffs have also diligently pursued production of documents withheld by Delta and United, by, for example, dedicating more than 30 attorneys to reviewing United's more than 40,000 entry log and preparing challenges to improperly withheld documents. Kenney Decl. ¶ 13. Here, Plaintiffs do not seek the extension to serve *new* discovery not previously pursued, but rather to afford them a meaningful opportunity to review the discovery they have diligently pursued and for which they secured production.

Third, Plaintiffs could not have foreseen United's voluminous document production made up predominantly non-responsive documents resulting from its deficient TAR process

---

[10] When Plaintiffs and Defendants United and Delta reached an impasse, Plaintiffs timely moved to compel their document production. *See* Notice of Motion (ECF No. 182).

when they jointly proposed an extension of the fact discovery deadline in February 2018.

Instead, Plaintiffs had anticipated significant document productions totaling about 3 million

documents (six times larger than the DOJ production), based on an extrapolation of the volumes

produced to the DOJ (approximately 500,000 documents total from a two-year collection period)

after accounting for the larger class discovery period and the number of custodians in the civil

action. Kenney Decl. ¶ 11.[11] At that volume, Plaintiffs believed a nine-month period for review

of documents and testimonial discovery would be challenging but workable. Instead, American,

Delta, and United, produced 6 million documents in their core productions, more than twice the

volume anticipated by Plaintiffs and 12 times the volumes produced to the DOJ. United

produced more documents than Delta and American *combined*, and *more than 33 times* the

volume it produced to DOJ. Nor could Plaintiffs have anticipated that United's voluminous

production would consist nearly entirely of non-responsive documents, unnecessarily hindering

Plaintiffs ability to review the responsive documents buried therein within the proposed

timeframes.

Fourth, as described above, Plaintiffs diligently reviewed United's TAR metric

disclosures made on the eve of United's core production, consulted with their ESI expert

regarding the same, and timely posed questions to United about the discrepancies in the

disclosures. United ignored Plaintiffs' inquiries for a month, despite Plaintiffs' follow-up. Then,

after meeting and conferring with Plaintiffs and committing to seek answers from its vendor,

United failed to make good on that commitment for yet another month. It only did so after

Plaintiffs repeatedly requested a response. That is, it took two months for Plaintiffs' to get

---

[11] Indeed, as to American and Delta, this extrapolation was fairly accurate. American, in fact, produced about 1.1 million documents in its core production, and Delta produced about 1.3 million documents. United is the outlier, owing to its poor level of precision.

responses to their reasonable questions about the precision and recall of United's TAR production. Here, Plaintiffs were diligent; United delayed.

Finally, Plaintiffs were diligent in timely filing this motion after it became apparent that they could not conduct a meaningful review of Defendants' document production sufficient to prosecute this case on the merits without an extension. As described above, Plaintiffs have devoted considerable resources to reviewing and attempting to prioritize United's document production. They also looked for technical solutions, internal to their own review tools, to expedite and prioritize review of responsive documents (and weed out non-responsive ones) without need for an extension. When it became clear that these tools were unavailing in the face of the exorbitant amount of non-responsive material produced by United, Plaintiffs timely notified Defendants and the Special Master of their intent to seek an extension.

Plaintiffs' demonstrated diligence provides good cause to modify the Scheduling Order. *See, e.g.*, *Abraham v. WPX Prods., LLC*, No. 12-cv-0917, 2016 WL 548251, at *12 (D.N.M. Jan. 25, 2016) ("Where a party is diligent in its discovery efforts and nevertheless cannot comply with the scheduling order, the Court has found good cause to modify the scheduling order if the requesting party timely brings forward its request."); *Marvin Lumber & Cedar Co. v. Norton Co.*, 113 F.R.D. 588, 594 (D. Minn. 1986) (granting extension where the case schedule had been tight to keep the parties attentive to the need to proceed expeditiously, time had been well utilized, and considerable work had been accomplished, and remaining time was insufficient to complete discovery).

## C.    Plaintiffs Would Be Prejudiced Without a Schedule Extension.

United's decision to dump nearly 3 million non-responsive documents on Plaintiffs, without any effort to improve precision (for example, through its own review), shifted the burden

of United's pre-production review to Plaintiffs. *See* Grossman Decl. ¶ 17. In doing so, it has prejudiced Plaintiffs' in conducting the meaningful and timely review of United's documents and in preparing for depositions of all parties and non-parties under the current Scheduling Order. Plaintiffs' time has been and will be spent reviewing irrelevant documents in lieu those important to this action or even central to resolution of this case on the merits.

Absent a schedule extension, Plaintiffs will be forced to proceed with depositions, and possibly to summary judgment at the close of fact discovery, without the benefit of a sufficient review of the documents.[12] Such a review will not only affect the scope of the depositions, documents presented, and the line of inquiry pursued in depositions, it may also affect who Plaintiffs chose to depose in the first place. Without an adequate amount of time to review Defendants' voluminous productions, isolate the responsive documents for review in United's production, and develop a clear picture of the evidence, Plaintiffs cannot adequately assess the proper scope of the depositions, which documents should be exhibits, or who they need to depose. In addition, without sufficient document review to form an adequate factual record, Plaintiffs and their experts are hindered in preparing for Class Certification as such review is necessary to test and form expert hypotheses on a full record and otherwise gather evidence to demonstrate Plaintiffs' ability to prove impact and damages using proof common to the class.

Courts have long recognized the purpose of discovery to permit actions to be decided on the merits rather than on incomplete facts. *See, e.g., Coleman v. Blockbuster, Inc.*, 238 F.R.D.

---

[12] United (together with Delta) has notified Plaintiffs of its intent to move to amend the scheduling order to provide for summary judgment motions at the close of fact discovery in January 2019. While that proposal is not surprising given Defendants' knowledge of the burdens imposed on Plaintiffs by the tsunami of non-responsive documents, Plaintiffs would be severely prejudiced if forced to defend against a dispositive motion without a reasonable time to find and review United's responsive documents and develop a meaningful testimonial record so that this case can be resolved on the merits.

167, 172 (E.D. Pa. 2006) (granting discovery extension despite prior extensions to permit the

case to be decided on the merits); *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 526

(D. Md. 2010) ("The civil justice system is designed for courts to decide cases on their merits,

and to do so, the fact-finder must review the facts to discern the truth.").

Accordingly, proceeding on the current fact discovery schedule in light of United's

enormous production and the burdens imposed on Plaintiffs is inconsistent with judicial policies

favoring resolution of matters on the merits. Indeed, because of the burden and prejudice

imposed on requesting parties by production of voluminous non-responsive materials, courts

disfavor such document dumps. *See, e.g., Haughton v. D.C.*, 315 F.R.D. 428, 430 (D.D.C.),

*objections overruled*, 161 F. Supp. 3d 100 (D.D.C. 2014) ("Plaintiff should not have to sort

through all of Defendant's records to find the responsive documents."); *Clientron Corp. v. Devon*

*IT, Inc.*, 310 F.R.D. 262, 266, 270-71 (E.D. Pa. 2015) (considering sanctioning data dump of 93

boxes of irrelevant documents); *Kwasniewski v. Sanofi-Aventis U.S. LLC*, No. 12-cv-515, 2013

WL 3297182, at *2-3 (D. Nev. June 28, 2013) (granting motion to compel where party produced

80,000 documents without identifying which are responsive, noting "[t]he Plaintiffs should not

have to guess which requests were responded to and which were not"); *Williams v. Taser Int'l,*

*Inc.*, No. 06-cv-51, 2006 WL 1835437, at *7 (N.D. Ga. June 30, 2006) (noting that "were the

Court to conclude that [defendant] had been "overly generous" in identifying responsive

documents so as to unduly burden Plaintiffs in their search of those documents, the Court would

similarly require [defendant] to organize and label documents as responsive to Plaintiffs'

requests"); *City of Colton v. Am. Promotional Events, Inc.*, 277 F.R.D. 578, 584–85 (C.D. Cal.

2011) (finding that whether a production complies with Rule 34(b)(2)(E)(i) will be determined

by whether it "allows the requesting party to reasonably determine what documents are

responsive to its requests"). A denial of the requested extension under these circumstances excuses and incentivizes electronic document dumps that contravene the truth-seeking goals of discovery.

**D.      Defendants Would Not Be Prejudiced by the Proposed Schedule Extension.**

Plaintiffs' proposal works no prejudice on Defendants. Plaintiffs are seeking this extension five months before the fact discovery deadline, not after the close of fact discovery or on the eve of summary judgment or trial, when courts may be loath to require opposing parties to alter their already developed strategies or disrupt a trial schedule. *See, e.g.*, *Youssef v. Lynch*, No. 11-cv-1362, 2016 WL 10674025 (D.D.C. Apr. 29, 2016) (denying motion to reopen discovery). But here, the extension works no unfair surprise on Defendants; they remain free to proceed with depositions of Plaintiffs or any third-party at any time and develop their merits strategy.

Further, the extension would not risk additional depositions of witnesses already deposed, as no depositions have taken place. Nor does the discovery extension permit Plaintiffs to take any more depositions than those to which they are presenting entitled under the Discovery Order (10 of any Defendants current or former employees). As under the current schedule, to exceed those limits, Plaintiffs would need Defendants' consent or leave of Court. Plaintiffs' proposal merely shifts the time at which those depositions are likely to occur—after Plaintiffs have had a reasonable opportunity to review documents and prepare for them. And extending discovery may, in fact, lead to fewer party and third-party depositions, after Plaintiffs have had the opportunity to hone in on the testimonial evidence they need after a reasonable review of the documentary record.

Nor are Plaintiffs seeking the extension to serve *new* discovery. Plaintiffs intend that the deadlines for additional document requests and interrogatories remain undisturbed, now set for

the end of this month and the end of September. The only impact of Plaintiffs' proposed

extension is to shift the case schedule out six months for the fact discovery and class certification

deadline, depositions, requests for admissions, and motions to compel. Plaintiffs' proposal does

not affect the pretrial schedule since the schedule for summary judgment, other pretrial

proceedings, and trial has not been set. Plaintiffs' need for sufficient time to review the

documentary record—key to liability in this case—prior to taking depositions outweighs any

potential inconvenience to Defendants from a six-month delay. *Cf. United States v. Sci.*

*Applications Int'l Corp.*, 301 F.R.D. 1, 4 (D.D.C. 2013) ("[M]inimal delay to the trial is

significantly outweighed by the potential value the evidence has to a central issue at retrial.").

Where the only prejudice is the passage of time, courts are often reluctant to reject an extension

where the other factors weigh in favor of one. *See, e.g.*, *In re Christou*, No. 06-68251, 2008 WL

7880888, at *1 (Bankr. N.D. Ga. Nov. 30, 2008) (granting discovery extension where opposing

party had "presented no specific evidence of prejudice except the mere passage of time"); *Equal*

*Rights Ctr.*, 2008 WL 11391642, at *2 (finding prejudice minimal where trial and summary

judgment deadlines were still distant).

### E.  The Court's Prior Extension of the Discovery Schedule Does Not Preclude a Further Extension and is Consistent with Schedules in Complex MDLs.

Although whether prior schedule extensions have been granted is a factor courts consider

upon motions for discovery extension, here the prior extension was granted upon a February

2018 joint request for schedule modifications by the Parties, not solely a request by Plaintiffs.

*See* Feb. 5, 2018 Joint Status Report. That schedule modification was necessitated because the

close of fact discovery and the deadline for class certification was fast approaching, but non-

transactional documents had largely not been produced and no deadline had been set for their

production.[13] At the encouragement of the Special Master, the parties waited until they had

largely completed search methodology negotiations to propose a schedule so Defendants would

have realistic sense of how much time was needed for production. Nov. 13, 2017 Joint Status

Report at 3-4. Under such circumstances, the prior extension should not bar the additional

extension Plaintiffs seek to review Defendants' voluminous document productions. *See, e.g.*,

*Watt v. All Clear Bus. Sols., LLC*, 840 F. Supp. 2d 324, 325-27 (D.D.C. 2012) (granting

extension even where moving party had previously been granted at least one extension to the

discovery deadline and the parties together had previously requested and been granted a further

continuance of the discovery deadline). Moreover, in large multi-district antitrust actions such as

this, where document productions are often voluminous and the facts are complex, extensions of

the fact discovery deadlines are frequently granted, and discovery periods far longer than those

sought here are common.[14] Accordingly, the discovery period sought by Plaintiffs' motion is

consistent with the orderly management of complex antitrust multidistrict litigation.

---

[13] All airlines had produced transactional data in July 2017. Kenney Decl. ¶ 7. But production of non-transactional documents had largely not begun. American Airlines did make rolling productions beginning in the fall of 2017, but had not completed its core production. *Id.* ¶ 16. Similarly, in early 2018, United began limited production, but had only produced a fraction of its core document production. *Id.*

[14] *See, e.g.*, *In re Polyurethane Foam Antitrust Litig.*, No. 10-md-02196 (N.D. Ohio) (discovery proceeded from April 27, 2011 (ECF No. 112) to February 28, 2014 (ECF 1033), with four interim fact discovery extensions (ECF Nos. 354, 417, 814, 1033)); *In re Thalomid and Revlimid Antitrust Litig.*, No. 14-cv-6997 (D.N.J.) (discovery proceeded from July 6, 2015 (ECF No. 49) to May 17, 2018 (ECF No. 173), with three interim fact discovery extensions (ECF Nos. 118, 137, 173)); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-md-1775 (E.D.N.Y.) (discovery proceeded from November 12, 2009 (ECF No. 1030) until December 31, 2013 (ECF No. 1729), with the fact discovery deadline extended three times (ECF Nos. 1335, 1513, 1729)); *In re Blue Cross Blue Shield Antitrust Litig.*, No. 13-cv-20000 (N.D. Ala.) (discovery began in 2014 (ECF No. 229) and proceeded until December 1, 2017 (ECF No. 1567), with three interim fact discovery extensions (ECF Nos. 575, 989, 1567)); *In re NCAA Student-Athlete Name and Likeness Litig.*, No. 09-cv-1967 (N.D. Cal.) (discovery proceeded from July 6, 2010 (ECF No. 224) to January 15, 2013, with three interim fact discovery extensions (ECF Nos. 439, 600, 632)); *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002 (E.D. Pa.) (negotiations

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs'

request for a six-month extension of the fact discovery period.

Dated: August 24, 2018

By: /s/ *Michael D. Hausfeld*
Michael D. Hausfeld
Hilary K. Scherrer
Jeannine Kenney
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
mhausfeld@hausfeld.com
hscherrer@hausfeld.com
jkenney@hausfeld.com

Michael P. Lehmann
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908
mlehmann@hausfeld.com

By: /s/ *Adam J. Zapala*
Adam J. Zapala
Elizabeth T. Castillo
Adam J. Trott
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
azapala@cpmlegal.com
ecastillo@cpmlegal.com
atrott@cpmlegal.com

Alexander E. Barnett
COTCHETT, PITRE & McCARTHY, LLP
40 Worth Street, 10th Floor
New York, NY 10013
Telephone: 212.201.6820
abarnett@cpmlegal.com

*Plaintiffs' Interim Co-Lead Counsel*

---

regarding scope and form of production and discovery protocols began April 21, 2010 during a discovery stay (ECF 320), with discovery and document production later proceeding from April 25, 2012 (ECF 656) to April 30, 2014 (ECF 869), with one interim extension of the fact discovery deadline (ECF 869)); *In re Municipal Derivatives Antitrust Litig.*, No. 08-cv-2516 (S.D.N.Y.) (limited discovery began on May 27, 2010 (ECF No. 755), then began in earnest after a stay was modified on June 14, 2013 (ECF No. 1784) and subsequently lifted on June 25, 2014 (ECF No. 1909), and continued until August 30, 2015 (ECF No. 1946), with certain depositions continuing until June 15, 2016 (ECF No. 1988)); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-md-1827 (N.D. Cal.) (limited discovery began after a partial stay was entered on September 25, 2007 (ECF No. 300), increased after the stay was modified in early 2008 (ECF Nos. 493 & 631), began in full after the stay was lifted on January 9, 2009 (ECF No. 986 at 4), and continued until May 11, 2011 (ECF No. 1875)); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-md-2420 (N.D. Cal.) (discovery proceeded from July 11, 2014 (ECF No. 475) to February 1, 2018 (ECF No. 1964)); *In re Automotive Parts (Wire Harness Systems)*, No. 02-md-2311 (E.D. Mich.) (discovery began June 6, 2013 (ECF 201) and closed Sept. 1, 2016 (ECF 273)).

Elizabeth J. Cabraser
Eric B. Fastiff
Brendan P. Glackin
LIEFF CABRASER HEIMANN &
BERNSTEIN
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
ecabraser@lchb.com
efastiff@lchb.com
bglackin@lchb.com

Warren T. Burns
Daniel H. Charest
BURNS CHAREST LLP
500 North Akard Street, Suite 2810
Dallas, TX 75201
Telephone: (469) 904-4550
wburns@burnscharest.com
dcharest@burnscharest.com

Robert N. Kaplan
Gregory K. Arenson
Elana Katcher
KAPLAN, FOX & KILSHEIMER LLP
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
rkaplan@kaplanfox.com
garenson@kaplanfox.com
ekatcher@kaplanfox.com

*Plaintiffs' Executive Committee*