UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE DOMESTIC AIRLINE TRAVEL ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>ALL CASES | MDL Docket No. 2656<br>Misc. No. 15-1404 (CKK)<br><br>JURY TRIAL DEMANDED |

**DECLARATION OF MAURA R. GROSSMAN
IN SUPPORT OF PLAINTIFFS' MOTION FOR AN
EXTENSION OF FACT DISCOVERY DEADLINES**

Pursuant to 28 U.S.C. § 1746, I, Maura R. Grossman, declare:

1. I am a Research Professor in the David R. Cheriton School of Computer Science at the University of Waterloo, in Ontario, Canada, as well as an eDiscovery attorney and consultant in New York. I also am an Adjunct Professor of Law at Osgoode Hall Law School at York University in Ontario, Canada. Since 2010, I have taught more than a dozen courses on electronic discovery at Columbia Law School, Georgetown University Law Center, Pace University Law School, and Rutgers Law School–Newark.

2. I received my Juris Doctorate (J.D.), *magna cum laude*, *Order of the Coif*, from the Georgetown University Law Center. I also hold masters (M.A.) and doctoral (Ph.D.) degrees from The Derner Institute of Advanced Psychological Studies at Adelphi University, and a Bachelor of Arts (A.B.), *magna cum laude*, with Honors in Psychology, from Brown University.

3. For seventeen years, I was a litigator at the New York law firm of Wachtell, Lipton, Rosen & Katz; from 2007 until my departure in June, 2016, I oversaw the firm's eDiscovery processes and conducted over 100 technology-assisted reviews. For more than ten

1

years, I have been advising lawyers and clients on legal, technical, and strategic issues involving eDiscovery and information governance, and I am an internationally recognized expert in the field of technology-assisted review ("TAR") technologies and processes.

4. I have served as a court-appointed neutral or special master in several high-profile federal cases: *National Day Laborer Organizing Network* v. *U.S. Immigration and Customs Enforcement Agency*, No. 10 Civ. 3488 (S.D.N.Y 2011), where District Judge Shira A Scheindlin appointed me to mediate search disputes; *Rio Tinto* v. *Vale*, No. 14 Civ. 3042 (RMB) (AJP), 2015 WL 4367250 (S.D.N.Y. July 15, 2015), where Magistrate Judge Andrew J. Peck appointed me to resolve disputes that arose in connection with the use of TAR; *In Re Broiler Chicken Antitrust Litigation*, No. 16 Civ. 08637 (N.D. Ill. Oct. 2, 2017), where Magistrate Judge Jeffrey T. Gilbert appointed me to oversee all eDiscovery disputes, particularly those involving search methodologies; and *Airquip, Inc. v. HomeAdvisor, Inc.*, No. 16-cv-01849-PAB-KLM (D. Colo. Apr. 9, 2018), where Magistrate Judge Kristen L. Mix appointed me to manage and supervise discovery and to resolve all discovery disputes. In Judge Peck's Opinion and Order of appointment in the *Rio Tinto* case, he referred to me as "one of the most knowledgeable lawyers (if not *the* most knowledgeable lawyer) about TAR . . . ." 2015 WL 436720, at *1.

5. My research on TAR with University of Waterloo Computer Science Professor Gordon V. Cormack has been cited approvingly in numerous federal cases, beginning with *Da Silva Moore v. Publicis Groupe*, 287 F.R.D. 182, 190 (S.D.N.Y. 2012). Most notably, our study, *Technology-Assisted Review in E-Discovery Can Be More Effective and More Efficient Than Exhaustive Manual Review*, published in Volume 17 of the Richmond Journal of Law and Technology (2011) has been widely cited in case law, both in the U.S. and abroad.

6. I have provided many eDiscovery training programs on TAR and other eDiscovery topics to federal and state court judges, by invitation of the court, and have testified, on several occasions, before the Advisory Committees on the Federal Rules of Civil Procedure and the Evidence Rules, at their invitation.

7. I have been retained by Plaintiffs in the above-captioned litigation to consult on discovery issues related to electronically stored information, particularly as relates to search methodologies and TAR.

8. I submit this declaration in support of Plaintiffs' Motion for an Extension of Fact Discovery Deadlines. I am generally familiar with these proceedings, the issues that have been raised in this Motion, have personal knowledge of the matters set forth herein, and if called upon and sworn as a witness, I could competently testify thereto.

9. Professor Cormack and I first coined the term "technology-assisted review" or "TAR" in our 2011 Richmond Journal paper (referenced in ¶ 5 above). We subsequently defined the term more formally in *The Grossman-Cormack Glossary of Technology-Assisted Review*, published in Volume 7 of Federal Courts Law Review (2013). Basically, TAR is a process for ranking—from most to least likely to be responsive—or for classifying—as responsive or non-responsive—a document collection, using computer software that learns to distinguish between responsive and non-responsive documents based on coding decisions made by one or more knowledgeable reviewers on a subset of the document collection. The software then applies what it has learned to the remaining documents in the collection. While TAR tools differ in their specific mechanisms and workflows, all TAR tools either rank or classify documents based on their likelihood of being responsive.

10. Search and review efforts are typically evaluated using two metrics drawn from the science of information retrieval. One is referred to as *recall*, which is a measure of *completeness*, reflected by the proportion (*i.e.*, percent) of responsive documents that have been found through a search or review process, out of all possible responsive documents in the collection. For example, if there were 100 responsive documents in a collection of 1,000 documents, and a search or review effort identified 450 documents for production, 90 of which were actually responsive, its recall would be 90/100, or 90%. The other metric is referred to as *precision*, which is a measure of *accuracy*, or the proportion (*i.e.*, percent) of the documents identified by a search or review process that are actually responsive. Using the same example, precision would be 90/450, or 20%. High recall (*e.g.*, 90%) suggests that substantially all responsive documents have been found; high precision suggests that primarily responsive documents have been found. On the other hand, low precision (*e.g.*, 20%) indicates that a search or review effort has categorized many documents as responsive when they are not; in other words, the production contains a high number of false positives. In this particular example, 360 of the 450 produced documents are false positives.

11. Many TAR tools, particularly those referred to in the industry as "simple active learning" or "SAL," strive to achieve an optimal balance between recall and precision (a "recall/precision threshold"), so as to capture as many of the responsive documents as possible, without capturing an unacceptably high number of non-responsive documents.

12. It is my understanding that Defendant United Airlines, Inc. ("United") produced approximately 3.5 million documents to Plaintiffs that were classified as responsive by its TAR tool based on a recall/precision threshold established by United.

13.     It also is my understanding that United provided to Plaintiffs, nearly contemporaneous with its production, certain statistics derived from a random sample of documents classified by its TAR tool, from which Plaintiffs were able to estimate recall and precision, pursuant to a stipulated validation protocol I had previously proposed. Those statistics revealed that United's production set had an estimated recall of 97%, and an estimated precision of only 17%.

14.     It follows from these statistics that, of the approximately 3.5 million documents United produced to Plaintiffs, *five out of every six documents were actually non-responsive*. Based on Plaintiffs' recall estimates, of the 3.5 million documents produced by United, approximately 600,000 are responsive to Plaintiffs' requests for production, and the other 2.9 million are not.

15.     It is common practice for responding parties to manually review the documents classified as responsive by their TAR tool, or those falling above the recall/precision threshold they set, before producing them. This is done in order to determine which documents are actually responsive and to remove those that are not, and also to determine which documents may be subject to a claim of privilege or attorney work product, or require a confidentiality designation.

16.     It is my understanding that United chose not to manually review the documents that fell above its chosen recall/precision threshold prior to its production of those documents to Plaintiffs. It is further my understanding that United chose this threshold (yielding 97% recall and 17% precision) without consulting with Plaintiffs.

17.     Because the documents falling above United's chosen recall/precision threshold were never manually reviewed before production, the low precision was never corrected, and as

a consequence *five times as many non-responsive documents as responsive documents were produced* to Plaintiffs. Thus, United's choice essentially shifted the cost and burden of the review for responsiveness from itself to Plaintiffs. Had the documents above the recall/precision threshold been manually reviewed before production, there would have been little opportunity for large numbers of non-responsive documents to make their way into the production set. When this pre-production review practice is employed, the parties tend to focus more on the recall (or completeness) of the production, under the assumption that the precision is likely to be adequate. But when the documents are not manually reviewed—as was the case here—the importance of precision increases because very low precision imposes substantial additional burden and cost on the receiving party.

18. I am not aware of any way for Plaintiffs to distinguish those documents in United's production that are responsive from those that are not, other than by doing one or more of the following: (i) manually reviewing all 3.5 million documents, which is impractical; (ii) applying search terms to the 3.5 million documents and reviewing all the "hits," which would be unlikely to achieve sufficiently high recall; or (iii) reapplying TAR—from scratch—to the 3.5 million documents produced by United to distinguish the responsive from the non-responsive documents.

19. It is my understanding that in light of the very low precision of its production, United has offered to identify, by means of a production "overlay," those documents that would have been produced at higher levels of precision. In my opinion, that is not a viable solution. For example, my understanding is that according to United, if the precision were set to a more reasonable level of 57.2%, the recall (that is, the percentage of responsive documents that would be produced) would drop to 56%, so that instead of containing approximately 600,000

6

responsive documents, the production set would contain only about 344,000. Therefore, Plaintiffs would have to forego some 250,000 responsive documents in order to substantially reduce their review effort.

20. I note that, by way of comparison, information retrieval research has shown that high-quality manual review can achieve about 70% recall, *and at the same time*, 70% precision. TAR should be able to match or exceed these results.

21. According to information supplied by United to Plaintiffs, which I have reviewed, other possible tradeoffs between recall and precision also fail to achieve a reasonable compromise between missing too many responsive documents and including too many non-responsive documents. *None of the recall/precision thresholds can achieve anywhere near 70% recall, and at the same time, 70% precision.* Therefore, it is my opinion that even if such an overlay could be provided, it would not resolve the shortcomings of United's production, or significantly advance Plaintiffs' ability to sift through the responsive and non-responsive documents in United's production.

22. I am not aware of a feasible remedy other than those identified in ¶ 18 above, all of which would require substantial time and effort on the part of Plaintiffs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this **24**th day of August 2018 in Waterloo, Ontario, Canada.

*Maura R. Grossman*
Maura R. Grossman