**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE DOMESTIC AIRLINE TRAVEL ANTITRUST LITIGATION | MDL Docket No. 2656 Misc. No. 15-1404 (CKK) |
| This Document Relates To: ALL CASES. | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR AN**
**<u>EXTENSION OF FACT DISCOVERY DEADLINES</u>**

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................................1

II.     ARGUMENT ..................................................................................................................1

        A.     Plaintiffs Have Consistently Sought To Balance Recall And Precision .......................4

               1.     The Negotiation History and TAR Protocol with United
                      Evidence Plaintiffs' Concern About Precision .......................................................4

               2.     Plaintiffs' Negotiations with Delta Similarly Evidence Plaintiffs'
                      Concern About Precision ..........................................................................................8

        B.     United's Production Was Unreasonable ......................................................................9

        C.     Plaintiffs Have Been Diligent In Pursuing Discovery And Defendants
               Have Articulated No Prejudice ................................................................................12

III.    CONCLUSION ............................................................................................................ 17

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Da Silva Moore v. Publicis Groupe & MSL Grp.*,
287 F.R.D. 187 (S.D.N.Y. 2012) ..................................................................................................1

*Dynamo Holdings Ltd. P'ship v. Comm'r of Internal Revenue*,
No. 2685-11, 2016 WL 4204067 (T.C. July 13, 2016) ...............................................................10

*Federal Houston Fin. Agency v. H.S.B.C. N.A. Holdings, Inc.*,
No. 11 Civ. 6189, 2014 WL 583900 (S.D.N.Y. Feb. 14, 2014) ....................................................1

*Progressive Cas. Ins. Co. v. Delaney*,
No. 2-11-CV-00678-LRH-PAL, 2014 WL 3563467 (D. Nev. July 8, 2014) .................................2

*Rio Tinto PLC v. Vale, S.A.*,
306 F.R.D 125 (S.D.N.Y. 2015) ...................................................................................................1

*Saunders v. District of Columbia*,
279 F.R.D. 35 (D.D.C. 2012) ......................................................................................................17

*St. Paul Mercury Ins. Co. v. Capitol Sprinkler Inspection, Inc.*,
No. 05–2115 (CKK), 2007 WL 1589495 (D.D.C. Jun. 1, 2007) .................................................17

*Watt v. All Clear Business Solutions*,
840 F. Supp. 2d 324 (D.D.C. 2012) ............................................................................................17

## I.     INTRODUCTION

The issue here is clear: United Airlines ("United") dumped nearly three million non-responsive documents upon Plaintiffs, thus impeding them from prosecuting their claims.  The reality of this situation only became apparent in late July, when United finally clarified the inconsistency in the metrics of responsiveness provided to Plaintiffs.  Plaintiffs will consequently require additional time to review these documents and take depositions with the fruits of that review.  This situation is what has led Plaintiffs to move for an extension of the fact discovery and related deadlines.  United opposes this request, denying that its own conduct is the source of the problem here.  United instead seeks to shift the blame to Plaintiffs in the hope that doing so will divert the Court's attention from what actually occurred.  This tactic, however, is based on mischaracterizations of the negotiations between the parties and on an unreasonable view of the scope of the production and the time necessary to review it.

For all of these reasons and as more fully stated below and in Plaintiffs' opening brief, Plaintiffs' motion for an extension of the fact discovery and related deadlines is fully warranted and should be granted.

## II.    ARGUMENT

Courts opining on the use of Technology Assisted Review ("TAR") have held that cooperation, disclosure, and transparency are essential to its use.[1]  But for such transparency to

---

[1] *See, e.g.*, *Rio Tinto PLC v. Vale, S.A.*, 306 F.R.D 125, 127 (S.D.N.Y. 2015)*; Da Silva Moore v. Publicis Groupe & MSL Grp.,* 287 F.R.D. 187, 192 (S.D.N.Y. 2012); *Federal Houston Fin. Agency v. H.S.B.C. N.A. Holdings, Inc.,* No.11 Civ. 6189, 2014 WL 583900, at *3 (S.D.N.Y. Feb. 14, 2014). As noted in one decision, "The article written by [plaintiff's] e-discovery consultant and his co-authors mentioned earlier cogently and comprehensively explains why technology assisted review has not received widespread acceptance by litigants, their counsel, and the judiciary.  The cases which have approved technology assisted review of ESI have required an unprecedented degree of transparency and cooperation among counsel in the review

mitigate concerns about TAR and ensure it is effectively and accurately carried out, such transparency must be timely.  Here, consistent with this understanding, Plaintiffs and United negotiated a TAR Protocol that required United's disclosure of statistics from which Plaintiffs could assess the accuracy (precision) and effectiveness (recall), or lack thereof, of United's TAR process prior to production so the parties could meet and confer about them and bring any disputes to the Court.

The foregoing is not what occurred.  Instead, United waited until it was far too late to take corrective action to disclose statistics suggesting that its TAR tool, though effective in finding responsive documents, buried such documents in a sea of non-responsive documents. Worse, United simultaneously disclosed other statistics suggesting the opposite conclusion (as it admits), and then failed to respond meaningfully to Plaintiffs' reasonable inquiries about the contradictory statistics for two months.  Because it cannot excuse those failures, United blames Plaintiffs for not unraveling its contradictory statistics sooner (in the face of United's protracted silence) and for being unable to mitigate *the very problem* Plaintiffs sought to prevent by requiring United's advance disclosure of recall and precision.

United does not (and cannot) deny that, without any advance disclosure, and in contravention of the plain language and intent of the parties' TAR agreement, United *unilaterally* determined that a recall rate of 97% was desirable and a corresponding precision rate of 17% was reasonable, and then dumped on Plaintiffs some 3.5 million documents, including 2.9 million irrelevant ones.  Notably, United does not even attempt to argue that Plaintiffs actually *asked* for 97% recall or even knew it was obtainable (much less at what cost).  Plaintiffs were never given

---

and production of ESI responsive to discovery requests." *Progressive Cas. Ins. Co. v. Delaney*, No. 2-11-CV-00678-LRH-PAL, 2014 WL 3563467, at *10 (D. Nev. July 8, 2014).

an opportunity prior to the production to reject this outcome. Contrary to United's assertions, Plaintiffs' desire for at least 75% recall, and higher recall if possible, was never unbounded. Rather, from the outset, Plaintiffs proposed the higher recall rates only if obtainable at reasonable precision levels. As the negotiation history makes clear, Plaintiffs *always* sought to strike a balance between precision and recall. That is precisely why they sought disclosure of United's TAR validation metrics that would reveal the precision rate obtained, and why the TAR Protocol anticipated the parties would meet and confer regarding recall levels above 75% and again after disclosure of the precision and recall metrics. United did not have the right, under the TAR Protocol, to unilaterally determine what level of precision was reasonable. And its claim, made for the *very first time* in its opposition brief, that Plaintiffs could have opted for 45% precision rate at 75% recall, is patently false: Plaintiffs did not have that option, as United well knows, because United never offered it to them until the filing of its brief opposing Plaintiffs' request for a schedule extension.

Thus, contrary to Defendants' assertions, Plaintiffs' request for an extension is not premised on a *post hoc* argument about the importance of precision. It is instead premised on the fact that United dumped an unanticipated 2.9 million non-responsive documents on Plaintiffs and that United's belated, incomplete, and conflicting information about its production has hampered Plaintiffs' ability to find a reasonable solution.

Plaintiffs are simply asking for additional time to review documents and prepare for and take depositions in an orderly fashion so that this case can properly be decided on the merits rather than gamesmanship. Defendants have raised no cognizable prejudice that they would suffer. Instead, as their papers make clear, their preference is to use the schedule as leverage against Plaintiffs, given their knowledge of the significant burden United's production has

caused.  In light of the prejudice Plaintiffs would face under the current schedule, and the fact

that Plaintiffs have diligently pursued the discovery at issue, Plaintiffs respectfully request that

the Court grant a six-month extension of the discovery deadlines.

      **A.**    **Plaintiffs Have Consistently Sought to Balance Recall and Precision.**

United's assertion that Plaintiffs were never concerned with precision is belied by the

negotiating history in this case.  As discussed in more detail below, the meet and confer process

regarding Defendants' search methodologies was protracted and arduous.  But underlying these

negotiations is the fact that Plaintiffs *always* sought to balance recall and precision.  And while

Plaintiffs were aiming for high recall, they only did so as long as a reasonable precision rate

could be achieved—which did not occur.

      **1.**    **The Negotiation History and TAR Protocol with United Evidence Plaintiffs' Concern about Precision.**

The Stipulation and Order Regarding the Search for and Production of Electronically

Stored Information and Hard Copy Documents ("ESI Order") entered by the Court (not to be

confused by the TAR Protocol negotiated and agreed to by Plaintiffs and United), set forth the

basic search methodology requirements, as well as required the producing party to make basic

disclosures regarding their search methodology.  *See generally* ECF No. 167.  With respect to

TAR, the ESI Protocol required the producing party to disclose the name and description of its

TAR tool and the vendor, identify the custodians and data sources to which TAR would be

applied and any document types that would be excluded from TAR, and to make other

disclosures reasonably necessary for the receiving party to evaluate the proposed TAR process.

*Id.* at 8.

United made the required disclosures on October 3, 2017, laying out the general process

it would use to apply TAR to custodial data sources and attaching materials provided by its

vendor that made certain disclosures about its TAR tool, known as Brainspace Discovery 5

("Brainspace").[2]  United disclosed that its process would involve a training set that would be

reviewed for responsiveness and non-responsiveness, as well as verification procedures to

determine whether the tool was achieving the "appropriate classification proficiency"—that is,

whether the tool was properly classifying responsive documents as responsive and non-

responsive documents as non-responsive.  *See* Ex. 1 at 2.  United also stated its intent to achieve

75% recall, which it characterized as the industry standard.  *Id.* at 1.

Plaintiffs did not object to United's use of Brainspace nor did they have any reason to do

so, given the representations and disclosures they were provided.  For example, Brainspace's

disclosures asserted that its patented tools included algorithms and other mechanisms that

"increase accuracy and relevance" and that "[u]nlike other solutions that depend on traditional

Latent Semantic Analysis (LSA) that suffers from high recall and low precision, Brainspace's

innovative approach . . . *significantly increases the accuracy without sacrificing recall*."  Ex. 1,

Attachment A at 3 (emphasis added); *see also id.* at 7 ("Brainspace offers predictive accuracy

that is at or close to the best across a range of published literature and internal experimental

results.").  Accordingly, Plaintiffs had no reason to believe that United's target recall rate of

75%, disclosed in its October 3 letter, would or could result in low precision or that the tool was

incapable of achieving higher levels of recall without a significant cost to precision.[3]

---

[2] United had initially stated that it intended to apply search terms to identify and review potentially responsive documents, and it proposed certain terms, subject to revision.  United's October 3, 2017 letter clarified that it intended to apply TAR, but ingest into the TAR application only those documents hit by search terms.  *See* Ex. 1 at 1.  Plaintiffs initially objected to this pre-culling before ingestion into TAR, but ultimately agreed, as discussed in footnotes 5 and 6, *infra*.

[3] Nor were Plaintiffs concerned that Brainspace would be unable to effectively "learn" to distinguish responsive from non-responsive documents if United had a very large document collection because United's disclosures asserted that the tool was effective even with document collections numbering in the hundreds of millions.  Ex. 1, Attachment A at 2 ("Unlike other

The parties continued to meet and confer regarding search methodologies, with United focusing on limiting the volume of data to be ingested into TAR to reduce its costs (by, for example, applying search terms prior to TAR and limiting file types that would be collected) and Plaintiffs focusing on solutions to balance United's costs against the need to ensure that pre-culling proposals did not remove unreasonable numbers of responsive documents from the collection even before TAR was applied. *See, e.g.*, Ex. 2 at 9; United Ex. 3 to Decl. of Brendan Sepulveda, ECF No. 276-3 (filed under seal), at 6.[4]

On January 5, 2018, after further negotiations, Plaintiffs offered a compromise protocol for United's TAR process.[5]  Notably, Plaintiffs' concerns with both recall *and precision* are evident in this very first proposal.  *First,* Plaintiffs proposed that United target a minimum 75% recall rate (the industry standard) "but endeavor to achieve the highest possible recall that may be obtained *with a reasonable level of precision*."  Ex. 3 at 3.  That is, Plaintiffs recognized that higher recall may come at the cost of lower precision and made any request for higher rates of recall contingent upon the reasonableness of the precision rate.  *Second*, Plaintiffs noted that their proposed validation process would avoid relying on the control set statistics regarding "prevalence, recall, *and precision*."  *See id.* at 3 (emphasis added).  *Third,* Plaintiffs proposed

---

semantic technologies that must sample smaller sets of documents for learning, our largest semantic index currently includes learning from hundreds of millions of documents.").

[4] At this same time, Plaintiffs were engaged in negotiations with Delta Air Lines, Inc. ("Delta") regarding its intent to pre-cull its collections prior to the application of TAR.  Ultimately, Delta opted not to pre-cull using search terms.

[5] Importantly, this proposal included concessions by Plaintiffs that increase the risk that responsive documents would be excluded from production.  For example, Plaintiffs agreed to the use of search terms to pre-cull documents before TAR was applied, subject to testing.  Plaintiffs also proposed that United could forego any manual review of documents that TAR could not categorize (with limited exceptions).  Thus, even if responsive documents were among that uncategorizable group, they would not be reviewed or produced.

that their alternative validation process include a sampling of documents *above* United's TAR "cutoff" score (that is, the documents that United proposed to produce) and disclose the number of responsive *and non-responsive* documents found. *See id.* at 3–4. That data (the number of non-responsive documents incorrectly identified as responsive above the cutoff, or "false positives") assists Plaintiffs in evaluating precision.

United made only minor modifications to Plaintiffs' language on the recall rate (§ 2.D), accepting Plaintiffs' caveat that higher recall would be subject to reasonable precision rates. *See* Ex. 4, attachment at 5. But United rejected Plaintiffs' proposed validation methodology, including its proposal for metrics that would allow Plaintiffs to better assess precision. *Id.* at 5–6. Plaintiffs persisted in their efforts to ensure that they had the data to evaluate both recall and precision. And following further meet and confers, Plaintiffs proposed (and United later accepted) an alternative validation sampling approach that gave Plaintiffs that ability. Specifically, the validation approach Plaintiffs proposed required United to disclose the number of documents classified as responsive by its TAR tool that were *not*, in fact, responsive. *See* Ex. 5, attachment at 4 (requiring disclosure of the number of "nonresponsive documents incorrectly coded as responsive"). Pursuant to the proposal, if Plaintiffs disagreed that United's "TAR tool achieved acceptable *results*" (not just acceptable recall) following this sampling, the parties would meet and confer. *Id.* at 4 (emphasis added).[6] United accepted Plaintiffs' language. *See* Exs. 6, 7.

As explained in Plaintiffs' opening brief, the resulting TAR Protocol required United to

---

[6] As part of this proposal, Plaintiffs also agreed to forgo search for and production of responsive excels or access files, with limited exceptions (eliminating responsive documents from search and review). *See* Ex. 8 at 2–3. Furthermore, in exchange for United accepting Plaintiffs' proposed pre-culling search terms for certain custodians, Plaintiffs agreed to forgo recall testing of search terms entirely.

review a statistically representative sample of documents classified by its TAR tool to test how often its TAR tool made the correct decision on responsiveness.  United was to report to Plaintiffs, *inter alia*, the total number of:

- documents coded by the human reviewer as Responsive in the validation sample but predicted as Not Responsive by TAR (*i.e.*, "false negatives");

- documents coded by the human reviewer as Responsive in the validation sample and correctly predicted as Responsive by TAR (*i.e.*, "true positives"); and

- documents coded by the human reviewer as Not Responsive in the validation sample but incorrectly predicted as Responsive by TAR (*i.e.*, "false positives").

*See* Ex. 6 at ¶ E.  The first two statistics allowed Plaintiffs to calculate the rate of recall.  The last two statistics permitted Plaintiffs to calculate the rate of precision.[7]  Because United, unlike Delta, agreed to the provision of these statistics, more detailed discussions with United regarding the need for statistics on precision were unnecessary.

These negotiations belie United's contention that Plaintiffs were unconcerned with precision or somehow voluntarily invited United's dump of 2.9 million non-responsive documents.  Plaintiffs would not have sought data on the rates of false positives if their only concern was recall; false positives are used to calculate precision, not recall.  Nor would they have asked that higher levels of recall beyond 75% be subject to reasonable precision rates.  And because of Plaintiffs' validation approach, Plaintiffs understood that they would be able to assess precision even at 75% recall and raise concerns about the results.

### 2.   Plaintiffs' Negotiations with Delta Similarly Evidence Plaintiffs' Concern about Precision.

During similar negotiations with Delta over a TAR protocol, Delta struck from Plaintiffs' proposed TAR validation testing a requirement that Delta disclose the number of non-responsive

---

[7]  United's sophisticated counsel, well-versed in ESI, cannot feign ignorance of what these metrics mean or that they had no understanding that Plaintiffs cared about precision.

documents that were incorrectly classified as responsive—that is, the data that revealed the precision rate. Instead, Delta proposed to provide *only* the recall rate. *See* Ex. 9, attachment at 2. Plaintiffs strongly objected. Plaintiffs explained that those data were necessary for Plaintiffs to calculate the recall *and precision* rate and pleaded with Delta to "at least agree to provide the precision rate in addition to the recall rate" if it would not provide the underlying data that allowed Plaintiffs to calculate those rates. *See* Ex. 10, at Mar. 6 email from B. Beard and at Feb. 27 email from B. Beard. After additional correspondence and meet and confers, Delta ultimately agreed to validation testing with the same disclosures agreed to by United, which would allow Plaintiffs to calculate precision *and* recall. *See* Ex. 11.

As this history makes clear, Plaintiffs not only proposed but also *fought* for disclosure of precision data that would allow them to raise red flags about unacceptably low precision *in advance* of United and Delta's core document productions. Any suggestion that Plaintiffs were unconcerned with precision is fiction.

### B.      United's Production Was Unreasonable.

Nothing in Defendants' opposition briefs overcomes the unreasonableness of United's production of 2.9 million non-responsive documents and its admitted failure to comply with the parties' agreements for disclosures prior to production. United's expert declaration by David Lewis is not to the contrary. Mr. Lewis says, carefully, only that 17% precision is reasonable at a 97% recall rate. But that is not at issue. At such high levels of recall, there is always a risk of low precision. And that is precisely why Plaintiffs caveated their request for 75% or higher recall upon "reasonable precision."

What is at issue is here, and what Mr. Lewis sidesteps, is whether *production* at these rates was reasonable where: (1) the requesting party did not demand 97% recall and was not told

that precision would be 17%, and (2) where these rates would result in production of 2.9 million non-responsive documents of 3.5 million documents produced. It was not reasonable. As Plaintiffs' expert opines, United's "*production set* with a recall of 97% precision of 17%—*where five out of every six documents are non-responsive*—is not merely imperfect, it is unreasonable." Declaration of Maura R. Grossman in Further Support of Plaintiffs' Motion for an Extension of the Fact Discovery Deadline ("Grossman Decl.") at ¶ 15 (emphasis in original); *see also id.* at ¶ 10. Because United chose not to manually review its documents after applying TAR, the precision of its TAR tool has taken on heightened importance.[8] *Id.* at ¶ 16.

United cites no authority, and Plaintiffs have found none, that a document dump of the magnitude here is reasonable, in the context of TAR or otherwise. Certainly, *Dynamo Holdings Ltd. P'ship v. Comm'r of Internal Revenue*, No. 2685-11, 2016 WL 4204067 (T.C. July 13, 2016), which United cites, does not support that proposition. In that case, unlike here, the *requesting* party was objecting that recall was *too low*, not that *precision* was too low. *Id.* at *4. Also, unlike here, the requesting party was directly involved training the TAR tool and had affirmatively selected a recall level of 95% (from a possible range of 65% to 95%) with 3% precision. *Id.* at *2–3. Given these circumstances, it is unsurprising that the court found the

---

[8] United's argument that "Plaintiffs made it clear in October 2017 that they did not want United to review its document production after application of TAR," United Opp. at 4, is a blatant mischaracterization of the record. Plaintiffs raised concerns about United's plan to utilize three separate culling stages—pre-TAR search terms, TAR, and then a manual review. *See* Ex. 2 at 8. Plaintiffs did not object to a manual review. They objected to use of pre-culling using search terms because doing so adds a third layer of culling to the two ordinarily undertaken as part of TAR. That Plaintiffs' concern was with search terms, not post TAR manual review, is plain from the letter. *See id.* at 8–11. Plaintiffs did not object to United's October 18 disclosure that it did not plan to manually review because Plaintiffs had no reason to at that time. United's lack of manual review is problematic because of its unreasonably low precision rate, information Plaintiffs would not have until after the production was complete. Manual review could have been used to remediate that low rate.

recall and precision levels appropriate.  Here, however, Plaintiffs did not demand a recall level of 97%, much less know that is what United achieved.  Nor were Plaintiffs permitted to train United's TAR tool.  Thus, *Dynamo Holdings* supports Plaintiffs' argument that transparency, disclosure, and cooperation are necessary when TAR is used.  The lack thereof resulted in an unreasonable production to Plaintiffs.[9]

Not only did United fail to disclose its low precision metrics to Plaintiffs sufficiently in advance for the parties to meet and confer and potentially avoid this problematic production before it occurred, it now appears that United itself may not have understood that it had produced documents at such a low rate of precision and such a high rate of recall.  United appears to have believed, at the time of its production, that it had achieved an 85% recall rate, accompanied by a 58% precision rate.  *See* Ex. 12; Decl. of Michael Kriegal, ECF No. 276-4.  It seems likely that, based on those metrics, United stopped training its TAR tool and prepared for production.  *See* Grossman Decl. ¶ 12.  It then conducted validation testing which revealed a 17% precision rate.  Rather than determine which of these divergent precision rates was correct or bring the matter to Plaintiffs' attention, United continued with the production, with no advance notice to Plaintiffs (or opportunity to confer) about this potentially unreasonably low precision rate.  For reasons that are unclear, United reported the two contradictory results to Plaintiffs.  It does not appear that United saw an issue with or did anything about the contradictory results until Plaintiffs specifically raised it.  *See* Sepulveda Decl. at ¶¶ 25–27; Kiegel Decl. at ¶¶ 8–9.

---

[9] United acknowledges in its brief that "[t]he selection of a 'reasonable' level of precision is thus a matter of perspective: if a party desires more responsive documents, it can demand higher recall at the expense of precision, and if a party prefers to have a more precise production, it can opt of a lower recall."  United Opp. at 9.  But United never gave Plaintiffs this opportunity; it unilaterally made the selection.

United now attempts to deflect attention from its own conduct and unreasonable production by arguing that the volume of non-responsive documents it produced is somehow Plaintiffs' fault—that the number of custodians and data sources Plaintiffs sought skewed the TAR results. But this argument is simply a red herring. The amount of data analyzed by the TAR tool should not affect whether reasonable precision rates can be achieved at higher recall rates. *See* Grossman Decl. at ¶ 8. As Professor Grossman explains: "[United's] argument is akin to saying that fishing in the ocean rather than in a lake is tantamount to requesting that the net contain more seaweed. The benefit of TAR is that it can more efficiently identify responsive documents than alternative approaches." *Id.* To the extent that United is now suggesting that the volume of data impeded the effectiveness of its TAR tool, such argument is in direct conflict with its TAR disclosures which suggested precisely the opposite. *See supra* at 5–6 & n.3. [10]

## C.    Plaintiffs Have Been Diligent in Pursuing Discovery and Defendants Have Articulated No Prejudice.

Defendants have wholly mischaracterized the relevant facts about Plaintiffs' due diligence here. As explained in their opening brief, Plaintiffs were not dilatory in bringing their concerns about the validation metrics to United's attention or seeking an extension of the discovery schedule. Pls.' Br. at 12–13. On May 23, 2018, after analyzing United's TAR metric disclosures, consulting with their ESI expert, and reviewing the production, Plaintiffs raised questions about United's inconsistent TAR metrics.[11] And on August 16, 2018, less than three

---

[10] Additionally, to the extent United implies that Plaintiffs pushed particularly hard on United in discovery, resulting in its large production, that is inaccurate. Plaintiffs actually negotiated for more custodians from Delta than United. *Compare* Ex. 13 (31 Delta custodians) *and* United Opp. at 16 (30 United custodians). Plaintiffs also convinced Delta not to run pre-TAR culling search terms, meaning a higher percentage of its documents were fed directly into TAR. *See* Ex. 14.

[11] Contrary to United's assertion, the ESI Order did not require Plaintiffs to respond to United's TAR validation metrics within 15 days. *See* ECF No. 167 at 9. The 15-day response period in Section III.D.2 relates to *initial* TAR disclosures, not validation metrics. Section III.D.1 requires

weeks after United finally admitted that its control set metrics were misleading, Plaintiffs finally

understood the composition of United's production, and after considering potential review

options and work-arounds, Plaintiffs notified Defendants of their intention to seek a schedule

extension.  It is ironic that United complains about this less than two-month delay in light of the

fact that United stalled in addressing Plaintiffs' inquiries into United's inconsistent TAR metrics

for over two months.[12]  Even if Plaintiffs had immediately raised questions about the inconsistent

TAR metrics upon receipt, it still took United two months to get answers and then Plaintiffs

needed time to assess their options.  Furthermore, while United criticizes Plaintiffs for raising

questions about, rather than immediately objecting to, United's validation metrics, as Plaintiffs

explained previously, Plaintiffs were trying to understand the discrepancy between the control

---

disclosures of a party's "intent to use TAR to search for responsive Documents, the name and a description of the TAR Tool being used and the outside vendor (if any) being used to conduct TAR, the Custodians and data sources to which TAR shall be applied and any Document types that may be excluded from the TAR process."  *Id.*  United made these disclosures on October 3 and Plaintiffs responded on October 9.  *See* Exs. 1, 2.  United's validation metrics were required under the parties' separate agreed-upon TAR Protocol and did not specify any objection deadline.  *See* Ex. 6.

[12] United's only explanation for this delay was that it was "research[ing] the questions presented by Plaintiffs."  Sepulveda Decl. at ¶ 27.  This delay, however, is consistent with United's pattern of dilatory communication and obfuscation in this litigation.  For example, in May, after three of Plaintiffs' letters regarding transactional data deficiencies had gone unheeded, Plaintiffs had to email United to demand answers.  *See* Ex. 15.  Finally, in June 2018, United committed to produce missing transaction data, some of which was overdue for more than a year.  *See* Ex. 16 (June 22 letter agreeing to produce cost, profitability, and ticket data for flights to and from U.S. territories); Ex. 17 at 4–5 (June 25 letter admitting that it could, and agreeing to, produce data on flight coupons and exchanges, as well as on pre-merger Continental data).  Notwithstanding United's commitments to produce these data, Plaintiffs heard nothing.  They followed up with an email on July 16, 2018.  Ex. 18 at 3–4.  When that email went unanswered, they followed up again on July 26, 2018.  *Id.* at 3.  Finally, United responded on July 27, 2018, informing Plaintiffs it hoped to produce the missing data in two weeks.  *Id.* at 2–3.  When that deadline passed, Plaintiffs followed up again on August 20.  *Id.* at 2.  United responded that it expected to produce most of the data that week but that some would be delayed until the following week.  *Id.* Then, on Friday, August 24, United claimed a significant portion of the data would not be produced for another 2 to 3 more weeks due to an inadvertent error.  *Id.* at 1.

set and the validation metrics and determine if there was a way to get a production that conformed to the former rather than the latter.  *See* Kenney Decl., ECF No. 270-4, at ¶ 21.

Notwithstanding the challenges posed by United's dump of 2.9 million non-responsive documents, Plaintiffs have been diligently reviewing documents.[13]  As set forth in their opening brief, Plaintiffs have explored and are using different means of culling, prioritizing, and reviewing the documents, including targeted searching, the use of TAR, and manual review.  But contrary to Delta's argument, Plaintiffs cannot simply use the TAR tool that they have already trained to find very specific documents in this case to instead focus on weeding out the non-responsive document produced by United.  *See* Grossman Decl. at ¶ 7.  Indeed, Delta's argument "is belied by the facts in this matter; if it were so easy to distinguish the non-responsive documents, then United's TAR tool should have been able to do so based on training using documents from that *same* collection." *Id.*

Plaintiffs have also discussed (and contrary to United's assertions, have not rejected) a potential overlay from United that would identify the documents that would have been produced at a higher level of precision.  Plaintiffs are of course willing to try the proposed overlay, but as explained in Plaintiffs' opening brief, it does not solve the problem.  Moreover, Plaintiffs have concerns that United continues to provide conflicting numbers about what levels of precision an overlay would be able to achieve, which makes Plaintiffs hesitant to rely on such an overlay.  Indeed, as recently as August 21, 2018, United told Plaintiffs it could only achieve 30% precision at 75% recall.[14]  *See* Ex. 19.  Thus, Plaintiffs were surprised when United disclosed *for*

---

[13] Delta is incorrect to imply that the settlement with American Airlines reduced Plaintiffs' discovery burden.  *See* Delta Opp. at 3.  American Airlines made a full production of documents, which Plaintiffs must review and synthesize to establish an overarching conspiracy in this case.

[14] Immediately after the August 20, 2018 status conference with the Special Master at which United first raised the possibility of such an overlay, Plaintiffs emailed United, inquiring about

*the first time* in its opposition brief that, at 75% recall, it could achieve a precision rate of 45%.[15] *See* United Opp. at 8.  But setting aside the inconsistencies and shifts in its disclosures, United's attempt to cure its faulty production with an overlay does nothing to recover the loss of time that Plaintiffs have spent sifting through United's mountain of non-responsive documents.

Contrary to Defendants' assertions, Plaintiffs face different burdens in proving their case than Defendants do in defending against the case that lead to very different types of document reviews.  Grossman Decl. at ¶ 6.  But even assuming Plaintiffs, like Defendants, need only engage in a simple responsiveness review, the rates at which Delta posits Plaintiffs should be reviewing documents are preposterous.  *See* Delta Opp. at 5 (suggesting Plaintiffs should review 3-20 documents per minute, or 3 to 20 seconds per document).  As explained by Professor Grossman, who co-authored the article relied upon by Delta, the review rates cited by Delta are taken out of context and are wholly unrealistic and unreasonable as applied to this case. Grossman Decl. at ¶¶ 3–5.

The results Delta relies upon were achieved in a laboratory setting, using a special TAR tool—one that is substantially different from the commercial review platforms employed by the parties in this case—that allowed the reviewers (two computer scientists) to quickly look at excerpts that the tool had already identified as responsive.  *Id*. at ¶ 4.  The review was also faster because the document population had high precision, unlike the population here.  *Id*.  Where the responsiveness decision was not obvious from the excerpt, the reviewers had to review the entire

---

the overlay and the levels of precision that could be achieved at various levels of recall.  United responded that a 75% recall would result in only a 30% precision rate.  *See* Ex. 19.

[15] United now states that the recall and precision numbers that were set forth in its August 21, 2018 email were referring to control set metrics, which have nothing to do with a potential overlay, rather than validation metrics.  *See* Sepulveda Decl. at ¶ 35.  It defies credulity for United to think that Plaintiffs were requesting the control set metrics given that they were seeking additional information about a potential overlay.

document to determine its responsiveness, a task which was considerably slower. *Id.* "For Delta

to suggest that the review rates of two computer scientists sitting in a laboratory trying to win a

competition using a tool that one of them designed is anything like a lawyer, who has a fiduciary

duty to a client, having to review and analyze millions of documents received from another party

and code them for multiple issues in preparation for a high-stakes litigation matter is absurd." *Id.*

at ¶ 5.

Even using Delta's proposal of reviewing documents at a "more conservative 3

documents per minute," Delta estimates it would take approximately 12 weeks for a simple

responsiveness review. Delta Opp. at 5. Thus, because this is time that Plaintiffs did not

anticipate they would need to spend and therefore did not build into the schedule that they

proposed to the Court in February, Plaintiffs should get a minimum of a 12-week extension.

More importantly, neither Defendant explains why Plaintiffs should be obligated to conduct a

responsiveness review that is ordinarily the obligation of the producing party, much less why

Plaintiffs should not be given extra time to perform that review.

While Plaintiffs have articulated the prejudice they would face absent a schedule

extension, Defendants have not articulated any legal prejudice they would face as a result of a

schedule extension. Delta claims only that it would be prejudiced by "further delay and

disruption" of depositions already scheduled for its senior executives.[16] Delta Opp. at 6. But

such inconveniences do not rise to the level of prejudice warranting denial of the requested

---

[16] In mid-August, Delta reached out to Plaintiffs, requesting the names of potential deponents.
While Plaintiffs provided names and Delta had provided dates, no dates had been agreed to when
Plaintiffs notified Defendants of their intention to move for a schedule extension. At the urging
of the Special Master, Plaintiffs have proceeded with negotiating deposition dates for the fall
with the proviso that if the discovery schedule is extended, Plaintiffs will likely seek to move the
dates of at least some of those depositions. Other depositions may not be necessary at all,
depending on a more complete review of the documents.

schedule extension.  United, on the other hand, complains that trial would be pushed to 2020 under Plaintiffs' proposed schedule.[17]  United Opp. at 2.  Defendants cite no cases finding prejudice under such circumstances and the cases United cites for the proposition that good cause does not exist to extend the schedule are readily distinguishable on the facts.[18]

## III.    CONCLUSION

For all of the foregoing reasons and as set forth in Plaintiffs' opening brief, Plaintiffs' request for a six-month extension of the fact discovery and related deadlines is fully warranted and should be granted.

Dated: September 2, 2018

---

[17] To that end, Plaintiffs would be agreeable to a six-month extension of the discovery schedule and a more limited extension of the class certification briefing such that the end of class certification briefing corresponds with the end of fact discovery.  This would result in the completion of class certification briefing on July 31, 2018, only nine weeks later than the current schedule, which has class certification ending on May 22, 2018.  If the Court deems it appropriate, the parties could then proceed immediately with summary judgment briefing.

[18] *Saunders v. District of Columbia*, 279 F.R.D. 35, 38 (D.D.C. 2012) (Kollar-Kotelly, J.) (denying request for extension because the parties' only progress before seeking an extension had been a first round of written discovery requests and responses); *St. Paul Mercury Ins. Co. v. Capitol Sprinkler Inspection, Inc.*, No. 05-2115 (CKK), 2007 WL 1589495, *7-9 (D.D.C. Jun. 1, 2007) (Kollar-Kotelly, J.) (denying motion to extend discovery deadline where the moving party failed to produce an expert designation and to depose third-party plaintiff witnesses of whom it was aware and then moved for an extension after the close of discovery); *but see Watt v. All Clear Business Solutions*, 840 F. Supp. 2d 324, 326–27 (D.D.C. 2012) (granting motion to reopen discovery for limited purpose even though plaintiff had not diligently sought discovery because no trial date had been set, the opposing party would suffer no prejudice because of the extension, and additional discovery was likely to lead to relevant evidence).

By: */s/ Hilary K. Scherrer*
Michael D. Hausfeld
Hilary K. Scherrer
Jeannine Kenney
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
mhausfeld@hausfeld.com
hscherrer@hausfeld.com
jkenney@hausfeld.com

Michael P. Lehmann
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633-1908
mlehmann@hausfeld.com

By: */s/ Adam J. Zapala*
Adam J. Zapala
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
azapala@cpmlegal.com

Alexander E. Barnett
COTCHETT, PITRE & McCARTHY, LLP
40 Worth Street, 10th Floor
New York, NY 10013
Telephone: 212.201.6820
abarnett@cpmlegal.com

*Plaintiffs' Interim Co-Lead Counsel*

Elizabeth J. Cabraser
Eric B. Fastiff
Brendan P. Glackin
LIEFF CABRASER HEIMANN &
BERNSTEIN
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
ecabraser@lchb.com
efastiff@lchb.com
bglackin@lchb.com

Warren T. Burns
Daniel H. Charest
BURNS CHAREST LLP
500 North Akard Street, Suite 2810
Dallas, TX 75201
Telephone: (469) 904-4550
wburns@burnscharest.com
dcharest@burnscharest.com

Robert N. Kaplan
Gregory K. Arenson
Elana Katcher
KAPLAN, FOX & KILSHEIMER LLP
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
rkaplan@kaplanfox.com
garenson@kaplanfox.com
ekatcher@kaplanfox.com

*Plaintiffs' Executive Committee*