**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE DOMESTIC AIRLINE TRAVEL ANTITRUST LITIGATION <br><br> This Document Relates To: <br><br> ALL CASES | MDL Docket No. 2656 <br> Misc. No. 15-1404 (CKK) <br><br> JURY TRIAL DEMANDED |

**DECLARATION OF MAURA R. GROSSMAN**
**IN FURTHER SUPPORT OF PLAINTIFFS' MOTION**
**FOR AN EXTENSION OF THE FACT DISCOVERY DEADLINE**

Pursuant to 28 U.S.C. § 1746, I, Maura R. Grossman, declare:

1. My credentials as an expert in electronic discovery and, in particular, in technology-assisted review ("TAR") are set forth in paragraphs 1 through 6 of the Declaration of Maura R. Grossman in Support of Plaintiffs' Motion for an Extension of the Fact Discovery Deadline, dated Aug. 24, 2018, submitted in connection with Plaintiffs' opening brief on this motion (Dkt. No. 270-3) (my "Prior Declaration"). Those paragraphs are incorporated herein by reference. I have been retained by Plaintiffs in the above-captioned litigation to consult on discovery issues related to electronically stored information, particularly as relates to search methodologies and TAR.

2. I submit this declaration in further support of Plaintiffs' Motion for an Extension of the Fact Discovery Deadline. I have reviewed Delta Air Lines, Inc.'s Opposition to Plaintiffs' Motion for an Extension of Fact Discovery Deadlines, Dkt. No.274 ("Delta's Opposition"), Defendant United Airlines, Inc.'s Opposition to Plaintiffs' Motion for an Extension of Fact Discovery Deadlines, Dkt. No. 276 ("United's Opposition"), and the Declarations of David D.

1

Lewis and Michael Kriegal in support of Defendant United Airlines, Inc.'s Opposition to Plaintiffs' Motion for an Extension of Fact Discovery Deadlines (the "Lewis Declaration" and "Kriegal Declaration," Dkt. No. 276-3 and Dkt No. 276-4, respectively). I submit this supplementary declaration to address certain statements made in those Oppositions and Declarations. I have personal knowledge of the matters set forth herein, and if called upon and sworn as a witness, I could competently testify thereto.

3.    Delta's Opposition references my 2011 study in the Richmond Journal of Law and Technology with Professor Gordon V. Cormack titled *Technology-Assisted Review in E-Discovery Can Be More Effective and More Efficient Than Exhaustive Manual Review* for the proposition that lawyers can review documents at "3 documents per minute and 20 documents per minute . . . ." Delta Opp. at 4–5. The "document review exercises" that Delta cites were not undertaken by lawyers preparing for a complex antitrust case; they were achieved by Professor Cormack and one of his graduate students (Mona Mojdeh), in a laboratory setting, using Professor Cormack's own research review platform—a TAR tool that is substantially different from the commercial review platforms employed by the parties in this case.

4.    That particular tool displayed to Professor Cormack and his graduate student the highest-scoring excerpts from documents, which reflected the basis on which the TAR tool had concluded the documents were responsive. The documents in the tool had already been ranked from most to least likely to be responsive, and *those review speeds were achieved on a high-precision ranking*, not a low precision collection, as is the case here. In other words, Professor Cormack and his graduate student had only to look at a brief excerpt *to confirm that the document was responsive to a single issue*, in a sequence of documents that were primarily responsive to begin with. If that decision was not obvious from the excerpt, Professor Cormack

and his graduate student had to review the entire document to determine its responsiveness, a task which was considerably slower.

5.  For Delta to suggest that the review rates of two computer scientists sitting in a laboratory trying to win a competition using a tool that one of them designed is anything like a lawyer, who has a fiduciary duty to a client, having to review and analyze millions of documents received from another party and code them for multiple issues in preparation for a high-stakes litigation matter is absurd. But even if the review rates were comparable, Delta concedes that the review effort that has now been foisted on Plaintiffs in this case would take at least 70 attorneys, working full time on review, 33,333 hours, or 12 weeks. And that review would only encompass the most basic, first-pass, responsiveness review—Plaintiffs would then have to re-review the documents tagged as responsive to analyze and code them for the specific subject matters addressed in the documents. The sort of basic responsiveness review that Delta contemplates is typically performed by the producing party for an outgoing production, not by the receiving party analyzing an incoming production to prepare its case.

6.  United similarly contends that Plaintiffs could solve the problem United created by hiring hundreds of contract reviewers to conduct a review of United's overwhelmingly non-responsive production. United Opp. at 17. This again confuses the type of review that Plaintiffs must conduct with the type of review that Defendants conducted in preparing their productions. The review United envisions would only accomplish a basic screening for responsiveness. However, after this screening effort was completed, Plaintiffs would still have to invest considerable time and expense to review the 600,000-some responsive documents in United's production on their merits. For that review, Plaintiffs would need to engage dozens of attorneys

experienced in coding documents for complex antitrust cases, as I understand that Plaintiffs have done here.

7. Delta's Opposition faults Plaintiffs for failing to explain why they cannot use the TAR tool they have already trained to separate out the 2.9 million non-responsive documents that United produced. Delta Opp. at 6. I am not aware of any evidence—and Delta does not point to any—suggesting that a TAR tool trained on one set of documents or for one purpose, can properly rank or classify documents from another set or for another purpose. Indeed, Delta's argument—"if the non-responsive documents are as irrelevant as Plaintiffs claim, they would not be identified as 'important' by Plaintiffs' TAR tool in the first place"— is belied by the facts in this matter; if it were so easy to distinguish the non-responsive documents, then United's TAR tool should have been able to do so based on training using documents from the same collection, for the same purpose. Apparently, it was unable to do so.

8. United's Opposition focuses on the point that Plaintiffs sought the search and review of greater and greater volumes of electronically stored information. United Opp. at 1, 3, 15. United seems to conflate searching and reviewing a larger universe of documents with producing more non-responsive documents. Their argument is akin to saying that fishing in the ocean rather than in a lake is tantamount to requesting that the net contain more seaweed. The benefit of TAR is that it can more efficiently identify responsive documents than alternative approaches. The precision of a TAR process is not a function of the size of the collection; it is a function of the quality of the TAR tool and the manual review that follows it. Plaintiffs' request for more custodians, or for the application of broader search terms, is not equivalent to requesting the production of *five non-responsive documents for every responsive one*, a point which neither United nor any of its declarants ever address. My understanding is that United

produced more *non-responsive* documents (approximately 2.9 million) than Delta and American produced in total combined (approximately 2.5 million).

9. United suggests that in my Prior Declaration, I proposed an "ideal precision level" of 70% (at 70% recall). United Opp. at 4–5. That is an incorrect characterization of my statement, which merely compared United's 17% precision at 97% recall (or 21% precision at 85% recall) with what a competent manual review would have achieved. *See* Prior Declaration at paragraph 20 ("By way of comparison, information retrieval research has shown that *high-quality manual review achieves about 70% recall at 70% precision*. TAR should be able to match or exceed this threshold." (emphasis in original)). I made that comparison in order to demonstrate how low United's precision was, and to show that had United reviewed the document population above the recall/precision threshold, its precision would have been considerably higher.

10. The TAR protocol on which I advised Plaintiffs stated that "United will set a minimum estimated recall rate of 75%, but will endeavor to achieve a higher estimated recall rate *if that rate can be obtained with a reasonable level of precision* . . . ." (emphasis added). In my opinion, a production set with 97% recall and 17% precision is not a *reasonable level of precision*.

11. The Lewis Declaration incorrectly conflates the effectiveness of a "predictive model" with the effectiveness of a TAR process and the sufficiency of a production set, suggesting that if a *predictive model* cannot achieve 70% recall and 70% precision, neither can a TAR process, nor the production set derived from it. This is not correct. A manual review of the documents identified as likely responsive by the predictive model (or above the recall/precision

threshold) can readily achieve or exceed this level of effectiveness. In the more-than-one-hundred TAR matters I have undertaken, this result has routinely been exceeded.

12. In Exhibit 5 to Plaintiffs' Motion (Dkt. No. 270-9), Mr. Sepulveda explains in an email dated July 23, 2018 at 5:21 PM that United's April 27 report of 85% recall at 57.2% precision based on a Control Set was in error, and that the correct estimate of precision at 85% recall should have been 21.7%. The Kriegal Declaration states at paragraph 9 that the "Control Set . . . is used both to monitor progress of training and for estimating the recall and precision of the predictive model." Taken together, these disclosures suggest that the training of United's predictive model may have been terminated prematurely because of this miscalculation.

13. The Kriegal Declaration indicates at paragraph 10 that often, parties are willing to sacrifice some precision to achieve a higher recall. A recall of 85%, with a precision of 57.2%, would likely have been reasonable, since Plaintiffs would only have had to review less than one non-responsive document for every responsive one. However, few parties that I have encountered would have accepted 85% recall on the condition that they would have had to review *four or five non-responsive documents for every responsive one*. United has not disclosed the number of documents it reviewed to train the predictive model so as to achieve its chosen recall/precision tradeoff, and we simply do not know whether additional training could have improved the predictive model sufficiently to yield an adequate production set. In any event, that would have required additional time and effort on the part of United that has now been shifted to Plaintiffs.

14. Finally, Mr. Kriegal asserts in his Declaration at paragraph 10 that 70% recall at 70% precision is not "a common requirement." As I explained in paragraph 9 above, I did not state that it was a common requirement; I pointed out that a competent manual review can

achieve that level, and also noted in my Prior Declaration (at paragraph 17), that parties do not tend to focus on the precision of the production set because *it is common practice to review the documents above the recall/precision threshold* (or those identified as responsive by the TAR tool) *before production*, so precision is typically not an issue. And while Dr. Lewis contends that "in [his] experience, **predictive models** often do not reach 70% estimated precision at 70% estimated recall," he does not state—because he cannot—that typical **production sets based on a TAR process** do not. Lewis Decl. at ¶ 27 (emphasis added).

15. While United and its declarants are entirely correct that a TAR process need not be perfect and should not be held to a higher standard than manual review, a production set must be reasonable and a TAR process should not be held to a lower standard. In my opinion, a *production set* with a recall of 97% and a precision of 17%—*where five out of every six documents produced are non-responsive*—is not merely imperfect, it is unreasonable.

16. As I explained in my Prior Declaration at paragraph 17, *because United chose not to manually review its documents after applying its TAR tool and prior to production*, the precision of its TAR tool has taken on heightened importance. The low precision of the TAR tool led directly to the production of a vast number of non-responsive documents, imposing considerable burden on Plaintiffs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 1st day of September 2018 in Waterloo, Ontario, Canada.

*Maura R. Grossman*
Maura R. Grossman