# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

IN RE DOMESTIC AIRLINE TRAVEL
ANTITRUST LITIGATION

This Document Relates To:

ALL CASES

MDL Docket No. 2656
Misc. No. 15-1404 (CKK)

## MEMORANDUM OPINION
(September 13, 2018)

Presently before the Court is Plaintiffs' [270] Notice of Motion and Motion for an Extension of Fact Discovery Deadlines pursuant to Federal Rule of Civil Procedure 16(b)(4). Defendants Delta Air Lines and United Airlines, Inc. oppose Plaintiffs' Motion, and assert that the discovery schedule set forth in this Court's February 14, 2018 Amended Scheduling Order Regarding Discovery and Class Certification, ECF No. 207, should not be altered. The Court acknowledges that it has set a strict schedule for discovery and exhorted the parties to comply with the deadlines therein; however, upon careful consideration of the pleadings,[1] the relevant legal authorities, and the entire record, the Court finds warranted an extension of the deadlines in the Amended Scheduling Order. Accordingly, the Court GRANTS Plaintiffs' [270] Motion for an Extension of Fact Discovery Deadlines, for the reasons described in more detail herein.

---

[1] Plaintiffs' Notice of Motion and Motion for an Extension of Fact Discovery Deadlines ("Pls.' Mot."), ECF No. 270; Plaintiffs' Memorandum of Law in support of its Motion ("Pls.' Mem."), ECF No. 270-1; Defendant Delta Air Lines, Inc.'s Opposition to Plaintiffs' Motion ("Delta Opp'n"), ECF No. 274; Defendant United Airlines, Inc.'s Opposition to Plaintiffs' Motion ("United Opp'n"), ECF No. 276; and Plaintiffs' Reply Memorandum of Law in support of Plaintiffs' Motion ("Pls.' Reply"), ECF No. 279. The motion is fully briefed and ripe for adjudication.

1

# I. BACKGROUND

This case involves a multidistrict class action litigation brought by Plaintiffs, who are purchasers of air passenger transportation for domestic travel, against [remaining] Defendants, Delta Air Lines, Inc. ("Delta") and United Airlines, Inc. ("United"), two of the four largest commercial air passenger carriers in the United States, based on allegations that Defendant airlines willingly conspired to engage in unlawful restraint of trade. *See generally* Corrected Consolidated Amended Class Action Complaint, ECF 184.[2]

On January 30, 2017, this Court set a [152] Scheduling Order Regarding Discovery and Briefing on Motion for Class Certification. On February 22, 2017, the Court entered a Minute Order noting that there was a joint request by the parties to extend a discovery deadline set forth in this Court's [152] Scheduling Order, and the Court granted this request. *See* February 22, 2017 Minute Order. On February 5, 2018, the parties filed a [204] Joint Status Report setting out a proposed amended schedule for discovery. The Court held a status conference on February 12, 2018, to discuss scheduling issues, and on February 13, 2018, the Court issued an [207] Amended Scheduling Order Regarding Discovery and Class Certification, whereby the close of fact discovery is set for January 31, 2019, and a class certification motion is to be filed by February 7, 2019.[3] On April 26, 2018, Plaintiffs filed an [231] Unopposed Motion for Extension of Time to Complete Discovery, solely regarding third party discovery, and this request was granted by the Court.

---

[2] Defendants Southwest Airlines Co. and American Airlines, Inc. have entered into settlement agreements with the Plaintiffs.

[3] The Court held several status conferences in this case where discovery and scheduling issues were discussed. (May 11, 2017; September 19, 2017; November 16, 2017; February 12, 2018; June 6, 2018). Prior to each status conference, the parties filed a joint status report.

On August 24, 2018, Plaintiffs filed the instant Motion for Extension of Time to Complete Discovery, ECF No. 270, wherein Plaintiffs request that this Court "extend the fact discovery deadline and certain other interim discovery deadlines, as well as the deadlines for the submission and briefing of Plaintiffs' motion for class certification, the deadline for depositions, the deadline for serving requests for admissions, and the deadlines for motions to compel by six months." Pls.' Mem. at 5.[4] Plaintiffs assert that this request for an extension of discovery is predicated on a recent "issue with United's "core" document production," which constitutes good cause to extend the discovery deadlines. Pls.' Mem. at 5-6. More specifically, Plaintiffs assert that United produced more than 3.5 million [core] documents to the Plaintiffs, but "due to United's technology assisted review process ("TAR"), only approximately 17%, or 600,000, of the documents produced are responsive to Plaintiffs' requests," and Plaintiffs must sort through them to determine which ones are responsive, which requires additional time. *Id.*

Defendants Delta and United oppose Plaintiffs' request for an extension, but for the reasons set forth herein, this Court shall GRANT Plaintiffs' Motion for an Extension of Fact Discovery Deadlines, with the proviso that no further extensions of discovery will be considered by this Court.

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 16(b)(4): "A schedule may be modified only for good cause and with the judge's consent." Similarly, Local Civil Rule 16.4 provides that the Court "may modify the scheduling order at any time upon a showing of good cause." In evaluating

---

[4]Page references are to the page numbers assigned by the electronic case filing (ECF) system.

good cause, the Court considers the following factors:

> (1) whether trial is imminent; (2) whether the request is opposed; (3) whether the non-moving party would be prejudiced; (4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court; (5) the foreseeability of the need for additional discovery in light of the time allotted by the district court; and (6) the likelihood that discovery will lead to relevant evidence.

*Rae v. Children's Nat'l Med Ctr.*, Civil Action No. 15-736, 2017 WL 1750255, at *2-3 (D.D.C. May 4, 2017) (citing *Childers v. Slater*, 197 F.R.D. 185, 188 (D.D.C. 2000)). "The primary consideration in the "good cause" analysis is whether the party seeking the amendment was diligent in obtaining the discovery sought during the discovery period [and] [a]n additional, yet secondary, consideration is the existence or degree of prejudice to the party opposing the modification." *See Equal Rights Ctr. v. Post Properties, Inc.,* No. 06-cv-1991, 2008 WL 11391642, at *1-2 (D.D.C. May 27, 2008) (internal quotation marks and citations omitted).

These factors relevant to showing "good cause" will be analyzed by the Court in the discussion set forth below, beginning with Plaintiffs' diligence and whether there is any prejudice to the Defendants.

### III. DISCUSSION

#### A. Plaintiffs' Diligence

Plaintiffs contend that a showing of diligence involves three factors — (1) whether the moving party diligently assisted the Court in developing a workable scheduling order; (2) that despite the diligence, the moving party cannot comply with the order due to unforeseen or unanticipated matters; and (3) that the party diligently sought an amendment of the schedule once it became apparent that it could not comply without some modification of the schedule. *See Dag Enters., Inc. v. Exxon Mobil Corp.*, 226 F.R.D. 95, 106 (D.D.C. 2005) (Kollar-Kotelly, J.)

4

First, there is no dispute that the parties diligently assisted the Court in developing workable scheduling orders through their preparation of Joint Status Reports prior to the status conferences in which discovery issues and scheduling were discussed, and in their meetings with the Special Master, who is handling discovery matters in this case. The parties were able to agree upon various deadlines and have been working diligently to meet those deadlines, particularly concerning the February 14, 2018 Amended Scheduling Order. Accordingly, the first factor necessary for a demonstration of Plaintiffs' diligence has been met.

Second, Plaintiffs assert that, subsequent to the commencement of fact discovery in late January 2017, they served their core document requests in a timely manner and, as reflected in the Status Reports filed by the parties, they negotiated Defendants' objections to their requests, the scope of production, search methodologies, and protocols. Pls.' Mem. at 15 (citing the Kenney Declaration and various Joint Status Reports). Completion of core document production was set for April 30, 2018, and by that date, Defendants American, United and Delta produced approximately 6 million documents to the Plaintiffs.[5] Despite having staffed their discovery review with 70 attorneys, who began their review "as soon as the [documents] could be processed into Plaintiff's review platform following production on April 30," Plaintiffs indicate that they will be unable to complete the review in time to use these documents for depositions and other purposes, if certain scheduling deadlines are not extended. Pls.' Mem. at 10. Accordingly, Plaintiffs seek an extension of certain scheduling order deadlines so that they are afforded "a

---

[5] Approximately 5.1 million documents were produced on April 30, 2018. Kenney Decl. ¶ 16. Jeannine M. Kenney is an attorney admitted to practice law in the District of Columbia and Pennsylvania, and a partner at Hausfeld, LLP, one of the Court-appointed Co-Lead Counsel for Plaintiffs in this case. Kenney Decl. ¶ 1.

meaningful opportunity to review the discovery they have diligently pursued and for which they secured production." Pls. Mem. at 15.

Defendants United and Delta question whether Plaintiffs have staffed the document review with 70 attorneys and suggest that Plaintiffs identify the 70 attorneys and how many hours they are working and/or that this Court review Plaintiffs' counsel's monthly time sheets to verify this statement. *See* United Opp'n at 20; Delta Opp'n at 4. Defendants do not provide any support for their request, and the Court finds it unnecessary to require Plaintiffs to produce a list of attorneys working on this matter, or to engage in any additional review of monthly time reports.[6] The Court assumes that counsel for Plaintiffs, as an officer of the court, has represented accurately the way in which this case is being staffed. Delta then questions why it would take Plaintiffs so long to comb through 6 million documents and tries to extrapolate how long it would take to review the entire set of documents based on a review of 3 documents per minute when working with a hypothetical set of documents. *See* Delta Opp'n at 4-5. Plaintiffs dispute Delta's hypothetical analysis as "preposterous." Pls.' Reply at 18; *see* Grossman [Second] Decl., ECF No. 279-1, ¶¶ 3-5 (discussing why the Delta analysis is unreasonable).[7] United notes that it engaged "over 180 temporary contract attorneys to accomplish its document production and privilege log process within the deadlines" set by Court and accordingly, Plaintiffs should be expected to engage in the same expenditure of resources. United Opp'n at 20. The Court finds that these contentions by

---

[6] Plaintiffs provide this Court with monthly cumulative time and expense reports, in accordance with the Court's Order of February 29, 2016. These reports do not provide the granular detail that Defendants are suggesting.

[7] Maura R. Grossman is a Research Professor in the David R. Cheriton School of Computer Science at the University of Waterloo, in Ontario, Canada, and she is also an eDiscovery attorney and consultant in New York. Grossman [First] Decl. ¶ 1.

Delta and United do not address the issue at hand — whether Plaintiffs had to deal with unforeseen or unanticipated matters, which justify Plaintiffs' request for additional time.

Plaintiffs contend that they "could not have foreseen United's voluminous document production made up [of] predominantly non-responsive documents resulting from its deficient TAR process when they jointly proposed an extension of the fact discovery deadline in February 2018." Pls.' Mem. at 15-16.[8] Plaintiffs explain that United's production was based on the results of the TAR process and to ensure accuracy and completeness, the parties entered into an agreement regarding a validation Protocol. *See* Pls.' Mot, Kenney Decl. Ex. 1 [Plaintiffs' (Initial) Proposals for United's Pre-TAR Search Term Culling & TAR Validation Process], Ex. 2 [Plaintiffs' Revised Proposals for United's Pre-TAR Search Term Culling & TAR Validation Process], Exs. 3-4 [e-mail exchange between counsel regarding the TAR process and the Protocol].[9] The Protocol (also referred to as the March 26 TAR Agreement) provided that the parties agree that:

> United will not "pre-set" its target value for estimated recall (i.e., the percent of responsive documents to be produced from the TAR corpus based on the control set metrics) at 75%. Instead, United will set a minimum estimated recall rate of 75% but will endeavor to achieve a higher estimated recall rate if that rate may be obtained with a reasonable level of precision through reasonable additional training effort, taking into account the concept of proportionality and the deadline for substantial completion of document production. Plaintiffs and United will meet and confer to attempt to reach agreement regarding an acceptable recall rate after TAR training is well advanced and United reasonably believes further training to obtain a higher recall is not practicable.

Ex. 2 ¶ D. Recall is a "measure of completeness, reflected by the proportion (i.e., percent) of

---

[8] Plaintiffs anticipated the production of about 3 million documents and believed a nine-month period to review documents would be sufficient. Pls.' Mem. at 16. United questions Plaintiffs' method of estimating the number of documents that would have been produced. United Opp'n at 19.

[9] Plaintiffs engage in a more detailed discussion of the negotiation history and TAR Protocol in their Reply.

7

responsive documents found through a search process out of all possible responsive documents in the collection. *See* Grossman [First] Decl., ECF No. 270-3, ¶ 10 (emphasis omitted). Precision is a "measure of accuracy, or the proportion (i.e., percent) of the documents identified by a search or review process that are actually responsive." *Id.* Pursuant to the Protocol, United was to engage in validation testing by reviewing a statistically representative sample of documents to test the accuracy of TAR as to the responsiveness of the documents, and United would report to Plaintiffs the results of this review, which would permit Plaintiffs to calculate the rate of precision and the rate of recall. Ex. 2 ¶ E. More specifically, United would provide Plaintiffs with, *inter alia*, the total number of documents coded by the human reviewer as: (1) Responsive in the validation sample but predicted as Not Responsive by TAR ("false negatives"); (2) Responsive in the validation sample and correctly predicted as Responsive by TAR ("true positives"); and (3) Not Responsive in the validation sample but incorrectly predicted as Responsive by TAR ("false positives"). *See id.*

On April 27, 2018, one business day before the April 30, 2018 production deadline, United provided the TAR validation metrics to Plaintiffs and reported the precision and recall results from the "control set," where the estimated recall was 85% and the estimated precision was 58%, and United provided the validation sampling metrics required by the Protocol. Pls.' Mem. at 9. When Plaintiffs analyzed the metrics, they found that the statistics from the validation sample indicated that the TAR process resulted in a recall of 97.4% and precision of 16.7%. *See* Kenney Decl., ECF No. 270-4, ¶ 20. Beginning in May and continuing through late July, Plaintiffs and United engaged in a series of back and forth exchanges regarding the metrics and the reasons why the results between the control set and final production varied, culminating in United indicating that

8

"it had incorrectly reported the control set metrics, and that the correct control set metrics were, in fact, consistent with the validation sample results." Pls.' Mem. at 9; *see* Ex 5 [e-mail exchange between counsel post-dating the production] at 2. According to Plaintiffs, that is when they "fully understood" that the core production of 3.5 million documents contained only 600,000 documents that were responsive. Pls.' Mem. at 10.

Plaintiffs explain that they consulted with United, and the parties considered various options to "alleviate the problem," but the answer seems to be that unless United starts the process over, Plaintiffs must review all the documents.[10] Pls.' Mem. at 6; Grossman [First] Decl. ¶ 18. One of these options was for Plaintiffs to use their own TAR methodology, which they use to prioritize documents, but Plaintiffs determined that, "even with further training, the tool is unlikely to weed out the millions of non-responsive documents from United's production." Pls.' Mem. at 11; Kenney Decl. ¶ 25. Because Plaintiffs are unable to segregate the large number of non-responsive documents from the responsive documents within the time remaining before the discovery deadline, so that they can use the responsive documents to prepare for depositions, motions practice, and trial, they have asked this Court for an extension of the deadline.[11]

---

[10] In their briefing, the Plaintiffs and United both reference a potential overlay from United that would identify the documents that would have been produced at a higher level of precision, but there is disagreement as to the effectiveness of such overlay, and at this point, it is too late for any overlay to be a factor considered regarding this Motion.

[11] This Court does not find it necessary to address specifically Plaintiffs' allegation that Defendant United "dumped" documents on them thereby shifting the pre-production burden, or Defendant's counter-allegation that, in October of 2017, Plaintiffs indicated that they did not want Defendants to manually review the documents to cull out non-responsive ones. These allegations are tangential to the issue of whether there were unforeseen or unanticipated matters, *i.e.*, a greater than anticipated number of non-responsive documents arising from the TAR process and errors associated therewith, which impede Plaintiffs from meeting the current deadlines.

Delta does not challenge the proposition that Plaintiffs had to address unforeseen or unanticipated matters; instead, Delta questions why Plaintiffs were unable to use their own TAR process to segregate documents, but this is explained to the Court's satisfaction in the Plaintiffs' pleadings and attachments thereto. United seems to shift the blame onto Plaintiffs regarding their core production, which encompasses millions of non-responsive documents, under the theory that Plaintiffs always stressed their desire for a high TAR recall without focusing on precision. *See* United Opp'n at 10 ("Plaintiffs got what they bargained for."); Sepulveda Decl. ¶¶ 18-19 (indicating that Plaintiffs approved of a proposed 85% recall without asking about the corresponding precision estimate because they were concerned with recall more than precision); Lewis Decl. ¶ 19 (defining recall and precision).[12] United's assertion is contradicted however by the language of the Protocol, which notes that "a reasonable level of precision" was a concern. *See* Pls.' Ex. 2 ¶ D.

In its Opposition, United spends a good deal of time on its argument that its precision level and the resulting document production are reasonable, but that argument is irrelevant to the issue at hand, which is whether United's core production of 3.5 million documents — containing numerous nonresponsive documents — was unanticipated by Plaintiffs, considering the circumstances leading up to that production. Having reviewed the Protocol and the correspondence between counsel, and the declarations attached to the pleadings, the Court finds that Plaintiffs have demonstrated that despite exercising diligence, there are unforeseen or

---

[12] Brendan Selpulveda is an attorney admitted to practice law in the District of Columbia and Virginia, and an associate with the law firm of Crowell & Moring, which represents Defendant United Airlines, Inc. Selpuveda Decl. ¶ 1. David D. Lewis is the Chief Data Scientist for Brainspace, a business of Cyxtera Technologies. Lewis Decl. ¶ 1.

unanticipated matters which thwart their compliance with the deadlines previously set. Accordingly, the second factor for a demonstration of Plaintiffs' diligence has been met.

This brings us to the third factor, whereby Plaintiffs must have diligently sought an amendment of the schedule once it became apparent that they could not comply with it. Delta asserts that Plaintiffs knew the size of the document production as of April 30, 2018, but they did not file the instant Motion until August of 2018. United argues that "[w]hile it is true that the control set disclosure contained in United's April 27 letter contained an error, Plaintiffs nonetheless had sufficient information as of April 27 to object to United's TAR precision and engage in meet-and-confer discussions," but they did not do so. United Opp'n at 14. United notes that Plaintiffs "waited" until May 23, 2018, to ask questions about the discrepancy between the control set and the actual production, but even then, they did not raise objections to the precision of the production until August 16, 2018, when they indicated that they were going to seek an extension of deadlines. *See* Selpulveda Decl. ¶¶ 25-26, 33. As previously discussed, Plaintiff and United engaged in multiple discussions after the April 30, 2018 core document production, to try to determine the reasons for the discrepancy in recall and precision between the control set and the actual production and to attempt to resolve the issue of Plaintiffs having to sift through so many non-responsive documents, but there was no resolution of this issue. In the meantime, Plaintiffs devoted considerable resources to the review of the United documents prior to filing this motion seeking an extension. The record before this Court indicates that approximately three weeks after the end of the e-mail exchange between counsel, Plaintiffs informed United that they would be filing a motion to extend discovery deadlines, and that motion was filed about a month prior to the first deadline which they seek to extend. Considering the circumstances in this case, the Court

finds that Plaintiffs exercised diligence in seeking an extension of deadlines, and accordingly, Plaintiffs have demonstrated all three factors necessary for a finding of diligence.

**2. Prejudice to the Non-Moving Parties**

The Court next turns to an evaluation of any prejudice to the non-moving parties if the requested deadlines are extended by six months. On the one hand, United's only claim of "prejudice" rests on its allegation that, if the extension is granted, it will "put this action on a path for trial in mid-2020, some *five years* after the putative class complaints were filed in the summer of 2015," and Plaintiffs "should not be allowed to prolong this action any longer[.]" United Opp'n at 5 (emphasis in original). Delta alleges that it has "expended significant resources to ensure timely compliance with the Court's deadlines [and] Delta has relied on these deadlines in scheduling depositions for its senior executives, and it would be highly disruptive to cancel and reschedule those depositions[.]" Delta Opp'n at 2.

On the other hand, Plaintiffs have articulated that "[a]bsent a schedule extension, Plaintiffs will be forced to proceed with depositions, and possibly to summary judgment at the close of fact discovery, without the benefit of a sufficient review of the documents." [13] Plaintiffs note that they seek an extension of discovery five months before the fact discovery deadline as opposed to after the close of discovery or on the eve of trial, and furthermore, they do not seek to serve new discovery, and therefore, the extension poses no unfair surprise to the Defendants. In summing up the balance of prejudices in this case, Plaintiffs state that:

> The only impact of Plaintiffs' proposed extension is to shift the case schedule out six months for the fact discovery and the class certification deadline, depositions, requests for admissions, and motions to compel. Plaintiffs' proposal does not affect the pretrial

---

[13] Pending before this Court is a motion by Defendants to set a summary judgment briefing schedule, ECF No. 277.

> schedule since the schedule for summary judgment, other pretrial proceedings, and trial has not been set. Plaintiffs' need for sufficient time to review the documentary record — key to liability in this case — prior to taking depositions outweighs any potential inconvenience to Defendants from a six month delay.

Pls.' Mem. at 21; *see United States v. Sci. Applications Int'l Corp.*, 301 F.R.D. 1, 4 (D.D.C. 2013) ("[M]inimal delay to the trial is significantly outweighed by the potential value that the evidence has to a central issue at retrial."); *see also Equal Rights Ctr. v. Post Properties, Inc.*, 2008 WL 11391642, at *2 (finding prejudice was minimal where the summary judgment and trial were still distant).

Weighing the Defendants' vague claims of "prejudice" against the actual prejudice that the Plaintiffs will incur in not having sufficient information before undertaking depositions, in the context of this multidistrict class action lawsuit where the potential class includes millions of persons, the Court finds that Plaintiffs' claim of prejudice in not having the deadlines extended far outweighs any inconvenience that Defendants will experience if the deadlines are extended. Accordingly, this factor of prejudice weighs in favor of Plaintiffs' request for extension of deadlines.

### 3. Other Factors for the Court to Consider

The other factors that weigh into this Court's consideration of whether to modify a schedule are: (1) whether the request for modification is opposed; (2) the trial date; (3) the likelihood discovery will lead to relevant evidence; and (4) the foreseeability of the need for additional discovery in the light of time allotted by the district court. The Court acknowledges that the request for extension of deadlines is opposed and the Court has addressed the arguments set forth by all parties within this Memorandum Opinion. In this case, no pretrial or trial date has been set, and trial is not imminent. Because this is a production of core documents by the Defendants, and the

production was made after numerous negotiations regarding search terms and methodologies, it is no stretch of the imagination that the documents which are responsive to Plaintiffs' discovery requests are likely to lead to relevant evidence.

With regard to the foreseeability of the need for additional discovery, the Plaintiffs explain that "the parties waited until they had largely completed search methodology negotiations to propose a schedule so Defendants would have [a] realistic sense of how much time was needed for production." Pls.' Mem. at 22. The Court set a strict schedule for discovery and insisted repeatedly that the parties comply with the deadlines in that schedule. The parties proceeded with discovery and they were complying with those deadlines until Plaintiffs received United's core production, which included numerous unanticipated non-responsive documents due to a glitch in United's TAR production. Thereafter, Plaintiffs realized that they would not be able to review all the United documents in accordance with the current deadlines, and they requested an extension in a timely manner. Accordingly, Plaintiffs' need for additional time to pursue discovery did not become apparent to the Plaintiffs until after United produced its core documents. Taken together, these additional factors relevant to the "good cause" analysis weigh in favor of the Plaintiffs.

## IV. CONCLUSION

The legal standard for this Court to modify a schedule permits this Court to exercise its discretion so long as the party seeking the modification shows good cause. In the instant case, Plaintiffs have demonstrated that they were diligent in assisting the Court to develop a workable scheduling order. Plaintiffs have demonstrated further that their compliance with the deadlines set in that scheduling order is hindered by matters that were unforeseen; *i.e.*, United's production of core documents that varied greatly from the control set in terms of the applicable standards for

recall and precision and included a much larger number of non-responsive documents that was anticipated. Additionally, Plaintiffs diligently sought an amendment of the schedule after it became apparent that there was no way to resolve the excess non-responsive document issue short of starting over, and the 70 attorneys engaged in document review were not going to be able to complete the job under the current deadlines. Moreover, while the Plaintiffs have claimed credibly that a denial of an extension of the deadlines will harm their ability to pursue their case in an informed manner, particularly regarding depositions, the Defendant have not proffered any prejudice except for general protestations of delay and inconvenience.

The Court concludes, in the exercise of its discretion, that Plaintiffs have demonstrated good cause to warrant an extension of deadlines in this case based upon Plaintiffs' demonstration of diligence and a showing of nominal prejudice to the Defendants, if an extension is granted, while Plaintiffs will be greatly prejudiced if the extension is not granted. Accordingly, the Court shall GRANT Plaintiffs' [270] Motion for Extension of Fact Discovery Deadlines, with the proviso that no further extensions of discovery will be considered by this Court. A separate Order accompanies this Memorandum Opinion.

DATED: September 13, 2018 _____/s/_____
COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE