**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE DOMESTIC AIRLINE TRAVEL ANTITRUST LITIGATION | NO. 1:15-mc-01404-CKK<br><br>MDL No. 2656 |
| This Document Relates To:<br><br>ALL CASES | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AGREEMENTS WITH <u>SOUTHWEST AIRLINES CO. AND AMERICAN AIRLINES, INC.</u>**

TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND ................................................................................................... 2

       A.   Procedural Background ............................................................................. 2

       B.   The Settlement Negotiations and Settlement Terms ................................. 4

            1.    Southwest ....................................................................................... 4

            2.    American ......................................................................................... 7

       C.   Preliminary Approval and the Class Notice Program ............................... 9

       D.   Class Notice ............................................................................................. 9

III.   ARGUMENT ..................................................................................................... 12

       A.   The Proposed Settlements are Fair, Reasonable, and Adequate and
            Should Be Finally Approved. .................................................................. 12

            1.    The Settlements Are the Results of Arm's Length Negotiations
                  Between Experienced Class Counsel. .......................................... 13

            2.    The Settlement Terms Are Reasonable Given the Strength of
                  the Plaintiffs' Case and the Risks of Continued Litigation. ....... 14

            3.    At the Time of Settlement, The Litigation Was Sufficiently
                  Developed ..................................................................................... 18

            4.    The Reaction of Class Members ................................................... 19

            5.    Experienced Counsel Deem the Settlements to Be Fair,
                  Reasonable, and Adequate ........................................................... 19

       B.   Notice to the Settlement Classes Comported with Rule 23 and Due Process ........... 20

       C.   The Court Should Grant Final Certification of the Proposed Settlement Classes ..... 21

IV.    CONCLUSION ................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ...............................................................................................20, 22

*Andrx Pharm., Inc. v. Biovail Corp. Int'l*,
   256 F.3d 799 (D.C. Cir. 2001) ...............................................................................18

*In re Auto. Parts Antitrust Litig. (Wire Harness Systems)*,
   ECF No. 577 (E.D. Mich. July 10, 2017) ...............................................................15

*In re Baan Co. Sec. Litig.*,
   284 F. Supp. 2d 62 (D.D.C. 2003) ..........................................................................13

*In re Capacitors Antitrust Litig.*,
   Case No. 14-cv-03264-JD, ECF No. 1934 (N.D. Cal. Oct. 30, 2017)....................15

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   MDL No. 1917, 2015 WL 9266493 (N.D. Cal. Dec. 17, 2015) ..............................16

*Ceccone v. Equifax Info. Servs. LLC*,
   No. 13-cv-1314, 2016 WL 5107202 (D.D.C. Aug. 29, 2016) .................................13

*Cohen v. Chilcott*,
   522 F. Supp. 2d 105 (D.D.C. 2007) ...........................................................13, 18, 19

*In re Corrugated Container Antitrust Litig.*,
   No. MDL 310, 1981 WL 2093 (S.D. Tex. June 4, 1981) ..................................15, 17

*In re Domestic Airline Travel Antitrust Litig.*,
   322 F. Supp. 3d 64 (D.D.C. 2018) ..........................................................................20

*Freeport Partners, LLC v. Allbritton*,
   No. Civ.A. 04-2030, 2006 WL 627140 (D.D.C. Mar. 13, 2006)............................13

*Howard v. Liquidity Servs. Inc.*,
   No. CV 14-1183 (BAH), 2018 WL 4853898 (D.D.C. Oct. 5, 2018)................13, 18

*In re Initial Pub. Offering Sec. Litig.*,
   226 F.R.D. 186 (S.D.N.Y. 2005) .............................................................................17

*In re Linerboard Antitrust Litig.*,
   292 F. Supp. 2d 631 (E.D. Pa. 2003) ................................................................15, 17

*In re LivingSocial Mktg. and Sales Practice Litig.*,
    298 F.R.D. 1 (D.D.C. 2013)................................................................................13

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    MDL No. 1290, 2003 WL 22037741 (D.D.C. June 16, 2003) ...........................16, 19

*Mayfield v. Barr*,
    985 F.2d 1090 (D.C. Cir. 1993) ........................................................................12

*Meijer Inc. v. Warner Chilcott Holdings Co. III Ltd.*,
    565 F. Supp. 2d 49 (D.D.C. 2008) ..............................................................12, 13, 20

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985) ..........................................................................................17

*In re Packaged Ice Antitrust Litig.*,
    No. 08-MD-01952, 2011 WL 717519 (E.D. Mich. Feb. 22, 2011) ........................17

*Pigford v. Glickman*,
    185 F.R.D. 82 (D.D.C.1999)...............................................................................16

*Precision Assocs. v. Panalpina World (Holding) Transp. Ltd.*,
    No. 08-cv-42 (JG) (VVP), 2013 WL 4525323 (E.D.N.Y. Aug. 27, 2013).............17

*Prince v. Aramark Corp.*,
    No. 16-cv-1477 (D.D.C. March 14, 2017), ECF No. 33 (Kollar-Kotelly, J.)........12

*Radosti v. Envision EMI, LLC*,
    717 F. Supp. 2d 37 (D.D.C. 2010) ......................................................................13

*Thomas v. Albright*,
    139 F.3d 227 (D.C. Cir. 1998) ...........................................................................12

*In re Transpacific Passenger Air Transportation Antitrust Litig.*,
    No. 07-05634-CRB, ECF Nos. 968, 1009 ...........................................................15

*United States v. MTU Am. Inc.*,
    105 F. Supp. 3d 60 (D.D.C. 2015) ......................................................................12

*Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*,
    246 F.R.D. 349 (D.D.C. 2007).......................................................................13, 16

*In re Vitamin C Antitrust Litig.*,
    No. 06-MD-1738 BMC JO, 2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) ...........15

*In re Vitamins Antitrust Litig.*,
    305 F. Supp. 2d 100 (D.D.C. 2004) ............................................................12, 13, 20

*In re Vitamins Antitrust Litig.*,
    No. MDL 1285, 2001 WL 1772352 (D.D.C. Nov. 30, 2001)..................................................16

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005).......................................................................................................21

**Statutes**

Sherman Act Section 1, 15 U.S.C, § 1 ..........................................................................................2

**Rules**

Federal Rule of Civil Procedure 23 ...................................................................................... passim

**Other Authorities**

Joshua P. Davis & Robert H. Lande, *Summaries of Twenty Cases of Successful
    Private Antitrust Enforcement, Univ. S.F. Law Research Paper No. 2013-01*.......................18

Robert H. Lande & Joshua P. Davis, *Benefits from Private Antitrust Enforcement:
    An Analysis of Forty Cases*, 42 U.S.F.L. Rev. 879, 907 (2008) .............................................18

## I.   INTRODUCTION

Class Plaintiffs, on their own behalf and on behalf of the Settlement Classes, as defined below, respectfully submit this memorandum in support of their motion for final approval of the settlements ("Settlements") reached with Defendants Southwest Airlines Co. ("Southwest") and American Airlines, Inc. ("American").[1]

The Settlement with Southwest requires it to make a $15 million cash payment and provide significant cooperation to Plaintiffs in pursuing their case against the non-settling Defendants. The Settlement with American requires it to make a $45 million cash payment and also undertake certain actions in connection with Plaintiffs in pursuing their case against the non-settling Defendants.   As set forth in more detail below and in the Declaration of Hilary K. Scherrer ("Scherrer Decl.") filed herewith, these settlements were reached after significant litigation and discovery, and hard-fought, arm's length negotiations by experienced counsel, and the cumulative $60 million settlement fund represents an excellent recovery for the class. The Settlements are fair, reasonable, and adequate under the governing standards in this Circuit and therefore warrant final approval. Additionally, the Court should find that Plaintiffs' class notice program has been conducted in accordance with Court-approved notice plan and comports with Rule 23 and due process.   Finally, the Court should grant final certification of the Settlement Classes under Rules 23(a) and 23(b)(3).

---

[1]   The Southwest and American Settlement Agreements were filed with the Court on December 29, 2017 and June 15, 2018 respectively (ECF Nos. 196-2 and 248-2) and are available for class members to review on the settlement website (www.DomesticAirClass.com).

## II.   BACKGROUND

### A.  Procedural Background

Beginning in July of 2015, numerous cases were filed around the country against the four largest commercial air passenger carriers in the United States—Southwest, American, Delta Air Lines, Inc. ("Delta"), and United Airlines, Inc. ("United") (collectively, "Defendants")—alleging that they violated Section 1 of the Sherman Act, 15 U.S.C, § 1, by, *inter alia*, colluding to limit capacity and increase prices for domestic airfares.  The cases were consolidated and assigned to this Court by the Judicial Panel on Multidistrict Litigation in October 2015, and Hausfeld LLP and Cotchett, Pitre & McCarthy LLP were appointed Interim Co-Lead Counsel on February 4, 2016. ECF No. 76.

In May 2016, Defendants filed a joint motion to dismiss arguing that Plaintiffs had not sufficiently alleged a plausible conspiracy or facts sufficient to establish their standing.  ECF No. 106. Southwest also filed a separate motion to dismiss arguing, *inter alia,* that Southwest employed a fundamentally different business model than the other Defendants and that it was an aggressive competitor, not a conspirator.  ECF No. 110.  The briefing and accompanying exhibits on these motions was extensive, totaling over a thousand pages.  ECF Nos. 106, 110, 116, 120, 121. Ultimately, the Court denied both motions to dismiss (ECF No. 124), and the parties commenced discovery in early 2017.

Discovery in this case has been an enormous undertaking, including but not limited to, the following tasks performed by Plaintiffs' Counsel:

- Drafting, negotiating, and submitting various protocols and stipulations with Defendants, such as: Discovery Stipulation and Order (ECF No. 160), Stipulated Protective Order Regarding Confidential and Privileged Materials (ECF No. 162), Stipulation and Order Regarding the Search for and Production of Electronically Stored Information and Hard Copy Documents (ECF No. 167), Stipulated Amended Scheduling Order Regarding Discovery and Summary Judgment (ECF No. 290), and others;

- Drafting, serving, and meeting and conferring over comprehensive sets of written discovery propounded by Plaintiffs. Plaintiffs have served three sets of interrogatories and three sets of document requests on Defendants. This written discovery has resulted in extensive meeting-and-conferring over the scope of Defendants' significant document productions in this case;

- Drafting and serving 42 subpoenas directed at non-parties, including dozens of subpoenas to the investment analyst community, other investors, airline industry associations, and phone companies. These subpoenas have similarly resulted in extensive meeting-and-conferring over the scope of the non-party productions;

- Engaging in extensive meet and confer negotiations with Defendants regarding the scope of their structured data, non-structured data, document productions, including search methodologies, data sources, search terms, and the scope of Defendants' responses to over 45 document requests and selection of Defendants' document custodians;

- Reviewing, analyzing, and collating millions of Defendants' documents (Defendants have collectively produced over six terabytes or 6.7 million documents constituting 27 million pages);

- Reviewing, and analyzing Defendants' transactional data (Defendants have collectively produced nearly one terabyte of sales data)—data critical to Plaintiffs' expert analysis;

- Obtaining, reviewing, and analyzing document productions from non-parties (non-parties have collectively produced over 250 gigabytes of documents and data excluding phone record productions);

- Briefing various motions to compel discovery by and against Defendants and non-parties;

- Participating in dozens of telephonic and in person conferences with the Special Master and Defendants regarding their discovery obligations;

- Responding to five sets of interrogatories and three sets of document requests propounded by Defendants with respect to the named Plaintiffs, including engaging in substantial meeting-and-conferring over the scope of their collection and production;

- Conducting research and analyses to determine proposed deponents of Defendants, reviewing documents of said deponents, and preparing deposition strategies for use at their depositions;

- Pursuing settlement cooperation from Southwest and American; and

- Consulting with economists and industry experts to build damages and models based on the facts of the industry.[2]

---

[2] A full recitation of the litigation events and extensive tasks performed by Class Counsel may be

As discussed in more detail below, at the time of settlement with both Southwest and American, Class Counsel were well-informed regarding the facts of this case, including the relative strengths and weaknesses of the parties' respective positions. Scherrer Decl. at ¶¶ 10, 19. Discovery conducted since the Southwest Settlement was consummated lends further support to Class Counsel's belief that the settlements are fair, reasonable, adequate and in the best interest of the classes. *Id.* at ¶ 21.

### B.  The Settlement Negotiations and Settlement Terms

#### 1.  Southwest

Co-Lead Counsel and counsel for Southwest first discussed settlement in September 2017. *Id.* at ¶ 6. Thereafter, over the course of three months, the parties engaged in hard-fought, arm's length negotiations. *Id.* ¶¶ 5-6. Southwest's counsel are highly experienced and capable, and, at all times, each side vigorously advocated its client's positions in the settlement negotiations. *Id.* at ¶ 7. The parties participated in numerous in-person and telephonic sessions and exchanged positions and drafts by email. *Id.* at ¶ 6. The settlement amount and other key terms of the agreement in principle were memorialized in a Memorandum of Understanding, dated November 20, 2017. *Id.* at ¶ 8. Thereafter, the parties continued negotiations regarding the detailed provisions of a Settlement Agreement, which was executed on December 20, 2017. *Id.* at ¶ 9.

At the time of settlement, Plaintiffs were in receipt of and had conducted an extensive review of the over 450,000 documents Defendants had produced to the United States Department of Justice as part of its investigation into anticompetitive conduct in the airline industry.

---

found in the Memorandum in Support of Plaintiffs' Motion for Award of Attorneys' Fees, Reimbursement of Reasonable Litigation Expenses, and Award of Future Litigation Expense and the joint declaration of Adam J. Zapala and Michael D. Hausfeld accompanying it, filed

Scherrer Decl. at ¶ 10.   Plaintiffs had received an additional 180,000 documents produced by American separate and apart from its DOJ production as well as over 88,000 documents produced by sixteen third parties.   *Id.* Additionally, among other things, Plaintiffs had consulted with experts and conducted economic and legal analyses of the U.S. airline industry and the alleged anticompetitive conduct in this case.   *Id.*   Thus, Co-Lead Counsel were well-informed of the facts and issues concerning liability and damages and the relative strengths and weaknesses of each side's litigation position. *Id.*

Pursuant to the Settlement Agreement, Southwest made a cash payment of $15 million and agreed to provide extensive cooperation, including the following:

- Pursuant to inquiries and direction from Class Counsel, Southwest's Counsel shall provide a full account of information known to Southwest that is relevant to the claims asserted in the Action, including, but not limited to, information related to the alleged conduct, the specific locations and dates of and participants in meetings and communications to which Class Counsel are interested, the alleged conduct's effect on pricing and profitability in the domestic air transportation industry, the identities of persons that have knowledge of information related to the alleged conduct, including current and former employees of Southwest, the other Defendants, and third parties, and the role of institutional investors and analysts in the domestic air transportation industry;

- Southwest's Counsel shall facilitate an informational meeting or meetings between Plaintiffs' Counsel and an industry expert regarding items of interest to Class Counsel. Southwest will pay for up to sixteen (16) hours of the industry expert's time;

- At Southwest's expense, Southwest shall use its good faith best efforts to make available for interviews with Plaintiffs' Counsel and/or their experts up to seven (7) current Southwest employees at the Vice President level or lower or former Southwest employees at the Vice President level or lower represented by Southwest's Counsel, as designated by Plaintiffs' Counsel;

- Southwest shall use its good faith best efforts to make available up to three (3) current Southwest employees at the Vice President level or lower or former Southwest employees at the Vice President level or lower represented by Southwest's Counsel, as designated by Plaintiffs' Counsel, to provide deposition testimony in the Action;

concurrently herewith and posted on the settlement website for class members to review.

- Southwest shall use its good faith best efforts to make available up to two (2) current Southwest employees at the Vice President level or lower or former Southwest employees at the Vice President level or lower represented by Southwest's Counsel, as designated by Plaintiffs' Counsel, to provide a declaration or affidavit;

- With respect to senior executive management (above Vice-President level), Southwest, at a time mutually agreeable to the parties but in all events prior to the close of fact discovery, will provide information gathered from those senior executives through an attorney proffer session(s).  At a later date, and upon Plaintiffs' request, Southwest will undertake good faith best efforts to provide information in an admissible evidentiary format (via affidavit/declaration or otherwise) in response to a reasonable number of targeted, specific requests for particular information; and

- Southwest shall use its good faith best efforts to make available for testimony at trial in the Action one (1) then-current Southwest employee at the Vice President level or lower designated by Plaintiffs' Counsel who possesses information, based on Plaintiffs' Counsel's good faith belief, that would assist Class Plaintiffs in the trial of the Class Plaintiffs' claims as alleged in the Action.

Southwest Settlement Agreement at ¶¶ 37, 45-53.

In addition, Southwest will stipulate to the certification of the following Settlement Class for settlement purposes only:

> All persons and entities that purchased air passenger transportation services for flights within the United States and its territories and the District of Columbia from Defendants or any predecessor, subsidiary or affiliate thereof, at any time between July 1, 2011 and December 20, 2017. Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, Defendants' officers, directors, employees, and immediate families, and any judges or justices assigned to hear any aspect of this action.

*Id.* at ¶ 22.  In exchange for the consideration described above, members of the Settlement Class shall release Southwest from any and all claims that were or could have been alleged in this Action arising out of the identical factual predicate of this Action.  *Id*. at ¶ 32. Excluded from the release are claims for product liability, personal injury, breach of warranty, breach of contract, violation of the Uniform Commercial Code or any other claims that were not or could not have been alleged in the Action whatsoever that are not related to the subject matter of the Complaint.

*Id.* at ¶ 34.[3]   Importantly, claims against the non-settling Defendants are not released by the Settlement and the sales of domestic air passenger transportation services by Southwest to Class Members and the damages associated therewith shall remain in the case against the Non-Settling Defendants.  *Id.* at ¶ 63.

### 2. American

Co-Lead Counsel and counsel for American first discussed settlement in March 2018. Scherrer Decl. at ¶ 16. Thereafter, over the course of three months, the parties engaged in hard-fought, arm's length negotiations.  *Id.* at ¶¶ 15-16. American's counsel are highly experienced and capable, and, at all times, each side vigorously advocated its client's positions in the settlement negotiations.  *Id.* at ¶ 17.  The parties participated in numerous in-person and telephonic negotiation sessions and exchanged positions and drafts by email.  *Id.* at ¶ 16.  These negotiations continued, and a final agreement was reached on the detailed provisions of a Settlement Agreement, which was executed on June 14, 2018.  *Id.* at ¶ 17.

At the time of the American settlement, Co-Lead Counsel had received over six million documents produced by Defendants, which Co-Lead Counsel were continuing to review.  *Id.* at ¶ 19.  In addition, Co-Lead Counsel had received cooperation from Southwest that informed their negotiations with American.  *Id.*  Thus, Co-Lead Counsel were well-informed of the facts and issues concerning liability and damages and the relative strengths and weaknesses of each side's litigation position. *Id.*

Pursuant to the Settlement Agreement, American made a cash payment of $45 million and agreed to undertake certain actions in connection with Plaintiffs pursuing their case, including making available for deposition up to three current American employees or former

---

[3] The full text of the proposed release, including the limitations thereof, is set forth in the

American employees as designated by Plaintiffs' Counsel, answering questions regarding American's documents and transactional data, and producing business records and authenticity declarations or affidavits.   American Settlement Agreement at ¶¶ 37, 47-49.   At Plaintiffs' Counsel's request, American will also meet and confer regarding additional depositions, declarations, and/or affidavits.  *Id.* at ¶ 49(b).

In addition, American will stipulate to the certification of the following Settlement Class for settlement purposes only:

> All persons and entities that purchased air passenger transportation services for flights within the United States and its territories and the District of Columbia from Defendants or any predecessor, subsidiary or affiliate thereof, at any time between July 1, 2011 and June 14, 2018. Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, Defendants' officers, directors, employees, and immediate families, and any judges or justices assigned to hear any aspect of this action.

*Id.* at ¶ 22.  In exchange for the consideration described above, members of the Settlement Class shall release American from any and all claims that were or could have been alleged in this Action arising out of the identical factual predicate of the Action.  *Id.* at ¶ 32. Excluded from the release are claims for product liability, personal injury, breach of warranty, breach of contract, violation of the Uniform Commercial Code or any other claims that were not or could not have been alleged in the Action whatsoever that are not related to the subject matter of the Complaint. *Id.* at ¶ 34.[4]  Importantly, claims against the Non-Settling Defendants are not released by the Settlement and the sales of domestic air passenger transportation services by American to Class Members and the damages associated therewith shall remain in the case against the Non-Settling Defendants.  *Id.* at ¶ 63.

---

Southwest Settlement Agreement. *Id.* ¶¶ 32-34.

[4] The full text of the proposed release, including the limitations thereof, is set forth in the American Settlement Agreement. *Id.*

### C.  Preliminary Approval and the Class Notice Program

Plaintiffs filed a Motion for Preliminary Approval of Settlement with Southwest on December 29, 2017. ECF No. 196. On January 3, 2018, the Court entered an Order Preliminarily Approving the Settlement with Defendant Southwest. ECF No. 197. Plaintiffs then filed a Motion for Approval of Settlement Notice Program on March 23, 2018. ECF No. 218. Before the Court granted that motion, Plaintiffs entered into an agreement to settle with American, and on June 15, 2018, Plaintiffs filed a Motion for Preliminary Approval of Settlement with American. ECF No. 248. On June 18, 2018, the Court entered an Order Preliminarily Approving the Settlement with Defendant American. ECF No. 249.

On August 2, 2018, Plaintiffs filed a Motion for Approval of Settlement Notice Program, which combined notice for both the Southwest and American Settlements. ECF No. 257. The Notice Program proposed direct notice by email, to be supplemented by publication through print and media outlets, as well as an array of additional online services. ECF No. 218, 257.  On August 22, 2018, the Court approved Plaintiffs' proposed Settlement Notice Program and ordered Defendants to produce email addresses to Plaintiffs. ECF No. 267. In a written decision accompanying its order approving the Settlement Notice Program, the Court deemed the proposed notice "the best notice practicable under the circumstances of this case," in compliance with Fed. Rule Civ. Pro. 23 and due process.  ECF No. 268.

### D.  Class Notice

Notice was provided to potential Class Members consistent with the Settlement Notice Program approved by the Court, which included notice to potential members of the Settlement Classes via direct email notice, paid media, and online outreach. *See* Declaration of Shannon R. Wheatman, Ph.D. ("Wheatman Decl.") at ¶¶ 10-25.  The Notice Program also included the

establishment of a settlement website, toll-free number, and a post office box, as means for Class Members to obtain answers to questions about the Settlements. *Id.* at ¶¶ 26-30.

Kinsella Media, LLC ("Kinsella"), the notice provider retained by Plaintiffs and approved by the Court, provided direct notice via email to Class Members based on email contact information provided by Southwest, American, and the Non-Settling Defendants. Wheatman Decl. at ¶ 10. A total of 181,836,321 valid emails were provided by the Defendants and sent out to putative class members. *Id.* at ¶ 11. The email notice included language in French and Spanish telling recipients they could view a translation of the notice on the settlement website. *Id*. at ¶ 12.

To supplement direct notice, Kinsella arranged for publication notice in numerous national publications, including *Time* magazine, that were targeted to reach members of the settlement class. Wheatman Decl. at ¶¶ 18-19.  Kinsella also used digital advertising to provide Class Members with additional notice opportunities, placing internet and banner advertisements on online networks and websites. *Id.* at ¶ 20. Internet advertisements appeared on a rotating basis on the following online networks: Conversant, Facebook.com, Oath, and RhythmOne, delivering a total of 56,428,571 gross impressions. *Id.* Internet advertisements also included targeting tactics such as using third-party data[5], advertising on premium travel websites[6], and targeting ads to reach travel enthusiasts. *Id.* The direct notice combined with the paid media delivery is estimated to have reached 72.3% of airline flyers. *Id.* at ¶ 22.

---

[5] Ads were targeted to people based on third-party data that identified them as Southwest, Delta, United, or American customers; airline flyers; travelers; domestic air travelers; or business professionals.

[6] Ads were placed on specific websites/outlets related to travel.  Websites included: cheaptickets.com, expedia.com, homeaway.com, kayak.com, and travel.cnn.com.

Additionally, Kinsella conducted an earned media program as well as online outreach. Kinsella distributed a press release targeting journalists and influencers in the travel industry, reaching approximately 15,000 print and media outlets and more than 5,400 websites and online services. Wheatman Decl. at ¶ 24. The press release was viewed 24,204 times by web/online services, newspapers, and other media types. *Id.* Kinsella also implemented an online outreach program, emailing 1,135 influential bloggers, reporters, and online outlets that cover relevant travel-related topics; and websites, forums, and blogs that post about class action settlements, asking them to share news of the Settlements with their followers. *Id.* at ¶ 25.

Kinsella established the settlement website (www.DomesticAirClass.com) to enable potential Class Members to obtain information about the Settlements and to register to receive notices about future settlements, judgments, or significant litigation events. Wheatman Decl. at ¶ 26. By accessing the website, Class Members are also able to review and download documents regarding the Settlements, including the Long Form Notice, court documents, frequently asked questions, and the text of the email notice. *Id.* As of December 5, 2018, the Settlement Website has had 1,443,800 unique visitors. *Id.* at ¶ 27.

Finally, Kinsella established a toll-free phone number and post office box allowing Class Members to call or write for additional information about the Settlements, to request that a Notice be mailed to them, to hear frequently asked questions, or to leave a message and have someone return their call. *Id.* at ¶¶ 28-30. As of December 5, 2018, there have been 13,119 calls to the toll-free number. *Id.* at ¶ 29.

## III.    ARGUMENT

### A. The Proposed Settlements are Fair, Reasonable, and Adequate and Should Be Finally Approved.

Federal Rule of Civil Procedure 23(e) provides that: "A class action shall not be dismissed or compromised without the approval of the court," and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs. Pursuant to Rule 23(e), the Court must determine that a class action settlement is "fair, adequate, and reasonable and is not the product of collusion between the parties." *Thomas v. Albright,* 139 F.3d 227, 231 (D.C. Cir. 1998) (citation omitted).

While courts generally have discretion to decide whether to approve or reject a proposed settlement, *see Mayfield v. Barr,* 985 F.2d 1090, 1092 (D.C. Cir. 1993), that discretion "is constrained by the 'principle of preference' favoring and encouraging settlement in appropriate cases." *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d 100, 103 (D.D.C. 2004). This preferential treatment is a matter of public policy in the D.C. Circuit, which strongly favors and encourages settlements, particularly in class actions and other complex matters, to avoid the inherent costs, delays, and risks of continued litigation. As this Court has stated, "[t]here is a longstanding judicial attitude favoring class action settlements." Mem. Op., *Prince v. Aramark Corp.,* No. 16-cv-1477 (D.D.C. March 14, 2017), ECF No. 33 (Kollar-Kotelly, J.); *see also Meijer Inc. v. Warner Chilcott Holdings Co. III Ltd.*, 565 F. Supp. 2d 49, 54 (D.D.C. 2008) (Kollar-Kotelly, J.); *Mayfield,* 985 F.2d at 1092; *United States v. MTU Am. Inc.*, 105 F. Supp. 3d 60, 63 (D.D.C. 2015) ("Settlement is highly favored, as "'[n]ot only the parties, but the general public as well, benefit from the saving of time and money that results from the voluntary settlement of litigation.'") (quoting *Citizens for a Better Env't. v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir.

1983)); *Freeport Partners, LLC v. Allbritton*, No. Civ.A. 04-2030, 2006 WL 627140, at *8 (D.D.C. Mar. 13, 2006) ("Public policy in this Circuit favors settlement of class actions . . .").

In the D.C. Circuit, there is no single test for evaluating a proposed settlement under Rule 23(e). *See In re LivingSocial Mktg. and Sales Practice Litig.*, 298 F.R.D. 1, 11 (D.D.C. 2013); *see also, e.g.*, *Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 54 (D.D.C. 2010); *Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*, 246 F.R.D. 349, 360 (D.D.C. 2007)*.* Rather, courts in this Circuit generally have considered five factors: (1) "whether the settlement is the result of arm's length negotiations;" (2) "the terms of the settlement in relation to the strength of plaintiffs' case;" (3) "the status of the litigation at the time of settlement;" (4) "the reaction of the class;" and (5) "the opinion of experienced counsel." *In re Vitamins*, 305 F. Supp. 2d at 104; *see also, e.g., Howard v. Liquidity Servs. Inc.*, No. CV 14-1183 (BAH), 2018 WL 4853898, at *4 (D.D.C. Oct. 5, 2018); *Ceccone v. Equifax Info. Servs. LLC*, No. 13-cv-1314, 2016 WL 5107202, at *8 (D.D.C. Aug. 29, 2016); *Cohen v. Chilcott*, 522 F. Supp. 2d 105, 117 (D.D.C. 2007) (Kollar-Kotelly, J.); *In re Baan Co. Sec. Litig.*, 284 F. Supp. 2d 62, 64 (D.D.C. 2003).

The Southwest and American Settlements satisfy all of these factors, and the Court should therefore approve them as fair, reasonable, and adequate.

### 1. The Settlements Are the Results of Arm's Length Negotiations Between Experienced Class Counsel.

"A presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Meijer,* 565 F. Supp. 2d at 49 (D.D.C. 2008) (quoting *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d at 104); *see also Radosti*, 717 F. Supp. 2d at 56 ("The opinion of experienced counsel 'should be afforded substantial consideration by a court in evaluating the reasonableness of a proposed settlement.'") (quoting *Cohen*, 522 F. Supp. 2d at 121).

Here, the parties' negotiations were hard-fought over a period of several months. Scherrer Decl. at ¶¶ 5-6, 15-16. Southwest's and American's counsel, who are highly experienced and capable, vigorously advocated their clients' positions in the settlement negotiations. *Id.* at ¶¶ 7, 18. Given the amount of litigation and discovery that had occurred at the time of the settlements, Class Counsel were well-informed of the facts and issues concerning liability and damages and the relative strengths and weaknesses of each side's litigation position. *Id.* at ¶¶ 10, 19. Moreover, as this Court itself recognized (*see* ECF Nos. 76, 203), Class Counsel have decades of experience litigating complex antitrust cases and have negotiated settlements in a wide range of cases, including many in the transportation and airline industries. Scherrer Decl. at ¶ 4; *see also* ECF No. 58-1. Given the evidence adduced to date, Class Counsel used their specific case knowledge and their experience in other cases to negotiate settlements on behalf of the Settlement Classes in a complex, difficult case. Scherrer Decl. at ¶¶ 11, 20.

Based on the totality of the information obtained and reviewed, Class Counsel are confident that the Settlement Agreements are well-founded and constitute a fair resolution of the claims against Southwest and American. In light of the non-collusive nature and procedural fairness of the settlements, the presumption of fairness, adequacy, and reasonableness should therefore attach.

### 2. The Settlement Terms Are Reasonable Given the Strength of the Plaintiffs' Case and the Risks of Continued Litigation.

The Settlement terms are reasonable in light of the strength of Plaintiffs' case and the attendant risks of continued litigation. Class Counsel have secured a $60 million recovery, which is particularly noteworthy because, despite investigating Defendants' conduct, the DOJ neither criminally prosecuted them nor obtained monetary restitution for the victims of Defendants'

alleged unlawful conduct.[7]   The Settlements also preserve Class Members' rights to recover the entire amount of damages against the Non-Settling Defendants based on joint and several liability (after an offset post-trebling for the settlement amounts).   *See In re Corrugated Container Antitrust Litig.*, No. MDL 310, 1981 WL 2093, at *17 (S.D. Tex. June 4, 1981) (noting that partial settlements preserved plaintiffs' ability to seek the entire amount of damages from non-settling defendants weighed in favor of settlement approval).

While Plaintiffs believe their cases against both Southwest and American are strong, there are still many hurdles to overcome in a case of this size and scope: class certification, *Daubert* motions, summary judgment, trial, and appeals could all potentially impede Plaintiffs' ability to secure a recovery for the Settlement Classes.   Scherrer Decl. at ¶¶ 13, 22; *see also In re Vitamin C Antitrust Litig.*, No. 06-MD-1738 BMC JO, 2012 WL 5289514, at *4 (E.D.N.Y. Oct. 23, 2012) ("Federal antitrust cases are complicated, lengthy, and bitterly fought, as well as costly."); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 639 (E.D. Pa. 2003)

---

[7] As set forth in the Long Form Notice approved by the Court and explained on the settlement website, Plaintiffs intend to distribute settlement proceeds to the class at a later date.   The purpose of this deferral is to minimize the administrative expense of distribution to a large settlement class by combining the distribution of the Southwest and American settlement proceeds with any future settlement or judgment proceeds from United and Delta, thereby maximizing recovery to class members and minimizing potentially large postage fees. Such deferrals are regularly approved by courts and do not preclude final approval of settlements or an award of attorneys' fees and expenses.   *See, e.g., In re Transpacific Passenger Air Transportation Antitrust Litig.*, No. 07-05634-CRB, ECF Nos. 968, 1009 (Judge Breyer granting approval of plan of allocation and final approval of interim settlements, ordering payment of attorneys' fees and reimbursement of litigation expenses with claims not being paid until the end of the case); *In re Auto. Parts Antitrust Litig.* (*Wire Harness Systems*), Master File No. 12-md-02311, Case No. 2:12-cv-00103, Order Approving End-Payor Plaintiffs' Plan of Allocation of the Settlements at ¶ 10 (ECF No. 577) (E.D. Mich. July 10, 2017) (approving a plan of allocation that contemplates paying class members at the end of the case to save expenses); *In re Capacitors Antitrust Litig.*, Case No. 14-cv-03264-JD, ECF No. 1934 (N.D. Cal. Oct. 30, 2017) (finally approving settlements, ordering an interim attorneys' fee award, and permitting distribution to the class at the end of the case).

("*Linerboard I*") ("An antitrust class action is arguably the most complex action to prosecute."). Southwest and American undoubtedly would have fought Plaintiffs at every procedural turn as well as on the merits, including contesting whether Plaintiffs had presented sufficient evidence of their respective involvement in any conspiracy and whether Plaintiffs had satisfied the standards for class certification set forth in recent Supreme Court and circuit opinions.

The Settlements avoid the risks of continued litigation, and courts weigh this consideration in favor of settlement approval. *See, e.g., Vista Healthplan*, 246 F.R.D. at 362 ("It is obvious that Plaintiffs faced significant risks in establishing both liability and damages and in continuing to trial, and that the fairness, adequacy, and reasonableness of the settlement must be viewed in light of these considerations.); *In re Lorazepam & Clorazepate Antitrust Litig.*, MDL No. 1290, 2003 WL 22037741, at *4 (D.D.C. June 16, 2003) (weighing risks and costs of continued litigation, which "operate to reduce the total potentially recoverable damages in this case," in favor of settlement); *see also In re Vitamins Antitrust Litig.*, No. MDL 1285, 2001 WL 1772352, at *3 (D.D.C. Nov. 30, 2001); *Pigford v. Glickman,* 185 F.R.D. 82, 104 (D.D.C.1999).

The $60 million total settlement amount is substantially enhanced by the cooperation Southwest and American have provided, and will continue to provide, under the Settlements. The value of this cooperation cannot be understated, particularly in light of the complexities of this case and this industry, in which Plaintiffs seek to establish the existence of a conspiracy among multiple large, sophisticated Defendants, facilitated by their relationships with the alleged conduits of the conspiracy: large institutional investors and the investor-analyst community. As the court in *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2015 WL 9266493 (N.D. Cal. Dec. 17, 2015), recently held, the "'provision of such assistance is a substantial benefit to the classes and strongly militates toward approval of the Settlement Agreement.'" *Id.*

at *6 (quoting *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 643 (E.D. Pa. 2003)); *see also Precision Assocs. v. Panalpina World (Holding) Transp. Ltd.*, No. 08-cv-42 (JG) (VVP), 2013 WL 4525323, at *9 (E.D.N.Y. Aug. 27, 2013); *In re Packaged Ice Antitrust Litig.*, No. 08-MD-01952, 2011 WL 717519, at *10 (E.D. Mich. Feb. 22, 2011) (noting cooperation "has already been beneficial to the Plaintiffs in their continued prosecution of their claims against the non-settling Defendants"); *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 197 (S.D.N.Y. 2005); *In re Corrugated Container*, 1981 WL 2093, at *16 ("The cooperation clauses constituted a substantial benefit to the class.").

The Southwest Settlement has additional value as an ice-breaker settlement. Courts commonly recognize the value of ice-breaker settlements in multi-defendant litigation. *See In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d at 643) (noting "that this settlement has significant value as an 'ice-breaker' settlement—it is the first settlement in the litigation—and should increase the likelihood of future settlements."). Indeed, less than four months after Southwest settled, American entered into settlement negotiations with Plaintiffs, ultimately settling for three times the amount of the Southwest Settlement. As the court in *Corrugated Container* explained: "[T]his strategy was designed to achieve a maximum aggregate recovery for the class and the fact that the later settlements were at considerably higher rates tends to show that the strategy was successful." 1981 WL 2093, at *23.

Finally, successful private enforcement actions significantly deter anticompetitive behavior. *See, e.g., Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 635 (1985) ("Without doubt, the private cause of action plays a central role in enforcing this regime. …The treble-damages provision wielded by the private litigant is a chief tool in the antitrust enforcement scheme, posing a crucial deterrent to potential violators."); *Andrx Pharm., Inc. v.*

*Biovail Corp. Int'l*, 256 F.3d 799, 805 (D.C. Cir. 2001) ("Private enforcement of the nation's antitrust laws also increases the likelihood that violators will be discovered."); *see also,* Robert H. Lande & Joshua P. Davis, *Benefits from Private Antitrust Enforcement: An Analysis of Forty Cases*, 42 U.S.F.L. Rev. 879, 907 (2008) ("[P]rivate litigation actually does a better job than the government in advancing the primary goal of the government's enforcement program: deterring illegal corporate behavior."); Joshua P. Davis & Robert H. Lande, *Summaries of Twenty Cases of Successful Private Antitrust Enforcement, Univ. S.F. Law Research Paper No. 2013-01*, SSRN (Jan. 30, 2013), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1961669. The significant Settlements in this case will serve to deter unlawful conduct by both the Settling Defendants and other industry actors.

### 3.   At the Time of Settlement, The Litigation Was Sufficiently Developed

In determining whether a proposed class action settlement is fair, adequate, and reasonable, "courts consider whether counsel had sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-a-vis the probability of success and range of recovery." *Cohen*, 522 F. Supp. 2d 105, 117. The settlement must "not come too early to be suspicious nor too late to be a waste of resources," but instead should occur "at a desirable point in the litigation for the parties to reach an agreement and to resolve the[ ] issues without further delay, expense, and litigation." *Howard*, 2018 WL 4853898, at *6 (quoting *In re Vitamins*, 305 F. Supp. 2d at 105).

As discussed above, the parties agreed to settle only after detailed factual investigation, significant motion practice, legal analysis, substantial discovery, and hard-fought negotiations. *See, supra*, 2, 4-5, 7. In addition, prior to the Settlement with American, Southwest had provided cooperation to Plaintiffs, which informed settlement negotiations with American. *Id*. at ¶ 19.

Therefore, at the time each Settlement was reached, both parties "possessed well-founded views of the merits of their respective positions and the potential for, and likely amount, of any recovery." *Cohen*, 522 F. Supp. 2d at 117.

### 4.   The Reaction of Class Members

The deadline for class members to object to the settlements and/or the fee and expense request or to opt out of the Settlements is January 4, 2019. ECF No. 285. Plaintiffs intend to address any objections and opt outs in a separate filing by February 22, 2019 (*i.e.*, one month before the final approval hearing).

### 5.   Experienced Counsel Deem the Settlements to Be Fair, Reasonable, and Adequate

Finally, the opinion of "experienced and informed counsel should be afforded substantial consideration by a court in evaluating the reasonableness of a proposed settlement." *In re Lorazepam*, 2003 WL 22037741, at *6. Class Counsel in these matters have extensive experience litigating and resolving complex antitrust class actions. Scherrer Decl. at ¶ 4; *see also* ECF No. 58 (Plaintiffs' Mot. in Support of Appointment of Hausfeld LLP and Cotchett, Pitre & McCarthy, LLP as Interim Co-Lead Counsel). Class Counsel strongly believe that these Settlements are fair, adequate, and reasonable for the reasons set forth, *supra*. The Court should credit counsel's opinion.

All settlement negotiations were undertaken in good faith by Class Counsel. Nothing in the course of the negotiations or the substance of the settlement "discloses grounds to doubt its fairness." *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d at 104 (citing *Manual for Complex Litig.* § 30.41 (3d ed.)); *see also Meijer*, 565 F. Supp. 2d at 55 ("The Court has been presented with absolutely no evidence that the settlement is anything other than the product of arm's-length negotiation between experienced counsel."). To the contrary, the arm's length nature of the

negotiations, the stage of the litigation at which they occurred, the protracted nature of these negotiations, and the involvement of experienced advocates throughout the process all support the conclusion that the proposed Settlement is fair, reasonable, and adequate, and should be approved.

All five factors thus weigh in favor of approval, and the Court should therefore grant Class Counsel's motion for final approval of the proposed Settlements.

### B.  Notice to the Settlement Classes Comported with Rule 23 and Due Process

Pursuant to Rule 23(e)(1), when approving a class action settlement, the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Further, for any class certified under Rule 23(b)(3), the court must direct to class members "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997). Notice need only be reasonably calculated to reach the class in order to satisfy due process. *In re Domestic Airline Travel Antitrust Litig.*, 322 F. Supp. 3d 64, 68 (D.D.C. 2018) (Kollar-Kotelly, J.) (collecting cases) (also ECF No. 268). Notice of a proposed settlement is adequate and satisfies Rule 23 and due process if it "fairly apprise[s] the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 114 (2d Cir. 2005) (internal citations omitted).

When it granted preliminary approval of the Settlements, the Court ordered a notice program that it deemed the best notice practicable under the circumstances of this case. ECF Nos. 267, 268. As set forth in more detail above, the Notice Program included direct and paid media notice that reached 72.3% of airline fliers.  Wheatman Decl. at ¶¶ 10-23. Those forms of

notice were supplemented by earned media and online outreach targeting journalists, bloggers, and influencers in the travel industry. *Id.* at ¶¶ 24-25. A website, toll-free number and post office box were established as means for Class Members to get additional information about the Settlements. *Id*. at ¶¶ 26-30.

Finally, the form and content of both the Publication Notice and the Long Form Notice clearly and effectively communicated information about the Settlements. *Id.* at ¶ 31. Specifically, the Publication Notice was designed to capture Class Members' attention with clear, concise, plain language. *Id.* at ¶ 32. The Notice directed readers to the Settlements website or toll-free number for more information. *Id.* No important or required information was missing or omitted. *Id.* In fact, this Notice stated all required information without omitting significant facts that Class Members need to understand their rights. *Id.* The Long Form Notice was available at the website or by calling the toll-free number. *Id.* at ¶ 33. The Long Form Notice provided substantial information, including all specific instructions Class Members need to follow to properly exercise their rights and background on the issues in the case. *Id.* It was designed to encourage readership and understanding in a well-organized and reader-friendly format. *Id.* The Long Form Notice was available in English and Spanish. *Id.*

Because the notice program was fully and timely carried out as required by the Court and provides the best notice practicable under the circumstances (*see* Wheatman Decl. at ¶ 34), the Court should reaffirm its prior ruling that the notice program satisfies the requirements of Rule 23 and due process.

**C.  The Court Should Grant Final Certification of the Proposed Settlement Classes.**

In the Court's Preliminary Approval Orders dated January 3, 2018 and June 18, 2018, the Court certified the Settlement Classes. ECF No. 197 ¶3; ECF No. 249 ¶3. Certification of the

Settlement Classes remains appropriate because, as discussed in the Preliminary Approval Briefs (ECF No. 196, 248) and reflected in the Court's Preliminary Approval Orders (ECF No. 197, 249), these Classes meet all the requirements of Rule 23(a) as well as the requirements of 23(b)(3). *See Amchem*, 521 U.S. at 614. Accordingly, Plaintiffs request that the Court grant final certification of the Settlement Classes under Rules 23(a) and 23(b)(3).

## IV.    CONCLUSION

For the foregoing reasons, Class Plaintiffs respectfully request the Court grant final approval of the Settlements, find that notice to the Settlement Classes comported with Rule 23 and due process, and grant certification of the proposed Settlement Classes.

Dated: December 5, 2018

Respectfully Submitted,

By: /s/ *Michael D. Hausfeld*

Michael D. Hausfeld
Hilary K. Scherrer
Jeannine Kenney
HAUSFELD LLP
1700 K Street NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
mhausfeld@hausfeld.com
hscherrer@hausfeld.com
jkenney@hausfeld.com

Michael P. Lehmann
Bonny E. Sweeney
HAUSFELD, LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone: (415) 633- 1908
mlehmann@hausfeld.com
bsweeney@hausfeld.com

Elizabeth J. Cabraser
Eric B. Fastiff

By: /s/ *Adam J. Zapala*

Adam J. Zapala
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: 650-697-6000
azapala@cpmlegal.com

Alexander E. Barnett
COTCHETT, PITRE & McCARTHY, LLP
40 Worth Street, 10th Floor
New York, NY  10013
Telephone: 212.201.6820
abarnett@cpmlegal.com

Warren T. Burns
Daniel H. Charest

Brendan P. Glackin
LIEFF CABRASER HEIMANN &
BERNSTEIN
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
ecabraser@lchb.com
efastiff@lchb.com
bglackin@lchb.com

Robert N. Kaplan
Gregory K. Arenson
Elana Katcher
KAPLAN, FOX & KILSHEIMER LLP
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
rkaplan@kaplanfox.com
garenson@kaplanfox.com
ekatcher@kaplanfox.com

BURNS CHAREST LLP
500 North Akard Street, Suite 2810
Dallas, TX 75201
Telephone: (469) 904-4550
wburns@burnscharest.com
dcharest@burnscharest.com