*Let this be filed C. Kollar-Kotelly Jan. 9, 2019*

December 2, 2018

Objection to *In re Domestic Airline Travel Antitrust Litigation*, MDL No. 2656

Howard Chen

1326 N Central Ave Unit 418

Phoenix AZ 85004

(520) 661-5343

I object to the Southwest and American Settlements for *In re Domestic Airline Travel Antitrust Litigation*, MDL No 2656. I do not plan to appear at the fairness hearing. As proof of membership in the class, enclosed are receipts (American, 0012387975309; Southwest, 5262136848972) that prove that I paid for a ticket during the time period between July 1, 2011 and December 20, 2017.

The specific reason why I am objecting to the settlement is because it violates for federal rule of civil procedures that a class action settlement be "fair, reasonable, and adequate."

I object to the amount of the settlement, and that it is stated that "it may not be economically practical to make a cash distribution to class members." The proposed settlements are for $45 million (American) and $15 million (Southwest).

According to https://www.bts.gov/newsroom/2017-traffic-data-us-airlines-and-foreign-airlines-us-flights (accessed December 2, 2018), there were approximately 300 million total passengers that flew on American and Southwest in 2017. Subtracting the 31 million international passengers, this leaves 269 million domestic customers. Extrapolated over the 6.5 years of the class membership period, this is approximately 1,750 million domestic passenger flights on these two airlines.

After attorneys' fees of 30%, this leaves $42 million of the $60 million remaining for the class. If every class member applied for a settlement benefit, this would provide under 4 cents per plane ticket. Even if only 10% of class members applied for a settlement benefit, this would provide a benefit of about 40 cents.

I would want further information regarding how the fixing of prices by Southwest and American would actually affect the price of a plane ticket. The airlines should settle for this amount, so the class can obtain real monetary relief.

If the amount per ticket is *de minimus*, and it is not practically feasible to provide monetary relief to class members, I object based on the possibility of donating the settlement monies to charity: https://www.wsj.com/articles/class-action-charity-racket-1540939527

Thank you,

Howard Chen

RECEIVED
Mail Room

DEC 1 1 2018

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia



American Airlines@aa.com
E-Ticket Confirmation-RKNODZ 10NOV
Aug 18, 2016 at 3:35:53 PM
HOWIECHEN7@GMAIL.COM

American Airlines     Reservations    Redeem Miles    My Account    Deals 

## eTicket Itinerary & Receipt Confirmation

### Howard Chen,

Thank you for choosing American Airlines / American Eagle, a member of the oneworld® Alliance. Below are your itinerary and receipt for the ticket(s) purchased. Please print and retain this document for use throughout your trip.

You may check in and obtain your boarding pass for U.S. domestic electronic tickets within 24 hours of your flight time online at AA.com by using www.aa.com/checkin or at a Self-Service Check-In machine at the airport. Check-in options may be found at www.aa.com/options. For information regarding American Airlines checked baggage policies, please visit www.aa.com/baggageinfo.

To receive updated flight status notifications, please visit www.aa.com/notifications.

**For faster check-in at the airport, scan the barcode below at any AA Self-Service machine.**

You must present a government-issued photo ID and either your boarding pass or a priority verification card at the security screening checkpoint.

You can now Manage Your Reservation on aa.com, where you can check in and purchase additional items to customize your journey. A variety of seating options are also available for purchase to enhance your travel with features such as convenient front of cabin location, extra legroom and early boarding.

Book a hotel »
Book a car »
Remind me to Uber »
Buy trip insurance »

EARN 25,000 AAdvantage® miles
DIRECTV   Click for details »

citi | AAdvantage
Earn 30,000 bonus miles, plus waive your checked bag fee
Learn more »

Up to 35% off plus 500 AAdvantage® bonus miles.
AVIS   Budget

Activate a new Sprint account and earn up to 25,000 miles.
Sign up for this offer today at Sprint.com/AAdvantage



| Record Locator | **RKNODZ** |
| --- | --- |

## Itinerary

| Carrier | Flight # | Departing | Arriving | Fare Code |
| --- | --- | --- | --- | --- |
| American Airlines | 3073 | PHOENIX THU 10NOV 5:55 PM | MONTEREY CA MRY 6:51 PM | N |
| | | OPERATED BY SKYWEST AIRLINES AS AMERICAN EAGLE | | |
| Howard Chen | Seat 4C | Economy | FF# 74E16E0 GLD | |

## Receipt

| Passenger | Ticket # | Fare-USD | Taxes and Carrier-Imposed Fees | Ticket Total |
| --- | --- | --- | --- | --- |
| Howard Chen | 0012387975309 | 114.42 | 22.68 | 137.10 |
| MasterCard XXXXXXXXXXXX9521 | | | | **$ 137.10** |

Baggage Information

[illegible fine print text]

        

[illegible fine print text]

NOTICE OF INCORPORATED TERMS OF CONTRACT



Southwest Airlines
Southwest Airlines Confirmation-CHEN/HOWARD K-
Confirmation: AB9Z62
Jun 12, 2013 at 3:38:57 PM
CPHTHODOC1@YAHOO.COM

Southwest Airlines

My Account | View My Itinerary Online

| Check In Online | Check Flight Status | Change Flight | Special Offers | Hotel Deals | Car Deals |

## Ready for takeoff!

Thanks for choosing Southwest for your trip! You'll find everything you need to know about your reservation below. Happy travels.

**Save up to 35%**
on base rates and earn up to 2,400 Rapid Rewards® points. Terms apply.

*Hertz*
Book car >

### AIR Itinerary

**AIR Confirmation: AB9Z62**                    Confirmation Date: 06/12/2013

| Passenger(s) | Rapid Rewards # | Ticket # | Expiration | Est. Points Earned |
|---|---|---|---|---|
| CHEN/HOWARD K | 361622973 | 5262136848972 | Jun 12, 2014 1417 |  |

Rapid Rewards levels are awarded only on Wanna Get Away/Wanna Get Away+ and... Southwest.com to Rapid Rewards account by the most relevant tiers... including A-List & A-List Preferred bonus points

| Date | Flight | Departure/Arrival |
|---|---|---|
| Sat Nov 16 | 3152 | Depart PHOENIX AZ (PHX) on Southwest Airlines at **10:10 AM** Arrive in NEW ORLEANS LA (MSY) at **2:05 PM** Travel Time: 2 hrs 55 mins *Wanna Get Away* |
| Tue Nov 19 | 1545 | Depart NEW ORLEANS LA (MSY) on Southwest Airlines at **3:05 PM** Arrive in PHOENIX AZ (PHX) at **5:40 PM** Travel Time: 3 hrs 35 mins *Wanna Get Away* |

**What you need to know to travel:**
- Don't forget to check in for your flight(s) 24 hours before your trip on southwest.com or your mobile device. This will secure your boarding position on your flights.
- Southwest Airlines does not have assigned seats, so you can choose your seat when you board the plane. You will be assigned a boarding position based on your checkin time. The earlier you check in, within 24 hours of your flight, the earlier you get to board.

Air Cost: 257.80

Carry-on items: 1 Bag + small personal item are free see full details. Checked items: First and second bags are free; size and weight limits apply.

Fare Rule(s): 52621J6848672: NONREF/NONTRANSFERABLE/STANDBY REQ UPGRADE TO Y.

Valid only on Southwest Airlines. All travel involving funds from this Confirmation Number must be completed by the expiration date. Unused travel funds may only be applied toward the purchase of future travel for the individual named on the ticket. Any changes to this itinerary may result in a fare increase. Failure to cancel reservations for a Wanna Get Away fare segment at least 10 minutes prior to travel will result in the forfeiture of all remaining unused funds.

PHX WN MSY109.77NZNVDNR WN PHX109.77MZNVDNR 219.54 END ZPPHXMSY XFPHX4.5MSY4.5 AY5.00$PHX2.50 MSY2.50

**Find a Hotel**
See ratings, photos and rates for over 40,000 hotels.
Book a Hotel

**Rent Some Wheels**
Explore your destination on the perfect set of wheels.
Rent a Car

Sign Up 'n Save

### Important Reminders:
**Check-In**
Be sure to arrive at the departure gate with your boarding pass at least 10 minutes before your scheduled departure time. Otherwise, your reserved space may be cancelled and you won't be eligible for denied booking compensation.

**No Show Policy**
If you are not planning to travel on any portion of this itinerary, please cancel your reservation at least 10 minutes prior to scheduled departure of the flight. For tickets purchased on or after May 10, 2013 for travel beginning September 13, 2013, customers

Join Rapid Rewards



who fail to cancel reservations for a Wanna Get Away fare segment at least 10 minutes prior to travel and who do not board the flight will be considered a no show, and all remaining funds on this reservation, including Anytime and Business Select fares, will be forfeited.

Go to Boarding School                    Get EarlyBird
                                          Check in for Details

## Cost and Payment Summary

A/P   AB9262

| | | | |
|---|---|---|---|
| Base Fare | $ 219.54 | **Payment Information** | |
| Excise Taxes | $ 16.46 | Payment Type: Amer Express XXXXXXXXXX1009 | |
| Segment Fee | $ 7.80 | Date: Jun 12 2013 | |
| Passenger Facility Charge | $ 9.00 | Payment Amount: $257.80 | |
| September 11th Security Fee | $ 5.00 | | |
| **Total Air Cost** | **$ 257.80** | | |

### Flight Status Alerts

Stay on your way with flight departure or arrival status via text message or email.

Subscribe Now

### Download DING!

Get exclusive travel deals straight to your desktop or iPhone

Download DING!

| Useful Tools | Know Before You Go | Special Travel Needs |
|---|---|---|
| Check In Online | In the Airport | Traveling with Children |
| Early Bird Check-In | Baggage Policies | Traveling with Pets |
| View Route Library | Estimated Airport Arrival Times | Unaccompanied Minors |
| Change Air Reservation | Security Procedures | Baby on Board |
| Cancel Air Reservation | Customers of Size | Customers with Disabilities |
| Check Flight Status | In the Air | |
| Flight Status Notification | Purchasing and Refunds | |
| Book a Car | | |
| Book a Hotel | | |

### Legal Policies & Helpful Information

Privacy Policy          Customer Service Commitment          Contact Us

Notice of Incorporated Terms          FAQs

Southwest Airlines... Purchase Password. See Terms Below. Manage My Account

Thank you for choosing Southwest Airlines. Please direct comments regarding this message...

...Southwest... September 11th Security Fee.

See Southwest's Contract of Carriage for details.
See Continental's Limit of Liability.

Southwest Airlines
P.O. Box...
...

Copyright 20...   Southwest Airlines Co. All Rights Reserved.



1320 Central Avenue #418
Phoenix AZ 85004

CERTIFIED MAIL

7018 1830 0001 9815 1339

Clerk of the Court
US District Court - District of Columbia
333 Constitution Ave
Washington DC 20001

PHOEN...
AZ 8...

1000

20001-2802

U.S. POSTAGE PAID
FCM LETTER
PHOENIX, AZ
85016
DEC 08, 18
AMOUNT
$3.95
R2304N117584-08

7018 1830 0001 9815 1339

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

To: Clerk of the Court                                                    Date: 29 Nov 2018
United States District Court for the District of Columbia
333 Constitution Avenue,
Washington, DC 2001

From: Monica J Baietti
5202 Texana Drive, Apt 836
San Antonio, TX
78249
210-538-5311 (landline)

*Let this be filed
Judge CK order Natt
Jan. 9, 2019*

Subject: Notice of Intention to Appear Domestic Airline Travel Antitrust Litigation, MDL No. 2656

On November 15, 2018, I, Monica J Baietti was identified as a possible victim in this lawsuit against these airlines. In the letter it explained I was allowed to write a letter that would be entered into evidence as I cannot make a physical appearance. When I received this notice, I performed a quick search in my records and depending upon how the counting is done I have at most 14 one-way flights that should be considered toward this case, which makes me wonder how much money I was forced to overspend?

Furthermore, this led me to wonder how much these companies are worth:

American Airlines is worth $51.4 billion (2017)
Delta Airlines $53.2 billion (2017)
Southwest Airlines $25 billion (2017)
United Airlines $21 billion (2018)
Continental Airlines $25 billion (2018)

When you see how much money these companies have made and how these companies then further conspired to increase fares by limiting capacity on domestic flights, to make even more money; personally, I hope this makes your blood boil, and I urge you to send a message to these companies that is loud and clear!

As I am sure you know, transportation plays an important part in economic growth and globalization. Additionally, transportation is important because it enables people to move about their country with ease and the ability to experience new things. **Millions** of people depend on this mode of transportation, so when large companies get greedy and squeeze people for more money, I just do not understand.

In June 2015, Daniel Shurz, senior vice president of commercial for Frontier Airlines stated "These additional fifteen routes are the latest evidence of Frontier's commitment to make air travel more affordable across the United States. We're offering not only amazing low fares, but a reliable and friendly service that allows customers to customize their travel experience to their needs and budget. This empowers more people than ever to fly. This is what our Low Fares Done Right philosophy is all about." (Frontier is worth $1.8 billion (2017))

RECEIVED
Mail Room

DEC 1 0 2018

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

These airlines should use Frontier as a business model to help more Americans travel and see their country, versus being insanely greedy, talk about an example of poor leadership that should be studied at the university level to understand what compels these companies to continue to advance prices without thinking of the poorest consumers, who most likely deserve traveling the most out of any person.

Why aren't these companies trying to set different standards like Frontier, instead Americans get ripped off and we always pay the money, ALWAYS. This case has the opportunity to set different industry standards. Transportation is one of the best things about a first world! you can experience other parts of your own country that before air, might have been too hard to do. The fact that these companies want to deny people their right as an American citizen to travel our great nation is abhorrent.

Thank you,

Monica J Baietti
Analyst, M.Ed.
202-297-2217 (mobile)
monica_baietti@yahoo.com

Ms. Monica Baietti
5202 Texana Dr Apt 836
San Antonio, TX, 78249-3796

Clerk of the Court
US District Court for the DC
333 Constitution Ave
Washington, DC

20001-2899

20001-2899001



# Yazdani Law, LLC

175 SOUTH THIRD STREET, STE. 1010
COLUMBUS, OHIO  43215-5188
PHONE 614-961-4414
FAX     614-961-4415

*Let this be filed*
*Judge CK Koller-Kotelly*
*Jan 9, 2019*
*nunc pro tunc*
*1/4/19*

January 3, 2019

<div style="border:1px solid black">

**PLEASE FILE
ON
01/04/2019**

</div>

Clerk of the Court
United States District Court for the
District of Columbia
333 Constitution Avenue,
Washington, DC 20001

via FedEx

**Re:    IN RE DOMESTIC AIRLINE TRAVEL ANTITRUST LITIGATION**

        NO. 1:15-mc-01404-CKK
        MDL No. 2656

Dear Sir or Madam:

Enclosed please find the following documents for filing in the referenced matter:

1. Objection;
2. Exhibit A; and
3. Certificate of Service.

**Please ensure that the above listed documents are filed on <u>January 4, 2019</u>. Please note that I am filing this objection on my own behalf and not on behalf of a client.**

If you have any questions or concerns, please do not hesitate to call me.  I can be reached directly at 614-961-4544 or via email at Payam@yazdanilawfirm.com.

Sincerely,

Payam Yazdani,
Attorney at Law

**RECEIVED**
**Mail Room**

JAN – 4 2019

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE DOMESTIC AIRLINE TRAVEL
ANTITRUST LITIGATION

NO. 1:15-mc-01404-CKK

MDL No. 2656

This Document Relates To:

ALL CASES



## CLASS MEMBER OBJECTION TO THE SETTLEMENTS AND
## THE FEE AND EXPENSE REQUEST

This objection is submitted pursuant to Federal Rules of Civil Procedure 23(e)(5), setting forth that:

1.      I am a member of the class.

2.      My address is 175 S 3rd St., STE 1010, Columbus, Ohio 43215.

3.      My telephone number is 614-961-4414.

4.      I submit this objection on my own behalf, filed in *In re Domestic Airline Travel Antitrust Litigation, MDL No. 2656.*

5.      I submit this objection to the settlement agreements between Plaintiffs and Defendants Southwest Airlines Co. ("Southwest") and American  Airlines, Inc. ("American"), and in objection to attorneys' fee and expense request submitted by Plaintiffs' attorneys or class counsel.

6.      I do not plan to personally appear at the fairness hearing.

7.      I have routinely traveled on American and Southwest flights during the period of time that is the subject of this action. As an example, between December 25, 2016 to December 25, 2018, I flew on or purchased 19 flight tickets in my own name from American and in 2017 I purchased 6 tickets in my own name from Southwest. Evidence of membership in the class is

attached as Exhibit A.

8.      I have also purchased and paid for flights from American and Southwest for my family members.

9.      I have personally witnessed unfair price fixing practices by American and Southwest. These included appearances of price fixing, where similar segments were similarly priced by American and Southwest, and where changes in price, in particular an increase, by one airline would be immediately followed by another.

10.     As a result of these practices, I was forced to pay a higher price for flights which could otherwise cost less.

11.     I have directly suffered a financial loss as a result of the practices which are the subject of this action by Defendants American and Southwest.

12.     The proposed settlement is unfair, unreasonable, inadequate, speculative, and does not prevent future harm.

## A. GROUNDS FOR OBJECTION

### I.   The settlement is unfair and unreasonable.

13.     The settlement is unfair because it stands to provide no benefit to class members while it provides a significant windfall for class counsel.

14.     While the settlement amount between the Settling Class and Defendants American and Southwest is a total of $60 million (US Dollars), pursuant to the information contained in the Settlement Notice, the class members stand to receive nothing. Therefore, although class counsel can receive up to $18 million in fees plus over $1.5 million in expenses, the settlement can yield nothing for the settling class.

15.     The settlement also does not appear to contain any injunctive relief preventing Southwest and American from continuing to engage in similar conduct now or in the future. As a

result, the Settling Class stand to be subject to harm again in the future, as Southwest and American may continue their unfair and unlawful practices at the expense of the class members.

16.   It therefore appears that the settlement is only an attempt to collect attorneys' fees, rather than to benefit the members of the class or the Settling Class. While on the memorandum of law in support of Plaintiffs' motion for final approval of settlement agreement, and on the motion for award of attorneys' fees and reimbursement of expenses, the class counsel goes to length to list the number of documents or size of data transmitted or turned over during discovery, class counsels fails to describe, what, if anything, would be disbursed to class members, or if any methods are designed or negotiated that would benefit the members. This is remarkable, as the purpose of the class action should be to provide relief or benefit to the aggrieved parties, not their counsel.

17.   As a class member, the undersigned believes that the settlement is fundamentally unfair to him and unreasonable, as he stands to receive no benefit, while he has suffered a loss as a result of the defendant's actions.

**II.   The settlement is inadequate and any benefits from the settlement is speculative.**

18.   The settlement is inadequate and any benefits from it would be speculative, because it is unclear whether any money would be disbursed to class members, or whether they would receive anything at all. In fact, the notice of settlement suggests that the settlement amount will not be disbursed to class members.

19.   The settlement also does not prevent future harm to class members because it does not include an injunctive relief, or any method to deter Southwest and American from participating in similar conducts in the future. The proposed settlement does not appear to even contain any promise by the named defendants to refrain from participating in conducts that may harm the class members or the Settling Class in the future.

3

20.    Because the Settling Class may not receive any benefits from the settlement, and because class members can be harmed again by Southwest and American, with little to no remedy, and because the named defendants can engage in similar practices again in future with no liability, the settlement is inadequate.

21.    Although class attorneys argue that the settlement will allow Plaintiffs to pursue claims against other defendants, there is no guarantee about the outcome of other claims, and any future benefit would be speculative.

22.    It is difficult to support that a $60 million settlement at this juncture is now necessary to continue the claim and support litigation against the additional defendants, while the counsel has set forth that only $1.57 million was expended during the 3-year litigation.

23.    Although the total amount of settlement may be a substantial sum, $60 million is insignificant compared to hundreds of millions of dollars that defendants American and Southwest potentially earned as a result of their unlawful and unfair practices.

24.    Although the settlement amount may appear to be substantial, it is inadequate if it is not large enough to allow any disbursement to class members. The notice of settlement states that given the number of Settlement Class Members, it may not be "economically practical" to make a direct cash distribution to Class Members, supporting that the settlement is inadequate.

25.    It is easy to provide a direct benefit to class members as the expense of an online disbursement system that can be set up and paid for by Southwest and American as part of the settlement can be insignificant with today's available technology.  The expense of an online airfare coupon system set up as part of the settlement by Southwest and American can also be insignificant and such benefit can be practical to achieve. While the class counsel is aware of the cost savings of technology as it made use of technology to reduce litigation expenses when Settlement Notice was emailed to class members, his claim that any direct disbursement may not

4

be economically practical supports the inadequacy of the settlement.

## III.   The settlement notice is inadequate as confusing.

26.     The Settlement Notice emailed to class members contained a link to the class action website. The detailed notice found on the website indicates in one section that "[i]n order to receive a payment, you will need to file a valid claim form before the claims period ends." This suggests that there will be a payment to class members. The notice also states in all capital letters that "[the claims period has not yet begun.]" Suggesting that it will begin in the future and class members will be able to take advantage of it and receive some form of payment or benefit. The notice states in a different section that "[a]t this time, it is unknown how much each eligible Settlement Class Member will receive," again, suggesting that there will be some form of payment in the future. However, while the noted statements suggest that there will ultimately be a "payment" to settling class, the Settlement Notice goes on to say that after payment of fees and expenses, it is possible that any "remaining amount will be distributed to charities, governmental entities, or other beneficiaries approved by the Court," suggesting that class members will likely receive nothing. This is confusing to average class member, and as a result, the Settlement Notice is inadequate.

## B. COCLUSION

27.     Class counsel involved in this matter should be dully compensated for its time and efforts through a reasonable accounting of fees after a reasonable settlement is achieved or a favorable judgement is entered. If the proposed settlement provides no benefit to the class, regardless of its size, the efforts of counsel in settling the matter is wasted, and the settlement is fundamentally unfair and inadequate and should be avoided. Class counsel should reasonably assure that class members will receive a benefit from the settlement before entering into a final settlement.

28.    Accordingly, the undersign objects to the proposed settlement as described, and objects to the request for attorneys' fees and reimbursement of expenses.

Respectfully Submitted: January 3, 2019

_____
Payam Yazdani

Thanks for choosing Southwest® for your trip.

# Southwest's

## Ready for takeoff!



Thanks for choosing Southwest® for your trip. You'll find everything you need to know about your reservation below. Happy travels!

 Air itinerary

## AIR Confirmation: K4PRER

Confirmation Date: 06/20/2017

| Passenger(s) | Rapid Rewards # | Ticket # | Expiration | Est. Points Earned |
|---|---|---|---|---|
| YAZDANI/PAYAM | ▬▬▬▬▬ | 5268535287674 | Jun 21, 2018 | 1606 |

| Date | Flight | Departure/Arrival |
|---|---|---|
| Fri Aug 4 | 988 | Depart **COLUMBUS, OH (CMH)** on Southwest Airlines at **10:00 AM**<br>Arrive in **DALLAS (LOVE FIELD), TX (DAL)** at **11:25 AM**<br>Travel Time 2 hrs 25 mins<br>Wanna Get Away |

| Date | Flight | Departure/Arrival |
|---|---|---|
| Mon Aug 7 | 1922 | Depart **DALLAS (LOVE FIELD), TX (DAL)** on Southwest Airlines at **07:30 PM**<br>Arrive in **COLUMBUS, OH (CMH)** at **10:50 PM**<br>Travel Time 2 hrs 20 mins<br>Wanna Get Away |

✓ **Check in for your flight(s):** 24 hours before your trip on Southwest.com or your mobile device to secure your boarding position. You'll be assigned a boarding position based on your check-in time. The earlier you check in within 24 hours of your flight, the earlier you get to board.



 American Airlines

Home    Hello, PAYAM ▼        English ▼        Search aa.com    🔍

Plan Travel    Travel Information    AAdvantage     oneworld

# Your activity

« Back to your account

## PAYAM YAZDANI

Award miles: 36,586  •  Million Miler℠ balance: 41,674

*Member since Jun 5, 2014*

Your miles

| What do you want to do? ▼ |
| --- |

Activity date range

( • Required)



From •                          To •

| Oct ▼ | 14 ▼ | 201 ▼ |    | Oct ▼ | 17 ▼ | 201 ▼ |    Search

AAdvantage program updates »

| Description | Elite Qualifying | | | Award miles | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | Miles (EQMs) | Segments (EQSs) | Dollars (EQDs) | Base miles | Bonus miles | Total |
| Oct 13 2017  CMH - DFW  Ticket # 0012151343059  ⊘ Flight details | 1,852 | 2 | 411 | 2,055 | -- | 2,055 |

Transactions may take up to 2 weeks to post.

Showing 1 of 1

Help            About American            Extras

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing objection and supporting exhibit via first class mail through USPS on January 3, 2019 to:

Michael D. Hausfeld
Hausfeld, LLP
1700 K Street NW, Suite 650
Washington, DC 20006

Roberta Liebenberg
Fine Kaplan and Black
One South Broad Street, Suite 2300
Philadelphia, PA 19107

Benjamin G. Bradshaw
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006

Respectfully Submitted,

Payam Yazdani

*Let this be filed*
*Judge C Kollar-Kotelly*
*Jan. 9, 2019*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| IN RE DOMESTIC AIRLINE TRAVEL ANTITRUST LITIGATION | NO. 1:15-mc-01404-CKK<br><br>MDL No. 2656 |
|---|---|

## SHIMSHON WEXLER'S OBJECTION TO FINAL APPROVAL OF SETTLEMENT AGREEMENTS WITH SOUTHWEST AIRLINES CO. AND AMERICAN AIRLINES, INC.

1. My name is Shimshon Wexler and I am over the age of 18 years. My address is 1856 Berkeley Mews, Atlanta, Georgia 30329. My phone number is 212-760-2400.
2. I am a member of both the Southwest Airlines and the American Airlines classes. See attached proof. I can provide additional proof at the Court's request.
3. I object to each settlement. I plan to appear at the Fairness Hearing.
4. In paragraph 8 of the Long Form Notice titled "How much money will I receive?" it states:
    "….Given the number of Settlement Class Members, it may not be economically practical to make a direct cash distribution to Class Members until additional settlements or judgments are achieved. It is possible that after deductions for any attorneys' fees, litigation expenses, settlement administration expenses, and class representative incentive awards approved by the Court, the remaining amount will be distributed to charities……"
5. In paragraph 9 of the Long Form Notice titled "When will I receive my payment?" it states: "As noted above, no money is being distributed at this time…"
6. The settlement is not fair, reasonable or adequate because it provides no compensation to the class but only compensation for the attorneys.
7. The settlement provides zero compensation for class members at this point in the litigation. Further, the settlement provides a strong potential of zero compensation for class members in the future gleaned from the papers which argue that this litigation is very risky.
8. Presumably this lawsuit was brought on behalf of class members to obtain compensation for class members. By that measure the lawsuit has not accomplished its goal.
9. The lawyers for the class should not be compensated now while the class does not get compensated now.
10. The lawyers should only be compensated based on the compensation obtained for its clients which at this point is zero.
11. This settlement does not provide any analysis for the feasibility of distributing money to the class.
12. The cooperation agreement obtained by the attorneys making it potentially more likely that liability may be assessed against the remaining defendants should be considered a potential benefit for the class and the attorneys should not be compensated for obtaining a potential benefit.

For the above reasons, I object to the settlement and ask that the Court not approve it.

Dated _Jan 2, 2019_       Signature _____

RECEIVED MailRoom

JAN - 7 2019

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

 Gmail

Shimshon Wexler <swexleresq@gmail.com>

---

## UPDATED flight reservation (H5ROUT) | 04NOV15 | ATL-LGA | Wexler/Shimshon
1 message

**Southwest Airlines** <SouthwestAirlines@luv.southwest.com>
Reply-To: Southwest Airlines <no-reply@luv.southwest.com>
To: SWEXLERESQ@gmail.com

Fri, Oct 23, 2015 at 8:29 PM

Thanks for choosing Southwest® for your trip.

**Southwest**

👤 Log in | View my itinerary

| Check In Online | Check Flight Status | Change Flight | Special Offers | Hotel Offers | Car Offers |

### Ready for takeoff!

 Thanks for choosing Southwest® for your trip. You'll find everything you need to know about your reservation below. Happy travels!

**Upcoming Trip:** 11/04/15 - New York

 Air itinerary

**AIR Confirmation: H5ROUT**

Confirmation Date: 10/23/2015


**Save up to 35%** on base rates and earn up to 2,400 Rapid Rewards® points. Terms apply.
**Hertz**
Book car >

| Passenger(s) | Rapid Rewards # | Ticket # | Expiration | Est. Points Earned |
|---|---|---|---|---|
| WEXLER/SHIMSHON | 20186629466 | 5262153783425 | Aug 5, 2016 | 195 |

| Date | Flight | Departure/Arrival |
|---|---|---|
| Wed Nov 4 | 3018 | Depart **ATLANTA, GA** (ATL) on Southwest Airlines at **12:20 PM** <br> Arrive in **NEW YORK (LAGUARDIA), NY** (LGA) at **2:35 PM** <br> Travel Time 2 hrs 15 mins <br> Wanna Get Away |


**EarlyBird Check-In**
Let us take care of check-in for you.
Get it now

✓ **Check in for your flight(s):** 24 hours before your trip on Southwest.com or your mobile device to secure your boarding position. You'll be assigned a boarding position based on your check-in time. The earlier you check in within 24 hours of your flight, the earlier you get to board.

 **Bags fly free®:** First and second checked bags. Weight and size limits apply. One small bag and one personal item are permitted as carryon items, free of charge.

🕐 **30 minutes before departure:** We encourage you to arrive in the gate area no later than 30 minutes prior to your flight's scheduled departure as we may begin boarding as early as 30 minutes before your flight.

🕐 **10 minutes before departure:** You must obtain your boarding pass(es)

**Add a hotel**
✓ Earn Rapid Rewards® points
✓ Best rate guarantee
✓ Free cancellation
**Book a hotel >**

and be in the gate area for boarding at least 10 minutes prior to your flight's scheduled departure time. If not, Southwest may cancel your reserved space and you will not be eligible for denied boarding compensation.

 **If you do not plan to travel on your flight:** In accordance with Southwest's No Show Policy, you must notify Southwest at least 10 minutes prior to your flight's scheduled departure if you do not plan to travel on the flight. If not, Southwest will cancel your reservation and all funds will be forfeited.

Air Cost: 48.98

Fare Rule(s): 5262153783425: NONREF/NONTRANSFERABLE/STANDBY REQ UPGRADE TO Y.
Valid only on Southwest Airlines. All travel involving funds from this Confirmation Number must be completed by the expiration date. Unused travel funds may only be applied toward the purchase of future travel for the individual named on the ticket. Any changes to this itinerary may result in a fare increase. Failure to cancel reservations for a Wanna Get Away fare segment at least 10 minutes prior to travel will result in the forfeiture of all remaining unused funds.

 Learn about our boarding process ✈

 Learn about inflight WiFi & entertainment ✈

## Cost and Payment Summary

✈ **AIR - H5ROUT**

| | | | |
|---|---|---|---|
| Base Fare | $ | 32.45 | **Payment Information** |
| Excise Taxes | $ | 2.43 | Payment Type: Ticket Exchange |
| Segment Fee | $ | 4.00 | Date: Oct 23, 2015 |
| Passenger Facility Charge | $ | 4.50 | Payment Amount: $48.98 |
| September 11th Security Fee | $ | 5.60 | |
| **Total Air Cost** | **$** | **48.98** | Tkls funds remaining in conf#H5ROUT for future travel $34.02 |

**Exchange Detail**
Oct 20, 2015 From ticket # 5262152986918 to ticket # 5262153783425

 Add a rental car

✓ Earn Rapid Rewards® points
✓ Guaranteed low rates
✓ Free cancellation

**Book a car  >**

**Travel more for less.**

Exclusive deals for your favorite destinations.

**Sign up and save  >**

**Southwest®**
Rapid Rewards®

✓ Unlimited reward seats
✓ No blackout dates
✓ Redeem for International flights and more

**Enroll now  >**

## Useful Tools

Check In Online
Early Bird Check-In
View/Share Itinerary
Change Air Reservation
Cancel Air Reservation
Check Flight Status
Flight Status Notification
Book a Car
Book a Hotel

## Know Before You Go

In the Airport
Baggage Policies
Suggested Airport Arrival Times
Security Procedures
Customers of Size
In the Air
Purchasing and Refunds

## Special Travel Needs

Traveling with Children
Traveling with Pets
Unaccompanied Minors
Baby on Board
Customers with Disabilities

Legal Policies & Helpful Information

Privacy Policy      Customer Service Commitment      Contact Us

Notice of Incorporated Terms      FAQs

Book Air | Book Hotel | Book Car | Book Vacation Packages | See Special Offers | Manage My Account

This is a post-only mailing from Southwest Airlines. Please do not attempt to respond to this message. Your privacy is important to us. Please read our Privacy Policy.

[1] All travel involving funds from this Confirmation Number must be completed by the expiration date.

[2] Security Fee is the government-imposed September 11th Security Fee.

See Southwest Airlines Co. Notice of Incorporation
See Southwest Airlines Limit of Liability

Southwest Airlines
P.O. Box 36647-1CR
Dallas, TX 75235

Contact Us

Copyright 2015 Southwest Airlines Co. All Rights Reserved.

 Gmail

Shimshon Wexler <swexleresq@gmail.com>

---

## Your trip confirmation-EZXCVN 24AUG
1 message

---

American Airlines@aa.com <notify@aa.globalnotifications.com>
To: "SWEXLERESQ@GMAIL.COM" <SWEXLERESQ@gmail.com>     Wed, Aug 16, 2017 at 2:18 PM

---

**American Airlines**         

Hello Shimshon Wexler!       Issued: Aug 16, 2017

## Your trip confirmation and receipt

### Record locator: **EZXCVN**

| View your trip |
| --- |

---

### Thursday, August 24, 2017

| ATL | | PHL | Seats: -- |
| --- | --- | --- | --- |
| **6:00** AM | → | **8:01** AM | Class: Economy (Q) |
| Atlanta | | Philadelphia | Meals: |

American Airlines 1731

| PHL | | ATL | Seats: -- |
| --- | --- | --- | --- |
| **8:40** PM | ⇢ | **10:51** PM | Class: Economy (Q) |
| Philadelphia | | Atlanta | Meals: |

American Airlines 719

Shimshon Wexler

## Earn miles with this trip.

Join AAdvantage »

Ticket # 0012144059525

# Your trip receipt

 Visa XXXXXXXXXXXXX7798

### *Shimshon Wexler*

| | |
|---|---|
| FARE-USD | $ 187.90 |
| TAXES AND CARRIER-IMPOSED FEES | $ 42.49 |
| **TICKET TOTAL** | **$ 230.39** |



Book a hotel »



Book a car »



Buy trip insurance »

Up to 35% off base rates with Budget 

 Earn miles while you sleep. Search now

 Be a holiday hero. Register now to start earning

 A chance at 500,000 miles. Plus a cruise for two.

Contact us | Privacy policy

Get the American Airlines app

 

**Baggage Information**

Baggage charges for your itinerary will be governed by American Airlines BAG ALLOWANCE -ATLPHL-No free checked bags/ American Airlines BAG ALLOWANCE -PHLATL-No free checked bags/ American Airlines 1STCHECKED BAG FEE-ATLPHL-USD25.00/ American Airlines /UP TO 50 LB/23 KG AND UP TO 62 LINEAR IN/158 LINEAR CM 1STCHECKED BAG FEE-PHLATL-USD25.00/ American Airlines /UP TO 50 LB/23 KG AND UP TO 62 LINEAR IN/158 LINEAR CM 2NDCHECKED BAG FEE-ATLPHL-USD35.00/ American Airlines /UP TO 50 LB/23 KG AND UP TO 62 LINEAR IN/158 LINEAR CM 2NDCHECKED BAG FEE-PHLATL-USD35.00/ American Airlines /UP TO 50 LB/23 KG AND UP TO 62 LINEAR IN/158 LINEAR CM ADDITIONAL ALLOWANCES AND/OR DISCOUNTS MAY APPLY

You have purchased a NON-REFUNDABLE fare. The itinerary must be canceled before the ticketed departure time of the first unused coupon or the ticket has no value. If the fare allows changes, a fee may be assessed for changes and restrictions may apply.

You have up to 24 hours from the time of ticket purchase to receive a full refund if you booked at least 2 days before departure. You must log in on aa.com or Contact Reservations to cancel. Once cancelled, your refund will be processed automatically.Refund Policy>>.

**Some American Airlines check-in counters do not accept cash as a form of payment. For more information, visit our Airport Information page.**



Corrosives

Some everyday products, like e-cigarettes and aerosol spray starch, can be dangerous when transported on the aircraft in carry-on and/or checked baggage. Changes in temperature or pressure can cause some items to leak, generate toxic fumes or start a fire. Carriage of prohibited items may result in fines or in certain cases imprisonment. Please ensure there are no forbidden hazardous materials in your baggage like:

Some Lithium batteries (e.g. spares in checked baggage, batteries over a certain size), Explosives / Fireworks, Strike anywhere matches/ Lighter fluid, Compressed gases / Aerosols Oxygen bottles/ Liquid oxygen, Flammable liquids, Pesticides/ Poison, Corrosive material.

There are special exceptions for small quantities (up to 70 ounces total) of medicinal and toilet articles carried in your luggage, spare lithium batteries for most consumer electronic devices in carry-on baggage, and certain smoking materials carried on your person.

Certain items are required to be carried with you onboard the aircraft. For example, spare lithium batteries for portable electronic devices, cigarette lighters and e-cigarettes must be removed from checked or gate-checked baggage and carried onboard the aircraft. However, e-cigarettes may not be used on-board the aircraft.

Traveling with medical oxygen, liquid oxygen, mobility aids and other assistive devices may require airline pre-approval or be restricted from carriage entirely. Passengers requiring these items should contact the airline operator for information on use of such devices.

To change your reservation, please call 1-800-433-7300 and refer to your record locator.

**NOTICE OF INCORPORATED TERMS OF CONTRACT**

Air Transportation, whether it is domestic or international (including domestic portions of international journeys), is subject to the individual terms of the transporting air carriers, which are herein incorporated by reference and made part of the contract of carriage. Other carriers on which you may be ticketed may have different conditions of carriage. International air transportation, including the carrier's liability, may also be governed by applicable tariffs on file with the U.S. and other governments and by the Warsaw Convention, as amended, or by the Montreal Convention. Incorporated terms may include, but are not restricted to: 1. Rules and limits on liability for personal injury or death, 2. Rules and limits on liability for baggage, including fragile or perishable goods, and availability of excess valuation charges, 3. Claim restrictions, including time periods in which passengers must file a claim or bring an action against the air carrier, 4. Rights on the air carrier to change terms of the contract, 5. Rules on reconfirmation of reservations, check-in times and refusal to carry, 6. Rights of the air carrier and limits on liability for delay or failure to perform service, including schedule changes, substitution of alternate air carriers or aircraft and rerouting.

You can obtain additional information on items 1 through 6 above at any U.S. location where the transporting air carrier's tickets are sold. You have the right to inspect the full text of each transporting

air carrier's terms at its airport and city ticket offices. You also have the right, upon request, to receive (free of charge) the full text of the applicable terms incorporated by reference from each of the transporting air carriers. Information on ordering the full text of each air carrier's terms is available at any U.S. location where the air carrier's tickets are sold or you can click on the Conditions of Carriage button below.

Air transportation on American Airlines and the American Eagle carriers® is subject to American's conditions of carriage..

NOTICE: This email and any information, files or attachments are for the exclusive and confidential use of the intended recipient(s).  This message contains confidential and proprietary information of American Airlines (such as customer and business data) that may not be read, searched, distributed or otherwise used by anyone other than the intended recipient.  If you are not an intended recipient, please do not read, distribute, or take action in reliance upon this message.   If you suspect you have received this email in error, please notify the sender and promptly delete this message and its attachments from your computer.

NRID: 156664136254161317359000

ShimShon Wexler
1856 Berkeley Mews
Atlanta GA 30329

FIRST CLASS MAIL

Clerk of the Court
US District Court for the
District of Columbia
333 Constitution Ave
Washington, DC 2000






*[handwritten annotations in top right margin]*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| In re: Domestic Airline Travel Antitrust | ) | No. 1:15-mc-1404 (CKK) |
| Litigation | ) | MDL No. 2656 |

### OBJECTION TO CLASS CERTIFICATION AND SETTLEMENT

Class member Michael Argie, 17055 Spanghurst Drive, Walton Hills, Ohio 44146, phone # 216-559-0249, hereby objects to the proposed settlement and settlement class certification in this case.[1] These objections apply to the entire Class, and both the Southwest and American settlements. I do not plan on attending the fairness hearing.

This case when filed had no prospect of delivering any consideration to the Class, due to the large size of the Class and the likely amount of any cash recovery. The proposed settlements confirm that there was never any possibility of a meaningful cash recovery for the Class that would make direct payment of Class members feasible. Cy pres may no longer be permitted in federal courts, depending upon the outcome of *Frank v. Gaos,* which is currently under advisement with the Supreme Court. See Transcript attached hereto. Therefore, the proposed class does not satisfy the superiority or adequacy prongs of FRCP 23(a) and (b)(3).

Direct payment of Class members is always preferable to payment to third parties or charities in the form of cy pres. That is why Justice Kavanaugh pressed the parties in *Frank v. Gaos* to explain why a lottery system could not be employed as a way of distributing a limited fund that does not permit direct payment to every class member. Here, it would be preferable to provide each Class member with a lottery ticket, and then draw, for example, 10,000 numbers from a hopper and divide the fund between the

RECEIVED
Mail Room

JAN – 4 2019

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

---

[1] I purchased airline tickets from Cleveland to Puerto Rico on United Airlines in January 2017 and January 2014. See attached proofs of purchase.

holders of the winning numbers.  This would provide the entire Class, not just the winners, with a valuable benefit, since a lottery ticket has a market value as evidenced by the amount of money consumers pay for them for other common lotteries.  Therefore, a lottery is *per se* required when possible before a *cy pres* distribution may be made.

Objector also objects to the use of settlement monies to fund ongoing litigation against other defendants, when that litigation will only increase the amount of attorney's fees and amounts paid to *cy pres* recipients, but will not increase the likelihood that there will be a direct distribution of settlement monies to the Class.

Signed by: _____   Date: 01.03.2019

2

cc.   Michael D. Hausfeld
Roberta Leibenberg
Benjamin Bradshaw

⊘ A confirmation email has been sent to: MIKE@GOOEYPROMOTIONS.COM

2017  1/2

## Trip information

Confirmation number:

# L7VCX8

Cleveland, OH, US (CLE) to San Juan, PR, US
(SJU - Luis Muñoz Marín)

## Purchase summary

| | |
|---|---|
| 2 adults (18-64) | $912.00 |
| Taxes and fees | $111.60 |

2 adults (18-64): $55.80 /person

| | |
|---|---|
| September 11th Security Fee | $5.60 |
| U.S. Passenger Facility Charge | $4.50 |
| U.S. Transportation Tax | $17.80 |
| September 11th Security Fee | $5.60 |
| U.S. Passenger Facility Charge | $4.50 |
| U.S. Transportation Tax | $17.80 |

| **Total** | **$1,023.60** |
|---|---|

Credit card payment: $1,023.60 (MasterCard-**6137)

## Trip summary

Saturday, January 07, 2017

| 7:00 am → | 12:15 pm | Nonstop |
|---|---|---|
| Cleveland, OH, US (CLE) | San Juan, PR, US (SJU - Luis Muñoz Marín) | 4h 15m total |

Cleveland, OH, US (CLE) to San Juan, PR, US (SJU - Luis Muñoz Marín)
7:00 am - 12:15 pm (4h 15m)

United Economy (W)
Meals for Purchase

✈ UA 421 | Boeing 737-800

🛜 Wi-Fi   📺 DIRECTV®

... ..... . (..........) . ............. ............... | ............ .............            ........//......................../.../.../............../........../................

Case 1:15-mc-01404-CKK   Document 319   Filed 01/09/19   Page 35 of 110

3:00 pm  ✈  6:40 pm                                    Nonstop                        2/2

San Juan, PR, US (SJU - Luis      Cleveland, OH, US          4h 40m total
Muñoz Marín)                      (CLE)

San Juan, PR, US (SJU - Luis Muñoz Marín) to Cleveland, OH, US (CLE)    United Economy (S)
3:00 pm - 6:40 pm (4h 40m)                                              Meals for Purchase

■ UA 387 | Boeing 737-800

📶 Wi-Fi     📺 DIRECTV®

## Travelers

MICHAEL ARGIE , MR.          CLE to SJU          Email address:
                                                 MIKE@GOOEYPROMOTIONS.COM
                             31C                 Home phone:      (216) 559-0249
                             SJU to CLE          Date of birth:   8/5/1945
                                                 Gender:          M
          •                  30C

MARGHERITA SCALISH-ARGIE ,   CLE to SJU          Date of birth:   9/1/1951
MRS.                                             Gender:          F
                             31D
                             SJU to CLE

                             30D

## Important travel information

The U.S. government raised the security alert level and implemented extra restrictions to assure the security of air travel. Certain changes in airport procedures and restrictions on items allowed on board aircraft are detailed on the Travel Alert: Elevated Security (http://www.united.com/web/en-US/content /news/travelnoticesecurity.aspx) page.

Any changes to your flight reservations may incur additional charges.

Airlines require government issued photo identification upon check-in, such as a driver's license or passport.

Passport, visa and health requirements (http://www.united.com/web/en-US/content/travel/destination /international/passport.aspx) may apply for this itinerary. Each passenger must ensure that he or she has all required travel documents as stated in Rule 19 of the Contract of Carriage (http://www.united.com /web/en-US/content/contract.aspx) . Information on this site is provided as a courtesy and should be verified by the passenger before travel. Other resources include the consulate of the destination country and the U.S. Department of State (http://www.travel.state.gov/) .

Please read important information governing airline baggage liability limitations (http://www.united.com /web/en-US/content/travel/baggage/liability.aspx) .

You will be contacted with any changes or additional information such as schedule changes, itinerary changes, etc.

Special services are on a request basis and cannot be guaranteed.

Special meal requests must be received at least 24 hours before the departure of your flight and cannot be guaranteed.

The price displayed includes up to a 7.5% U.S. Federal Transportation Tax on the base amount of the fare on itineraries wholly within the United States. This tax also applies to certain itineraries between the United States and Canada or Mexico. You will not earn PQD or award miles for the full amount of the displayed price for these itineraries because the U.S. Federal Transportation tax is not eligible to earn PQD or miles.

Mileage accrued will vary depending on the terms and conditions of your frequent flyer program. United MileagePlus mileage accrual and other benefits of MileagePlus associated with air travel are

UNITEDAIRLINES@UNITED.COM

1.800.864.8331

RAYMOND #QY

# UNITED  | A STAR ALLIANCE MEMBER

Confirmation:
HREF1P
Check-In >

Issue Date: August 21, 2013

| Traveler | eTicket Number | Frequent Flyer | Seats |
|---|---|---|---|
| ARGIE/MICHAELJMR | 0162377430269 | | ---/--- |
| SCALISHARGIE/MARGHERITAMRS | 0162377430270 | | ---/--- |

## FLIGHT INFORMATION

| Day, Date | Flight | Class | Departure City and Time | Arrival City and Time | Aircraft | Meal |
|---|---|---|---|---|---|---|
| Sat, 18JAN14 | UA1570Q | | CLEVELAND, OH (CLE) 8:45 AM | SAN JUAN, PR (SJU) 2:00 PM | 737-700 | Purchase |
| Sat, 25JAN14 | UA1587S | | SAN JUAN, PR (SJU) 3:00 PM | CLEVELAND, OH (CLE) 6:32 PM | 737-700 | Purchase |

## FARE INFORMATION

Fare Breakdown

| | | |
|---|---|---|
| Airfare: | 567.00USD | Form of Payment: |
| U.S. Federal Transportation Tax: | 34.40 | VISA |
| September 11th Security Fee: | 5.00 | Last Four Digits 7530 |
| U.S. Passenger Facility Charge: | 9.00 | |
| Per Person Total: | 615.40USD | |

eTicket Total:             1,230.80USD

The airfare you paid on this itinerary totals: 1,134.00 USD

The taxes, fees, and surcharges paid total: 96.80 USD

Fare Rules:    Additional charges may apply for changes in addition to any fare rules
listed.

NONREF/0VALUAFTDPT/CHGFEE
Cancel reservations before the scheduled departure time or TICKET
HAS NO VALUE.

# SUPREME COURT
# OF THE UNITED STATES

IN THE SUPREME COURT OF THE UNITED STATES

- - - - - - - - - - - - - - - - - -

THEODORE H. FRANK, ET AL.,            )

             Petitioners,            )

                v.            ) No. 17-961

PALOMA GAOS, INDIVIDUALLY AND ON   )

BEHALF OF ALL OTHERS SIMILARLY       )

SITUATED, ET AL.,                    )

             Respondents.            )

- - - - - - - - - - - - - - - - - -

Pages:  1 through 73

Place:  Washington, D.C.

Date:   October 31, 2018

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 206
Washington, D.C.  20005
(202) 628-4888
www.hrccourtreporters.com

1

1       IN THE SUPREME COURT OF THE UNITED STATES

2    - - - - - - - - - - - - - - - - - -

3    THEODORE H. FRANK, ET AL.,            )

4                    Petitioners,          )

5                v.                        ) No. 17-961

6    PALOMA GAOS, INDIVIDUALLY AND ON      )

7    BEHALF OF ALL OTHERS SIMILARLY        )

8    SITUATED, ET AL.,                     )

9                    Respondents.          )

10   - - - - - - - - - - - - - - - - - -

11                   Washington, D.C.

12               Wednesday, October 31, 2018

13

14           The above-entitled matter came on for

15   oral argument before the Supreme Court of the

16   United States at 10:04 a.m.

17

18   APPEARANCES:

19   THEODORE H. FRANK, ESQ., Washington, D.C.; on behalf

20       of the Petitioners.

21   JEFFREY B. WALL, Principal Deputy Solicitor General,

22       Department of Justice, Washington, D.C.; for

23       the United States, as amicus curiae, in support of

24       neither party.

25

```
1    APPEARANCES: (Continued)
2    ANDREW J. PINCUS, ESQ., Washington, D.C.; on behalf of
3        Respondent Google LLC.
4    JEFFREY A. LAMKEN, ESQ., Washington, D.C.; on behalf
5        of Respondents Paloma Gaos, et al.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

                C O N T E N T S

ORAL ARGUMENT OF:                        PAGE:

THEODORE H. FRANK, ESQ.

    On behalf of the Petitioners          4

ORAL ARGUMENT OF:

JEFFREY B. WALL, ESQ.

    For the United States, as amicus

    curiae, in support of neither party   25

ORAL ARGUMENT OF:

ANDREW J. PINCUS, ESQ.

    On behalf of Respondent Google        37

ORAL ARGUMENT OF:

JEFFREY A. LAMKEN, ESQ.

    On behalf of Respondents

    Paloma Gaos, et al.                   52

REBUTTAL ARGUMENT OF:

THEODORE H. FRANK, ESQ.

    On behalf of the Petitioners          70

```
 1              P R O C E E D I N G S
 2                              (10:04 a.m.)
 3             CHIEF JUSTICE ROBERTS:  We'll hear
 4    argument first this morning in Case 17-961,
 5    Frank versus Gaos, Individually And On Behalf
 6    Of All Others Similarly Situated.
 7             Mr. Frank.
 8             ORAL ARGUMENT OF THEODORE H. FRANK
 9                ON BEHALF OF THE PETITIONERS
10             MR. FRANK:  Thank you, Mr. Chief
11    Justice, and may it please the Court:
12             Amchem instructs that courts should
13    interpret Rule 23 with the interests of absent
14    class members in close view.  The best way to
15    interpret Rule 23's text requiring settlements
16    be fair and reasonable is to align class
17    counsel's interests with those of the absent
18    class members.
19             In Deposit Guaranty versus roper at
20    page 339, this Court called it an abuse when
21    class members were not the primary
22    beneficiaries of a class action.  How can it be
23    fair and reasonable for a court to endorse such
24    an abuse?
25             JUSTICE GINSBURG:  Why is it an abuse?
```

1     Because, practically, the class members would

2     get nothing, nothing at all, and, here, at

3     least they get an indirect benefit.

4          MR. FRANK:  Well, the indirect benefit

5     is even less than nothing.  The -- it was

6     feasible to distribute money to class members.

7     And, instead, class counsel chose to agree to a

8     settlement that directed that money elsewhere.

9          JUSTICE GINSBURG:  How much would it

10    have come to for each class member?

11         MR. FRANK:  Each claiming class member

12    probably could have gotten between 5 and 10

13    dollars with typical claims rates if -- for

14    example, in the Fraley versus Facebook

15    settlement, the court rejected an all cy pres

16    settlement --

17         JUSTICE SOTOMAYOR:  Sorry.  There's an

18    amicus brief that talked -- who laid out pretty

19    thoroughly the costs associated with, first,

20    identifying the class; second, preparing the

21    mailing; third, executing the mailing; and then

22    processing the claims that came up with a

23    figure of 67 cents.

24         Now, putting aside that there may be a

25    question about whether the trial court

```
 1    adequately determined feasibility, but assuming
 2    it did, why would it have been an abuse of
 3    discretion for the court to believe that
 4    processing 67 cents didn't make sense because
 5    the cost would outweigh what they would pay?
 6              MR. FRANK:  Well, the district court
 7    applied the wrong legal standard, but --
 8              JUSTICE SOTOMAYOR:  No, no.  I know
 9    your standard for feasibility --
10              MR. FRANK:  Right, right.
11              JUSTICE SOTOMAYOR:  -- is can we give
12    10 percent of the class something even if
13    nobody else gets anything, meaning what you
14    would like to do is select 10 percent of the
15    class and pay them alone and do nothing for
16    everybody else.
17              MR. FRANK:  Well, no.  We would like
18    to give everybody in the class the opportunity
19    to make a claim.  And in practice, a very small
20    minority of the class would not be indifferent
21    to the opportunity, and typically --
22              JUSTICE SOTOMAYOR:  Everybody else
23    would receive not even an indirect benefit?
24              MR. FRANK:  No, they would receive the
25    opportunity to make a claim.
```

1           JUSTICE SOTOMAYOR:  They always have
2      that opportunity.
3           MR. FRANK:  They don't have that
4      opportunity here as a class member.  Class
5      members were deprived of that opportunity.
6           JUSTICE SOTOMAYOR:  They could opt
7      out.
8           MR. FRANK:  They could opt out in
9      Amchem also, but that didn't make the
10     settlement fair.
11          JUSTICE SOTOMAYOR:  But I go back to
12     my point, which is are you disputing the
13     finding of fact that under the normal
14     application of feasibility, whether cost
15     outweighs the payment or cost far exceeds
16     whatever could be given out, is that -- are you
17     disputing that?
18          MR. FRANK:  The court never made that
19     finding.  The court applied the Ninth Circuit's
20     de minimis test under Lane versus Facebook,
21     which required it to divide by the entire
22     denominator the entire class.
23          In reality, settlements settle all the
24     time for well under a dollar per class member
25     and then successfully distribute that money to

8

```
 1      the class because most class members are just
 2      simply indifferent to the opportunity for these
 3      small sums.
 4                 JUSTICE GINSBURG:  And then is it all
 5      right to have some kind of a cy pres doctrine
 6      operate?
 7                 MR. FRANK:  I --
 8                 JUSTICE GINSBURG:  Because if --
 9      would -- with -- for all the class members who
10      don't make any claim?
11                 MR. FRANK:  I -- I -- I -- I -- I
12      don't understand the question, Justice.  I -- I
13      apologize.  What --
14                 JUSTICE GINSBURG:  Suppose the class
15      members are notified and only 10 percent of
16      them make a claim.  What happens to the rest of
17      the amount that was agreed upon as a
18      settlement?
19                 MR. FRANK:  First of all, in practice,
20      I just want to let the Court know that
21      10 percent is an extraordinarily high claim
22      rate.  The claims rate is typically below
23      1 percent.  But --
24                 JUSTICE GINSBURG:  And then the
25      99 percent.
```

1          MR. FRANK:  Absolutely.  In the
2     typical settlement, it's a pro rata
3     distribution.  You have a fund of a few million
4     dollars.  That's tens of millions of class
5     members have the opportunity to make a claim.
6     A very small percentage make the claim.  And
7     the fund is distributed pro rata to them.
8          That's what happens in Fraley, where
9     the number of class members making claims was
10    so small they still had money left over even
11    after giving every claiming class member $15,
12    even though we were talking $9 million for 150
13    million class members.  That's 6 cents per
14    class member.
15         CHIEF JUSTICE ROBERTS:  What -- what
16    do they do?  Do they wait until -- a reasonable
17    period and figure that most of the claims are
18    in and then divide it up or --
19         MR. FRANK:  The settlement procedures
20    will establish 90 days or 60 days or 120 days
21    to make a claim.  The claims come in either
22    electronically or through paper, depending on
23    how the claims process is set up.
24         And sometimes there's an audit for --
25    to make sure there aren't fraudulent claims.

1    That's what happened in Carrier IQ, where,

2    again, even though we were talking pennies per

3    class member, it only cost them $600,000 to

4    distribute a few million dollars to 30 million

5    class members and still audit the claims and

6    reject 30 percent of the claims.  So --

7              JUSTICE SOTOMAYOR:  I'm sorry, I --

8    I'm talking -- this is a full cy pres award,

9    meaning there's no direct benefit to the class.

10    What about the residual cy pres?  I thought in

11    many instances, if a fund is created and the

12    claimants are all paid off, there's some money

13    left over, the residual cy pres, and that's

14    given indirectly often.

15              MR. FRANK:  Circuits differ on that.

16    The Seventh rejects that proposal because they

17    recognize that the settling parties have the

18    ability to adjust the claims rate by --

19    depending on how difficult they make the claims

20    process.

21              So, in a Seventh Circuit case, there

22    is a $1.1 million residual and 12 million class

23    members, though that was 8 cents per class

24    member.  The court rejected the idea that that

25    was a benefit to the class and said you've made

1    the claims process too hard and required them

2    to redo the settlement on remand.  Millions

3    more dollars went to the class because they

4    changed the -- the claims process and made it

5    easier for class members to make claims.

6              So, if you have a residual and you

7    incentivize the attorneys to prefer the

8    residual to the actual claims, what will happen

9    is you'll have a very difficult claims process.

10   There is a Third Circuit case, a $35 million

11   fund, and -- but you had to fill out a

12   five-page claim form to claim your $5.  And so

13   very few class members did that.  They were

14   only going to distribute $3 million with over

15   15 million to cy pres.

16             And the Third Circuit rejected that,

17   that the district court failed to prioritize

18   direct benefit to the class.  And it just --

19             JUSTICE SOTOMAYOR:  Assuming all of

20   that, let's assume a very efficient claim

21   process, let's assume a -- a careful

22   feasibility study by the district court.

23             Are you still -- you're still taking

24   the position that if there's a residual for any

25   reason that's legitimate, there's been an easy

1    claims process, there's been a simple

2    distribution, whatever, you're still saying

3    that an indirect benefit, a partial cy pres, is

4    not okay?

5          MR. FRANK:  I'm saying that you can't

6    reward class counsel for it.  You have to

7    incentivize them to prioritize the direct

8    benefit to the class.

9          JUSTICE SOTOMAYOR:  So your position

10   is that cy pres is okay, but we should write

11   legislation in our opinion saying that we can't

12   pay class counsel for that.

13          Have you read the Third Circuit

14   opinion that talks about this and says there's

15   a lot to balance in this issue, and are the

16   courts the appropriate one or is Congress the

17   appropriate one?

18          MR. FRANK:  Well --

19          JUSTICE SOTOMAYOR:  Or is the

20   individual district court's discretion

21   appropriate until the Congress looks at this

22   and decides?

23          MR. FRANK:  I think Rule 23(e) means

24   something.  And this Court has previously

25   called disproportionate benefits an abuse.  And

1    it's -- it's very clear that Rule 23 -- not --

2    not -- it's not the case that everything goes

3    under Rule 23(e), so long as a district court

4    rubber stamps it.

5              JUSTICE ALITO:  In a case such as

6    this, is any effort made -- and would it even

7    be possible -- to determine whether every

8    absent class member or even most of the absent

9    class members regard the beneficiaries of the

10   cy pres award as entities to which they would

11   like to make a contribution?

12             MR. FRANK:  It's very possible to

13   establish a claims process where somebody

14   checks a box and said, instead of sending me a

15   check for $6, send it to the American Cancer

16   Society.

17             Nobody does that, or at least we -- we

18   haven't seen settlements that do that.  And the

19   reality is, if class members want to send their

20   money to charity, they can do it without the

21   intermediary of class counsel.

22             JUSTICE ALITO:  So who decides who

23   these beneficiaries are going to be?

24             MR. FRANK:  It varies from settlement

25   to settlement.  In this case, class counsel and

1    Google negotiated and agreed to a set of six

2    beneficiaries.  That process was opaque, and we

3    don't understand which beneficiaries didn't

4    make the cut and why they didn't make the cut,

5    but they -- they chose these particular

6    beneficiaries.

7            JUSTICE ALITO:  So the parties and the

8    lawyers get together and they choose

9    beneficiaries that they personally would like

10   to subsidize?  That's how it works?

11           MR. FRANK:  That's usually how it

12   works.  We've had -- I've seen settlements

13   where the judge says I don't like these

14   beneficiaries, pick these beneficiaries.

15           CHIEF JUSTICE ROBERTS:  Where the

16   judge has designated the beneficiaries?

17           MR. FRANK:  There are settlements

18   structured where the judge designates the

19   beneficiaries.

20           And in another Google settlement that

21   we discuss in our opening brief, the parties

22   designated a beneficiary and -- and the court

23   re-designated the beneficiary.

24           JUSTICE KAGAN:  Mr. Frank --

25           JUSTICE GORSUCH:  We -- I'm sorry.

Official - Subject to Final Review

1           JUSTICE KAGAN:  Sorry.  No, go ahead.

2           JUSTICE GORSUCH:  Oh, please go ahead.

3           JUSTICE KAGAN:  No.

4           CHIEF JUSTICE ROBERTS:  Justice Kagan.

5           JUSTICE KAGAN:  I was going to change

6     the subject.

7           (Laughter.)

8           JUSTICE GORSUCH:  So was I.

9           (Laughter.)

10          JUSTICE GORSUCH:  Jurisdiction?

11          JUSTICE KAGAN:  Yes.

12          JUSTICE GORSUCH:  Go for it.

13          (Laughter.)

14          JUSTICE KAGAN:  May I ask you, Mr.

15    Frank, to -- to -- to address the standing

16    issue in this case, to -- to talk about what

17    you think the harm was and whether any court

18    has addressed your theories about the harm?

19          MR. FRANK:  Are you -- are you talking

20    my harm or the harm of the plaintiffs?

21          JUSTICE KAGAN:  The harm of the

22    plaintiffs.

23          MR. FRANK:  The harm of the

24    plaintiffs, we discuss that at pages 25 and 26

25    of our reply brief.

1          And one of the named plaintiffs,

2     Anthony Italiano, alleges a statutory violation

3     that corresponds to the common law tort of

4     public disclosure of private facts.

5          And the lower courts are unanimous in

6     holding that that kind of statutory claim

7     satisfies Spokeo.

8          Even on remand in Spokeo, the Ninth

9     Circuit found standing, and this Court denied

10    cert the second time up.

11         So I don't think there's a real

12    standing issue, unless the Court is inclined to

13    expand Spokeo.

14         JUSTICE KAGAN:  I had thought, Mr.

15    Frank, that the lower court thought that there

16    would be -- there was standing just because it

17    was a statutory claim, and that there was no

18    reason that the plaintiff had to show a

19    particularized or a concrete injury.

20         MR. FRANK:  That is certainly the

21    wrong standard for the district court to have

22    applied, with later Supreme Court jurisprudence

23    indicating that, but we can determine from the

24    face of the complaint that Anthony Italiano

25    made an allegation of concrete injury within

```
 1    the ambit of what Justice Thomas's concurrence
 2    in Spokeo indicated was acceptable and what
 3    lower courts have unanimously indicated that it
 4    was -- was acceptable.
 5              CHIEF JUSTICE ROBERTS:  I was curious
 6    where you were going to come down before you
 7    filed your brief, because, obviously, if
 8    there's no standing, the whole class action's
 9    thrown out, right?
10              MR. FRANK:  That would be correct.
11    That would be the right thing to do under
12    Arizonans for Proper English, or Official
13    English.  That's exactly what the Court did.
14    The Court found that the lower courts did not
15    have jurisdiction and vacated everything.
16              JUSTICE GORSUCH:  Now you say -- to
17    follow up with Justice Kagan, who anticipated
18    exactly where I wanted to go -- you say there's
19    an allegation with respect to Mr. Italiano that
20    -- that he was injured.  But do we know that he
21    was injured?  Is there any evidence that his
22    personal information, for example, wasn't
23    already available through the white pages and
24    otherwise published so that there is no injury
25    in fact?
```

1          MR. FRANK:  Well, that goes to the

2     merits.  If I allege that my friend here

3     punched me in the head and -- and owes me over

4     $75,000 and we're citizens of different states,

5     I have a claim for standing even if that claim

6     is completely fictional.

7          JUSTICE GORSUCH:  Well, fair enough at

8     a 12(b)(6) stage, but, here, we're entering a

9     final judgment, and should we at least remand

10    to -- to a lower court to make a decision as to

11    whether there is actually standing as opposed

12    to a mere allegation of standing?

13         MR. FRANK:  I don't think that's the

14    case.  I think the -- the -- the allegation of

15    concrete injury establishes the standing, and

16    then the merits question's always different

17    than the jurisdictional question.

18         JUSTICE BREYER:  So what is the

19    private -- I mean, what I have here, my law

20    clerk looked it up, is that the search that Mr.

21    Italiano engaged in was his name, that's

22    certainly public, his home address, I imagine

23    that's public, name in bankruptcy, his name in

24    foreclosure proceedings, his name in short sale

25    proceedings, his name in Facebook, and his name

```
 1    and the name of his then soon-to-be ex-wife and
 2    the words "forensic accounting."
 3            Now how, if that -- if those are all
 4    the things that he looked up, how are the --
 5    what concrete injury was there because somebody
 6    might discover through Google that he made
 7    those searches?
 8            I mean, I -- I don't quite see how
 9    this is some kind of secret or private or --
10    information.  And I don't see alleged anywhere
11    how those things were hurt.  So I had a hard
12    time distinguishing this from Spokeo.
13            MR. FRANK:  Well, the Ninth Circuit --
14            JUSTICE BREYER:  And -- and -- and the
15    statute -- and the judge, by the way, didn't
16    even try.
17            MR. FRANK:  I agree.
18            JUSTICE BREYER:  He just said that the
19    very fact that the statute forbids it is
20    enough, which I think is one thing Spokeo says
21    that's wrong.
22            MR. FRANK:  I agree that the judge did
23    not apply the Spokeo standard.  And if you
24    think the Ninth Circuit would do something
25    differently here than it would in Spokeo or has
```

1    a chance of doing something differently here,

2    then maybe the appropriate decision is to

3    remand and let them consider that.

4            And while the case for Mr. Italiano's

5    injury may be weak, which suggests why this

6    settled for such an infinitesimal amount of the

7    statutory damages, that does not change that

8    the allegation was made and that --

9            JUSTICE BREYER:  Yes, the allegation

10   is made, but where is an allegation of some

11   kind of injury that would actually concretely

12   and particularly hurt him?

13           MR. FRANK:  Again --

14           JUSTICE BREYER:  By somebody looking

15   up on the -- at Google and discovering he made

16   those searches?

17           MR. FRANK:  Even under the common law,

18   the public disclosure of private facts --

19           JUSTICE BREYER:  And which are the

20   private facts?

21           MR. FRANK:  The private facts

22   regarding the dissolution of his marriage and

23   -- and -- and things of that nature.

24           JUSTICE GORSUCH:  Well, again, though,

25   I think this gets -- we're stuck in the same

1   place, I think, which is that you have to
2   assume that that information isn't otherwise
3   available.
4            At least, fine, you don't want to
5   prove it, an allegation of it, there's no
6   allegation that that information wasn't
7   otherwise available.
8            So what do we do about that?  I think
9   that's the part where -- that we're struggling
10  with here.
11           MR. FRANK:  If the complaint is not
12  strong enough to establish the concrete injury
13  under what a majority of the Court indicated
14  would be sufficient under Spokeo and what the
15  lower courts have repeatedly found with respect
16  to Spokeo, then the appropriate decision is to
17  have a limited remand and take it back up,
18  assuming that the Court finds jurisdiction.
19           CHIEF JUSTICE ROBERTS:  Is -- putting
20  aside the question of whether it's pertinent to
21  the standing analysis, just so I understand the
22  claims, the disclosures go to any searches that
23  somebody engages in, correct?
24           MR. FRANK:  That's correct.
25           CHIEF JUSTICE ROBERTS:  Okay.  So it

1    may be that they have the wrong named plaintiff

2    if the disclosures are not private?

3              MR. FRANK:  If -- if both Gaos and

4    Italiano don't qualify, then they might have

5    the wrong named plaintiff.  If one of the named

6    plaintiffs satisfies it, though, under Rumsfeld

7    versus FAIR, that would be sufficient.

8              CHIEF JUSTICE ROBERTS:  But it -- but

9    it has to be one of the named plaintiffs?

10             MR. FRANK:  It does have to be a named

11   plaintiff.

12             JUSTICE GINSBURG:  But your argument

13   is passing standing.  You're not challenging

14   that?

15             MR. FRANK:  We're not challenging

16   standing.  We're not challenging the court's

17   finding -- nobody is challenging the court's

18   finding under Rule 23(a) that all the class

19   members have a common injury.

20             The -- the Ninth Circuit's standard

21   creates perverse incentives for class counsel

22   to divert money away from their clients and to

23   third-parties.  When courts have insisted that

24   attorneys don't get paid unless their clients

25   get paid, the attorneys find a way to improve

1    the claims process and make money get to the

2    class.

3              JUSTICE SOTOMAYOR:   I -- I --

4              JUSTICE ALITO:   Is there --

5              JUSTICE SOTOMAYOR:   -- I -- I

6    understand your fear, but, as I look at the

7    full cy pres awards, they're rare.   The list

8    that I've looked at is, what, five in how many

9    years?   It's not as if it's occurring

10   routinely, number one.

11             Number two, you do point to some

12   potentially abusive situations, but in all

13   those situations, it's the cases where the

14   circuit court rejected a cy pres award.   It

15   seems like the system is working, not not

16   working.

17             MR. FRANK:   Well, the system will

18   cease to work if the Ninth Circuit's standard

19   is affirmed by this Court.   And, otherwise,

20   class counsel will direct settlements to the

21   Ninth Circuit.

22             There are two all-pres settlements

23   with just Google alone that are pending,

24   waiting for resolution of this decision.   And

25   the Ninth Circuit's standard permits even

1    hundred million dollar settlements --

2           JUSTICE SOTOMAYOR:  How is the Ninth

3    Circuit's standard different than all the other

4    standards?  I thought the circuits had

5    basically coalesced around the ALI three-factor

6    test.

7           MR. FRANK:  The Ninth Circuit rejected

8    that.  It said all that's needed is that the

9    money is de minimis per class member.  And

10   that's at page 8 of the Petition Appendix.  And

11   we see that in our supplemental brief, where we

12   point out that in a case with 1.3 million class

13   members where every class member is

14   identifiable and 3 to 9 million dollars left

15   over, the court said that's de minimis and it's

16   okay to send all of that to a local university

17   where the defendant can name a chair after

18   itself.

19          JUSTICE SOTOMAYOR:  So is this appeal

20   all about feasibility alone?

21          MR. FRANK:  No.  The -- it's about

22   settlement fairness under Rule 23(e).

23          I'd like to reserve the rest of my

24   time for rebuttal.

25          CHIEF JUSTICE ROBERTS:  Thank you,

1    counsel.

2           General Wall.

3               ORAL ARGUMENT OF JEFFREY B. WALL

4           FOR THE UNITED STATES, AS AMICUS CURIAE,

5               IN SUPPORT OF NEITHER PARTY

6           MR. WALL:  Mr. Chief Justice, and may

7    it please the Court:

8           Two points.  First, when the district

9    court here resolved Petitioners' objections,

10   approved the settlement agreement, and entered

11   it as a binding judgment that appears at pages

12   62 to 66 of the Petition Appendix, it was

13   exercising Article III jurisdiction, which

14   means the plaintiffs had to have standing and

15   the court's ordered cy pres relief had to

16   redress plaintiffs' injuries under Laidlaw.

17   Neither of those is likely true here.

18           Second, the other limitations of

19   feasibility and fee proportionality should not

20   be paper tigers.  Lower courts need to conduct

21   rigorous numerical analyses of feasibility and

22   determine fees based on actual relief to the

23   class, not, as here, based on an inflated

24   percentage or multiplier.  Meaningful limits

25   are necessary to align incentives and deter

1    abuse of the class action device.

2         CHIEF JUSTICE ROBERTS:  I don't -- I

3    don't understand your argument on the fee.  I

4    mean, I think you either decide the cy pres

5    award provides relief or it doesn't provide

6    relief.  If it doesn't provide relief, you

7    don't get a fee for it.  But, if it does

8    provide relief, then I don't know why the fee

9    should be cut back just because it's not money.

10        MR. WALL:  Well, I still think you

11   have to look at what relief it provides to the

12   class.  If the Court agrees with us that the

13   lower courts are not being very rigorous with

14   respect to redressability and feasibility, and

15   it tightens the inquiry, I still think it's

16   possible to say, Mr. Chief Justice, that

17   tailored cy pres provides some benefit to the

18   class but not benefit that should be treated

19   dollar for dollar like money in the pocket of

20   the class members.

21        But, I mean, I'd certainly agree that

22   not much of a discount would be warranted if

23   you've got really tailored cy pres.  The

24   problem here is that, of the six proposals,

25   only one even argued the World Privacy Forum's

1    proposal, even arguably deals with referral

2    headers and the subject of this suit. The --

3    one of them, the AARP's proposal, deals with

4    online fraud. And this wasn't even a fraud

5    case. All the fraud claims were dismissed.

6    And the other four just deal with Internet

7    privacy in general.

8            And I think if -- if the inquiry is --

9    if cy pres is going to be so far divorced

10    despite I think -- what I think are serious

11    redressability concerns from the claimed

12    injuries, then I don't think we can treat it

13    anywhere near dollar for dollar. I think the

14    discount has to be more substantial.

15            JUSTICE ALITO: Is there any reason

16    why we should not decide the standing question?

17    It's a question of law. At the 12(b)(6) stage,

18    it's the plaintiff's obligation to allege

19    standing. If it wasn't alleged properly,

20    sufficiently, then -- then we should -- then

21    there isn't any standing.

22            Why -- why does -- why is a remand

23    necessary?

24            MR. WALL: I think the Court could

25    decide it, Justice Alito. I think it could

```
 1    decide it or remand.  We would urge the Court
 2    to do either of those, rather than DIG.  But --
 3              JUSTICE ALITO:  Yeah, but why remand?
 4              MR. WALL:  Well, because I think --
 5    and Justice Gorsuch was getting at this a
 6    little bit -- it isn't clear -- the -- the
 7    common law tort that everybody keeps pointing
 8    to required public disclosure of private facts
 9    about you.
10              Here, we know that somebody searched
11    Mr. Italiano's name, but from the fact that
12    somebody searches my name, it doesn't mean it
13    was me.  So they've developed this
14    re-identification theory saying, oh, well, the
15    websites you click through to will glean other
16    information about you off of the Internet and
17    they'll be able then to reverse-engineer and
18    figure out that you were the one that did the
19    search.
20              That seems pretty speculative, I
21    think, for Spokeo purposes, and there isn't a
22    record on it, though I don't know that the
23    Court needs one.  And then, even beyond that,
24    even if you could identify that these people
25    were the ones doing the searches, if they're
```

1    searching information that's already public and

2    they're not pointing to any other additional

3    harm, is that harm under Spokeo, I think that

4    latter part of it is a legal inquiry that I

5    agree, I think the Court is as well positioned

6    as the lower court to decide.

7            JUSTICE ALITO:  Well, do you think

8    that every time we get a case where there's

9    been a dismissal at the pleadings stage and a

10   question of standing arises, we should remand

11   it to the lower court to see whether the

12   plaintiff might be able to come up with some

13   additional allegations, or should we decide

14   whether the plaintiff has sufficiently alleged

15   standing, as the plaintiff must sufficiently

16   allege all the elements of whatever claim is

17   being pressed?

18           MR. WALL:  I -- Justice Alito, I think

19   the Court could decide it.  If the Court thinks

20   that, on the basis of these allegations, it's

21   got enough to decide the standing question, I

22   think it could do that here.

23           JUSTICE BREYER:  We know this, on that

24   very point -- we have in the complaint, quote

25   -- there was one search that was his name,

```
 1    Italiano, and then, quote, "the name of his
 2    then soon-to-be ex-wife."  End quote.
 3           All right.  Now was the search, the
 4    words -- it couldn't have been "the name" --
 5    there must have been a different actual search.
 6    Do we know what it was, and were the words in
 7    the search "soon-to-be ex-wife"?  Because those
 8    words would seem private.  Probably.  And --
 9    but maybe those words weren't there.  Maybe all
10    that was there was his name and his wife's
11    name, which I don't think is private.  But --
12    but -- but -- so do we know?
13           MR. WALL:  So, in fairness to their
14    theory, Justice Breyer, I don't think it's the
15    -- I don't think that what they're pointing the
16    harm is the disclosure of the information
17    itself.  I think the harm that they're claiming
18    is the disclosure that they performed that
19    search.  I am known then to have searched for
20    my name, plus the following terms.
21           And for the reasons I -- the two
22    reasons I gave to Justice Alito --
23           JUSTICE BREYER:  But that is --
24           JUSTICE KAVANAUGH:  Isn't that an
25    injury?
```

1              MR. WALL:  I'm sorry?

2              JUSTICE KAVANAUGH:  Isn't that an

3      injury, disclosure of what you searched?

4              MR. WALL:  I don't think --

5              JUSTICE KAVANAUGH:  I don't think

6      anyone would want the disclosure of everything

7      they searched for disclosed to other people.

8      That seems a harm.

9              MR. WALL:  I think on a --

10             JUSTICE KAVANAUGH:  It may not -- may

11     or may not be a cause of action, but it's a

12     harm.

13             MR. WALL:  Justice Kavanaugh, I'm not

14     so sure.  At the common law, it was at least

15     uncertain as of the Second Restatement in the

16     19 --

17             JUSTICE KAVANAUGH:  But it doesn't

18     have to be exactly at common law, according to

19     the language in Spokeo.  It doesn't say that.

20             MR. WALL:  No, I -- it's just an

21     analogue.  Look, I will agree with you that on

22     a particular --

23             JUSTICE KAVANAUGH:  Just as a common

24     sense matter.

25             MR. WALL:  Well, on a --

1          JUSTICE KAVANAUGH:  Just -- just go to

2     plain common sense.

3          MR. WALL:  Oh, on a --

4          JUSTICE KAVANAUGH:  What you search

5     for, if that's disclosed to other people?

6          MR. WALL:  Yes, I think on a

7     particularized basis, you could conduct

8     searches the disclosure of which would

9     embarrass or harm you.  But, if all he searched

10    was his own name, is that a sufficient harm for

11    Spokeo purposes?  I -- I'm not sure that it is.

12         JUSTICE KAVANAUGH:  If it's disclosed

13    to another person?

14         MR. WALL:  Again, I'm not sure that it

15    is a sufficient harm under Spokeo.  I will

16    say --

17         JUSTICE KAGAN:  And -- and what --

18         MR. WALL:  -- though, that the

19    predicate problem and the reason I think you

20    don't even get there is this re-identification

21    theory is itself so speculative, I don't think

22    it's at all clear that the Internet sites you

23    click through to could be used to figure out it

24    was you.

25         JUSTICE KAVANAUGH:  But isn't that a

1    merits question?

2            MR. WALL:  I don't think so.  I think

3    it's a question of whether they've plausibly

4    alleged a harm.  If the harm that they're

5    pointing to couldn't occur because nobody could

6    reverse-engineer, they don't have a sufficient

7    injury.

8            JUSTICE GORSUCH:  General Wall --

9            JUSTICE KAGAN:  And what is the record

10   with respect to that question, about whether

11   anybody can identify the person who did the

12   search?

13           MR. WALL:  As far as we can tell,

14   there is no record because the district court

15   never reexamined this post-Spokeo and no one

16   raised it, either because they were bound not

17   to attack the settlement agreement or because

18   they wanted a ruling on the merits of cy pres.

19           JUSTICE GORSUCH:  General Wall, what's

20   the -- what's the government's position on

21   Justice Thomas's theory in Spokeo that standing

22   can be proven by violation of a legal right

23   granted by Congress, even if it wouldn't be

24   otherwise recognized at common law?

25           MR. WALL:  We have not taken a

1    position on that here, Justice Gorsuch.

2         JUSTICE GORSUCH:  So what -- what --

3    what -- what do you recommend the Court do

4    about that?  The government's got nothing to

5    offer us.

6         MR. WALL:  Just, we would be happy to

7    supplementally brief the standing question.  We

8    flagged it for the Court, and then none of the

9    parties has really delved into it on the

10   merits.  And so I think if the Court wants --

11        JUSTICE GINSBURG:  Isn't that a reason

12   why we should -- we should not decide it in the

13   first instance?

14        MR. WALL:  Justice Ginsburg, for the

15   reasons I gave earlier, I think the Court could

16   on this record or it could remand.  As long as

17   the Court doesn't DIG, both because it would

18   leave standing, a judgment that I think the

19   Court had no jurisdiction to enter, and I think

20   it would encourage parties not to flag

21   jurisdictional issues at the cert stage, as the

22   parties here should have.

23        And just to say one word about the

24   merits, I do think if the Court reaches the

25   merits, the government's primary submission is

1     the lower courts have just not been very

2     rigorous.

3                 JUSTICE KAVANAUGH:  Why -- why -- to

4     pick up on Justice Sotomayor's question

5     earlier -- why shouldn't that be a question for

6     the Rules Committee in Congress to address in

7     the first instance?

8                 MR. WALL:  Well, so, look, guidance

9     from Congress would be helpful, but in its

10    absence, I still think we have to say what the

11    fair, reasonable, and adequate standard means

12    under Rule 23.

13                The Rules Committee has essentially

14    punted to the courts by saying the courts are

15    actively looking at this issue, we're not going

16    to address it.

17                Now they did amend the rule in various

18    ways that I think support our approach by

19    saying you should consider fees at the 23(e)

20    stage, you can delay to see what the claims

21    rate is, the court should be looking at the

22    claims rate.

23                I mean, a number of the things that

24    they've done in the amended rule, I think, are

25    designed to tighten up the inquiry.  They're

1    consistent with what we're saying here.

2            But they didn't directly tackle the

3    question.  They, in effect, deferred to the

4    courts.  And so what we would say is, for

5    essentially the -- the reasons that Petitioners

6    give, there are these three important

7    limitations that the Court should articulate

8    and they should have real teeth.

9            I think the way that Respondents talk

10   about them, as applied here, they don't have

11   real teeth because there wasn't a real analysis

12   of feasibility here.  There wasn't a real

13   analysis of redressability.  And $950,000 in

14   fees were bumped up to $2.1 million through a

15   2.2 multiplier that's essentially sort of

16   plucked out of the air.

17           It's just a reverse justification for

18   taking $2 million in fees off of an $8 million

19   settlement that didn't actually deliver any

20   relief to the class on its specific claim here,

21   which is that there's a referrer header that

22   turns over my information.

23           And all three of those seem like

24   serious problems.  And I think that it's

25   important that, if the Court reached the

1     merits, that it tighten them up so that we

2     don't have cy pres that's completely untethered

3     from the injury to the class and the relief

4     that's actually being delivered.

5             If there are no further questions,

6     thank you.

7             CHIEF JUSTICE ROBERTS:  Thank you,

8     counsel.

9             Mr. Pincus.

10            ORAL ARGUMENT OF ANDREW J. PINCUS

11               ON BEHALF OF RESPONDENT GOOGLE

12            MR. PINCUS:  Thank you, Mr. Chief

13     Justice, and may it please the Court:

14            To the extent Petitioners are arguing

15     for a per se rule invalidating settlements,

16     where the monetary payments only go to third

17     parties, nothing in the Rules Enabling Act or

18     Rule 23 authorizes a flat prohibition.

19            And as Justice Sotomayor indicated and

20     Judge -- Professor Rubenstein's amicus brief

21     submits, these are very, very rare settlements.

22            But Rule 23(e)'s requirement that

23     settlements be fair, reasonable, and adequate

24     does impose significant constraints, which is

25     why I think these settlements are rare.

```
 1                    Maybe I'll just say --
 2                    CHIEF JUSTICE ROBERTS:  Is there --
 3                    MR. PINCUS:  -- something about
 4          standing because someone's probably going to
 5          ask about it.
 6                    CHIEF JUSTICE ROBERTS:  Well, go ahead
 7          and speak to the standing.
 8                    (Laughter.)
 9                    MR. PINCUS:  We agree with the
10          government that there's a serious question
11          about whether this action was ever properly in
12          federal court and that the standing issue has
13          to be addressed before the court could
14          determine the questions presented.
15                    So that means either the case should
16          be dismissed as improvidently granted, there
17          should be remand, or the Court should decide
18          the question.  I think the question is
19          complicated under Spokeo.
20                    Mr. Italiano was the only plaintiff
21          whose claims weren't addressed by the district
22          court.  In -- in order for his claim -- for him
23          to have a sufficient allegation of injury, we
24          think it depends on this re-identification
25          theory, as General Wall indicated.
```

1          And the complaint in paragraphs 88 and

2   95 doesn't allege -- for re-identification to

3   happen, a website operator has to get more than

4   one search, because the whole idea is you put

5   the searches together to figure out who's

6   making them.

7          There's no allegation here that Mr.

8   Italiano for his searches clicked on the same

9   website, and, therefore, there's really no way

10  that the re-identification could take place.

11         JUSTICE ALITO:  What does -- what does

12  Google admit it discloses to third-parties?  I

13  don't know.  All of us have probably done

14  searches.

15         If I do a search and search for men's

16  shoes, I will immediately get all sorts of

17  advertisements for men's shoes or whatever

18  other product I am searching for.

19         So what do you admit that you

20  disclose?

21         MR. PINCUS:  Well, the issue here is

22  -- is there were -- there are -- there are lots

23  of cookies and other things that -- that

24  generate the -- the serving up of ads to your

25  particular computer.

```
 1                 The question here is the referrer
 2       header, which is that the search terms -- when
 3       you -- when you conduct a search, you get a
 4       list of websites.  When you click on one of
 5       those sites, that site gets your search.
 6                 That's the issue here.
 7                 JUSTICE SOTOMAYOR:  Well --
 8                 JUSTICE ALITO:  And that's not a harm,
 9       that isn't a harm --
10                 MR. PINCUS:  I -- I don't think --
11                 JUSTICE ALITO:  -- to disclose that?
12                 MR. PINCUS:  -- I don't think that the
13       mere disclosure of a search without more, your
14       men's shoes search, is not a harm because
15       there's no disclosure that you're making the
16       search.  There's a disclosure that somebody
17       searched for men's shoes.
18                 JUSTICE KAGAN:  And could you --
19                 CHIEF JUSTICE ROBERTS:  Based on --
20       based on -- based on what Justice Alito typed
21       in, right, someone searched for men's shoes?
22                 MR. PINCUS:  Well, yes, but not that
23       Justice Alito --
24                 CHIEF JUSTICE ROBERTS:  Well, that's
25       kind of revelatory of private information.
```

```
 1                    MR. PINCUS:  But -- but not that
 2    Justice Alito searched for men's shoes.
 3                    JUSTICE ALITO:  But my idea was --
 4                    JUSTICE SOTOMAYOR:  I'm not -- I'm not
 5    sure how not.
 6                    MR. PINCUS:  Excuse me?
 7                    JUSTICE SOTOMAYOR:  The -- the -- I'm
 8    not sure how not.  The reverse-engineering is
 9    self-evident because he is receiving the men's
10    shoes advertising.  So somehow something he's
11    doing is identifying his website.
12                    And given that I went into a store not
13    long ago, and without giving them anything
14    except my credit card, they came back with my
15    website, I -- it seems --
16                    MR. PINCUS:  Well, there are -- there
17    are lots of ways that information is disclosed
18    that don't have to do with the referrer header.
19    Again, we're talking about the referrer header
20    here.  There are lots of other --
21                    JUSTICE SOTOMAYOR:  Oh, I see what you
22    mean.
23                    MR. PINCUS:  -- the placement of
24    cookies in your browser and other -- other ways
25    that -- that you may be served ads based on
```

```
 1    your searches.  That's not the claim in this
 2    case.  The claim in this case --
 3              CHIEF JUSTICE ROBERTS:  But do you
 4    think that problem is going to be meaningfully
 5    redressed by giving money to AARP?
 6              MR. PINCUS:  Well, I -- I -- I think
 7    the question is --
 8              (Laughter.)
 9              MR. PINCUS:  I think -- I think it is
10    because I --
11              CHIEF JUSTICE ROBERTS:  As if only --
12    as if this is only a problem for elderly
13    people?
14              (Laughter.)
15              MR. PINCUS:  No, but AARP is not the
16    only recipient and elderly people are
17    particularly --
18              CHIEF JUSTICE ROBERTS:  Well, you're
19    changing the subject, Mr. Pincus.  AARP is one
20    of the recipients.
21              MR. PINCUS:  It is.  And I think one
22    of the questions that a district court has to
23    ask is the fit between the recipients and the
24    harm alleged in the complaint and the plaintiff
25    class.
```

```
 1              Here, the plaintiff class was everyone
 2    who used Google in a -- in a very long period,
 3    129 million people, basically everyone on the
 4    Internet in America.
 5              It is a fact that elderly people are
 6    less knowledgeable about privacy and their
 7    vulnerability on the Internet than other
 8    people.  And so having part of the award be
 9    designated to -- for that group we think meets
10    that fit test.
11              JUSTICE KAGAN:  Especially when you
12    use a --
13              CHIEF JUSTICE ROBERTS:  Including a
14    group that engages in -- engages in political
15    activity, having nothing to do with the
16    inability of elderly people to conduct
17    searches?
18              MR. PINCUS:  Well, this grant had
19    nothing to do with political activity.  AARP,
20    like the other recipients, had to submit a
21    proposal, and the money was specifically for
22    that proposal.
23              JUSTICE KAGAN:  May I go back, Mr.
24    Pincus?  You -- you talked about the
25    re-identification theory, and I'm not quite
```

```
 1    sure I understand it.  So could you tell me the
 2    technology that I need to know to understand it
 3    and what plaintiffs would have to show to prove
 4    their own theory of harm?
 5              MR. PINCUS:  Well, I think this is one
 6    of the reasons why more information, either
 7    re-briefing here or a remand is necessary, but
 8    what would have to be alleged would be that
 9    enough referrer headers went to a single
10    website operator that that website operator
11    could combine them and say:  A-ha, I can now
12    figure out that this is the person who made the
13    search and tie the search terms to that person.
14              I'm not sure that would be enough.
15    The restatement section, 652(h), seems to
16    indicate that actual imminent damages are
17    required for privacy violations.
18              In other words, the -- the mere
19    revelation of facts at -- at common law in 1950
20    -- in the 1960s was not enough, let alone in
21    1787.
22              JUSTICE KAVANAUGH:  But that's a
23    merits question.  That -- I mean, that goes to
24    the merits of the tort.
25              MR. PINCUS:  I don't think so, Your
```

1    Honor.  I think -- I think that's a question --
2               JUSTICE KAVANAUGH:  We're just talking
3    about harm, and you don't have a mini-trial on
4    whether the harm, sufficient for standing, is
5    proved.
6               MR. PINCUS:  I think that -- that
7    standing -- there are two ways that standing
8    can be contested by a defendant.  One is based
9    on the allegations of the complaint, whether
10   they're sufficient.  And the second is whether
11   the allegations of the complaint are, in fact,
12   backed up by real facts.
13              Both of those are preliminary
14   inquiries at the standing stage.  In this case,
15   Google filed a motion to dismiss Mr. Italiano's
16   claim when the -- when the final consolidated
17   complaint was filed.  The district court didn't
18   act on that motion.
19              But I think the question whether --
20   the Spokeo question, whether there's concrete
21   harm, has two components.  One is, is it -- is
22   it the kind of harm that's generally
23   recognized?  And then, if it's not, the
24   question is, is it an intangible harm that
25   because of its recognition at the common law or

1    because of what Congress may have elevated

2    makes it a harm that's actionable?

3              And I think, under the Stored

4    Communications Act, there's a real question.

5    It's an Act that both requires that a plaintiff

6    be aggrieved and it's an Act that two circuits

7    have said requires proof of actual damages to

8    recover.

9              And so the -- I think there's a very

10   significant question about whether that Act

11   could be said by -- that in that Act, Congress

12   could have been said to elevate that harm.  But

13   --

14             JUSTICE BREYER:  Would the following

15   make sense if we get to the merits?  Professor

16   Rubenstein's brief -- I'm referring to that,

17   interesting.  Could we say something like this:

18   Where the actual plaintiffs receive something

19   significant so there were -- then quite often

20   there is money left over, a little bit, some or

21   sometimes more.  But where -- and in those

22   circumstances, you apply the ALI four-step

23   thing and just do it and be sure it's done.

24             But where they get nothing, under

25   those circumstances, while we wouldn't say

1    never, what's happening in reality is the

2    lawyers are getting paid and they're making

3    sometimes quite a lot of money for really

4    transferring money from the defendant to people

5    who have nothing to do with it.  And under

6    those circumstances, scrutinize very carefully

7    to see that the four standards are met.

8         MR. PINCUS:  I think there should be

9    careful scrutiny.

10        JUSTICE BREYER:  Yeah, but, I mean --

11        MR. PINCUS:  I think --

12        JUSTICE BRYER:  -- you heard -- I was

13   trying to make up a --

14        MR. PINCUS:  Yes.  I think -- I think

15   in -- there's a great difference between most

16   of the cases that Mr. Frank relies on, which

17   are cases where claimants have been identified

18   and there is nonetheless a separate

19   multimillion-dollar cy pres payment.  That's a

20   very different case because you don't have the

21   question of the costs of identifying the

22   plaintiffs.

23        In this kind of case, where the

24   question at the outset is, is it worth the

25   candle to try and identify the claimants

1    because you have a very large class and a very

2    small settlement, there should be close

3    scrutiny and a three-part test.  One is

4    feasibility.  Is the amount that the class

5    members are likely to receive after

6    administrative costs, taking into account what

7    the claiming rate may be, so small that the

8    benefit of that payment to a class member is

9    outweighed by the indirect benefit from the

10   third-party's activity?

11            I think that's a -- a tough test.  The

12   district court needs discretion because there

13   are two unknowns:  What will the administrative

14   costs actually be of distributing the money?

15   And, two, how many class members will claim?

16   But that's the question the district court

17   should ask.

18            Second, the district court should look

19   at the link between the harm -- the claimed

20   injury and the recipients.  We don't agree with

21   General Wall that there's a redressability

22   issue here.  This is a settlement.  Settlements

23   between individual parties are not limited to

24   things that would be awardable under the

25   statute.  But, for the test to be satisfied, we

1    think the funds have to be used for a purpose

2    that will benefit the class members and address

3    injuries similar to those that are subject to

4    the lawsuit.

5              And the third test is no conflicts of

6    interest.  The -- the lower courts here

7    actually addressed that test.  We don't think

8    the fact -- the happenstance that the defendant

9    may have given contributions in the past to the

10   organization should rule them out, but the

11   court should make sure that this isn't a

12   displacement of money that the defendant would

13   otherwise give and --

14             CHIEF JUSTICE ROBERTS:  On -- on that

15   --

16             JUSTICE KAVANAUGH:  Why not a --

17             MR. PINCUS:  -- that that organization

18   will control the money and decide how it's

19   going to be used.

20             CHIEF JUSTICE ROBERTS:  On that point,

21   would you agree that the district court should

22   never be the one suggesting possible recipients

23   of the funds of a settlement he has to approve?

24             MR. PINCUS:  I -- I totally agree,

25   Your Honor.  I think a settlement is an

1    agreement between the parties.  The district

2    court's role here is to apply Rule 23(e) and

3    tell the parties that because one of these

4    three tests is not met, we would submit, that

5    the settlement is not approved.  And then if

6    they -- if that -- then it's up to the parties

7    to go back and come up with different

8    recipients or a different process that -- that

9    meets the test.

10              JUSTICE KAVANAUGH:  Why is it --

11              CHIEF JUSTICE ROBERTS:  Why do you --

12              JUSTICE KAVANAUGH:  Go ahead.

13              CHIEF JUSTICE ROBERTS:  Why do you --

14    why do you assume that simply because someone

15    wants money in the settlement or is entitled

16    to, that he's also opposed to what gave rise to

17    the -- the wrong?  I mean, you may be in an

18    auto accident with someone who's speeding.

19    That doesn't mean you automatically think that

20    highway safety is affected and the speed limit

21    should be changed.

22              MR. PINCUS:  Well, I --

23              CHIEF JUSTICE ROBERTS:  You just want

24    money because of what happened to you.

25              MR. PINCUS:  And -- and I think that's

```
 1    why I think the critical first inquiry is, is
 2    the -- is the -- in the real world, is the --
 3    is the cost of distributing the money going to
 4    mean that people get essentially little or
 5    nothing or -- or essentially nothing so that
 6    this indirect benefit is better?
 7              JUSTICE KAVANAUGH:  Isn't it --
 8              MR. PINCUS:  I don't think the -- I
 9    think --
10              CHIEF JUSTICE ROBERTS:  I think
11    Justice Kavanaugh had a question.
12              MR. PINCUS:  I'm sorry.
13              JUSTICE KAVANAUGH:  Isn't it always
14    better to at least have a lottery system then
15    that one of the plaintiffs, one of the injured
16    parties gets it, rather than someone who's not
17    injured?  Why isn't that always more
18    reasonable?
19              MR. PINCUS:  We agree with the
20    government that a lottery system would be very
21    strange.  If a class member takes the time to
22    file a claim, it just seems it would be a very
23    --
24              JUSTICE KAVANAUGH:  This is strange
25    too.
```

 1          MR. PINCUS:  Well, I think this --
 2    this --
 3          JUSTICE KAVANAUGH:  I mean, it's a
 4    question of what's more strange, I think.
 5          MR. PINCUS:  Well, if I may answer the
 6    question, I think this is actually -- and this
 7    is partially an answer to the Chief Justice's
 8    question.  The -- the actual application of a
 9    cy pres-like doctrine here is that the class
10    representatives and their lawyers are
11    essentially fiduciaries to the class.  And
12    they're looking at this and saying, does it
13    make sense at the end of the day to have this
14    indirect benefit rather than a direct benefit
15    that is essentially going to be a dollar?
16          CHIEF JUSTICE ROBERTS:  Thank you,
17    counsel.
18          MR. PINCUS:  Thank you, Your Honor.
19          CHIEF JUSTICE ROBERTS:  Mr. Lamken.
20          ORAL ARGUMENT OF JEFFREY A. LAMKEN
21     ON BEHALF OF RESPONDENTS PALOMA GAOS, ET AL.
22          MR. LAMKEN:  Thank you, Mr. Chief
23    Justice, and may it please the Court:
24          This case undoubtedly implicates
25    interesting policy and empirical questions, but

1     those are the types of questions that the

2     Administrative Office, the Judicial Conference,

3     the Advisory Committee, Congress can

4     investigate and answer.

5              JUSTICE ALITO:  Well, where did the cy

6     pres doctrine come from?  Was that created by

7     Congress?

8              MR. LAMKEN:  No, Your Honor.  The cy

9     pres doctrine comes out of -- and it's inaptly

10    named -- from the notion that what -- someone

11    who gets a reward, someone who gets an award,

12    can repurpose it to a different thing, to a

13    different purpose, if the current -- if the

14    existing purpose isn't used -- feasible.

15             So, for example, we cite the Beastie

16    Boys examples.  Private parties regularly will

17    get an award or a settlement, but they can

18    actually, instead of having that settlement

19    come to them, go to a third-party for their

20    benefit.

21             And the question in this case is, is

22    there anything in Rule 23(e) that says that

23    classes, that class representatives, where it's

24    fair, reasonable, and adequate, cannot do

25    exactly what the Beastie Boys or any other

1      private party can?

2              And Rule 23(e) doesn't answer that

3      question by saying never.  It answers that

4      question by providing a standard of fairness,

5      reasonableness, and adequacy.

6              JUSTICE KAVANAUGH:  The question's

7      what reasonableness means.

8              MR. LAMKEN:  I think that's right.

9      And the question is -- and the answer to that,

10     I think, is when the alternative, when you have

11     a possibility of getting millions of dollars of

12     indirect relief, it is better, it is fair,

13     reasonable, and adequate, to get that when the

14     alternative is likely nothing or the nominal

15     equivalent of nothing.

16              And that's the fundamental decision

17     that ALI made.  If it's infeasible, if it's not

18     possible to give this money out to people

19     without it becoming practically zero or there's

20     a grave risk of that happening, then you can

21     take the money and give it to institutions for

22     particular uses that serve the interests of the

23     individual class members.

24              And that --

25              JUSTICE ALITO:  In whose opinion do

1       they serve the interests of the individual

2       class members?  In the opinion of the

3       individual class members?

4                MR. LAMKEN:  Well, the decision is

5       initially made by the class representatives and

6       the lawyers, and it's subject to judicial

7       review by the court.  And that -- in this case,

8       rather than simply giving money to -- and,

9       frankly, this is an issue that's not before the

10      Court because Petitioner didn't challenge the

11      requisite nexus between the recipients and the

12      interests of the class members.

13               But turning to it anyway, in this

14      case, specific proposals were provided, and

15      those proposals are actually quite closely

16      linked to not just the injury that occurred

17      here, that underlies both the cause of action

18      and the actual complaint, but also the specific

19      class.

20               JUSTICE KAVANAUGH:  But there is the

21      appearance, as the district court said in the

22      hearing, the appearance of favoritism and alma

23      maters of -- of counsel.

24               MR. LAMKEN:  Your Honor, I think, in

25      this case, the district court acknowledged that

1    there was the potential of conflict, but he did

2    what a district court should do.  He took

3    evidence.  He heard counsel -- from counsel

4    live in court, including the statement:  I got

5    my degree from Harvard and that's simply the

6    end of it.

7           He reviewed detailed proposals which

8    carefully calibrated the -- the money to the

9    specific harms, the impact of search terms and

10   disclosures and third-party data flows.  And

11   the district court found "no indication" that

12   counsel's allegiance to alma maters factored

13   into selection.

14           CHIEF JUSTICE ROBERTS:  Well, don't

15   you think it's just a little bit fishy that the

16   money goes to a charity or a 501(c)(3)

17   organization that Google had contributed to in

18   the past?

19           MR. LAMKEN:  So, Your Honor, remember,

20   because we're in the high-tech area and we're

21   in an emerging area, there's only so many

22   organizations that are going to have track

23   records of this.  And so it's not at all

24   surprising --

25           CHIEF JUSTICE ROBERTS:  I bet there

 1     are other organizations active in the area that

 2     Google had not contributed to in the past.

 3               MR. LAMKEN:  And -- and many were

 4     included here.  But one of the critical things

 5     is, while Google was involved -- and this is at

 6     page 40 of the Joint Appendix -- it was

 7     involved in identifying potential recipients,

 8     it -- counsel for class, the class, not Google,

 9     vetted the actual proposals.  Class counsel,

10     not Google, determined which recipients.

11               CHIEF JUSTICE ROBERTS:  Well, I know,

12     but the allegation -- you know, I mean, the

13     allegation is that counsel for the class and

14     the defendant are working together because no

15     money is going to anybody else, it's just going

16     to counsel for the -- for the class, and that

17     Google for its part as part of the deal -- I'm

18     not suggesting that's what's going on -- but

19     the allegation, it says part of the deal, they

20     get to give money to their favorite charity.

21               MR. LAMKEN:  And the district court

22     looked at it and understood that Google's role

23     ended at selecting potential recipients.  It

24     had no role in deciding who got how much money

25     either.

1                    And the district court heard from

2         counsel and said:  Look, it's not just an

3         accounting core change.  And the Court

4         responded:  I appreciate that.  And that's at

5         Joint Appendix 135.

6                    Google's own counsel explained to the

7         Court that if you look at the detail of these

8         programs and the lack of Google's involvement

9         in the development of the programs, it rebuts

10        that.  That's Joint Appendix 155.

11                   If you look at the actual recipients,

12        these are not necessarily flattering recipients

13        for Google.  There's two that referred Google

14        to the FTC, resulting in a $17 million fine.

15                   One of them is dedicating its money

16        to, among other things, auditing, from outside

17        the Google ecosphere, Google's compliance with

18        privacy policies.

19                   And each of them, which is where I was

20        going just a moment ago, is specifically

21        directed to not just privacy on the Internet

22        but what happens when you do searches, for

23        example, the Brooklyn center.

24                   JUSTICE KAVANAUGH:  The appearance

25        problem here, which has happened in many cases,

```
 1      is symptomatic of a broader question, which is
 2      why is it not always reasonable, more
 3      reasonable in this situation, which is a
 4      difficult one, to try to get the money to
 5      injured parties, either through pro rata
 6      distribution or some kind of lottery system.
 7              Imperfect or strange as that may be,
 8      it seems to me potentially less strange or why
 9      isn't it less strange than giving it to people
10      who weren't injured at all, who have
11      affiliations with the counsel, and who in many
12      cases don't need the money?
13              MR. LAMKEN:  Your Honor, in terms of
14      what the standard is, yes, absolutely, the
15      priority is to give the individual class
16      members money.  That's the number one priority.
17      And only when it proves infeasible to do that
18      can you go to a cy pres result.
19              And in this case -- and I turn the
20      Court to Pet App 47a -- the district court
21      actually found, he looked and said, the cost to
22      do claims processing, cost to do claims forms,
23      cost to do distribution, and said it's clearly
24      infeasible when you look at those factors.
25              JUSTICE KAVANAUGH:  How about a
```

1    lottery versus this?

2           MR. LAMKEN:  So the lottery doesn't

3    really help much for two reasons.  First, you

4    have to go and identify the class members in

5    order to determine who do you give your lottery

6    tickets to.  So you now have to go out and find

7    the names of the 129 million people, or however

8    many you're going to submit, and ask.  You have

9    to process and determine, are these valid

10   requests for lottery tickets, or is this person

11   not a Google user?  So you have to verify.

12          JUSTICE KAVANAUGH:  But at least it's

13   someone who -- who, quote, to use your analogy,

14   paid for the lottery ticket as opposed to

15   giving the billion dollar award to someone who

16   didn't buy the lottery ticket.

17          MR. LAMKEN:  Well, I think --

18          JUSTICE KAVANAUGH:  I mean, that's the

19   --

20          MR. LAMKEN:  -- it is a little --

21          JUSTICE KAVANAUGH:  -- that's, to use

22   your analogy, the --

23          MR. LAMKEN:  It's a little passing

24   strange to start -- to use all the money,

25   virtually all the money, to actually set up

1     this lottery process to accept all these

2     claims, administer that process, and then

3     exclude the vast majority of the class and say:

4     And we're going to take some people who were

5     injured and entitled to money, and we're not

6     going to give them their money, we're going to

7     give that money to somebody else because they

8     won the lottery.

9              It's just a little unseemly, in

10    addition to being grossly inefficient, because

11    the only thing it reduces -- it doesn't reduce

12    claims administration cost in terms of

13    accepting claims.  It doesn't reduce claims

14    administration cost in terms of vetting the

15    claims.  The only thing it reduces is the end

16    mailing cost.  That's the only thing it does.

17             JUSTICE KAVANAUGH:  It -- it reduces,

18    to pick up on the Chief Justice's comments, the

19    appearance of favoritism and collusion --

20             MR. LAMKEN:  And that --

21             JUSTICE KAVANAUGH:  -- which is rife

22    in these cases.  At least that's been the

23    allegation.  There have been lots of courts

24    that have said that.  And the district court

25    here, as you know in the transcript, was very

62

1    concerned about that.

2              MR. LAMKEN:  Well, he wasn't concerned

3    about the collusion because he specifically

4    found that it did not enter into the decision.

5    And if the district court had -- the standard

6    everyone agrees is, if there's even doubt, if

7    there's substantial doubt about whether the

8    recipients were selected on the merits, that

9    doubt is called against the settlement.  It's

10   called in favor of trying something different.

11             But, in this case, the court of

12   appeals and the district court both applied

13   that -- that ALI standard and both determined

14   that, after looking at all the evidence, after

15   looking at the detailed proposals, after

16   hearing from counsel, after doing all that,

17   there wasn't that substantial doubt.

18             And I think we can rely on our

19   district courts to make those determinations,

20   to be careful, and to not get engaged in the

21   type of process that brings the judiciary into

22   disrepute.

23             JUSTICE ALITO:  I mean, if you step

24   back --

25             MR. LAMKEN:  Now if someone's opposed

```
 1    --

 2              JUSTICE ALITO:  -- if you step back

 3    from what happened in this case and cases like

 4    this, how can you say that it makes any sense?

 5    The purpose of asking for compensation, it's

 6    not injunctive relief that would benefit a --

 7    benefit a broad class, but the purpose --

 8    benefit the public -- it's compensation for the

 9    -- for the class members.

10              And at the end of the day, what

11    happens?  The attorneys get money, and a lot of

12    it.  The class members get no money whatsoever.

13    And money is given to organizations that they

14    may or may not like and that may or may not

15    ever do anything that is of even indirect

16    benefit to them.

17              So how can -- how can such a system be

18    regarded as a sensible system?

19              MR. LAMKEN:  So two parts to that.

20    The first is, with respect to fees, and we

21    don't believe -- because that's Rule 24(h), a

22    reasonable fee adder.  We don't think that's

23    before the Court either.

24              But, with respect to fees, it's well

25    established that a court can reduce attorneys'
```

1    fees if it believes that the cy pres

2    distribution is less valuable to the class than

3    its cash equivalent.

4           It just happened in this case the

5    district court heard objectors' arguments and

6    said that he did not agree that the fees and

7    incentive awards are inconsistent with the

8    value of the class benefit, specific finding on

9    Pet App 60.

10          Moreover, class counsel's request is

11   not disproportionate to the class benefit.  So

12   this is a situation where district courts on

13   the ground can value what is the cy pres

14   benefit and then make a determination:  Is the

15   fee a disproportionate result?  And they can

16   reduce it.  And, in fact, they have in the past

17   in a number of cases reduced fees because it's

18   a cy pres distribution.

19          The second part, Justice Alito, is

20   that somehow this distribution doesn't benefit

21   the class.  But this isn't a case where you

22   simply take money and give it to charity that

23   happens to be in a space that's similar to or

24   occupied by the underlying injuries.

25          There are specific proposals here with

```
 1       a very close nexus.  The injury here is that
 2       search terms are given out -- and I'm going to
 3       come back to standing in a moment if I have
 4       enough time -- but that search terms of
 5       individuals are given out to third parties
 6       without their consent.
 7               And the Stored Communications Act is
 8       very clear, it's not illegal to give out that
 9       information if there is consent.  And both the
10       prospective relief, the modifications to
11       Google's FAQs, and all these organizations are
12       working towards making sure that the public is
13       properly notified that this is the consequence
14       of entering potentially extremely personal
15       information, what your worries, your concerns
16       are, into that search box will do.
17               So it is not at all even remotely the
18       case that this is not benefitting the class.
19       This is targeted precisely to the type of
20       injury and precisely the type of problem,
21       privacy invasion, that that class is subjected
22       to.
23               JUSTICE KAVANAUGH:  You started -- you
24       started with what for me is a very good point,
25       which is why is this for us and not for
```

1     Congress and the committee.  But, on the other
2     hand, the retort to that is that the committee
3     thinks it's for us.
4            And -- and -- and maybe Congress does,
5     too, because reasonable gives common law-like
6     power to the courts to figure out and to put
7     limits on these things.  So how can we rely on
8     Congress and the committee if they're thinking
9     that --
10           MR. LAMKEN:  Well, Your Honor, I think
11    --
12           JUSTICE KAVANAUGH:  -- the court's
13    going to do it?
14           MR. LAMKEN:  -- what the Court has
15    before it is the text of the rule, and the one
16    thing the Court can't do is substitute some
17    categorical rule that it thinks more efficient
18    or better than the rule itself.
19           We have to apply the rule --
20           JUSTICE KAVANAUGH:  But isn't that
21    what courts do all the time with the word
22    "reasonable," is over time apply -- learn from
23    experience and then draw sometimes bright-line
24    rules?
25           MR. LAMKEN:  As in Rule 23(h), where

1    it's a reasonable fee, courts typically fill

2    reasonableness with factors and considerations.

3    They typically don't substitute a different

4    test, such as to say cy pres is never fair,

5    reasonable, and adequate.  And it certainly --

6            JUSTICE KAGAN:  Mr. Lamken -- I'm

7    sorry, please.

8            MR. LAMKEN:  No, and it certainly

9    should be fair, reasonable, and adequate when

10   the alternative is nothing.

11           JUSTICE KAGAN:  Could I ask you to

12   address standing, please?

13           MR. LAMKEN:  Yes.  Okay.  So turning

14   to standing very quickly.  Look, neither court

15   below addressed the Stored Communications Act

16   or the other four causes of action under the

17   standard of Spokeo.  Very few courts have.

18   There's a dearth of authority on it.

19           So this isn't a situation where the

20   Court should be going out on its own and

21   addressing the issue without the benefit of the

22   viewpoints of other jurists, without the

23   benefit of the refinement that occurs when the

24   case comes up from the lower courts.

25           They simply didn't apply that

1    standard.  So the Court has two options in our

2    view.  One is to remand.  The alternative is to

3    dismiss as improvidently granted.

4           If the Court were inclined to think it

5    might grant again, I think that remand would be

6    the right answer, but this Court is so -- this

7    case is so rife with vehicle problems that I

8    think the proper answer under those

9    circumstances is to dismiss as improvidently

10   granted, but that aside, that is in the Court's

11   discretion.

12          Turning to the merits, if the Court

13   were to be the first to address this issue --

14          CHIEF JUSTICE ROBERTS:  You can take

15   an extra minute on standing.

16          MR. LAMKEN:  Okay.  If the Court were

17   to be the first to address the Stored

18   Communications Act under Spokeo, since the

19   framing, the rule has been the disclosure of

20   another's communication without their consent

21   is actionable.

22          And the Court can look to Justice

23   Story's opinion in Folsom versus Marsh for

24   that.  Even the recipient of a letter was not

25   permitted to disclose that letter without the

1     author's permission.

2            This -- in Bartnicki versus Vopper,

3     that issue was thoroughly briefed by the United

4     States, among others, and the Court in Doe

5     versus Chao recognized that, for privacy harms,

6     they're often actionable without specific harm,

7     that the damage is presumed.

8            Congress is entitled to make that same

9     judgment in --

10           JUSTICE KAGAN:  The -- the alleged

11    injury here, am I correct, is that a

12    third-party will know that a particular person

13    did the search.  It's not what -- it's not

14    simply the nature of the search.  Is that

15    correct?

16           MR. LAMKEN:  I think that when it's

17    associated with you, that -- that is an injury.

18    But merely disclosing your letter, even if it

19    was an anonymous letter, to a third-party, I

20    think that would have been actionable at common

21    law.  That would have been actionable before

22    the framing.

23           But -- and Congress did make the

24    judgment in this case that, even without

25    individual actual harm, that the presumed harm

1    is a submission because it gave as damages not

2    just actual harm, it gave as damages the

3    wrongdoer's profits.  There's entitlement

4    to recover the wrongdoer's profits, which,

5    again, is consistent with the common law.

6             But this is an extraordinarily complex

7    issue.  You have to go deep into history that,

8    in the pageant pages we had, we didn't.  I

9    think, under the circumstances, the right

10   answer for the Court, given that this is a

11   jurisdictional question, is to dismiss or -- is

12   to remand or dismiss as improvidently granted.

13            Thank you very much.

14            CHIEF JUSTICE ROBERTS:  Thank you,

15   counsel.

16            Mr. Frank, you have three minutes

17   remaining.

18            REBUTTAL ARGUMENT OF THEODORE H. FRANK

19                 ON BEHALF OF THE PETITIONERS

20            MR. FRANK:  Thank you, Mr. Chief

21   Justice, and may it please the Court:

22            My friend is alleging that the

23   district court made factual findings that it

24   simply did not reach because it believed its

25   hands were tied by the Ninth Circuit precedent.

1                   It did not look at the potential

2         conflicts between Google and the recipients

3         because, in Lane versus Facebook, the Ninth

4         Circuit approved a settlement where Facebook

5         gave to a charity created by Facebook.

6                   It did not look at the difficulty of

7         distributing to some class members because the

8         Ninth Circuit has a de minimis standard.  And

9         as we discuss at page 22 of our reply brief,

10        what the district court found was that it would

11        be too hard to distribute to over 100 million

12        class members.  We don't contest that, but

13        that's not the standard under any other court.

14                  So returning to the question that a

15        number of Justices raised, why not leave this

16        to Congress?  And I return to the example of

17        State Oil versus Khan, where the Court was

18        interpreting restraint of trade under the

19        Sherman Act.  And not only was it interpreting

20        that, but it already had a three-decade-old

21        precedent, Albrecht, that it was being asked to

22        reverse.

23                  And Congress had specifically

24        considered the rule in Albrecht over the --

25        those three decades and it never acted on it.

1    Yet, in 522 U.S. 3, State Oil versus Khan, the

2    Court unanimously reversed Albrecht and came to

3    the economically sound conclusion about the way

4    to interpret restraint of trade.

5         And we have courts here that are

6    already importing a proportionality requirement

7    into the reasonableness and fairness inquiries,

8    and at no point do my friends indicate that

9    Pearson versus NBTY, the Seventh Circuit

10    decision, is wrong or why it's wrong or why it

11    is not the superior rule here.

12         And as we document in our opening

13    brief, when courts demand that counsel is

14    faithful to their fiduciary obligations,

15    counsel responds to those incentives.

16         The Ninth Circuit's rule creates

17    incentives for class counsel to argue that it's

18    too hard to get money to the class, and, in

19    fact, the de minimis rule would take many

20    settlements that are settling now for less than

21    $1 per class member, for less than $2 per class

22    member, that distribute tens of millions, even

23    over $100 million to class members, it's now

24    appropriate under the Ninth Circuit's rule to

25    take all of that money and give it to the

1      defendant's favorite charity or the plaintiff's

2      favorite charity.

3              If there are no further questions, I'd

4      ask the Court to vacate and reverse.

5              CHIEF JUSTICE ROBERTS:  Thank you,

6      counsel.  The case is submitted.

7              (Whereupon, at 11:06 a.m., the case

8      was submitted.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25