# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

*Leave to file
Granted but
documents 307 & 310
should be stricken as
Duplicative -
Judge*

*C Kollen-Kolelly*

*1/24/2019*

| | |
|---|---|
| In re DOMESTIC AIRLINE TRAVEL ANTITRUST LITIGATION | MDL No. 2656<br>Case No. 1:15-mc-01404-CKK<br><br>[ORAL ARGUMENT REQUESTED] |
| This document relates to:<br><br>ALL CASES | |

---

## OBJECTION OF THEODORE H. FRANK AND M. FRANK BEDNARZ
## TO SETTLEMENTS AND ATTORNEY FEE REQUEST

---

Theodore H. Frank (DC Bar No. 450318)
CENTER FOR CLASS ACTION FAIRNESS
1629 K Street, NW, Suite 300
Washington, DC 20006
Telephone: (703) 203-3848
Email: tedfrank@gmail.com

*Attorneys for Objectors*
*Theodore H. Frank and M. Frank Bednarz*



JAN 10 2019

U.S. District Court, District of Columbia

## Introduction

Class members Theodore H. Frank and M. Frank Bednarz object to the approval of the settlement and the attorney-fee request and reserve the right to object to the settlement class certification. The notice to the class fails to disclose critical details about the process that will be used to decide how to distribute settlement funds, and leaves open the possibility that funds will be entirely distributed to as-yet-undisclosed *cy pres* recipients without any further notice to the class or opportunity to object. (Indeed, neither the motion for settlement approval nor approval of Rule 23(h) fees mentions the words "*cy pres*" nor makes any attempt to justify this clause of the settlement agreement. Dkt. 299, 300. Neither does the Motion to Hold in Abeyance (Dkt. 305).) Frank and Bednarz are forced to object now, lest, as plaintiffs' Motion to Hold in Abeyance suggests, class counsel will argue that class members missed the objection deadline if class counsel attempts such a bait-and-switch in the absence of objections. A settlement that leaves open the possibility of the attorneys receiving tens of millions while the class receives no direct benefit is unfair; so is the potential for abusive *cy pres* distributions where class counsel is incentivized to use the settlement fund as a slush fund.

The problem is more than hypothetical here. Lead class counsel, in a previous antitrust class action, diverted $5.1 million of settlement money away from the class, to fund the development of future litigation, while accomplishing a sizable donations to his *alma mater*—an abuse so egregious it was cited in the merits brief in the pending Supreme Court case *Frank v. Gaos* as an example of why Rule 23 should not permit all-*cy pres* settlements. *Frank v. Gaos* Brief for Petitioners 29, No. 17-961 (filed July 9, 2018) (citing Ashley Roberts, *Law School Gets $5.1 Million to Fund New Center*, GW Hatchet (Dec. 3, 2007)).

## I.      Frank and Bednarz are class members.

As documented by their attached declarations, Theodore H. Frank and M. Frank Bednarz are class members in both the Southwest and American Airlines settlements and have registered with the settlement administrator. They object on behalf of the entire settlement class in both settlements, and

can be reached through their counsel Frank at his business address and phone number. They intend to appear at the fairness hearing through counsel.

Frank founded the Center for Class Action Fairness in 2009, which has won over $200 million for class members through dozens of successful objections in the last decade; Frank is an experienced appellate attorney who argued *Frank v. Gaos* in the Supreme Court this October. Bednarz is also an attorney with the Center for Class Action Fairness. (The Center became part of the Competitive Enterprise Institute in 2015, and will move to the new non-profit public interest law firm Hamilton Lincoln Law Institute later this month.) While the Center is using its own attorneys as objectors here for convenience, many class members and a number of government officials reached out to the Center when they received notice of this settlement. Many more class members would likely have done so but never learned of the settlement, because the settlement administrator used methods of e-mail distribution that resulted in countless class members' email systems filtering the notice as spam. The percentage and number of class members who object will be very low, but the Court should not use that as a reason to disregard objections; there is even less incentive to object to a class action settlement of pennies per class member than there is to participate in an individual antitrust suit, which is why this case is proceeding as a class action to begin with. It is "naïve" to view the lack of objections as acquiescence, much less support for a settlement. *Redman v. RadioShack Corp.*, 768 F.3d 622, 628 (7th Cir. 2014); *accord Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 205 (D.D.C. 2013) (low objection rate "proves little").

Frank and Bednarz join in full the objections of any state attorney general or the Department of Justice, and join the meritorious objections of any class members that are not inconsistent with this one. On information and belief, a group of state attorneys general agreed at the last minute not to file objections or a statement of interest with the court in exchange for plaintiffs filing the Motion to Hold in Abeyance; Frank and Bednarz intended to rely upon those filings. Unfortunately, class counsel's motion does not resolve the problems with the settlements and notice.

## II.   The Settlements contains loopholes that violate Rule 23, and notice is deficient.

The settlement and settlement notice leave open the possibility that the entire net settlement fund after a Rule 23(h) award (which if granted, would be over 40% of the fund) will go to *cy pres* recipients; they provide no procedures for additional notice to the class or additional opportunities to object; they provide no notice of how the decision to distribute the fund will be made; they provide no information about the identity of *cy pres* recipients. All of this is a violation of Rule 23(e) and of Rule 23(h)'s notice procedure. *See generally Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 203 (D.D.C. 2017). If the intent of the settlement is to divert the entire fund to *cy pres*, as seems likely if the case is so meritless that defendants will repeatedly engage in only nuisance settlements for less than $1/class member or avoid liability altogether, then there are class certification problems under Rule 23(a)(4) and Rule 23(g).

*First*, the settlement and notice explicitly leave open the possibility that the entire fund will go to *cy pres*. Southwest Settlement ¶ 40 (leaving plan of allocation undisclosed); American Settlement ¶ 40 (same); Class Notice 4-5. Meanwhile class counsel's Rule 23(h) request seeks tens of millions of dollars, while class members may receive no direct benefit, nor have any opportunity to object to a misallocation. *Cy pres* should not be counted as a benefit to the class. *Pearson v. NBTY, Inc.*, 772 F.3d 778, 784 (7th Cir. 2014). And a settlement that proposes to pay class counsel so disproportionately to the class is fundamentally unfair under Rule 23(e). *Id.* at 781 (rejecting settlement with much better ratio of known class payment to attorney payment) (quoting *Redman*, 768 F.3d at 630).

*Second*, Frank and Bednarz object to the settlement to the extent it leaves open any possibility that material amounts of money will go to charity instead of class members. "There is no indirect benefit to the class from the defendant's giving the money to someone else." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004). "[S]ettlement-fund proceeds, having been generated by the value of the class members' claims, belong solely to the class members." *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011). "Class members are not indifferent to whether funds are

distributed to them or *cy pres* recipients, and class counsel should not be either." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 178 (3d Cir. 2013).

Even if claims rates were so high such that it would be prohibitively expensive to distribute money to every claimant (much less every class member), random lottery distribution to a percentage of claiming class members would successfully distribute the fund. Shay Lavie, *Reverse Sampling: Holding Lotteries to Allocate the Proceeds of Small-Claims Class Actions*, 79 Geo. Wash. L. Rev. 1065 (2011). As arbitrary as that sounds, it is less arbitrary to distribute $40 million of settlement money to 400,000 or 4,000,000 class members than nothing to class members and $40 million to third-party charities affiliated with class counsel, and no more arbitrary than the typical claims-made settlement that leaves over 99% of the class uncompensated.

*Third*, Frank and Bednarz object to the Rule 23(h) request because it proposes to pay attorneys regardless of whether the settlement fund goes to class members or to the attorneys' favorite charities. "*Cy pres* distributions also present a potential conflict of interest between class counsel and their clients because the inclusion of a *cy pres* distribution may increase a settlement fund, and with it attorneys' fees, without increasing the direct benefit to the class." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 173 (3d Cir. 2013). And if class counsel gets paid the same either way, they have no incentive to do the extra work to move money to their anonymous clients, rather than to their favorite charities. But class attorneys have no more authority to divert their clients' moneys to preferred charities than attorneys for individual clients do. For this reason, Frank and Bednarz object to any payment going to class counsel before class members are paid. This controversy is live because class counsel's motion to hold in abeyance may not be granted, and there are no guarantees that any money will ever go to the class.

*Fourth*, the notice to the class is deficient in multiple ways.

- The Allocation Plan is "an integral part of effectuating the proposed settlement[s]," and the failure to include it in either the settlement or the notice means the parties have not "met their Rule 23(e)(3) burden to identify the terms of the settlement." *In re Toyota Motor*

*Corp. Unintended Acceleration Mktg.*, 2013 WL 3224585, at *5 (C.D. Cal. June 17, 2013). A notice should include, *inter alia*, "the essential terms of the proposed settlement," "any special benefits provided to the class representatives," "the procedures for allocating and distributing settlement funds, and, if the settlement provides different kinds of relief for different categories of class members, clearly set forth those variations," "the basis for valuation of nonmonetary benefits"; and should "provide information that will enable class members to calculate or at least estimate their individual recoveries, including estimates of the size of the class and any subclasses." *Manual for Complex Litigation* § 21.312 (4th ed.). "To constitute adequate notice, the postcard and e-mail to be distributed to class members must provide them with a way of comparing their anticipated recoveries with those of other class members and of forming opinions about whether the proposed settlement is fair, reasonable, and adequate." *O&R Constr. v. Dun & Bradstreet Credibility Corp.*, 2017 WL 1788410, at *2 (W.D. Wash. May 5, 2017). In a sentence, the plan of allocation is a material detail of the settlement (*see, e.g. In re Fed. Nat'l Mortg. Ass'n Secs., Derivative and ERISA Litig.*, 4 F. Supp. 3d 94, 108-09 (D.D.C. 2013)) and class members are entitled to make their decision whether to object, opt out, or participate willingly with that information at hand. At a minimum, there needs to be notice of what standard the parties propose to use to determine whether class distributions will be feasible. *See Haggart v. Woodley*, 809 F.3d 1336, 1348-49 (Fed. Cir. 2016).

- While the Notice suggests money may go to charity instead of the class, there is no disclosure what charities are being considered, much less what conflicts exist between the class representatives, class counsel, and the possible recipients. This is deficient when there is no established procedure for notice to the class or opportunity to object to the recipients. *Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012). Moreover, when charitable recipients are not designated until the opt-out deadline has passed, class members have no way to distance themselves from the subsidy, and thus it constitutes compelled speech in

violation of the First Amendment. "[E]xcept perhaps in the rarest of circumstances, no person in this country may be compelled to subsidize speech by a third party that he or she does not wish to support." *Harris v. Quinn*, 134 S. Ct. 2618, 2644 (2014).

- Rule 23(h) requires notice to the class of the basis for attorneys' fees, but, because of the lack of a plan of allocation, the class does not know whether any money is going to the class, the most important basis for fees, yet is expected to object by a deadline well before they get that knowledge. This violates the rule. *Redman*, 768 F.3d at 637-38; *In re Mercury Interactive Corp. Securities Litigation,* 618 F.3d 988, 993-95 (9th Cir. 2010). The request for $3 million in "future" expenses that cannot be vetted similarly violates Rule 23(h).

*Fifth*, Frank and Bednarz object to the proposal to pay class counsel for unsupervised future expenses. Courts routinely reject such unsupported fund requests for "future" use. *See Ferrick v. Spotify USA, Inc.*, 2018 WL 2324076, at *11 (S.D.N.Y. May 22, 2018) (denying fund for future expert expenses); *In re Domestic Drywall Antitrust Litig.*, 2016 WL 1457917, at *2 (E.D. Pa. Apr. 16, 2016) (denying future expenses without prejudice until plaintiffs could "account[] for the money they have expended and and/or expenses incurred"); *7-Eleven, Inc. v. Etwa Enter.*, 2013 WL 2947112, at *5 (D. Md. Jun. 12, 2013); *St. Hilaire v. Indus. Roofing Co.*, 346 F. Supp. 2d 212, 215 (D. Me. 2004) ("[T]he Court is not prepared to accept Plaintiff's bald projection of reasonable future fees without corroborating support in the record."). Expenses can only be granted upon a showing of clear and demonstrable benefit, accompanied by proper documentation. *Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 334 (N.D. Cal. 2014) (expenses require documentation); *Wolph v. Acer Am. Corp.*, 2013 U.S. Dist. LEXIS 151180, at *18 (N.D. Cal. Oct. 21, 2013) (expenses must be "clear"); *Davis v. Cole Haan, Inc.*, 2013 U.S. Dist. LEXIS 151813, at *10 (N.D. Cal. Oct. 21, 2013) (expenses must be sufficiently described). "[W]ithout knowing the ultimate attorneys' fees, other expenses of claims administration, or total value of recovery to the class" it is not possible to "carry out the required 'thorough judicial review' of these costs." *In re Mushroom Direct Purchaser Antitrust Litig.*, 2018 WL

6603868, at *9 (E.D. Pa. Dec. 17, 2018) (quoting *Halley v. Honeywell Int'l Inc.*, 861 F.3d 481, 497 (3d Cir. 2017)).

While some courts permit a fund for future expenses, a number did so in situations with protections for the class such as the fact that they (1) were suggested by a court-appointed mediator and required court approval for any expenditure, *Newby v. Enron Corp.*, 394 F.3d 296, 302 (5th Cir. 2004), or (2) required court approval for payments and were overseen by sophisticated, "institutional investor[]" plaintiffs and counsel who, "in striking contrast to the common circumstance of attorneys choosing their clients in class actions," had been actively selected by the plaintiffs and requested fees amounting to only 10 percent of the recovery, *In re Cal. Micro Devices Secs. Litig.*, 965 F. Supp. 1327, 1330, 1332, 1337 (N.D. Cal. 1997). No such safeguards exist here, and orders rubber-stamping unopposed requests for future expenses should not be viewed as dispositive here—especially where the settlement and class certification may have fatal problems.

*Sixth*, Frank and Bednarz note that these are nuisance settlements for less than 1% of alleged damages, and perhaps even less than the cost of the defendants fully litigating the case. While there is nothing inherently wrong with a class settlement for a nuisance amount (*but see Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 954 (7th Cir. 2006)), here there is a substantial chance that class counsel has harbored the intent all along to create a *cy pres* slush fund and fees for counsel's use with nothing for the class. If so, this is an abuse of the class action system that should preclude class certification and settlement approval. *E.g., In re Subway Footlong Sandwich Mktg. Litig.*, 869 F.3d 551, 557 (7th Cir. 2017). The opacity of the allocation and *cy pres* process unfortunately creates problems here. Because this objection reveals to class counsel that class members are paying attention, class counsel can safely disclaim any bad-faith intent, as we will never know what they would have attempted had there been no detailed objections filed. While the objectors have no direct evidence of bad faith here, and are unlikely to obtain any in the absence of a whistleblower or discovery, class counsel's track record in a previous D.D.C. antitrust settlement discussed above permits an adverse inference.

## Conclusion

For the above reasons, the settlement and Rule 23(h) request should not be approved, and the court should consider whether class certification is appropriate at all.

Dated:  January 4, 2019

Respectfully submitted,

/s/ Theodore H. Frank
Theodore H. Frank (DC Bar No. 450318)
CENTER FOR CLASS ACTION FAIRNESS
1629 K Street, NW, Suite 300
Washington, DC 20006
Telephone: (703) 203-3848
Email:  tedfrank@gmail.com

*Attorneys for Objectors*
*Theodore H. Frank and M. Frank Bednarz*

## Certificate of Service

I certify that on January 4, 2019, I served a copy of the above on all counsel of record registered for electronic filing by filing a copy via the CM/ECF system.

In addition, in accordance with the Class Notice, I caused a copy of the foregoing to be sent by first-class mail to the following persons at the following addresses:

| | |
|---|---|
| **Clerk of the Court**<br>United States District Court for the District of Columbia<br>333 Constitution Avenue<br>Washington, DC 20001 | **Michael D. Hausfeld**<br>Hausfeld, LLP<br>1700 K Street NW, Suite 650<br>Washington, DC 20006 |
| **Roberta Liebenberg**<br>Fine Kaplan and Black<br>One South Broad Street, Suite 2300<br>Philadelphia, PA 19107 | **Benjamin G. Bradshaw**<br>O'Melveny & Myers LLP<br>1625 Eye Street, NW<br>Washington, DC 20006 |

Dated: January 4, 2019

/s/ *Theodore H. Frank*
Theodore H. Frank

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| In re DOMESTIC AIRLINE TRAVEL ANTITRUST LITIGATION | MDL No. 2656<br>Case No. 1:15-mc-01404-CKK<br><br>[ORAL ARGUMENT REQUESTED] |
| This document relates to:<br><br>ALL CASES | |

**DECLARATION OF THEODORE H. FRANK**



I, Theodore H. Frank, declare as follows:

1.      I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2.      My business address for the next week is Competitive Enterprise Institute, 1310 L Street NW, Washington DC 20005. After that, my business address is Hamilton Lincoln Law Institute, 1629 K Street NW, Suite 300, Washington, DC 20006. (I have already moved my business address for purposes of D.D.C. membership.) My telephone number is (703) 203-3848. My email address is tfrank@gmail.com.

3.      I represent myself and M. Frank Bednarz as class members in this matter. We object to both the Southwest and American Settlements and the accompanying Rule 23(h) request in *In re Domestic Airline Travel Antitrust Litigation*, MDL No. 2656, on behalf of the entire class, for the reasons stated in the accompanying filing. I plan to appear at the Fairness Hearing on behalf of both myself and Mr. Bednarz.

### My class membership

4.      Between July 1, 2011, and December 20, 2017, I purchased thousands of dollars of tickets from defendant United Airlines for personal use. For example, on August 18, 2017, I paid $1,402.40 for last-minute tickets from United, with confirmation number F6Z76B, to fly roundtrip between Washington-Dulles and Denver so that I could see the solar eclipse in Wyoming with my girlfriend on August 21. A true and correct copy of my receipt is attached as Exhibit 1.

### Center for Class Action Fairness

5.      I founded the non-profit Center for Class Action Fairness ("CCAF"), a 501(c)(3) non-profit public-interest law firm based out of Washington, DC, in 2009. In 2015, CCAF merged into the non-profit Competitive Enterprise Institute ("CEI") and became a division within their law and litigation unit. Later this month, CCAF will become part of the Hamilton Lincoln Law Institute, a new non-profit public-interest law firm founded in 2018.

6.      CCAF's mission is to litigate on behalf of class members against unfair class action procedures and settlements. *See, e.g., Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014) (praising

CCAF's work); *In re Dry Max Pampers Litig.*, 724 F.3d 713, 716-17 (6th Cir. 2013) (describing CCAF's client's objections as "numerous, detailed and substantive") (reversing settlement approval and certification); *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 205 (D.D.C. 2013) (describing CCAF's client's objection as "comprehensive and sophisticated" and noting that "[o]ne good objector may be worth many frivolous objections in ascertaining the fairness of a settlement") (rejecting settlement approval and certification). The Center has won millions of dollars for class members and received national acclaim for its work. *See, e.g.*, Adam Liptak, *When Lawyers Cut Their Clients Out of the Deal*, N.Y. TIMES, Aug. 13, 2013 ("the leading critic of abusive class action settlements"); Roger Parloff, *Should Plaintiffs Lawyers Get 94% of a Class Action Settlement?*, FORTUNE, Dec. 15, 2015 ("the nation's most relentless warrior against class-action fee abuse"); The Editorial Board, *The Anthem Class-Action Con*, WALL ST. J., Feb. 11, 2018 (opining "[t]he U.S. could use more Ted Franks" while covering CCAF's role in exposing "legal looting" in the Anthem data breach MDL).

7.    The Center has been successful, winning reversal or remand over a dozen federal appeals decided to date. *E.g.*, *In re Subway Footlong Mktg. Litig.*, 869 F.3d 551 (7th Cir. 2017); *In re Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608 (8th Cir. 2017); *In re Walgreen Co. Stockholder Litig.*, 832 F.3d 718 (7th Cir. 2016); *In re EasySaver Rewards Litig.*, 599 Fed. Appx. 274 (9th Cir. 2015) (unpublished); *In re BankAmerica Corp. Secs. Litig.*, 775 F.3d 1060 (8th Cir. 2015); *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014); *Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014); *In re MagSafe Apple Power Adapter Litig.*, 571 Fed. Appx. 560 (9th Cir. 2014) (unpublished); *In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013); *In re HP Inkjet Printer Litigation*, 716 F.3d 1173 (9th Cir. 2013); *In re Baby Products Antitrust Litigation*, 708 F.3d 163 (3d Cir. 2013); *Dewey v. Volkswagen*, 681 F.3d 170 (3d Cir. 2012); *Robert F. Booth Trust v. Crowley*, 687 F.3d 314 (7th Cir. 2012); *Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011). Several of these appeals centered around *cy pres*. *E.g.*, *Pearson*; *BankAmerica*; *Baby Products*; *Nachshin*. This October, I argued the first *cy pres* case ever to be heard by the Supreme Court, *Frank v. Gaos*, No. 17-961. While, like most experienced litigators, we have not won every appeal we have litigated, CCAF has won the majority of them.

8.      CCAF has won more than $200 million dollars for class members by driving the settling parties to reach an improved bargain or by reducing outsized fee awards. Andrea Estes, *Critics hit law firms' bills after class-action lawsuits,* BOSTON GLOBE (Dec. 17, 2016). *See also, e.g., McDonough v. Toys 'R' Us,* 80 F. Supp. 3d 626, 661 (E.D. Pa. 2015) ("CCAF's time was judiciously spent to increase the value of the settlement to class members") (internal quotation omitted); *In re Citigroup Inc. Secs. Litig.,* 965 F. Supp. 2d 369 (S.D.N.Y. 2013) (reducing fees, and thus increasing class recovery, by more than $26 million to account for a "significantly overstated lodestar"); *In re Apple Inc. Sec. Litig.,* No. 5:06-cv-05208-JF, 2011 U.S. Dist. LEXIS 52685 (N.D. Cal. May 17, 2011) (parties nullify objection by eliminating *cy pres* and augmenting class fund by $2.5 million).

### Pre-empting *Ad Hominem* Attacks

9.      In my experience, class counsel often responds to CCAF objections by making a variety of *ad hominem* attacks, often wildly false. The vast majority of district court judges do not fall for such transparent and abusive tactics. In an effort to anticipate such attacks and to avoid collateral litigation over a right to file a reply, I discuss and refute the most common ones below. If the Court is inclined to disregard the *ad hominem* attacks, it can avoid these collateral disputes entirely.

10.     CEI pays me on a salary basis that does not vary with the result in any case; I expect my HLLI contract will have the same structure. CEI, HLLI, and CCAF attorneys do not receive a contingent bonus based on success in any case, a structure that would be contrary to I.R.S. restrictions.

11.     Class counsel often try to tar CCAF as "professional objectors," and then cite court opinions criticizing for-profit attorneys who threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a share of attorneys' fees. But this is not the non-profit CCAF's *modus operandi,* so the court opinions class counsel rely upon to tar CCAF are inapposite. *See* Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors,* 2003 U. Chi. Legal F. 403, 437 n. 150 (public interest groups are not professional objectors); Paul Karlsgodt & Raj Chohan, *Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Approval,* BNA: Class Action Litig. Report (Aug. 12, 2011) (distinguishing CCAF from professional objectors). CCAF refuses to engage in *quid pro quo* settlements, and has never withdrawn an objection in exchange for payment. Instead, it is funded

entirely through charitable donations and court-awarded attorneys' fees. The difference between a for-profit "professional objector" and a public-interest objector is a material one. As the federal rules are currently set up, "professional objectors" have an incentive to file objections regardless of the merits of the settlement or the objection. In contrast, a public-interest objector such as myself has to triage dozens of requests for *pro bono* representation and dozens of unfair class action settlements, loses money on every losing objection (and most winning objections) brought, can only raise charitable donations necessary to remain afloat by demonstrating success, and has no interest in wasting limited resources and time on a "baseless objection." CCAF objects to only a small fraction of the number of unfair class action settlements it sees.

12.     While one district court called me a "professional objector" in a broader sense, that court stated that it was not meant pejoratively, and awarded CCAF fees for a successful objection and appeal that improved the settlement for the class. *Dewey v. Volkswagen*, 909 F. Supp. 2d 373, 396 n.24 (D.N.J. 2012). Similarly, the Seventh Circuit in *In re Subway Footlong Mktg. Litig.*, 869 F.3d 551 (7th Cir. 2017) referred to me non-pejoratively as a "professional objector" in an opinion agreeing with my objection and reversing a settlement approval and class certification.

13.     Indeed, CCAF feels strongly enough about the problem of bad-faith objectors profiting at the expense of the class through extortionate means that it has initiated litigation to require such objectors to disgorge their ill-gotten gains to the class. *See Pearson v. Target Corp.*, 893 F.3d 930 (7th Cir. 2018); *see generally* Jacob Gershman, *Lawsuits Allege Objector Blackmail in Class Action Litigation*, WALL ST. J., Dec. 7, 2016.

14.     Before I joined CEI, I had a private practice unrelated to my non-profit work. One of my former clients, Christopher Bandas, is a professional objector who has settled objections and withdrawn appeals for cash payments. I withdrew from representation of Mr. Bandas in 2015 when he undertook steps that interfered with my non-profit work. Mr. Bandas was criticized by the Southern District of New York after I ceased to represent him, and class counsel in other cases often cites that language and attempts to attribute it to me. Class counsel in multiple cases, using boilerplate language, has tried to make it seem like my paid representation of Mr. Bandas was somehow scandalous, using

language like "forced to disclose" and "secret." The sneering is false: my representation of Mr. Bandas was not secret, as I filed declarations in my name on his behalf in multiple cases, noting under oath that I was being paid to perform legal work for him; I filed notices of appearances in cases where he had previously appeared; and my declaration in the *Capital One* case ending the relationship was filed voluntarily at great personal expense to myself, as I had been offered and refused to take a substantial sum of money to accede to a Lieff Cabraser fee award of over $3400/hour. I only worked for Mr. Bandas in cases where I believed there was a meritorious objection to be made, had no role in any negotiations he made to settle appeals, and my pay was flat-rate or by the hour and not tied to his ability to extract settlements. I argued two appeals for Mr. Bandas, and won both of them. There is nothing scandalous about that, unless one believes it is scandalous for an attorney to be paid to perform successful high-quality legal services for a client. CCAF had no attorney-client relationship with Mr. Bandas, and Mr. Bandas never paid CCAF, other than for his share of printing expenses when he was an independent co-appellant representing clients unrelated to CCAF.

15.     Firms whose fees we have objected to have previously cited to *City of Livonia Employees' Ret. Sys. v. Wyeth*, No. 07 Civ 10329 (RJS), 2013 WL 4399015 (S.D.N.Y. Aug. 7, 2013), in efforts to tar CCAF. While the *Wyeth* court did criticize our client's objection (after mischaracterizing the nature of that objection), it ultimately agreed with our client that class counsel's fee request was too high, and reduced it by several million dollars to the benefit of shareholder class members.

16.     Class counsel frequently cite an eight-year-old case, *Lonardo v. Travelers Indemnity Co.*, 706 F. Supp. 2d 766, 804 (N.D. Ohio 2010), where the district court criticized a policy-based argument by CCAF as supposedly "short on law"; however, CCAF ultimately was successful in the Seventh and Ninth Circuits on that same argument. *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) (agreeing that reversionary clauses are a problematic sign of self-dealing); *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014) (same). Moreover, the court in *Lonardo* stated its belief that "Mr. Frank's goals are policy-oriented as opposed to economic and self-serving" and even awarded CCAF about $40,000 in attorneys' fees for increasing the class benefit by $2 million. *Lonardo*, 706 F. Supp. 2d at 813-17.

17.     CCAF has no interest in pursuing "baseless objections," because every objection we bring on behalf of a class member has the opportunity cost of not having time to pursue a meritorious objection in another case. We are confronted with many more opportunities to object (or appeal erroneous settlement approvals) than we have resources to use, and make painful decisions several times a year picking and choosing which cases to pursue, and even which issues to pursue within the case. CCAF turns down the opportunity to represent class members wishing to object to settlements or fees when CCAF believes the underlying settlement or fee request is relatively fair.

18.     While I am often accused of being an "ideological objector," the ideology of CCAF's objections is merely the correct application of Rule 23 to ensure the fair treatment of class members. Likewise, I have often seen class counsel assert that I oppose all class actions and am seeking to end them, not improve them. The accusation—aside from being utterly irrelevant to the legal merits of any particular objection—has no basis in reality. I have been writing and speaking about class actions publicly for nearly a decade, including in testimony before state and federal legislative subcommittees, and I have never asked for an end to the class action device, just proposed reforms for ending the abuse of class actions and class-action settlements. That I oppose class action abuse no more means that I oppose class actions than someone who opposes food poisoning opposes food. As a child, I admired Ralph Nader and consumer reporter Marvin Zindler (whose autographed photo was one of my prized childhood possessions), and read every issue of *Consumer Reports* from cover to cover. I have focused my practice on conflicts of interest in class actions because, among other reasons, I saw a need to protect consumers that no one else was filling, and as a way to fulfill my childhood dream of being a consumer advocate. I have frequently confirmed my support for the principles behind class actions in declarations under oath, interviews, essays, and public speeches, including a January 2014 presentation in New York that was broadcast nationally on C-SPAN and in my certiorari petition filed in 2015 in *Frank v. Poertner*. On multiple occasions, successful objections brought by CCAF have resulted in new class-action settlements where the defendants pay substantially more money to the plaintiff class without CCAF objecting to the revised settlement. And I am the class representative in

a pending federal class action, represented by a prominent plaintiffs' firm. *Frank v. BMOCorp., Inc.*, No. 4:17-cv-870 (E.D. Mo.).

19.     Some class counsels have accused us of improper motivation because CCAF has on occasion sought attorneys' fees. While CCAF is funded entirely through charitable donations and court-awarded attorneys' fees, the possibly of a fee award never factors into the Center's decision to accept a representation or object to an unfair class-action settlement or fee request. Indeed, numerous class members asked if I wanted to represent them in this objection; because I am instead representing myself as an objector, I will be unable under current law to ask for attorneys' fees for any work I perform writing this objection, no matter how much I win for the class.

20.     CCAF's history in requesting attorneys' fees reflects this approach. Despite having made dozens of successful objections and having won over $200 million on behalf of class members, CCAF has not requested attorneys' fees in the majority of its cases or even in the majority of its appellate victories. CCAF regularly passes up the opportunity to seek fees to which it is legally entitled. In *Classmates*, for example, CCAF withdrew its fee request and instead asked the district court to award money to the class; the court subsequently found that an award of $100,000 "if anything" "would have undercompensated CCAF." *In re Classmates.com Consol. Litig.*, No. 09-cv-0045-RAJ, 2012 WL 3854501, at *11 (W.D. Wash. June 15, 2012). In other cases, CCAF has asked the court for a fraction of the fees to which it would be legally entitled based on the benefit CCAF achieved for the class and asked for any fee award over that fractional amount be returned to the class settlement fund.

21.     In 2004 or 2005, I interviewed with class counsel Mr. Hausfeld and his previous firm for a job as an antitrust attorney. Before that firm either extended me an offer or rejected me, I withdrew my application to accept another job offer.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 4, 2019, in Arlington, VA.

/s/ Theodore H. Frank
Theodore H. Frank

 Gmail

Ted Frank <tfrank@gmail.com>

## eTicket Itinerary and Receipt for Confirmation F6Z76B

**United Airlines, Inc.** <unitedairlines@united.com>
To: TFRANK@gmail.com

Fri, Aug 18, 2017 at 5:30 PM

Receipt for confirmation F6Z76B

# UNITED  A STAR ALLIANCE MEMBER

United logo link to home page

## Issue Date: August 18, 2017

### Confirmation: F6Z76B

Check-In >

## TRAVELER INFORMATION

| Traveler | eTicket Number | Frequent FlyerNumber | Seats |
|---|---|---|---|
| FRANK/THEODORE | 0162361504805 | UA-XXXXX921 Premier Gold / *G | 4E/3E |

## FLIGHT INFORMATION

| Day, Date | Flight | Class | Departure City and Time | Arrival City and Time | Aircraft | Meal |
|---|---|---|---|---|---|---|
| Sun, 20AUG17 | UA542 | A | WASHINGTON, DC (IAD - DULLES) **4:17 PM** | DENVER, CO (DEN) **6:18 PM** | 737-900 | Dinner |
| Tue, 22AUG17 | UA495 | A | DENVER, CO (DEN) **9:55 AM** | WASHINGTON, DC (IAD - DULLES) **3:14 PM** | 737-900 | Breakfast |

## FARE INFORMATION

**Fare Breakdown**

| | | Form of Payment: |
|---|---|---|
| Airfare: | 1,278.14US | VISA |
| U.S. Transportation Tax: | 95.86 | Last Four Digits 7822 |
| U.S. Flight Segment Tax: | 8.20 | |
| September 11th Security Fee: | 11.20 | |
| U.S. Passenger Facility Charge: | 9.00 | |
| Per Person Total: | 1,402.40US | |
| | | |
| eTicket Total: | 1,402.40US | |

The airfare you paid on this itinerary totals: 1,278.14 USD

The taxes, fees, and surcharges paid total: 124.26 USD

Fare Rules:     Additional charges may apply for changes in addition to any fare rules listed.

NONREF/0VALUAFTDPT/CHGFEE
Cancel reservations before the scheduled departure time or TICKET HAS NO VALUE.

---

## Baggage allowance and charges for this itinerary.

### Baggage fees are per traveler

| Origin and destination for checked baggage | 1st bag | 2nd bag | Maximum weight and dimensions per piece of baggage Max wt / dim per piece |
|---|---|---|---|

8/20/2017 Washington, DC (IAD - Dulles) to Denver, CO (DEN) 0.00 USD 0.00 USD 70.0lbs (32.0kg) - 62.0in (157.0cm)
8/22/2017 Denver, CO (DEN) to Washington, DC (IAD - Dulles) 0.00 USD 0.00 USD 70.0lbs (32.0kg) - 62.0in (157.0cm)

Baggage check-in must occur with United or United Express, and you must have valid MileagePlus Premier® Gold membership at time of check-in to qualify for waiver of service charges for up to three checked bags (within specified size and weight limits).

---

### MileagePlus Accrual Details

| FRANK/THEODORE | | | | | | |
|---|---|---|---|---|---|---|
| Date | Flight | From/To | Award Miles | PQM | PQS | PQD |
| 8/20/2017 | 542 | Washington, DC (IAD - Dulles)-Denver, CO (DEN) | 5120 | 2904 | 1.5 | 640 |
| 8/22/2017 | 495 | Denver, CO (DEN)-Washington, DC (IAD - Dulles) | 5120 | 2904 | 1.5 | 640 |
| | | | Award Miles | PQM | PQS | PQD |
| Theodore's MileagePlus Accrual totals: | | | 10240 | 5808 | 3 | 1280 |

---

## Important Information about MileagePlus Earning

- Accruals vary based on the terms and conditions of the traveler's frequent flyer program, the traveler's frequent flyer status and the itinerary selected. United MileagePlus® mileage accrual is subject to the rules of the MileagePlus program
- Once travel has started, accruals will no longer display. You can view your MileagePlus account for posted accrual
- You can earn up to 75,000 award miles per ticket. The 75,000 award miles cap may be applied to your posted flight activity in an order different than shown
- PQD are a Premier status requirement for members in the U.S. only.
- Accrual is only displayed for MileagePlus members who choose to accrue to their MileagePlus account.

---

## eTicket Reminders

- **Check-in Requirement** - Bags must be checked and boarding passes obtained at least 30 minutes prior to scheduled departure. Baggage will not be accepted and advance seat assignments may be cancelled if this condition is not met.

  **EXCEPTION**: When departing from Anchorage, Atlanta, Austin, Baltimore, Chicago, Cincinnati, Cleveland, Dallas/Ft. Worth, Denver, Detroit, Fort Lauderdale, Greenville-Spartanburg, Guam, Honolulu, Houston, Indianapolis, Jacksonville,

  Kona, Las Vegas, Los Angeles, Maui, Miami, New York (LGA), Newark, Orange County (SNA), Orlando, Philadelphia, Phoenix, Pittsburgh, Raleigh/Durham, Reno, San Diego, San Francisco, San Juan, PR (60 minutes), Savannah, Seattle, St. Louis,

  St. Thomas, U.S. Virgin Islands (60 minutes), Tampa, Washington, DC (both IAD and DCA), the check in requirement time for Passengers and Bags is 45 minutes except where noted.

- **Boarding Requirement** - Passengers must be prepared to board at the departure gate with their boarding pass at least 15 minutes prior to scheduled departure.

- Failure to meet the **Boarding Requirements** may result in cancellation of reservations, denied boarding, removal of checked baggage from the aircraft and loss of eligibility for denied boarding compensation.

- Bring your boarding pass or this eTicket Receipt along with photo identification to the airport.

- The FAA now restricts carry-on baggage to one bag plus one personal item (purse, briefcase, laptop computer, etc.) per passenger. The fare rules for your ticket may restrict your carry-on baggage allowance even further.

- For up to the minute flight information, sign-up for our Flight Status Updates or call 1-800-824-6200; in Spanish 1-800-426-5561.

- If flight segments are not flown in order, your reservation will be cancelled. Rebooking will be subject to the fare rules governing your ticket.

- For the most current status of your reservation, go to our Flight Status page.

- Your eTicket is non transferable and valid for 1 year from the issue date unless otherwise noted in the fare rules.

# Customer Care Contact Information

We welcome your compliments, comments or complaints regarding United or a United travel experience.

You may contact us using our Customer Care form

# Refunds Within 24 Hours

When you book and ticket a reservation through united.com, the United mobile app, the United Customer Contact Center, at our ticket counters or city ticket offices, or if you

use MileagePlus® miles to book an award ticket, we will allow you to cancel the ticketed reservation without penalty and receive a 100 percent refund of the ticket price

to the original form of payment if you cancel the reservation within 24 hours of purchase and if the reservation is made one week or more prior to scheduled flight departure.

# Hazardous materials

Federal law forbids the carriage of hazardous materials on board aircraft in your luggage or on your person. A violation can result in five years imprisonment and penalties of $250,000 or more (49 U.S.C. 5124).

Hazardous materials include explosives, compressed gases, flammable liquids and solids, oxidizers, poisons, corrosives and radioactive materials. Common examples of hazardous materials/dangerous goods

include spare or loose lithium batteries, fireworks, strike-anywhere matches, aerosols, pesticides, bleach and corrosive materials.

Additional information can be found on:

> united.com restricted items page
> FAA website Pack Safe page
> TSA website Prohibited Items page

## Proud Member of Star Alliance

We are making connections so you make yours. You can earn and redeem miles on 28 member airlines offering over 18,000 daily flights to more than 1,300 destinations worldwide.

Go to www.staralliance.com to find out more. You've earned it.

### IMPORTANT CONSUMER NOTICES

- **Notice of Baggage Liability Limitations** - For domestic travel between points within the United States (except for domestic portions of international journeys), United's liability for loss of, damage to, or delay in delivery of a customer's checked baggage is limited to $3,500 per ticketed customer unless a higher value is declared in advance and additional charges are paid (not applicable to wheelchairs or other assistive devices). For such travel, United assumes no liability for high value, fragile, perishable, or otherwise excluded items; excess valuation may not be declared on certain types of valuable articles. Further information may be obtained from the carrier. For international travel governed by the Warsaw Convention (including the domestic portions of the trip), maximum liability is approximately 640 USD per bag for checked baggage, and 400 USD per passenger for unchecked baggage. For international travel governed by the Montreal Convention (including the domestic portions of the trip), maximum liability is 1,131 SDRs per passenger for baggage, whether checked or unchecked. For baggage lost, delayed, or damaged in connection with domestic travel, United requires that customers provide preliminary notice within 24 hours after arrival of the flight on which the baggage was or was to be transported and submit a written claim within 45 days of the flight. For baggage damaged or delayed in connection with most international travel (including domestic portions of international journeys), the Montreal Convention and United require customers to provide carriers written notice as follows: (a) for damaged baggage, within seven days from the date of receipt of the damaged baggage; (b) for delayed baggage, within 21 days from the date the baggage should have been returned to the customer. Please refer to Rule 28 of United's Contract of Carriage for important information relating to baggage and other limitations of liability.
- **Notice of Incorporated Terms** - Transportation is subject to the terms and conditions of United's Contract of Carriage, which are incorporated herein by reference. Incorporated terms may include, but are not limited to: 1. Limits on liability for personal injury or death of the customer, and for loss, damage, or delay of goods and baggage, including high value, fragile, perishable, or otherwise excluded items. 2. Claims restrictions, including time periods within which customers must file a claim or bring an action against the carrier. 3. Rights of the carrier to change terms of the contract. 4. Rules about reconfirmation of reservations, check-in times, and refusal to carry. 5. Rights of the carrier and limits on liability for delay or failure to perform service, including schedule changes, substitution of an alternate air carrier or aircraft, and rerouting. The full text of United's Contract of Carriage is available at united.com or you may request a copy at any United ticket counter. Passengers have the right, upon request at any location where United's tickets are sold within the United States, to receive free of charge by mail or other delivery service the full text of United's Contract of Carriage.

- **Notice of Certain Terms** - If you have purchased a restricted ticket, depending on the rules applicable to the fare paid, one or more restrictions including, but not limited to, the following may apply to your travel: (1) the ticket may not be refundable but can be exchanged for a fee for another restricted fare ticket meeting all the rules/restrictions of the original ticket (including the payment of any difference in fares); (2) a fee may apply for changing/canceling reservations; or (3) select tickets may not be eligible for refunds or changes even for a fee; (4) select tickets have no residual value and cannot be applied towards the purchase of future travel; or (5) travel may be restricted to specific flights and/ or times and a minimum and/or maximum stay may be required. United reserves the right to refuse carriage to any person who has acquired a ticket in violation of any United tariffs, rules, or regulations, or in violation of any applicable national, federal, state, or local law, order, regulation, or ordinance. Notwithstanding the foregoing, you are entitled to a full refund if you cancel a ticket purchased at least a week prior to departure within 24 hours of purchase.

- **Notice of Boarding Times** - For Domestic flights, customers must be at the boarding gate at least 15 minutes prior to scheduled departure. For International flights, customers must be at the boarding gate at least 30 minutes prior to scheduled departure. The time limits provided by United in this Notice are minimum time requirements. Customer and baggage processing times may differ from airport to airport. Please visit united.com for information regarding airport-specific boarding times. It is the customer's responsibility to arrive at the airport with enough time to complete check-in, baggage, and security screening processes within these minimum time limits. Please be sure to check flight information monitors for the correct boarding gate and the departure time of your flight. Failure to be at the boarding gate by the required time could result in the loss of your seat without compensation, regardless of whether you are already checked in or have a confirmed seat and boarding pass.

- **Advice to International Passengers on Carrier Liability** - Passengers on a journey involving an ultimate destination or a stop in a country other than the country of departure are advised that international treaties known as the Montreal Convention, or its predecessor, the Warsaw Convention, including its amendments, may apply to the entire journey, including any portion thereof within a country. For such passengers, the treaty, including contracts of carriage embodied in applicable tariffs, governs, and may limit the liability of the Carrier in respect of death or injury to passengers, and for destruction or loss of, or damage to, baggage, and for delay of passengers and baggage.

- **Notice - Overbooking of Flights** - Airline flights may be overbooked, and there is a slight chance that a seat will not be available on a flight for which a person has a confirmed reservation. If the flight is overbooked, no one will be denied a seat until airline personnel first ask for volunteers willing to give up their reservation in exchange for compensation of the airline's choosing. If there are not enough volunteers, the airline will deny boarding to other persons in accordance with its particular boarding priority. With few exceptions, including failure to comply with the carrier's check-in deadlines, which are available upon request from the air carrier, persons, denied boarding involuntarily are entitled to compensation. The complete rules for the payment of compensation and each airline's boarding priorities are available at all airport ticket counters and boarding locations. *Some airlines do not apply these consumer protections to travel from some foreign countries, although other consumer protections may be available. Check with your airline or your travel agent.*

**Thank you for choosing United Airlines**
united.com

Legal Notices. Privacy Policy
Copyright © 2017 United Airlines, Inc. All rights reserved.
For assistance, please contact United Airlines via telephone or via e-mail.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In re DOMESTIC AIRLINE TRAVEL
ANTITRUST  LITIGATION

MDL No. 2656
Case No. 1:15-mc-01404-CKK

[ORAL ARGUMENT REQUESTED]

This document relates to:

ALL CASES

## DECLARATION OF M. FRANK BEDNARZ



I, Theodore H. Frank, declare as follows:

1.      I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

1.      My address is 1145 E. Hyde Park Blvd. Apt 3A, Chicago, IL 60615. My telephone number is 202-448-8742. My email address frank.bednarz@gmail.org.  I am a United States citizen and resident, currently domiciled in Chicago, Illinois.

2.      I am an attorney with the Center for Class Action Fairness ("CCAF"), a 501(c)(3) non-profit public-interest law firm based out of Washington D.C., founded in 2009. In 2015, CCAF merged into the non-profit Competitive Enterprise Institute ("CEI") in Washington, D.C and became a division within their law and litigation unit. Shortly, CCAF will be moved to the Hamilton Lincoln Law Institute, and my employment will more with it. I am a member of the state bars of Illinois and Massachusetts.

2.      I am represented in this objection by several other CCAF attorneys, including Theodore H. Frank. I object to both the Southwest and American Settlements and the accompanying Rule 23(h) request in *In re Domestic Airline Travel Antitrust Litigation*, MDL No. 2656, on behalf of the entire class, for the reasons stated in the accompanying filing. I expect that Theodore H. Frank will appear at the Fairness Hearing and object on my behalf.

### My class membership

3.      Between July 1, 2011, and December 20, 2017, I purchased thousands of dollars of tickets from defendant Southwest Airlines for personal use. I estimate that I have flown over 100 flights with Southwest over this time period as it is by far my favorite carrier. In fact, I find myself saddened by the passing of Southwest founder and long-time Chairman Herb Kelleher, and I wish condolences to anyone involved in this litigation that might have known him.

4.      Among the numerous flights taken over the class period, on February 11, 2017, I paid $158.94 (with unused travel funds) for a ticket from Chicago (Midway) to Salt Lake City, confirmation number 5FN9K2, to attend to the funeral arrangements for my late brother Phillip. A true and correct copy of my receipt is attached as Exhibit 1.

5.     Although Southwest has possessed one of my email addresses for many years, and even though regularly sends me both promotional emails and reservation confirmations to this address (as shown in Exhibit 1), I received no email notice of this settlement. It does not appear the settlement administrator sent notice to the address Southwest should have for me, which is associated with my Southwest Rapid Rewards account. I would not have known about this settlement it if I didn't work for CCAF.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 4, 2019, in Chicago, IL.

M. Frank Bednarz

 Gmail

**Frank Bednarz <frank.bednarz@gmail.com>**

---

### Flight reservation (5FN9K2) | 14FEB17 | MDW-SLC | Bednarz/Michael Frank
1 message

---

**Southwest Airlines** <SouthwestAirlines@luv.southwest.com>
Reply-To: Southwest Airlines <reply@wnco.com>
To: bednarz@uchicago.edu

Sat, Feb 11, 2017 at 10:57 PM

Thanks for choosing Southwest® for your trip.

 Southwest

👤 Log in | View my itinerary

| Check In Online | Check Flight Status | Change Flight | Special Offers | Hotel Offers | Car Offers |

### Ready for takeoff!

Thanks for choosing Southwest® for your trip. You'll find everything you need to know about your reservation below. Happy travels!

**Upcoming Trip:** Brothers Birthday



✈ Air itinerary

**AIR Confirmation:** 5FN9K2

Confirmation Date: 02/11/2017

| Passenger(s) | Rapid Rewards # | Ticket # | Expiration | Est. Points Earned |
|---|---|---|---|---|
| BEDNARZ/MICHAEL FRANK | ~~[redacted]~~ | 5262487067731 | Aug 15, 2017 | 808 |

Rapid Rewards points earned are only estimates. Visit your (MySouthwest, Southwest.com or Rapid Rewards) account for the most accurate totals - including A-List & A-List Preferred bonus points.

| Date | Flight | Departure/Arrival |
|---|---|---|
| Tue Feb 14 | 1410 | Depart **CHICAGO (MIDWAY), IL** (MDW) on Southwest Airlines at **8:05 PM**<br>Arrive in **SALT LAKE CITY, UT** (SLC) at **10:40 PM**<br>Travel Time 3 hrs 35 mins<br>Wanna Get Away |



 **Check in for your flight(s):** 24 hours before your trip on Southwest.com or your mobile device to secure your boarding position. You'll be assigned a boarding position based on your check-in time. The earlier you check in within 24 hours of your flight, the earlier you get to board.

 **Bags fly free®:** First and second checked bags. Weight and size limits apply. One small bag and one personal item are permitted as carryon items, free of charge.

 **30 minutes before departure:** We encourage you to arrive in the gate area no later than 30 minutes prior to your flight's scheduled departure as

we may begin boarding as early as 30 minutes before your flight.

**10 minutes before departure:** You must obtain your boarding pass(es) and be in the gate area for boarding at least 10 minutes prior to your flight's scheduled departure time. If not, Southwest may cancel your reserved space and you will not be eligible for denied boarding compensation.

**If you do not plan to travel on your flight:** In accordance with Southwest's No Show Policy, you must notify Southwest at least 10 minutes prior to your flight's scheduled departure if you do not plan to travel on the flight. If not, Southwest will cancel your reservation and all funds will be forfeited.

Air Cost: 158.94

Fare Rule(s): 5262487067731: NONREF/NONTRANSFERABLE/STANDBY REQ UPGRADE TO Y.
Valid only on Southwest Airlines. All travel involving funds from this Confirmation Number must be completed by the expiration date. Unused travel funds may only be applied toward the purchase of future travel for the individual named on the ticket. Any changes to this itinerary may result in a fare increase. Failure to cancel reservations for a Wanna Get Away fare segment at least 10 minutes prior to travel will result in the forfeiture of all remaining unused funds.

CHI WN SLC134.64OLN0WNR 134.64 END ZPMDW XFMDW4.5 AY5.60$MDW5.60


Learn about our boarding process


Learn about inflight WiFi & entertainment

## Cost and Payment Summary

✈ **AIR - 5FN9K2**

| | | | | |
|---|---|---|---|---|
| Base Fare | $ | 134.64 | **Payment Information** | |
| Excise Taxes | $ | 10.10 | Tkls funds applied from Conf# BB486H | |
| Segment Fee | $ | 4.10 | ($0.00 remaining) $87.98 | |
| Passenger Facility Charge | $ | 4.50 | | |
| September 11th Security Fee | $ | 5.60 | Tkls funds applied from Conf# BC7F8S | |
| **Total Air Cost** | **$** | **158.94** | ($0.00 remaining) $38.98 | |
| | | | Tkls funds applied from Conf# B76MV7 | |
| | | | ($17.00 remaining) $31.98 | |

Add a rental car
✓ Earn Rapid Rewards® points
✓ Guaranteed low rates
✓ Free cancellation

Book a car >

**Travel more for less.**
Exclusive deals for your favorite destinations.

Sign up and save >

**Southwest**
Rapid Rewards
✓ Unlimited reward seats
✓ No blackout dates
✓ Redeem for International flights and more

Enroll now >

## Useful Tools
Check In Online
Early Bird Check-In
View/Share Itinerary
Change Air Reservation
Cancel Air Reservation
Check Flight Status
Flight Status Notification
Book a Car
Book a Hotel

## Know Before You Go
In the Airport
Baggage Policies
Suggested Airport Arrival Times
Security Procedures
Customers of Size
In the Air
Purchasing and Refunds

## Special Travel Needs
Traveling with Children
Traveling with Pets
Unaccompanied Minors
Baby on Board
Customers with Disabilities

Legal Policies & Helpful Information

Privacy Policy              Customer Service Commitment        Contact Us
Notice of Incorporated Terms        FAQs

Book Air | Book Hotel | Book Car | Book Vacation Packages | See Special Offers | Manage My Account

This is a post-only mailing from Southwest Airlines. Please do not attempt to respond to this message. Your
privacy is important to us, Please read our Privacy Policy.

[1] All travel involving funds from this Confirmation Number must be completed by the expiration date.

[2] Security Fee is the government-imposed September 11th Security Fee.

See Southwest Airlines Co. Notice of Incorporation
See Southwest Airlines Limit of Liability

Southwest Airlines
P.O. Box 36647-1CR
Dallas, TX 75235

Contact Us

Copyright 2017 Southwest Airlines Co. All Rights Reserved.