# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE DOMESTIC AIRLINE TRAVEL ANTITRUST LITIGATION | **MDL Docket No. 2656**<br>**Misc. No. 15-1404 (CKK)** |
| This Document Relates To:<br><br>ALL CASES | |

## MEMORANDUM OPINION
### (May 9, 2019)

Presently before the Court is Plaintiffs' [299] Motion for Final Approval of Settlement Agreements with Southwest Airlines Co. and American Airlines, Inc. ("Pls. Motion"). Class Plaintiffs, on their own behalf and on behalf of the Settlement Classes, as defined herein, move for final approval of the settlements ("Settlements") reached with Defendants Southwest Airlines Co. ("Southwest") and American Airlines, Inc. ("American"). Plaintiffs' Motion, which is fully briefed and ripe for adjudication, was the subject of a March 22, 2019 Fairness Hearing, where the following persons gave oral presentations: Michael Hausfeld and Adam Zapala, Interim Class Counsel (hereinafter referred to as "Settlement Class Counsel"); Roberta Liebenberg, Counsel for Southwest; Richard Parker, Counsel for American, and Class Members Theodore Frank and Michael Suessmann. Counsel for Non-Settling Defendants Delta Air Lines, Inc. and United Airlines, Inc. were also present in the courtroom, as were several other Class Members.

Upon consideration of the pleadings,[1] the relevant legal authorities, and the entire record in this case, the Court GRANTS Plaintiffs' [299] Motion for Final Approval of Settlement Agreements with Southwest and American for the reasons described herein.

## I. BACKGROUND

### A. The Multidistrict Litigation

The United States Judicial Panel on Multidistrict Litigation ("the Panel") consolidated 23 actions pending in seven districts involving claims that four major airlines —Southwest, American, Delta Air Lines, Inc. ("Delta"), and United Airlines, Inc. ("United") — violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by colluding to limit capacity and increase prices for domestic airfares. The Panel transferred these consolidated actions to this Court on October 13, 2015. The Panel subsequently transferred additional related actions to be consolidated into the instant litigation, and at present, there are a total of 105 cases consolidated in this action.

On October 30, 2015, the Court entered its [4] Initial Practice and Procedure Order Upon Transfer Pursuant to 28 U.S.C. § 1407, in which the Court set out a general outline of how it intended to proceed in this matter. On February 4, 2016, the Court appointed Hausfeld LLP and Cotchett, Pitre & McCarthy LLP as Interim Co-Lead Counsel ("Settlement Class Counsel"), and on March 25, 2016, Plaintiffs filed their Consolidated Amended Class Action Complaint. *See*

___

[1] Settlement Agrmt. between Pls. and Southwest, ECF No. 196-2 (Ex. A); Settlement Agrmt. between Pls. and American, ECF No. 248-2 (Ex. A); Pls.' Mot. for Final Approval of Settlement Agreements ("Pls.' Mot."), ECF No. 299; Pls.' Mem. In Support of Pls' Mot. for Final Approval ("Pls.' Mem."), ECF No. 299-1; the Objections filed by various Class Members, ECF Nos. 301, 302, 309, 311, 316, 318, 319, 320, 321, 326, 329 [*see* Appendix A (list), ECF No. 334-1]; Pls.' Omnibus Resp. to Objections, ECF No. 334; and Reply in support of Objection by Paul DeMott, ECF No. 339, which was accepted by the Court for consideration in lieu of any oral argument by Mr. DeMott or his counsel at the Fairness Hearing.

Order Appointing Plaintiffs' Interim Class Counsel, ECF No. 76; Consolidated Amended Class

Action Complaint, ECF No. 91. On May 11, 2016, Defendants filed their [106] Motion to Dismiss

Plaintiffs' Consolidated Amended Complaint, which was denied by this Court. *See* Order, ECF

No. 123; Memorandum Opinion, ECF No. 124. The Court entered a [152] Scheduling Order on

January 30, 2017; discovery commenced shortly thereafter and continues for the two Non-Settling

Defendants, Delta and United. Fact discovery closes on July 31, 2019; summary judgment

motions, if any, are due on December 16, 2019; and a class certification briefing schedule will be

determined following resolution of any summary judgment motions. *See* Stipulated Am. Sch.

Order, ECF No. 290.

### B. The Settlements with Southwest and American

On December 27, 2017, Plaintiffs filed their [196] Motion for Preliminary Approval of

Settlement with Defendant Southwest Airlines Co., which included a declaration by counsel in

support of the motion, and a copy of the Plaintiffs' Settlement Agreement with Southwest

("Southwest Settlement Agreement"). Pursuant to the Southwest Settlement Agreement,

Southwest stipulates to the certification of the following Settlement Class:

> All persons and entities that purchased air passenger transportation services for flights
> within the United States and its territories and the District of Columbia from Defendants
> or any predecessor, subsidiary or affiliate thereof, at any time between July 1, 2011 and
> December 20, 2017. Excluded from the class are governmental entities, Defendants, any
> parent, subsidiary or affiliate thereof, Defendants' officers, directors, employees, and
> immediate families and any judges or justices assigned to hear any aspect of this action.

Southwest Settlement Agreement, ECF No. 196-2 (Ex. A), at 10; Pls.' Mem., ECF No. 299-1, at

6.

The Southwest Settlement Agreement is considered an "ice-breaker settlement" because it

is the first settlement in the litigation. The Southwest Settlement Agreement requires Southwest to make a $15 million cash payment. Southwest is required further to significantly cooperate with Plaintiffs regarding the pursuit of their case against the Non-Settling Defendants by: (1) providing a full account of information known to Southwest that is relevant to the claims asserted in the Action; (2) arranging an informational meeting or meetings between Settlement Class Counsel and an industry expert, with some payment provided by Southwest; (3) using its best efforts to make available for interviews up to seven current or former Southwest employees at the Vice President level or lower; (4) using its best efforts to make available for depositions up to three current or former Southwest employees; (5) using its best efforts to make available up to two current or former Southwest employees to provide a declaration or affidavit; (6) providing information gathered from senior executive management through an attorney proffer session, and using best efforts to later provide some of it in an affidavit or declaration; and (7) using its best efforts to make available for testimony at trial one then-current Southwest employee at the Vice President level or lower who possesses information that would assist the Plaintiffs at trial. Southwest Settlement Agreement, ECF No. 196-2 (Ex. A). In exchange for the payment of cash and cooperation, Settlement Class Members release Southwest from any and all claims that were or could have been alleged in this legal action arising out of the identical factual predicate. The Southwest Settlement was preliminarily approved by this Court on January 3, 2018. *See* Order Preliminarily Approving Settlement with Defendant Southwest, ECF No. 197. Settlement Class Counsel was ordered to submit to the Court for approval a Notice Plan for purposes of advising the Settlement Class members of their rights.

On March 23, 2018, Plaintiffs' filed their [218] Motion for Approval of Settlement Notice

Program, and in connection with the documentation filed with that [218] Motion, the Court instructed the Plaintiffs to provide additional information. *See* April 16, 2018 Minute Order; April 25, 2018 Minute Order.

On June 15, 2018, Plaintiffs filed their [248] Motion for Preliminary Approval of Settlement with Defendant American Airlines, Inc., which included a declaration by counsel in support of the motion, and a copy of the Settlement Agreement with American ("American Settlement Agreement"). Pursuant to American Settlement Agreement, American stipulates to the certification of the following Settlement Class:

> All persons and entities that purchased air passenger transportation services for flights within the United States and its territories and the District of Columbia from Defendants or any predecessor, subsidiary or affiliate thereof, at any time between July 1, 2011 and June 14, 2018. Excluded from the class are governmental entities, Defendants, any parent, subsidiary or affiliate thereof, Defendants' officers, directors, employees, and immediate families and any judges or justices assigned to hear any aspect of this action.

American Settlement Agreement, ECF No. 248-1 (Ex. A) at 10; Pls.' Mem., ECF No. 299-1, at 13.

The settlement with American requires it to make a $45 million cash payment. American is required further to significantly cooperate with Plaintiffs regarding the pursuit of their case against the Non-Settling Defendants by: (1) responding to questions regarding American's documents and transactional data; (2) using its best efforts to make available for depositions up to three current or former American employees; (3) using its best efforts to make available current and former American employees, for the provision of declarations, certifications, and affidavits regarding the authenticity and certification of documents; and (4) at Plaintiffs' request, meet and confer regarding additional deposition, declarations and/or affidavits. American Settlement

Agreement, ECF No. 248-2 (Ex. A) at 18-20. In exchange for the payment of cash and cooperation, Settlement Class Members release American from any and all claims that were or could have been alleged in this legal action arising out of the identical factual predicate.[2]

On June 16, 2018, this Court granted preliminary approval of the Plaintiffs' settlement with Defendant American. Order granting Motion for Preliminary Approval of Settlement with Defendant American Airlines, Inc., ECF No. 249. On August 2, 2018, Plaintiffs made a [257] Motion for Approval of Settlement Notice Program, which combined notice for both the Southwest and American Settlements. The Notice Program proposed direct notice by email, to be supplemented by publication through print and media outlets, as well as additional online services. The Settlement Notice Program was approved by this Court in its [267] Order and [268] Memorandum Opinion, wherein the Court deemed that the proposed notice via email and publication was the "best notice practicable under the circumstances of this case[,]" consistent with the standard set forth in Fed. R. Civ. P. 23(c)(2)(B). Memorandum Opinion, ECF No. 268, at 6, 13; Fed. R. Civ. P. 23 (c)(2)(B) (requiring the court to direct to class members "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort"). On December 5, 2018, Plaintiffs filed their [299] Motion for Final Approval of Settlement Agreements with Southwest Airlines Co. and American Airlines Inc.

---

[2] Both Settlement Agreements exclude from the release claims for product liability, personal injury, breach of warranty, breach of contract, violation of the Uniform Commercial Code or any other claims not related to the subject matter of the Complaint. Southwest Settlement Agreement, ECF No. 196-2 (Ex. A) ¶ 34; American Settlement Agreement, ECF No. 248-2 (Ex. A) ¶ 34. Furthermore, claims against Non-Settling Defendants are not released. Southwest Settlement Agreement ¶ 63; American Settlement Agreement ¶ 63.

### C. Class Notice

This case involves a class of approximately 100 million Class Members. Notice was provided to potential Class Members — consistent with the Settlement Notice Program approved by the Court — via direct email, paid media and online outreach. *See* Declaration of Shannon R. Wheatman, Ph.D. ('Wheatman Decl."), ECF No. 299-3 ¶¶ 10-25. The Notice Program also included a settlement website, a toll-free number, and a post office box whereby Class Members could obtain answers to questions about the Settlements. *Id.* ¶¶ 26-30. Kinsella Media, LLC ("Kinsella"), the notice provider, used the email contact information provided by Southwest, American and the Non-Settling Defendants to provide direct email notice to 181,836,321 valid email addresses. *Id.* ¶¶ 10-12. Notice was also provided through national publications, an earned media program (a press release targeting journalists and influencers in the travel industry), an online outreach program (targeting bloggers, reporters, etc.) and digital advertising such as internet and banner advertisements online.[3] Id. ¶¶ 18-20, 24-25. "The direct notice combined with paid media delivery is estimated to have reached 72.3% of airline flyers." Pls.' Mem., ECF No 299-1, at 15; Wheatman Decl. ¶ 22.

### D. Objections and Plaintiffs' Response

When Class Members received notice regarding the proposed Settlements, they were permitted the opportunity to opt out of and/or to file objections to the proposed Settlements. Objections received from Class Members were recorded on the Court's docket, *see* Appendix A, ECF No. 334-1, and they were considered by the Court. Plaintiffs filed their [334] Omnibus

---

3 On February 25, 2019, this Court entered an Order granting the Plaintiffs' Motion to Disburse Funds for Costs of Class Notice from the Qualified Settlement Fund. *See* Order, ECF No. 343.

Response to the Objections on February 14, 2019.  A Fairness Hearing was held on March 22, 2019, to consider the Plaintiffs [299] Motion for Final Approval of Settlement and the Objections thereto.

## II. LEGAL STANDARD

### A.  Federal Rule of Civil Procedure 23 (e)

Federal Rule of Civil Procedure 23 (e) provides that: "The claims, issues or defenses of a . . . class proposed to be certified for purposes of settlement [ ] may be settled, voluntarily dismissed or compromised only with the court's approval." If notice of the proposal is being provided to the class, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal" if giving such notice is warranted by the parties' showing that the court will likely be able to approve the proposal and certify the class for purposes of the judgment.  Fed. R. Civ. P. 23 (e)(1)(B)(i) and (ii).  Pursuant to Rule 23(e)(2), the court may approve a proposal that binds class members "only after a hearing and only on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2); *Thomas v. Albright*, 139 F. 3d 227, 231 (D.C. Cir. 1998) (citation omitted) (a court must determine if a settlement is "fair, adequate, and reasonable and is not the product of collusion between the parties.").

In determining whether a proposal is fair, reasonable and adequate, courts look to whether: (1) the class representatives and class counsel have adequately represented the class; (2) the proposal was negotiated at arm's length; (3) the relief provided was adequate; and (4) the proposal treats class members equitably relative to each other.  Fed. R. Civ. P. 23 (e)(2)(A)-(D).  The question of whether the relief provided is adequate involves looking at: (1) the costs, risks and delay of trial; (2) the effectiveness of the proposed means of distributing relief to the class,

8

including the processing of claims; (3) the terms of any award of attorneys' fees, including the timing; and (4) any agreement identified in connection with settlement. Fed. R. Civ. P. 23(e)((2)(C)(i)-(iv).

While courts have discretion to decide whether or not to approve a proposed settlement, *see Mayfield v. Barr*, 985 F.2d 1090, 1092 (D.C. Cir. 1993), that discretion "is constrained by the principle of preference favoring and encouraging settlement in appropriate cases." *In re Vitamins Antitrust Litig.* (*"Vitamins"*), 305 F. Supp. 2d 100, 103 (D.D.C. 2004) (internal quotation marks omitted); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 375 (D.D.C. 2002) (while courts may "scrutinize the terms of the settlement," a court's discretion to reject a settlement must be balanced against the preference in favor of settlements). Class action settlements are favored as a matter of public policy in the District of Columbia Circuit. *See United States v MTU Am. Inc.*, 105 F. Supp. 3d 60, 63 (D.D.C. 2015) ("Settlement is highly favored, as "[n]ot only the parties, but the general public as well, benefit from the saving of time and money that results from the voluntary settlement of litigation.") (quoting *Citizens for a Better Env't. v. Gorsuch*, 718 F. 2d 1117, 1126 (D.C. Cir. 1983)), *Freeport Partners, LLC v. Allbritton*, No. Civ. A. 04-2030, 2006 WL 627140, at *8 (D.D.C. Mar. 13, 2006) (In this Circuit, public policy "favors settlement of class actions.").

The District of Columbia Circuit does not employ a single test for evaluating a proposed settlement under Rule 23(e); however, courts in this Circuit generally consider the following five factors: (1) whether the settlement is the result of arm's length negotiations; (2) the terms of the settlement in relation to the strength of the plaintiffs' case; (3) the status of the litigation at the time of settlement; (4) the reaction of the class; and (5) the opinion of experienced counsel. *In re*

*Vitamins*, 305 F. Supp. 2d at 104; *see also, e.g., Howard v. Liquidity Servs. Inc.,* No. CV 14-1183 (BAH), 2018 WL 4853898, at *4 (D.D.C. Oct. 5, 2018); *Ceccone v. Equifax Info. Servs., LLC*, No. 13-cv-1314, 2016 WL 5107202, at *8 (D.D.C. Aug. 29, 2016).

## III. ANALYSIS OF THE PROPOSED SETTLEMENT

The Southwest and American Settlement Agreements (hereinafter referred to collectively as the "Settlements") will be considered together as they are similar in terms of the consideration provided (payment of cash and cooperation); the same legal standards set forth in Rule 23 apply to both; and the objections in this case do not distinguish between the Southwest and American Settlements. In analyzing the proposed Settlements, this Court will first address the factors set forth in Rule 23, followed by the factors set forth in *Vitamins* that are not duplicative of the Rule 23 factors.

### A. Is the Settlement Fair, Reasonable and Adequate?

"A presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Meijer Inc. v. Warner Chilcott Holdings Co. III, Ltd.*, 565 F. Supp. 2d at 49, 55 (D.D.C. 2008) (Kollar-Kotelly, J.) (quoting *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d at 104). Looking at the first two factors addressed in Rule 23(e)(2)(A) & (B) — adequate representation of the class and negotiation of the proposal at arm's length — the Court notes that the objections submitted in response to the proposed Settlements do not dispute that the Settlements were reached through arm's length negotiations between experienced, capable counsel after meaningful discovery. Nor does anyone contest that the proposed Settlements treat class members equitably relative to each other. Fed. R. Civ. P. 23(e)(2)(D). The final factor — adequacy of the relief

proposed in the Settlements, pursuant to Rule 23(e)(2)(C)—was addressed in detail at the Fairness Hearing, and it is discussed below.

### 1. Adequacy of Settlement

To determine whether relief is adequate, pursuant to Rule 23, courts look at: (1) the costs, risk and delay of trial; (2) the effectiveness of the proposed means of distributing relief to the class, including the processing of claims; (3) the terms of any award of attorneys' fees, including the timing, and (4) any agreements identified in connection with the settlement. Fed. R. Civ. P. 23 (e)(2)(C)(i)-(iv). The fourth factor — agreements in connection with the settlement — is inapplicable in this case.

At the March 22, 2019 Fairness Hearing, the Court began its inquiry about the adequacy of the Settlement by noting that Rule 23 contains the following commentary:

> The Court would look to the conduct of the litigation and then the negotiations leading up to the proposed settlement. Attention to these matters is an important foundation for scrutinizing the substance of the proposed settlement. The focus on this point is on the actual performance of counsel acting on behalf of the class. The nature and amount of discovery in this and other cases or the actual outcome of other cases may indicate whether counsel negotiating on behalf of the class had an adequate information base. . . . Another central concern would relate to the costs and risks involved in pursuing a litigated outcome. Often, courts may need to forecast the likely range of possible class-wide recoveries and the likelihood of success in obtaining such results.

March 22, 2019 Transcript of Fairness Hearing ("Tr."), ECF No. 354, at 8:17-9:8 (quotation marks omitted).

### a. Costs, Risks, and Delay of Trial

Settlement Class Counsel discussed the risks inherent in this antitrust litigation, which include the "multitude of challenges or obstacles which [the Defendants, in their motion to dismiss] contended the Plaintiffs could not and would not meet to establish accountability;" Tr. at 11:10-

11

14; the probabilities with regard to summary judgment; obstacles in class certification, preparation and argument of *Daubert* motions, and the trial itself. *See generally In re Vitamin C Antitrust Litig.*, No. 06-MD-1738, 2012 WL 5289514, at *4 (E.D.N.Y. Oct. 23, 2012) ("Federal antitrust cases are complicated, lengthy, and bitterly fought, . . . , as well as costly.") Other factors considered by Settlement Class Counsel included unfavorable holdings in recent antitrust cases, disputes regarding the amount and type of discovery produced by the Defendants, the prospect of prolonged litigation, the costs associated with experts and discovery, and the Department of Justice's closing of its investigation into Defendants' actions.[4] Settlement Class Counsel summarized the negotiations process as "look[ing] at what you feel are the strengths of your case and understand[ing] the limits of those strengths and the obstacles being placed, both procedurally and factually." Tr. at 10:23-11:1-4; s*ee Vista Healthplan, Inc. v. Warren Holdings Co. III, Ltd.*, 246 F.R.D. 349, 362 (D.D.C. 2007) ("It is obvious that Plaintiffs faced significant risks in establishing both liability and damages and in continuing to trial, and that the fairness, adequacy, and reasonableness of the settlement must be viewed in light of these considerations."); s*ee also In re Lorazepam & Clorazepate Antitrust Litig.*, MDL No. 1290, 2003 WL 22037741, at *4 (D.D.C. June 16, 2003) (weighing risks and costs of continued litigation, which "operate to reduce the total potentially recoverable damages in this case).

Counsel for Southwest agreed that each side pointed out the "weaknesses and strengths of its positions, as well as the risks that the other side faced." Tr. at 46:15-19. Southwest was

---

[4] At the Fairness Hearing, Southwest's counsel stated her understanding that the DOJ investigation is "not officially closed, but [they] have not heard from DOJ for several years [s]o [their] view is that it's closed but not officially closed. Tr. at 83:22-84:1.

distinguished by its Counsel as a low-cost carrier operating on a point-to-point network as compared to the legacy airlines operating on a hub-and-spoke network. Tr. at 47:3-9. Counsel noted that Southwest's focus was on "low costs, low fares and all-inclusive pricing," and furthermore, Southwest increased its capacity during the class period, which flies in the face of claims about limiting capacity. Tr. at 47:10-22.

According to Settlement Class Counsel, balancing potential weaknesses of Plaintiffs' case and risks of failure against the strengths and merits of their case was done with an eye toward opportunities for settlement, which would result in payment of money for the Class Members and cooperation by the settling Defendants. *See generally In re Linerboard Antitrust Litig.*, 203 F.R.D. 197, 208 (E.D. Pa. 2001) ("[P]laintiffs have an incentive to prove a case against all defendants [and] [i]t is in plaintiffs' interest to maximize potential recovery against all defendants and to demonstrate the full extent of the alleged conspiracy.") Settlement Class Counsel considered that the cooperation proffered by Southwest would provide "significant resource information as to the nature, scope and operation of the industry which would be of assistance [ ] in the further prosecution, [ ] of the case." Tr. at 16:3-9. The Southwest Settlement also had the distinction of being an "icebreaker settlement," demonstrated by the fact that four months after the Southwest Settlement, American started negotiating with the Plaintiffs. Tr. at 48:17-49:1. *See In re Processed Egg Prod. Antitrust Litig.*, 284 F.R.D. 249, 276 (E.D. Pa. 2012) (granting approval of "ice-breaker" settlement with cooperation provision that "aid[ ] the Plaintiffs in prosecuting and resolving their claims against the other Defendants"); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 643 (E.D. Pa. 2003) ($7.2 million settlement had "significant value" because "early settlement with one of many defendants can "break the ice" and bring other defendants to the point of serious

13

negotiations"). Counsel for Southwest noted that "in an icebreaker settlement, the first settling defendant does typically get a discounted amount because [of] the significant value in and of itself as an icebreaker settlement and also because of the cooperation provisions," Tr. at 49:2-7, but counsel noted that the portion of the Settlement Funds (the cumulative $60 million collected from Southwest and American) contributed by Southwest in this case ($15 million) is in line with other icebreaker settlement amounts. Tr. at 60:19-25; s*ee In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. C 07-05634, 2015 WL 3396829, at *1, 4 (N.D. Cal. May 26, 2015) (approving a $39 million settlement involving eight of the defendant airlines and a class of hundreds of thousands).

Settlement Class Counsel indicated that negotiations between the parties did not necessitate the involvement of a mediator because of the "longstanding relationships, both adversarial and collegially" between counsel. Tr. at 15:3-19; Tr. at 46:9-14. The Southwest Settlement was "reached after extensive arm's-length, good-faith negotiations" that were "conducted over almost a four-month period and after two and a half years of hard-fought litigation" which included motions to dismiss and extensive discovery. Tr. at 46:3-8. "At the time of [Southwest] settlement, Plaintiffs were in receipt of and had conducted an extensive review of the over 450,000 documents Defendants had produced to the United States Department of Justice as part of its investigation" and Plaintiffs received "an additional 180,000 documents produced by American" and "88,000 documents produced by sixteen third parties." Memo. in Support of Pls.' Mot. for Final Approval, ECF No. 299-1, at 9-10.

Settlement Class Counsel had to "weigh the value of [Defendant's cooperation] in going forward and then look at what amount monetarily would make sense in conjunction with what

[they] considered the value of cooperation to proceed." Tr. at 16:23-17:1. For the Southwest Settlement, the parties arrived at "$15 million being equally unacceptable to both sides, but fair in terms of resolving Southwest's accountability in the matter along with what [Settlement Class Counsel] considered and measured as the value of the cooperation." Tr. at 17:10-14. Furthermore, under the Southwest Settlement, "all of Southwest's sales remain in the case as a basis for damages against the Non-Settling Defendants under joint and several liability, under the antitrust laws [a]nd numerous courts have recognized that a provision that preserves joint and several liability is an important factor in final approval of a settlement." Tr. at 50:3-10. "[S]ettlements do not prejudice class members' ability to recover the full amount of their damages should the non-settling Defendants be found liable and, in fact, increase the likelihood of such recovery because of the cooperation provisions in those agreements." Pls' Omnibus Resp., ECF No. 334, at 20; *see In re Auto Parts Antitrust Litig.*, No. 12-MD-02311, 2018 WL 7108016, at *5 (E.D. Mich. Nov. 6, 2018) (granting final approval to settlement between Auto Dealers and Certain Defendants and noting that the non-settling defendants remained jointly and severally liable for damages relating to sales, less the amounts paid in settlement). In that case, the court noted that "[c]onsequently, the Settlements will not limit the Settlement Classes' right to recover the full amount of the damages available under the law from the non-settling defendants, against whom the Auto Dealers continue to prosecute their claims in those parts of the cases that have not been fully resolved." *Id.*

When questioned by the Court about whether there was a range contemplated for the monetary component of the settlement in the instant case, Settlement Class Counsel indicated that "[t]he range was not tied in this matter [to a] specific value of commerce or an amount of damage" but was instead based on counsel's "half-century career and experience in antitrust early

settlements." Tr. at 19:7-21; Tr. at 46:9-14 (indicating that counsel for Southwest who negotiated the settlement each had over 40 years of antitrust class-action experience); *see also Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 56 (D.D.C. 2010) ("the opinion of experienced counsel 'should be afforded substantial consideration by a court in evaluating the reasonableness of a proposed settlement.'") (quoting *Cohen v. Chilcott*, 522 F. Supp. 2d 105, 121 (D.D.C. 2007)). In the instant case, vouchers were considered by Settlement Class Counsel but were rejected for the initial settlement in favor of a combination of cash and cooperation, which was deemed significant.

Settlement Class Counsel noted that settlement discussions with Southwest began with the consideration of nonmonetary terms first – specifically, what Southwest "could provide that would assist [Plaintiffs] in prosecuting the case against the remaining Defendants" including "agree[ments] in advance that they would make certain people available to [Plaintiffs] after they told [them] which people it is that [they] should be focusing on: interviews, . . . , informal, with Southwest officials; meetings with Southwest industry experts; trial testimony; production of documents . . . authenticity declarations as well as the stipulation of class certification." Tr. at 16:3-22. "[S]imilar to Southwest, [American] [was] amenable to significant cooperation," Tr. at 23:2-3; *see* Tr. at 51:18-21 (noting that American's cooperation provisions include "explaining documents and responding to reasonable questions on the documents.") "What [Plaintiffs] needed to do [was to] pick up more of the pieces and have someone assist [them] in guiding how those pieces get put together in terms of prosecuting the remainder of the claims." Tr. at 24:8-15. Settlement Class Counsel indicated that the ongoing cooperation provided by Southwest and American has proved to even be "[m]ore [valuable] than [they] thought." Tr. at 23:18-24; *see* Tr. at 49:8-13 (where Southwest counsel notes that the cooperation agreements are "quite extensive"

with some "unique and different features").  *See also In re Packaged Ice Antitrust Litig.*, No. 08-MD-01952, 2011 WL 717519, at *10 (E.D. Mich. Feb. 22, 2011) (noting cooperation "has already been beneficial to the Plaintiffs in their continued prosecution of their claims against the non-settling Defendants").

Settlement Class Counsel employed a similar approach in its settlement with Defendant American, focusing on cooperation provisions as well as "what new amount would signify a material advancement of the value to the class from a monetary perspective."  Tr. at 24:2-7.  The negotiations with American "came at a time when [American] had literally produced 1.5 million pages of documents," which was both extensive and expensive. Tr. 52 at 1-13.  Moreover, Plaintiffs had "received over six million documents produced by Defendants" and "cooperation from Southwest that informed their negotiations with American."  Pls.' Mem., ECF No. 299-1, at 12. In arriving at a figure of $45 million, Settlement Class Counsel noted that "[i]t was significant along with the cooperation as to what would materially advance the value of the class in relation to the remaining Defendants who would be responsible for the full damage trebled. . . " Tr. at 25:3-8; *see, e.g., Meijer, Inc.*, 565 F. Supp. 2d at 56 (granting final approval to settlement between direct purchaser plaintiffs and Warner Chilcott Defendants, and noting that at the fairness hearing, Class Counsel mentioned that with the prospect of joint and several liability and of treble damages, the direct purchaser plaintiffs could still recover a significant damages award); *In re Corrugated Container Antitrust Litig.*, No. MDL 310, 1981 WL 2093, at *17 (S.D. Tex. June 4, 1981) (noting that the partial settlements preserved plaintiffs' ability to seek the entire amount of damages from non-settling defendants weighed in favor of settlement approval).

This Court finds that the cost and risk analysis undertaken by Settlement Class Counsel, in

connection with counsel for Southwest and American, weighs in favor of approving the Settlements as adequate. The Settlements were negotiated over time, by competent and experienced counsel who had access to a large body of information through discovery. Settlement Class Counsel weighed the costs and risks of continued litigation versus entering into an "icebreaker" settlement with Southwest and a subsequent settlement with American, both of which provided Settlement Funds for the Class Members as well as continued cooperation to aid Plaintiffs in their litigation against the Non-Settling Defendants. Furthermore, the Settlements do not limit the Class Members' ability to obtain joint and several liability and treble damages against those Non-Settling Defendants, which would increase the Total Funds Available for Distribution. Accordingly, evaluation of the "costs and risks" factor favors finding the Settlements adequate.

### b. Effectiveness of proposed means of distribution and processing of claims

The Court inquired next about the "terms of the plan of allocation or distribution" in the context of Rule 23 commentary, which provides that:

> The relief that the settlement is expected to provide to class members is a central concern. Measuring the proposed relief may require an evaluation of any proposed claims process. Often, it'll be important for the Court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims. And a claims-processing method should deter and defeat unjustified claims, but the Court should be alert to whether the claims process is unduly demanding and to make sure that those that are part of the class that should make claims, make them.

TR. at 26:9-22. The Court asked Settlement Class Counsel to explain their proposed means of distribution and processing of claims.

Settlement Class Counsel indicated that the distribution of the Settlement Funds will be deferred until the end of the entire case when there is a better indication of the Total Funds Available for Distribution (total money collected based on the resolution of the case against all

four Defendants) and amount of damages suffered by Class Members, so that Settlement Class Counsel will be better able to compute "what value in proportion to the damage [is available] for class reimbursement." Tr. at 28:11-20. Class Members will be notified regarding the claims process (and their right to object) in a manner similar to the way in which they received initial notification of the settlement. Information provided to Class Members as to their potential recovery, which is dependent on the number of claims, will help Class Members decide whether to object and/or make a claim. Settlement Class Counsel volunteered that they can "work with [their] claims administrator in terms of coming up with a range or at least providing guideposts to class members." Tr. at 36:13-15. A claims administrator will review any claims made by Class Members, and the distribution method will be "pro rata," Tr. at 30:3-11, with a "pro rata, per capita return to class members." Tr. at 35:4-6.

The Settlement Agreements provide that Defendants Southwest and American "take no position with respect to such proposed plan of allocation or such plan as may be approved by the Court." Southwest Settlement Agreement, ECF No. 196-2 ¶ 40; American Settlement Agreement, ECF No. 248-2 ¶ 40.

Settlement Class Counsel argued that "it's not an impediment to approval of the settlement that the actual amount to be distributed to class members" is not known at this time. Tr. at 58:22-59:1. "[F]inal approval is not precluded simply because the settlements and/or the class notice did not contain a distribution plan or did not provide specificity with respect to what each class member will ultimately receive." Pls.' Omnibus Resp., ECF No 334, at 26. *See In re Drexel Burnham Lambert Group*, *Inc.*, 130 B.R. 910, 925 (S.D.N.Y. 1991) ("It is not an impediment to approval of the Settlement that the actual amounts to be distributed to Class members will be subject to further

allocation procedures."), *aff'd*, 960 F.2d 285 (2d Cir. 1992); *In re Corrugated Container Antitrust Litig.*, 643 F. 2d 195, 223-24 (5th Cir. 1981) (finding that the district court did not abuse its discretion when it approved a notice of settlement that did not give "an estimated range of unitary recovery), *cert. denied*, 456 U.S. 998 (1982); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 480 (S.D.N.Y. 1998) ("[I]t is appropriate, and often prudent, in massive class actions to follow a two-stage procedure, deferring the Plan of Allocation until after final settlement approval[.]").

In a case such as this, involving a large number of Class Members and two Non-Settling Defendants, it would be inefficient to distribute and process claims until the entire case has been resolved through litigation or otherwise and the Total Funds Available for Distribution are known. The Court finds that Settlement Class Counsel has demonstrated the adequacy of the Settlements with regard to their proposed means of distributing and processing claims, which will be done through a second notice to Class Members, followed by a right to object and/or file a claim.

### c. Attorneys' Fees

Plaintiffs requested previously that this Court hold in abeyance their request for $15 million in attorneys' fees until Settlement Class Counsel presents the Court with a motion to distribute the Total Funds Available for Distribution, and the Court granted that request. *See* Plaintiffs' [305] Request to Hold in Abeyance, in Part, Plaintiffs' Motion for Attorneys' Fees; *see also* January 4, 2019 Minute Order staying Plaintiffs' request for attorneys' fees <u>and</u> future litigation expenses until further Order of this Court. At the beginning of the March 22, 2019 Fairness Hearing, the Court noted that the issue of attorneys' fees is not under consideration in connection with approval of the Southwest and American Settlements. Accordingly, this factor of attorneys' fees does not

weigh into any adequacy determination by the Court.

### d. Other Factors Considered in the *Vitamins* case

Several of the factors from the *Vitamins* litigation have already been addressed herein; namely: (1) arm's length negotiations; (2) terms of the settlement in relation to the strength of the case; (3) the status of the litigation at the time of settlement; and (4) the opinion of experienced counsel. A factor that has not been addressed is the reaction of the class. That will be addressed in Section IV. below.

### IV. OBJECTIONS TO THE PROPOSED SETTLEMENTS

In approving class action settlements, courts gauge the reaction of the class by looking at the number of objections as compared to the overall size of the class. *See Vitamins*, 305 F. Supp. 2d at 105. In this case, the settlement class is comprised of approximately 100 million Class Members, and there were initially 23 responses objecting to the settlement ("Objections") filed on behalf of 25 Class Members. *See* Appendix A (Objections), ECF No. 334-1 (listing names of the persons who objected and the additional information regarding the objection). Accordingly, the objectors are but a tiny fraction of the class. *See, e.g. Kifafi v Hilton Hotels Ret. Plan*, 999 F. Supp. 2d 88, 101 (D.D.C. 2013) (Kollar-Kotelly, J.) (out of a class of 23,000 persons, five raised objections, and this weighed in favor of approval); *Cohen v. Chilcott*, 522 F. Supp. 2d 105, 119 (D.D.C. 2007) (Kollar-Kotelly, J.) (finding the small number of objections indicative of fairness and reasonableness); *Tromble v. Natl. City Bank*, 826 F. Supp. 2d 179, 200-01 (D.D.C. 2011) (finding class reaction positive where there were only 10 objections out of over 13 million class members). *But see Reynolds v. King*, 790 F. Supp. 1101, 1109 (M.D. Ala. 1990) ("[W]here the class is large and there is no evidence that most of its members are particularly interested in the

litigation, a court should view the absence of any objections from the majority with caution.")

One Objection was withdrawn because it dealt primarily with legal fees and future litigation expenses, and the Court had stayed consideration of attorneys' fees and future litigation expenses. *See* Shimshon Wexler's Withdrawal of Objection, ECF No. 347. There were a number of other similarly premature Objections relating to the amount and timing of payment of attorneys' fees (DeMott, Doe, Bednarz/Frank, Harris, Johnson, Nash, Suessmann, Yazdani)[5] and future litigation expenses (Argie). The remaining Objections raise issues that fall into the following categories: (1) the settlement amounts are too small (Argie, Baker, Bednarz/Frank, DeMott, Klover, Suessmann, Willett, Zajac); (2) it's not clear how much the class members will receive because of a lack of adequate information (Chen, Bednarz/Frank, DeMott, Harris, Liebich, Suessmann, Weissman, Yazdani, Zajac); (3) the Settlement Funds may be subject to a *cy pres* distribution (Anaya, Argie, Chen, Bednarz/Frank, Johnson, Klover, Liebich, Nash, Weissman, Yazdani); and (4) the Settlements do not provide for injunctive relief (Yazdani). *See* Tr. at 6:3-8. Class Members' Objections regarding attorney's fees were deemed premature because the attorneys' fees issue will not be addressed until the entire case has been resolved. Similarly, uncertainty about the settlement amounts to be received by Class Members is also a premature basis for an objection until such time as the case against the remaining two Defendant airlines has been resolved and the Total Funds Available for Distribution are known. There is a procedure in place whereby Class Members will receive notification of a plan of allocation/distribution, including information regarding the range of settlement, and there will be an opportunity to make

---

5 The Court refers to the Class Members who objected by their last names. *See* Appendix A.

claims and/or objections at that time regarding settlement amounts. All other Class Member objections will be addressed by this Court.

### A. The Possibility of a *Cy Pres* Distribution

The Court noted that although a *cy pres* distribution is disfavored, it could become an issue "if there's not enough claims so there's money left over," which indicates that "[counsel] wouldn't be doing [their] job." Tr. at 37:14-18. The alternative scenario that could lead to a *cy pres* distribution would be if there are "so many claims and there's not enough money in this to make it worthwhile to be distributed" because it would be "outweighed . . . by the cost of disbursing the money." Tr. at 37:19-23. In their Objection, two Class Members proffered that vouchers sent via electronic mail might be fairer and would avoid the costs of mailing checks. Objection of Alexander and Michelle Zajac, ECF 301, at 11-15; *see also* Objection of Paul DeMott, ECF No. 321, at 39 (discussing vouchers as part of the settlement). Settlement Class Counsel have noted that they will "work with the Claims Administrator to determine at what level distribution is not economically feasible; *i.e.*, the 'break-even point.'" Pls.' Omnibus Resp., ECF No. 334, at 28. Furthermore, they will explore various cost-effective ways of facilitating the distribution of the Total Funds Available for Distribution.

In their Omnibus Response, Plaintiffs note that the argument by Class Member Theodore Frank that c*y pres* awards may be used to divert the Settlement Funds from the Class Members for the personal benefit of counsel "disregards this Court's role in carefully scrutinizing any proposed *cy pres* recipient but is also entirely without factual support." Pls.' Omnibus Resp., ECF No. 334, at 29; Frank Objection, ECF No. 329, at 5-6. *See Diamond Chemical Co. v. Akzo Nobel Chemicals, B.V.*, 517 F. Supp. 2d 212, 217-18 (D.D.C. 2007) (Kollar-Kotelly, J.) (where a *cy pres* distribution

23

was proposed and granted only after every class member who filed a claim received at least trebled damages and there were efforts to locate additional class members); *see also Diamond Chemical Co. v. Akzo Nobel Chemicals B.V.*, No. 01-cv-2118, 2007 WL 2007447, at *3-5 (D.D.C. July 10, 2007) (Kollar-Kotelly, J.) (examining the appropriateness of the *cy pres* recipient and the proposed use of the funds).

Settlement Class Counsel agreed that *cy pres* distribution is disfavored but acknowledged that "[t]here is always the possibility that the take rate will not equal, . . ., the fund available." Tr. at 38:13-14. *See generally Pollard v. Remington Arms Co.,* LLC, 320 F.R.D. 198, 214 (W.D. Mo. 2017) (gathering numerous examples of cases featuring claims rates between ~ .25% and ~ 2%). Settlement Class Counsel was emphatic however in stating that there is "no intention to *cy pres* this entire fund . . . [or] [any] desire to *cy pres* this entire fund [and] . . . no need to claim that there's a *cy pres* to this entire fund " or to think that "there's any reasonable basis for any fear that anyone would request such a remedy in this matter at either this stage or at any subsequent stage of this litigation[.]" Tr. at 74:19-75:4. Settlement Class Counsel noted further that in some instances where a portion of the fund has not been distributed, "if class members have not received 100 percent of three times their damage, there can be a second distribution to those who made the claim. . . " Tr. at 38:20-25.

While "precise distribution amounts cannot be calculated until the claims process has been completed, Plaintiffs expect meaningful distributions to class members that submit qualifying claims, assuming the claims rate in this case is comparable to the claims rates in other antitrust and consumer class actions." Pls.' Omnibus Resp., ECF No. 334, at 27. *See, e.g., Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (*en banc*) (noting that the claims rates do

not normally exceed 7% "even with the most extensive notice campaigns."); *In re Apple iPhone 4 Prods. Liab. Litig.*, No. 10-md-2188 RMW, 2012 WL 3283432, at *1 (N.D. Cal. Aug. 10, 2012) (claims rate was ~.25% for $15 cash payment in settlement involving at least 20 million iPhone owners). Given these historical claims rates, it is unlikely that there will be a *cy pres* distribution due to a combination of a large number of claims and resulting miniscule pro rata settlement distribution amounts. On the flip side, Settlement Class Counsel noted that, in a case such as this, which involves "corporate users of [ ] flight reservations," he would anticipate an "aggressive[ ] submi[ssion] [of] claims" by those corporate entities. Tr. at 74:4-16.

Whether the need for a *cy pres* distribution will arise, and if so, in what amount, cannot be known at this stage of the proceeding, but this uncertainty should not act as a bar to the approval of the Settlements, particularly in light of Settlement Class Counsel's intention to maximize the distribution to Class Members and this Court's own disinclination toward *cy pres* distributions. Accordingly, the Class Members' objections regarding the *cy pres* distributions are deemed insufficient to affect approval of the Settlements.

### B. Lack of Injunctive Relief

A lack of injunctive relief included in the Settlements was raised in one Objection. Settlement Class Counsel explained that:

> Traditionally, there is no follow-on injunction to an antitrust violation which has ended as of the time of either the beginning of the complaint or at the time, . . ., of a settlement or a judgment. Normally, you ask for injunctive relief where violations that are claimed to have occurred in the past are continuing because there's no change in the behavior or the conduct in the industry. To date, we have no indication that that's true with regard to this matter presently or going forward. So there does not seem to be, you know, a basis for an injunction prohibiting conduct which presently does not exist nor for which there is, particularly given the attention paid to this, should ever rationally be engaged in again.

Tr. at 39:7-22.

Plaintiffs assert that "courts repeatedly reject the argument that the lack of injunctive relief renders a settlement unfair, particularly where, as here, the injunctive relief provision would require the settling party to simply abide by the law. *See Kanrst Envtl. Educ. & Prot., Inc. v. U.S. EPA*, 403 F. Supp. 2d 74, 82 (D.D.C. 2005) (noting that "a court cannot merely give parties a broad order to obey the law" . . . and commenting that "[e]njoining the defendants from violating the [relevant statute], . . ., would merely require them to obey the law."), *aff'd*, 475 F.3d 1291 (D.C. Cir. 2007). As aptly explained in an airlines antitrust case filed in the Northern District of Georgia:

> [W]hile the settlement releases defendants from claims for certain past practices, nothing prevents a class member from pursuing a suit against defendants for future misconduct of the type complained of in the present case. The Court agrees with the plaintiffs that the best assurance against future antitrust violations by defendants is the persistent threat of litigation by any class member. The Court finds that the right to bring claims against defendants for future misconduct is a valuable right of every class member. The absence of injunctive relief, therefore, does not render the settlement unfair.

*In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 337 (N.D. Ga. 1993). *See generally Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 635 (1985) ("Without doubt, the private cause of action plays a central role in enforcing this regime. . . . [and] [t]he treble-damages provision wielded by the private litigant is a chief tool in the antitrust enforcement scheme, posing a crucial deterrent to potential violators.")

This Court finds that the Settlements may be approved despite the lack of injunctive relief as such injunctive relief here would serve no purpose other than directing that Defendants obey the law. *See, e.g., Pigford v. Glickman*, 185 F.R.D. 82, 110-11 (D.D.C. 1999) (approving class settlement and rejecting class member objection that "the absence of any such prospective injunctive relief renders the settlement as a whole unfair"), *aff'd*, 206 F.3d 1212 (D.C. Cir. 2000). Accordingly, the objection based on a lack of injunctive relief is deemed insufficient to affect

approval of the Settlements.

**C. Size of Settlement Amounts**

The Court permitted Class Members Theodore Frank ("Mr. Frank") and Michael Suessmann ("Mr. Suessmann") an opportunity to speak on behalf of the Objectors at the Fairness Hearing. *See* Order Regarding Procedures for the March 22, 2019 Fairness Hearing, ECF No. 342, at 6. Mr. Suessmann stated his "concern [that] the notice provided to the class is inadequate" in part because the notice discusses a "right to object" and "[i]nherent in that is the idea that we're provided information from which we can make decisions about whether to object or not" but the "information in the notice that [he] received was not sufficient for [him] to be able to tell whether the settlement was fair and reasonable." Tr. at 69:14-24-70:1-2. Mr. Suessmann specified that he was "not worried about the distribution and allocation" but was instead worried about "liability, because there's nothing in there that says how the [Settlement Funds] numbers were arrived at," when you look at airline profits. Tr. at 70:12-23; *see also* DeMott Objection, ECF No. 321, at 38-39 (questioning the relationship of the settlement amounts to the class's damages); Sajak Objection, ECF No. 301, at 11-12, 15 (same).

Mr. Suessmann did not dispute that experienced counsel negotiated an arm's length settlement before arriving at the Settlement Funds amounts, which together with the Defendants' cooperation, provide relief for the Class Members; rather, he appeared curious about any formula that was used to arrive at the $15 million and $45 million amounts. As explained in Section III (A)(1)(a) herein, these ultimate numbers were derived through extensive negotiations between counsel who all have a great deal of experience in litigating class action antitrust lawsuits. Furthermore, it is unclear if Mr. Suessmann has placed any value on the cooperation provided by

Defendants Southwest and American. *See also* Liebich Objection, ECF No. 321, at 13 (where Class Member Jason Liebich, through counsel, asserted that the value of the cooperation by Southwest and American was "speculative," but cited no support for this assertion). At the Fairness Hearing, the Court inquired as to whether the cooperation by the settling Defendants has proven to be valuable, and Settlement Class Counsel indicated that the significant cooperation provided by Southwest and American in "la[ying] out to [counsel] where they thought [they] should be looking, why [they] should be looking there, how [they] should go about looking" has been even "[m]ore [valuable] than [counsel] thought," Tr. at 23:2-9; 23:18-24. Nor is it clear if Mr. Suessmann's objection accounts for Southwest's role as an "icebreaker," or the litigation risks and costs of continued litigation, which were discussed in considerable detail in Plaintiffs' Motion for Final Approval and Omnibus Response and at the Fairness Hearing. As previously noted, this Court is satisfied with the explanation of the Settlement Funds amounts, and this objection relating to size of the Settlement Funds is rejected.

In a Reply filed by Class Member Paul DeMott, Mr. DeMott, through counsel, notes that even while Settlement Class Counsel cites "persuasive authority holding that the parties are not required to provide estimates of damages" he objects to counsel's failure to provide such estimate in this case — where counsel allegedly possesses that information — on grounds that it will hinder this Court in making a reasoned decision. DeMott Reply, ECF No. 339, at 8-10. The Court notes that Mr. DeMott's assumption that Settlement Class Counsel had information reflecting an accurate estimate of damages in this case relies on a footnote in the Omnibus Response that includes the word "estimates," and it is belied by counsel's statements during the hearing. *See* Tr. at 18:2-7 ("It wasn't, for example, looking at the totality of the revenue of affected commerce and

saying, what does $15 million or what does any amount of money compare as the numerator to a denominator of the total revenue? We weren't quite sure what the total revenue was, nor what [ ] shape [ ] the case might take depending upon discovery advances."); Tr. at 24:16-22 (answering the Court's question whether there was "any particular formula or way of deciding" to triple the settlement amount for American, counsel stated that "[i]n terms again of an ultimate damage calculation, you know, through economic regression, no.") Furthermore, any estimate of damages relevant to the early settlement by one defendant in a multi-defendant case does not give the full picture of all potential damages (especially where such damages from the remaining defendants may be ultimately enhanced through cooperation with the settling defendant) and as noted above, such estimate may not be viewed in a vacuum but rather, it must be weighed against the risks and costs of continued litigation. Accordingly, objections related to counsel's "failure" to provide at this time a damages estimate are insufficient to affect approval of the Settlements.

### D. Issues regarding Notice Provided to Class Members

At the Fairness Hearing, Mr. Frank indicated that he was not contesting the settlement amount, Tr. at 63:25-64:1-9, but instead focused on the fact that there was no information about the allocation plan and "[Settlement Class Counsel] didn't even give a metric, an algorithm for determining, Yes, we're going to give money to the class or No, we're going to give money to *cy pres*." Tr. at 63:19-21. Mr. Frank stated that "if they're going to have a claims process, they need to disclose what that claims process is. *Pro rata* is probably fine. But they need to set that forward and bind themselves to it." Tr. at 64:17-20. The Court noted that, pursuant to the Settlement Agreements, Defendants Southwest and American are not involved and do not provide input in the claims process and distribution of settlement proceeds. The Court did not view this as a defect

in the settlement, instead noting that "[i]t seems to me that you would want the Plaintiff to be the one to figure it out."  Tr. at 66:6-12.

The balance of Mr. Frank's objection regarding the lack of a distribution formula has been addressed previously by this Court in Section III (A)(1)(b). There is a two-stage procedure for notice to Class Members prior to the claims process and distribution of the Total Funds Available for Distribution. The first stage provided notice of the Settlements which was consistent with the notice required pursuant to Fed. R. Civ. P. 23(c)(2)(B), which sets forth seven items that must be clearly and concisely stated. The second stage — which will occur after the entire case is resolved — will provide Class Members with notification of the Total Funds Available for Distribution and information about the claims process, including the manner in which to make an objection and/or a claim, and possible ranges of recovery based on hypothetical claims percentages.  Accordingly, Mr. Frank's objection to the lack of information about the claims process and distribution of settlement proceeds is rejected

Mr. Suessmann alleged a different deficiency in the notice that Class Members received insofar as the notice failed to indicate what documents would have to be provided in connection with the submission of Class Members' claims and whether Class Members or counsel would provide the underlying data to support such claims.  Settlement Class Counsel and counsel for Southwest and American explained that Class Members who received the notice are in the database, and there will be provisions made at the time when claims are filed regarding alternative means for submitting claims, such as by affidavit, if certain paper records are not available to Class Members.  Accordingly, the Court finds that counsel have provided an explanation in response to Mr. Suessmann's "objection" regarding lack of clarity about provision of claims documentation,

and this "objection" will be rejected at this time. Class Member Stephan Willett objected to one sentence in the class notice, which contained the word "and," when he thought it should be an "or," and some language that he found confusing regarding the postmark/receipt date, Willett Obj., ECF No. 309, at 10-11, but the Court disagrees with this objection which does not affect the validity of the Settlements.

## V. OTHER CONSIDERATIONS - DEFENDANTS' COOPERATION

The Court considered delaying a final approval of the Southwest and American Settlements until after resolution of the case as to all Defendants. In considering this option, the Court inquired as to whether Defendants Southwest and American would continue to cooperate with the Plaintiffs pursuant to the terms of the Settlement Agreements, if the Court were to delay approval of the Settlements until the entire case was resolved. Counsel for Southwest and American both indicated that a postponement would pose "[r]eal risks" to their cooperation, Tr. at 45:13-15, because it would "deprive the Plaintiffs of the finality of this and it would deprive what [Southwest] bargained for as Defendant in terms of the finality of the settlement." Tr. at 44:8-12; *see* Tr. at 51:15-25 (noting that American paid "fair value," and wanted "finality"). "And we need finality so that we get the releases from the claims, we get the benefit of the settlement to which we bargained for." Tr. at 84:8-11. "[W]ithout having finality, we're really not getting the benefit of our bargain . . . to pay a certain amount to get out of this litigation, so we could stop the flow of expenses in terms of, . . ., the costs of discovery and the costs of experts [and] [w]e'll continue to have to monitor this litigation and incur significant costs [so] [w]ithout finality, we may also have to consider the rescission provisions in the settlement agreement." Tr. at 84:24-85:7. Counsel for Southwest stressed further that, without finality, there could be a "significant chilling effect on

early icebreaker settlements," Tr. at 85:8-14, and she noted that "a really important point here is the fact that all of the sales remain in the case and that they would be available for [ ] a claim for damages against the nonsettling Defendants[,]" which benefits ultimately the Class Members in terms of the Total Funds Available for Distribution. Tr. at 85:15-18.

Counsel for American emphasized that if the Settlements are not approved at this time and approval was delayed, it would be "extraordinarily disruptive" in light of the payments made and cooperation provided by American and Southwest. Tr. at 54:14-25. A delayed approval of the settlement would "present[ ] American with an . . . immense, practical problem" because if there is no release, "then we have to go back to preparing for trial" since they did not get the "benefit of [their] bargain." Tr. at 86:7-14.

Settlement Class Counsel asserted that postponing approval of the Settlements would create "uncertainty [ ] as to whether or not the Defendants will continue to cooperate" by producing materials informally and permitting informal interview. Tr. at 55:18-56:23. Settlement Class Counsel noted that this lack of finality may jeopardize the Plaintiffs' case against the remaining Non-Settling Defendants. Counsel for Southwest noted that it would be a "logistical quagmire in terms of not knowing what [the] status was" and accordingly, "finality is needed." Tr. at 60:3-5. *See In re Cathode Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2015 WL 9266493, at *6 (N.D. Cal. Dec. 17, 2015) (finding that "the 'provision of such assistance is a substantial benefit to the classes and strongly militates toward approval of the Settlement Agreement'") (quoting *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 643 (E.D. Pa. 2003)); *see also Precision Assocs., Inc. v. Panalpina World Transport (Holding) Ltd.*, No. 08-cv-42, 2013 WL 4525323, at *9 (E.D.N.Y. Aug. 27, 2013) (involving an extensive agreement to cooperate); *in re Packaged Ice*

*Antitrust Litig.*, No. 08-MD-01952, 2011 WL 717519, at *10 (E.D. Mich. Feb. 22, 2011) (noting cooperation "has already been beneficial to the Plaintiffs in their continued prosecution of their claims against the non-settling Defendants"); *In re Corrugated Container*, 1981 WL 2093, at *16 ("The cooperation clauses constituted a substantial benefit to the class.")

As part of their respective Settlements with the Plaintiffs, Defendants Southwest and American agreed to cooperate with the Plaintiffs by providing information through documents, informal interviews, consultations with industry experts, and deposition/trial testimony, affidavits and declarations, and this information will be used to assist Plaintiffs in their continuing litigation against the Non-Settling Defendants. Both Southwest and American confirmed at the Fairness Hearing that their cooperation would not be forthcoming in the event that this Court delays final approval of the Settlements, as they would again have to begin litigating this case. Accordingly, this factor of continued cooperation by Southwest and American, which benefits the Plaintiffs in their litigation against the Non-Settling Defendants, further weighs in favor of this Court approving the Settlements at this time.

## VI. CONCLUSION

For the foregoing reasons, the Court rejects the objections of the Class Members and grants approval of the Southwest Settlement and the American Settlement on the basis that they are fair, reasonable, and adequate as to and in the best interest of the Class Members, within the meaning of and in compliance with the requirements of Federal Rule of Civil Procedure 23, and considering

the factors discussed in the *Vitamins* case.  An appropriate Order accompanies this Memorandum

Opinion.

                                                             */s/*
                                                **COLLEEN KOLLAR-KOTELLY**
                                                UNITED STATES DISTRICT JUDGE