## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE DOMESTIC AIRLINES TRAVEL ANTITRUST LITIGATION | MDL Docket No. 2656<br>Misc. No. 15-1404 (CKK) |
| **This Document Relates to:**<br>**ALL CASES** | **Public Version of**<br>**Sealed Document ECF 495-2**<br><br>**Oral Argument Requested** |

## CORRECTED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UNITED AIRLINES, INC'S <u>MOTION FOR SUMMARY JUDGMENT</u>

Kent A. Gardiner (D.D.C. No. 432081)
Cheryl A. Falvey (D.D.C. No. 414277)
David M. Schnorrenberg (D.D.C. No. 458774)
Luke van Houwelingen (D.D.C. No. 989950)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 624-2578
Facsimile: (202) 628-5116
kgardiner@crowell.com
cfalvey@crowell.com
dschnorrenberg@crowell.com
lvanhouwelingen@crowell.com

*Counsel for United Airlines, Inc.*

### TABLE OF CONTENTS

GLOSSARY OF TERMS ................................................................................... vi

LIST OF PERSONS IDENTIFIED ................................................................. viii

INTRODUCTION ............................................................................................. 1

ARGUMENT ..................................................................................................... 4

I.    UNITED'S CAPACITY CONDUCT WAS RATIONAL AND
UNILATERAL. ......................................................................................... 4

    A.    After United's Undisciplined Growth Strategy Led It into
Bankruptcy, It Became More Cautious. ................................................. 5

    B.    In the Face of the Fuel Price Spike, Severe Recession, and Slow
Economic Recovery, United Continued Exercising Cautious
Capacity Management and Continued to Respond to Investor
Concerns About Careful Growth. ....................................................... 10

    C.    United Merged With Continental to Better Compete, but Problems
Plagued Their Integration, Hampering United's Ability to Meet Its
Growth Plans Between 2011 and 2014. ............................................... 12

    D.    United Planned to Grow to Make Up Ground Lost to Delta and
American but Was Delayed by Management Turmoil. ......................... 14

II.    PLAINTIFFS' CIRCUMSTANTIAL EVIDENCE DOES NOT "TEND
TO EXCLUDE THE POSSIBILITY" OF UNITED'S UNILATERAL
CONDUCT. ............................................................................................ 15

    A.    The Defendant Airlines Did Not Act in Parallel Regarding Their
Capacity. ............................................................................................. 16

        1.    Plaintiffs Cannot Demonstrate Parallel Conduct at the
Level of the Routes at Which Competition for Airline
Passengers Occurs. .................................................................. 18

        2.    Defendants' Capacity Growth Was Dramatically Non-
Parallel at the System-Wide Level at Which Plaintiffs Say
the Alleged Conspiracy Operated. ........................................... 23

        3.    Alleged Conspirators Grew Domestic Capacity Above
GDP in Half of the Years at Issue, With No Punishment. ....... 26

    B.    United's Communications With Its Owners and Investors Cannot
Create a Plausible Inference of Collusion. .......................................... 28

        1.    Plaintiffs' Evidence of United's Alleged "Signaling"
Regarding Capacity Through Public Disclosures to
Investors Does Not Tend to Exclude the Possibility It Was
Acting Independently. .............................................................. 29

        2.    United's Public Disclosures to Investors Were Made in Its
Unilateral Self-Interest. ........................................................... 31

C.    United Did Not Act Against Its Unilateral Self-Interest by Exercising Capacity Discipline. ................................................................. 43

    1.    United Did Not Act Against Its Unilateral Self-Interest by Continuing to Manage Its Capacity Carefully During and After the Great Recession. ........................................................ 44

        a.    Plaintiffs' Alleged Conspiracy Period Makes No Sense. ...................................................................... 45

        b.    United's and Continental's Retrenchments in 2008–2009 Were Rationally Self-Interested. ......................................... 48

        c.    United's Continued Exercise of Capacity Discipline During 2010–2013 Was Rationally Self-Interested. .................. 50

        d.    United's Efforts to Grow Starting in 2014 Further Demonstrate Its Independent Behavior. ...................................... 53

    2.    United Did Not Act Against Its Unilateral Self-Interest by Prioritizing Profitability Over Market Share. .......................................... 54

D.    Plaintiffs' "Plus Factors" Are Equally Consistent with Independent Action Because They Are True of Other Airlines Not Accused of Conspiring. ......................................................................................... 59

CONCLUSION ......................................................................................................... 60

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re AMR Corp.*,
 527 B.R. 874 (Bankr. S.D.N.Y. 2015)....................................................................19

*Apex Oil Co. v. Dimauro*,
 641 F. Supp. 1246 (S.D.N.Y. 1986).......................................................................60

\**In re Baby Food Antitrust Litig.*,
 166 F.3d 112 (3d Cir. 1999)............................................................................ *passim*

*In re Beef Indus. Antitrust Litig.*,
 907 F.2d 510 (5th Cir. 1990) ........................................................................16, 28

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)......................................................................................15, 56

*Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*,
 203 F.3d 1028 (8th Cir. 2000) ..............................................................................60

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
 509 U.S. 209 (1993)......................................................................................16, 56

*Cason-Merenda v. Detroit Med. Ctr.*,
 862 F. Supp. 2d 603 (E.D. Mich. 2012)..................................................................16

*In re Chocolate Confectionary Antitrust Litig.*,
 801 F.3d 383 (3d Cir. 2015)............................................................................ *passim*

*In re Citric Acid Litig.*,
 191 F.3d 1090 (9th Cir. 1999) .....................................................................50, 54

\**City of Moundridge, KS v. Exxon Mobil Corp.*,
 409 F. App'x 362 (D.C. Cir. 2011)........................................................................25

\**City of Moundridge v. Exxon Mobil Corp.*,
 No. 04-940, 2009 WL 5385975 (D.D.C. Sept. 30,2009), *aff'd*, 409 F. App'x
 362 (D.C. Cir. 2011) ....................................................................................... *passim*

*Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*,
 851 F.2d 478 (1st Cir. 1988)..................................................................................56

_____

\* Cases or authorities on which counsel chiefly relies.

*In re Delta/Airtran Baggage Fee Antitrust Litig.,
   245 F. Supp. 3d 1343 (N.D. Ga. 2017), aff'd 714 F. App'x 986
   (11th Cir. 2018) ............................................................................ 30, 33, 39, 41

In re Domestic Airline Travel Antitrust Litig.,
   221 F. Supp. 3d 46 (D.D.C. 2016) ................................................................ 3, 42

First Nat'l Bank v. Cities. Serv. Co.,
   391 U.S. 253 (1968) ........................................................................................ 43

Harris v. Ivax Corp.,
   998 F. Supp. 1449 (S.D. Fla. 1998), aff'd, 182 F.3d 799 (11th Cir. 1999) ............................ 36

Holiday Wholesale Grocery Co. v. Philip Morris, Inc.,
   231 F. Supp. 2d 1253 (N.D. Ga. 2002), aff'd, 346 F.3d 1287 (11th Cir. 2003) .......... 29, 30, 36

*Kleen Prods. LLC v. Ga.-Pacific LLC,
   910 F.3d 927 (7th Cir. 2018) ......................................................................... passim

Kleen Prods. LLC v. Int'l Paper,
   276 F. Supp. 3d 811 (N.D. Ill. 2017), aff'd, 910 F.3d 927 (7th Cir. 2018) ........... 39, 50, 56, 57

*Kreuzer v. Am. Acad. of Periodontology,
   735 F.2d 1479 (D.C. Cir. 1984) ..................................................................... 43

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
   475 U.S. 574 (1986) ...................................................................................... passim

N. Penn Oil & Tire Co. v. Phillips Petroleum Co.,
   358 F. Supp. 908 (E.D. Pa. 1973) .................................................................... 52

In re Petroleum Prods. Antitrust Litig.,
   906 F.2d 432 (9th Cir. 1990) .......................................................................... passim

Petruzzi's IGA Supermarkets, Inc. v. Darlinq-Delaware Co., Inc.,
   998 F.2d 1224 (3d Cir. 1993) .......................................................................... 16

In re Potash Antitrust Litig.,
   954 F. Supp. 1334 (D. Minn. 1996), aff'd, 203 F.3d 1028 (8th Cir. 2000) ............................ 60

Res. Supply Corp. v. Owens-Corning Fiberglas Corp.,
   971 F.2d 37 (7th Cir. 1992) ............................................................................ 29, 49

*In re Text Messaging Antitrust Litig.,
   782 F.3d 867 (7th Cir. 2015) ......................................................................... 49, 55, 56, 58

---

* Cases or authorities on which counsel chiefly relies.

*Valspar Corp. v. E.I. du Pont de Nemours & Co.*,
    152 F. Supp. 3d 234 (D. Del. 2016), *aff'd*, 873 F.3d 184 (3d Cir. 2017) ..............................29

*Valspar Corp. v. E. I. du Pont de Nemours & Co.*,
    873 F.3d 185 (3d Cir. 2017)........................................................................... *passim*

*Wallace v. Bank of Bartlett*,
    55 F.3d 1166 (6th Cir. 1995) ...................................................................31, 34, 59

*White v. R.M. Packer Co.*,
    635 F.3d 571 (1st Cir. 2011)...................................................................................57

*Williamson Oil Co. v. Philip Morris USA*,
    346 F.3d 1287 (11th Cir. 2003) .................................................................. *passim*

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*,
    513 F. Supp. 1100 (E.D. Pa. 1981) ......................................................................49

**Regulations**

17 C.F.R. § 243.100(a)...............................................................................................38

**Other Authorities**

65 Fed. Reg. 51716 (Aug. 24, 2000)..........................................................................38

DOJ Competitive Impact Statement, *U.S. v. Alaska Air Group*, No. 16-2377
    (D.D.C. Dec. 6, 2016) .......................................................................................19

H. Conf. Rep. No. 104-369 (Nov. 28, 1995) .............................................................36

P. Areeda & H. Hovenkamp, ANTITRUST LAW (4th ed. 2020) .................................49, 58

P. Areeda & H. Hovenkamp, FUNDAMENTALS OF ANTITRUST LAW (4th ed., 2021-
    1 Supp).............................................................................................................50, 57

S. Choi & A. Pritchard, SECURITIES REGULATION (5th ed. 2019) ..............................35, 36, 37, 39

---

*Cases or authorities on which counsel chiefly relies.

# GLOSSARY OF TERMS

| TERM | DEFINITION |
|---|---|
| 8-K or Form 8-K | A report of unscheduled material events or corporate changes at a company that could be of importance to the shareholders or the SEC |
| 10-K | A comprehensive report filed annually by a publicly-traded company about its financial performance; required by the SEC |
| AirTran | AirTran Airways, Inc. |
| Alaska or ALK | Alaska Airlines, Inc. |
| American or AA | American Airlines, Inc. |
| ASM(s) | Available Seat Mile(s) |
| ATPCO | Airline Tariff Publishing Company |
| BCG | Boston Consulting Group |
| Carlton Rep. | Expert Report of Delta's Expert Economist, Dennis W. Carlton (Sept. 29, 2019) |
| Carlton Reb. | Expert Rebuttal Report of Delta's Expert Economist, Dennis W. Carlton (Nov. 14, 2019) |
| Compl. | Corrected Consolidated Class Action Complaint, ECF 184 |
| Continental or CO | Continental Airlines, Inc. |
| Delta or DL | Delta Air Lines, Inc. |
| GAO | U.S. Government Accountability Office |
| Huber Rep. | Expert Report of United & Delta's Securities Disclosure Expert, John J. Huber (Sept. 30, 2019) |
| Israel Rep. | Expert Report of United's Expert Economist, Mark A. Israel (Sept. 30, 2019) |
| Israel Reb. | Expert Rebuttal Report of United's Expert Economist, Mark A. Israel (Nov. 14, 2019) |
| JetBlue | JetBlue Airways Corporation |
| LCC | Low-cost carrier (e.g., Southwest, JetBlue) |
| Legacy Carriers | In 2008: American, Continental, Delta, Northwest, US Airways, and United, plus regional legacy carriers Alaska and Hawaiian |
| Mangum Rep. | Expert Report of Plaintiffs' Expert Economist, Russell W. Mangum III (Sept. 30, 2019) |
| Mangum Reb. | Rebuttal Report of Plaintiffs' Expert Economist, Russell W. Mangum III (Nov. 14, 2019) |

| TERM | DEFINITION |
|------|------------|
| Miller Report | Expert Report of United & Delta's Investor Relations Expert, Gregory S. Miller (Sept. 30, 2020) |
| Miller Reb. | Rebuttal Expert Report of United & Delta's Investor Relations Expert, Gregory S. Miller (Nov. 14, 2019) |
| Northwest | Northwest Airlines, Inc. |
| OAG | Official Airline Guide |
| PRASM | Passenger revenue per available seat mile |
| Pritchard Report | Expert Report of Plaintiffs' Securities Expert, Adam C. Pritchard (Sept. 30, 2019) |
| Pritchard Textbook | S. Choi & A. Pritchard, Securities Regulation (5th ed. 2019) |
| Pritchard Transcript | Deposition Transcript of Plaintiffs' Securities Expert, Adam C. Pritchard (Oct. 23, 2020) |
| Southwest or WN or LUV | Southwest Airlines Co. |
| United, UA or UAL | United Airlines, Inc. |
| US Airways or US | US Airways, Inc. |
| Virgin America or VX | Virgin America Inc. |

## LIST OF PERSONS IDENTIFIED

| NAME | ROLE (2006-2015, UNLESS OTHERWISE NOTED) |
|---|---|
| Baker, Jamie* | J.P. Morgan, Analyst (Managing Director, Equity Research Department) |
| Carlton, Dr. Dennis W. | Delta's Expert Economist |
| Compton, James (Jim)* | United, EVP & Chief Revenue Officer (2010-2016) |
| Davis, Andrew* | T. Rowe Price, VP & Investment Analyst, Equity Group |
| Havens, Valerie* | United, Director Domestic Pricing (2013-present, 2007-2011); Director Latin American Pricing (2011-2013) <br><br> United 30(b)(6) Witness |
| Heimlich, John* | Airlines for America, VP & Chief Economist |
| Huber, John | United's & Delta's Securities Disclosure Expert |
| Ireland, Jonathan* | United, Senior Analyst, Financial Planning (2008-2010) <br><br> United, Senior Analyst, Financial Analysis (2010-2011) <br><br> United, Senior Manager, Financial Analysis (2011-2012) <br><br> United, Director, Financial Analysis (2012-2014) <br><br> United, Managing Director, Investor Relations (2014-2016) |
| Israel, Dr. Mark A. | United's Expert Economist |
| Keay, Hunter* | Wolfe Research, Analyst (formerly, Analyst at Stifel Nicolaus) |
| Kern, R.D.* | Capital Group, Investor Analyst |
| Kirby, John Scott (Scott)* | American, President (2013-2016); <br><br> US Airways, President (2006-2013) |
| Leo, Douglas* | United, VP Revenue Management (2008-2010); VP Pricing & Revenue Management (2010-2012); SVP Strategy & Business Development (2012-2013); SVP Network Pricing and Revenue Management (2013-2016) |
| Mangum, Dr. | Plaintiffs' Expert Economist |

---

\* Individuals whose deposition transcripts are referenced in United's Brief are marked with an asterisk (\*).  The witnesses' transcripts are identified as follows: "[Last name] Tr." (e.g., "Baker Tr.").

| NAME | ROLE (2006-2015, UNLESS OTHERWISE NOTED) |
|---|---|
| Russell W., III* | |
| Mikells, Kathryn* | United, VP, Investor Relations (2007-2008); EVP & CFO (2008-2010) |
| Miller, Prof. Gregory | United's & Delta's Investor Relations Expert |
| Moulis, Matthew* | Fidelity, Investor Analyst |
| Munoz, Oscar | United, CEO (2015-2020) |
| Pfennigwerth, Duane* | Evercore Partners, Analyst (Senior Managing Director) |
| Pritchard, Prof. Adam C.* | Plaintiffs' Securities Expert |
| Smisek, Jeff | United, Chairman, President & CEO (2010-15); formerly Chairman, President & CEO of Continental Airlines (pre-merger) |
| Starnes, James* | United, Manager Schedule Planning & Analysis (2000-11); Director Domestic Planning (2011-present) United 30(b)(6) Witness |
| Tilton, Glenn* | United, Chairman, President & CEO (2002-2010) |
| Znotins, Brian* | United, Managing Director, International & Long Range Planning (2010-2012); VP Network Planning (2012-2016) |

## INTRODUCTION

At issue in this Motion is whether during the time period 2009–2015, it was in United Airlines' independent self-interest to manage its capacity to align with costs and demand, and to tell its investors that it was doing so.  Plaintiffs' theory is that it was irrational for United to have engaged unilaterally in either behavior, and therefore claims that United's conduct can be explained only by its participation in a conspiracy with the other Defendants.

Plaintiffs admit the massive record assembled here is devoid of direct evidence of such an unlawful agreement to restrict capacity.  *See* Ex. 19, Resp. to RFA 17 at 12-13; ECF 354, Final Approval Hr'g Tr. (3/27/2019), 13:5-16.  And every witness in this case—each airline employee, investor, and analyst who was asked in deposition—denied participating in or being aware of any such agreement.  SOF ¶ 233.  The U.S. Department of Justice ('DOJ') has investigated the facts alleged in Plaintiffs' complaint and, in Plaintiffs' words, "closed the investigation with no further activity."  ECF 354 at 12:24-13:3.

Plaintiffs must therefore build their case on inferences they seek to draw from circumstantial evidence.  But "antitrust law limits the range of permissible inferences from ambiguous evidence" and requires a plaintiff to justify "the inference of conspiracy . . . in light of the competing inference[] of independent action."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).  When relying on circumstantial evidence, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy."  *Id.*  Thus, to withstand summary judgment, Plaintiffs must present evidence that "tends to exclude the possibility that the alleged conspirators acted independently."  *Id.* (quotation omitted).  And "[w]here there is an independent business justification for the [defendants'] behavior, no inference of conspiracy can

1

be drawn." *City of Moundridge v. Exxon Mobil Corp.*, No. 04-940, 2009 WL 5385975, at *6 (D.D.C. Sept. 30,2009), *aff'd*, 409 F. App'x 362 (D.C. Cir. 2011).

Plaintiffs do <u>not</u> have circumstantial evidence from which a conspiracy can plausibly be inferred.  The undisputed record is that excess capacity in 2002 drove United into a three-year bankruptcy.  Emerging in 2006—years before the alleged conspiracy—United exercised newfound care to avoid building excess capacity.  Its new investors insisted on knowing United's capacity strategy would be prudent and not render their investments worthless with a return trip to Chapter 11.  United's disclosures to investors—aimed at attracting critical equity capital— included its plans to discipline its own growth to align its supply with customer demand.

In 2008–2009, United encountered astronomically high and volatile fuel costs followed by the worst recession (until recently) since the Great Depression.  United did what any rational company would do when faced with high costs and low demand—it reduced its supply (*i.e.*, its capacity).  Many companies across the whole U.S. economy did the same, including the U.S. airlines that Plaintiffs do not say were part of any conspiracy.

In the slow economic recovery that followed the Great Recession and in the face of continued volatile fuel prices, United pursued a careful capacity strategy centered on the basic economic principle that its supply not exceed demand for its product.  It was perfectly rational Economics 101.  United continued to address investor concern about careful capacity management.  And, to achieve a more robust domestic network that would boost its ability to compete internationally and against its biggest rival (Delta), United merged with Continental Airlines. The merger presented various challenges that required capacity reductions to ensure reliable operations.  The decisions to fix these problems and maintain reliable customer service were unilaterally rational.

United's efforts—to survive bankruptcy (and not return to it), navigate wildly fluctuating fuel prices, withstand the Great Recession, and emerge from its merger with Continental as a high-quality airline—make absolutely clear that every decision United made, and every action it took, was unilateral and creates no plausible inference of conspiracy with other airlines.  In each instance, United was motivated by an independent interest in creating a more profitable and valuable business of investment grade quality.  In the view of United management, that was the path to viability instead of bankruptcy.  United's business judgments about its capacity strategy and investor disclosures cannot be mistaken for a violation of the antitrust laws.

The massive record compiled over four years of discovery thus demonstrates the compelling unilateral reasons for United's conduct.  It is also devoid of support for core assertions Plaintiffs once claimed it would contain:  In place of the alleged "marked change" in conduct and public statements about capacity coincident with the start of the alleged conspiracy in 2009, *see In re Domestic Airline Travel Antitrust Litig*., 221 F. Supp. 3d 46, 69 (D.D.C. 2016), there is substantial evidence that United began exercising capacity discipline—and disclosing that strategy to investors—upon its exit from bankruptcy years earlier.  Absent is evidence of the alleged annual capacity cuts or stagnation across Defendants, or even any claim of an "agreed-upon range" in Defendants' capacity changes.  *See id*.  These allegations are now replaced by an amorphous theory of unspecified "restraint," yet even that is rebutted by hard evidence that Defendants' actual capacity actions diverged dramatically.  Gone too is the DOJ investigation that precipitated the case, or any supporting testimony from executives of the settling defendants, who Plaintiffs never even sought to depose despite what Plaintiffs' touted as their "cooperation." ECF 354 at 22:19–23:24.

3

None of what Plaintiffs proffer as circumstantial evidence of conspiracy comes close to meeting their burden of proof that "tends to exclude the possibility" of United's unilateral behavior:

- Plaintiffs' arguments regarding "parallel" conduct among the Defendants, where the undisputed evidence shows that these airlines in fact acted in fundamentally different ways regarding their capacity and used that capacity to compete vigorously against each other;

- Plaintiffs' arguments regarding United's public communications with its owners and potential investors, which were crucial to United's ability to attract equity investment and lower its cost of capital while remaining fully compliant with U.S. securities laws;

- Plaintiffs' view that United should have rapidly increased capacity as oil prices fell in 2009 and gave way to the Great Recession, notwithstanding United's experience with bankruptcy wrought by prior excessive capacity expansion; and

- Plaintiffs' other purported "plus factors," which fail to account for what they themselves describe as the oligopolistic structure of the airline industry and do not tend to exclude independence in that context.

There is simply no basis on which a jury could conclude that United engaged in a conspiracy to restrict capacity.  Therefore, the Court should grant United summary judgment.

## ARGUMENT

## I.   UNITED'S CAPACITY CONDUCT WAS RATIONAL AND UNILATERAL.

To understand United's business behavior during the 2009–2015 period that Plaintiffs allege was subject to a capacity conspiracy, a review of United's capacity decisions and actions leading up to and during that period is instructive.  In the context of business realities, not abstract theory, the independent business justifications for United's conduct are not only plausible but compelling, precluding any reasonable inference of conspiracy and necessitating summary judgment.  *See Moundridge*, 2009 WL 5385975, at *4, *6.

### A. After United's Undisciplined Growth Strategy Led It into Bankruptcy, It Became More Cautious.

The 2000 recession and September 11, 2001 terror attacks (which used two United aircraft) caused air transport demand to decline sharply. United tried to cut its capacity and expenses every way it could. SOF ¶¶ 54–56. But as it experienced, it is "difficult for [airlines] to contract rapidly in the face of declining demand," because "aircraft are expensive, long-lived capital assets," "passengers are already booked on flights for months in advance," and airlines "cannot reduce employment costs very quickly" in their widely unionized workforce. *Id.* ¶¶ 39–43; Ex. 327, GAO July 2008 Rep., at 8–9. As Plaintiffs' expert economist puts it, "capacity is 'sticky,' that is, slow to adjust to cost and demand shocks." Ex. 1, Mangum Rep. ¶ 29; SOF ¶ 40; *see also* Ex. 83, at UAL-008451509. Despite its efforts, United "couldn't adjust our capacity as quickly as we needed to, we couldn't kind of pull costs out of the system and we didn't have the right level of flexibility." Ex. 24, Mikells Tr. 136:2–18; SOF ¶ 57.

After the capital markets refused to lend to United, it filed for bankruptcy protection in December 2002. SOF ¶¶ 58–59. United watched as many U.S. airlines followed suit over the following decade. *See id.* ¶ 60; Ex. 1, Mangum Rep. ¶ 120 ("Volatile fuel costs together with unpredictable demand saw U.S. Airways (twice since 2000), United, Continental, Delta, and American all file for Chapter 11 Bankruptcy protection."). United's and other airlines' senior leadership had historically been "macho business people" raised in the airline industry who engaged in a "'my runway is longer than your runway' management style" that prioritized "market share and not profitability." Ex. 20, Smisek Tr. 225:14–226:4; SOF ¶¶ 30–31 & nn.52–53 (these ███████████████████████" sought "███████████████████████" with a "'market share at all costs' mentality"). These priorities led to "████████████████████ ██████," SOF ¶ 37, and debt-financed fleet expansions that created "highly leveraged capital

structures," Ex. 75, at UAL-001808779; SOF ¶¶ 32–33.  The result was a "boom and bust" cycle, SOF ¶¶ 34, 47–53, that "systematically destroyed shareholder value," Ex. 22, Tilton Tr. 42:15–43:1.  Short-term earnings would be undermined by "airlines gr[o]w[ing] their capacity too quickly in an effort to gain market share," and then wiped out by "such substantial financial distress that . . . the industry as a whole has failed to earn sufficient returns to cover capital costs in the long run." Ex. 327, at 8, 13; SOF ¶¶ 37, 52–53; *see* Ex. 1, Mangum Rep. ¶ 50.

In February 2006—years before the alleged conspiracy and a time when Plaintiffs effectively concede United was acting unilaterally—United emerged from bankruptcy after more than three years, with new priorities and a new management team led by CEO Glenn Tilton, a seasoned oil executive and outsider to the airline industry.  SOF ¶¶ 64–66. Tilton shared the view of United's Board that it would need to change its business strategies to be "profitable through the business cycle" and earn its cost of capital over the long run.  Ex. 22, Tilton Tr. 37:16–23, 38:9–20; Ex. 83, at UAL-008451507; SOF ¶ 67.  Specifically, United concluded that the only way to achieve long-run profit was to escape the cycle of severe financial losses caused by growing an "inflexible cost structure" ill-suited to the "volatility of demand."  Ex. 75, at UAL-001808779; SOF ¶¶ 67–72, 80–83; Ex. 76, at UAL-001808823 ("[V]alue creation in the 'up cycles' is not sufficient to weather the troughs."); Ex. 328, GAO April 2009 Rep., at 8 ("The airline industry's cyclical profits are caused by the airlines' inability to quickly adjust the supply of air service.").

United therefore concluded that "prudent capacity planning is critical to get a long-term revenue model . . . that deals with these shocks as an expected consequence of our business as opposed to the exception."  SOF ¶ 70 (quoting Ex. 144, at 18).  Because United could not eliminate "all the different externalities that the industry . . . face[s]" or the structural obstacles to

rapid capacity reductions, prudence required United to "be all over matching capacity and demand" by expanding output no more than long-term demand expectations could meet.  Ex. 24, Mikells Tr. 138:5–10; SOF ¶¶ 69, 73–74.  As "anybody who worked at United Airlines during that three-year bankruptcy" knew firsthand, overcapacity had been irreversible and disastrous, "an incredibly hard lesson learned," instilling that "we have to . . . be much more disciplined about capacity to make sure that we don't get into that same situation as well."  Ex. 24, Mikells Tr. 136:1–137:3; SOF ¶¶ 54–59, 69.

By 2006, United was using the term *capacity discipline* to describe carefully "match[ing] capacity . . . to the available demand" in order to "maximize the profitability of [its] flight[s]."  SOF ¶¶ 129, 114, 71, 77, 79–80, 128–31 (quoting United executives' definitions of capacity discipline).  And it wagered that by being more disciplined than its peers, it could "[o]utperform [the] [i]ndustry." *Id.* ¶ 80 & n.148; Ex. 83, at UAL-008451598–599, UAL-008451636–637.  United under Mr. Tilton thus made capacity decisions that were "guided by profitability."  Ex. 22, Tilton Tr. 40:16–19.  Going into and during bankruptcy, United cut domestic "Available Seat Miles" (ASMs)—by 7% in 2002, 6% in 2003, and 10% in 2005.  SOF ¶ 63.  In late 2004, United announced a plan to bring capacity more in line with demand, reducing its overall mainline fleet and redeploying aircraft to more profitable international routes while relying more on regional jets domestically. *Id.* ¶ 62. Coming out of bankruptcy, it grew by 4% in 2006 but by early 2007 realized it had grown too fast and hurt its profitability relative to its competitors, and pruned its domestic mainline ASMs by 3% that year. *Id.* ¶ 84.

Consistent with its post-bankruptcy strategy, United wanted to attract a "whole different type of investor," Ex. 22, Tilton Tr. 65:18–66:4—institutional investors "focused on long-term value creation" with expectations "aligned with management, whether it's reducing debt, long-

term return-driven investments or return on invested capital," Ex. 97, at UAL-009820898.  *See* SOF ¶¶ 90–92 (long-term investors carefully weigh a company's long-term financial prospects, often over a three- to five-year investment horizon).  Before its bankruptcy, United's typical investors had been "hedge funds and volatility investors" with short investment horizons who primarily invested in airlines as a hedge against oil stocks.  Ex. 22, Tilton Tr. 65:18–24; SOF ¶¶ 88–89.  This investment profile caused United's stock price to gyrate wildly even when demand for airline travel did not.  SOF ¶¶ 88–89.  "[A] longer-term-oriented shareholder base reduces the volatility in stock prices," Ex. 43, Davis Tr. 221:5–17; Ex. 8, Miller Rep. ¶¶ 54–57, and that reduced volatility in turn leads to a higher stock price and lower cost of capital, *see* SOF ¶ 92; Ex. 8, Miller Rep. ¶ 36.  Because air transport is a highly capital-intensive business, a reduced cost of capital translates into potentially billions of dollars each year in savings towards "how [United] grow[s] the airline [and] . . . how we invest in our people, which is how we invest in the product."  Ex. 23, Kirby 135:6–23; SOF ¶ 93; *see also* Ex. 22, Tilton Tr. 366:20–367:13 (capital from high stock price is "a means by which you fund your finance your future").

To attract long-term investors, United needed to build investor confidence.  Yet because of the industry's boom-and-bust history, "the burden of proof was very squarely on" airlines like United "to show that they had changed."  Ex. 40, Keay Tr. 345:25–346:16; SOF ¶¶ 94–98.  Restoring potential investors' confidence could occur only by being transparent and responsive to investors' questions and concerns about United's management, strategy, and financial conditions.  *See* SOF ¶¶ 99-100, 105–07.

And investors were "extremely interested" in capacity.  Ex. 40, Keay Tr. 346:23–348:6 (testifying that in his experience it "would be rare" for there to be an airline earnings call without "at least one question [] asked about capacity"); SOF ¶¶ 96–98, 102–04, 117–18.  While in

bankruptcy in 2003, United executives began explaining to owners and investors its strategy to bring capacity "into better alignment with current market demand" as a reason United could be trusted as a sound investment.  SOF ¶¶ 99, 113.  From at least 2005 onward, in securities filings and submissions, earnings calls, investor conferences, and meetings with investors and analysts, United disclosed a strategy of "capacity discipline" and a focus on profitability and return on capital, rather than just market share growth.  *Id.* ¶¶ 114.  Its Chief Revenue Officer touted that strategy on United's first post-bankruptcy earnings call in May 2006: "Recall that in 2005 United introduced capacity discipline to the domestic market when we restructured our overall network, shifting weaker domestic mainline capacity to international markets while backfilling with Express operations to maintain domestic coverage."  *Id.*  United's strategy focused on keeping its supply aligned with demand in order to become sustainably profitable.  *Id.* ¶¶ 67–74, 101, 113–14.  And since at least 1999, United issued regular numeric guidance on anticipated changes in its aggregate ASMs for the upcoming quarter and year.  *Id.* ¶ 115.  United also identified capacity actions by competing airlines and industry over-capacity as important risks to United's own performance.  *Id.* ¶ 116.

United provided voluntary capacity disclosures because "enhanced disclosure can reduce costs of capital in both the equity and debt markets," Ex. 8, Miller Rep. ¶¶ 36–46, "yields enhanced valuation" through stock prices, *id.* ¶¶ 47–50, and attracts sustained investment by "'high-quality,' 'long-term'" investors, *id.* ¶¶ 51–62; *see* SOF ¶¶ 105–07, 125.  The Securities & Exchange Commission's Regulation FD (or "Fair Disclosure") requires companies to make such disclosures publicly to all potential investors all at once.  *Infra* at 37–38.

United's focus on improving its access to equity capital by assuring investors of its "capacity discipline" thus began years before the supposed conspiracy.  And Plaintiffs nowhere

claim that United's communications with investors during 2003–2007—about capacity discipline, forward-looking projections, and its opinions about the industry as a whole—were anything but rational, unilateral, non-conspiratorial actions.  Plaintiffs theorize that the exact same decisions, actions, and investor disclosures suddenly became contrary to United's unilateral interests in 2009.  But the economic conditions United confronted in 2008–2009 made its cautious approach to aligning supply with demand and its focus on profitability and investor confidence even more obvious, rational, and consistent with its unilateral interests.

> **B.    In the Face of the Fuel Price Spike, Severe Recession, and Slow Economic Recovery, United Continued Exercising Cautious Capacity Management and Continued to Respond to Investor Concerns About Careful Growth.**

United's continued recovery faced major challenges.  First, the price of jet fuel, one of any airline's largest variable costs, was rising and unprecedentedly volatile.  SOF ¶¶ 132–34.  The price of a barrel of crude oil—$40 in 2006—climbed steadily to an all-time high of $147 in July 2008.  *Id.* ¶¶ 133, 144.  For United, this meant an operating cost increase of over $2 billion, more than twice its operating earnings in favorable macroeconomic conditions.  *Id.* ¶ 135; Ex. 80, at UAL-001048375.  High fuel prices then gave way to the Great Recession, which caused demand for air travel to fall sharply.  SOF ¶¶ 140–42; Ex. 1, Mangum Rep. ¶ 127 ("[A]t the same time as the macroeconomic shock of the fuel price fluctuations transpired, demand for passenger air transportation fell sharply as the Great Recession took hold."); Ex. 3, Mangum Tr. 69:11–19 ("I do think that reducing capacity at that time was something that individual firms would be looking towards."); Ex. 7, Pritchard Tr. 124:20–125:10 ("I don't think anybody was growing in 2008 because the financial crisis is hammering them, and the question is: How much capacity are you going to cut? And I think everyone was cutting.").

Faced with high variable costs and low demand that made many routes unprofitable, United reduced capacity decisively in both 2008 and 2009.  SOF ¶¶ 136, 138–39, 146–52.  It

accelerated more than 100 aircraft retirements, scaled back excess hubs, and grounded and sold its entire fleet of 737s, realizing efficiencies by eliminating that aircraft type. *Id.* ¶¶ 150–51. United hoped these cost-cutting measures would save it $841 million through 2009. *Id.* ¶ 152. United nevertheless suffered a net loss of $5.3 billion in 2008. *Id.* ¶ 153. In 2009, its loss was $628 million. *Id.* Continental, too, was forced to contract. Routes representing 80% of its revenue lost money in 2008, and it lost $586 million. *Id.* ¶¶ 154–55. United and Continental watched as the Great Recession forced numerous other U.S. airlines into bankruptcy while their own cautious planning and actions allowed them to weather the storm. *See id.* ¶ 137.[1]

The U.S. economy began to slowly emerge from the global recession starting at the end of 2009. *Id.* ¶¶ 157–64. Demand for business travel stayed weak through mid-2011, however, and fuel prices remained unstable, reaching a record-high annual average in 2012. *Id.* ¶¶ 140–44 & nn.249–51. United was particularly sensitive to the continued high fuel prices; a $5 per barrel increase could cut its income by 24%. *Id.* ¶ 145. And its domestic network was focused on business travelers, leaving it particularly exposed to weakness in the overall economy. *Id.* ¶ 142; Ex. 44, Pfennigwerth Tr. 192:15–193:3 (explaining "United's greater sensitivity to the economic cycle": "corporate travel, premium travel tends to have greater variability in a downturn than . . . leisure . . . [s]o to the extent you are more levered to corporate travel[,] theoretically your revenue will decline more in a downturn than say pure leisure."). Concerned with fears of a renewed recession, United was conservative in its growth plans as the economy began its slow recovery. SOF ¶¶ 158, 164. And like many companies facing mounting debts and significant

---

[1]   U.S. airlines declaring bankruptcy between January 2008 and November 2011 included Big Sky, Aloha, Champion Air, ATA, Frontier, Air Midwest, Eos, Sun Country, Mesa, Arrow Air, and American. *See* "U.S. Airline Bankruptcies," AIRLINES FOR AMERICA, *available at* https://www.airlines.org/dataset/u-s-bankruptcies-and-services-cessations/.

liquidity pressures after the Great Recession, *id.* ¶¶ 163, 165, United needed to greatly *reduce* rather than increase its debt burden, to reduce costs, make capital available for productive uses, and survive the volatile environment, *id.* ¶¶ 165–66.  Potential investors in United continued to voice their strong preferences that United continue focusing on matching its supply to demand, which they saw as vital to sustainable profits and avoiding a return to its recent financial turmoil. *Id.* ¶¶ 96–98, 102–04.

Accordingly, two years into Plaintiffs' supposed conspiracy, costs remained high, demand remained low, and United's stockholders and potential investors continued to push United for caution in its capacity planning.  These undisputed forces drove United's behavior and fully explain United's unilateral, rational decision-making.

### C.     United Merged With Continental to Better Compete, but Problems Plagued Their Integration, Hampering United's Ability to Meet Its Growth Plans Between 2011 and 2014.

In 2008, Delta had merged with Northwest to become the world's largest airline, *see id.* ¶¶ 167–68, with a global scale that posed a direct challenge to United's competitiveness with business travelers.  To better compete against Delta, United began talks to merge with Continental, which could combine the airlines' complementary networks and give it access to Continental's younger fleet and "terrific order book" of new aircraft on order.  Ex. 21, Compton Tr. 76:8–23, 117:5–119:3; *see* SOF ¶¶ 168–70; Ex. 316, at UAL-009952935; Ex. 1, Mangum Rep. ¶ 63.  United viewed the merger as a competitive response that "present[ed] a relatively lower risk alternative to other options."  Ex. 78, at UAL-001809151–152.  The merger was announced in May 2010, approved by regulators that August, and closed in October.  SOF ¶ 170.

In the merger's wake, however, United faced several serious operational challenges that hampered its ability to grow.  SOF ¶¶ 172–212; Ex. 44, Pfennigwerth Tr. 205:4–16 (describing "difficult periods in the years . . . following [United's] merger," which required United to be

"internally focused").  *First*, the integration of United's and Continental's computer systems in March 2012 was plagued with problems that led to "significant operational shortfalls."  SOF ¶¶ 175–82; Ex. 26, Znotins Tr. 284:15–285:14.  United was forced to cut flights and increase ground times to enable employees to maintain its customer service standards.  SOF ¶ 172.

*Second*, legacy United's aging fleet required extensive maintenance, but legacy Continental-led maintenance planners underestimated those needs, leaving many more planes grounded than expected.  *Id.* ¶¶ 201, 204.  To address this and improve reliability, United reassigned many planes to serve as "spare" aircraft for active planes experiencing mechanical problems, which reduced the number of aircraft available to schedule.  *Id.* ¶¶ 178, 203, 210.

*Third*, starting in 2013, United faced a chronic regional pilot shortage due to widespread retirements and two new FAA regulations that made it harder to become a regional jet pilot and limited their flight and duty times.  *Id.* ¶¶ 185–86.  Facing similar pilot shortages, ██████ ████████████████████████████████████████████████████ ████████████████████████████.  *Id.* ¶¶ 187–90.  United depended more on regional jets than American or Delta and was particularly hard hit by the pilot shortage which forced it to remove the equivalent of 60 regional aircraft from its schedules by 2014.  *See id.* ¶¶ 183–84, 193.

Together, these problems prevented United from achieving even its modest capacity growth plans from 2011 through 2014.[2]  *Id.* ¶¶ 192, 211; Ex. 25, Leo Tr. 97:1–99:22 ("We had issues with the different systems that were integrated.  We had issues with reliability of aircraft. We had different assumptions that the two airlines used on a variety of detail things . . . . [T]he net result of all that is we were unable to operate reliably.  We couldn't grow.").  Delta and

---

[2]   United's inability to meet its capacity goals is reflected in successive 10-Ks and internal capacity planning reports.  *See* SOF ¶ 211; Ex. 260, at UAL-000720786 ("Since merger, United has consistently delivered actual capacity which is noticeably lower than planned.").

American took advantage of United's operational difficulties by taking greater share of lucrative business travel from United in 2012–2014.  SOF ¶¶ 212, 235, 238.

> **D.    United Planned to Grow to Make Up Ground Lost to Delta and American but Was Delayed by Management Turmoil.**

By mid-2014, United had largely resolved its post-merger operational issues.  *Id.* ¶ 234. And, given the economy's recovery from the recession, demand was increasing in a more sustainable and predictable way.  After observing its competitors, specifically Delta and American, growing domestically while increasing profits, *id.* ¶¶ 237–43, United hired Boston Consulting Group ('BCG') in May 2014 to evaluate how to respond—including the merits of a more robust growth strategy, *id.* ¶ 235.  United and BCG worked together for the next 16 months to analyze its competitors' success and recommend how to make up ground lost during its integration problems.  *Id.* ¶ 236. At the conclusion of this work in 2015, United developed a plan to grow capacity primarily by increasing the number of seats per flight and operating more flights over shorter distances—strategies that had shown success for Delta.  *Id.* ¶¶ 244–45.

Then-CEO Jeff Smisek was slated to present those recommendations to United's Board of Directors in September 2015, but that presentation was postponed when the Board dismissed him weeks earlier.  *Id.* ¶¶ 251–52.  Network head Doug Leo presented Smisek's replacement, Oscar Munoz, with the growth strategy recommendations during his first week as CEO.  *Id.* ¶ 254.  Munoz suffered a heart attack and underwent transplant surgery before he could present the strategy to the Board.  *Id.* ¶ 255.

Upon Munoz's recovery in Spring 2016, his leadership team undertook a "top-to-bottom, full scale view on everything [that they did]"  and ultimately announced its intent to start growing capacity faster than GDP to finally catch up with growth achieved by United's competitors during its prolonged integration challenges.  *Id.*; Ex. 40, Keay Tr., 366:24–367:3

("United in 2016 embarked on a multiyear capacity expansion to effectively take back the market share that it had lost from Delta.").

Thus, for the last three years of the alleged conspiracy, undisputed economic and business challenges once again fully explain United's unilateral, rational actions.

## II.   PLAINTIFFS' CIRCUMSTANTIAL EVIDENCE DOES NOT "TEND TO EXCLUDE THE POSSIBILITY" OF UNITED'S UNILATERAL CONDUCT.

There is no direct evidence of conspiracy in this case.  Not a single witness (including from the airlines that have settled); not a single document or email.  Plaintiffs cannot point to a meeting or communication that supposedly launched a conspiracy, who was involved, or what they supposedly agreed to do.  Plaintiffs simply theorize conspiracy by identifying a period of slow capacity growth, and try to link that with legitimate public communications to airline investors.  Far more is required to withstand summary judgment.

While direct evidence is not required to make out Plaintiffs' Sherman Act § 1 claim, proof of an actual agreement—a meeting of the minds among the four Defendants—is.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) ("[T]he crucial question [in a Sherman Act § 1 case] is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express.") (quotation and citations omitted); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1299 n.10 (11th Cir. 2003) ("Although this meeting of the minds need not be formal, it must transpire.").

A plaintiff opposing summary judgment by relying on circumstantial evidence to establish an unlawful agreement existed must first "establish[] a pattern of parallel behavior" and then present evidence that "tends to exclude the possibility that the alleged conspirators acted independently."  *Moundridge*, 2009 WL 5385975, at **3–4 (invoking test applied in *Williamson Oil*, 346 F.3d at 1301 (quoting *Matsushita*, 475 U.S. at 588)).  Plaintiffs here can do neither.

15

**A.      The Defendant Airlines Did Not Act in Parallel Regarding Their Capacity.**

For a plaintiff alleging a conspiracy based on circumstantial evidence, a factual

demonstration of actual parallelism, though not sufficient, is necessary.  *See In re Beef Indus.*

*Antitrust Litig*., 907 F.2d 510, 514 (5th Cir. 1990) ("When an antitrust plaintiff relies on

circumstantial evidence of conscious parallelism to prove a § 1 claim, he must first demonstrate

that the defendants' actions were parallel."); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 132

(3d Cir. 1999) (evidence could not show conscious parallelism where "defendants' prices were

neither uniform nor within any agreed upon price range of each other"); *Moundridge*, 2009 WL

5385975, at *4 (quoting *Petruzzi's IGA Supermarkets, Inc. v. Darlinq-Delaware Co., Inc*., 998

F.2d 1224, 1242–43 (3d Cir. 1993)).  That is because parallel conduct is necessary for a cartel to

function: it is economically implausible for firms to maintain such an agreement without it.  And

economically implausible theories require "more persuasive evidence to support their claim than

would otherwise be necessary."  *Matsushita*, 475 U.S. at 587.

The agreed conduct must be meaningfully parallel because otherwise a co-conspirator has

no reciprocal conduct to rely on.  To be plausible, an agreement must therefore meaningfully

establish discernible parallel conduct, a requirement not satisfied by indefinitely "higher" prices

or "lower" output alone.  *See Baby Food*, 166 F.3d at 129–30 ("These trend lines reveal nothing

more than that the transaction prices tended to increase over time" which "'does not in itself

permit a rational inference of conscious parallelism.'") (quoting *Brooke Grp. Ltd. v. Brown &*

*Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993)); *Cason-Merenda v. Detroit Med. Ctr.*,

862 F. Supp. 2d 603, 636 (E.D. Mich. 2012).  Without this concrete range of permitted conduct

from which to identify and punish deviation, a competitor would have no reason to rely on its

rivals to forbear competing, depriving it of any plausible motive to conspire.  As a court in this

District explained of similar evidence of non-parallel output changes, "[i]t would be contrary to

16

[alleged co-conspirators'] economic interests to participate in a conspiracy where one conspirator could increase production and market share at the expense of other co-conspirators." *Moundridge*, 2009 WL 5385975, at \*7; *see also Williamson Oil*, 346 F.3d at 1321 ("[I]t makes little sense to posit that [defendants] would continue to participate in a conspiracy that cut their market shares so dramatically."); *Baby Food*, 166 F.3d at 133, 137.

Plaintiffs have steadily retreated from their allegations about parallel capacity conduct among the Defendants.  Discovery revealed that after the immediate response to the Great Recession in 2009, "airline capacity" during the alleged conspiracy was not, as Plaintiffs alleged, "stagnant or decreasing on an annual basis."  ECF 184, Corr. Consol. Am. Class Action Compl. (8/31/2016) ("Compl."), ¶ 4.  As Plaintiffs' expert acknowledges, Defendants' domestic system-wide ASMs underline grew each year except 2012 (a year when average fuel prices were at a record high). Ex. 1, Mangum Rep. Fig. 48; *see* SOF ¶ 144 (Ex. 11, Israel Rep. Fig. 15 (comparing domestic capacity growth and adjusted jet fuel prices over time)); Ex. 47, Heimlich Dep. 214:4–215:5. In his report, Plaintiffs' expert economist took the position that by 2010 capacity discipline meant "keeping capacity growth less than or equal to GDP growth," and that this provided a "particular test for whether or not an airline was adhering to the alleged agreement."  Ex. 1, Mangum Rep. ¶¶ 145, 151.  But after Defendants' experts rebutted this with evidence Defendants grew above GDP at several points during the alleged cartel without facing punishment, *see* SOF ¶¶ 226–29; Ex. 12, Israel Reb. Rep. ¶¶ 77–79; Ex. 14, Carlton Reb. Rep. ¶¶ 34–35, he then denied that the airlines had actually *agreed* to grow less than GDP or that those that repeatedly failed this "test" ever violated the agreement.  Ex. 3, Mangum Tr. 110:5–16, 122:4–11.

Plaintiffs have thus now fallen back to a theory that Defendants did not agree to cut capacity, but instead agreed to grow "system-wide" capacity, by less than they otherwise would

17

have, by some unspecified amount.  Ex. 18, Resp. to Interrog. 21 (7/31/2019) at 1–2; Ex. 3, Mangum Tr. 112:2–15.  Dr. Mangum now opines the agreement was no more concrete than "there's going to be something that . . . independently you're going to want to do.  Try not to do that."  *Id*. 111:2–17.  No fixed level of output.  No agreed-upon range.  *See Baby Food*, 166 F.3d at 132.  This is an extraordinary view of the alleged "meeting of the minds" in a cartel that supposedly lasted six years.  And even this squishy new theory of conspiracy—that Defendants agreed to grow something less than they would have—runs headlong into the record. Defendants acted in fundamentally different ways regarding their capacity, and used capacity growth to compete vigorously against each other, all through the supposed conspiracy period.

### 1.    Plaintiffs Cannot Demonstrate Parallel Conduct at the Level of the *Routes* at Which Competition for Airline Passengers Occurs.

Plaintiffs do not allege Defendants agreed to particular routes on which capacity would be cut or restricted.  Nor do they identify communications (public or private) about capacity restrictions on specific routes.  *See* Ex. 16, Resp. to Interrog. 29 (4/29/2019) at 24–25.  The supposedly conspiratorial public disclosures to investors relate to overall or mainline "domestic" capacity, and many are even less specific, addressing "consolidated" capacity including international markets.  Ex. 18, App'xs. I & II.

Such a conspiracy would be hard-pressed to serve any purpose.  When companies decide to violate the law by conspiring, they do so to eliminate competition between them.  Yet the parties' expert economists agree that competition between airlines actually happens at the *route* level—the particular origins and destinations between which passengers generally seek to travel.[3]

---

[3]    Ex. 1, Mangum Rep. ¶¶ 54 (demand for air travel on specific routes depends on both macroeconomic and "local economic conditions"), 123-24, Figs. 15 & 16 (degree of intermodal competition for air travel varies based on route-level factors), 302 (contrasting

The DOJ has long-recognized this, too, and focuses its competitive analysis of proposed airline mergers on the extent to which the merging parties serve the same non-stop routes.[4]

But the undisputed record reflects that there was nothing parallel about Defendants' capacity decision-making on individual routes, and shows instead they competed fiercely for passengers on those routes.  Such "aggressive" and common competition between Defendants "is inconsistent with the idea that those same firms have conspired not to compete" by restricting capacity.  *See Valspar Corp. v. E. I. du Pont de Nemours & Co.*, 873 F.3d 185, 196 (3d Cir. 2017) ("market realities" reflecting "'aggressive' and 'common' price competition between firms is inconsistent with the idea that those same firms have conspired *not* to compete on price").

Dr. Mark Israel examined Defendants' entry behavior on large routes during the alleged conspiracy, explaining that "[e]conomic theory teaches that under a conspiracy to raise price one would expect to see Defendants avoiding competition with each other in order to increase profits and avoid undermining the conspiracy."  Ex. 11, Israel Rep. ¶ 193.  He found the opposite here: Defendants frequently added capacity—starting new regular service—on each other's routes.

---

capacity growth "at [Defendants'] hubs" (their "key airports and routes") with "elsewhere in their domestic networks"); Ex. 11, Israel Rep. ¶ 173; Ex. 13, Carlton Rep. ¶¶ 20-21, 52.

[4]     SOF ¶ 215.  *E.g.*, U.S. DOJ Press Release (8/27/2010) (announcing transfer of United and Continental assets to Southwest, explaining that the merger would "combine the airlines' largely complementary networks," resulting in "overlap ***on a limited number of routes where United and Continental offer competing nonstop service***," the largest of which were routes between United's hubs and Continental's Newark hub, to be resolved by transfer of Newark slots and other assets to Southwest) (emphasis added) https://www.justice.gov/opa/pr/united-airlines-and-continental-airlines-transfer-assets-southwest-airlines-response; DOJ Competitive Impact Statement, *U.S. v. Alaska Air Group*, No. 16-2377, Dkt. 4 (D.D.C. Dec. 6, 2016) (alleging "scheduled air passenger service on those twenty routes on which Virgin and American compete today, and the routes on which they would have likely competed in the future, are relevant markets within the meaning of Section 7 of the Clayton Act").  *See also In re AMR Corp.*, 527 B.R. 874, 886 (Bankr. S.D.N.Y. 2015) ("Unlike a national market, the case law recognizes that city pairs are an appropriate way to define the market for antitrust purposes in the airline industry.").

United was the target of competitive entry by other Defendants on 18% of its network in just 2011, for example, the heart of the alleged conspiracy. SOF ¶ 216; Ex. 11, Israel Rep. ¶ 93 & Fig. 13. Just some examples of this competitive entry and the capacity growth that followed include (SOF ¶ 217; Ex. 11, Israel Rep. ¶¶ 194–95):

- American entered the Houston (IAH)/Los Angeles (LAX) route against United in 2011; overall market capacity went up 17% from 2010 to 2012.

- Delta entered the Dallas-Fort Worth (DFW)/LAX route against American in 2014–2015, while Southwest began service to LAX from Dallas Love Field (DAL); overall capacity for Dallas/LAX grew 28% from 2013 to 2015.

- Delta entered the Boston/LAX route in 2013/2014 against United and American (and JetBlue and Virgin); overall route capacity increased by 9% from 2012 to 2014.

- Southwest entered the Nashville/New York LaGuardia (LGA) route against American and Delta, and Nashville to Newark (EWR) against United; overall Nashville-New York City capacity grew by nearly 68% from 2012 to 2014.

- United entered the LAX/Minneapolis route in 2014 against Delta, and American entered two years later; market capacity went up over 45% from 2013 to 2016.

- Delta entered the Seattle/San Francisco route against United (and Alaska and Virgin America) in 2014; overall market capacity grew nearly 20% from 2013 to 2015.

If there were an agreement among the four Defendants to "jointly limit" their capacity to raise prices, one would expect it to be most pronounced where they compete directly and therefore have the greatest control over a route's capacity, and, by Plaintiffs' theory, on prices. But Dr. Israel further found that United did not back off capacity growth on routes where *only* other Defendants were present, *i.e.*, those "where capacity is entirely under the control of the alleged cooperators" and "economics teaches the conspiracy should be most successful." SOF ¶ 218; Ex. 11, Israel Rep. ¶¶ 196–197. He found that these "Codefendant Only" routes did *not* grow more slowly by a statistically significant amount; instead, United's capacity deployment during 2012 to 2015 depended on whether a route had been profitable in the recent past, exactly

20

what would be expected in a competitive environment.  SOF ¶ 218; Ex. 11, Israel Rep. ¶¶ 196–202, 206–07 & Table 3.

United's supposed co-conspirator Delta substantially increased its capacity between 2009–2015 in several cities in which other airlines operated hubs, including Los Angeles and New York—each a hub for both American and United—and took share at the expense of both alleged co-conspirators, as documented by Dr. Dennis Carlton.  SOF ¶ 220; Ex. 13, Carlton Rep. Figs. 9–12.  He also found that Delta grew between 2009–2015 substantially more on routes in which it competed with at least one Defendant (by 16.5%) than on those where it was the only carrier or competed with only non-Defendants.  SOF ¶ 221; Ex. 13, Carlton Rep. ¶ 58, Fig. 16.

Industry analysts documented some of Delta's "aggressive" competitive growth during the period the Defendants were supposedly conspiring.[5]  One sell-side analyst observed in 2012 that "[i]t looks to me like Delta is essentially trying to break the back of [American] on core 'hub to hub' flying."  SOF ¶ 219 n.388.[6]  The recipient of this analysis, at investment management firm T. Rowe Price, testified, "[I]t looked like Delta, who had been trying to gain a larger share of the local New York area by gaining additional slots at LaGuardia and JFK, that they were trying to . . . take more share relative to [American] while [it was] in a weakened competitive state with the bankruptcy and lack of funds." *Id.*; Ex. 43, Davis Tr. 256:4–258:7.

Delta launched another competitive challenge to United in the middle of the purported conspiracy, announcing its new West Coast Shuttle in August 2013—hourly, specially-branded

---

[5]   SOF ¶ 219; *e.g.*, Ex. 90, at FID-AIR-287936 (" ███████████████████████
███████████████████████████████████████████████████████ .

[6]   Ex. 50, at TRP-CIVIL-00028940 (listing Delta's "Top 10 Growth Markets" from NYC, showing 575% growth to Dallas (an American hub), 395% to Philadelphia (US Airways), 178% to Denver (United), 33% to Miami (American), and 25% to Charlotte (US Airways)).

service—between San Francisco (SFO) and Los Angeles (LAX), two United hubs.  SOF ¶ 222.

This service targeted United's most lucrative customers, business travelers, and caused one

analyst to observe of Delta, "███████████████████████████████████████████████████

███████████████████████████████████."  *Id.*[7]  Internal Delta materials from September 2013

prepared for a "full court press" on "Top Corporate LAXSFO Accounts" confirmed Delta's

competitive aspirations, asking "sales managers to promote and support this key route."  *Id.*

¶ 222 n.392.[8]  United evaluated options for a competitive response, *id.* ¶ 223; Ex. 320, at UAL-

00528983–9001, and in reaction to this and other entry by Delta on routes "targeting markets

where United is the dominant carrier," ultimately entered multiple new routes to Delta hubs and

increased capacity from San Francisco to Delta's hub in Seattle, SOF ¶ 223.[9]  The next year,

Delta announced even more new capacity on the SFO-LAX route.  *Id.* ¶ 222.[10]

In June 2015, the same analyst who had observed Delta's effort to "███████████" in 2013

conducted an analysis looking back at industry competition over the prior five years, i.e., the

---

[7]  Ex. 63; Ex. 40, Keay Tr. 380:11-382:18 ("I think [Delta was] trying to take away some of United's most valuable market share"); *see also* Ex. 250, at UAL-000359121–122 ( "Delta Goes for the Jugular": "Delta is designing its shuttle product to appeal to high-fare business passengers . . . . Los Angeles and San Francisco are both United hubs, and the new Delta Shuttle service is clearly designed to win more corporate accounts from United."); Ex. 88, at EVR_AIRLINE_MDL_00031366 ( "Delta is playing offense" through "competitive incursions (DAL [Delta] vs. UAL [United] Pacific/West Coast, DAL vs. ALK [Alaska Airlines] Seattle"); Ex. 1, Mangum Rep. ¶ 125 (recognizing that "Defendants . . . openly courted business travelers and oriented their business to attracting and retaining this 'high-value' customer segment") & n. 256.

[8]  Ex. 232, at DLT1_07638578–581 ("LAXSFO is the 3rd largest O&D with five airlines (AA/UA/DL/WN/VX) operating over 50 weekday flights. Competition is stiff but Delta Shuttle features, benefits and brand will clearly differentiate DL from OA [other airlines]").

[9]  *See* Ex. 274, UAL-001618527 (10/9/2013 email forwarding Motley Fool Article, "The United-Delta Grudge Match Escalates" to CEO Jeff Smisek, noting that "[i]t seems clear that Delta is looking to exploit United's merger integration woes to gain market share").

[10]  Ex. 245, UAL-000232129 (2/2/2015 Delta press release announcing use of larger aircraft on 8 of 15 daily flights, "offering 40 percent more seats on its hourly nonstop Delta Shuttle").

bulk of the alleged conspiracy period.  This analysis showed that "[s]ince 2010 U.S. domestic seats are . . . up 10% within the top 50 airports" with "the competition . . . as brutal as ever in markets like LAX, SFO, NYC, Dallas, and Chicago."  *Id.* ¶ 224.[11]

Plaintiffs' conspiracy theory and their expert ignore this dramatic lack of parallelism— and intense competition—at the route level, where customers actually fly and airlines actually compete.  Plaintiffs' approach is akin to the *Baby Food* plaintiffs' focus on list prices and "'trend lines' of *average transaction prices*" rather than actual transaction prices. 166 F.3d at 129. The court in *Baby Food* rejected that approach, because that focus ignored how competition actually occurred in the industry.  *Id.* at 128–29.  The aggressive competitive capacity growth demonstrated by the record—at the level at which competition occurs in the airline industry— belies the theory that Defendants were colluding.  *See Valspar*, 873 F.3d at 195–96.

> **2.     Defendants' Capacity Growth Was Dramatically Non-Parallel at the System-Wide Level at Which Plaintiffs Say the Alleged Conspiracy Operated.**

Ignoring this extensive record of intense competition on routes in which Defendants compete, Plaintiffs allege instead that the Defendants agreed to limit domestic "system-wide industry capacity growth."  Ex. 1, Mangum Rep. ¶¶ 132–33.  The record reveals, however, that Defendants' system-wide capacity decisions and actions, too, were far from parallel.  This lack of parallelism is starkly demonstrated by Dr. Mangum himself, charting the annual percentage change in Defendants' capacity during the alleged conspiracy, measured by ASMs:

---

[11]   Ex. 65, at WOLFE-AIR-0003040. *See also* Ex. 40, Keay Tr. 393:6-399:18 ("76 percent of all U.S. consumer travel occurs in those top 50 airports, that's where capacity growth was really high. . . . So headline numbers can be misleading and the level of competition in the markets where most of the demand exists at that time, was not . . . in line with the headline capacity number that people had sort of become accustomed to seeing."); Ex. 64, at AA-CAPMDL-0000008922  ("[I]t's not fair for an airline to say its capacity growth is below GDP when *system* capacity is but region-specific capacity isn't, as we're seeing").



Figure 30. Annual Percent Change in Defendants' Domestic ASMs, 2007-2018

Source: OAG Schedules Analyser.

*Id.* Fig. 30; SOF ¶ 226.  The differences in Defendants' domestic system-wide capacity-related

conduct after 2009 are glaring.  As Prof. Mangum shows:

- In 2010, Delta grew its ASMs by over 2%—more than twice as fast as Southwest and while American and United were both still cutting capacity.

- In 2011, Southwest grew more than 4%, while Delta cut its ASMs and United, in the process of planning to integrate with Continental, shrunk by more than 1%.

- In 2012, American's ASMs were flat while United reduced its ASMs by nearly 4%.

- In 2013, all Defendants but United increased their domestic ASMs. American increased its ASMs by nearly 3%, nearly three times faster than Southwest.

- In 2014, Delta grew well above 2%, American and Southwest grew less than half as fast (around 1% and 0.5%), and United's ASMs declined.

Ex. 1, Mangum Rep. Fig. 30[12]; *see* Ex. 13, Carlton Rep. ¶ 45 & Fig. 7; 59; Ex. 12, Israel Reb.

Rep. Fig. 4 (comparing growth to GDP); SOF ¶¶ 226–228.  Overall, United (in green) repeatedly

---

[12]  Notably, to arrive at these numbers, Dr. Mangum invented a definition of "domestic" that the Defendants did not actually use.  He maintains the geographic scope of the cartel was limited to the 48 contiguous United States, claiming he saw "market references by . . . the

contracted while others expanded, at rates that differed greatly from year to year and Defendant to Defendant.  Ex. 1, Mangum Rep. Fig. 30; Ex. 13, Carlton Rep. ¶ 43 & Fig. 6 (United *reduced* its domestic ASMs by 6% between 2009 and 2015; Delta and American *grew* by 7.0% and 7.7%; and Southwest grew by 13.1%, nearly *twice* as fast as Delta and American); SOF ¶¶ 226–28.

In *Moundridge*, this District considered similar evidence of a lack of parallel conduct among supposed conspirators.  There, as here, the plaintiffs alleged a conspiracy to limit output—there, natural gas production—in order to artificially raise prices.  But the record actually showed that some defendants decreased production, while others increased.  The court thus noted:

> Evidence that ConocoPhillips and Shell increased their production levels in a given year while Exxon Mobil and BP America's production levels decreased suggests no conspiracy occurred.  It would be contrary to Exxon Mobil and BP America's economic interests to participate in a conspiracy where one conspirator could increase production and market share at the expense of other co-conspirators.

*Moundridge*, 2009 WL 5385975, at *7 (citing *Williamson Oil*, 346 F.3d at 1321).  The D.C. Circuit affirmed the district court's grant of summary judgment, noting that "we seriously doubt the record is sufficient to establish parallel conduct."  *City of Moundridge, KS v. Exxon Mobil Corp.*, 409 F. App'x 362, 363–64 (D.C. Cir. 2011).

---

defendants" describing this as "an area of operations of the commerce," Ex. 3, Mangum Tr. 13:18–15:11, but he did not cite any such documents, *see* Ex. 1, Mangum Rep. ¶ 4.  United, however, counts all 50 states, D.C., and Canada as its "domestic" network and in its public guidance.  SOF ¶ 4.  If Dr. Mangum had calculated growth using the Parties' own definitions of domestic capacity, Delta's capacity increases would have been substantially higher than Dr. Mangum reported and above GDP growth in 2013-2015.  *See* Ex. 14, Carlton Reb. Rep. ¶¶ 14  n.40, 29 n.58, 31 n.62.

### 3.   Alleged Conspirators Grew Domestic Capacity Above GDP in Half of the Years at Issue, With No Punishment.

It is clear from this disparate conduct that Plaintiffs cannot point to any "agreed-upon range" of capacity conduct that Defendants committed or adhered to.  And Plaintiffs and their expert economist have conceded as much, failing to identify any such range in their verified interrogatory response defining the agreement after discovery and denying the existence of such a range when deposed.  *See* Ex. 18, at 1–2; Ex. 3, Mangum Tr. 110:5–16 ("Q. So by 2010 their agreement is not to grow more than GDP growth rate; is that right? . . . [A.] I don't think that was the agreement.  I think the agreement was about capacity discipline.").  The closest Plaintiffs have come to articulating an "agreed upon range" of capacity growth is to treat GDP not as a limit but as a "focal point" and "test for whether or not an airline was adhering to the alleged agreement."  Ex. 1, Mangum Rep. ¶¶ 145, 151.

Defendants' documents and deposition testimony set forth the compelling reasons GDP projections provided useful guidance regarding future demand for air travel, which Plaintiffs' expert acknowledges is "pro-cyclical," *i.e.*, "moving in the same direction as the business cycle." Ex. 1, Mangum Rep. ¶ 53; SOF ¶ 76.  GDP growth is thus a relevant metric for any firm planning to grow its output in line with demand.  *See* SOF ¶ 76; Ex. 3, Mangum Tr. 96:2–14 ("I believe [GDP is] a good measure of the overall demand in the country.").  On the other hand, Defendants' diverging real-world capacity levels—and aggressive use of capacity expansions to take each other's business—show plainly why a commitment to aggregate growth to GDP or less would provide no assurance to co-conspirators seeking a forbearance of competitive behavior.

But even accepting Prof. Mangum's reference to GDP as a "test," the reality belies it.  At several junctures during this supposed cartel, multiple Defendants grew at rates *greater* than GDP, sometimes substantially greater:  Southwest grew more than 4% in 2011 (more than twice

26

as fast as GDP growth of 1.6%).  American grew 3% in 2013 (GDP: 1.8%).  And in early 2015, while supposedly still conspiring, Southwest planned to grow at 7% that year and 6% the next (again more than double expected GDP of 2.6–3.0% and 2.5–3.0%, respectively).   SOF ¶¶ 228–29; Ex. 13, Carlton Rep. ¶¶ 45; Ex. 1, Mangum Rep. Fig. 30; Ex. 12, Israel Reb. Rep. Fig. 4; Ex. 11, Israel Rep. ¶ 182 & Fig. 23; Ex. 183, at 6; Ex. 185, at 6; Ex. 335, at 41.  And if Alaska and Hawaii are not peculiarly excluded from "domestic" capacity as Plaintiffs now advocate, then Delta's growth between 2013 and 2015 also significantly exceeded expected GDP.  *See supra* note 12.  Thus, alleged conspirators' behavior failed the "test" of adherence to the agreement half the time Plaintiffs claim it was in effect.

Yet Plaintiffs point to no disciplinary actions actually taken against these apparent breaches of the supposed agreement beyond "criticizing" them and "expressing displeasure." Ex. 1, Mangum Rep. ¶ 259; *see*, *e.g.*, *Kleen Prods. LLC v. Ga.-Pacific LLC*, 910 F.3d 927, 937 (7th Cir. 2018) (Wood, C.J.) (recognizing that "[i]f this was a cartel, it would have tried to impose disciplinary measures on the 'cheaters' who did not go along with the price increases" but "that type of evidence [was] conspicuously absent").  Plaintiffs' expert opines the cartel was successfully enforced entirely through "communications, whether it be directly, whether it be indirectly," Ex. 3, Mangum Tr. 119:23–121:13, and other "signal[s] to get . . . attention," *id.*, 218:20–219:15 (explaining effect of fare discounts known as "cross-market initiatives").  The reason, he explains, is that over the entire period of alleged agreement no punishment was ever necessary because none of the airlines ever violated the agreement, even when they grew capacity at more than twice the supposed benchmark rate.  *Id.*, 122:4–11 ("[P]unishment needs to follow if there was a perceived violation.  And I don't see there being perceived violations.").  He goes so far as to claim it is "irrelevant" whether growing more than twice the agreed

benchmark rate violated the agreement to exercise capacity discipline, because it remained in each carrier's interest to keep exercising capacity discipline even if rivals regularly did not. *Id.,* 126:20–127:16.

In other words, now that the evidence shows not only nakedly unparallel conduct but that alleged conspirators routinely flouted the alleged cartel benchmark with impunity, Plaintiffs take the extreme position that even an agreed-upon range of conduct is unnecessary to prove a cartel. This position is contrary to the case law. *See Beef Indus.*, 907 F.2d at 514; *Baby Food*, 166 F.3d at 132; *Moundridge*, 2009 WL 5385975, at *4. And it is the ultimate economically implausible theory of conspiracy: Why have such an agreement at all? If any conspirator can deviate so dramatically from the alleged benchmark without consequence, why wouldn't every conspirator have done so—unless they had independent reasons not to? And how would a court distinguish an illicit conspiracy from lawful—and divergent—independent reactions to rivals' conduct? Plaintiffs have no answer, but there is a simple explanation: Defendants weren't conspiring. Each airline had its own independent reasons for how it grew—sometimes above, sometimes at, and sometimes below GDP.

Plaintiffs cannot demonstrate even the threshold requirement of consciously parallel conduct by Defendants, precluding any inference of an unlawful agreement between them.

## B. United's Communications With Its Owners and Investors Cannot Create a Plausible Inference of Collusion.

United—like every other public company—needs capital to survive. Attracting capital from stockholders thus is quintessentially unilateral behavior.

For years before the supposed conspiracy began, many investors had refused to buy United's stock because they believed United's overcapacity had forced it into bankruptcy. When United emerged from bankruptcy in 2006, potential investors and investment analysts repeatedly

interrogated United about whether it would again grow its capacity beyond demand for its product.  United responded to those inquiries, disclosing its plans and belief that disciplined capacity management would enhance its profitability, stabilize earnings, and attract their investment.  And when it did so, federal securities law required it to do so publicly.

Lacking direct evidence of agreement and conceding there were no "clandestine meetings," ECF 354 at 13:5–16, Plaintiffs instead attack essentially every one of these necessarily public disclosures as an illegal "signal" to competitors, Ex. 18, at 1–2 & App'xs. I & II.  Plaintiffs would have the Court ignore indisputable evidence that these statements were vital to potential investors' decisions to buy or not buy United's stock—and in turn United's independent reasons for making them.  The courts have dealt with allegations that attempt to subordinate securities law principles and policies in this way.  And they have rejected them where, as here, the disclosures were sought by investors and critical to a company's ability to do business.  Such disclosures do not tend to exclude the possibility of United's unilateral action.

### 1.    Plaintiffs' Evidence of United's Alleged "Signaling" Regarding Capacity Through Public Disclosures to Investors Does Not Tend to Exclude the Possibility It Was Acting Independently.

Public statements that supposedly constitute "signaling" are circumstantial evidence like any other, to which the same *Matsushita* "tends to exclude" standard applies.  *See, e.g.*, *Valspar Corp. v. E.I. du Pont de Nemours & Co.*, 152 F. Supp. 3d 234, 248–49 (D. Del. 2016) ("In short, nothing about these announcements tends to exclude the possibility of independent action."), *aff'd*, 873 F.3d 184 (3d Cir. 2017).

Public statements with legitimate non-collusive purposes are at most ambiguous evidence from which conspiracy cannot be inferred unless the plaintiffs' evidence tends to exclude those legitimate purposes as the explanation for the statements.  *See, e.g.*, *Res. Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 54 (7th Cir. 1992); *Holiday Wholesale Grocery Co. v.*

*Philip Morris, Inc.*, 231 F. Supp. 2d 1253, 1276–77 (N.D. Ga. 2002), *aff'd*, 346 F.3d 1287; *In re Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 445–48 (9th Cir. 1990).  "[C]ourts have refused to construe corporate communications as invitations to collude where the communications contain 'the type of information companies legitimately convey to their shareholders[.]'"  *In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1372 (N.D. Ga. 2017) (quoting *Holiday Wholesale*, 231 F. Supp. 2d at 1276), *aff'd*, 714 F. App'x 986 (11th Cir. 2018).

To allow a conspiracy to be inferred from legitimate public disclosures would "significantly deter [the] important legitimate conduct" of corporations communicating effectively and transparently with their owners and investors and potentially "create a significant irrational dislocation in the market."  *See Petroleum Prods.*, 906 F.2d at 440, 448.  Only where "there was essentially no purpose for publicly announcing" the information at issue have courts permitted claims of a conspiracy reached or furthered through public signals to proceed past summary judgment.  *See id.* at 446, 448; *accord Holiday Wholesale*, 231 F. Supp. 2d at 1276 ("In sum, the court finds Plaintiffs' theory of signaling among [defendants] to be based on . . . ominous readings of typical industry reporting on strategy. To reach the inferences suggested would require the jury to engage in speculation and does not tend to exclude the possibility that Defendants acted independently."); *Delta/Airtran*, 245 F. Supp. 3d at 1372.

In *Petroleum Products*, for example, the Ninth Circuit explained that the posting of "unusually detailed [information], listing [dealer prices] and dealer discounts for each individual price zone[,]" which would reveal any discounting from a collusive price, "served little purpose *other* than to facilitate" collusion.  906 F.2d at 448–50 (emphasis added).  Defendants in that case claimed "that the posting was done '[f]or the customer's benefit, to inform the customer

what the applicable prices were.'"  *Id.* at 449.  But the record showed their customers had already

been "individually notified" about those discounts prior to their posting.  *Id.* at 448.

This case is completely opposite.  United did <u>not</u> provide "detailed" information about

prices or particular routes or market-specific capacity forecasts (i.e., the kind of specific

information of interest to competitors).  United instead provided macro-level capacity

information of great relevance to investors deciding whether or not to buy or sell United stock.

*See* SOF ¶¶ 96–98, 102–104, 115, 117-18, 215; Ex. 23, Kirby Tr. 117:19–119:6 ("The Wall

Street analysts will spend an awful lot of time focused on macro capacity.  That's really not how

an airline works.").  Plaintiffs' own disclosure expert himself concludes "[i]n sum," that United's

disclosures are "consistent with . . . providing investors with more information about [its]

business prospects."  Ex. 4, Pritchard Rep. ¶ 15.  This conclusion necessarily means the

statements do nothing to exclude independence as the reason for United's actions and as a matter

of law are not "plus factor" evidence of any underlying agreement.  *See*, *e.g.*, *Valspar*, 152 F.

Supp. 3d at 248–49; *Williamson Oil*, 346 F.3d at 1306; *Wallace v. Bank of Bartlett*, 55 F.3d

1166, 1168–69 (6th Cir. 1995).

### 2.  United's Public Disclosures to Investors Were Made in Its Unilateral Self-Interest.

United's disclosures to investors about its capacity decisions were made in its rational,

unilateral self-interest, for legitimate—and compelling—business reasons.  This distinguishes

this case from those few "signaling" cases that have survived summary judgment, where

defendants have been unable to offer such justifications.  *E.g.*, *Petroleum Prods.*, 906 F.2d at

446–48.  Those disclosures thus cannot satisfy Plaintiffs' burden to offer evidence that tends to

exclude the possibility of independent action.

It is beyond dispute that public companies—particularly capital-intensive businesses like airlines that need to reinvest in aircraft and airport facilities—benefit when investors choose to invest in their stocks.  SOF ¶¶ 92–93, 165–66; *see* Ex. 3, Mangum Tr. 224:11–225:5; Ex. 8, Miller Rep. ¶¶ 17, 31; *see generally* Ex. 8, Miller Rep. Section IV.  Relative to costly debt, "[e]quity is the far superior fuel of growth."  SOF ¶¶ 93 & n.168, 165. Equity investment and high stock prices provide a firm cheaper additional capital and reduce its effective cost of capital. *See* SOF ¶¶ 92–93; Ex. 43, Davis Tr. 220:4–21; Ex. 8, Miller Rep. ¶ 47.  Efficient access to such capital is "how we grow the airline; it's how we invest in our people, which is how we invest in the product."  Ex. 23, Kirby Tr. 135:6–23; SOF ¶ 93.  When it went bankrupt, in contrast, United called "the capital markets' loss of confidence in United" its "biggest financial setback since September 11."  Ex. 331, at 25.  But after years of work to improve investor confidence, "our cost of capital went down [from 8 to 9 percent] to 4 to 5 percent.  Saving 5 percent on [$]40 billion of airplanes is $2 billion a year."  Ex. 23, Kirby Tr. 135:6–16.

After a wave of bankruptcies among U.S. passenger airlines following September 11, 2001—including United's in 2002–2006—investors were intently focused on airline capacity plans and decision-making, and analysts communicated to airlines that those plans were "of extreme importance" to investors.  Ex. 1, Mangum Rep. ¶ 238 (quoting analyst Hunter Keay); SOF ¶¶ 59–60, 96–98, 102–04.   Investors and industry analysts had concluded that "█████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████.  Ex. 45, Moulis Tr. 215:15–216:3 (explaining why he monitored airline supply decisions); Ex. 42, Baker Tr. 367:6–17 (a "████████████████

████████" was that the airline industry "████████████████████████

███████████████████████████████████"); SOF ¶¶ 37–38, 96, 117.[13]

Not surprisingly then, capacity—an airline's own capacity actions and plans and the industry's as a whole—was a constant subject of analyst questions to United from well before the alleged conspiracy began in 2009.  SOF ¶¶ 117–18.  United executives were asked about capacity on every earnings call after United emerged from bankruptcy in early 2006.  *Id.*[14]   And United's capacity-related statements were often made in *direct response* to those questions.  *Id.* (38% of United's supposedly conspiratorial public disclosures to investors identified by Plaintiffs, and 39% of Continental's, were made in direct response to questions posed by analysts about capacity).  *See Delta/Airtran*, 245 F. Supp. 3d at 1372–74 (granting summary judgment on claims defendants used earnings call statements to reach an unlawful agreement because statement at issue "concerned a topic that was of interest" and was in response to question from investment analyst who repeatedly asked similar questions).

The uncontradicted record shows that analysts asked these questions of United because actual and potential *investors* in United cared intensely about its capacity.  *E.g.*, Ex. 40, Keay Tr. 346:23–348:6 (it "would be rare" for there to be an airline earnings call without "at least one question [] asked about capacity" because analysts and investors were "extremely interested" in the topic); SOF ¶¶ 96–98, 102, 117–18.  Multiple industry sell-side analysts issued regular

---

[13]   *See also* Ex. 44, Pfennigwerth Tr. 165:3-2-–18 ("[H]ow do you ask investors to care, never mind invest in, in an industry that has all the history of bankruptcies and labor strife and oil price spikes[?] . . . And so I think our view at the time was matching supply and demand which any business would hope to do is an important variable in investor confidence.").

[14]   *See also* Ex. 10, Huber Rep. App'x 14 (describing analyst capacity-related questions on United earnings calls for Q1, Q2, Q3, and Q4 of 2008); *id.* ¶ 83 ("Of the 32 United earnings calls during the Relevant Period, at least one question relating to capacity was asked in 32, or 100%, of the earnings calls."); Ex. 8, Miller Rep. ¶¶ 91, 121.

reports on the domestic airlines' capacity actions, reflecting their client-investors' deeply-held concerns. *See* SOF ¶ 117; Ex. 40, Keay Tr. 204:22–206:8 (discussing Wolfe's "Competitive Capacity Monitor" report); Ex. 44, Pfennigwerth Tr. 133:9–137: 1 (describing his "Eye on Supply" report).

The unrebutted testimony of Defendants' SEC disclosure and investor relations experts, John Huber and Prof. Gregory Miller respectively, is that when executives of public companies know a particular issue is of concern to potential investors and analysts, they will also likely address it in their *prepared* remarks. SOF ¶ 119; Ex. 8, Miller Rep. ¶¶ 90–91, 121; Ex. 10, Huber Rep. ¶¶ 102, 114; Ex. 29, Ireland Tr. 55:3–17 ("[W]hat your owners consider to be priorities . . . help us in crafting our communication plan, knowing what [shareholders a]re interested to hear and not to hear."); *see also* Ex. 7, Pritchard Tr. 104:10–114:2, 114:19–115:4 (explaining investors may develop a standard for voluntary disclosure, and evidence of "pervasive" analyst questioning may suggest such a standard for particular information has developed).

Silence in the face of critical investor concerns, in contrast, would be clearly contrary to a company's unilateral interest: depriving investors of information they needed "to make efficient market decisions." *Petroleum Prods.*, 906 F.2d at 448 n.14; *see Wallace*, 55 F.3d at 1169; SOF ¶¶ 105, 125; Ex. 46, Kern Tr. 283:2–17 (explaining that, if he was not provided insight into an airline's capacity planning, "[i]t would make me far less likely to invest in the airlines because we value the ability to forecast what is likely to happen . . . with a company that we could potentially invest in."); Ex. 44, Pfennigwerth Tr. 181:19–182:10 (testifying that it is important in assessing whether to recommend investment in a stock that he have an understanding of how the company assesses the risks it faces). For United, refusal to address those investor concerns

would have made investors "far less likely to invest" in United, Ex. 46, Kern Tr. 283:2–17, and "reduce the value they assign[ed]" to United as the company that "opt[ed] for silence," Ex. 6, S. Choi & A. Pritchard, SECURITIES REGULATION 23–24 (5th ed. 2019) ('PRITCHARD TEXTBOOK'); Ex. 7, Pritchard Tr. 100:14–102:19; SOF ¶ 105.[15]

And exercising "capacity discipline" was a central plank of United's post-bankruptcy strategy to achieve sustainable profitability, one it developed and implemented years before the supposed conspiracy.  SOF ¶¶ 67–72, 80–81.  *Of course* it was a principal topic of United's communications with potential investors.  *See id.* ¶¶ 113–14.  Addressing the risk of overcapacity, widely viewed by investors as a fundamental cause of the industry's poor cyclical performance, *id.* ¶ 37, was especially important as United sought to attract a "whole different type of investor" in order to improve its post-bankruptcy financial health.  Ex. 22, Tilton Tr. 65:12–66:8; SOF ¶ 90.  Unlike the destabilizing hedge fund investors that traded United stock before its bankruptcy—and whose volatility had increased United's effective cost of capital—the investors that United targeted had long-term investment horizons that could support United's recovery.  SOF ¶¶ 90–93.

In so doing, United was competing for investor capital against other airlines.  *Id.* ¶ 120.  When airlines expanded capacity in ways the market judged to be undisciplined, investors sold off those airlines' stock and stock prices dropped.  *Id.* ¶ 103.  When United exercised greater discipline than its peers, analysts reported that it was "the best-positioned legacy carrier" and "the best airline stock to own in an overweight sector." *Id.* (quoting Ex. 87, at EVR_AIRLINE_MDL_00030142; Ex. 102, at UAL-001845741).  The capital markets' clear

---

[15]   *See also* Ex. 8, Miller Rep. ¶ 92 ("If one firm begins to disclose information that is helpful for understanding expected performance, such as expected capacity plans, investors are likely to request it from other firms as well").

response to airlines' capacity actions and disclosures plainly demonstrates United's clear incentive not only to exercise caution regarding its capacity plans, but to explain that strategy to its investors.  *See Holiday Wholesale*, 231 F. Supp. 2d at 1301 (evidence that price increase announcement "was met with great favor by investors and stock analysts" refutes argument that the price increase was contrary to self-interest.).

As Prof. Pritchard recognizes, long-term investors base their decisions on expectations about a company's *future* performance, and thus expect robust forward-looking disclosures about its core strategies and views of its prospects before they are likely to invest.  *See* Ex. 6, PRITCHARD TEXTBOOK 16 ("Most investors . . . make investments in order to receive even more money in the future."); SOF ¶ 105; Ex. 7, Pritchard Tr. 80:7–19.  As Dr. Miller explains in unrebutted testimony, robust voluntary disclosure from a public company about its strategy and plans reduces information asymmetry between management and investors assessing its future, thereby facilitating a liquid market for its stock and increasing its valuation, and in turn, lowering its cost to acquire capital.  Ex. 8, Miller Rep. ¶¶ 17, 22, 31, 45, 47.  *See generally id.* ¶¶ 20–66. *See also* Ex. 7, Pritchard Tr. 71:17–72:18, 90:7–12, 92:25–96:11.  And this increased transparency with investors is not merely in a company's individual economic interest; as United's executives recognized, SOF ¶ 110, it is also encouraged by federal securities law.[16]

---

[16]   *See, e.g.*, *Harris v. Ivax Corp.*, 998 F. Supp. 1449, 1452 (S.D. Fla. 1998) (Congress enacted safe harbor for forward-looking statements in Private Securities Litigation Reform Act of 1995 "in reaction to the fear that liability exposure was chilling issuers from providing information about the strength and future of their business"), *aff'd*, 182 F.3d 799, 806 (11th Cir. 1999) ("Congress enacted the safe-harbor provision in order to loosen the 'muzzling effect' of potential liability for forward-looking statements, which often kept investors in the dark about what management foresaw for the company") (quoting H. Conf. Rep. No. 104-369 (Nov. 28, 1995) at 42).

To attract investors, United had a clear unilateral incentive to discuss its capacity strategy with investors. "[T]he burden of proof was very squarely on" recently bankrupt airlines to show "their profit margins were more sustainable," Ex. 40, Keay Tr. 345:25–346:22; SOF ¶ 94, and "█████████████████████████████████████████████████████████████," Ex. 59, at WOLFE-AIR-0001609.00002; SOF ¶ 96.  As Prof. Pritchard has acknowledged, Defendants' capacity-related disclosures were "consistent with . . . providing investors with more information about their business prospects." Ex. 4, Pritchard Rep. ¶ 15; Ex. 7, Pritchard Tr. 54:10–55:4 ("[W]ere they trying to communicate to industry analysts? Yes, seems to me. It's consistent with an effort to communicate that intention to analysts as well."), 59:25–60:23.   And he acknowledges that the volume of those disclosures—their "ubiquity," which Plaintiffs seek to impugn—is "consistent with th[e] conclusion" that "airline investors find that information important in their valuation of the firms."  Ex. 7, Pritchard Tr. 216:21–217:11; *see* SOF ¶¶ 125, 105.  Public companies across industries face similar incentives to voluntarily disclose information sought by investors,[17] and use the same disclosure methods.  SOF ¶¶ 107–09, 126. And as Dr. Miller demonstrates, those in capital-intensive industries make long-term, forward-looking disclosures to investors about capacity similar to those made by United.[18]

But a company like United that wants to provide information about its strategy and prospects to potential long-term investors may not do so secretly or selectively with only

---

[17]   *See* Ex. 6, PRITCHARD TEXTBOOK 23–24 ("Companies . . . have an incentive to provide their firm-specific, inside information voluntarily to the marketplace . . . . [I]f the managers can make a credible disclosure of their company's true value to investors, then the . . . company will receive substantially more for its securities.").

[18]   Ex. 8, Miller Rep. ¶¶ 125–186 (describing robust capacity-related disclosures among public companies in other industries, including rental cars, cruise lines, trucking, hotels, oil and gas, ocean shipping, casinos, offshore drilling, equipment rentals, automobile manufacturing, semiconductor packaging, chemical manufacturing, oil well services, industrial gas manufacturing, and waste management); *see also* SOF ¶ 126.

particular investors. Instead, to prevent insider trading, federal securities law requires companies to disclose such information simultaneously to the entire public. Beginning in 2000, the SEC's Regulation FD, for "Fair Disclosure," mandates that when the issuer of a security (like United) discloses any material information about its planning to any investor or analysts, it must disclose that information publicly, such as through earnings releases and accompanying conference calls. Regulation FD, 17 C.F.R. § 243.100(a); "Selective Disclosure and Insider Trading," U.S. SEC. & EXCHANGE COMM'N, 65 Fed. Reg. 51716 (Aug. 24, 2000) (announcing adoption of Regulation FD); Ex. 4, Pritchard Rep. ¶ 14 ("Regulation FD . . . requires . . . broad, non-exclusionary distribution of the information to the public."). United thus could not communicate capacity information with the investors it sought to reach while also keeping that information from the eyes and ears of the general public, including competing airlines. SOF ¶ 111.

United's unilateral incentives to communicate with potential investors about its capacity plans are clear: Investors would not invest in United if it didn't. Yet Plaintiffs cast those disclosures as conspiratorial "signals" to the other Defendants. The United disclosures that Plaintiffs challenge fall into two categories: (1) United's forward-looking guidance about its own capacity plans, and (2) its observations about the industry and risks posed by its competitors' capacity decisions. *See* Ex. 18. Both categories are fully consistent with unilateral conduct.

***United's forward-looking guidance about its own capacity.*** United provided forward-looking guidance on its capacity plans to the investing public in various forums, including earnings calls, investor conferences, and meetings with investors and analysts. SOF ¶ 107. United provided this guidance, including numeric projections for its quarterly and annual aggregate capacity growth, at least as far back as *1999*—ten years before the alleged conspiracy supposedly began in 2009. *Id.* ¶ 115. Likewise, starting at United's exit from bankruptcy in

*2006*, United's executives used the term "capacity discipline" or similar language to describe "prudent capacity planning [that] is critical to get a long-term revenue model . . . that deals with these shocks as an expected consequence of our business as opposed to the exception," *id.* ¶¶ 70, 79, 114; Ex. 144, at 18—the kinds of unpredictable changes in demand that Plaintiffs' expert recognizes have historically plagued the industry, *see* Ex. 1, Mangum Rep. ¶¶ 11, 120, 127. These disclosures are just "the type of information companies legitimately convey to their shareholders," particularly when capacity was such a focus of investors' attention. *Delta/AirTran*, 245 F. Supp. 3d at 1372–73.  *See Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 836 (N.D. Ill. 2017), *aff'd,* 910 F.3d 927 (7th Cir. 2018).

> ***United's observations about industry capacity and competitor actions.***  United also communicated with investors about the competitive context in which it operated, including the implications of other airlines' capacity moves to its own performance.  Plaintiffs themselves label the air transport market a "tight oligopoly" during the relevant period.  Compl. ¶¶ 2, 34. The "distinctive characteristic" of such a market is "recognized interdependence," *Williamson Oil*, 346 F.3d at 1299, meaning any competitor's "price and output decisions . . . . will have a noticeable impact on the market and on its rivals," *Valspar*, 873 F.3d at 191.  *See Williamson Oil*, 346 F.3d at 1298–99.

United's value as an investment, then, plainly depends not only on its own plans but the broader landscape in which United competes.  SOF ¶¶ 95, 104, 116, 120; Ex. 7, Pritchard Tr. 160:1–17 ("I think the values of the defendant airlines depend on the plans of other airlines."); Ex. 6, Pritchard Textbook 25 (explaining of a hypothetical illustrative company that its value "depends on," *inter alia*, "the plans of its competitors to introduce competing . . . products"). Investors expect any business leader to understand and address the industry context in which her

supply decisions will play out, SOF ¶¶ 94-96, 98, 105, 120, 125–26; Ex. 44, Pfennigwerth Tr.

187:5–188:2 ("Supply and demand are basic inputs to any industry analysis, to an understanding

and a confidence of industry earnings and industry profitability.  So supply is very fundamental

to any economic analysis."), and United would have been asleep at the switch had it failed to

"take into account the anticipated reaction of the other firms" to its conduct, *Valspar*, 873 F.3d at

191.  *See also Baby Food*, 166 F.3d at 122.  Indeed, as Prof. Pritchard also admits, other airlines'

capacity actions warrant disclosure because they could pose significant risks to the success of

United's own strategies.  *See* Ex. 4, Pritchard Rep. ¶ 11 n.1 ("Capacity changes by peer firms

might be considered a relevant risk under [Item 105 of Regulation S-K].");  Ex. 7, Pritchard Tr.

257:1–14 ("If [your] peer firms [were] going to jack up their capacity [t]hat could result in your

revenues going down.").  United identified and discussed these very risks in its periodic filings

with the SEC.[19]

 But even more fundamentally, an airline does not compete for capital only against other

airlines, but against all potential investments: "[N]obody needs to invest in an airline." Ex. 44,

Pfennigwerth Tr. 185:21–186:16.  Many potential investors, free to invest in any company in any

industry, believe a company's prospects are tied to the health of the industry in which they

operate.  *See* SOF ¶¶ 94–95, 120.  And many investors had recent, painful experience with races

to expand output and capture market share that had made the entire industry unprofitable,

attributing recent airline bankruptcies—like United's bankruptcy in 2002–2006—to

---

[19] Professor Pritchard asserts that "Defendants have not included capacity projections among
their risk factors . . . . [n]or have they included discussions of capacity in their [Management
Discussion and Analysis] pursuant to Item 303 of Regulation S-K based on [his] review of
Defendants 10-Ks."  Ex. 4, Pritchard Rep. ¶ 11.  A simple review of United's 10-Ks,
however, shows both assertions are in error.  United included competitors' capacity actions
among the risk factors identified in its periodic securities reporting and capacity was
discussed in its MD&A.  *See* SOF ¶ 116.

overcapacity.  *Id.* ¶¶ 37, 94; Ex. 42, Baker Tr. 367:6–17 (a "███████████████████████"
was that the airline industry "███████████████████████████████████████
███████████████████████").  Critically, that risk to investors was ever-present
*regardless of United's individual conduct*: Based on decades of experience, prudent investors
would consider *industry* overcapacity to be a risk factor relevant to their investment decisions,
even if United itself did not expand.  *Cf.* SOF ¶ 104 (when investors perceived any airline's
capacity management to be undisciplined, stock prices fell across the industry).

United therefore faced pressure from the investors whose capital it needed to discuss both
its individual prospects and those for the industry, to which those investors saw its fate as tied.
United's opinions about whether rivals' capacity-related conduct would make the industry more
or less profitable therefore rationally addressed topics of great interest to United's potential
investors, *id.* ¶¶ 94–95, 102, 116–18, and they do not tend to exclude the possibility that United
was acting unilaterally.  *See Kleen Prods.*, 910 F.3d at 939 (statement suggesting "the industry
should 'say "no" on deals' that, though competitive, are not profitable . . . is hardly an
earthshattering insight" and does not tend to exclude independence); *Williamson Oil*, 346 F.3d at
1307–08 (public statement expressing "'no wish to escalate [the price war]'" but "'read[iness] to
respond'" does not suggest conspiracy because it "simply recognizes th[e] economic fact" that
price reductions would have reduced speaker's revenues without increasing market share).  On
the contrary, Plaintiffs' list of public statements addressing these issues—frequently in response
to specific questions from analysts about capacity (*see* SOF ¶ 118; App'x 1)—simply compiles
"typical industry reporting on strategy."  *Williamson Oil*, 346 F.3d at 1305; *see also*
*Delta/Airtran*, 245 F. Supp. 3d at 1372–73.

41

And critically, contrary to Plaintiffs' *allegations*, United's capacity disclosures did not reflect a sudden "departure from prior practice" in 2009 suggestive of conspiracy beginning at that time. *See Domestic Airline Travel*, 221 F. Supp. 3d at 61–63.  United provided regular numeric guidance on its capacity plans back to at least 1999, described its strategy as "capacity discipline" coming out of bankruptcy in 2006, and offered public observations about the industry context for United's capacity decisions at the same time.  *See* SOF at ¶¶ 79, 81, 113–16, 118. *See also id.* ¶ 121 (for Continental).  Such communications during the years Plaintiffs concede there was no conspiracy prove they were in United's unilateral self-interest.  Plaintiffs can't just reinvent history here, and misrepresent that established features of United's securities disclosures were "unique" to Plaintiffs' alleged conspiracy period.  *See* Ex. 3, Mangum Tr. 254:16–25.  Such a "continuation of a historic pattern . . . does not plausibly allow one to infer the existence of a cartel." *Kleen Prods.*, 910 F.3d at 937 (citing *Valspar*, 873 F.3d at 196 and *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 410 (3d Cir. 2015)).

Finally, Plaintiffs assert that, in addition to Defendants' public disclosures, Defendants used private interactions with airline industry stock analysts and institutional investors to make conspiratorial communications with each other.  Specifically, Plaintiffs assert that forty-seven non-party individuals at twenty-seven different investment or research firms communicated with the airlines "pursuant to the non-Defendant's role as a conduit of a conspiracy between Defendants."  Ex. 16, at 12–23; Ex. 15, Resp. to Interrog. 9 (7/23/2018), at 10–13; Ex. 17, Suppl. Resp. to Interrog. 37 (6/24/2019), at 7–10.

But Plaintiffs can point to no evidence that these individuals did anything other than seek or obtain from United information ordinarily sought by investors.  In other words, they were just doing their jobs.  *See* SOF ¶¶ 106, 109; Ex. 7, Pritchard Tr. 100:6–13 ("[A]nalysts work for

investors essentially."); Ex. 21, Compton Tr. 43:23–44:6.  Like a host of public companies across a broad range of industries, United's investor relations personnel and executives communicated about its public disclosures by phone, email, and in investor conferences or meetings with airline stock analysts and institutional investors, who value such interactions as part of an effort to compile a "mosaic" of information about a public company.  SOF ¶¶ 107–09. There is no evidence in the record that United ever violated Regulation FD by disclosing material non-public information, or passed to or received from another Defendant any confidential information via an investor or analyst. *See id.* ¶ 112 (compiling testimony of every investor and analyst deposed in this case denying passing any confidential information to or from United and another airline).  Plaintiffs' "conduit" assertions, like their "signaling" theory, fail to sustain their effort to spin a conspiracy tale from United's unilaterally-driven communications with potential investors.

### C.   United Did Not Act Against Its Unilateral Self-Interest by Exercising Capacity Discipline.

A firm's conduct can be a "plus factor" relevant to a conspiracy claim where the conduct was contrary to the firm's independent self-interest.  *See*, *e.g.*, *Kreuzer v. Am. Acad. of Periodontology*, 735 F.2d 1479, 1487–88 (D.C. Cir. 1984) (surveying D.C. Circuit precedent). But, actions as consistent with the pursuit of self-interest in the absence of agreement cannot support an inference of conspiracy.   *See Matsushita*, 475 U.S. at 587 (citing *First Nat'l Bank v. Cities. Serv. Co.*, 391 U.S. 253, 280 (1968) (inference that refusal to deal was "product of factors other than conspiracy [is] at least equal to the inference it was due to conspiracy")).

Courts "must exercise prudence in labeling a given action as being contrary to the actor's economic interests, lest we be too quick to second-guess well-intentioned business judgments of all kinds." *Williamson Oil*, 346 F.3d at 1310.  "Accordingly, [Plaintiffs] must show more than

that a particular action did not ultimately work to a [Defendant's] financial advantage," but rather "the action must tend[] to exclude the possibility of independent action," which it fails to do if "a benign explanation for the action is equally or more plausible than a collusive explanation." *Id.* (internal quotations omitted).

 Plaintiffs are forced to take an extreme position in their theory that United was acting against its unilateral self-interest as it pursued cautious growth.  They ignore United's history of near-financial ruin as its struggled through bankruptcy; ignore the Great Recession and its devastating impact on customer demand; ignore the unprecedented spike in fuel costs in 2008, which caused huge losses for United; ignore the slow recovery of the global economy during 2010–2012; and ignore United's efforts to grow capacity thereafter.  These undisputed realities make it impossible for Plaintiffs to carry their burden of presenting evidence that tends to exclude the possibility of United's independent conduct.

> **1.      United Did Not Act Against Its Unilateral Self-Interest by Continuing to Manage Its Capacity Carefully During and After the Great Recession.**

Plaintiffs claim that, as soon as the Great Recession bottomed out and fuel prices dropped below their record high, any rational airline would have "b[ought] new planes, use[d] every one of their airport slots, and tr[ied] to wrest market share from each other" by rapidly expanding output.  ECF 116, Pls. Opp. to Mot. to Dismiss (6/27/2016) at 35.  Plaintiffs' expert asserts that even though it is undisputed that this very behavior had for decades led to regular cycles of overcapacity and financial peril, *see* Ex. 1, Mangum Rep. ¶¶ 11, 50; Ex. 3, Mangum Tr. 33:4–34:24, not only was repeating that unprofitable cycle economically rational, every individual airline is actually "helpless" to do anything else—and it is irrational to try, Ex. 3, Mangum Tr. 40:5–43:25.  In other words, he concludes flatly that every airline is doomed to perpetual

unprofitability because it is impossible for any airline individually not to overinvest in capacity unless it forms a cartel. *See id.* 84:19–86:22.

But Plaintiffs' argument ignores United's consistent business objectives and real-world experience dating to its bankruptcy, conveniently carves the Great Recession itself out of their conspiracy period, and ultimately misrepresents or ignores the real-world factors that made another boom-and-bust expansion cycle imprudent for United to pursue.

### a.    Plaintiffs' Alleged Conspiracy Period Makes No Sense.

Plaintiffs contended after discovery closed that the alleged conspiracy began "no later than early 2009." Ex. 16, Resp. to Interrog. 30 (4/29/2019), at 25. They committed that their "experts [would] address this in more detail in their reports." *Id.* But Dr. Mangum did not do that. Instead he pointed back to Plaintiffs, stating only that he "under[stood] that Plaintiffs allege that the conspiracy became effective in 2009" and pegging his analysis of the "Misconduct Period" to January of that year. Ex. 1, Mangum Rep. ¶ 4. Ex. 3, Mangum Tr. 29:15–30:21.

Dr. Mangum admits, however, that capacity is "slow to adjust to cost and demand shocks," Ex. 1, Mangum Rep. ¶ 29, and that even typical capacity reductions take a year to materialize, *see id.* ¶ 316. SOF ¶¶ 40–41. Capacity levels in at least 2009–2010 were therefore determined in 2008–2009, at the height of the jet fuel crisis and Great Recession. United and Continental in particular decided to reduce capacity in June and July 2008, respectively—before Plaintiffs' theorized conspiracy—with United planning its drawdown to take 18 months. *See* SOF ¶ 41; Ex. 84, at UAL-009441637–641; Ex. 321, UAL-001702655–675.[20]   Given these

---

[20]   United's decision to cut capacity was contemporaneous almost to the month with (i) peak jet fuel prices and (ii) the GAO's report that the industry's "cost characteristics can lead to considerable excess capacity in the face of declining demand," making it "susceptible to rapid swings in its financial health." SOF ¶¶ 133, 151; Ex. 327, at 8–9.

obvious (and conceded) non-conspiratorial reasons to cut capacity, Plaintiffs can point to no basis to reasonably infer a capacity conspiracy began in 2009.

Plaintiffs have misrepresented the timing of United's conduct, as United's core strategy of capacity management in this period was no different from its strategy in 2006: "running an enterprise that is stable and strives to earn an economic profit . . . through the business cycle," Ex. 79, at UAL-004190885, to which capacity discipline was essential, SOF ¶¶ 67–70, 130, 164 169 & n.309, 171.  United had begun exercising greater discipline in managing its capacity not in 2009 as Plaintiffs contend, but "coming out of bankruptcy" in 2006.  SOF ¶¶ 64–87, 114; Ex. 22, Tilton Tr., 40:16–19; Ex. 24, Mikells Tr., 136:2–137:3.  Internal documents from 2007 stressed that United viewed "capacity discipline" as key to its future success, SOF ¶ 80; Ex. 83, at UAL-008451598–599; Ex. 261, UAL-000738105 (native file) at 3–5, and it openly viewed such discipline as the means to "deal[] with these shocks as an expected consequence of our business as opposed to the exception," SOF ¶¶ 69–74, 81; Ex. 144, at 18.

Well before the alleged conspiracy, United had adopted greater capacity discipline as a way to outperform its rivals.  SOF ¶ 80; Ex. 83, at UAL-08451595 ("Capacity Discipline Provides Opportunity To Outperform Industry," showing benefits of growing less than rest of industry).  United's contemporaneous documents set out a strategy to "[l]e[a]d [t]he [i]ndustry [i]n [c]apacity [d]iscipline," which it defined as growing capacity substantially less than other airlines.  SOF ¶ 128; Ex. 309, at UAL-009441711 (showing United had grown capacity up to 6.6% less than industry).  In particular, United believed that slower growth and more active management of aircraft deployment would give it higher per-unit revenue than its peers.  SOF ¶ 80; Ex. 83, at UAL-08451636 ("Relative capacity change vs. industry[:] Low capacity growth

vs. peers creates revenue premium" and "Industry leading performance"), UAL-08451637

("Capacity Discipline Creates A Premium To Projected Industry PRASM Growth").

This focus on improving unit revenue rather than pursuing every last marginal revenue

opportunity was essential to United's plan to achieve sustainable profitability, because "marginal

costs don't stay marginal and marginal revenues not only often stay that way, but can actually be

destructive to core revenue performance."  SOF ¶¶ 81–83; Ex. 144, at 8.  As United management

reported to its Board in 2008, "We know by experience that adding that last seat under a belief

that we can do so at lower marginal costs will in fact destroy the entire revenue structure as we

chase that last low fare passenger to fill it."  SOF ¶ 82; Ex. 309, at UAL-009441710 (speaker's

notes).  Because of this, to "deploy[] capacity based on a slavish belief in marginal economics"

all but guarantees severe losses when conditions change.  SOF ¶ 82; Ex. 144, at 8; *see* Ex. 76, at

UAL-001808824 ("Fuel volatility . . . can sink a traditionally low margin model . . . . It will force

design of business models that have sufficient economic headroom to absorb this burden . . .

throughout the cycle.").

United's experience implementing this strategy refutes Plaintiffs' insistence that it is

business suicide for any airline to grow less than its peers; to exit marginally profitable markets

in favor of more profitable ones; or to fail to carry every last passenger.  United's executives

explicitly *knew* that some of their rivals were "up-gauging"—increasing the capacity of—their

domestic flights, but United remained "pleased with the results" and planned to "continue down

this path" of shifting its highest-capacity aircraft to more profitable international routes.  SOF ¶

86; Ex. 144, at 12.  Even on routes with incursions by low cost carriers, United found that a

strategy of "circumspect" capacity management rather than "fighting the battle between the

titans" still produced unit revenue improvement.  SOF ¶ 85; Ex. 144, at 12–13.  On the occasions

United grew while other airlines contracted, far from the windfall Dr. Mangum's theory predicts, United saw its revenue "underperform our peers."  SOF ¶ 87; Ex. 142, at 1, 5–6.

Plaintiffs' theory ignores United's unilateral reasons to adopt a strategy of capacity discipline well before 2008.  And it ignores that the events of 2008—the pivotal year Plaintiffs conveniently cut out of the conspiracy period—are exactly what vindicated that strategy.  *See* Ex. 345, at 1–2 (2010–2015 CEO Jeff Smisek explaining the recession had demonstrated "the importance of capacity discipline" to ensure survival in economic downturn); SOF ¶ 164.

### b.   United's and Continental's Retrenchments in 2008–2009 Were Rationally Self-Interested.

In 2008, United and Continental each began drastic capacity cuts to respond to record high fuel prices and the Great Recession.  *See* SOF ¶¶ 146–55.  These cuts were plainly economically rational:  First, jet fuel prices steadily increased to a record high in July of 2008, imposing increased costs more than double United's operating *earnings* during good times and making flights representing 80% of Continental's revenue lose money.  *Id.* ¶¶ 132–35, 154; Ex. 80, at UAL-001048375; Ex. 11, Israel Rep. ¶ 18.[21]  Second, the worst macroeconomic collapse since the Great Depression sharply reduced air transport demand, *see* SOF ¶¶ 138, 140–41; Ex. 1, Mangum Rep. ¶ 127; Ex. 346, at 1, "especially among [the] business and international travelers" United's network depended on to be profitable.  SOF ¶¶ 141–42.  Continental lost $586 million in 2008.  *Id.* ¶ 154.  United lost $5.3 *billion*.  *Id.* ¶ 153.  In June 2008, Continental decided "significant reductions in flying and staffing [were] necessary" to survive, *id.* ¶ 155, and in July 2008, United calculated that a plan to "right-size the business" through six quarters of

---

[21]   Even ignoring costs such as aircraft ownership that are avoidable only in the medium term, Dr. Mangum concedes that flights on routes representing 6.4% of Continental's revenue could not even cover their variable costs.  *See* Ex. 2, Mangum Reb. Rep. ¶ 84 & n.121.

capacity cuts would contribute $316 million in operating earnings through the end of 2009 and $525 million from the sale of aircraft.  Ex. 84, at UAL-009441637–644; SOF ¶¶ 151–52.

When costs rise and demand falls, to reduce output is fully "consistent with [a defendant's] independent economic self-interest."  *Res. Supply Corp.*, 971 F.2d at 52, 55 ("strategy of raising prices and decreasing capacity" in the face of increasing costs and slack demand was consistent with defendants' self-interest).  It is also basic microeconomics.  *See* SOF ¶ 149 & n.252; Ex. 146, at 7 (United CFO Jake Brace: "This isn't rocket science, this is econ 101.").  A rational firm cuts operations that unrecoverable cost increases have rendered unprofitable.  *See* P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 1410a (4th ed. 2020) ('AREEDA') ("[A]ll the sellers in a competitive market may reduce their output in response to a general fuel price increase . . . . [E]ach is responding to its own higher costs.").  A rational firm does not maintain operations when declining demand makes it likely to lose money. *See* Ex. 11, Israel Rep. ¶ 19.  *Not* to withdraw from such operations, and to continue sustaining losses instead would have been contrary to self-interest.  *See*, *e.g.*, *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 513 F. Supp. 1100, 1287 n.321 (E.D. Pa. 1981) ("MIC sold its MGA division, serving its own self-interest, instead of acting contrary to that interest by continuing to sustain losses.").

United's contraction might have risked losing market share, but it restored profitability (as did Continental's).  That is a net win for a rational firm that cares not about its sales volume but "its total revenues relative to its total costs."  *See In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 877 (7th Cir. 2015) (Posner, J.).  On that point, United did the math, calculating that any revenue loss from its capacity cuts would be "more than offset by step-change cost recovery in 2009."  SOF ¶¶ 151–52; Ex. 84, at UAL-009441639.  Dr. Mangum concedes these points,

agreeing that firms behaving unilaterally would reduce capacity in these conditions, and even that the factors United analyzed in making its decision were precisely those a firm acting unilaterally would consider.  Ex. 3, Mangum Tr. 69:11–76:20.  With the Great Recession having decimated demand for its product, retrenchment was the *less* hazardous course.

**c.    United's Continued Exercise of Capacity Discipline During 2010–2013 Was Rationally Self-Interested.**

Just as in 2006, United's continued focus on long-term stability remained a rational approach to profit-maximization after 2009 even if not expanding more rapidly sacrificed marginal revenues in the short-term.  *See In re Citric Acid Litig.*, 191 F.3d 1090, 1101 (9th Cir. 1999) ("Cargill has explained why it did not expand even more rapidly: it was concerned that an excessively rapid expansion in citric acid supply would undermine prices and wanted to avoid precipitating a costly price war as it had done when it first entered the citric acid market (incurring substantial losses as a result)."); *Kleen Prods.*, 276 F. Supp. 3d at 828 ("[E]ven in the absence of an illicit agreement, Defendants may choose not to chase after every business opportunity.").  *See* P. Areeda & H. Hovenkamp, FUNDAMENTALS OF ANTITRUST LAW § 14.10[E] at 14-78 (4th ed., 2021-1 Supp.) ("One must not characterize a firm's sacrifice of short-run interest in favor of long-run interest as contrary to its self-interest.").

Caution was particularly appropriate in the circumstances.  What Plaintiffs characterize as "multiple years of economic growth," Ex. 1, Mangum Rep. ¶ 307, was the slowest macroeconomic recovery since the Second World War, during which businesses across the country forbore from capital investments, and fears of a potentially-imminent double-dip recession prevailed as late as the third quarter of 2012, SOF ¶¶ 160–63.  What Plaintiffs characterize as jet fuel prices that have "never since reached the 2008 peak," Compl. ¶ 74, in fact rose in 2011 through "levels not seen since 2008," reaching their highest sustained levels ever in

50

2012, SOF ¶¶ 143–44; Ex. 161, at 7; Ex. 11, Israel Rep. Fig. 15.  United's greater reliance than its competitors on business passengers left it particularly exposed to a weak recovery and second recession, and it was the most vulnerable of legacy carriers to fuel price increases.  SOF ¶¶ 142, 145.

Like analysts throughout the industry and economy as a whole, *see id.* ¶¶ 160–63, United and Continental executives rationally regarded these conditions as "tepid," "volatile," and "uncertain," Ex. 21, Compton Tr. 178:13–179:5; SOF ¶¶ 158–59, 164.  And United, which was bankrupt just four years earlier, once again faced liquidity pressures and desperately needed to *reduce* its debt burden, not increase it by expanding its fleet.  *See* SOF ¶¶ 165–66.  United's and Continental's executives each rationally concluded that in this environment, "one thing you didn't want to guess was guess wrong on overcapacity."  Ex. 20, Smisek Tr. 43:20–44:11; SOF ¶ 171.  As Plaintiffs' expert himself puts it, if an airline buys expensive aircraft that are delivered months or years later when conditions have changed, it "might have pre-committed to something that later ended up not being a good idea."  Ex. 3, Mangum Tr. 213:18–214:12.  United thus set modest net capacity growth goals throughout the tepid recovery, guided by GDP expectations but erring on the side of stability rather than overcapacity.  *See* SOF ¶¶ 158, 171–73.

United's cautious growth rationally targeted the most profitable options.  *See id.* ¶¶ 77–79, 218; Ex. 3, Mangum Tr. 137:3–139:11 (admitting airlines rationally allocate their scarce resources to maximize profitability in the absence of a cartel).  Plaintiffs arrive at the conclusion that United did not grow to seize profitable opportunities during the period only by ignoring specifically the most profitable markets available to United:  international travel.  It is undisputed that since before the alleged conspiracy, United's internal analyses generally found prioritizing international opportunities more profitable than domestic ones, and that international growth has

long been at the core of United's business model. SOF ¶ 78.  It is likewise undisputed that United planned to grow its international capacity, partly by reallocating domestic assets, but in such magnitude that United planned its *net* capacity to increase in every year but 2013.  *Id.* ¶ 172 & n.315.  Dr. Mangum failed to investigate any of this before labeling it cartel behavior.  Ex. 3, Mangum Tr. 165:21–166:16.

United's plans for cautious growth, however, encountered serious obstacles.  It merged with Continental in 2010 to build a cost structure and network that could compete with the merged Delta-Northwest.  SOF ¶¶ 167–70.  But the troubled transition to Continental's Passenger Service System in March 2012 (*see id.* ¶¶ 175–82); the FAA rules issued in July 2013 that a created a regional pilot shortage disproportionately affecting United (*see id.* ¶¶ 183–96); the restrictions and labor disputes preventing pilots and crew from flying newly integrated equipment (*see id.* ¶¶ 197–98); the inadequacy of the Continental maintenance plan to keep United's aging fleet in the air (*see id.* ¶¶ 201–09); and the grounding in parts of 2013 of entire aircraft types on which United heavily relied (*see id.* ¶¶ 199–200), each produced the same effect: United could not fly as much as it had planned while maintaining its desired quality of service.  S*ee id.* ¶¶ 172–74, 210–11.

Because it could not reliably meet its planned service commitments, revising those commitments downward "ma[de] economic sense."  *N. Penn Oil & Tire Co. v. Phillips Petroleum Co.*, 358 F. Supp. 908, 923 (E.D. Pa. 1973) (when oil crisis left it unable to supply gasoline to all its customers, "[f]ar from being contradictory to Phillips' self-interests, the withdrawal [from supplying the plaintiff's market] makes economic sense.").  United "had to . . . reduce [its] capacity to a level that [it] could operate reliably and on time" to compete effectively for customers.  Ex. 25, Leo Tr. 97:1–99:22; SOF ¶ 172 & n.316.  In economic terms,

United sacrificed output to assure quality, an especially rational choice for a firm highly reliant on corporate customer loyalty towards its premium services.  *See* Ex. 11, Israel Rep. ¶¶ 28, 47 ("United lost some of its most-valuable customers as a result of its operational issues.").

### d.   United's Efforts to Grow Starting in 2014 Further Demonstrate Its Independent Behavior.

When United's operational problems had been largely resolved in 2014 and it "could actually go back to actually thinking about growth," Ex. 25, Leo Tr. 97:1–99:22; SOF ¶ 234, leaders of United's network department retained the Boston Consulting Group to develop an optimum growth strategy, known as "Project R$^2$." *See* SOF ¶¶ 235–36.  United's executives were well aware that rivals such as Delta and American had for years been growing substantially at United's expense while it had shrunk to manage operational problems.  *See id.* ¶¶ 222–23, 235. BCG's analysis pointed to some of the particular ways rivals had grown that were more efficient and less exposed to competitive pressures, which United then set out to emulate.  *Id.* ¶¶ 237–51. *See*, *e.g.*, Ex. 269, at UAL-001308977 ("[S]eat growth will exceed ASM growth, driving toward R-squared goals.").

But management turmoil further delayed United from executing its growth plan.  CEO Jeff Smisek was dismissed weeks before he was to present the plan to United's Board in September 2015.  SOF ¶ 252.   His replacement, Oscar Munoz, reviewed the growth plan in his first week on the job but rationally deferred endorsing the new strategy before the Board until he had time to digest it. *Id.* ¶¶ 253–54.  Before he had the chance, Munoz suffered a heart attack and underwent a heart transplant.  *Id.* ¶ 255. This turmoil left United effectively rudderless until March 2016, and ultimately delayed United's adoption of a robust growth plan until mid-2016. *See id.*; Ex. 40, Keay Tr. 366:18–367:3.

### 2. United Did Not Act Against Its Unilateral Self-Interest by Prioritizing Profitability Over Market Share.

Plaintiffs next claim that Defendants acted "[i]nconsistent[ly] with [their] [i]ndependent [s]elf [i]nterest" by prioritizing margin and profitability rather than growing market share. *See* Ex. 1, Mangum Rep. ¶¶ 271–276; Ex. 2, Mangum Reb. Rep. ¶¶ 14, 108 n.164; *see also* Compl. ¶¶ 89–91. This argument has two fundamental flaws. First, as discussed extensively above, United had plenty of unilateral reason—and the economic scars to prove it—to prioritize profitability. Its efforts a decade earlier to grow market share without regard to profitability had plunged it into bankruptcy and cost it precious access to capital markets and stockholder interest. And so a focus on profitability—and an associated cautious approach to cutting prices and gaining share—was obvious. Plaintiffs just ignore this.

Second, Plaintiffs instead offer a flawed economic theory that United actually had no choice in the matter: It was compelled to grow capacity to chase after market share, regardless of how much money it lost doing so, because absent a conspiracy other airlines would take share from it. The problem with that theory is that in the context of an oligopoly, as Plaintiffs assert the U.S. airline industry to be, its premise is wrong as a matter of well-established law. *E.g.*, *Valspar*, 873 F. 3d at 191 (describing "'oligopolistic rationality'" under which a "firm is unlikely to lower its price in an effort to win market share because its competitors will quickly learn of that reduction and match it, causing the first mover's profits to decline and a subsequent decline in the overall profits of the industry"); *Williamson Oil*, 346 F.3d at 1307, 1311–15; *Chocolate*, 801 F.3d at 400–401; *Kleen Prods.*, 910 F.3d at 931. Thus, far from being against self-interest, seeking to avoid provoking unprofitable market share battles can be a valid business justification for not expanding or discounting in pursuit of market share gain. *See Baby Food*, 166 F.3d at 127; *Citric Acid*, 191 F.3d at 1101; *Williamson Oil*, 346 F.3d at 1307; *Valspar*, 873 F.3d at 199–

200.  Plaintiffs' own expert agrees.  Ex. 7, Pritchard Tr. 152:9–14 (admitting that "a firm in an oligopolistic market may not seek to gain market share for reasons other than an unlawful conspiracy").

Plaintiffs describe the domestic airline industry as a "tight oligopoly," Compl. ¶ 34, one their expert economist, Dr. Mangum, notes became "much *more* concentrated" immediately before and during the alleged conspiracy, Ex. 1, Mangum Rep. ¶¶ 15, 61–64 (emphasis added). To be clear, an oligopoly is not a Sherman Act violation; it is a set of market characteristics, and the law imposes no punishment for participating in such a market. *E.g.*, *Williamson Oil*, 346 F.3d at 1317.  Indeed, the U.S. Department of Justice approved the mergers that produced the U.S. airline marketplace.  And oligopolistic markets present distinct issues in applying the *Matsushita* standard, because such markets produce incentives that make parallel behavior likely without any agreement.  *See*, *e.g.*, *Valspar*, 873 F.3d at 191; *Kleen Prods.*, 910 F.3d at 931.

Indeed, Judge Posner has used the airline industry as a paradigmatic example of markets where parallel behavior occurs without agreement:

> Think of what happens in the airline industry . . . . Suppose one airline thinks of and implements a method for raising its profit margin [when fuel prices rise] . . . . The airline's competitors will monitor carefully the effects of the airline's response to the higher fuel prices afflicting the industry and may well decide to copy the response should the responder's response turn out to have increased its profits.

*Text Messaging*, 782 F.3d at 875.  "[T]he distinctive characteristic of oligopoly is recognized interdependence among the leading firms: the profit-maximizing choice of price and output for one depends on the choices made by others." *Williamson Oil*, 346 F.3d at 1299.  This interdependence means "[c]ompetitors in concentrated markets watch each other like hawks" to react to one another's actions, whether they result in lower prices or not. *Text Messaging*, 782 F.3d at 875.  This, in turn, makes rivals likely to detect and match any initiatives to cut price or

expand output, preventing market share gains for the first mover while reducing profits, and giving firms little incentive to take such actions.  *See*, *e.g.*, *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 484 (1st Cir. 1988) (Breyer, J.); *Valspar*, 873 F.3d at 191; *Williamson Oil*, 346 F.3d at 1299.  For the same reason, rivals often follow actions like price increases because each "might think that it will reap greater profits if it imitates, rather than undermines, its peers' price hikes."  *Kleen Prods.*, 910 F.3d at 935–36.  *See*, *e.g.*, *Chocolate*, 801 F.3d at 397, 401; *Clamp-All*, 851 F.2d at 484 ("One does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry.").

The result of this process can be a competitive standoff known as "oligopolistic price coordination" or "conscious parallelism," which the Supreme Court has defined as "the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993).  Such decision-making is termed "interdependent" as a matter of economics, but it remains independent under antitrust law because there is no agreement between competitors.  *See Twombly*, 550 U.S. at 553–54 (distinguishing interdependent parallelism from the agreement necessary for § 1 liability).  Indeed, this dynamic may be inevitable in many markets, and a court cannot order competitors in them—or in any market—not to account for each other's actions or force firms to try harder to take market share.  *See Clamp-All,* 851 F.2d at 484; *Text Messaging*, 782 F.3d at 873–74.

Thus, even on facts where the *outcome* of conscious parallelism is "nearly indistinguishable from horizontal price fixing," *Valspar*, 873 F.3d at 191, it is a plaintiff's burden

under *Matsushita* to produce evidence tending to exclude conscious parallelism as the explanation for the defendants' behavior, *see, e.g.*, *Williamson Oil*, 346 F.3d at 1302; *Kleen Prods.*, 910 F.3d at 934; *Valspar*, 873 F.3d at 195; *White v. R.M. Packer Co.*, 635 F.3d 571, 577 (1st Cir. 2011).  Courts therefore now roundly recognize that, in an oligopoly context, a plaintiff's case cannot withstand summary judgment where it remains consistent with oligopolistic interdependence or otherwise "neglects the theory of conscious parallelism." *Valspar*, 873 F.3d at 195.  *See Kleen Prods.*, 910 F.3d at 934 (requiring evidence "that would rule out the hypothesis that defendants were engaged in self-interested but lawful oligopolistic behavior").

It follows that what might serve as a plus factor in a perfectly competitive market may "be a necessary fact of life" in an oligopoly, *Valspar*, 873 F.3d at 193; *see Petroleum Prods.*, 906 F.2d at 443, and is not sufficient to withstand summary judgment unless the evidence goes further by tending to *exclude interdependence* as the cause, *see, e.g.*, *Kleen Prods.*, 910 F.3d at 934–35; *Chocolate*, 801 F.3d at 399–401("[A]lthough there is some evidence that the Chocolate Manufacturers acted inconsistently with a competitive market, the evidence does not go beyond interdependence.").

The antitrust laws do not oblige firms to permanently resign themselves to the boom-and-bust mentality Plaintiffs demand to avoid the inference of conspiracy.  *See, e.g.*, *Baby Food*, 166 F.3d at 127 (Heinz' decision not to expend substantial capital and resources to invest in new markets was "consistent with permissible, rational competitive conduct.").  "[E]ven in the absence of an illicit agreement, Defendants may choose not to chase after every business opportunity." *Kleen Prods.*, 276 F. Supp. 3d at 828.  *See also* FUNDAMENTALS OF ANTITRUST LAW § 14.10[E] at 14-78 ("One must not characterize a firm's sacrifice of short-run interest in

favor of long-run interest as contrary to its self-interest.").  United's behavior in this respect was not contrary to its self-interest if it could rationally conclude that the risks of expanding rapidly outweighed any short-term market share gains.  *See Valspar*, 873 F.3d at 195 (conduct does not suggest conspiracy unless "no reasonable firm would have engaged in it" absent agreement.). Having recently gone bankrupt by doing so and having survived the Great Recession only by not, United clearly could have reached this conclusion.  Thus, Plaintiffs' claim that United generally chose not to place big airplane orders or otherwise grow faster as the economy emerged slowly from the Great Recession cannot tend to exclude the possibility of United's independent conduct.

Finally, Plaintiffs' assertions that the industry's concentrated *structure* renders it "[s]usceptible" or "conducive to collusion," *e.g.*, Ex. 1, Mangum Rep. ¶¶ 58–70.; Compl. ¶ 33, once again merely identify the U.S. airline industry as an oligopoly in which interdependent decision-making is "a necessary fact of life," *Baby Food*, 166 F.3d at 122.  *See Williamson Oil*, 346 F.3d at 1317.  "These characteristics make it easier for companies either to form a cartel *or* to follow the leader independently . . . . Because of the competing inferences that can be drawn from this market structure," such "evidence d[oes] not tend to exclude the possibility of independent action."  *Kleen Prods.*, 910 F.3d at 935 (emphasis in original).  Neither does "[c]onspiratorial motivation in the sense of a reasonable prospect of increasing profits through collective action," which "is a logical corollary of interdependence . . . . and therefore adds nothing to it."  AREEDA ¶ 1434c1.  *Accord Chocolate*, 801 F.3d at 398 (such motive "without more . . .  merely restates interdependence.").

Accordingly, evidence that the Defendants monitored and reacted to one another's capacity does nothing to tend to exclude lawful, independent responses to one another's actions in a transparent market.  *See Text Messaging*, 782 F.3d at 879; *Chocolate*, 801 F.3d at 409 ("In

sum, gathering the price information of competitors can be just as consistent with lawful interdependence as with a price-fixing conspiracy."). Likewise, Plaintiffs' assertion that conspirators *could* use the marketplace's transparency to monitor a conspiracy provides no evidence this occurred. *See Wallace*, 55 F.3d at 1169; *Valspar*, 873 F.3d at 198. Essentially all airlines publish their currently-scheduled flights via the Official Airline Guide ('OAG') and their currently-available fares through the Airline Tariff Publishing Company ('ATPCO'). *See* SOF ¶¶ 17–19, 21–22; ECF 116 at 38; Ex. 1, Mangum Rep. ¶¶ 249–53; Ex. 7, Pritchard Tr. 130:1–23. Such information has been provided to the marketplace for decades before the alleged conspiracy and is indisputably valuable to and sought by airline customers seeking to buy airlines' services. SOF ¶¶ 17–19, 21–22. It thus cannot create a reasonable inference of collusion. *See Petroleum Prods.*, 906 F.2d at 448 n.14; *Wallace*, 55 F.3d at 1169.

### D. Plaintiffs' "Plus Factors" Are Equally Consistent with Independent Action Because They Are True of Other Airlines Not Accused of Conspiring.

Almost by definition, conduct pursued by non-conspirators, thus in the absence of any alleged conspiracy, must be at least "as consistent with permissible competition as with illegal conspiracy." *Matsushita*, 475 U.S. at 588. Absent a material distinction, then, the fact that United also engaged in such conduct cannot "'tend[] to exclude the possibility' that the alleged conspirators acted independently." *Id.*

Here, a number of other airlines that Plaintiffs have effectively conceded did not conspire nonetheless engaged in the conduct Plaintiffs hold out as plus factors. Non-Defendant U.S. airlines cut their capacity in 2009 *at a greater rate than Defendants*, but Plaintiffs do not claim this was against their self-interest. SOF ¶ 156; Ex. 1, Mangum Rep. Fig. 46; Ex. 13, Carlton Rep. ¶ 37. Non-Defendant airlines such as JetBlue and Alaska regularly touted their "capacity discipline" to investors and discussed the industry context: "We're certainly trying to do our part,

to be disciplined about everything we do and we're encouraged that the industry will be so as well and we'll have a long period of profitability in the industry."  SOF ¶¶ 122–23; Ex. 10, Huber Rep. App'x 7, at 140 (quoting Alaska Airlines CEO on 3Q 2010 Earnings Call).  But Plaintiffs do not cast such statements as signals of agreement.  Non-defendant airlines regularly disclosed numerical capacity guidance, both before and during the alleged conspiracy period. S*ee* SOF ¶ 122.   A number of non-Defendants provided their schedules to OAG, which in turn made its "industry standard" information public to all subscribers.  *Id.* ¶ 19.  A number of non-Defendants posted their fares using ATPCO, which likewise made the information public to any subscriber.  *See id.* ¶ 22.  Plaintiffs can dispute none of this.

These other domestic airlines' presumptively self-interested pursuit of this conduct refutes any suggestion that United's conduct is less consistent with independence than agreement.  *See Kleen Prods.*, 910 F.3d at 936 (price increases led by non-defendants suggests free leading-and-following rather than coordination of approximately parallel conduct); *Apex Oil Co. v. Dimauro*, 641 F. Supp. 1246, 1264 (S.D.N.Y. 1986) (finding the same conduct by non-defendants refutes "departure" from "custom or practice" from which to infer conspiracy); *In re Potash Antitrust Litig.*, 954 F. Supp. 1334, 1377–78 (D. Minn. 1996) ("Given the fact that more non-Defendants provided production information than did the Defendants," instance of limited information exchange was "insufficient to favor an inference of conspiracy."), *aff'd*, 203 F.3d 1028 (8th Cir. 2000).  Plaintiffs' insinuation that what essentially all airlines do to compete *could* facilitate a cartel falls far short of Plaintiffs' burden.  *See Valspar*, 873 F.3d at 198; *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1037 (8th Cir. 2000).

## CONCLUSION

For these reasons, United respectfully submits that summary judgment should be granted.

December 16, 2020                              Respectfully submitted,
(as corrected, December 22, 2020)

                                              */s/ David M. Schnorrenberg*
                                              Kent A. Gardiner (D.D.C. No. 432081)
                                              Cheryl A. Falvey (D.D.C. No. 414277)
                                              David M. Schnorrenberg (D.D.C. No. 458774)
                                              Luke van Houwelingen (D.D.C. No. 989950)
                                              CROWELL & MORING LLP
                                              1001 Pennsylvania Avenue, N.W.
                                              Washington, D.C. 20004
                                              Telephone: (202) 624-2578
                                              Facsimile: (202) 628-5116
                                              kgardiner@crowell.com
                                              cfalvey@crowell.com
                                              dschnorrenberg@crowell.com
                                              lvanhouwelingen@crowell.com

                                              *Counsel for United Airlines, Inc.*