**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE DOMESTIC AIRLINE TRAVEL ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>ALL CASES | MDL Docket No. 2656<br>Misc. No. 15-1404 (CKK)<br>Redacted Public Version |

**MEMORANDUM OPINION**

(September 5, 2023)

Defendants Delta Air Lines, Inc. ("Delta") and United Airlines, Inc. ("United") (together, the "Moving Defendants") move for summary judgment in this multidistrict class action civil lawsuit, which is based on allegations of antitrust violations by Moving Defendants as well as Defendants American Airlines, Inc. ("American") and Southwest Airlines Co. ("Southwest") (together, the "Settling Defendants").[1] *See* Order granting Motion for Settlement with Southwest and American,

---

[1] In connection with this Opinion, the Court has considered the following documents: (1) Delta's Motion for Summary Judgment, which includes the Memorandum of Points and Authorities ("Delta Mot."), ECF No. 464, and exhibits accompanying the Motion (explained in the Michael Mitchell Declaration), ECF No. 466; (2) Delta's Corrected Statement of Undisputed Material Facts ("Delta SUMF"), ECF No. 496-1; (3) United's Corrected Motion for Summary Judgment, ("United Mot."), ECF No. 495-1, the Corrected Memorandum of Points and Authorities in support thereof ("United Mem"), ECF No. 495-2, and exhibits accompanying the Motion (explained in the Corrected Chalana Damron Declaration), ECF No. 495-4; (4) United's Corrected Statement of Undisputed Material Facts ("United SUMF"), ECF No. 495-3; (5) Defendants' Joint Notice of Supplemental Authority ("Supp. Auth."), ECF No. 525; (6) Plaintiffs' Corrected Omnibus Opposition ("Pls.' Opp'n"), ECF No. 552-1, and exhibits accompanying the Opposition (explained in the Corrected Adam Zapala Declaration), ECF No. 552-5; (7) Plaintiffs' Corrected Counterstatement of Facts in Opposition ("Pls.' CSMF"), ECF No. 552-2; (8) Plaintiffs' Corrected Responses to Delta's SUMF (Pls.' Resp. to Delta SUMF"), ECF No. 552-3; (9) Plaintiffs' Corrected Responses to United's SUMF ("Pls.' Resp. to United SUMF"), ECF No. 552-4; (10) Delta's Reply in support of Motion ("Delta Reply"), ECF No. 551, and exhibits accompanying the Reply (explained in the Second Mitchell Declaration), ECF No. 551-1; (11) United's Reply in support of Motion ("United Reply"), ECF No. 549, and exhibits accompanying the Reply (explained in the David Schnoorenberg Declaration), ECF No. 549-2; (12) Reply of Delta and United to Plaintiffs' Counterstatement of Facts ("Defs.' Reply to CSMF"), ECF No. 550; (13)

ECF No. 373 (entered after this Court held a fairness hearing on March 22, 2019). More specifically, Plaintiffs allege that between January 2009 and mid-2015, Defendants conspired in violation of Section 1 of the Sherman Act by agreeing to limit industry capacity growth on domestic flights (referred to throughout this Opinion as "capacity discipline") for the purpose of increasing airfares.[2]

The class action lawsuits filed against Defendants were triggered by reports around July 1, 2015, that the United States Department of Justice ("DOJ") was investigating possible collusion among the airlines to limit "capacity." *See* Delta Mot., ECF No. 464, at 14 (citing DX 1, James B. Stewart, "'*Discipline for Airlines, Pain for Fliers,*'" New York Times (6/11/2015) at 2).[3] Subsequently, it was reported that the DOJ decided not to take any action against the airlines because it had not "found evidence that merits an antitrust case against the airline industry for collusion

---

Plaintiffs' Notice of Errata, ECF No. 552; (14) Defendants' Response to Plaintiffs' Notice of Errata ("Defs.' Errata Resp."), ECF No. 570; and the entire record in this case. Defendants' Response to Plaintiffs' Notice of Errata indicates that "Plaintiffs' Notice makes scores of changes to their . . . Opposition and related filings [such as Pls.' Counterstatement of Facts] . . . [and] [t]he Notice was filed more than three weeks after Defendants timely filed their Replies to that Opposition [.]" Defs.' Errata Resp., ECF No. 570, at 1. In lieu of Defendants revising their timely-filed responses to correspond to Plaintiffs' late-noticed corrections, Defendants provide this Court with red-lined versions of Plaintiffs' corrected documents, attached as ECF No. 570, Exhibits 1-4.

The Court notes that Defendant United filed its [549-1] Statement of Facts in Reply to Plaintiffs' [552-4] Responses to United's Statement of Undisputed Material Facts, but that statement of facts in reply is not being considered by the Court, as there is no provision for a reply to a response to a statement of material facts. *See* LCvR 7(h); *see also* Scheduling and Procedures Order, ECF No. 459.

[2] Section 1 of the Sherman Act provides that "[e]very contract, combination . . . or conspiracy, in restraint of trade . . . is declared to be illegal." 15 U.S.C. § 1. Delta notes that Plaintiffs also allege a claim under Section 3 of the Sherman Act, which extends Section 1 to the United States territories and the District of Columbia. Delta Mot., ECF No. 464, at 14-15 n.3.

[3] Sealed complete versions of the motions have been filed, as well as redacted public versions. The Court references the sealed versions and refers to the page numbers assigned through the Court's Electronic Case Filing ("ECF") system. Exhibits are referenced in the same manner that the parties referenced them: DX (Delta Exhibit), UX (United Exhibit), and PX (Plaintiffs' Exhibit).

between carriers." Delta Mot., ECF No. 464, at 14 (citing DX 2, Brent Kendall & Susan Carey, "*Obama Antitrust Enforcers Won't Bring Action in Airline Probe,*" Wall Street Journal (1/11/2017)); March 22, 2019 Fairness Hearing Transcript, ECF No. 354, at 12:24-13:3 (noting that the DOJ investigation has been closed)). Nevertheless, this multidistrict ("MDL") class action civil lawsuit remains pending before the undersigned.

## I. Background

Pending before this Court are Delta's [464] Unredacted Sealed Motion for Summary Judgment and Memorandum of Points and Authorities and United's [495-1] Unredacted Sealed Corrected Motion for Summary Judgment and United's [495-2] Memorandum of Points and Authorities in Support thereof, which are opposed by the Plaintiffs in their [552-1] Sealed Corrected Omnibus Opposition.[4] For the reasons set forth in detail herein, the Moving Defendants' Motions for Summary Judgment are both DENIED. A separate Order and Executive Summary accompany this Memorandum Opinion.

### A. Procedural Background

An abbreviated procedural background of this case is included herein. On February 4, 2016, this Court issued its [76] Order Appointing Plaintiffs' Interim Class Counsel. On March 25, 2016, Plaintiffs filed their [91] Consolidated Amended Class Action Complaint, and the Court denied Defendants' Motion to Dismiss that Complaint on October 28, 2016. *See* Order, ECF No. 123; Memorandum Opinion, ECF No. 124. On February 9, 2017, pursuant to Fed. R. Civ. P. 53, the Court appointed a Special Master, primarily for the purpose of managing extensive discovery and resolving a multitude of discovery disputes. The Court granted Plaintiffs' Motion for Leave to File a Corrected

---

[4] In an exercise of its discretion, the Court finds that holding oral argument would not be of assistance in rendering its decision. *See* LCvR 7(f).

Consolidated Amended Class Action Complaint on August 31, 2017.  *See* Order, ECF No. 183; Corrected Consolidated Amended Class Action Complaint, ECF No. 184.

On January 3, 2018, the Court issued its [197] Order preliminarily approving Plaintiffs' settlement with Southwest, and on June 18, 2018, the Court issued its [249] Order preliminarily approving Plaintiffs' settlement with American.  On August 22, 2018, the Court granted Plaintiffs' Motion for Approval of the Settlement Notice Program regarding notice of settlements with Southwest and American.  *See* Order, ECF No. 267.  Plaintiffs filed their [299] Motion for Settlement Final Approval regarding both settlements on December 5, 2018.  The Court set a March 22, 2019 Fairness Hearing and issued an Order regarding the procedures to be employed at that Hearing, and the Fairness Hearing commenced and was completed on that date.

In May of 2019, this Court issued its Memorandum Opinion and Order granting the Motion for Settlement Final Approval regarding Southwest and American.  *See* Order, ECF No. 373; Memorandum Opinion, ECF No. 374.  The Court noted that the settlement funds will not be distributed until all funds available for distribution (from the Settling Defendants and the Moving Defendants) have been determined, and this will involve dissemination of a proposed distribution plan with an opportunity for the class members to object.  Because the distribution of funds will occur in the future, the cases underlying the multidistrict litigation remain pending.  The Court awarded reimbursement of litigation expenses that had been incurred to date but stayed any future litigation expenses and attorneys' fees.

Moving Defendants proceeded with discovery in this case, and on September 24, 2018, the Court approved the parties' [290] Stipulated Amended Scheduling Order regarding discovery and summary judgment.  The deadlines for dispositive motions were extended several times pursuant to the parties' requests.  *See* Scheduling Order, ECF No. 446; Amended Scheduling and Procedures Order, ECF No. 462.  Dispositive motions filed by Delta and United are fully briefed and ripe for

4

resolution by the Court.

### B. Factual Background

As previously noted, American and Southwest have entered into a settlement with the Plaintiffs, while Delta and United opted to file dispositive motions denying that the Defendants conspired to limit capacity for purposes of increasing airfares.  In presenting the facts pertinent to resolving the present motions, this Court "assume[s] that facts identified by the moving part[ies] in [their] statement[s] of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1).

In most instances the Court shall cite to Delta's [496-1] Statement of Undisputed Material Facts ("SUMF") and United's [495-3] SUMF unless Plaintiffs dispute or controvert relevant aspects of a fact proffered by Moving Defendants.[5] In such instances, the Court shall also cite to Plaintiffs' [552-3] Response to Delta's SUMF and/or Plaintiffs' [552-4] Response to United's SUMF, and/or to Plaintiffs' [552-2] Counterstatement of Material Facts ("CSMF"), with references to Moving Defendants' [550] Reply to Plaintiffs' CSMF, as needed. The Court shall also cite directly to the record, where appropriate, to provide additional information not covered by the parties' statements or counterstatements, or to provide applicable references to testimony and exhibits. Many of the following facts are material to resolution of the alleged conspiracy issue, although the Court includes some facts primarily relevant for purposes of explaining airline industry practices and terminology as well as the Defendants' businesses and interrelationships.

---

[5] In citing statements of material fact that are admitted by both sides, the Court will not reference the underlying exhibits.  In the event that Moving Defendants set forth a statement of fact, and Plaintiffs admit it in [relevant] part but disagree in part, the Court will cite to Moving Defendants' SUMFs and may also cite to Plaintiffs' Response but will not necessarily reiterate the underlying evidentiary cites.  In those circumstances, the Court may adopt Moving Defendants' statement, or a more restrictive version of Moving Defendants' statement, as admitted by Plaintiffs, depending on the evidence cited by the parties.

In considering the Statements and Counterstatement of Material Facts proffered by the parties and the responses thereto, this Court notes that LCvR 7(h)(1) provides that an opposing statement of material facts consists of a "separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include reference to the parts of the record relied on to support the statement." LCvR7(h)(1); *see also* Amended Sch. and Proc. Order, ECF No. 462, at 1-2 (noting this Court's strict adherence to LCvR 7(h)). Furthermore, this Court has found previously that "summary judgment briefing – including the affirmative and opposing statements of material facts – is designed to isolate[ ] facts that the parties assert are material, distinguish[ ] disputed from undisputed facts, and identify [ ] the pertinent parts of the record." *Johnson v. District of Columbia*, Civil Action No. 17-883, 2019 WL 3767103, at *2 (D.D.C. Aug. 9, 2019) (Kollar-Kotelly, J.) (citation and internal quotation marks omitted).

"Requiring strict compliance with the local rule is justified by the nature of summary judgment and the rule's purposes." *See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 153 (D.C. Cir. 1996) (examining a prior but materially identical version of the rule and finding the statement of genuine disputed material issues in that case to be "[r]eplete with factual allegations not material to [the] substantive claims and repeatedly blending factual assertions with legal argument"). This Court will disregard factual allegations that are not material to the substantive claims and legal argument that is contained within statements of facts or responses thereto. In the instant case, several paragraphs in Plaintiffs' responses to Moving Defendants' statements of facts contain gratuitous facts and/or improper argument. *See, e.g.,* Pls.' Resp. to Delta SUMF ¶ 27 (which launches into an argument based on what Delta's statement might "impl[y]"); Pls.' Resp. to Delta SUMF ¶ 46 (containing argument based on what Delta's statement might "impl[y]"); Pls.' Resp. to Delta SUMF ¶ 62 (admitting Delta's statement that "airlines . . . have

long provided capacity guidance — before, during, and after the alleged conspiracy period," but also providing a three page discourse on capacity discipline); Pls.' Resp. to Delta SUMF ¶ 182 (adding gratuitous information that is not responsive to Delta's statement); Pls.' Resp. to United SUMF ¶ 27 (where paragraphs 2 and 3 of the Response contain supplemental argument); Pls.' Resp. to United SUMF ¶ 109 (responding to United's statement, but then, in paragraph 2, making an argument).

Moreover, this Court notes that the Statements and Counterstatement of Material Facts provided by the parties have made this Court's job more difficult insofar as some of the "facts" asserted therein are facts mixed with opinions, which are supported by selective quotes, and then challenged in whole or in part by the opposing side's contradictory facts mixed with opinions, which are supported by other selective quotes.  By way of example,  Delta's SUMF ¶ 90 states broadly that:

> Delta recognized that the path to both sustained profitability and to gaining investor trust was to manage its capacity, costs, capital expenditures, and other aspects of its business with increased "discipline."[6]

This is followed by three pages of quotes from three persons in support of this "fact."

> Plaintiffs' response in its CSMF is a qualified denial:

> The cited materials and other evidence do not support the assertion that Delta recognized that the path to both sustained profitability and to gaining investor trust was to manage only *its* capacity, costs, and capital expenditures, and other aspects of *its* business with increased discipline; rather, Delta recognized that path required coordinated and collective *industry discipline* with respect to capacity.

This is followed by three pages of quotes from the same three persons in support of this "denial."

Furthermore, some "facts" within the Plaintiffs' CSMF fail to comply with LCvR 7(h)'s requirement that they be "concise" insofar as they consist of numerous subparts with multiple references to evidence supporting multiple facts and/or legal argument; *see, e.g.*, ¶¶ 161, 208, 211

---

[6] Following on Delta's SUMF ¶ 89, the time frame relative to this "fact" *may* be fall of 2007.

(spanning 3 and ½ pages), 221, 226, 227, 230.   By way of example, Pls.' CSMF ¶ 223 states that Defendants "used their second quarter 2006 earnings call to give shape to the agreement [to restrain capacity]," and in a 2 and ½ page discussion, they set forth 8 subparts, each discussing sources that allegedly support this conclusory "statement."  Also in a 2 and ½ page discussion, Defendants deny Plaintiffs' "statement," but they deny some subparts and admit others in whole or in part – noting often that sources cited should be viewed in a broader context.  In sum, the parties proffer varying interpretations of/rationale for statements made by airline executives [which may be construed as material facts pertaining to the alleged conspiracy], and the parties' positions indicate disagreement as to the import to be accorded to those statements.

The Court notes that even some of "facts" that do not include subparts still contain multiple facts, making it a narrative rather than a fact; *see, e.g.*,  ¶¶ 99, 174, 185, 220, and this holds true for some of Moving Defendants' "facts" as well.  Accordingly, this will also be taken into account when the Court sets out the undisputed facts herein.

Finally, some of Plaintiffs' CSMF fail to conform to LCvR 7(h) because the citations to the record therein are cross references to an entirely different portion of Plaintiffs' CSMF without explanation as to which of the paragraphs in that section and what evidence cited supports the contentions at issue.  *See, e.g.*, ¶¶ 22, 95, 194, 463.  Instead of providing "precise citations to the portions of the record on which [Plaintiffs] rely," the evidence cited by Plaintiffs is voluminous, and the Court is required to weed through it in an effort to locate supporting facts.  "Merely incorporating entire affidavits and other materials without reference to the particular facts cited therein is not sufficient."  *Robertson v. American Airlines*, 239 F. Supp. 2d 5, 8 (D.D.C. 2002). Accordingly, where the allegations in Plaintiffs' CSMF are disputed by Defendants, and Plaintiffs have not supported their allegations with precise citations, this Court will consider those allegations to be disputed.

**1. The Parties**

As of the early 2000s, the major "legacy" carriers (airlines that existed prior to the Airline Deregulation Act of 1978) in the United States domestic airline industry included defendants American, Delta, and United, as well as several other airlines. Delta SUMF ¶ 1; Pls.' Resp. to Delta SUMF ¶ 1. While airlines compete with each other – by charging fares and setting schedules – between origins and destinations, Delta SUMF ¶ 38, the airline industry is an oligopoly, and the industry became more concentrated during the alleged conspiracy period (2009-2015) as a result of the mergers between 2008 and 2013. Delta SUMF ¶¶ 23, 24. In October 2008, Delta merged with Northwest. Delta SUMF ¶ 18. United is the successor to United Air Lines, Inc., which merged with Continental Airlines, Inc. in October of 2010. United SUMF ¶ 1; Delta SUMF ¶ 19. In December 2013, American merged with US Airways. Delta SUMF ¶ 21; Pls.' Resp to Delta SUMF ¶ 21. Delta, American and United believed that consolidation would be good for the airline industry. Defs.' Reply to Pls.' CSMF ¶ 41.

Legacy carriers operate hub-and-spoke networks, which allow carriers to collect passengers at hub airports originating from spoke cities who then make connections at the hub to other spoke cities, creating origins and destinations ("O&Ds") for which service would not be otherwise practically feasible. Delta SUMF ¶¶ 2, 3; United SUMF ¶ 6; *see also* United  SUMF ¶ 5 (noting that an airline's "network consists of a system of "routes" between pairs of origins and destinations"). Legacy carriers may partner with regional carriers to service small spoke cities. Delta SUMF ¶ 6; Pls.' Resp. to Delta SUMF ¶ 6. Legacy carriers operate several types of planes. Delta SUMF ¶ 5; Pls.' Resp. to Delta SUMF ¶ 5. Acquiring aircraft expends capital and increases fixed costs, and these expenditures can create significant liquidity pressures and undermine an airline's ability to weather economic downturns. United SUMF ¶ 46; Pls.' Resp. to United SUMF ¶ 46.

Defendant Southwest began intrastate operations in Texas as a low-cost carrier ("LCC") but has since expanded into a nationwide carrier.  Delta SUMF ¶ 8; Pls.' Resp. to Delta SUMF ¶ 8; United SUMF ¶ 29 (stating that Southwest was "historically considered a low-cost carrier but has at times been perceived to blur the distinction between low-cost and network carriers); Pls.' CSMF ¶ 15 (although Southwest "operated as a low-cost carrier, flying passengers point-to-point, its model became increasingly like the network carriers with an emphasis on certain "focus cities" that functioned [ ] like hubs and its efforts to attract high-margin business travelers"); Defs.' Reply to Pls.' CSMF ¶ 15.[7]  Plaintiff's Expert Economist, Dr. Russell W. Mangum, III, opined that Southwest "became increasingly like legacy carriers Delta, United, U.S. Airways, Continental, and American with its hub-like focus cities, its expanding network, and its courtship of business travelers."  PX 1, Mangum Report ¶ 22.  The LCCs typically operate on a point-to-point basis rather than a hub-and-spoke basis.  Delta SUMF ¶ 11; Pls.' Resp. to Delta SUMF ¶ 11.  The LCCs and ultra low-cost carriers ("ULCCs") have different business models and smaller operations than legacy carriers such as Delta, American, and United.  Delta SUMF ¶ 9.

### 2. Understanding Capacity

"Capacity" is synonymous with the supply of airline seats, most commonly measured by available seat miles ("ASMs"), which is equivalent to one seat flown one mile, and capacity depends at least in part on size and composition of certain inputs such as fleet, cockpit and cabin crew, access to runways (such as through takeoff and landing "slots"), gates and other infrastructure at origin and destination airports.  Delta SUMF ¶¶ 25, 26; United SUMF ¶ 13; Pls.' Resp. to United SUMF ¶ 13; *see* United SUMF ¶ 8 (noting that one ASM is defined as one

---

[7] The Court notes that Paragraphs 28, 29, and 30 of United's SUMF are misnumbered; *i.e.*, there are 2 different sets of Paragraphs 28, 29, and 30 therein.

available seat flown one mile (occupied or not)).  In the airline industry, seat capacity is supply and directly affects price, Pls.' CSMF ¶ 87, and holding demand constant, "changes in capacity affect price" and furthermore, "an increase in capacity that exceeds demand will cause prices to fall and a reduction in capacity below demand will cause prices to rise."  Pls.' CSMF ¶ 88; Defs.' Reply to Pls.' CSMF ¶ 88.

In terms of passenger air transportation, capacity refers to the output characterized as "the sum total of all the flying you do."  United SUMF ¶ 7.  The amount of capacity purchased by customers is known as "traffic," and it is generally measured by Revenue Passenger Miles ("RPMs"), which for a given flight is calculated as the number of revenue-paying passengers carried multiplied by the average number of miles flown.  United SUMF ¶ 9; Pls.' Resp. to United SUMF ¶ 9.  The proportion of capacity purchased is known as the "load factor," and it is calculated by dividing RPMs by ASMs.  United SUMF ¶ 10.  Due to the nature of the aforementioned inputs, capacity is "sticky" or slow to adjust to cost and demand shocks.  Delta SUMF ¶ 27; PX 1, Mangum Report ¶ 29.

Passenger demand "move[s] in the same direction as the business cycle, increasing when the U.S. economy is strong and decreasing during periods of economic retrenchment," and it is tied to macroeconomic conditions including GDP [gross domestic product] growth and unemployment rates.  United SUMF ¶ 47.  Delta used GDP as a macroeconomic indicator of system-wide demand.  Delta SUMF ¶ 94; Pls.' Resp. to Delta SUMF ¶ 94.  Delta's then-President Ed Bastian testified that GDP is a "macroeconomic measure" that Delta used to predict demand, DX 21, Bastian Deposition ("Dep.") at 48:4-5, and it was "one of the measures that we would think about in terms of the overall economic growth of the market as a whole . . . "  *Id.* at 47:9-12.  The Government Accountability Office, Commercial Aviation, has noted that, "[c]apacity increases by individual airlines are frequently matched by competitors."  UX 326, GAO Report,

Commercial Aviation: Bankruptcy and Pension Problems Are Symptoms of Underlying Structural Issues (September 2005), GAO-05-945 at 15.

Delta plans its capacity 7 to 18 months in advance of departure. Delta SUMF ¶ 30. The Network Planning Department at Delta has responsibilities for planning and scheduling the airline's fleet, and it plans capacity with input from other departments such as Finance and Revenue Management, as well as from Delta's CEO and President. Delta SUMF ¶¶ 31, 32; Pls.' Resp. to Delta SUMF ¶¶ 31, 32. United's Network Department had some level of responsibility for planning United's capacity, managing its schedule, and developing a fleet plan and a Five Year business plan, in collaboration with other departments. United SUMF ¶¶15-16; Pls.' Resp. to United SUMF ¶¶ 15-16. Because United sold tickets up to 330 days in advance, the schedule published was subject to change and did not reflect contemplated changes to the network plan or schedule until those changes were made in the Official Airline Guide ("OAG"). United SUMF ¶ 18; Pls.' Resp. to United SUMF ¶ 18. Delta and other airlines publish their flight schedules about 330 days in advance of departure on their websites and in the OAG. Delta SUMF ¶ 35.

Airlines provide their projected capacity information to the investment community through means such as earnings releases, earnings calls, and investment banker conferences. Delta SUMF ¶ 42; Pls.' Resp. to Delta SUMF ¶ 42; *see* United SUMF ¶ 107; Pls.' Resp. to United SUMF ¶ 107 (United's management disclosed information about its plans and strategies to the investment community through corporate disclosures, including mandatory Securities and Exchange Commission ("SEC") filings, earnings calls, presentations at industry conferences, investor days, and direct communications with the investment community). Investors may look to industry-expert analysts for help in understanding corporate disclosures, United SUMF ¶ 106; Pls.' Resp. to United SUMF ¶ 106, and analysts regarded "capacity discipline" as important in their investment decisions. Delta SUMF ¶¶ 84, 130; Pls.' Resp. to Delta SUMF ¶¶ 84, 130.

Airlines, including non-defendant airlines, have provided capacity information [to investors and analysts] — before, during and after the alleged conspiracy period. Delta SUMF ¶ 62; Pls.' Resp. to Delta SUMF ¶ 62.[8]  Delta regularly provided capacity-related information both in response to questions posed by analysts and investors and in prepared remarks on earning calls and at investor conferences. Delta SUMF ¶ 69; United SUMF ¶ 118 ; Pls.' Resp. to United SUMF ¶ 118 (admitting that before and during the conspiracy, "United and other airlines faced . . . capacity-related questioning from analysts."). Public disclosures of future capacity plans provide investors with more information about business prospects. Delta SUMF ¶ 43; Pls.' Resp. to Delta SUMF ¶ 43. Defendants' stock prices were interdependent, in that each Defendant's stock price was affected by the actions of their competitors. Pls.' CSMF ¶ 111.  If a Defendant or any airline announced a capacity increase, it could depress the value of all airline stocks. Defs.' Reply to Pls.' CSMF ¶ 112.

### 3. Events Pre-dating the Alleged Conspiracy

In the years before the January 2009 start of the alleged conspiracy, the airline industry in the United States suffered "an extended period of financial losses in which the Defendants failed to return their cost of capital."  Delta SUMF ¶ 70; *see, e.g.*, DX 86, excerpt of a June 2014 GAO Report, "Airline Competition: The Average Number of Competitors in Markets Servicing the Majority of Passengers has Changed Little in Recent Years, but Stakeholders Voice Concerns about Competition," GAO-14-515, at AA-CID-0000171854 (discussing challenges to the airline industry, including the economic recession beginning in 2001, record fuel prices, the financial crisis and the recession of 2007-2009)); United SUMF ¶ 38; Pls.' Resp. to United SUMF ¶ 38 (the

---

[8] The Court added the phrase [to investors and analysts] based on the context of this fact; *i.e.*, it followed a number of other facts addressing investors and analysts, and it was in a subsection titled "Importance of Capacity Information . . . to Investors."

airlines had a "history of bankruptcy and poor financial performance" in the period preceding the early 2000s). The combination of high fixed costs, slow-moving supply decisions, and the volatility of cost and demand conditions historically led to "boom and bust" cycles producing poor long-term financial performance for airlines. United SUMF ¶ 52; Pls.' Resp. to United SUMF ¶ 52.

Delta and United, among other airlines, filed for bankruptcy prior to the start of the alleged conspiracy. Delta SUMF ¶¶ 71, 72. United filed for bankruptcy in December 2002 and operated under bankruptcy protection for more than three years until February 1, 2006. United SUMF ¶ 59; Pls.' Resp. to United SUMF ¶ 59. Delta and its future merger partner Northwest entered bankruptcy in 2005. Delta SUMF ¶ 72. When Delta emerged from bankruptcy in 2007, its debt securities were rated noninvestment grade, sometimes referred to as "junk" by rating agencies. Delta SUMF ¶ 82.

In December 2007, the economy entered the Great Recession, which was described by Delta executives as "cataclysmic" and the "worst recession in our lifetime." Delta SUMF ¶ 97. At the same time the country moved into the Great Recession, the producer price index for jet fuel capped a series of increases, rising by 60 percent over early 2007 levels by the third quarter of 2008. Delta SUMF ¶ 98; Pls.' Resp. to Delta SUMF ¶ 98. After peaking at $4.81 per gallon in September 2008, jet fuel prices began to plummet in the second half of 2008 and early 2009, ultimately hitting $1.11 per gallon in March 2009. Delta SUMF ¶ 99. In 2008, "[t]he uncertainty and volatility surrounding jet fuel prices – a major component of Defendants' variable costs – directly impacted Defendants' bottom line" and at the same time as the fuel price fluctuations, "demand for passenger air transportation fell sharply as the Great Recession took hold." Delta SUMF ¶¶ 100, 102; Pls.' Resp. to Delta SUMF ¶ 100, 102; PX 1, Mangum Report ¶ 127. The combination of high fuel costs and the Great Recession caused the Defendants to be in a dire

14

financial situation in 2008.  Delta SUMF ¶ 103; *see also* PX 647, Tr. of United's Q2 2008 earnings conference call, UAL-010028404-22, at 10 (where United's Chief Financial Officer Jake Brace stated: "[T]he industry simply cannot recover higher fuel costs unless we affect a shift in the supply curve.  In order to get a shift in the supply curve, we must shrink capacity.  This isn't rocket science, it's Econ. 101.")

### 4. Capacity Discipline

Airlines used the term "capacity discipline" prior to the alleged conspiracy period.[9] Delta SUMF ¶65; DX 72, Professor Gregory Miller [Defendants' Investor Relations Expert] Rebuttal Report ¶ 11 (listing examples) & Ex. C; *see* Pls.' Resp. to Delta SUMF ¶65 (indicating that Professor Miller's Rebuttal Report "reveals only 39 occasions where Defendants and their predecessors used the phrase '"capacity discipline" in the 12 years prior to [the alleged conspiracy period]" with 21 references occurring during the period 1997 through 2007).  Plaintiffs note  230 references to "capacity discipline" during the 6.5 year alleged conspiracy period.  *See* PX 717, Appendix I (Annotated) to Plaintiffs' Amended Supplemental Responses and Objections to Defendants' Fifth Set of Interrogatories to All Plaintiffs Pursuant to Special Master's Amended Report and Recommendation No. 8; PX 718, Appendix II (Annotated) to Plaintiffs' Interrogatory Responses.  At least one question related to capacity- increasing or decreasing flights or seats - was asked on every one of Defendants' earnings calls during the period Q1 2007- Q3 2019.  Delta

---

[9] *See, e.g.,* UX 138, May 8, 2006 Q1 2006 UAL Corporate Earnings Call transcript, at 3 (where United Executive Vice President and Chief Revenue Officer John Tague commented that: "Industry capacity restraint and strong underlying passenger demand have created a relatively favorable pricing environment.  This combined with our improving revenue execution and the benefits of our differentiated customer strategy led to a 12% year-over-year improvement in consolidated passenger unit revenue. Recall that in 2005 United introduced capacity discipline to the domestic market when we restructured our overall network, shifting weaker domestic mainline capacity to international markets while backfilling with Express operations to maintain domestic coverage.")

SUMF ¶ 67; Pls.' Resp. to Delta SUMF ¶67; United SUMF ¶ 118 (before and during the alleged

conspiracy, "United and other airlines faced . . . capacity-related questioning from analysts").

Delta regularly provided capacity-related information in response to questions posed by analysts

and investors and in prepared remarks on earning calls and at investor conferences.  Delta SUMF

¶ 69.

Having concluded the background section of this Memorandum Opinion, the Court will

now address the applicable legal standard.

## II. Legal Standard

The Court includes a discussion of the legal standard for summary judgment generally, and

more specifically for summary judgment involving antitrust claims.

### A. General Summary Judgment

Granting a motion for summary judgment is appropriate if the movant carries the burden

of showing "that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law," based upon the pleadings, depositions, and affidavits, and other

factual materials in the record.  Fed. R. Civ. P. 56(a); *Ali v. Tolbert*, 636 F.3d 622, 628 (D.C. Cir.

2011); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).   The mere existence of some factual

dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material"

fact.  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only

disputes over facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgment.")  Nor may summary judgment be avoided based on just

any disagreement as to the relevant fact; the dispute must be "genuine," meaning the nonmoving

party must establish more than "[t]he mere existence of a scintilla of evidence" in support of its

position, *Anderson*, 477 U.S. at 252, "must do more than simply show that there is some

metaphysical doubt as to the material facts," *Scott v. Harris*, 550 U.S. 373, 380 (2007), and cannot

rely on mere allegations or conclusory statements, *see Estate of Mark Parsons v. Palestinian Authority*, 651 F.3d 118, 123 (D.C. Cir. 2011); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993).[10]

The nonmoving party must present specific facts "'such that a reasonable jury could return a verdict for the nonmoving party.'" *Grosdidier v. Broadcast Bd. of Governors, Chairman*, 709 F.3d 19, 23 (D.C. Cir. 2013) (quoting *Anderson*, 477 U.S. at 248); s*ee also* Fed. R. Civ. P. 56(c)(1). If the evidence proffered "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 6 (D.C. Cir. 2010).

### B. Sherman Act Section 1 Antitrust Claims

In the context of a Sherman Act Section 1 claim, "[t]o survive [Moving Defendants'] motion[s] for summary judgment, [Plaintiffs] must establish that there is a genuine issue of material fact as to whether [Defendants] entered into an illegal conspiracy that caused [Plaintiffs] to suffer a cognizable injury." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-586 (1986). Where the conspirators "had a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946); *see also Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (plaintiff should present evidence reasonably proving that there was a "conscious commitment to a common scheme designed to achieve an

---

[10] In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a  genuine dispute. Fed. R. Civ. P. 56(c)(1). The Court is only required to consider the materials explicitly cited by the parties, but may, on its own accord, consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

unlawful objective") (citations omitted).

In an antitrust case under Section 1, "a plaintiff can offer direct or circumstantial evidence to show a conspiracy." *City of Moundridge v. Exxon Mobil Corp.*, Civil Action No. 04-940 (RWR), 2009 WL 5385975, at *3 (D.D.C. Sept. 30, 2009), *aff'd*, 409 Fed. App'x 362 (D.C. Cir. 2011).[11] To survive summary judgment in a case in which plaintiffs allege a conspiracy based on circumstantial evidence, the plaintiffs "must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita*, 475 U.S. at 588 (quoting *Monsanto Co v. Spray-Rite*, 465 U.S. at 764 (1984)). In *Eastman Kodak v. Image Technical Serv., Inc.*, 504 U.S. at 451, 468 (1992), the Supreme Court clarified that *Matsushida's* "tends to exclude" standard "demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision." Later decisions have applied a "sliding scale approach" to this standard where "[m]ore evidence is required the less plausible the charge of collusive conduct." *In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, 13 (D.D.C. 2004) (quoting *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661 (7th Cir. 2002)). In contrast, broader inferences are permitted when the conspiracy is economically sensible. *In re Publication Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012).

To survive summary judgment on an antitrust conspiracy claim based on circumstantial evidence, Plaintiffs must prove a "pattern of parallel behavior" as well as "the existence of one or more plus factors that tends to exclude the possibility that the alleged conspirators acted independently." *In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1368 (N.D. Ga. 2017), *aff'd sub nom. Siegel v. Delta Air Lines, Inc.*, 714 F. App'x 986 (11th Cir. 2018). In the

---

[11] Delta notes that, during the fairness hearing, Plaintiffs indicated that their case involved "pulling together the circumstantial evidence" as there was "no smoking gun in this matter." Transcript of 3/22/2019 Fairness Hearing, ECF No. 354, at 13:5-16

absence of direct evidence of an agreement [to limit capacity], "the most likely way that such an arrangement would manifest itself to outsiders – and potential plaintiffs – would be through parallel action that gives rise to a suspicion of unlawful coordination in restraint of trade." *Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 626 (E.D. Mich. 2012); *compare In Re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009) (noting that "[a]llegations of concerted action by competitors are frequently based on a pattern of uniform business conduct," which is referred to as "conscious parallelism" and is "not in itself prohibited under § 1 of the Sherman Act"). "Conspiracy may be inferred from evidence of 'parallel business behavior' if the evidence tends to exclude the possibility of independent action." *Moundridge*, 2009 WL 5385975, at *4 (quoting *FTC v. Lukens Steel Co.*, 454 Fed. Supp. 1182, 1189 (D.D.C. 1978).

"[P]lus factors indicate the existence of a conspiracy by ruling out the legitimate explanation for parallel behavior: they suggest that an alleged conspirator's actions are 'inconsistent with independent pursuit of economic self-interest.'" *Moundridge*, 2009 WL 5385975, at *4 (quoting *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 267 (D.C. Cir. 1981)).  Plus factors are evidence that makes it "more likely than not" that parallel conduct, once established, was the result of a preceding agreement rather than interdependent action. *Kleen Prods LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 934 (7th Cir. 2018) ("Purchasers needed evidence that would allow a trier of fact to nudge the ball over the 50-yard line and rationally say that the existence of an agreement is more likely than not.") "[I]f a benign explanation for the action is equally or more plausible than a collusive explanation, the action cannot constitute a plus factor." *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F. 3d 1287, 1310 (11th Cir. 2003).

### III.  Argument

It is the Moving Defendants' position in their motions for summary judgment that there is

no evidence of any parallel capacity behavior that would indicate a conspiracy among the Defendant airlines.  Moving Defendants' arguments may be consolidated and summarized as follows: (A) there is no evidence of parallel capacity behavior because (1) Defendants' domestic system capacity changes differed substantially and sometimes exceeded GDP; (2) Defendants' capacity growth rates did not deviate from historical patterns; (3) Moving Defendants' competition at the route level and in other hubs defies an inference of conspiracy; (4) Plaintiffs have no evidence of punishment for Moving Defendants' [in this case, Delta's] above-GDP capacity growth; (5) there is no evidence of Delta/Defendants engaging in private conspiratorial communications;[12] and (B) Moving Defendants had legitimate, non-conspiratorial reasons for their capacity actions and statements about capacity, which do not exclude the possibility of independent action and unilateral self-interest; and (C) Plaintiffs' plus factors are equally consistent with independent action because they hold true for other airlines.   The arguments set forth above will be addressed by this Court in turn.[13]

As previously noted, all parties have acknowledged that the airline industry is an oligopoly. "Oligopolies pose a special problem under § 1 because rational, independent actions taken by oligopolists can be nearly indistinguishable from horizontal price fixing.  This problem is the result of 'interdependence,' which occurs because 'any rational decision [in an oligopoly] must take into account the anticipated reaction of the other firms.'"  *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185, 191 (3d Cir. 2017) (quoting *In re Flat Glass Antitrust Litig.*, 383 F.3d 350,

---

[12] Although this argument was made primarily by Delta, United includes a few statements regarding "conspiratorial" disclosures/communications, and those statements will be addressed in connection with subsections (A)(5) and (B).

[13] Because the briefing is so voluminous, the Court has tried to focus its analysis on the major arguments presented by the parties. For ease of reference, the Court has used an identical lettering and numbering system in both the summary of arguments and the subsequent discussion of each argument; however, the Court notes that the arguments presented are not mutually exclusive; rather, they overlap often.

359 (3d Cir. 2004) (brackets in original)); *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d

383, 397 (3d Cir. 2015) (explaining that "despite the facial plausibility of the Plaintiff's theory and

the circumstantial evidence supporting it, we must be cautious . . . [since] the U.S. chocolate market

is a textbook example of an oligopoly and we cannot infer too much from mere evidence of parallel

pricing among oligopolists") (quotation and internal citation omitted).   Accordingly, to survive

summary judgment regarding Section 1 claims, plaintiffs must do more than come forward with

"evidence of conduct that is consistent with both legitimate competition and an illegal conspiracy."

*Thompson Everett, Inc. v. Nat'l Cable Advertising, L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995).

### A. Evidence of Parallel Capacity Behavior

An antitrust plaintiff relying on circumstantial evidence of conscious parallelism as proof of

a § 1 claim "must first demonstrate that the defendants' actions were parallel."   *In re Beef Indus.*

*Antitrust Litig.*, 907 F.2d 510, 514 (5th Cir. 1990).   Discernible parallel conduct requires more than

simply indefinite "higher" prices or "lower" output alone.   *In re Baby Food Antitrust Litig.*, 166

F.3d 112, 129-130 (3d Cir. 1999).   "It would be contrary to [the alleged co-conspirators'] economic

interests to participate in a conspiracy where one conspirator could increase production and market

share at the expense of other co-conspirators."   *Moundridge*, 2009 WL 5385975, at *7.

Accordingly, Plaintiffs must demonstrate that the inference of conspiracy is reasonable in

light of the competing inferences of independent action.   *Publication Paper*, 690 F.3d at 62-63;

*accord In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d at 1368 (noting that "the

Supreme Court has required that inferences of a . . . conspiracy drawn from circumstantial evidence

be reasonable").   No formal agreement is necessary but instead, a court may look to "a course of

dealings or other circumstances as well as in any exchange of words."   *In re Polyurethane Foam*

*Antitrust Litig.*, 152 F. Supp. 3d 968, 978 (N.D. Ohio 2015) (quotation omitted).

Moving Defendants assert that "even if Plaintiffs could show that the Defendants engaged

in parallel conduct to "limit" their capacity growth, the most [they] could show is "conscious parallelism," 'the process, not in itself unlawful, by which firms in a concentrated market might set[ ] their prices at a profit-maximizing, supercompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions.'" Delta Mot., ECF No. 464, at 19 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993)). "Evidence that does not support the existence of a . . . conspiracy any more strongly than it supports conscious parallelism is insufficient to survive a defendant's summary judgment motion." *Williamson Oil Co.,* 346 F. 3d. at 1300.

Plaintiffs, in turn, argue that the evidence demonstrates that Defendants engaged in parallel conduct because of the manner in which they acted "similarly" and the effects of such similar conduct. Pls.' Opp'n, ECF No. 552-1, at 67 (citing *Petruzzi's IGA Supermarkets, Inc. v. Darling Delaware Co., Inc.*, 998 F.2d 1224, 1243 (3d Cir. 1993)) (where defendants acted similarly by refraining from competing on existing accounts, while competing for new accounts, and they retaliated against competitors who went after their accounts). For example, plaintiffs may attempt to prove relevant parallel conduct through output-restrictions, *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Assoc.*, 744 F.2d 588, 594-95 (7th Cir. 1984), or they may look to statements at trade association meetings "followed closely by unprecedented industry-wide production cuts," *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 894-95 (N.D. Ill. 2009). "The crucial question is whether each Defendant's conduct stemmed from an independent decision or from an agreement, though such agreement need not be express, and it may be inferred from all the circumstances." *Id.* at 893 (citing *U.S. v. Gen. Motors Corp.*, No. 38219, 1974 WL 926, at *19 (E.D. Mich. Sept. 26, 1974)).

### 1. Defendants' Capacity Changes and Relationship to GDP

The conspiracy at issue in this case relies on an alleged predicate of Defendants' exercise of

capacity discipline in order to increase profitability. Prior to beginning its analysis of capacity changes in relation to GDP, the Court notes that some of Moving Defendants' arguments rely on references to alleged deficiencies in Plaintiffs' Complaint; *e.g.*, stating that it "does not identify a single capacity action taken by any of the Defendants pursuant to the alleged agreement . . .," Delta Mot., ECF No. 464, at 47, and it alleges that "Defendants' domestic capacity during the alleged conspiracy period 'has largely been stagnant or decreasing on an annual basis'" which is "not true." *Id.* at 49 (emphasis omitted). Moving Defendants' reliance in that regard is misplaced as Defendants' motions to dismiss the Consolidated Amended Complaint were denied late in 2016; *see* October 28, 2016 Order, ECF No. 123; Memorandum Opinion, ECF No. 124, and this case is now before the Court on summary judgment motions which require the Court to look beyond the allegations of the Consolidated Amended Complaint. In the context of summary judgment, this Court shall evaluate the evidence proffered by the Plaintiffs "to determine whether that evidence, if credited, "tends to" establish a conspiracy more than it indicates conscious parallelism." *Williamson Oil*, 346 F.3d at 1301. The Court turns now to the parties' arguments pertaining to Defendants' capacity changes during the alleged conspiracy period.[14]

Plaintiffs argue that Defendants conspired to maintain capacity discipline in order to drive up fare prices. Delta points out that "for 2009, all four Defendants decreased capacity compared to the prior year — as did the *entire* airline industry in the midst of the Great Recession and the immediate aftermath of record high fuel prices" and in fact, even the non-Defendant LCCs reduced capacity[.]" Delta Mot., ECF No. 464, at 50. Plaintiffs acknowledge that "capacity discipline may have been born of crisis," but they assert that the Defendants agreed to continue capacity discipline in "late

---

[14] Plaintiffs' contention that Defendants made parallel statements (in connection with their parallel capacity restraints) will be addressed with Moving Defendants' argument that they had legitimate, non-conspiratorial reasons for their statements about capacity.

2008 and early 2009, [after] the jet fuel crisis began to ease [and] [f]uel prices began to decline [and] [d]emand slowly returned."  Pls.' Opp'n, ECF No. 552-1, at 35.

Plaintiffs assert that, "[i]n late 2010, . . ., Defendants established a reliable benchmark — limiting capacity growth to or below gross domestic product [GDP.]"  Pls.' Opp'n, ECF No. 552-1, at 16, and this was done to "assess co-conspirator compliance with the agreement," *id.* at 38; *see, e.g.* PX 94, Tr. of American's Q2 2010 earnings conference call, AA-CAPMDL-0001195918-36, at 5 (where Gerard Arpey, President/CEO of American, stated that "[w]e have talked about in the past and continue to firmly believe that one of the keys to continued recovery in our industry is that overall industry capacity should not grow faster than gross domestic product here in the US or anywhere in the world for that matter.")[15]  United indicates that "Defendants' documents and deposition testimony

---

[15] In their CSMF, many "facts" alleged by Plaintiffs rely, at least in part, on references to statements made by airline executives regarding capacity discipline that employ GDP as a benchmark measure.  While Defendants often deny, in whole or in part, the "facts" alleged, and they sometimes ask that the Court look at the references in a more complete context, overall, the statements demonstrate that GDP was a benchmark for capacity discipline.  *See, e.g.,* PX 169, Tr. of US Airways remarks at Nov. 17, 2010 Citi North American Credit Conference, at AA-CAPMDL-0008296662 (where US Airways' CFO Derek Kerr stated that: "domestic [capacity] we believe is going to be 0% to 2 % up, so modest capacity growth as we go forward, hopefully not to exceed GDP growth"); PX 342, Tr. of Dec. 15, 2010 Delta Investor Day, at DLT1_05895731 (where Delta's President Ed Bastian stated: "Now with respect to capacity for 2011, our commitment to you is that we are going to continue to be responsible stewards of your capital and our capacity.  And that we're going to make certain that any capacity growth is well within GDP bounds for the given year.  And our projected system capacity growth for 2011 will be in the range of 1% to 3%."); PX 602, Tr. of United Airlines 2013 Investor Day, at UAL-0004359497 (where Jim Compton, United Vice Chairman and Chief Revenue Officer stated: "Capacity discipline. You've heard us talk a lot about it over the last couple of years, and it's a very important tenet of our strategy.  And you can see what we're talking about in 2014 is growing capacity about 1% to 2%.  Very consistent with [how] we've managed capacity and demand in the previous years.  We think we are looking at a GDP growth, the experts say, about 2.5% . . . [G]oing back to 2008, . . . we have been very consistent in keeping capacity growing less than demand.  So as we look out over the next four years, . . . we'll keep it below GDP growth, at about that 1% to 2% over the next four years."); PX 226, Tr. of Delta's remarks at May 7, 2014 BoAML Transportation Conference, at DLT1_00442977 (where Delta's President Ed Bastian stated that Delta was "going to continue to maintain capacity discipline" despite better times, with a "capacity outlook and the goal over the next five years [ ] for capacity growth of roughly 2%, which is well within our expectations what the general economic forecasts for the future are," noting that if the economy was "not as strong as

set forth the compelling reasons GDP projections provided useful guidance regarding future demand for air travel," *see* UX 3, Mangum Tr. 96:2-14 ("I believe [GDP is] a good measure of the overall demand in the country."), but asserts that Defendants' "real-world capacity levels" diverged from GDP.  United Mem., ECF No. 495-2, at 36.  United argues therefore that GDP should not be viewed as a "limit," and in fact, it notes that Plaintiff's expert, Dr. Mangum, stated that GDP was a "focal point" and "test for whether or not an airline was adhering to the alleged agreement" (citing UX 1, Mangum Report ¶¶ 145, 151).[16]

In their Opposition, ECF No. 552-1, at 69-70, Plaintiffs proffer that in order to restrain capacity growth, Defendants "sold aircraft, took planes out of service, and leased or subleased planes to other carriers," *see* PX1, Mangum Report ¶¶ 287-289; they "shifted capacity from domestic to international routes," *id.* at 292, "cut[ ] back on flight frequencies," *id.* at ¶¶ 288, 294-96, and avoided fleet expansion by limiting purchases of new planes.  *Id.* at ¶¶ 291-293.  Such restraint in the face of increased demand meant that planes "[flew] with fewer empty seats," Mangum Report ¶ 300, and "[b]y 2011, all Defendants had increased their load factors compared to the pre-period Period[.]"  PX 1, Mangum Report, Figure 31.  Plaintiffs indicate that Dr. Mangum's findings are consistent with a report by the Government Accountability Office [PX 28] finding that, from 2009-2012, airlines did not respond to rising demand for air travel by increasing capacity and noting industry studies indicating that Southwest was undertaking capacity discipline strategies from 2007-2012.  *See* Pls.'

---

2% to 3%, [the] baseline assumption for GDP" Delta could "adjust capacity accordingly"); PX 509, Tr. of United's remarks at the Nov. 6, 2014 Raymond James conference, at UAL-000302332 (where United's Vice Chairman and Chief Revenue Officer James Compton referenced "capacity discipline" and said: "[P]eople always ask how do you think about capacity? And we think about it relative to demand and one of the guideposts for defining demand is GDP.  And so we're very much forward focused on making sure, whatever capacity we allocate out there is growing less that GDP.  It's a competitive environment and we need to be aware of that.  And so we watch obviously what's happening in the marketplace, but from a core how we think about the business we look to grow our capacity at less than GDP.")

[16] United refers to its exhibits as Ex, but for consistency sake, the Court uses UX.

Opp'n, ECF No. 552-1, at 71-72.[17]

With regard to the argument that Defendants' actions were or were not parallel, both sides rely, at least in part, on their experts' analyses of this issue, but their focus differs.  While Plaintiffs focus on underline commonalities in capacity trends during the alleged conspiracy, Moving Defendants focus on the underline differences between Defendants' actual capacity rates during that period.   Moving Defendants assert that "objective data show that Delta's and other Defendants' changes in aggregate domestic capacity were not parallel; instead, they diverged significantly."  Delta Mot., ECF No. 464, at 48.  Moving Defendants' divergence argument relies on statistics such as one that compares cumulative capacity changes "over the [entire] course of the alleged conspiracy," noting that "Delta increased domestic capacity by 7 percent and United reduced capacity by 6 percent, a difference of 13 percent over the period during which they were supposedly conspiring with each other and Southwest and American to restrict capacity growth."  *Id.* at 48-49; at 41 (referencing Figure 2, Change in Domestic ASMs 2009-2015).  The Court does not find this chart particularly illuminating in measuring parallel behavior as it takes each Defendant's collective capacity *for the entire period* and measures one Defendant's collective capacity against another Defendant's collective capacity, as opposed to focusing on annual capacity figures or capacity trends among Defendants.[18]

_____

[17] Plaintiffs point to Dr. Mangum's finding that, during the alleged conspiracy – "a period in which GDP grew by 11.1% – Defendants' collective capacity shrank by 3.3%, compared to the non-defendants' collective capacity, which grew 33.7% during the same period."  Pls.' Opp'n, ECF No. 552-1, at 69; *see* PX 736 (Domestic ASMs and GDP); *but see* Delta Reply, ECF No. 551, at 22 (noting that "Defendants' *collective* capacity growth relative to GDP masks the individual undisputed divergences in growth") (emphasis in original).  "[I]ndustry-wide data" does not indicate how the individual defendants acted and "[w]ithout specific information regarding each Defendant, the Court has no basis to analyze which, how many, or when any of the individual Defendants may have affirmatively acted to reduce the supply [ ]" and that type of information is "vital to pleading parallel conduct."  *In re Pork Antitrust Litig.*, Civil No. 18-1776 (JRT/LIB), 2019 WL 3752497 at *8 (D. Minn. 2019).
[18] Delta argues that "Defendants' aggregate growth rate *over a multi-year period* is irrelevant because Plaintiffs allege that Defendants' growth was restrained relative to GDP growth '*on an annual basis.*'"  Delta Reply, ECF No. 551, at 23 (quoting Compl. ¶ 4) (emphasis added by Delta).

26

Moving Defendants rely also upon Figure 3 – a summary of the "Year-over-Year Change in Defendants' ASMs vs. GDP" – which indicates numerical values for both the change in ASMs and GDP and shows that Southwest and American had "above-GDP capacity growth in several years during the alleged conspiracy."  Delta Mot., ECF No. 464, at 42; DX 4, Mangum Report, Figure 30 - Annual Percentage Change in Defendants' Domestic ASMs, 2007-2018 (showing the same trends but with a slight variation in percentages).  In comparing the two charts, the Court notes that Figure 30 spans the time frame from 2007-2018; the order of the airlines is slightly different than in Figure 3; and it does not include numerical values for the percentage change or GDP.

Relying on Figure 3, Delta argues that there can be no "pattern of parallel behavior" because there are "substantial differences in Defendants' annual capacity changes," including some years when one or more Defendants increased capacity while others reduced capacity.  Delta Mot., ECF No. 464, at 50; United Mem., ECF No. 495-2, at 37 (referencing some airlines with growth rates above GDP during the alleged conspiracy and concluding that the "alleged conspirators' behavior failed the "test" of adherence to the agreement half the time Plaintiffs claim it was in effect); *see Moundridge*, 2009 WL 5385975, at *7 (finding that some defendants increased output while others decreased output "suggests no conspiracy occurred" and "[i]t would be contrary to [defendants'] economic interest to participate in a conspiracy where one conspirator could increase production and market share at the expense of other co-conspirators"); *see also Baby Food*, 166 F.3d at 132 (although "parallel pricing does not require uniform prices, and permits prices within an agreed upon range," in this case involving an alleged conspiracy to fix, raise and maintain wholesale prices, the defendants' prices were neither uniform, nor did they fall within an agreed upon range; instead, the evidence demonstrated that "defendants engaged in independent pricing determined by market conditions at the time") (internal quotation marks omitted).  Delta suggests — but this Court disagrees — that summary judgment may be granted on this basis alone, *i.e.*, that Defendant failed

to establish parallel behavior, and therefore, there was no collusion.[19]  Delta Mot., ECF No. 464, at

51.

Plaintiffs proffer that Dr. Mangum's analysis of capacity distinguishes between *price-fixing*

and *supply restriction* conspiracies.  Dr. Mangum notes that in a price-fixing conspiracy, it is

"possible that if one participant increased prices substantially more than another participant, then

the participant with the larger price increase could lose significant volume," and its benefits would

be undermined by the participant with a smaller price increase.  Pls.' Opp'n, ECF No. 552-1, at 100;

*see* PX 2, Mangum Rebuttal Report ¶109.  In contrast, Dr. Mangum explains that, with a supply

restriction conspiracy, as in this case, "even if one participant restricted supply by a smaller amount

than another participant, the incremental reduction in supply still leads to artificially reduced

industry capacity resulting in supracompetitive prices for all participants."  *Id.*  "Working

cooperatively, the cartel members gain from the output reductions of each firm.  When all firms

belong to the cartel, all the gains from reducing output and raising prices go to the cartel, which

divides the gains among its members."  PX 711, Carlton & Perloff, *Modern Industrial Organization*

(4th ed.) at 125.

In examining Plaintiffs' alleged supply restriction conspiracy, Dr. Mangum opines as

follows:

> [Defendants' Economics Experts] Dr. [Dennis] Carlton and Dr. [Mark A.] Israel suggest that
> the differences among the Defendants in the year-to-year or cumulative capacity growth rates
> means that there was no parallel behavior and that, absent such parallel behavior, there would
> need to be side payments. They are incorrect.  A capacity-restricting cartel need not have
> uniform changes in capacity or capacity growth among participants in order to artificially
> restrain industry capacity and artificially elevate prices.  According to Dr. Carlton's own

---

[19] The Court notes that, in its reading of Figure 3, in most years, Defendants' change in ASMs came
in under the Plaintiffs' GDP benchmark, although there were aberrations: (1) Southwest exceeded
GDP by 2.8% in 2011 (when it merged with AirTran), and by 3.8% in 2015 (when the DOJ
investigation commenced); (2) American exceeded GDP by .4% in 2013 (when it exited bankruptcy
and merged with US Airways); and (3) Delta exceeded GDP by .1% in 2013, by .4% in 2014, and
.8% in 2015; (4) United did not exceed GDP during this period.

textbook, an effective cartel is one in which total industry capacity is reduced relative to the competitive capacity level.

PX 2, Mangum Rebuttal Report ¶ 105; *see* DX 6, Carlton Report  ¶¶ 39, 41 n.58, 42; DX 13, Israel Report  ¶¶ 181-184.

Dr. Mangum opines further that the "standard that Drs. Carlton and Israel propose for collusive conduct — parallel and uniform capacity changes among Defendants — is unfounded in cartel theory and cartel history."  PX 2, Mangum Rebuttal Report ¶ 106.  Instead, "[v]ariable capacity changes are consistent with a cartel to restrain capacity and capacity growth."  *Id.*  Dr. Mangum notes also that the "differences in Defendants' domestic networks, such as their hubs and their key routes, . . . , make uniform changes both impractical and unnecessary to an effective cartel in the domestic passenger air transportation industry."  *Id.* ¶ 105.  Plaintiffs assert that it is "well-settled that parallel conduct need not be identical in either amount or timing."  Pls.' Opp'n, ECF No. 552-1, at 101 (citing *Interstate Circuit v. U.S.*, 306 U.S. 208, 227 (1939)); *see Kleen Prod., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1077 n.8 (N.D. Ill. 2011) ("Variations in the size of capacity reductions do not disprove the existence of a conspiracy[.]"); *see also High Fructose*, 295 F.3d at 657 (recognizing that additions to capacity during the contested period "do[ ] not disprove the existence of a conspiracy"); *compare Williamson Oil Co.*, 346 F. 3d at 1321 (11th Cir. 2003) (affirming summary judgment in favor of defendants on conspiracy claims involving two defendants whose market shares increased 20% and 50% respectively, while two other defendants' market shares declined 25% and 19% respectively).

Dr. Mangum proffers that it inures to an individual Defendant's benefit to restrict capacity growth if all Defendants collectively restrict capacity growth because in the absence of an agreement, each Defendant unilaterally has an incentive to increase its own capacity and earn more revenue and profit.  PX 1, Mangum Report ¶ 126.  Because "[a] single company reducing output

would lose market share and sales[,] [o]nly if all the companies reduced supply would the price rise enough to increase profits."  Pls.' Opp'n, ECF No. 552-1, at 81 (citing *Petroleum Prod.*, 906 F.2d at 463).  Accordingly, Plaintiffs' expert emphasizes Defendants' controlling market share during the alleged conspiracy, when a "small number of major carriers that Defendants consolidated further . . . through mergers dominated the industry, with Defendants and their predecessors collectively accounting for [a majority] of industry seats."  Pls.' Opp'n, ECF No. 552-1, at 73; *see* PX 1, Mangum Report ¶¶ 61-70; 115-118; *see also* Pls.' CSMF ¶ 30 ("Defendants accounted for 85% of the domestic market as measured by seats"); *compare* Defs.' Reply to Pls.' CSMF ¶ 30 (challenging the Mangum Report <u>85%</u> calculation insofar as excludes seats on flights to and from Alaska and Hawaii and does not include AirTran as a Defendant or Co-Conspirator [like US Airways and Continental are included]); *see also* Pls.' CSMF ¶ 31 (noting that not one non-defendant airline exceeded a 5% share of domestic capacity during the alleged conspiracy period).

While Defendants challenge the 85% figure cited by Plaintiffs, at a June 4, 2014 Deutsche Bank Conference, United's CEO Jeff Smisek stated: "In 2007 the four largest carriers, nobody had more than 16% share of the US market, and together those four carriers had about a 55% market share.  Today those four carriers, post-merger, have over 80% market share, and each of those four carriers, including United, has greater than 16% share of the market."  PX 487, Tr. of United's remarks, at UAL-000038312.  Similarly, John Rainey, United's Executive VP, said "And the top four carriers in this business, the top four largest carriers have over 80% of the domestic market share and that's created a discipline in this business that didn't exist previously."  PX 492, Tr. of United's remarks at a June 4, 2015 Deutsche Bank Global Industrials and Basic Materials Conference, at UAL-000058674.  Plaintiffs assert that because a majority of the industry needed to collectively reduce capacity to create a "shift in the supply curve," Pls.' Opp'n, ECF No. 552-1, at 23, capacity reductions had to be made "in conjunction with the other carriers" in order to make the

industry profitable." *Id.* at 24.

Looking at the expert opinions in this case, this Court finds that there are inconsistencies regarding interpretation of Defendants' capacity figures as well as varying interpretations by the experts as to whether – using GDP as a benchmark – the capacity conduct by Defendants is consistent with collusion. This is despite the fact that the experts analyzed largely the same set of facts/statistics. In sum, Moving Defendants assert that there is no parallel behavior because the Defendants' changes in capacity varied widely during the time frame at issue and in several years exceeded GDP. Dr. Carlson opined that individual defendants changed capacity by substantially different amounts and concluded that the capacity increases of the defendants were not parallel. DX 6, Carlton Report ¶¶ 41-45. Dr. Israel opined that "[t]he capacity coordination alleged here would work by limiting the number of airline seats for sale in the industry to raise fares and industry profits [but] [c]oordination of this kind does not work well when the alleged agreement to restrain capacity leaves out an important, rapidly growing segment of the industry [LCCs (other than Southwest) and ULCCs] that can react to the capacity reductions by expanding [their] own capacity and stealing passengers." DX 13, Israel Report ¶ 139; *but see* PX 2, Magnum Rebuttal ¶ 183 ("Dr. Israel's speculation about the ability of LCCs and ULCCs to affect any agreement by defendants to restrict capacity or capacity growth and to erode supracompetitive fares, ignored defendants' combined market power and the sheer difference in size between defendants and non-defendants [who had a fraction of the domestic passenger air transportation market]."

In contrast, Dr. Mangum opined that – taking into account the nature of the airline industry – all Defendants adhering to capacity discipline is a form of parallel behavior even if capacity changes by each were not uniform." ECF No. 553-2, at 56; at 101 (referencing Mangum Report, Figure 13) (where "Defendants' market shares remained nearly identical relative to each other throughout the [alleged conspiracy]"). Dr. Mangum noted that "what is required to artificially restrain capacity

and effectuate an artificial elevation in fares is Defendants' combined [80 percent of the domestic passenger air transportation capacity] market power."  PX 1, Magnum Report ¶ 107.  Furthermore, Dr. Mangum opined also that competitive factors alone cannot explain either Defendants' capacity or fares – which led to record profits.  *See generally* PX 1, Mangum Report ¶ 362; PX 2, Mangum Rebuttal ¶¶ 176, 178-184.

In sum, Plaintiffs argue that "all defendants['] adhere[nce] to capacity discipline is a form of parallel behavior even if capacity changes by each were not perfectly uniform."  Pls.' Opp'n, ECF No. 552-1, at 99; PX2 Mangum Rebuttal ¶ 109.  "[A]n unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators."  *Interstate Circuit*, 306 U.S. at 227.   Nor would Defendants need identical changes in capacity among participants "in order to artificially restrain industry capacity and artificially elevate prices."  Pls.' Opp'n, ECF No. 552-1, at 99; *see* PX 2, Mangum Rebuttal ¶ 105.

When, at the summary judgment stage, the parties present a genuine dispute about the facts, the Court must draw all justifiable inferences in favor of the nonmoving party and accept the nonmoving party's evidence as true.  *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009); *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Evans v. Sebelius*, 716 F.3d 617, 619-20 (D.C. Cir. 2013).   The district court may not make credibility determinations or weigh the evidence; instead, the court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.  If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is not appropriate.  *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).

In this case, the Court finds that Dr. Mangum's inferences in support of alleged parallel conduct by Defendants [based on capacity changes] diverge sufficiently from the inferences of

Moving Defendants' experts.  Furthermore, Dr. Mangum's inferences are justifiable in the context of the capacity-restricting cartel alleged by Plaintiffs, where there may be variable capacity changes. Accordingly, in this case, the evidence regarding parallel conduct (as analyzed by both sides' experts) is not so "one-sided" in favor of Moving Defendants that they must prevail as a matter of law, and as such, summary judgment on this grounds is not supported or sustained.[20]

### 2. Capacity Changes and "Historical Patterns"

 "For a change in conduct to create an inference of conspiracy, the shift in behavior must be a 'radical' or 'abrupt' change from the industry's business practices."  *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 409-10 (3d Cir 2015) (quoting *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 935 (7th Cir. 2000)).  "[C]omplex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors and made for no other discernible reason would support a plausible inference of conspiracy." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 566 n.4 (2007). In contrast, in *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 826 (N.D. Ill. 2017), the court rejected an inference of conspiracy where "parallel price increases were in line with historic behavior."

Delta contends that "Plaintiffs in this case have adduced no evidence that Delta's or the other Defendants' domestic capacity growth deviated from "historical patterns" during the alleged conspiracy period . . . "  Delta Mot., ECF No. 464, at 52.  To the extent it did deviate, it "did so in the exact opposite of the direction that Plaintiffs contend" as Delta grew its capacity more during the seven years alleged than in the seven previous years. *Id.* Delta argues that because Defendants' capacity growth relative to GDP 'is in fact consistent with how this industry has historically operated,' no conspiracy can be inferred."  Delta Mot., ECF No. 464, at 54 (quoting

---

[20] The Court is not treating the experts' opinions as dispositive of this case.

*Chocolate*, 801 F.3d at 410).  Delta references Figure 4 (Year-over-Year Change in Delta's Domestic ASMs vs. GDP, 2002-2015) and Figure 5 (Year-over-Year Change in Defendants' Aggregate Domestic ASMs vs. GDP, 2002-2015) in its Motion, but the Court notes that neither chart on its face demonstrates any clearly apparent pattern of behavior in the airline industry, which appears somewhat volatile depending on the general state of the economy, fuel prices, and airline mergers and bankruptcies, with perhaps fewer ups and downs from 2010 through 2015.

This Court notes further that, in their Opposition, Plaintiffs do not rely necessarily on the historical patterns or variations therefrom on which Moving Defendants rely.  Instead, in support of their conspiracy allegation, Plaintiffs argue that the practice of "capacity discipline" was "a marked change from past practice for the airline industry,"  Pls.' Opp'n, ECF No. 552-1, at 34, and they note that Defendants "concede . . . that capacity discipline was a fundamentally different approach to their previous business models."  *Id.* at 83 (citations omitted); *see, e.g.*, *In re Broiler Chicken*, 290 F. Supp. 3d at 798 (recognizing that a break from past practice is indicative of anticompetitive conduct).  In contrast, United asserts that it "described its strategy as "capacity discipline" coming out of bankruptcy in 2006, well before the alleged conspiracy period .  United Mem., ECF No. 495-2, at 52.  "Such a 'continuation of historical pattern . . . does not plausibly allow one to infer the existence of a cartel.'"  *Kleen Prods.*, 910 F. 3d at 937 (citations omitted).

The Court notes that while there is general acknowledgment by the parties that capacity discipline was mentioned in advance of the alleged conspiracy period, and it made economic sense during the Great Recession, Defendants continued to exercise capacity discipline even after the Great Recession, when fuel prices stabilized and demand increased.  Plaintiffs allege that this was for the purpose of driving up fares, and in support thereof, they proffer statements made by airline executives.  By way of example, in response to a question about keeping capacity flat to raise prices, Southwest CFO Laura Wright said "I think the big issue on fares  — and let's just say

yields . . . were down for the entire industry . . . No question, if there's a lot of capacity discipline in the market, that will — that should help yields as well." PX 432, Tr. of Southwest's remarks at the Feb. 24, 2010 Thomson Reuter's summit, at PLTF000204.  Furthermore, at the March 22, 2011 JP Morgan Conference, United President and CEO Jeff Smisek said:

> [O]f course we have raised prices and we have had a round of price increases that has been faster than I have seen in the 16 years in the business.  I think that speaks volumes to the experience that the business has gained from the fuel increases and crises of 2008, as well as capacity discipline as we recognize it. As you do raise prices, you do have an adverse effect on demand . . . and so you need to be responsive in your capacity.

PX 318, Tr. of United's remarks, at DLT1_04752109.  Accordingly, in considering capacity discipline – and specifically, whether or not a "change" in historical "patterns" can be detected regarding capacity trends – there is a colorable argument by Plaintiffs that "capacity discipline" was a strategy that differed from past practice, and therefore, with regard to this argument, summary judgment is not supported or sustained.

### 3. Competition at the Route Level and in Other Hubs

Delta argues that "[t]he contrast in competitive growth strategies between Delta and other Defendants stands out . . . at the route level," Delta Mot., ECF No. 464, at 54, where Delta "aggressively competed against its rivals" and this illustrates the "absence of any parallel behavior." *Id.* at 55. [21]  "[M]arket realities" reflecting "'aggressive' and 'common' price competition between firms is inconsistent with the idea that those same firms have conspired not to compete on price." *Valspar*, 873 F.3d at 196.  United notes that the expert economists "agree that competition between airlines actually happens at the *route* level — the particular origins and destinations between which passengers generally seek to travel."  United Mem., ECF No. 495-2, at 29 (asserting that Defendants "competed fiercely for passengers on those routes").

---

[21] United asserts that Plaintiffs do not "identify communications (public or private) about capacity restrictions on specific routes[.]" United Mem., ECF No. 495-2, at 28.

Moving Defendants' expert, Dr. Mark Israel, found that Defendants frequently added capacity in the form of new regular service on each other's routes, and by way of example, United was "the target of competitive entry by other Defendants on 18% of its network in just 2011[.]" United Mem., ECF No. 495-2, at 30; UX 11; Israel Report ¶ 93 & Fig. 13.  Furthermore, United contends that it "did not back off capacity growth on routes where *only* other Defendants were present, *i.e.*, those 'where capacity is entirely under the control of the alleged cooperators[.]'" *Id.* at 30; UX 11, Israel Report ¶¶ 196-197, 202, 206-207 & Table 3 (opining that "Codefendant Only" routes did not grow more slowly).  United notes further that its "supposed co-conspirator Delta substantially increased its capacity between 2009-2015 in several cities in which other airlines operated hubs . . . and took shares at the expense of both alleged co-conspirators, as documented by Dr. Dennis Carlton.[22]  United Mem., ECF No. 495-2, at 31; UX 13, Carlton Report Figs. 9-12. United concludes that Plaintiffs' and their expert "ignore this dramatic lack of parallelism – and intense competition – at the route level[.]"  United Mem., ECF No. 495-2, at 33; *see Baby Food*, 166 F.3d at 128-129 (involving claims of price-fixing and discussing charts prepared by plaintiffs' expert and finding no error by the District Court in concluding that the evidence was insufficient to prove conscious parallelism where the expert focused on list prices and "trend lines of average transaction prices" as opposed to actual transaction prices).

Plaintiffs contend however that their allegations of a systemwide domestic supply-restriction conspiracy do not require a demonstration of parallel conduct at the route level.  Pls.' Opp'n, ECF No. 552-1, at 100 n. 272.  In support thereof, Plaintiffs note that Moving Defendants' expert Dr. Israel opined that "capacity on all routes in the network is fundamentally interconnected; one simply

---

[22] Delta points to Figure 6 (Percentage Change in ASMs on Defendant Routes vs. Other Routes (2009 compared to 2015)), which shows that, of the Defendants, Delta's percentage change in ASMs was the greatest on routes where it competed with the other Defendants, when comparing 2009 to 2015.  Delta Mot., ECF No. 464, at 57-58.

cannot cut capacity on a single or small, targeted number of routes."  PX 5, Israel Report ¶ 112. Furthermore, "subtracting capacity on any segment affects seat availability and fares on hundreds of routes; there really is no carefully targeted capacity-reduction strategy in this industry."  PX 5, Israel Report ¶ 137.   Accordingly, Plaintiffs assert, and this Court agrees, that "[Moving] Defendants' focus on capacity changes for a handful of individual routes and cities ignores capacity changes in other routes and other hubs and presents an incomplete . . . picture of an increasingly capacity-constrained domestic passenger air transportation industry."  Pls.' Opp'n, ECF No. 552-1, at 100 n. 272; see PX 2, Mangum Rebuttal ¶ 32. This focus on expansions in cities where other carriers had hubs ignores the bigger picture regarding Defendants' capacity changes.

Delta indicates that it built new hubs in the existing hubs of United and American in New York and Los Angeles as well as in Alaska Airlines' hub in Seattle and expanded service in other large cities, which is inconsistent with conspiracy.  Delta Mot., ECF No. 464, at 57; *see* DX 4, Mangum Report ¶ 111 ("the mutual threat of retaliation for going into each other's hubs leads to a result where Defendants generally stay out of each other's hubs"); *compare* PX 2, Mangum Rebuttal ¶ 144 ("Delta was careful to reassure the other defendants that its capacity changes were not intended to cannibalize competitors' market share").  Plaintiffs argue however that Delta's "capacity expansions at cities where other carriers had hubs, in particular Los Angeles, Boston, Seattle, and New York, do not disprove the existence of an agreement to restrain network-wide capacity."  Pls.' Opp'n, ECF No. 552-1, at 103.  This is because, when Delta's "gains are offset by decreases in Minneapolis-St. Paul, Salt Lake City, Cincinnati, and Memphis, Delta's overall capacity growth during the Misconduct Period is consistent with the alleged conspiracy to restrain capacity growth systemwide."[23]  *Id.* at 104; PX 2, Mangum Rebuttal ¶143 & Figure 11.  As noted by analyst Helane

---

[23] Plaintiffs refer to the alleged conspiracy period as the Misconduct Period.

Becker, Delta's capacity addition in Seattle represented a shift in capacity from markets it was leaving, such as Cincinnati and Memphis.  PX 18, Oct. 17, 2014 Cowen and Company Report, at AA-CID-0000030697.

Delta counters that the "undisputed system-level capacity data disprove this assertion" because Delta not only "expanded capacity where it competed with its supposed co-conspirators" but also "grew its overall domestic capacity," as illustrated by Figures 2 and 3, which is not "neutral."  Delta Mot., ECF No. 464, at 61.  In contrast, Plaintiffs reiterate that "Delta's expansions were capacity neutral."  Pls.' Opp'n, ECF No. 552-1, at 103; PX 2, Mangum Rebuttal ¶ 143 (network reduction in certain cities "funded" growth in other hubs).  Plaintiffs note that they "allege a conspiracy to restrain capacity and capacity growth, not an agreement to shrink capacity in absolute terms," *id.*, and accordingly, Defendant's capacity need not have decreased or been stagnant during the entire alleged conspiracy.  Instead "[w]ithin the parameters of their agreement, Defendants could grow capacity, so long as their growth was limited to around the rate of GDP growth."  Pls' Opp'n, ECF No. 552-1, at 99.

Once again, this Court notes that the parties are approaching from different perspectives what is evidence of a conspiracy – here, in the context of competition on the routes.  The parties' arguments rely in part on their experts' opinions as to whether the facts alleged either support or do not support a conspiracy, with Moving Defendants perhaps ignoring the economic differences between types of conspiracies. Where, as here, there are undisputed facts subject to divergent but justifiable inferences, summary judgment is not supported or sustained.  Furthermore, there are also disputed material facts inherent in the parties' arguments as to whether there was competition in the hubs.  Moving Defendants' focus is on new hubs and growth therein, while Plaintiffs allege that a complete picture involves any growth being offset by reductions in other hubs.  For this reason also, summary judgment on this issue is not supported or sustained.

### 4. Punishment or Mechanism to Punish Delta for Above-Capacity Growth

Delta contends that "[i]n order for a conspiracy to make sense, there must be some punishment mechanism to enforce it."  Delta Mot., ECF No. 464, at 61.  "[A] cartel cannot survive absent some enforcement mechanism because otherwise the incentives to cheat are too great." *Kleen Prods.*, 276 F. Supp. 3d at 842, *aff'd sub nom, Kleen Prods.*, 910 F.3d at 937 ("If this was a cartel, it would have tried to impose disciplinary measures on the 'cheaters' who did not go along with the price increases.")  Delta asserts that, at certain times, it grew its domestic capacity faster than GDP growth, as did Southwest and American, but "Plaintiffs have adduced no evidence either that Delta retaliated, commented on or otherwise sought to punish either Southwest or American [for its growth exceeding GDP during certain years] or that any other Defendant sought to punish Delta for its violations of the supposed agreement."  Delta Mot., ECF No. 464, at 62.  "With no punishment, or even a mechanism to punish, the inference tends toward no agreement."  *Kleen Prods*., 276 F. Supp. 3d at 842 (granting summary judgment, finding "there is no evidence of a single instance in which a Defendant was punished for deviating from the conspiracy"), *aff'd sub nom Kleen Prods.,* 910 F.3d at 937 (plaintiffs "propose two possible mechanisms for enforcement, but they have not pointed to any evidence indicating that either one was used").

Delta seemingly ignores Plaintiffs' assertions that Delta's activation of "previously moth-balled aircraft" was considered "cheating[.]" Pls.' Opp'n, ECF No. 552-1, at 16.[24] Plaintiffs expound on this, arguing that the agreement to exercise capacity discipline went well at the end of

---

[24] Plaintiffs allege that this resulted in the establishment of a GDP "benchmark" to limit capacity growth, with such agreement to abide by this benchmark ending in June of 2015 when the DOJ opened its investigation into potential anticompetitive conduct.  Pls.' Opp'n, ECF No. 552-1, at 16: *see* Pls.' CSMF ¶ 423; Defs.' Reply to Pls.' CSMF ¶ 423 ("On June 30, 2015, the United States Department of Justice Antitrust Division issued Civil Investigative Demands to Defendants to determine whether there [had] been a violation of Section 1 of the Sherman Act[.]")

2009, but "by the middle of 2010, an article in the *Atlanta Business Chronicle* . . . aroused suspicion of the other Defendants that Delta was "cheating" on the capacity reduction agreement."  Pls.' Opp'n, ECF No. 552-1, at 37; Defs.' Reply to Pls.' CSMF ¶ 251 (admitting only that the Atlanta Business Chronicle reported that Delta was putting back into service unused aircraft that had been placed in desert storage).  Plaintiffs proffer that, while there may not have been a *per se* sanction on Delta, the other Defendants criticized Delta and "work[ed] . . . behind the scenes" to pressure Delta to fall in line.  Pls.' Opp'n, ECF No. 552-1, at 39-41.  By way of example, during an earnings call, US Airways Chairman and CEO Doug Parker responded to a question about one of the airlines going "off the wagon" and going on a "growth binge" by stating that "it won't be us" and "we share your concern," and noting that if an airline adds more planes, "it causes us all to lose money."  PX 95, July 21, 2010 Earnings Call, at AA-CAPMDL-0001195948-49.  And Delta conceded that it felt pressured, as noted by Delta's General Counsel Richard B. Hirst, in his Declaration, DX 142 ¶¶ 6-7, where he stated that there were "incidents in which Delta employees received communications perceived as attempts by other airlines to influence Delta's pricing and capacity decisions."[25]

Plaintiffs proffer that Delta acknowledged adherence to the agreement, as indicated *inter alia* in an email from Jill Greer, Delta's Director of Investor Relations, to Delta's Gina Laughlin, noting that aircraft coming out of the desert were replacements, which was reassurance that Delta was "not suddenly growing capacity in the face of improving revenue trends." PX 373, May 25, 2010 email from Jill Greer to (among others) Gina Laughlin (whose position at Delta is not indicated).  And Delta's President Ed Bastian was quoted as saying that Delta "remain[s] committed to keeping our

---

[25] Plaintiffs discuss also Defendants' "scrutiny" and "criticism" of American's announced plans to "increase its capacity by 20% over the [following] five years [after] it exited bankruptcy."  Pls.' Opp'n, ECF No. 552-1, at 43-45 (citations omitted).  This includes a discussion of US Airways' 2013 merger with American, which they allege was a "way to maintain Defendants' joint capacity discipline strategy."  *Id.* at 45 (citations omitted).

capacity discipline in check and our capacity growth within GDP rates." PX 350, October 20, 2010 Delta Earnings Call, at DLT1_06205060.  When asked to define discipline, Delta CEO Richard Anderson stated that "whatever growth you have in the business has got to be below GDP and can't be at the expense of yield and RASM improvement, [s]o basically, you keep up with demand, don't worry about chasing share . . . "  *Id.* at DLT1_06205062.

Delta argues also that it engaged in "aggressive capacity growth" from 2013-2015 and its 'expansion at the hubs of its competitors drew investor and analyst criticism" because the investment community "viewed Delta's actions as, *inter alia*, 'aggressive/hostile,' 'totally unacceptable,' [and] 'bordering on out of control[.]'" Delta Mot., ECF No. 464, at 38 (citations omitted).[26]  In September 2014, Delta was accused by the media of "adding too much capacity at a time when 'capacity discipline,' strongly encouraged by Wall Street, ha[d] been a key factor in the airline industry's transformation into a more profitable, less cyclical, investment-worthy business." *Id.* at 38-39 (citing DX 187, Ted Reed, "*Delta to Wall Street: Don't Tell Us How to Run our Airline*," The Street (10/20/2014)).  Delta proffers that, when challenged by a JP Morgan analyst on its "aggressive capacity expansion on routes dominated by competitors," Delta's CEO Richard Anderson "rebuffed what he perceived as a potential attempt to influence the airline's capacity plans and stated that 'we'll continue to make the right unilateral decisions.'"  Delta Mot., ECF No. 464, at 39; DX 142, Hirst Declaration ¶ 23 & Ex. H.  In sum, Delta notes its "[faster than GDP] capacity growth [from 2013-2015] in the face of repeated criticism [,]"  Delta Mot., ECF No. 464, at 40, and Delta argues that it "never backed off its capacity expansion plans, including in its rivals' hubs, despite intense analyst and investor criticism," *id.* at 62, nor was any punishment meted out to Delta for its capacity

---

[26] Plaintiffs acknowledge that the fall in fuel prices by mid-2014 made it more likely that one or more Defendants "would try to expand capacity and gain market share." Pls.' Opp'n, ECF No. 552-1, at 50.

decisions.

Plaintiffs disagree with Delta's assertion that there was "no punishment" for its capacity expansion plans in 2013-2015; instead, Plaintiffs contend that, "[a]s it had in 2010 when the industry thought Delta was cheating on the agreement, American and some members of the investment community worked together to discipline Delta." Pls.' Opp'n, ECF No. 552-1, at 51 (citing statements by analysts).  Moreover, Plaintiffs submit that "concerns about Delta's cheating [during that period] were unfounded" as Delta was "only optimizing its network," with "capacity decreases at certain hubs subsidiz[ing] capacity growth at other hubs, but overall capacity remained low." *Id.* at 52.  Plaintiffs contend that Delta's capacity growth between 2013 and 2015 "does not disprove a conspiracy" because "during the Misconduct Period, Delta's capacity was consistently lower than its capacity prior to the Misconduct Period, failing to recover to 2008 levels until 2015." Pls.' Opp'n, ECF No. 552-1, at 102; *see* PX 1, Mangum Report, at 175, Figure 49.  Plaintiffs assert further that "Delta's capacity growth was at or below GDP for six of the seven years during the alleged Misconduct Period and exceeded GDP in the other year by a miniscule amount. . ." *Id.; see* PX 1, Mangum Report, at 158, Figure 30.[27]

While the Court notes again the discrepancy in how Moving Defendants and Plaintiffs measure Delta's capacity growth, Plaintiffs' Figure 49 does illustrate that Delta's capacity during the alleged conspiracy was lower than its capacity prior to the alleged conspiracy, and even after fuel prices recovered, capacity remained lower for several years.  The Court finds Moving

---

[27] As previously noted, Moving Defendants' Figure 3 indicates that Delta's capacity was under GDP in 2010-2012; .1% over GDP in 2013; .4% over GDP in 2014, and .8% over GDP in 2015, the year the DOJ investigation was announced.  *See* Figure 3.  In contrast, Plaintiffs allege that "in 2014, Delta's capacity growth of 2.5% matched GDP," *see* Pls.' Opp'n, ECF No. 552-1, at 102, *see also* Figure 30, and with regard to 2015, Plaintiffs discuss only the *first half* of 2015 (before the DOJ investigation) and indicate that Delta's capacity grew 0.8% *less* than GDP; *see id.* (emphasis added).

Defendants' focus relies upon the predicate that the amount by which Delta's capacity exceeded GDP during 2013-2015 would have triggered a mechanism to punish Delta. But Plaintiffs have pointed out and this Court agrees that the amount that Delta's capacity exceeded GDP needs to be viewed in connection with its higher capacity levels prior to the alleged conspiracy in order to get a true picture of the significance of its capacity levels/growth during the alleged conspiracy. This Court notes the conflicting statements in the record as to whether or not Delta's intention around 2010 was to grow its capacity and/or whether it was committed to upholding capacity limits, and views Delta's alleged "aggressive capacity growth," from 2013-2015, in the context of historical capacity rates and movement at the hubs. As such, this Court rejects Moving Defendants' argument that summary judgment is warranted on grounds that Plaintiffs have no evidence of punishment for Moving Defendants' [Delta's] above-GDP capacity growth.

### 5. Lack of Evidence of Defendants Engaging in Private Conspiratorial Communications

United rejects Plaintiffs' assertion that, in addition to public disclosures, "Defendants used private interactions with airline industry stock analysts and institutional investors to [have] conspiratorial communications with each other." United Mem., ECF No. 495-2, at 52 (noting that Plaintiffs "assert that forty-seven non-party individuals at twenty-seven different investment or research firms communicated with the airlines [and] the non-Defendant's role [was] as a conduit of a conspiracy between Defendants.") (internal citations and quotation marks omitted). United asserts that "Plaintiffs can point to no evidence that these [analysts and investors] did anything other than seek or obtain from United information ordinarily sought by investors." *Id.*; *see* Delta Mot., ECF No. 464, at 63 ("Plaintiffs have no evidence of Delta initiating any non-public communications, either directly between Delta and a competitor or indirectly using an analyst or investor, in an attempt to influence a competitor's capacity decisions."). Moreover, even if there were

opportunities for private communications during trade association meetings or merger discussions, Delta contends that there is "no evidence . . .  that Delta actually used any of these opportunities to engage in collusive private communications."  *Id.* at 64 (emphasis omitted); *see* United Mem., ECF No. 495-2, at 53 (noting "no evidence in the record that United ever violated Regulation FD by disclosing material non-public information via an investor or analyst") (internal citations omitted).

United argues that "opportunity to conspire" arguments "should be accorded little, if any weight" on summary judgment.  United Reply, ECF No. 549, at 45 (citing *Baby Food*, 166 F.3d at 133).  "[M]ere contacts and communications, or the mere opportunity to conspire among antitrust defendants was insufficient evidence of conspiracy."  *Moundridge*, 2009 WL 5385975, at *9 (internal quotation marks and citation omitted); *accord Fed. Prescription*, 663 F.2d at 265 ("Mere membership in associations is not enough to establish participation in a conspiracy with other members of those associations.").  Furthermore, "evidence of informal communications among several parties does not unambiguously support an inference of conspiracy."  *Market Force Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1173 (7th Cir.1990)).  And a "mere showing of close relations or frequent meetings between the alleged conspirators" will not sustain a plaintiff's burden unless there is evidence permitting an inference that these ties led to an illegal agreement being formed.  *H.L. Moore Drug Exch. v. Eli Lilly & Co.*, 662 F.2d 935, 941 (2d Cir. 1981). "[I]t is only when those communications rise to the level of an agreement, tacit or otherwise, that they become an antitrust violation."  *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F. 3d 996, 1013 (3d Cir. 1004).

While Delta cites caselaw for the proposition that neither mere contacts, communications nor memberships are sufficient to support an inference of conspiracy, in the instant case, Plaintiffs assert that Defendants used institutional investors and analysts to facilitate and enforce the conspiracy.  A "facilitating practice" is "an activity that makes it easier for parties to coordinate pricing or their

behavior in an anticompetitive way [and] increases the likelihood of a consequence offensive to antitrust policy." *Domestic Drywall*, 163 F. Supp. 3d at 241 n.49 (E.D. Pa. 2016) (quoting Phillip E. Areeda & Herbert Hovencamp, *Fundamentals of Antitrust Law* § 14.05(B)(1)(4th ed. 2015 Supp.)). Courts have considered co-conspirators' use of third-party intermediaries, such as market analysts as a "facilitating practice" of an antitrust conspiracy. *Id.* at 242-248 & 241 n.49; *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 812-813, 829 (D. Md. 2013) (discussing an "industry consultant" serving as a "conduit"). Courts may consider co-conspirators' use of third-party intermediaries, such as market analysts, as "conduits." *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d at 991, 1012.

Plaintiffs argue that there is "evidence that Defendants used the investment community to act as conduits of messages between Defendants and to facilitate monitoring and enforcement of Defendants' agreement." Pls.' Opp'n, ECF No. 552-1, at 88; *see* CSMF ¶¶ 264 (discussing US Airways "work[ing] with investors and analysts to spread the message about Delta's cheating"), 380 (discussing investor pressure on American), 393 (United executives discussing ███████████ ██████████████████████████████████████████████████████████████████████████), 402-408 (describing interactions between and among airline executives and industry analysts).

More specifically, Plaintiffs point to United's use of analysts to discourage Southwest from implementing its plan to expand in 2015, and American criticizing Southwest's expansion, which was detailed by investors and analysts. Pls' Opp'n, ECF No. 552-1, at 88-89. Plaintiffs explain that United described ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ███████████████████ Pls.' Opp'n, ECF No. 552-1, at 88; PX 523, email between United's Managing Director Jonathan Ireland and VP of Network Planning Brian Znotins. Similarly, it was recognized

by JP Morgan analysts that ███████████████████████████████████████████████
███████████████████████████████████ *id.* at 88; PX 419, May 20-21, 2015 email chain with
JP Morgan analyst Jamie Baker (discussing ███████████████████████████).   Plaintiffs
contend that American's President [from 2013-2016] Scott Kirby was ██████████████████████
███████████████████████ *id.* at 89; PX 422, May 21, 2015 Bloomberg chat.

     Furthermore, investors and analysts acknowledged that, during the alleged conspiracy period,
███████████████████████████████████████████████████████ Pls.' Opp'n, ECF
No. 552-1, at 88-89 (citing statements ████████████████████████████████████████████
████████████████████████████████████).[28]  Plaintiffs explain that
Defendants conceded being pressured, as noted in the Declaration of [Delta's General Counsel]
Richard "Ben" Hirst.  Mr. Hirst stated that "Delta employees received communications that Delta
perceived as attempts by other airlines to influence Delta's pricing or capacity decisions, including
indirectly through third parties such as airline stock analysts." DX 142, Hirst Decl. ¶ 6.  In the instant
case, Plaintiffs have gone beyond "mere contacts, communications, and memberships" and
presented some examples illustrating that Moving Defendants may have used third-party
intermediaries as conduits to facilitate conspiratorial communications.  Moving Defendants dispute
Plaintiffs' characterization of the analyst and investor interactions cited by Plaintiffs; *see* Defs.'
Reply to CSMF, ECF No. 550, ¶¶ 264, 380, 393, 402-408, and assert that these third parties sought
only information relevant to analysts and investors.

     Determining the purpose behind the communications by third parties within the larger
framework of the ongoing communications by Defendants is an issue appropriate for a factfinder.

---

[28] Delta asserts that the core of Plaintiffs' argument is that Delta's earnings calls and investor
conferences were a "pretext to communicate with its fellow alleged conspirators," Delta Reply,
ECF No. 551, at 27, but the Court finds that this characterization of Plaintiffs' argument is
oversimplified.

As such, this Court finds that there are disputed issues of material fact regarding whether analysts acted as conduits to pressure various airlines to maintain an industry policy of capacity discipline.[29]

For the reasons noted in the aforementioned discussion, this Court has considered and rejected Moving Defendants' argument that summary judgment is warranted because there is no evidence of parallel capacity behavior.  As noted previously herein, Moving Defendants have based their argument on allegations that: (1) varied capacity changes that sometimes exceeded GDP do not constitute parallel behavior; (2) their capacity growth rates did not deviate from historical patterns; (3) there was competition at the route level and in the hubs, which disproves parallel capacity; (4) Plaintiffs fail to provide evidence of punishment for Delta's above-GDP capacity growth or (5) that Moving Defendants engaged in private conspiratorial communications.  Having found that there are material facts in dispute regarding Defendants' allegations and/or that undisputed facts underlying these allegations are susceptible to divergent inferences, this Court concludes that the evidence presents sufficient disagreement as to require submission to a factfinder. The Court turns now to Moving Defendants' assertion that Plaintiffs cannot survive summary judgment because Moving Defendants had legitimate, non-conspiratorial reasons for their capacity actions and statements about capacity.

### B. Reasons for Capacity Actions and Statements

Moving Defendants argue that there are legitimate, non-conspiratorial reasons for their capacity conduct and statements about capacity, which they allege "were entirely consistent with

---

[29] Delta notes that Plaintiffs "do not cite any evidence, . . ., that *Delta* ever 'used the investment community to act as conduits of messages' to other Defendants."  Delta Reply, ECF No. 551, at 26 (emphasis added).  United argues that "[m]ere contacts and communications" – even among competitors – do not support a conspiracy without "evidence that the information exchanged had any impact on [competitive] decisions."  United Reply, ECF No. 549, at 30 (citing *Moundridge*, 2009 WL 5385975, at *9) (referring to price in that case).

[their] independent economic interest[s]." Delta Mot., ECF No. 464, at 65. "Where there is an independent business justification for the defendant's behavior, no inference of conspiracy can be drawn." *Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F. 3d 1028, 1037 (8th Cir. 2000). Summary judgment is appropriate where defendants "provide a plausible and justifiable alternative interpretation of [their] conduct that rebuts the alleged conspiracy." *Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.*, 971 F.2d 37, 54 (7th Cir. 1992). The standard for summary judgment does not however require nonmovants to "exclude" or "dispel" the possibility of independent conduct. *Publication Paper*, 690 F.2d at 63. "[T]hat would amount to an absurd and legally unfounded burden to prove with 100% certainty that an antitrust violation occurred." *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 934-35 (7th Cir. 2000). Rather, what is required is that 'if a plaintiff relies on ambiguous evidence to prove its claim, the existence of a conspiracy must be a reasonable inference that the jury could draw from that evidence; it need not be the sole inference;" *i.e.*, a "reasonable factfinder [may] infer that the conspiratorial explanation is more likely than not." *Publication Paper*, 690 F.3d at 63.

Plaintiffs proffer two alleged explanations for Defendants continuing the capacity discipline arrangement after fuel prices stabilized and demand started to increase: (1) Southwest had become more of a key player in the industry regarding its ability to "undermine the other Defendants' ability to maintain industry capacity and increase price;" and (2) there was a concern "that lower fuel prices and increased demand would cause defections from co-conspirators who would increase capacity to try to gain market share, thus undermining the ability to increase fares." Pls.' Opp'n, ECF No. 552-1, at 35-36. Plaintiffs assert these two concerns were addressed rapidly and publicly. *Id.* First, with regard to Southwest, their CEO Gary Kelly made statements indicating that Southwest would abide by the agreement, in order to "reassure[ ] the other Defendants;" *see* PX 150, Tr. of 3/10/2009 statements by Southwest at the JP Morgan Aviation and Transportation Conference, at AA-

CAPMDL-0004374814. Shortly thereafter, Scott Kirby, President of US Airways, "acknowledged Southwest's statement and the importance of Southwest's commitment to also exercise capacity discipline," and commented that Southwest's "desire to grow[ ] has changed," with the effect that Southwest is more "rational competition." Pls.' Opp'n, ECF No. 552-1, at 35; *see* PX 119, Tr. of US Airways remarks at the March 16, 2009 JP Morgan Aviation and Transportation Conference, at AA-CAPMDL-0002446525.

Second, with regard to possible defections, Plaintiffs note that Defendants' capacity announcements and public statements shifted to being more proactive on the "need for Defendants to *continue* to act together." Pls.' Opp'n, ECF No. 552-1, at 36 (emphasis in original). Plaintiffs assert that the Defendants continued to agree to exercise capacity discipline even after economic conditions improved.[30]

### 1. Capacity Actions

Delta explains that it had legitimate business reasons for its capacity actions insofar as its actions were a "response to macro-economic conditions that it confronted as it emerged from bankruptcy with new leadership." Delta Mot., ECF No. 464, at 65. More specifically, Delta asserts that:

> In December of 2007, eight months after it exited bankruptcy, as Delta was still recovering from its time in bankruptcy, the economy officially entered the Great Recession, the lengthiest and (until recently) the most severe economic downturn in this country's history since the Great Depression. The following year, the price of jet fuel increased dramatically, rising by nearly 60 percent, peaking at record high levels. In the midst of these twin global economic crises, in 2008, Delta reduced capacity as it announced and then closed its merger with Northwest Airlines after a DOJ review. In 2009 . . . still reeling from skyrocketing fuel prices and the precipitous drop in demand resulting from the Great Recession, Delta again reduced its capacity. But the entire airline industry also reduced capacity in 2009 in response

---

[30] As noted earlier herein, Plaintiffs allege that, by mid-2010, there was a discussion among Defendants about Delta activating "previously moth-balled aircraft," which triggered concerns that "Delta was "cheating" on the capacity reduction agreement," and thereafter, Defendants "redoubled their efforts to remind their co-conspirators that they must act in accordance with their commitment to grow capacity 'responsibly.'" Pls.' Opp'n, ECF No. 552-1, at 38.

to the same macro-economic forces.

Delta Mot., ECF No. 464, at 65-66; *see* United Mem., ECF No. 495-2, at 58 (noting that when costs go up and demand goes down, a reduction in output is consistent with economic self-interest, and furthermore that United's "contraction might have risked losing market share, but it restored profitability").

Delta asserts that its capacity actions post-2009 "are also justified by unilaterally rational responses to the economic environment."  Delta Mot., ECF No. 4646, at 66. "Although the Great Recession technically ended in mid-2009, the reduced demand effects persisted until at least the end of 2012 and fuel prices remained high through later 2014 and continued to be volatile."  *Id.* at 67; Pls.' Resp. to Delta SUMF ¶¶ 124, 126 (admitting that total domestic airline passenger traffic measured in revenue passenger miles did not recover to pre-recession levels until the end of 2012, and that jet fuel prices fluctuated from 2008-2016). Accordingly, "Delta was understandably cautious with its capacity growth between 2010 and 2012 [and] [a]lthough Delta increased domestic system capacity in 2010 (and was roundly criticized for doing so by analysts and investors), it reduced capacity in 2011 and 2012 in response to fuel price increases and volatility."  Delta Mot., ECF No. 464, at 67; Pls.' Resp. to Delta SUMF ¶¶ 155-157 (admitting that, in early 2011, Delta executives noted increasing fuel costs and "keeping a close watch on fuel prices" and making "responsible decisions around capacity." (internal citations omitted)).  Delta argues that its actions in this regard were not "irrational," *Moundridge*, 2009 WL 5385975, at *6, or "so perilous" that no "reasonable firm" would have done without an agreement, and accordingly, Plaintiffs cannot support their inference of conspiracy.  Delta Mot., ECF No. 464, at 67; *see In re Musical Instruments and Equipment Antitrust Litig.*, 798 F.3d 1186, 1195 (9th Cir. 2015).

For the period 2010-2013, United asserts that its "continued focus on long-term stability remained a rational approach to profit-maximization after 2009 even if not expanding more rapidly

sacrificed marginal revenues in the short-term."  United Mem., ECF No. 495-2, at 60 (case citations omitted) (discussing United merger with Continental and "plans for cautious growth").

Subsequently, in 2013 through 2015, the remaining years of the conspiracy,  Delta alleges that "as the economy improved, [it] increased aggregate domestic capacity . . . by an amount greater than GDP growth," and did not "back down" even when "sharply criticized by investors and analysts for its capacity growth."  Delta Mot., ECF No. 464, at 67-68.  United contends that, in 2014, "management turmoil further delayed [the airline] from executing its growth plan" until mid-2016. United Mem., ECF No. 495-2, at 63. In sum, Moving Defendants assert that they have proffered a rationale for their business decisions, and the Plaintiffs and this Court may not engage in "impermissible 'second guessing' of business judgments[.]"  Delta Mot., ECF No. 464, at 68. "Courts have recognized that firms must have broad discretion to make decisions based on their judgments of what is best for them and that business judgments should not be second-guessed" *Moundridge*, 2009 WL 5385975, at *6  (internal quotation marks and quotation omitted).

In turn, Plaintiffs focus on Defendants' acknowledgement that capacity discipline resulted in industry profitability in the form of increased fare prices and revenue, and Plaintiffs assert that this profitability would have been undone if the Defendants competed for fares and increased capacity as they had in the past.  After fuel prices stabilized, it would have been impractical for one Defendant to engage in capacity discipline if others had been competing for fares and increasing capacity.  PX 312, Tr. of Delta's remarks at Mar. 22, 2011 JP Morgan Aviation Conference, at DLT1_04655135 (where Delta's President Ed Bastian stated: "We are fond of talking about capacity discipline within the industry, but we also need to couple that, mirror that with pricing discipline as well to make certain that we are getting the cost of our product covered in our revenue stream."); PX 744, "Jeff Smisek: United Continental's King of the Skies," April 21, 2011 Fortune Magazine interview, at 2 (where United's CEO Jeff Smisek indicated that "We've been very disciplined at United and across

the industry in making sure we've got the right level of capacity and not supplying overcapacity, driving down pricing.").  In this case, Plaintiffs contend that Defendants "reduced capacity on profitable routes and underutilized their fleets by parking aircraft, using active aircraft less, and under-gauging (not supplying as many seats in the market as they could).  PX 1, Magnum Report ¶¶ 277-286.  Furthermore, Plaintiff's expert Dr. Magnum opined that: "Reducing or restricting capacity on a route [to try to achieve increased prices] is only in a carrier's individual self-interest if the other carriers that operate on the route reduce or restrict capacity."  PX 1, Mangum Report ¶ 277.  Otherwise, if one carrier reduced capacity as its competitors expanded their own capacity, then "the only outcome the "capacity-disciplined" carrier would accomplish is reduced market share for itself."  *Id.*

Moreover, Plaintiffs assert that  "in an industry in which unilateral production cuts expose a company to loss of market share, a publicly announced production cut makes it more likely that the producer has an agreement from other producers to either cut production as well, or at least to forbear from assuming the vacated market share."  Pls.' Opp'n, ECF No. 552-1, at 81 (quoting *Broiler Chicken*, 290 F. Supp. 3d at 798)).  Plaintiffs rely in large part on Dr. Mangum's "'structure, conduct, and performance' analysis of the domestic airline industry," which they allege is an "accepted economic approach for evaluating the presence or absence of conduct consistent with a conspiracy," including collusion.  Pls.' Opp'n, ECF No. 552-1, at 93.  More specifically, Dr. Mangum evaluated the structure of the domestic airline market and determined that it was susceptible to collusion; analyzed Defendants' conduct and found it inconsistent with independent economic interests absent collusion; and evaluated the economic "performance" of the industry to determine the consistency of capacity and prices with competitive supply and demand, and upon considering all economic factors, found Defendants' conduct consistent with collusion.  Pls.' Opp'n, ECF No. 552-1, at 93-94; *see generally* PX 1, Magnum Report ¶¶ 308-362.  "And critically, he

found that competitive factors alone cannot explain either Defendants' capacity or their fares —
which led to record profits." *Id.* ¶¶ 10, 362.  Delta submits, in turn, that "none of Dr. Magnum's
arguments have merit and all are fully rebutted by Delta's and United's economics experts, Dr.
Carlton and Dr. Israel."  Delta Reply, ECF No. 551, at 38.

In this case, Defendants have proffered economic justifications for their alleged unilateral
capacity discipline actions, where such actions continued even after the Great Recession ended and
fuel prices had stabilized.

. In turn, Plaintiffs have cast doubt on Moving Defendants' proffered justification through
evidence that supports Plaintiffs' theory that Defendants' capacity actions were not unilateral but
were instead coordinated in order to limit capacity and drive up prices.  Upon consideration of
Defendants' capacity discipline actions, the Court cannot rule out that a factfinder could reasonably
infer from the evidence the existence of a conspiracy, and accordingly, summary judgment is not
supported or sustained.

### 2. Capacity Statements

Moving Defendants assert that the airline bankruptcies that happened before the alleged
conspiracy "wiped out shareholder equity" and were "widely believed by investors to have been
caused by excessive capacity growth."  Delta Mot., ECF No. 464, at 69.  They explain that,
subsequently, airline management focused on "responsibly managing the business for shareholders'
benefit – emphasizing margin rather than market share."  *Id.*  And "to attract long-term capital, they
needed to convince investors that they would not repeat the mistakes of the past."  *Id.* at 70 (citations
to deposition testimony omitted).  According to Moving Defendants, "[a]irline stock analysts began
to highlight in their reports . . . future capacity plans and the commitment to capacity discipline as
a central, if not the most important factor in analysts' recommendations . . . [on] airline stocks."
Delta Mot., ECF No. 464, at 70 (citing deposition testimony about the importance of industry-wide

capacity discipline); *id.* at 71.  Plaintiffs' Securities Law Expert, Professor Adam C. Pritchard concluded that Defendants' "voluntary disclosure" of future capacity plans was "'consistent' with: (1) providing investors with more information about their business prospects; and (2) communicating with their industry peers about their intentions to restrict supply." DX 38, Pritchard Report ¶ 15.[31]

Moving Defendants claim that providing investors with more information about Defendants' business prospects is "an independent business justification" for disclosure of such information. Delta Mot., ECF No. 464, at 71 (citing *Moundridge*, 2009 WL 5385975, at *6).  United asserts that "[i]nvestors would not invest in United if it didn't [communicate about its capacity plans]."  United Mem., ECF No. 495-2, at 48.   United contends further that its disclosures are "fully consistent with unilateral conduct" as they were either "forward-looking guidance about its own capacity plans" or "observations about the industry and risks posed by its competitors' capacity decisions." *Id.* "Plaintiffs do not dispute that investors were intensely interested in Delta's future capacity plans [after exiting bankruptcy] and would downgrade or sell Delta's stock if they perceived that Delta was not exercising capacity discipline."  Delta Reply, ECF No. 551, at 11 (citing Pls' CSMF ¶¶ 111-113 (discussing interdependence of stock prices) and a Wall Street Journal article).

Moving Defendants assert that because this demonstrates an independent business justification, "no inference of conspiracy can be drawn." *Blomkest*, 203 F.3d at 1037. For example, published statements could not support an inference of conspiracy when a defendant offered a "legitimate purpose sufficient to rebut any implication that [they] were an attempt to communicate with competitors." *Hall v. United Air Lines, Inc.*, 296 F. Supp. 2d 652, 672 (E.D.N.C. 2003), *aff'd*

---

[31] United notes that 38% of its "supposedly conspiratorial public disclosures to investors identified by Plaintiffs . . . were made in direct response to questions posed by analysts about capacity." United Mem., ECF No. 495-2, at 43.

*sub nom. Hall v. Am. Airlines, Inc.*, 118 F. App'x 680 (4th Cir. 2004). In the context of establishing plus factors, "courts have refused to construe corporate communications as invitations to collude where the communications [statements regarding possible imposition of bag fees] contain 'the type of information companies legitimately convey to their shareholders,' instead restricting such findings to cases involving 'far more detailed communications with no public purpose.'" *Delta/Airtran*, 245 F. Supp. 3d at 1372-73 (quoting *Holiday Wholesale*, 231 F. Supp. 2d at 1276-77).

Delta cautions that "courts should not infer a conspiracy from public communications where the defendant, as here, has demonstrated reasonable business justification for its actual conduct." Delta Mot., ECF No. 464, at 68-69. "[W]hen the defendant puts forth a plausible, procompetitive explanation for [its] actions, [courts should] not be quick to infer, from circumstantial evidence, that a violation of the antitrust laws has occurred." *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1574 (11th Cir. 1991) (citing *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1456 (11th Cir. 1991)). But, as noted in the prior subsection, this Court has not accepted without question Moving Defendants' proffered business justification for its capacity discipline actions. Accordingly, in the instant case, "[where] the class . . . present[s] independent evidence tending to exclude an inference that the [defendants] acted independently," then, "it [may] use these [public] communications for whatever additional evidence of conspiracy they may provide." *Blomkest*, 203 F.3d at 1037.

Delta contends that the question before this Court is "whether a reasonable business justification is *at least as likely* as conspiracy to explain Delta's capacity statements." Delta Reply, ECF No. 551, at 27 (emphasis added by Delta). While all reasonable inferences are drawn in favor of the non-moving party – here, the Plaintiffs – they must "put on the table 'some evidence which, if believed, would support a finding of concerted behavior.'" *Kleen Prods.*, 910 F.3d at 934

(citations omitted). Delta claims that the business justification for sustained reduced capacity in this case hinges on the "*repeated* emphasis by investors and analysts on the criticality of capacity discipline to their investment decisions[[.]" Delta Reply, ECF No. 551, at 29; DX 51, Miller Report ¶ 92. Delta proffers a business justification – i.e., the airline was reassuring investors that it would maintain capacity discipline – versus more actively competing for market share – as a way of increasing profitability. But this Court notes that Plaintiffs have presented credible evidence that the increased profitability at issue here hinged on several airlines (together controlling a majority share of the domestic market) taking similar actions. A single airline reducing capacity would lose sales and market share. In contrast, when several airlines controlling a majority share agree to reduce supply, this results in upward price pressure and an increase in profitability for all. And, according to Plaintiffs' theory of the case, this capacity discipline agreement was acknowledged and encouraged by the investment community and analysts.

"Evidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that defendant operated in a competitive market." *Flat Glass*, 385 F.3d at 361. Courts have held that "[t]he most important evidence will generally be non-economic evidence 'that there was an actual, manifest agreement not to compete.'" *Flat Glass*, 385 F.3d at 361 (quoting *High Fructose Corn Syrup*, 295 F.3d at 661). That evidence may involve "proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." *Flat Glass*, 385 F.3d at 361 (citations omitted). Plaintiffs assert and this Court agrees that, in this case, Defendants exchanged assurances of commitment to a common capacity plan when "on hundreds of occasions, they repeatedly stated their intentions to participate in and abide by an agreement to limit capacity," Pls.' Opp'n, ECF No. 552-1, at 77. Additionally, the "timing of the statements with the alleged concerted action provides some of the requisite "factual heft" in support of Plaintiffs'

allegations of parallel conduct."  *Standard Iron*, 639 F. Supp. 2d at 895.

This Court notes that courts have found it appropriate to draw inferences of conspiracy from public statements.  *See, e.g., United States v. Foley*, 598 F. 2d 1323, 1331-1332 (4th Cir. 1979) (one defendant's announcement regarding prices at an industry dinner followed by price increases by those in attendance was sufficient to support a conviction for conspiracy); *see also In re Travel Agency Comm'n Antitrust Litig.*, 898 F. Supp. 685, 690 (D. Minn. 1995) (denying summary judgment where the plaintiffs alleged that Delta, American, and United, among others, engaged in a conspiracy to cut travel agency commissions, which involved signaling through public speeches and subtle press releases).  In *Travel Agency*, 898 F. Supp. at 690, the court looked to the "set of occurrences, speeches, meetings, events, official and unofficial corporate utterances, and conferences at which information was exchanged," identified by the plaintiffs, and rejected the defendants' arguments that there was insufficient evidence to convince a jury that, although these messages were sent and received, each defendant made an entirely independent decision to revise its domestic ticket structure.  The court therein commented that while defendants "den[ied] that there [was] sufficient evidence to convince a jury that these messages were sent and received," and this may be correct, "defendants confuse[d] a triable issue with a winning case." *Id.* Correspondingly in this case, while Plaintiffs may or may not ultimately prevail, the record evidence presents triable issues.

In response to Moving Defendants' arguments about capacity statements, Plaintiffs rely in part on *Petroleum Products*, 906 F.2d at 432, a case involving an alleged price fixing conspiracy by petroleum companies.  In that case, the Circuit Court concluded that the district court erred in granting summary judgment because the appellants "presented sufficient evidence concerning their allegations of a conspiracy to create a shortage to warrant submission of the issue to a jury." *Id.* at 465. More specifically, Plaintiffs note that, in *Petroleum Products*, the Circuit Court found that

defendants' price increase announcements could be interpreted as messages aimed at rivals to coordinate prices because they were of no use to the consumers and furthermore, they "could hardly be described as fostering the efficient or rational operation of the market." *Id.*

Similarly, in the instant case, Plaintiffs argue and this Court agrees that Defendants' announcements about forward-looking capacity plans and the Defendants' alleged need for and their commitment to capacity discipline were "useless to consumers." Pls.' Opp'n, ECF No. 552-1, at 79. The Court notes that there is a disconnect between what benefits airlines and their investors, and what benefits consumers. Plaintiffs assert also that the investment community's desire for information about capacity discipline does not "constitute a legitimate business reason to provide such information," because such information does not "foster an efficient or rational market." *Id.* (emphasis added).

Delta distinguishes *Petroleum Products* insofar as "the public statements [there] contained 'unusually detailed [information] listing [dealer prices] and dealer discounts for each individual price zone'" and "[dealers] had already been 'individually notified' about those discounts prior to their posting" so "the public announcements 'served little purpose other than to facilitate' conspiracy." Delta Reply, ECF No. 551, at 34 (quoting *Petroleum Products*, 906 F.2d at 448-450). Delta asserts that it "does not disclose detailed information to its investors about capacity plans," *id.* at 34, or convey competitively sensitive information that could be used to "facilitate any alleged conspiracy" or "provide meaningful new information to competitors." Delta Mot., ECF No. 464, at 70-71. Delta argues that generalized, aggregated information about capacity plans serves a purpose other than facilitating a conspiracy insofar as it is "incredibly important to investors" in order to "assess[ ] individual airline profitability" and "overall industry forecast." Delta Reply, ECF No. 551, at 35.

Moreover, "both Defendants and non-Defendant airlines made such disclosures during the

alleged conspiracy period."  Delta Mot., ECF No. 464, at 70-71.  United explains that airlines such as Jet Blue and Alaskan Air "touted 'capacity discipline' to investors," disclosed their "numerical capacity guidance," and in some cases provided "schedules to OAG" and made publicly available their fares information.  United Mem., ECF No. 495-2, at 69-70.  Accordingly, United argues that "presumptively self-interested pursuit of this [type of] conduct" by other domestic airlines "refutes any suggestion that United's conduct is less consistent with independence than with agreement." *Id.* at 70.[32]  This argument ignores however that non-defendants Jet Blue and Alaskan Air held a very limited share in the market for domestic flights versus Defendants' controlling share of that market.

        In contrast to Defendants' representations that competitively sensitive information was not shared, Plaintiffs argue that the airlines engaged in a high level of interfirm communication that allowed them to implement and facilitate the conspiracy.  Plaintiffs assert that not only was there a large amount of publicly available information accessed through industry groups such as Airline Tariff Publishing Company ("ATPCO"), OAG, and International Air Transport Association ("IATA"), but they claim also that Defendants "directly exchanged sensitive capacity information with each other through Airlines for American ("A4A" or "ATA") in the form of weekly traffic reports."  Pls.' CSMF ¶ 165 (indicating that United, Delta, and American all participated in the weekly traffic exchange from 2008 until the exchange was terminated after Delta resigned from

---

[32] Delta notes that "Plaintiffs discount the importance of public information in OAG because schedules naturally change" and the schedules "produced in OAG represent Delta's best estimate of the schedules and planes that it will fly" and "its total planned domestic . . . capacity."  Delta Reply, ECF No. 551, at 14 (citing DX 30, Baldoni Dep. 129:19-24); United Reply, ECF No. 549, at 44 (explaining that OAG [and ATPCO] are "the core systems by which airlines – all airlines – have for decades published the seats currently available for travelers to buy and the airfares at which they are currently being offered") (internal citation and emphasis omitted).  "The schedules submitted to OAG reflected flights that were made available for sale."  Defs.' Reply to Pls.' CSMF ¶ 75.

A4A in October 2015).   Moving Defendants dispute whether Plaintiffs have supported their characterization of this capacity information as "confidential" but admit that the weekly traffic information was not public.  Defs.' Reply to Pls.' CSMF ¶¶ 164, 173.

Plaintiffs allege that this "data exchange" of weekly traffic reports involved "non-anonymized near-real time capacity information from each of the participating Defendants that enabled them to understand each other's capacity at a granular level," with "other carriers refus[ing] to participate in [this exchange] because of the sensitivity of the data."   Pls.' Opp'n, ECF No. 552-1, at  89-90; *see* Pls.' CSMF ¶ 167; Defs.' Reply to Pls.' CSMF ¶ 167 (█████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████).[33]   PX 686, Heimlich Dep. Tr. 99:2-102:10.

Plaintiffs argue that the exchange of competitively sensitive information was against independent self-interest.  Pls.' Opp'n, ECF No. 552-1, at 93; *Home Depot*, *U.S.A., Inc. v. E.I. Dupont De Nemours & Co.,* Case No. 16-cv-04865- BLF, 2019 WL 3804667 at *9 (N.D. Ca. 2019).  In *Polyurethane Foam*, 152 F. Supp. 3d at 989-991, the court accepted the plaintiffs' argument that,

---

[33] "ATPCO is a clearinghouse through which airfares currently available for purchase, for flights that are planned to take place in the future, are submitted by Defendants and other airlines and published four times per day during weekdays and once on weekends."  Defs.' Reply to Pls.' CSMF ¶ 60.  During the alleged conspiracy period, "Defendants American, Delta and United had ownership interests in ATPCO," along with other carriers.  *Id.* at ¶ 61.  United and Delta "monitored each other's pricing actions in ATPCO on a regular basis throughout each day."  *Id.* at ¶ 65.

A4A is a trade association that advocates before Congress and federal agencies on behalf of the domestic airline industry and conducts economic analysis regarding the air transport industry.  Pls.' CSMF ¶ 115. IATA is an international trade association for the airline industry that performed functions comparable to A4A and advanced the collective agenda of the international airline industry.  Pls.' CSMF ¶ 130.

absent an agreement, the private exchange of sensitive business information would be "risky" and found that questions of fact were raised regarding the defendants' assertion that only "public information" was shared.  In this case, there are conflicting accounts regarding the sharing of information about capacity.  On an October 16, 2014 earnings call, Delta's Chief Executive Officer Richard Anderson stated that: "we will not discuss capacity among competitors on these [earnings] calls today or in the future, because it's not appropriate."  PX 363, Earnings Call Transcript, at DLT1_06205440.  In contrast, during his deposition, Jonathan Ireland, United's Managing Director, Investment Relations, indicated that Defendants all provided forward-looking capacity guidance during their earnings calls as well as during industry conference presentations. PX 687, Jonathan Ireland Deposition transcript.

Plaintiffs contend further that Defendants shared "sensitive business information, including *inter alia,* "a Delta/American data exchange of comprehensive information about the status of fleets, . . . an exchange of data about their support aircraft between Continental, US Airways, and United, . . . and an exchange of personnel and staffing information between American, Delta, US Airways, Continental and United . . ."  Pls.' Opp'n, ECF No. 552-1, at 90 (referencing CSMF ¶¶ 182-184). Plaintiffs allege that Defendants "shared enormous amounts of sensitive information with each other during the frequent unconsummated merger discussions that occurred between them, including information on all aspects of their operations and plans, [such as] projections of ASMs, yield, load factors, PRASM, CASM, operating revenue, operating expenses."  Pls' Opp'n, ECF No. 552-1 at 90; *see* CSMF ¶¶ 97, 149-58; PX1, Mangum Report ¶¶ 85-86.  The timing of many of these exchanges was during early 2008, "the period when the agreement took shape." *Id.*   As a more specific example, "[a]n exchange of information regarding employee headcounts, job titles, grade levels by station and department between United and Delta led to a statement by United's Director of Investor Relations, Jonathan Ireland: "I can't believe DL is giving us this information. Simply

can't believe it."  Pls.' Opp'n, ECF No. 552-1, at 90; *see* PX 600, email from Jonathan Ireland to

Anil Khorana, at UAL-004235408; *see also* Defs.' Reply to Pls.' CSMF ¶ 184 (acknowledging that

Defendants discussed exchanging information about headcounts and American exchanged this

information with Delta).

In this case, the record is replete with references to "parallel" public statements pertaining to

the need to restrict capacity as well as more private communications regarding the need for

defendant airlines to together maintain this course of action, which tend to exclude the possibility

of independent action.  Plaintiffs have presented evidence about the manner, purposes, and effects

of sharing capacity information that tends to exclude the possibility that it was merely part of the

normal course of business – informing investors and keeping track of competitors – rather than

unifying and pressuring Defendants to keep capacity low to drive up prices, even during times it

went against an airline's self-interest to compete against other airlines by expanding capacity. "It is

certainly plausible that absent coordination and agreement by each producer to give its "pint of

blood," no Defendant would have sacrificed profitable production." *Standard Iron Works*, 639 F.

Supp. 2d at 896-897.  Furthermore,"[w]hile more innocent inferences can be drawn from the

statements that Plaintiffs contend infer an agreement to [maintain capacity discipline], it is not

Plaintiffs' burden to allege facts that cannot be squared with the possibility of unilateral action." *Id.*

at 895 (citation omitted).

The Court finds this case unlike *Kleen Prods.*, 910 F.3d at 934-35, where the court there

affirmed summary judgment and concluded that "nothing in this record would permit a trier of fact

to conclude that the defendants were colluding, rather than behaving in their independent self-

interest."  Accordingly, summary judgment regarding Moving Defendants' argument involving

capacity statements is not supported or sustained. The Court turns now to the plus factors alleged

by Plaintiffs, to the extent that such factors have not been already addressed herein.

### C. Plus Factors

In additional to proof of parallel conduct, Plaintiffs must produce evidence of "plus factors" that "indicate the existence of a conspiracy by ruling out a legitimate non-collusive explanation for the parallel behavior: [these factors] suggest that an alleged conspirator's actions are 'inconsistent with independent pursuit of economic self-interest.'"  Delta Mot., ECF No. 464, at 19 (quoting *Moundridge*, 2009 WL 5385975, at *6 (internal quotation omitted)).  "Evidence that the defendant acted contrary to its interests means evidence of conduct that would be irrational assuming that the defendant operated in a competitive market."  *Moundridge*, 2009 WL 5385975, at *6 (citations omitted), or action that would be "so perilous," *Musical Instruments*, 798 F.3d at 1195, or "so unusual that in the absence of advance agreement no reasonable firm would have engaged" in it. *Baby Food,* 166 F.3d at 135 (discussing parallel price fixing).

Plaintiffs' asserted plus factors are that: (a) the airline industry was conducive to collusion (here, all parties acknowledge that it is an oligopoly);[34] (b) Defendants had a significant and common motive for colluding – to increase profitability (discussed in subsection B.1 above); (c) Defendants' announcements and statements expressed commitment to a common plan (discussed in subsection B.2 above); (d) Defendants shared competitively sensitive data to facilitate the conspiracy, and they engaged in a high level of interfirm communication (discussed in subsection B.2 above); (e) airline investors and analysts facilitated and enforced capacity restraints (discussed in subsection A.5 above); (f) this was a structural break from Defendants' past conduct (discussed in subsection A.2 above), there were admissions by certain Defendants that Defendants' conduct

---

[34] Delta disputes that the structure of an industry or any market characteristic indicating that an industry is an oligopoly is a plus factor.  Delta Reply, ECF No. 551, at 35-36.  "[E]vidence [that] is consistent with" being an oligopoly is "not actionable under section 1 of the Sherman Act."  *Id.* (quoting *High Fructose*, 295 F.3d at 661).  This Court does not consider the structure of the industry as a "plus factor."

raised antitrust concerns, and after the DOJ investigation, Defendants' conduct changed (discussed below); (g) economic evidence demonstrates that capacity restraints and fare increases are not explained by reasons other than collusion (discussed throughout this Memorandum Opinion).

### 1.   United Argues that Plus Factors Apply to Other Airlines

United argues briefly that Plaintiffs' plus factors are equally consistent with independent action because they hold true for airlines that were not accused of conspiring.  United Mem., ECF No. 495-2, at 69-70 (indicating that non-defendant airlines touted capacity discipline and disclosed capacity guidance).[35]  As previously noted, not one non-defendant airline exceeded a 5% share of domestic capacity during the alleged conspiracy period, and furthermore, there are disputes herein as to the [statistical] capacity trends demonstrated by Defendants versus non-defendant airlines.

### 2. Defendants' Admissions and Change in Conduct After DOJ Investigation

With regard to alleged admissions by the Defendants, Plaintiffs focus on the Hirst Declaration, wherein Mr. Hirst [Delta's former General Counsel] conceded that he experienced conduct by analysts that raised antitrust concerns, and that "Delta viewed these communications as attempts at signaling" and as "inappropriate," and Mr. Hirst "perceived" such communications as "attempts to influence [Delta's] actions in anticompetitive ways."   DX 142, Hirst Decl. ¶¶ 11-12. By way of example, Mr. Hirst indicated that after a 2014 second quarter earnings call – during which  Delta had "concerns" with an analyst's behavior – he explained to Ed Wolfe, Wolfe Research's founder and Managing Partner, that "an analyst who allows himself to be used as a conduit for anticompetitive communications might be exposing both himself and his firm to

---

[35] United indicates that non-defendant airlines "cut their capacity in 2009 at a greater rate than Defendants, but Plaintiffs do not claim this was against their self-interest."  United Mem., ECF No. 495-2, at 69 (emphasis deleted and citations omitted). Plaintiffs acknowledge however that in 2008-2009, "demand plummeted with the onset of the Great Recession" and the airline industry recognized that it "needed to shed capacity."  Pls.' Opp'n, ECF No. 552-1, at 29-30.

potential exposure under the antitrust laws." *Id.* ¶ 16; *see also* ¶¶ 21-24 (discussing a "similar incident involv[ing] an airline analyst at JP Morgan). Plaintiffs argue that Mr. Hirst makes some "self-serving statements" about trying to stop this signaling in an attempt to absolve Delta from any wrongdoing, Pls.' Opp'n, ECF No. 552-1, at 85, and they assert that such statements actually lend credence to Delta being involved in the conspiracy. *Id.* at 86. "Nor does even this self-serving declaration make it clear that Mr. Hirst was trying to stop the signaling about which he now attests." *Id.*

In his Declaration, Mr. Hirst recounts two incidents where Mr. Parker, now-CEO of American [then-CEO of US Airways] conveyed direct and indirect messages to Delta executives in August and October of 2010, allegedly in an attempt to influence Delta's capacity and pricing decisions. DX 142, Hirst Decl. ¶¶ 7-11. Mr. Hirst conveys that he discussed this later with Mr. Johnson, the chief legal officer for US Airways, and Mr. Hirst "demanded that all such communications stop." DX 142, Hirst Decl. ¶¶ 11, 18. In both cases, Mr. Hirst states that he made it made it clear to airline executives and analysts that Delta made independent decisions. *Id.* ¶¶ 11, 16, 18-20.[36] Plaintiffs argue however that Mr. Hirst's "assertions that Delta did not change its capacity plans in response to influence or signaling" are belied by emails between Mr. Scott Kirby, then-president of US Airways and now-CEO of United, and Mr. Ed Shapiro of Par Capital, ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ Pls.' Opp'n, ECF No. 552-1, at 86-87 (quoting PX 45, October 20, 2010 email chain). Delta contests Plaintiffs' claim that it "altered its capacity guidance

---

[36] In its defense, Delta asserts that "receiving and rebuffing these communications, however, does not implicate Delta in 'signaling,' 'or [in] attempts to influence [the] actions [of others] in anticompetitive ways.'" Delta Reply, ECF No. 551, at 26 (italics removed).

as a result of pressure from US Airways" based on the aforementioned email.  Delta Reply, ECF No. 551, at 27 n.23.  The Court notes that this disputed factual issue, like so many others in this case, cannot be viewed in a vacuum.  Instead, it is best looked at as part of the overall bigger picture - that is, was there a change in Delta's prior capacity projections that coincided in timing with any alleged pressure by US Airways (or Defendant airlines), and/or were there other factors that Delta can point to as an explanation for any such change.

Plaintiffs assert also that "[c]hanges in Defendants' conduct and practices" after the alleged conspiracy period further evidence a conspiracy, and one example of this is the "cessation of public statements committing to 'capacity discipline' and encouraging the 'industry' to participate" therein.  Pls.' Opp'n, ECF No. 552-1, at 96-97.  Plaintiffs note that, in mid-2015, after becoming aware of the DOJ investigation, "officials at IATA [International Air Transport Association, a trade association] modified a draft of a 'Weekly Message' to remove references to 'discipline' and 'capacity' to avoid the perception of them being 'misinterpreted as collusion.'"  *Id.* at 97.  Furthermore, Delta's CEO Richard Anderson indicated during Delta's January 19, 2016 Q4 Earnings Call that: "[i]t's our policy to not comment about our future actions with respect to competitive dynamics in the marketplace."  *Id.*; PX 300, Delta's January 19, 2016 Earnings Call, at DLT1_03066522.  Similarly, United CEO Scott Kirby "demurred to a question about capacity discipline" by indicating that he had "learned not to use the word 'capacity discipline.'"  Pls.' Opp'n, ECF No. 552-1, at 97 (internal citation omitted).

Moving Defendants do not dispute that they stopped using the term "capacity discipline" after the DOJ investigation commenced, but they dispute the significance of this action.  United compares this situation with a "company adopt[ing] a compliance policy directing its employees to avoid statements that had caused a DOJ investigation."  United Reply, ECF No. 549, at 45-46.  In similar vein, Delta argues that "[i]t is not a sign of guilt if Delta has used that term less frequently — it is

66

a sign that Delta, like any reasonable company, wanted to stop the filing of meritless and costly lawsuits."  Delta Reply, ECF No. 551, at 45.  A factfinder – looking at these statements in the context of the cumulative evidence – could draw their own conclusions as to whether these statements by airline executives were merely responsive to the ongoing DOJ investigation.

With regard to Defendants' actions after the DOJ's launch of its investigation, Dr. Mangum asserts that, within a few months thereafter, airfares began to decline and quarterly operating profits fell.  PX 1, Mangum Report ¶¶ 52, 135, 138; Figure 8 (intended to show increasing yields during the alleged conspiracy period); *see also see* Figures 45-46 (intended to show increases in domestic systemwide scheduled seats after the alleged conspiracy period).  In contrast, United claims that higher growth occurred *during* the alleged conspiracy after the economy improved and jet fuel prices went down.  United Reply, ECF No. 549, at 46.  Delta claims similarly that is "indisputably grew in the last three years of the supposed conspiracy amidst a recovering economy and continued to grow in the three years after the alleged conspiracy in line with an expanding economy and a decline in fuel prices that began in late 2014."  Delta Reply, ECF No. 551, at 44-45.  Moreover, Delta asserts that its "post-alleged conspiracy growth coincided with the delivery of numerous aircraft *ordered during the alleged conspiracy*."  *Id.* at 45 (emphasis in original).

The Court notes that, in their Replies, Moving Defendants challenge the type of regression analysis used by Plaintiff's expert, Dr. Magnum, and they challenge Plaintiffs' claim that this analysis is a "reliable technique" that aids in helping them meet their burden of proof.  Pls.' Opp'n, ECF No. 552-1, at 96 (citing *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1241 (3d Cir. 1993)).  United acknowledges that expert evidence is useful as a guide but notes that "[n]o court has ever held a regression model sufficient in itself to withstand summary judgment as to the existence of a conspiracy[.]"  United Reply, ECF No. 549, at 48, 47 ("[a]n expert's opinion cannot suffice to avoid summary judgment where it is 'based on predicates that are insufficient under

out caselaw[.]'"') (quoting *Valspar*, 873 F. 3d at 197 n.9). Delta indicates that "Plaintiffs do not even pretend that Mangum's regressions could ever prove conspiracy" because this type of analysis is regularly used instead "to test for antitrust impact and estimate overcharge percentages by estimating relationships . . . " Delta Reply, ECF No. 551, at 43. Delta claims that its own economics expert, Dr. Carlton, "effectively dismantled Dr. Magnum's regressions." *Id.* The Court notes that while there are disagreements among the experts, no party in this case moved to disqualify any expert, and furthermore, some type of regression analysis was also used by Moving Defendants' expert, Dr. Israel.

As the aforementioned discussion indicates, there are disputes between Moving Defendants and Plaintiffs as to the import of: (1) admissions by certain Defendants that they perceived some communications as improper signaling; and (2) the reasoning behind Moving Defendants' decision not to use the term "capacity discipline" after the commencement of the DOJ investigation. Upon consideration of the evidence and argument in this case, this Court finds that, in addition to proof of parallel conduct discussed earlier herein, Plaintiffs have produced evidence of "plus factors" that suggest that Defendants' actions are "inconsistent with independent pursuit of economic self-interest," *Moundridge*, 2009 WL 5385975, at *6. Accordingly, summary judgment is neither warranted nor sustained regarding Defendants' claim that plus factors have not been demonstrated.

### IV. Conclusion

In this case, Defendants engaged admittedly and openly in the practice of capacity discipline on domestic flights, with the effect that diminished capacity resulted in higher industry profits. Moving Defendants proffer business justifications as the reason for this practice, first, because of economic conditions, and later, to appease their investors. Plaintiffs point out however that this practice results in higher industry profits only if there is a coordinated effort among airlines controlling a majority share of the domestic market; otherwise, it makes little economic sense for

airlines to elect not to compete for market share.

As noted earlier herein, the Court is faced with conflicting interpretations of statistical evidence and/or conflicting methodologies, which weighs against granting summary judgment, even though the Court is not treating expert testimony as dispositive.  Plaintiffs have proffered a fair amount of circumstantial evidence to demonstrate an alleged conspiracy by Defendants to restrict capacity in order to drive up profits.  Similar to *Kleen Products*, this Court has "properly considered 'economic evidence suggesting that the defendants were not in fact competing, and noneconomic evidence suggesting that they were not competing because they had agreed not to compete.'"  910 F.3d at 934 (quoting *High Fructose Corn Syrup*, 295 F.3d 651, 655).  As in that case, this Court has "dr[awn] and compared the corresponding inferences," and, in viewing evidence, the court first looked at the evidence individually, and if a piece of evidence "did not rule out the possibility of independent action," it then "reviewed the evidence in the aggregate, as required."  *Kleen Products*, 910 F.3d at 934.  In *Kleen,* the appellate court disputed the district court's conclusion that "because no individual piece of evidence tended to show collusion, the combined probative value was zero." *Id.*  Instead, the appellate court noted that: "[w]hile no single piece of evidence may win the day, the whole may be greater than the sum of its parts in tending to exclude the possibility of conscious parallelism."  *Id.* (citing *High Fructose Corn Syrup*, 295 F.3d at 655) (noting that "[E]vidence can be susceptible to different interpretations. . . without being wholly devoid of probative value. . . .")  Accordingly, the pieces of evidence here are viewed in tandem.  "All of the evidence provides context for understanding the conclusions a reasonable jury could draw from Defendants' [capacity] discussions."  *In re Polyurethane Foam*, 152 F. Supp. 3d at 989.

Furthermore, while Moving Defendants in this case dispute the type of statistical evidence proffered by Plaintiffs, the Court notes that non-economic evidence suggesting a conspiracy carries weight, and this evidence includes "proof that the defendants got together and exchanged assurances

of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." *In re Titanium Dioxide*, 959 F. Supp. 2d at 829 (citing *Flat Glass*, 385 F. 3d at 361).  Moreover, statements by competitors that are ambiguous may be "taken as a whole [in] support [of an] inference of a [ ] conspiracy," such as "statements by the defendants referring to an understanding within the industry not to undercut each other's prices [or] support for efforts to limit [capacity, in this case]" or a "statement that there was an understanding between the companies . . . that causes us not to . . . make irrational decisions" and references to "play[ing] by the rules (discipline)."  *In re Titatium Dioxide*, 959 F. Supp. 2d at 829 (analyzing *In re High Fructose Corn Syrup*, 295 F. 3d at 662) (internal quotation marks omitted).  Here, "there are competitor statements regarding industry "discipline" and the sharing of industry information," *In re Titatium Dioxide*, 959 F. Supp. 2d at 829, as well as discussions of competitors being onboard regarding the employment of similar strategies of capacity discipline.  Additionally, Plaintiffs "highlight communications involving industry [analysts] . . . that support Plaintiffs' theory that [they] served as [ ] conduit[s]."  *Id.*

Accordingly, upon considering the parties' arguments in their briefs and the exhibits attached thereto, this Court concludes that Plaintiffs have presented enough evidence demonstrating a pattern of parallel behavior and the existence of one or more plus factors (that tend to exclude the possibility that Defendants acted independently) to survive Moving Defendants' motions for summary judgment.  A separate Order and an Executive Summary accompany this Memorandum Opinion.

<div style="text-align:center">

_____/s/_____<br>
COLLEEN KOLLAR-KOTELLY<br>
UNITED STATES DISTRICT JUDGE

</div>