**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| IN RE DOMESTIC AIRLINE TRAVEL ANTITRUST LITIGATION | MDL Docket No. 2656 Misc. No. 15-1404 (CKK) |
| **This Document Relates to:** ALL CASES | **ORAL ARGUMENT REQUESTED** |

**MOTION OF DEFENDANTS UNITED AIRLINES, INC. AND**
**DELTA AIR LINES, INC. FOR CERTIFICATION OF AN**
**INTERLOCUTORY APPEAL PURSUANT TO 28 U.S.C. §1292(b),**
**OR IN THE ALTERNATIVE FOR RECONSIDERATION,**
**AND SUPPORTING STATEMENT OF POINTS AND AUTHORITIES**

Kent A. Gardiner (D.D.C. No. 432081)
Cheryl A. Falvey (D.D.C. No. 414277)
David M. Schnorrenberg (D.D.C. No. 458774)
Luke van Houwelingen (D.D.C. No. 989950)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 624-2578
Facsimile: (202) 628-5116
kgardiner@crowell.com
cfalvey@crowell.com
dschnorrenberg@crowell.com
lvanhouwelingen@crowell.com

*Counsel for United Airlines, Inc.*

James P. Denvir (Bar No. 225359)
Michael S. Mitchell (Bar No. 986708)
BOIES, SCHILLER & FLEXNER LLP
1401 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
jdenvir@bsfllp.com
mmitchell@bsfllp.com

*Counsel for Delta Air Lines, Inc.*

**TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY ...................................................................................1

LOCAL CIVIL RULE 7(M) STATEMENT .......................................................................5

THE APPLICABLE STANDARDS......................................................................................5

      1.      Certification of an Interlocutory Appeal....................................................5

      2.      Reconsideration of an Interlocutory Order ...............................................6

THE REQUIREMENTS FOR CERTIFICATION OR RECONSIDERATION
     ARE MET HERE...........................................................................................7

    B.      Certification is warranted regarding the Court's ruling that parallel
          conduct in an oligopolistic market may, standing alone, support an
          inference of conspiracy sufficient to meet a plaintiff's summary
          judgment burden. ......................................................................................8

          1.      The Court's ruling is an important question on which there
                is substantial ground for difference of opinion. .......................8

          2.      The Court's ruling improperly relies on expert opinion that
                is insufficient under antitrust case law regarding consciously
                parallel conduct in oligopolistic markets. ..............................18

    C.      Certification is warranted regarding the Court's ruling that
          Defendants lacked a legitimate business interest in public statements
          to investors about their "forward-looking capacity plans" because
          the statements were "useless to consumers."........................................20

          1.      The Court's ruling is an important question on which there
                is substantial ground for difference of opinion. .....................20

          2.      The Court's ruling will chill pro-competitive business
                communications with investors...............................................29

          3.      The Court's ruling improperly shifts the burden of
                persuasion from Plaintiffs to Defendants.................................32

CONCLUSION..................................................................................................................36

# TABLE OF AUTHORITIES[*]

**Page(s)**

**Cases**

*Anderson News, L.L.C. v. American Media, Inc.*,
    899 F.3d 87 (2nd Cir. 2018)..................................................................................33, 34, 35

*Anderson v. Liberty Lobby*,
    477 U.S. 242 (1986).................................................................................................17

*APCC Servs. v. Sprint Commc'ns Co.*,
    297 F. Supp. 2d 90 (D.D.C. 2003).......................................................................5, 6

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988).................................................................................................31

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................................................12

*Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*,
    203 F. 3d 1028 (8th Cir. 2000) ...............................................................21, 26, 27, 34

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993)..........................................................................................3, 11, 20

*Capitol Sprinkler Inspection, Inc. v. Guest Servs.*,
    630 F.3d 217 (D.C. Cir. 2011)................................................................................6

*Citibank (S.D.), N.A. v. Fed. Deposit Ins. Corp.*,
    857 F. Supp. 976 (D.D.C. 1994)...........................................................................7

*City of Moundridge v. Exxon Mobil Corp.*,
    Civ. No. 04-940 (RWR), 2009 WL 5385975 (D.D.C. Sept. 30, 2009), *aff'd*,
    409 F. App'x 362 (D.C. Cir. 2011) ....................................................................8, 13, 21

*Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*,
    851 F.2d 478 (1st Cir. 1988).................................................................................14

*E.I. du Pont de Nemours & Co. v. Fed. Trade Comm'n*,
    729 F.2d 128 (2d Cir. 1984)..................................................................................14

*Freedom Watch, Inc. v. Google, Inc.*,
    816 F. App'x 497 (D.C. Cir. 2020)........................................................................13

[*] Authorities upon which Defendants chiefly rely are marked with asterisks.

ii

*Hall v. United Air Lines, Inc.*,
   296 F. Supp. 2d 652, 672 (E.D.N.C. 2003) , *aff'd sub nom. Hall v. Am.
   Airlines, Inc.*, 118 F. App'x 680 (4th Cir. 2004) ...................................................................28

*Harris v. Ivax Corp.*,
   998 F. Supp. 1449, 1452 (S.D. Fla. 1998), *aff'd*, 182 F.3d 799 (11th Cir. 1999) ....................31

*Holiday Wholesale Grocery Co. v. Philip Morris Cos.*,
   231 F. Supp. 2d 1253 (N.D. Ga. 2002), *aff'd sub nom. Williamson Oil*, 346
   F.3d 1287 (11th Cir. 2003) ................................................................................19, 28, 29, 31

*Hyland v. Home Services of Am., Inc.*,
   771 F.3d 310 (6th Cir. 2014) ....................................................................................................35

*In re Baby Food Antitrust Litig.*,
   166 F.3d 112 (3d Cir. 1999)...................................................................................11, 15, 21, 33

*In re Chocolate Confectionary Antitrust Litig.*,
   801 F.3d 383 (3d Cir. 2015)...............................................................................................15, 32

*\*In re Citric Acid Litig.*,
   191 F.3d 1090 (9th Cir. 1999) .........................................................1, 10, 13, 16, 24, 32, 34

*\*In re Coordinated Pretrial Proceeding in Petroleum Prods. Antitrust Litig.*,
   906 F.2d 432 (9th Cir. 1990) ...........................................................................23, 24, 25, 28, 31

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
   245 F. Supp. 3d 1343, 1373 (N.D. Ga. 2017), *aff'd sub nom. Siegel v. Delta
   Air Lines, Inc.*, 714 F. App'x 986 (11th Cir. 2018).................................................................28

*\*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust
   Litig.*,
   28 F.4th 42 (9th Cir. 2022) ....................................................................................12, 16, 17, 27

*In re Flat Glass Antitrust Litig.*,
   385 F.3d 350 (3d Cir. 2004)...............................................................................................11, 12

*In re Musical Instrs. & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ...........................................................................................15, 17

*In re Publication Paper Antitrust Litig.*,
   690 F.3d 51, 63 (2d Cir. 2012)..................................................................................................34

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   Civ. No. 11-1049 (PLF), 2021 WL 2433737 (D.D.C. June 15, 2021) ...................................5, 6

*\*In re Text Messaging Antitrust Litig.*,
   782 F.3d 867 (7th Cir. 2015) ................................................................................12, 14, 15, 18, 34

*In re Travel Agency Comm'n Antitrust Litig.*,
   898 F. Supp. 685 (D. Minn. 1995)..................................................................................25

*Kahl v. Bureau of Nat'l Affairs, Inc.*,
   856 F.3d 106 (D.C. Cir. 2017) ........................................................................................4

*Kahl v. Bureau of Nat'l Affairs, Inc.*,
   Civ. No. 09-0635 (KBJ), 2015 WL 13546450 (D.D.C. Aug. 21, 2015)...........................4

*Keystone Tobacco Co. v. U.S. Tobacco Co.*,
   217 F.R.D. 235 (D.D.C. 2003).........................................................................................7

*\*Kleen Prods. LLC v. Ga.-Pac. LLC*,
   910 F.3d 927 (7th Cir. 2018) ..................................................................13, 15, 17, 35

*Kleen Prods. LLC v. Int'l Paper*,
   276 F. Supp. 3d 811 (N.D. Ill. 2017), *aff'd sub nom. Kleen Prods. LLC v. Ga.-
   Pac. LLC*, 910 F.3d 927 (7th Cir. 2018) .....................................................................10, 12

*Lantec, Inc. v. Novell, Inc.*,
   306 F.3d 1003 (10th Cir. 2002) .....................................................................................34

*\*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).........................................1, 2, 4, 7, 8, 23, 26, 29, 32, 33, 34, 35

*Merck-Medco Managed Care, LLC v. Rite Aid Corp.*,
   No. 98-2847, 1999 WL 691840 (4th Cir. Sept. 7, 1999) ...............................................33

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984)...................................................................................................32, 35

*PepsiCo, Inc. v. The Coca Cola Co.*,
   315 F.3d 101 (2d Cir. 2002)............................................................................................32

*Riverview Invs., Inc. v. Ottawa Cmty. Improvement Corp.*,
   899 F.2d 474 (6th Cir. 1990) ..........................................................................................34

*United States v. Citizens & S. Nat'l Bank*,
   422 U.S. 86 (1975)...........................................................................................................29

*United States v. Foley*,
   598 F.2d 1323 (4th Cir. 1979) ........................................................................................25

*United States v. Philip Morris Inc.*,
   314 F.3d 612 (D.C. Cir. 2003).........................................................................................6

*Valspar Corp. v. E.I. du Pont de Nemours & Co.*,
   152 F. Supp. 3d 234 (D. Del. 2016), *aff'd*, 873 F.3d 185 (3d Cir. 2017)......................19

*Valspar Corp. v. E.I. du Pont de Nemours & Co.*,
  873 F.3d 185 (3d Cir. 2017)...............................................................10, 11, 12, 15, 19

*Wallace v. Bank of Bartlett*,
  55 F.3d 1166 (6th Cir. 1995) .......................................................................19, 34

*White v. R.M. Packer Co.*,
  635 F.3d 571 (1st Cir. 2011)........................................................................33, 35

*Williamson Oil Co. v. Philip Morris USA*,
  346 F.3d 1287 (11th Cir. 2003) .........................................1, 2, 10, 11, 15, 32, 33, 34

**Statutes**

28 U.S.C. § 1292(b) ...............................................................1, 2, 4, 5, 6, 7, 20, 35, 36

**Rules**

Fed. R. Civ. P. 54(b) .......................................................................................1, 6, 36

Local Rule 7(m) .....................................................................................................5

**Regulations**

17 C.F.R. § 243.100(a)..........................................................................................26

**Other Authorities**

65 Fed. Reg. 51,716 (Aug. 24, 2000)....................................................................26

16 EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE (WRIGHT & MILLER)
  § 3930 (3d ed. 2012) ...........................................................................................6

H. Conf. Rep. No. 104-369 (Nov. 28, 1995) .........................................................31

STEPHEN J. CHOI & A.C. PRITCHARD, SECURITIES REGULATION: CASES AND
  ANALYSIS 23-24 (5th ed. 2019) .........................................................................31

In denying summary judgment, the Court made two legal rulings that directly conflict with clear legal precedent from every Circuit that has considered the issues raised in this motion. As a result, Defendants United Airlines, Inc. ("United") and Delta Air Lines, Inc. ("Delta") respectfully move this Court pursuant to 28 U.S.C. § 1292(b) for the certification of an interlocutory appeal of the Court's Order of September 5, 2023 (ECF No. 614) denying the motions for summary judgment filed by United and Delta, or in the alternative, for reconsideration of the Court's Order pursuant to Federal Rule of Civil Procedure 54(b).

The Court's two legal rulings do not depend on any factual analysis and directly conflict with decisions from other courts. The Court should certify an interlocutory appeal or alternatively reconsider its decision because: (1) The two legal rulings involve important controlling questions of law, (2) on which there is, if not clear error, at a minimum, a substantial ground for disagreement, and (3) their review by the Court of Appeals would materially advance the termination of this litigation. Reversal on appeal (or reconsideration) would mean summary judgment for Defendants. Allowing the case to go to trial with these rulings in place would mean a jury trial compromised by legal error and, in the event of a verdict unfavorable to Defendants, subject to reversal on appeal after several more years of expensive and burdensome litigation.

## INTRODUCTION AND SUMMARY

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986), and the cases that have interpreted it, "limit[] the range of permissible inferences" that can be drawn from circumstantial evidence at summary judgment in antitrust cases. They do so to protect business decisions from being second-guessed by juries based on ambiguous evidence. *See*, *e.g.*, *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1310 (11th Cir. 2003); *In re Citric Acid Litig.*, 191 F.3d 1090, 1101 (9th Cir. 1999). Under this standard, when a defendant proffers evidence of a rational, unilateral explanation for its business conduct, the plaintiff must respond

1

with evidence of conspiracy that "tends to exclude the possibility" of unilateral conduct. *Matsushita*, 475 U.S. at 588. Courts applying *Matsushita* have interpreted the "tends to exclude" standard to mean that if the evidence is as consistent with unilateral conduct as with conspiracy, then the evidence does not support a reasonable inference of conspiracy, the case cannot go to the jury, and the Court must grant summary judgment for defendants. *See, e.g.*, *Williamson Oil*, 346 F.3d at 1310.

Although this Court's Opinion recited the *Matsushita* standard, it rests on two legal rulings that are starkly inconsistent with the case law in other Circuits – and therefore involve substantial grounds for disagreement within the meaning of § 1292(b).

First, this Court held that, in an undisputed oligopoly (Op. at 9),[1] parallel actions by competitors (in this case, airlines) to increase price or limit output can by itself create an inference of a conspiracy because "it makes little economic sense for airlines to elect not to compete for market share." *Id.* at 68-69. Thus, this Court held that a showing that a Defendant exercised capacity discipline while anticipating "similar actions" by its competitors (*id.* at 56)[2] satisfied Plaintiff's burden of rebutting the Defendants' unilateral business justifications for its conduct and justified sending the case to the jury. This holding conflicts with longstanding case law. Contrary to this Court's decision, every Circuit Court of Appeals that has considered the issue has held that in an oligopoly like the airline industry, similar actions by competitors to increase price or limit their output growth, in lieu of trying to "compete for market share" (*id.* at 69), do not support an inference of unlawful agreement. Those Circuits have held that such actions are readily explained

---

[1] Citations to "Op." refer to the Court's Memorandum Opinion (ECF No. 615), dated September 5, 2023, that accompanied the Court's Order denying Defendants' motions for summary judgment.

[2] Solely for purposes of this motion, Defendants do not contest that their capacity actions were similar.

as the product of consciously parallel – but not agreed upon – conduct.  Such "conscious parallelism," according to the U.S. Supreme Court, is lawful.  *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993).  And therefore, evidence of conscious parallelism in limiting output in an oligopoly does not, *as a legal matter*, "tend to exclude" the possibility of independent conduct and cannot support a reasonable inference of conspiracy.  In holding otherwise, this Court rested its decision on a novel view of antitrust law that conflicts with precedent in other Circuits.

Second, this Court held that Defendants did not have a legitimate business interest in making public statements to investors about their "forward-looking capacity plans" because the statements were "useless to consumers."  Op. at 58.  Until now, the relevant question has been framed as whether Defendants' public statements to investors served a legitimate *business* interest that Plaintiffs' evidence does not tend to exclude; no court has ever required that the justification also serve a *consumer's* interest.  There is no dispute that Defendants' communications to investors served a legitimate business interest.  As this Court found, investors in the Defendant airlines sought "[p]ublic disclosures of future capacity plans" and "regarded 'capacity discipline' as important in their investment decisions," particularly in view of the risks that overcapacity presented to profitability.  Op. at 12-13.  No court (prior to this one) has ever held that public statements like those of Defendants lack an independent business purpose or tend to exclude the possibility of independence because they are useful primarily to investors rather than consumers.  And for good reason:  The Court's holding will deter important legitimate conduct and impair the efficient functioning of capital markets by depriving investors of vital information.

This Court's rulings on these two legal issues are outcome-determinative.  Without them, there is no basis for excluding the Defendants' legitimate business justifications for their conduct

and public statements.  The Court did not find, and Plaintiffs did not adduce, any evidence tending to rebut the non-conspiratorial explanations Defendants had offered for them.  This leaves the evidence for Plaintiffs, at most, in equipoise.  In the antitrust conspiracy context, in contrast to other areas of law, equipoise requires summary judgment for Defendants under *Matsushita*.

The Court's rulings on both points present important and controlling questions of law that merit certification for interlocutory appeal.  Certification is particularly appropriate because these controlling legal questions arise in a context where the Supreme Court has directed courts to be on alert to the risk that failure to cull out unmeritorious claims will chill lawful conduct.  *See*, *e.g.*, *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 108-109 (D.C. Cir. 2017) (recognizing "importance" of § 1292(b) certification of a summary judgment decision in a substantive area of the law where "the Supreme Court has directed courts to expeditiously weed out unmeritorious . . . suits" that threaten "[c]ostly and time-consuming" litigation).  *See also Kahl v. Bureau of Nat'l Affairs, Inc.*, Civ. No. 09-0635 (KBJ), 2015 WL 13546450, *2 (D.D.C. Aug. 21, 2015) (granting § 1292(b) certification in light of precedent that "a question for the jury" does not "automatically" arise from "circumstantial evidence tending to show" the defendant's intent).

Similarly in *Matsushita*, the Supreme Court instructed the lower courts to guard against the perverse result of subjecting companies that compete by properly pursuing their own economic interests to costly and time-consuming trials, jury speculations about their motives, and potential liability, when evidence does not meet the standard to sustain a reasonable inference of conspiracy.  *See* 475 U.S. at 593-94.

Accordingly, the Court should grant interlocutory appeal, or in the alternative reconsider its decision, in light of the two legal errors upon which its summary judgment ruling rests, that

4

conflict with existing antitrust precedent.  Defendants also respectfully request the opportunity to present oral argument in support of this motion.[3]

## LOCAL CIVIL RULE 7(m) STATEMENT

Counsel for Defendants conferred with counsel for Plaintiffs, who advised Defendants' counsel that Plaintiffs oppose the relief sought in this motion.

## THE APPLICABLE STANDARDS

### 1.    Certification of an Interlocutory Appeal

Under 28 U.S.C. § 1292(b), a District Court may certify an order for immediate appeal if: (1) It involves a controlling question of law; (2) a substantial ground for difference of opinion exists; and (3) immediate appeal would materially advance the ultimate termination of the case. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, Civ. No. 11-1049 (PLF), 2021 WL 2433737, *4 (D.D.C. June 15, 2021).

A "question of law" is "an abstract legal issue or what might be called one of 'pure' law, matters the court of appeals can decide quickly and clearly without having to study the record." *Id.* at *4 (cites and internal quotes omitted).  "Controlling" means the District Court's ruling on the certified issues "would require reversal if decided incorrectly or … could materially affect the course of litigation with resulting savings of the court's or the parties' resources." *APCC Servs. v. Sprint Commc'ns Co.*, 297 F. Supp. 2d 90, 95-96 (D.D.C. 2003).  "[R]esolution of an issue need not necessarily terminate an action in order to be controlling, but instead may involve a procedural determination that may significantly impact the action." *Rail Freight*, 2021 WL 2433737, at *4 (cites and internal quotes omitted).  "A steadily growing number of decisions . . . have accepted the better view that a question is controlling . . . if interlocutory reversal might save time for the

---

[3] A proposed order is attached to this motion as Exhibit A.

district court, and time and expense for the litigants." 16 EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE (WRIGHT & MILLER) § 3930 at 499 (3d ed. 2012). Finally, the "impact that the appeal will have on other cases is also a factor supporting a conclusion that the question is controlling." *APCC Servs.*, 297 F. Supp. 2d at 96.

The second requirement of "substantial ground for difference of opinion" is "often established by a dearth of precedent within the controlling jurisdiction and conflicting decisions in other circuits" or where the "challenged decision conflicts with decisions of several courts." *Id.* at 97-98. The Court can grant § 1292(b) certification even though it "is confident in its rulings." *Rail Freight*, 2021 WL 2433737, at *9. The Court need only conclude that "'the arguments in support of contrary conclusions are not insubstantial.'" *Id.* (quoting *APCC Servs.*, 297 F. Supp. 2d at 98).

The requirement that "immediate appeal from the order may materially advance the ultimate termination of the litigation" is satisfied in cases where "reversal would hasten or at least simplify the litigation in some material way, such as by significantly narrowing the issues, conserving judicial resources, or saving the parties from needless expense." *Id.* at *5 (cites and internal quotes omitted). Interlocutory review is warranted where "the interest in avoiding excessively burdensome and expensive litigation is 'significant relative to the efficiency interests sought to be advanced by adherence to the final judgment rule.'" *APCC Servs.*, 297 F. Supp. 2d at 101 (quoting *United States v. Philip Morris Inc.*, 314 F.3d 612, 617 (D.C. Cir. 2003)).

### 2.    Reconsideration of an Interlocutory Order

Reconsideration of an interlocutory order is governed by Rule 54(b), which allows a court to revise a prior order at any time before entry of judgment. Relief under Rule 54(b) is available "as justice requires." *Capitol Sprinkler Inspection, Inc. v. Guest Servs.*, 630 F.3d 217, 227 (D.C. Cir. 2011); *Citibank (S.D.), N.A. v. Fed. Deposit Ins. Corp.*, 857 F. Supp. 976, 981 (D.D.C. 1994).

6

Reconsideration is "within the discretion of the trial court."  *Citibank*, 857 F. Supp. at 981.  If the prior order embodies a "clear error of law," reconsideration is an appropriate exercise of the Court's discretion.  *Keystone Tobacco Co. v. U.S. Tobacco Co.*, 217 F.R.D. 235, 237 (D.D.C. 2003).

### THE REQUIREMENTS FOR CERTIFICATION OR RECONSIDERATION ARE MET HERE

Defendants satisfy all three requirements for § 1292(b) certification, and certification would be an appropriate exercise of the Court's discretion.

First, the Order involves "controlling questions of law."  The Order presents straightforward questions of law, namely:

1.  Whether parallel conduct by competing oligopolists, in declining to expand capacity in order to compete for market share, gives rise to an inference of an unlawful agreement.

2.  Whether a company's business justification for its public statements to its investors must be "useful to consumers" to qualify as a legitimate, unilateral explanation for its conduct.

These questions do not require factual analysis.  They are also controlling.  If the Court of Appeals reverses, it will materially alter this litigation.

Second, there is a "substantial ground for difference of opinion" concerning the Court's Order.  This is evidenced by a substantial conflict between the Court's Opinion and the law in other Circuits regarding the proper application of the *Matsushita* standard to either (a) a company's similar actions in the context of an oligopolistic industry, or (b) a publicly held company's statements to its shareholders regarding its business management.  This Court should afford the Court of Appeals the opportunity to weigh in on these questions.

Third, certification would materially advance the termination of this litigation.  In the event of reversal, summary judgment would likely be granted to Defendants, and the litigation would

end.  The parties have been litigating this case since 2015, well over 8 years and at considerable expense.  Before the Court and the parties bear the burden of class certification proceedings and a trial potentially compromised by legal error, certification is appropriate to clarify the proper legal standard for judging Defendants' conduct.

**B.      Certification is warranted regarding the Court's ruling that parallel conduct in an oligopolistic market may, standing alone, support an inference of conspiracy sufficient to meet a plaintiff's summary judgment burden.**

**1.      The Court's ruling is an important question on which there is substantial ground for difference of opinion.**

The Court held that a reasonable inference of conspiracy may be drawn where a firm in an oligopolistic market limits its output expansion and declines to pursue increases in market share while anticipating similar conduct by competitors.  No court has ever permitted such conduct, known as "conscious parallelism," to be the evidentiary basis for a jury to infer a conspiracy.  On this important legal question, the Court is an outlier, and its opinion conflicts with other Circuits that have addressed this very issue.

To meet their burden to show the inference of conspiracy is "reasonable," plaintiffs must adduce evidence that "tends to exclude the possibility that the alleged conspirators acted independently." *Matsushita*, 475 U.S. at 588 (internal quote and cite omitted).  Where defendants provide an independent explanation for conduct that plaintiffs contend is evidence of conspiracy, plaintiffs' proffered evidence must "indicate the existence of a conspiracy by *ruling out* the legitimate explanation for parallel behavior:  [It] suggest[s] that an alleged conspirator's actions are inconsistent with independent pursuit of economic self-interest." *City of Moundridge v. Exxon Mobil Corp.*, Civ. No. 04-940 (RWR), 2009 WL 5385975, *4 (D.D.C. Sept. 30, 2009) (emphasis added; internal quote and cite omitted), *aff'd*, 409 F. App'x 362 (D.C. Cir. 2011).

Here, Plaintiffs alleged that a reasonable inference of conspiracy could be drawn from Defendants' failure to expand capacity and pursue market share growth after 2009 – what the Court described as Defendants' "practice of capacity discipline on domestic flights, with the effect that diminished capacity resulted in higher industry profits." Op. at 68. Defendants adduced substantial evidence that each Defendant pursued this strategy for reasons other than conspiracy, namely that each had a powerful reason, informed by recent experience, to fear that undisciplined expansion would be unprofitable to the point of bankruptcy. *See* UA Br. at 5-7, 10-12, 46-52; DL Br. at 13-14, 19, 56-57.[4] Based on this evidence, the Court concluded: "In this case, Defendants have proffered economic justifications for their alleged unilateral capacity discipline actions, where such actions continued even after the Great Recession ended and fuel prices had stabilized." Op. at 53.

The Court nevertheless held that Plaintiffs "cast doubt" (Op. at 53) on Defendants' legitimate business justifications because "Plaintiffs have presented credible evidence that increased profitability at issue hinged on several airlines (together controlling a majority share of the domestic market) taking ***similar actions***" (*id.* at 56), and that "this profitability would have been undone if the Defendants competed for fares and increased capacity as they had in the past" (*id.* at 53) (emphasis added). The Court stated this finding succinctly in its conclusion:

> Defendants engaged admittedly and openly in the practice of capacity discipline on domestic flights, with the effect that diminished capacity resulted in higher industry profits. Moving Defendants proffer business justifications as the reason for this practice, first, because of economic conditions, and later, to appease

---

[4] Citations to "UA Br." and "DL Br." refer to, respectively, (1) the Corrected Memorandum of Points and Authorities in Support of Defendant United Airlines, Inc.'s Motion for Summary Judgment, ECF No. 495-2 (Dec. 22, 2020), and (2) Defendant Delta Air Lines, Inc.'s Memorandum of Points and Authorities in Support of its Motion for Summary Judgment, ECF No. 464 (Dec. 16, 2020). Exhibit citations refer to those filed in support of or opposition to the summary judgment motions – UX by United, DX by Delta, and PX by Plaintiffs. *See* Op. at 2 n.3.

> their investors.  Plaintiffs point out however that ***this practice results in higher industry profits <u>only if</u> there is a coordinated effort*** among airlines controlling a majority share of the domestic market; ***otherwise, it makes little economic sense for airlines to elect not to compete for market share***.

Op. at 68-69 (emphasis added).  For this reason the Court held that the evidence tended to exclude the possibility that the Defendants had acted independently.

This ruling is legal error in direct conflict with longstanding case law governing inferences of conspiracies in an oligopoly.  *E.g.*:

> [I]t is not reasonable to infer that a firm is engaging in illegal activities merely from the fact that it failed to increase market share.  If a conspiracy could be inferred so easily, then no firm against whom an antitrust claim is levied would ever be entitled to summary judgment unless it continually increased its market share.  In light of the fact that firms enjoy discretion in exercising business judgment . . ., such a rule of law would be untenable.

*Citric Acid*, 191 F.3d at 1101.

As the Court found, "the airline industry is an oligopoly."  Op. at 9.  And as the Court acknowledged, "'[o]ligopolies pose a special problem under § 1 because rational, independent actions taken by oligopolists can be nearly indistinguishable from horizontal price fixing.  This problem is the result of 'interdependence,' which occurs because any rational decision [in an oligopoly] must take into account the anticipated reaction of the other firms.'"  Op. at 20 (quoting *Valspar Corp. v. E.I. du Pont de Nemours & Co.*, 873 F.3d 185, 191 (3d Cir. 2017) (internal quote and cite omitted).  *See also Williamson Oil*, 346 F.3d at 1299 ("[T]he distinctive characteristic of oligopoly is recognized interdependence among the leading firms: the profit-maximizing choice of price and output for one depends on the choices made by others."); *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 819 (N.D. Ill. 2017) ("As a large firm operating among a select few, each Defendant recognizes that its pricing and output decisions affect its competitors, and depending on how they react, the market as a whole," and thus, "any Defendant acting rationally

10

and independently takes into account the anticipated reactions of the other firms."), *aff'd sub nom.*

*Kleen Prods. LLC v. Ga.-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018).

In an oligopoly, companies anticipate that to cut prices or expand output is unlikely to increase market share.  All it will accomplish is reduced profits because competitors are likely to respond with similar actions.[5]  *See*, *e.g.*, *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 359-60 & n.10 (3d Cir. 2004); *Valspar*, 873 F.3d at 191.  As a result, oligopolists frequently – and rationally and unilaterally – do not cut prices or expand output.

Instead, as the U.S. Supreme Court has explained:

> firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions.

*Brooke Grp.,* 509 U.S. at 227.  This "kind of interdependent conduct just described is variously known as conscious parallelism, tacit collusion, follow-the-leader strategy, or interdependent parallelism," but "[h]owever it is referred to, ***the crucial thing is that such conduct is lawful***." *Kleen Prods.,* 276 F. Supp. 3d at 819 (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 553-554 (2007)) (emphasis added).  *See id.* at 820 ("Tacit collusion thus is lawful, and this is despite the

---

[5] *See, e.g., In re Baby Food Antitrust Litig.*, 166 F.3d 112, 127 (3d Cir. 1999) ("[T]here would be strategic issues for Heinz to consider, that might draw fire from its competitors.  They could aggressively respond to Heinz's territorial expansion in the expanded area and in other territories that might prove the expansion to be eruptive, destructive, and expensive.  These considerations may have weighed against the likelihood of long-run success in Heinz's ability to maintain its presence on retail shelves and gain market share in the face of its competitors' response.  Such decisions are consistent with permissible, rational competitive conduct."); *Williamson Oil*, 346 F.3d at 1307 ("RJR and B&W's decisions to accept the narrower premium-discount price gap preferred by PM do not tend to exclude the possibility of independent behavior or to establish a price fixing conspiracy.  It is plain to us that RJR and B&W's actions are readily explained as economically rational, self-interested responses ….  PM's premium price cuts strongly suggested to its competitors that any attempt to gain market share for discount brands through further price cuts would not be accepted.").

fact that it may have the same anticompetitive effects as proscribed express collusion."); *In re Text Messaging Antitrust Litig.,* 782 F.3d 867, 871 (7th Cir. 2015) (The "fewer the firms, the easier it is for them to engage in 'follow the leader' pricing ('conscious parallelism,' as lawyers call it, 'tacit collusion' as economists prefer to call it) – which *means coordinating their pricing without an actual agreement to do so*." (emphasis added)).

Because it is legal and likely to result from interdependence alone, in an oligopoly, "pricing supracompetitively, or above a level justified by competitive conditions, is *as consistent* with legal oligopolistic behavior as it is with illicit conspiracy." *Kleen Prods.,* 276 F. Supp. 3d at 819 (emphasis added). *See also Valspar,* 873 F.3d at 197 ("'[F]irms in a concentrated market may maintain their prices at supracompetitive levels, or even raise them to those levels, without engaging in any overt concerted action.'") (quoting *Flat Glass*, 385 F.3d at 359).

The same is true with respect to *output* restrictions: "[A] firm acting independently may choose to … lower output because it anticipates (or hopes) that its competitors, likewise acting independently and in their best interests, may follow the same course of action." *Kleen Prods.,* 276 F. Supp. 3d at 819 (citing *Text Messaging*, 782 F.3d at 876). Parallel decisions by competitors in an oligopoly not to increase supply (capacity), or to decrease it, will often result from lawful interdependence. Such conduct is therefore insufficient to support a reasonable inference of a conspiracy. *See, e.g.*, *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 49-50 (9th Cir. 2022) ("[I]t was economically rational for [one defendant] to reduce its supply growth below demand levels and for [the other two defendants] to maintain production commensurate with the market leader" and "focus on profitability" when "[p]rior to the class period, Defendants' vigorous competition on market share had caused DRAM supply to exceed demand and prices to decline, affecting all Defendants' profitability."); *Citric*

12

*Acid*, 191 F.3d at 1101 ("Cargill has explained why it did not expand even more rapidly: it was concerned that an excessively rapid expansion in citric acid supply would undermine prices and wanted to avoid precipitating a costly price war as it had done when it first entered the citric acid market (incurring substantial losses as a result)."); *Kleen Prods. LLC v. Ga.-Pac. LLC*, 910 F.3d 927, 938 (7th Cir. 2018) ("But underusing machinery is the kind of flexible behavior that is consistent with rational attempts to raise prices through watchful attention to one's competitors' actions. Far from perilous, had Georgia-Pacific's efforts not paid off, it could have increased its output quickly. Georgia-Pacific's supply behavior does not point towards its having a role in any conspiracy.").

Thus, the D.C. Circuit specifically held (in the context of an allegedly oligopolistic social media market) that "parallel conduct alone cannot support a claim under the Sherman Act." *Freedom Watch, Inc. v. Google, Inc.*, 816 F. App'x 497, 500 (D.C. Cir. 2020) (*per curiam*) (involving Sherman Act § 2 collective monopolization claim).  *See also Moundridge*, 2009 WL 5385975, at *4 ("Tacit collusion, sometimes called oligopolistic price coordination or conscious parallelism" is "not in itself unlawful" and "does not create the inference of a conspiracy." (internal quote and cite omitted)).  The other Circuits are in accord.

Judge Posner, writing for the Seventh Circuit, recognized the <u>airline</u> <u>industry</u> as a textbook example of how an oligopoly produces consciously parallel behavior among competitors without the necessity of an unlawful agreement:

> Think of what happens in the ***airline industry*** ….  Suppose one airline thinks of and implements a method for raising its profit margin [when fuel prices rise] ….  The airline's competitors will monitor carefully the effects of the airline's response to the higher fuel prices afflicting the industry and ***may well decide to copy the response should the responder's response turn out to have increased its profits.***

*Text Messaging*, 782 F.3d at 875 (emphasis added).  There is nothing illegal about this behavior.  It evidences oligopoly, not a conspiracy.[6]

Thus, every Circuit that has considered the issue has uniformly held as a matter of law that conscious parallelism is normal in an oligopoly and not evidence that tends to exclude the possibility of lawful, independent conduct:

- **First Circuit:**  "A firm in a concentrated industry typically has reason to decide (individually) to copy an industry leader.  After all, a higher-than-leader's price might lead a customer to buy elsewhere, while a lower-than-leader's price might simply lead competitors to match the lower price, reducing profits for all.  One does not need to match the lower price, reducing profits for all.  One does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry."  *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 484 (1st Cir. 1988) (Breyer, J.).

- **Second Circuit:**  "The mere existence of an oligopolistic market structure in which a small group of manufacturers engage in consciously parallel pricing of an identical product does not violate the antitrust laws. . . .  [I]ndeed, it could be consistent with intense competition."  *E.I. du Pont de Nemours & Co. v. Fed. Trade Comm'n*, 729 F.2d 128, 139 (2d Cir. 1984).

- **Third Circuit:**  "In an oligopolistic market, meaning a market where there are few sellers, interdependent parallelism can be a necessary fact of life but be the result of independent pricing decisions. . . .  The concept of 'action against self-interest' is ambiguous and one of its meanings could merely constitute a restatement of interdependence . . . .  Thus, no conspiracy should be inferred from ambiguous evidence or from mere parallelism when defendants' conduct can be explained by independent business reasons."  *Baby Food*, 166 F.3d at 122.[7]

---

[6] As the Court found undisputed, the airline industry "became more concentrated . . . as a result of the mergers between 2008 and 2013" (Op. at 9), making oligopolistic behavior all the more likely in the absence of agreement.  The mergers included:  (1) Delta and Northwest; (2) United and Continental; (3) American and US Airways; and (4) Southwest and AirTran.  Thus, eight airlines became four, which collectively comprised approximately 80% of domestic capacity.  *See* PX 1, Mangum Report, ¶¶ 61-64.

[7] *See also Valspar,* 873 F.3d at 191 ("This 'oligopolistic rationality' can cause supracompetitive prices because it discourages price reductions while encouraging price increases.  A firm is unlikely to lower its price in an effort to win market share because its competitors will quickly learn of that reduction and match it, causing the first mover's profits to decline and a subsequent decline in overall profits of the industry."); *In re Chocolate Confectionary Antitrust Litig.,* 801

- **Seventh Circuit:** "Following a competitor's price increases can be consistent with a rational self-interest in oligopolies. . . . Each firm in a tight oligopoly might think that it will reap greater profits if it imitates, rather than undermines, its peers' price hikes. . . . And it might reach that conclusion without any conscious coordination with its competitors." *Kleen Prods.*, 910 F.3d at 935.[8]

- **Ninth Circuit:** "An action that would seem against self-interest in a competitive market may just as well reflect market interdependence giving rise to conscious parallelism. For example, each firm in an interdependent market expects that a widely unfollowed price increase will be rescinded. But so long as prices can be easily readjusted without persistent negative consequences, one firm can risk being the first to raise prices, confident that if its price *is* followed, all firms will benefit. By that process ('follow the leader'), supra competitive prices and other anticompetitive practices, once initiated, can spread through a market without any prior agreement." *In re Musical Instrs. & Equip. Antitrust Litig.*, 798 F.3d 1186, 1195 (9th Cir. 2015) (emphasis original).

- **Eleventh Circuit:** "As the Supreme Court has recognized, oligopolies . . . often feature coordinated pricing and related behaviors. . . . Thus, these behaviors typically result from firms' rational recognition that the market structure in which they operate will most easily yield profits by means other than price competition. . . . Over time, courts have become attuned to the economic costs associated with using circumstantial evidence to distinguish between altogether lawful, independent, consciously parallel decision-making within an oligopoly on the one hand, and illegal, collusive pricing fixing on the other." *Williamson Oil*, 346 F.3d at 1299-1300.

The Ninth Circuit's recent decision in *DRAM* is illustrative. In granting a <u>motion to dismiss</u>, it held that parallel actions by oligopolists to limit supply, and not to chase market share, are "insufficient to establish a plausible conspiracy." 28 F.4th at 49-52. The facts in *DRAM* were:

> Samsung unilaterally announced its intent to stop competing on market share and begin focusing on profitability prior to the class period. Samsung then publicly reaffirmed its intent to focus on profitability over supply throughout the next two years. The other

---

F.3d 383, 398 (3d Cir. 2015) ("[E]vidence of conscious parallelism cannot alone create a reasonable inference of a conspiracy.").

[8] *See also Text Messaging*, 782 F.3d at 879 ("We can, moreover, without suspecting collusion, expect competing firms to keep close track of each other's pricing and other market behavior and often to find it in their self-interest to imitate that behavior rather than try to undermine it – the latter being a risky strategy, prone to invite retaliation.").

> Defendants, as smaller players in the DRAM market, followed Samsung's lead and stopped competing on market share.

*Id.* at 51. The Ninth Circuit held that Defendants' conduct at the start and end of the class period was "consistent with conscious parallelism in an interdependent market" and therefore could not support the inference of an agreement in restraint of trade as a matter of law. Accordingly, the Ninth Circuit affirmed the dismissal of the § 1 claim. *Id.* at 51-52.

The same reasoning applies here. The Court found it to be undisputed fact that "[a]irlines used the term 'capacity discipline' prior to the alleged conspiracy period." Op. at 15. And thereafter, during the alleged cartel period, United and Delta continued a "capacity discipline" strategy that focused on profitability instead of market share. *Id.* at 68-69. As in *DRAM*, the parallel conduct of United and Delta was consistent with legitimate, unilateral business strategy by oligopolists. [9]

---

[9] The Court also considered a plus factor (Op. at 63) the "colorable argument" that capacity discipline during the alleged cartel period "differed from past practice" (*id.* at 34-35 (relying on motion to dismiss case law)). The Court in particular was troubled that Defendants did not more quickly expand capacity after the end of the Great Recession to the capacity levels that they had in 2008. *See id.* at 42-43. But the decision not to rapidly increase capacity and repeat financial mistakes of the past was more than plausibly due to the unilateral, or possibly consciously parallel, business decisions of the Defendants to be profitable by not allowing supply to exceed demand. *See Citric Acid*, 191 F.3d at 1101 ("Cargill has explained why it did not expand even more rapidly: it was concerned that an excessively rapid expansion in citric acid supply would undermine prices and wanted to avoid precipitating a costly price war as it had done when it first entered the citric acid market (incurring substantial losses as a result)."). Courts have found such profit-maximizing strategies by oligopolists to match supply with demand to be unilaterally rational economic behavior that does not prove a conspiracy. *See DRAM*, 28 F.4th at 50 (finding no support for conspiracy claim where "it was economically rational for Samsung to reduce its supply growth below demand levels and for Micron and SK Hynix to maintain production commensurate with the market leader"); *Kleen Prods.*, 910 F.3d at 938 (affirming summary judgment in light of the proffered business justification for the defendant's supply restriction: "Georgia-Pacific aimed to produce just enough containerboard to fill orders without creating excess inventory"). If there is reversal of the Court's decision to permit the inference of conspiracy from oligopolistic conscious parallelism, then a merely "colorable argument" that these decisions differed from historical ones should not prevent summary judgment. *See* Op. at 17 ("If the evidence 'is merely colorable, . . .

16

Likewise in *DRAM*, the Ninth Circuit concluded that the public statements in earnings calls that the oligopolists made about their respective strategies of supply restriction evidenced nothing more than the lawful conscious parallelism of oligopolists.  In *DRAM*, the plaintiffs alleged that

> in April 2016, first Samsung and then SK Hynix stated on quarterly earnings calls that industry capex would decline that year. The following month, Micron's CEO stated that news of competitors' decreased capex was "relatively encouraging" and that he expected "slowing bit growth" in the industry, implying that Micron, too, would decrease its DRAM capex.

28 F.4th at 49.  The Ninth Circuit found the public statements "more consistent with conscious parallelism than with [a] plus factor":

> SK Hynix and Micron's capex cuts following Samsung's announcement align with a "follow the leader" theory of conscious parallelism, as they could have independently and rationally reached the same decision to follow market leader Samsung. We have recognized that "[e]ven assuming that the progressive adoption of similar policies across an industry constitutes simultaneity, that fact does not reveal anything more than similar reaction to similar pressures within an interdependent market, or conscious parallelism." *Musical Instr.*, 798 F.3d at 1196.

*Id.* (footnote omitted).

Judge Posner adopted similar reasoning in affirming the grant of summary judgment against a § 1 claim in the oligopolistic wireless communications market.  He explained that plaintiffs had failed to meet their burden of establishing an agreement based on parallel conduct because an oligopolist rationally focuses on profitability rather than market share:

> [A] rational profit-maximizing seller does not care about the number of customers it has but about its total revenues relative to its total costs.  If the seller loses a third of its customers because it has doubled its price, it's ahead of the game because twice two-thirds is greater than one (4/3 > 3/3).

---

summary judgment may be granted.'" (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986)).

*Text Messaging*, 782 F.3d at 877.

As these cases show, declining to expand output in pursuit of market share, while anticipating "similar actions" by oligopolists, does not support a reasonable inference of conspiracy. This Court's decision holding otherwise was clear error.

> **2.    The Court's ruling improperly relies on expert opinion that is insufficient under antitrust case law regarding consciously parallel conduct in oligopolistic markets.**

The only "evidence" on which the Court relied in support of its erroneous ruling was the opinion of Plaintiffs' expert, Dr. Russell Mangum:

> Plaintiff's expert Dr. Mangum opined that: "Reducing or restricting capacity on a route [to try to achieve increased prices] is only in a carrier's individual self-interest if the other carriers that operate on the route reduce or restrict capacity." PX 1, Mangum Report ¶ 277. Otherwise, if one carrier reduced capacity as its competitors expanded their own capacity, then "the only outcome the 'capacity-disciplined' carrier would accomplish is reduced market share for itself." *Id.*

Op. at 52. As the Court explained, "Plaintiffs rely in large part on Dr. Mangum's 'structure, conduct, and performance analysis,'" from which he concludes that "'competitive factors alone cannot explain either Defendants' capacity or their fares – which led to record profits.'" *Id.* at 52-53.[10]

Dr. Mangum fails to recognize that an oligopolistic market perfectly explains why a defendant would unilaterally decide not to chase market share. But his opinion cannot supplant the bedrock principle of antitrust law that conscious parallelism does not tend to exclude a defendant's unilateral business justification for its conduct. As the Third Circuit has held:

---

[10] Plaintiffs' other expert Adam Pritchard contradicted Dr. Mangum. *See* UX 7, Pritchard Tr. 152:9-14 ("Q:  And would you agree with the possibility that a firm in an oligopolistic market may not seek to gain market share for reasons other than an unlawful conspiracy?. . . . THE WITNESS: Yes.").

18

> Although Valspar's expert, Dr. Williams, concluded that its evidence excludes the inference that the competitors acted independently, that conclusion was based on predicates that are insufficient under our caselaw. For example, Dr. Williams took the type of evidence that we have said is of diminished value in the oligopoly context (*i.e.*, parallel price movement and evidence best considered under the first two plus factors) and from there concluded that the suppliers had illegally conspired. The District Court was correct to reject this line of argument and note that the evidence from which the expert based his conclusions is "not necessarily . . . evidence of an agreement" under our oligopoly caselaw.

*Valspar*, 873 F.3d at 197 n.9 (quoting *Valspar Corp. v. E.I. du Pont de Nemours & Co.*, 152 F. Supp. 3d 234, 243 (D. Del. 2016). *See also Holiday Wholesale Grocery Co. v. Philip Morris Cos.*, 231 F. Supp. 2d 1253, 1321 (N.D. Ga. 2002) ("The failure of Plaintiff's expert to distinguish conscious parallelism from cartel behavior makes his subsequent opinion inadmissible as he finds inferences of collusion where the law finds none."), *aff'd sub nom. Williamson Oil*, 346 F.3d 1287 (11th Cir. 2003).

At summary judgment, a court must examine the predicates for an expert's opinion, not to assess its credibility or weight, but to determine whether the opinion relies on facts that as a matter of law do not support the reasonable inference of conspiracy. *See Wallace v. Bank of Bartlett*, 55 F.3d 1166, 1170 (6th Cir. 1995) ("[An expert's] affidavit is not sufficient to defeat the Banks' motion for summary judgment. … [His] conclusions are based on nothing more than facts which, as we have already stated, are equally consistent with independent actions by the Banks."); *Brooke Grp.*, 509 U.S. at 242 ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when the indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."). As a matter of law, the facts of oligopolistic interdependence on which Dr. Mangum relies for his opinion do not support a reasonable inference of conspiracy.

19

Accordingly, there is a substantial ground for difference of opinion regarding the Court's ruling that consciously parallel conduct in an oligopolistic market may support an inference of conspiracy. Therefore, the Court should certify a § 1292(b) appeal.

**C.      Certification is warranted regarding the Court's ruling that Defendants lacked a legitimate business interest in public statements to investors about their "forward-looking capacity plans" because the statements were "useless to consumers."**

**1.      The Court's ruling is an important question on which there is substantial ground for difference of opinion.**

From the outset, a central focus of this litigation has been about whether each Defendant airline's public statements to its shareholders and investment analysts about how the airline was managing its capacity – and the fact that such statements were undoubtedly heard by competitors – could provide circumstantial evidence from which a conspiracy can reasonably be inferred. The Court ruled that the communications could support an inference of an agreement on two grounds.

First, the Court explained that each Defendant's public statements about capacity discipline could support an inference of conspiracy because the Court had not accepted the Defendants' business justifications for their capacity decisions due to the consciously parallel nature of their capacity conduct:

> But, as noted in the prior subsection, this Court has not accepted without question Moving Defendants' proffered business justification for its capacity actions. Accordingly, in the instant case, "[w]here the class . . . present[s] independent evidence tending to exclude an inference that the [defendants] acted independently," then, "it [may] use these [public] communications for whatever additional evidence of conspiracy they may provide."

Op. at 55 (quoting *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F. 3d 1028, 1037 (8th Cir. 2000)). For the reasons discussed in Section A above, the Court erred in rejecting Defendants' business justifications for their capacity conduct in this oligopolistic market. It thus was likewise error to permit a jury to infer a conspiracy from Defendants' public

statements to investors and analysts on the ground that the conduct they described was not independently justified. That is, because Plaintiffs offered no evidence tending to exclude these independent justifications, the Court must conclude that the statements do not support a reasonable inference of conspiracy.[11]

Second, United and Delta each proffered evidence that its communications with investors and analysts were responsive to the keen interest of investors in each airline's (and every other airline's) prudent capacity management, which investors saw as determinative of each Defendant's business health. Such interest on the part of shareholders was entirely understandable given the undisputed recent history of airline bankruptcies. *See* Op. at 13 ("In the years before the January 2009 start of the alleged conspiracy, the airline industry in the United States suffered 'an extended period of financial losses in which the Defendants failed to return their cost of capital.'" (quoting DL SUMF ¶ 70)); *id.* at 14 ("The combination of high fixed costs, slow-moving supply decisions, and the volatility of cost and demand conditions historically led to 'boom and bust' cycles producing poor long-term financial performance for airlines."); *id.* ("Delta and United, among

---

[11] More generally, the Court's erroneous rejection of Defendants' legitimate explanations for their capacity conduct and interactions with investors are predicates for each of the Court's plus factor holdings. The Court recognized that its plus factor analysis overlapped significantly with its analysis of Defendants' capacity conduct and public statements. Op. at 20 n.13, 62, 63-64. If Defendants' explanations for their capacity conduct and statements to investors are not improperly disregarded, the remaining plus factors referenced by the Court would do nothing to "rul[e] out the legitimate explanation for parallel behavior." *City of Moundridge*, 2009 WL 5385975, at *4. These include the receipt of historical (already flown) aggregated airline capacity data from the trade association A4A (Op. at 59), receipt of benchmarking data about competitor employee headcount (*id.* at 61-62), receipt of information shared in potential merger discussions (*id.*), and the rationale for no longer using the term "capacity discipline" in reaction to the DOJ investigation (*id.* at 66-67). Moreover, in the absence of the Court's erroneous conclusions concerning the inferences to be drawn from parallel capacity conduct and public statements on capacity, these observations could not sustain a verdict for Plaintiffs because, among other things, there is no "evidence that the exchanges of information had an impact on [capacity] decisions." *Baby Food*, 166 F.3d at 125.

other airlines, filed for bankruptcy prior to the start of the alleged conspiracy.").  *See also* UA Br. at 7-10, 32-43; DL Br. at 9-15, 19-20, 56-58.

The Court identified the following facts as undisputed:

- "Airlines provide their projected capacity information to the investment community through means such as earnings releases, earnings calls, and investment banker conferences." Op. at 12.

- "Investors may look to industry-expert analysts for help in understanding corporate disclosures." *Id.*

- "[A]nalysts regarded 'capacity discipline' as important in their investment decisions." *Id.*

- "Airlines, including non-defendant airlines, have provided capacity information [to investors and analysts] – before, during and after the alleged conspiracy period." *Id.* at 13.

- "Public disclosures of future capacity plans provide investors with more information about business prospects." *Id.*

- "Defendants' stock prices were interdependent, in that each Defendant's stock price was affected by the actions of their competitors," and "[if] a Defendant or any airline announced a capacity increase, it could depress the value of all airline stocks." *Id.*

- "At least one question related to capacity – increasing or decreasing flights or seats – was asked on every one of Defendants' earnings calls during the period Q1 2007-Q3 2019." *Id.* at 15.

- "Delta regularly provided capacity-related information in response to questions posed by analysts and investors and in prepared remarks on earning calls and at investor conferences." *Id.* at 16.

- "[B]efore and during the conspiracy, 'United and other airlines faced . . . capacity-related questions from analysts.'" *Id.* at 13 (quoting Pls. Resp. to United SUMF ¶ 118).

It is therefore undisputed that Defendants' communications furthered both the need of a public company to communicate with investors, and each Defendant's competitive interest in effectively raising capital to fund its operations.  There is no dispute of fact here.

22

This Court did not, and could not, reject the business justifications for the communications as an issue of fact. Instead, the Court reasoned that while the communications were useful to investors, they were "useless to consumers." *Id.* at 58. Having thus rejected the legitimacy of Defendants' explanations for their statements to investors and analysts, the Court concluded that a jury could reasonably infer that the statements actually constituted conspiracy, in the form of "exchanged assurances of commitment to a common capacity plan." *Id.* at 56. In sum, the Court did not find *evidence* tending to exclude Defendant's non-conspiratorial explanation of investor interest; rather, the Court rejected the explanation as *illegitimate as a matter of law.* The Court then considered these investor communications as a plus factor in denying summary judgment. *Id.* at 63.

There is a "substantial ground for difference of opinion" concerning the Court's Order, because no other court has engrafted a "use[ful] to consumers" requirement onto a defendant's independent business justification. To the contrary, other courts that have considered public company communications with investors and analysts have found those communications to serve a legitimate business purpose that, if unrebutted, does not permit an inference of conspiracy under *Matsushita*.

This Court relied (Op. at 57-58) on a 1990 case, *In re Coordinated Pretrial Proceeding in Petroleum Products Antitrust Litigation*, 906 F.2d 432 (9th Cir. 1990), that has since been essentially abandoned by the Ninth Circuit.[12] Even on its own terms, *Petroleum Products* does

---

[12] As the Ninth Circuit explained in 1999, *Petroleum Products* was a case presenting "*direct* evidence of conspiracy" and its "discussion . . . of the standard applicable when plaintiffs rely exclusively on circumstantial evidence" was "dicta." *Citric Acid*, 191 F.3d at 1096 (emphasis in original). Instead, the Ninth Circuit now recognizes *any* reasoning "permitting the inference of conspiratorial behavior from evidence consistent with both lawful and unlawful conduct would deter pro-competitive conduct." *Id.* at 1094.

23

not support this Court's ruling. It involved press releases and public posting of prices, not investor communications. And *Petroleum Products* did not say or suggest that usefulness to consumers was a requirement in determining whether the defendant's conduct serves its business interest. Instead, the Ninth Circuit asked whether the conduct was "consistent with other plausible explanations" and whether inferring conspiracy from that conduct would "deter important legitimate conduct." *Id.* at 440, 447-48.

Applying this standard, the Ninth Circuit found that the defendants did not have <u>any</u> legitimate business explanation for their conduct. The "virtually uniform" deposition testimony of defendants' officers was that their public statements had been "for the purpose of quickly informing competitors of the price change" given to franchised dealers in the wholesale market. *Id.* at 446. And there was no other reason to announce the wholesale prices publicly because "[r]etail purchasers do not care what the dealer paid for the oil," and the "uncontested record evidence" was that the wholesale dealers that did care had already been "individually notified" of price changes. *Id*. at 448. It was in this factual sense that the Ninth Circuit rejected the suggestion that the communications at issue were useful to anyone other than competitors. Given that there was no other purpose for the communications other than the admitted purpose of communicating pricing plans with competitors, the Ninth Circuit concluded that it would be reasonable to draw an inference of conspiracy from the disclosures: "Under these circumstances, there is no significant probability that permitting the proffered inference would deter important legitimate conduct." *Id.*

24

Thus, in *Petroleum Products*, there was no requirement that a non-conspiratorial explanation for a public statement must be "useful to consumers" to be legitimate. Rather, there was no non-conspiratorial explanation at all.[13]

There is no evidence in this case that Defendants' proffered business justifications were not "useful." Here, the "uncontested record evidence" is that the information disclosed was of concern to investors and analysts, to whom it was directly disclosed. Investors and analysts demanded this information. And those demands increased in the wake of the Great Recession, when investors voiced concerns that airlines might over-invest in capacity as the economy slowly recovered and might return to the bankruptcies they had only recently escaped. The Defendants' cost-effective access to capital, and thus the cost-effectiveness of their capital-funded business

---

[13] *In re Travel Agency Comm'n Antitrust Litig.*, 898 F. Supp. 685 (D. Minn. 1995), also cited by the Court (Op. at 57), did not involve communications with clear independent business purposes. Instead, it involved an array of public and private information exchanges – "public speeches, electronic communications, subtle press releases, private dinners for airline executives and attendant antitrust counsel, and industry-bonding meetings at the Super Bowl and other locations" – but, tellingly, <u>not</u> disclosures to investors. *Id.* at 690. Importantly, the information exchanges in *Travel Agency* led the seven defendant airlines to revise a 35-year-old commission structure in exactly the same way over the course of 144 hours. *Id.* at 687. Those circumstances could hardly be more different than here, where Defendants are accused of managing their capacity in admittedly varying amounts over a seven-year period through disclosures to investors about capacity that they have a long history of making. *See* Op. at 12-16 ("Airlines, including non-defendant airlines, have provided capacity information [to investors and analysts] – before, during and after the alleged conspiracy period.").

This Court also cited *United States v. Foley*, 598 F.2d 1323, 1331-1332 (4th Cir. 1979) in noting that "courts have found it appropriate to draw inferences of conspiracy from public statements." Op. at 57. The statements in *Foley* were not "public," but it makes no difference in itself whether or not the statements were "public." What matters is whether there was an independent business explanation for them. The pricing discussion at the country club "dinner party" in *Foley*, like the announcements in *Petroleum Products*, served no business purpose other than to communicate prices with competitors – "public" or not, it was the quintessential "smoke-filled room" conspiracy. *Foley*, 598 F.2d at 1327, 1331-32.

activities, depended on addressing these concerns. [14]  *See* UA Br. at 7-10, 32-41; DL Br. at 9-15, 19, 56-58.

Here, the information was indisputably useful to the investors and analysts who asked for it.  Each airline's provision of such information was thus legitimate and consistent with its business needs.  Plaintiffs offered arguments to interpret Defendants' statements conspiratorially, but no evidence to exclude this independent explanation for them.  This is a relatively straightforward application of the *Matsushita* standard.  Yet despite the undisputed evidence, the Court held that Defendants' capacity statements supported an inference of conspiracy because "Defendants' announcements about forward-looking capacity plans and the Defendants' alleged need for and their commitment to capacity discipline were '*useless to consumers*.'"  Op. at 58 (emphasis added).

The Court's ruling runs counter to precedent from other Circuits.  No court has ever held that the legitimacy of a defendant's communication depends on its usefulness to consumers.  Instead, the law in other Circuits requires that "[w]here there is an independent business justification for the defendant's behavior" – and that justification is unrebutted by plaintiffs with evidence tending to exclude the justification – "no inference of conspiracy can be drawn."  *Blomkest*, 203 F.3d at 1037.  For this reason, in *Blomkest*, the Eighth Circuit concluded that Canadian competitors could enter a settlement agreement with the U.S. Department of Commerce

---

[14] Under the securities laws, statements to address these concerns had to be made *publicly*, to ensure access by all investors.  Regulation FD (or "Fair Disclosure") requires broad, public disclosure of any information that a company wants to provide to investors about its strategic plans, its view of industry conditions, and the key risks it faced to its future performance.  *See* 17 C.F.R. § 243.100(a); UX 332, Securities & Exchange Commission, Selective Disclosure and Insider Trading, 65 Fed. Reg. 51,716, 51,726 (Aug. 24, 2000) ("The purpose of Regulation FD is to discourage selective disclosure of material nonpublic information by imposing a requirement to make the information available to the markets generally when it has been made available to a select few."); UX 4, Pritchard Report ¶ 14 (report of Plaintiffs' expert that "Regulation FD . . . requires . . . broad, non-exclusionary distribution of information to the public").

("DOC"), in which the competitors set a minimum price at which Canadian producers could sell their potash in the United States and thereby the competitors raised the price of potash sold in the United States. *Id.* at 1031-32, 1037. This settlement agreement with the DOC may have benefited domestic U.S. potash producers, but it certainly did not "benefit consumers." Nonetheless, it provided a legitimate business justification for the defendants' conduct, and therefore the Court held that the plaintiff class had "failed to carry its burden to rebut the producers's independent business justification for their actions." *Id.* at 1037.

The Ninth Circuit's recent decision in *DRAM*, 28 F.4th 42, is directly on point and reached the same result. In that case, plaintiffs alleged that defendants announced their supply cuts in advance, encouraged each other to restrain supply by exercising "capital discipline," and reassured each other following supply cuts "during investor calls, presentations to industry groups, and/or in response to investor and analyst questions." *Id.* at 50-51. The court held that defendants' public statements "regarding market predictions and strategies" could not be a plus factor even at the *motion to dismiss* stage – thus under a standard far more lenient to plaintiffs than applied at summary judgment:

> Defendants' statements reproduced in the amended complaint are largely consistent with unilateral conduct in an interdependent [oligopoly] market. If no conspiracy existed, Defendants would likely make the same public statements about their observations, predictions, and strategies for the future, particularly in response to investor and analyst questions.

*Id.* at 50.

Another court likewise found responsiveness to investment analyst questions on earnings calls to be legitimate unilateral conduct:

> Fornaro's statement was made on a quarterly earnings call with AirTran's analysts and investors. It concerned a topic that was of interest to the airline industry at the time, as evidenced by both the widespread adoption of bag fees by airlines during the first three

27

> quarters of 2008 and the fact that bag fees and ancillary fees were discussed on several airlines' earnings calls in 2008.  This is precisely "the type of information companies legitimately convey to their shareholders," *Holiday Wholesale*, 231 F. Supp. 2d at 1277, and courts are properly reluctant to characterize them as evidence of unlawful conspiracies, *Petroleum Prods*., 906 F.2d at 440.

*In re Delta/AirTran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1373 (N.D. Ga. 2017), *aff'd sub nom. Siegel v. Delta Air Lines, Inc.*, 714 F. App'x 986 (11th Cir. 2018) ("[W]e affirm based on the well-reasoned decision of the district court.").  *See also Hall v. United Air Lines, Inc.*, 296 F. Supp. 2d 652, 672 (E.D.N.C. 2003) ("Delta sent a series of letters to various trade publications in an attempt to end industry speculation about where it was looking to reduce costs under its Leadership 7.5 Program . . .; this is a legitimate purpose sufficient to rebut any implication that the letters were an attempt to communicate with competitors."), *aff'd sub nom. Hall v. Am. Airlines, Inc.*, 118 F. App'x 680 (4th Cir. 2004).

Similarly, the *Holiday Wholesale* court found nothing wrong with the companies' public disclosure of information to analysts, even though the information was significant to competitors: "Plaintiffs have documented nothing reaching the level of prohibited exchanges, but rather have described the type of information companies legitimately convey to their shareholders."  *Holiday Wholesale*, 231 F. Supp. 2d at 1277.[15]  The court held that this was legitimate business behavior from which no jury could be allowed to infer a conspiracy:

> Because in competitive markets, particularly oligopolies, companies will monitor each other's communications with the market in order to make their own strategic decisions, ***antitrust law permits such***

---

[15] *See*, *e.g.*, *id.* at 1279-80 ("Plaintiffs' assertion that RJR's CEO Charles M. Harper 'was signaling that RJR would meet PM's conditions for a price hike' . . . is without support.  On November 2, 1993, Harper stated that RJR was going to focus on earnings growth and was 'willing to accept modest market share losses as the cost of improving earnings.' . . .  There is nothing ominous or collusive about this statement.  It is typical of the statements made every day by corporate executives to industry analysts as a means of providing investors information on a company's future strategic marketings plans.").

> *discussions* even when they relate to pricing because the "dissemination of price information is not itself a *per se* violation of the Sherman Act."

*Id.* at 1276 (emphasis added) (quoting *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975)).

### 2. The Court's ruling will chill pro-competitive business communications with investors.

In engrafting a "benefit to consumers" requirement onto the *Matsushita* test, the Court stated that "there is a disconnect between what benefits airlines and their investors, and what benefits consumers." Op. at 58. But what the case law requires is that there be an alternative legitimate, unilateral explanation for the conduct, other than unlawful agreement. It does not require a judgment about the social utility of the conduct. As both a practical and economic matter, it is not only rational, but imperative that a public company be able to communicate with its investors and provide them with information showing that it is running its business prudently.[16] Before this Court's ruling, no court had ever determined that such an ordinary business responsibility of public companies is somehow illegitimate, thus giving rise to a potential inference that providing the information was actually in furtherance of a conspiracy.

This Court's approach will chill legitimate communications with investors and analysts. Publicly traded companies constantly answer questions from analysts about market conditions and the companies' strategies for growth and profitability. That is the case in the airline industry, as the Court's factual findings make abundantly clear:

- "Investors may look to industry-expert analysts for help in understanding corporate disclosures." *Id.* at 12.

---

[16] An airline's success in securing investment, and thus becoming a better and more competitive airline, would indisputably benefit consumers. But such a showing is not required to satisfy the *Matsushita* test.

- "[A]nalysts regarded 'capacity discipline' as important in their investment decisions." *Id.*

- "Public disclosures of future capacity plans provide investors with more information about business prospects." *Id.* at 13.

- "At least one question related to capacity – increasing or decreasing flights or seats – was asked on every one of Defendants' earnings calls during the period Q1 2007-Q3 2019." *Id.* at 15.

Disclosure is even more vital to capital-intensive businesses like airlines that depend on capital investment to fund their growth and create healthy balance sheets. *See* UA Br. at 9, 32; DL Br. at 9-10, 12-14. The Court found it an undisputed fact that "[a]cquiring aircraft expends capital and increases fixed costs, and these expenditures can create significant liquidity pressure and undermine an airline's ability to weather economic downturns." Op. at 9. After their bankruptcies, the Defendants had to demonstrate to investors that they could withstand liquidity pressure and weather economic downturns. *See id.* at 14 ("The combination of high fixed costs, slow-moving supply decisions, and the volatility of cost and demand conditions historically led to 'boom and bust' cycles producing poor long-term financial performance for airlines.").

Indeed, the textbook written by Plaintiffs' expert Adam Pritchard makes clear how imperative it was for the Defendants to speak openly with investors and analysts about capacity strategy:

> Companies . . . have an incentive to provide their firm-specific, inside information voluntarily to the marketplace. . . . [I]f the managers can make a credible disclosure of their company's true value to investors, then the . . . company will receive substantially more for its securities. . . . ***[I]nvestors, if rational, will reduce the value they assign to the companies that opt for silence***.

30

UX 6, Stephen J. Choi & A.C. Pritchard, Securities Regulation: Cases and Analysis 23-24 (5th ed. 2019) (emphasis added).[17]

For the same reasons, and contrary to the Court's conclusion, Defendants' capacity disclosures did "foster an efficient or rational market" (Op. at 58): the market for airline stocks. In the investment market, United competes with Delta and the other airlines, as well as companies in completely different industries, for investment capital. *See Basic Inc. v. Levinson*, 485 U.S. 224, 234 (1988) ("Disclosure, and not paternalistic withholding of accurate information, is the policy chosen and expressed by Congress. We have recognized time and again, a fundamental purpose of the various Securities Acts, was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." (internal cite and quote omitted)). And of course, the efficient functioning of securities markets benefits consumers.

If the Court's rejection of the legitimacy of communications with investors stands, all any plaintiff needs to do to take allegations of price-fixing to a jury is to offer "ominous readings of typical industry reporting on strategy." *Holiday Wholesale*, 231 F. Supp. 2d at 1275. This will "deter important legitimate conduct" of communicating with shareholders and potential investors, *Petroleum Prods.*, 906 F.2d at 448, and impair the efficient functioning of capital markets. In antitrust cases, courts are directed not to employ an "evidentiary standard" that allows an

---

[17] Such forward-looking disclosure is fully consistent with, indeed encouraged by, the securities laws. *See, e.g.*, *Harris v. Ivax Corp.*, 998 F. Supp. 1449, 1452 (S.D. Fla. 1998) (Congress enacted a safe harbor for forward-looking statements in the Private Securities Litigation Reform Act of 1995 "in reaction to the fear that liability exposure was chilling issuers from providing information about the strength and future of their business."), *aff'd*, 182 F.3d 799, 806 (11th Cir. 1999) ("Congress enacted the safe-harbor provision in order to loosen the 'muzzling effect' of potential liability for forward-looking statements, which often kept investors in the dark about what management foresaw for the company." (quoting H. Conf. Rep. No. 104-369 (Nov. 28, 1995) at 42)).

"agreement to be inferred" that "could deter or penalize perfectly legitimate conduct." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 762 (1984).[18] The Court's new "useful to consumers" requirement will do just that.[19]

### 3. The Court's ruling improperly shifts the burden of persuasion from Plaintiffs to Defendants.

As the Court's Opinion recognized, Plaintiffs' expert Adam Pritchard summed up the evidence as follows:

> Defendants' "voluntary disclosure" of future capacity plans was "'consistent' with:  (1) providing investors with more information about their business prospects; and (2) communicating with their industry peers about their intentions to restrict supply."

Op. at 54 (quoting DX 38, Pritchard Report ¶ 15).  In his deposition, Prof. Pritchard agreed that Defendants' disclosures were "*equally* consistent with reinforcing the credibility of their commitment to capacity discipline to *investors and analysts*."[20]  This is an outcome determinative admission by Plaintiffs' expert.

---

[18] *See also Chocolate*, 801 F.3d at 396 ("The purpose of this [*Matsushita*] standard is to avoid mistaken inferences that could impose liability for lawful conduct . . . ."); *PepsiCo, Inc. v. The Coca Cola Co.*, 315 F.3d 101, 104 (2d Cir. 2002) ("In the context of antitrust cases, however, summary judgment is particularly favored because of concern that protracted litigation will chill pro-competitive market forces."); *Citric Acid*, 191 F.3d at 1101 ("Courts have recognized that firms must have broad discretion to make decisions based on their judgments of what is best for them and that business judgments should not be second-guessed even where the evidence concerning the rationality of the challenged activities might be subject to reasonable dispute."); *Williamson Oil*, 346 F.3d at 1310 (observing that courts "must exercise prudence in labeling a given action as being contrary to the actor's economic interests, lest we be too quick to second-guess well-intentioned business judgments of all kinds").

[19] The Court ruled that the issue of whether analysts served as a conduit of conspiratorial communications among Defendants was a question for the factfinder to consider "within the larger framework of the ongoing communications by Defendants" with analysts. *See* Op. at 46.  If, for the reasons discussed above, the information provided to analysts was not sufficient to draw an inference of conspiracy among oligopolists, the fact that the information may have been channeled through analysts cannot lead to liability for Defendants.

[20] DX 50, Pritchard Tr. 210:20-211:8 ("Q. Looking at paragraph 38, first sentence says: 'The defendants also made capacity-related disclosures that appear intended to reinforce the credibility

This Court recognized that: "'[I]f a benign explanation for the action is *equally* or more plausible than a collusive explanation, the action cannot constitute a plus factor.'" Op. at 19 (quoting *Williamson Oil*, 346 F.3d at 1310 (emphasis added)). Thus, where particular evidence is equally "consistent" with <u>both</u> a legitimate business justification (Prof. Pritchard's point 1) <u>and</u> an illegal agreement (Prof. Pritchard's point 2), conspiracy cannot reasonably be inferred from that evidence. If Plaintiffs offer a facially reasonable conspiratorial inference, but adduce no evidence tending to exclude a reasonable non-conspiratorial inference, the two inferences remain in "equipoise."

In antitrust cases, where evidence is in "equipoise" – is equally consistent with both legitimate and illegitimate conduct – summary judgment must be granted. This is uniformly the law in every Circuit to have considered the question:

- **First Circuit:** "The sum total of this evidence simply does not rise to the level *Matsushita* requires. Plaintiffs' ambiguous evidence is entirely consistent with permissible conscious parallelism." *White v. R.M. Packer Co.*, 635 F.3d 571, 585 (1st Cir. 2011).

- **Second Circuit:** "[I]f the evidence is in equipoise, then summary judgment must be granted against the plaintiff." *Anderson News, L.L.C. v. American Media, Inc.*, 899 F.3d 87, 98 (2nd Cir. 2018).

- **Third Circuit:** "[N]o conspiracy should be inferred from ambiguous evidence or from mere parallelism when defendants' conduct can be explained by independent business reasons." *Baby Food*, 166 F.3d at 122.

- **Fourth Circuit:** "[Appellant plaintiff] has failed to establish that the evidence is more consistent with conspiracy than with independent action . . . . Thus, viewing the facts in a light most favorable to appellant, [plaintiff] has failed to present material issues of disputed fact necessitating a trial." *Merck-Medco Managed Care,*

---

of their commitment to capacity discipline.' Do you see that? A. Yes. Q. Would you agree that the disclosures you've listed here as examples in paragraph 38 are equally consistent with reinforcing the credibility of their commitment to capacity discipline to investors and analysts? . . . THE WITNESS: Yes.").

*LLC v. Rite Aid Corp.*, No. 98-2847, 1999 WL 691840, \*15 (4th Cir. Sept. 7, 1999) (listed in table of decisions without reported opinions, 201 F.3d 436).

- **Sixth Circuit:** "[A] plaintiff cannot demonstrate a conspiracy 'if, using ambiguous evidence, the inference of a conspiracy is less than or equal to an inference of independent action.'" *Wallace*, 55 F.3d at 1168 (quoting *Riverview Invs., Inc. v. Ottawa Cmty. Improvement Corp.*, 899 F.2d 474, 483 (6th Cir. 1990)).

- **Seventh Circuit:** "The plaintiffs have presented circumstantial evidence consistent with an inference of collusion, but that evidence is equally consistent with independent parallel behavior . . . . The district court had therefore no alternative to granting summary judgment in favor of the defendants." *Text Messaging*, 782 F.3d at 879.

- **Eighth Circuit:** "[T]he [*Matsushita*] standard requires that if it is as reasonable to infer from the evidence a price-fixing conspiracy as it is to infer permissible activity, then the plaintiff's claim, without more, fails on summary judgment." *Blomkest*, 203 F.3d at 1032.

- **Ninth Circuit:** "[E]vidence as consistent with legitimate behavior as illegal behavior cannot independently support an inference of conspiracy." *Citric Acid*, 191 F.3d at 1104.

- **Tenth Circuit:** "[C]onduct as consistent with permissible competition as with illegal conspiracy does not support an inference of antitrust conspiracy." *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1030 (10th Cir. 2002).

- **Eleventh Circuit:** "[I]f a benign explanation for the action is equally or more plausible than a collusive explanation, the action cannot constitute a plus factor. Equipoise is not enough to take the case to the jury." *Williamson Oil*, 346 F.3d at 1310.

To be clear, a plaintiff need not *completely* exclude the inference of independence, but it must offer some evidence that, if credited, *tends* to do so. *See Anderson News*, 899 F.3d at 98, 104-05.[21]    Thus, where defendants proffer evidence of an independent explanation for their

---

[21] The Court appears to interpret *In re Publication Paper Antitrust Litigation*, 690 F.3d 51, 63 (2d Cir. 2012), to mean Plaintiffs need only support their own theory and need not present any evidence rebutting the theory of independence. *See* Op. at 48. *Publication Paper* states only that a plaintiff need not "exclude" or "dispel" the inference of conspiracy – that is, *completely* eliminate it as an inference the jury could draw from the evidence. 690 F.3d at 63. But even under *Publication Paper* and its progeny, Plaintiffs' evidence must still *tend to* exclude or dispel independence for a

34

conduct, and plaintiffs proffer a conspiratorial explanation for that conduct, but no evidence tending to exclude independence, interpreting the conduct is not a triable issue of fact because the inference of conspiracy is not "reasonable" as a matter of law, no matter how "reasonable" the conspiratorial explanation is on its face. *See Hyland v. Home Services of Am., Inc.*, 771 F.3d 310, 322 (6th Cir. 2014) ("[P]laintiffs have come forward with a good deal of circumstantial evidence that supports its theory of collusion. What is missing, however, is the critical element mentioned in *Matsushita . . .*: countering . . . that the conduct at issue is also consistent with permissible competition."); *Kleen Prods*, 910 F.3d at 941 ("[Plaintiffs] failed to carry the burden . . ., offering no more than a plausible interpretation of the defendants' anticompetitive conduct." (internal quote and cite omitted)); *White*, 635 F.3d at 577 ("In order to survive summary judgment, plaintiffs must produce direct or circumstantial evidence that is not only consistent with conspiracy, but 'tends to exclude the possibility of independent action.'" (quoting *Monsanto*, 465 U.S. at 764)); *Anderson News*, 899 F.3d at 104-05 ("A jury could permissibly infer two conclusions from the evidence in this case: (1) an illegal agreement …; or (2) legal, independent business decisions …. A jury's choice between these two equally likely explanations for defendants' conduct, one legal and one illegal, would amount to mere speculation." (internal quote and cite omitted)).

Equipoise is not enough as a matter of law; yet that is what the Court found in this case. Out of step with every Circuit, the Court held equipoise precluded summary judgment. This ruling, therefore, warrants certification pursuant to § 1292(b).

---

reasonable jury to find the conspiratorial explanation more likely than not. *See Anderson News*, 899 F.3d at 98, 104-05.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion of United and Delta for certification of an interlocutory appeal pursuant to 28 U.S.C. § 1292(b), or in the alternative, for reconsideration pursuant to Federal Rule of Civil Procedure 54(b).  The Court should also grant Defendants' further request for oral argument to present their case for certification or reconsideration.

Dated: September 28, 2023

Respectfully submitted,

*/s/ David M. Schnorrenberg*

Kent A. Gardiner (D.D.C. No. 432081)
Cheryl A. Falvey (D.D.C. No. 414277)
David M. Schnorrenberg (D.D.C. No. 458774)
Luke van Houwelingen (D.D.C. No. 989950)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 624-2578
Facsimile: (202) 628-5116
kgardiner@crowell.com
cfalvey@crowell.com
dschnorrenberg@crowell.com
lvanhouwelingen@crowell.com

*Counsel for United Airlines, Inc.*

James P. Denvir (Bar No. 225359)
Michael S. Mitchell (Bar No. 986708)
BOIES, SCHILLER & FLEXNER LLP
1401 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 237-2727
Facsimile: (202) 237-6131
jdenvir@bsfllp.com
mmitchell@bsfllp.com

*Counsel for Delta Air Lines, Inc.*

36

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 28, 2023, the foregoing document was filed electronically using the Court's CM/ECF system, which will send notifications of such filing to all counsel of record, including the following Plaintiffs' Interim Co-Lead Counsel:

Michael D. Hausfeld
Hilary K. Scherrer
Paul T. Gallagher
HAUSFELD LLP
888 – 16th Street, N.W., Suite 300
Washington DC 20006
Telephone:  (202) 540-7200
mhausfeld@hausfeld.com
hscherrer@hausfeld.com
pgallagher@hausfeld.com

Michael P. Lehmann
Bonny E. Sweeney
Seth Gassman
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA  94111
Telephone:  (415) 633-1908
mlehmann@hausfeld.com
bsweeney@hausfeld.com
sgassman@hausfeld.com

Jeannine Kenney
HAUSFELD LLP
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 985-3270
jkenney@hausfeld.com

Adam J. Zapala
Elizabeth T. Castillo
COTCHETT, PITRE & MCCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
azapala@cpmlegal.com
ecastillo@cpmlegal.com

Alexander E. Barnett
COTCHETT, PITRE & MCCARTHY, LLP
40 Worth Street, 10th Floor
New York, NY  10013
Telephone:  (212) 201-6820
abarnett@cpmlegal.com

*/s/ David M. Schnorrenberg*
David M. Schnorrenberg

*Counsel to Defendant United Airlines, Inc.*

37